## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| KAISER GYPSUM COMPANY, INC., *et al.,*[1] | : | Case No. 16-_____ (___) |
|  | : |  |
| Debtors. | : | (Joint Administration Requested) |
|  | : |  |

## DEBTORS' MOTION FOR ENTRY OF INTERIM
## AND FINAL ORDERS (I) AUTHORIZING THEM TO OBTAIN
## POSTPETITION FINANCING ON A SUPERPRIORITY, SECURED BASIS,
## (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (III) MODIFYING
## THE AUTOMATIC STAY, AND (IV) SCHEDULING A FINAL HEARING

The above-captioned debtors (together, the "Debtors") move the Court for the

entry of an interim order, in substantially the form attached hereto as Exhibit A (the "Interim DIP

Order"), and a final order (the "Final DIP Order" and, together with the Interim DIP Order,

the "Financing Orders"), under sections 105, 362, 363, 364, 503(b) and 507 of the Bankruptcy

Code, Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules"), and Rule 1002-4 of the Rules of Practice and Procedure of the United

States Bankruptcy Court for the Western District of North Carolina (the "Local Rules"):

(i) authorizing the Debtors to enter into that certain Loan and Security Agreement substantially

in the form attached as Exhibit 1 to the proposed Interim DIP Order (the "DIP Credit

Agreement") by and among the Debtors, as borrowers, and Lehigh Hanson, Inc. ("Lehigh

Hanson" or the "DIP Lender"), a non-debtor affiliate of the Debtors, as lender, providing for

postpetition financing on a superpriority, secured basis; (ii) granting liens and superpriority

---

[1]     The Debtors are the following entities (the last four digits of their respective taxpayer identification
numbers follow in parentheses):  Kaiser Gypsum Company, Inc. (0188) and Hanson Permanente Cement,
Inc. (7313).  The Debtors' address is 300 E. John Carpenter Freeway, Irving, Texas 75062.

claims; (iii) modifying the automatic stay; and (iv) prescribing the form and manner of notice

and setting the time for the final hearing (the "Final Hearing") on the motion (the "Motion").  In

support of this Motion, the Debtors incorporate the statements contained in the Declaration of

Charles E. McChesney II in Support of First Day Pleadings (the "First Day Declaration") filed

contemporaneously herewith and the Declaration of Keith Kaiser (the "Kaiser Declaration")

attached hereto as Exhibit B, and further respectfully state as follows:

## Background

1.      On the date hereof (the "Petition Date"), each of the Debtors commenced a

case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The

Debtors are continuing in possession of their properties and are managing their businesses, as

debtors in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.[2]

2.      Debtor Hanson Permanente Cement, Inc. ("HPCI") is a wholly-owned,

indirect subsidiary of non-debtor Lehigh Hanson.  HPCI is the direct parent of Debtor Kaiser

Gypsum Company, Inc. ("Kaiser Gypsum") and certain additional domestic non-debtor

subsidiaries.  Kaiser Gypsum holds a 41 2/3% joint venture interest in Gypsum Carrier, Inc., a

Panama company.  The ultimate parent of the Debtors and Lehigh Hanson is non-debtor

HeidelbergCement AG, a German company.

3.      In addition to the equity in its subsidiaries, HPCI owns a cement plant,

rock plant and quarry (including the minerals) located in Santa Clara County, California that it

leases to a non-debtor affiliate, which manages and operates them.  Kaiser Gypsum has no

current business operations, other than managing its legacy liabilities, and no material, tangible

---

[2]      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core
proceeding pursuant to 28 U.S.C. § 157(b).  Venue for this matter is proper in this district pursuant to
28 U.S.C. § 1409.

assets.

4.      The Debtors are defendants in asbestos-related bodily injury lawsuits filed in various state courts.  Those lawsuits generally seek unspecified damages for asbestos-related diseases based on alleged exposures to asbestos-containing products previously manufactured and sold by the Debtors.  The Debtors have primary and excess insurance policies that cover asbestos bodily injury claims.  In addition, the Debtors have environmental liabilities arising from manufacturing plants they previously owned and operated in the Pacific Northwest. Although the Debtors believe they have insurance coverage for these liabilities, their primary and excess insurers to date have issued reservations of rights and declined to confirm their coverage obligations with respect to these liabilities.

5.      In June 2015, the Debtors and Truck Insurance Exchange ("Truck"), an affiliate of Farmers Insurance, entered into a confidential cost sharing agreement pursuant to which Truck agreed to reimburse a portion of the costs incurred by the Debtors in connection with their efforts to permanently resolve their asbestos liability, including the reasonable fees and expenses of professionals retained by the Debtors and by representatives of current and future asbestos claimants.  Because the cost sharing agreement terminates by its terms upon the filing of these cases, the Debtors and Truck have recently been in discussions regarding an amended cost sharing agreement that, subject to the approval of this Court, would cover costs and expenses of the Debtors' bankruptcy cases.

6.      None of the Debtors nor the Operating Subsidiaries has any funded indebtedness.

## Summary of Relief Requested

7.      By this Motion, the Debtors seek entry of interim and final orders authorizing them to obtain postpetition credit, as set forth below, with their non-debtor affiliate

Lehigh Hanson, which, if approved on a final basis, would provide the Debtors with postpetition secured credit, on a superpriority basis, of up to $45,000,000. On an interim basis, the Debtors are requesting authority to borrow up to $2,000,000.

8.       The Debtors have determined, in the exercise of their sound business judgment, that they require financing to ensure that they can pay the costs of these chapter 11 cases and certain other expenses. The proposed postpetition financing will provide them with the necessary funding and constitutes the best alternative available under the circumstances. Although the Debtors are in discussions with their insurers regarding an amended cost sharing agreement pursuant to which the insurers would reimburse the Debtors for a portion of the costs of these cases, no agreement has yet been reached to date. Accordingly, the Debtors have requested, and Lehigh Hanson has agreed to provide, financing in an amount sufficient to fund HPCI's operations and these cases irrespective of whether an amended cost sharing agreement can be negotiated with the insurers.

9.       Moreover, the Debtors have an immediate need for Court approval of up to $2,000,000 in interim funding. The interim financing will ensure that the Debtors have sufficient liquidity to address potential short term funding needs, including capital expenditures, reclamation costs and other administrative expenses.

**Material Terms of the DIP Credit Agreement**

10.       The principal terms of the DIP Credit Agreement are as follows:[3]

---

[3]       This summary is qualified in its entirety by the provisions of the DIP Credit Agreement and the Interim DIP Order. Unless otherwise set forth in this summary, capitalized terms used within this summary shall have the meanings ascribed to them in the DIP Credit Agreement. Further, the DIP Credit Agreement also contains other customary affirmative and negative covenants and representations and warranties that are not described herein but are customary for a transaction of this nature.

| | |
|---|---|
| **Borrower:**<br><br>*DIP Credit Agreement, Definitions* | Hanson Permanente Cement, Inc.<br>Kaiser Gypsum Company, Inc. |
| **Lender:**<br><br>*DIP Credit Agreement, Definitions* | Lehigh Hanson, Inc. |
| **DIP Facility:**<br><br>*DIP Credit Agreement § 2.01* | The proposed facility is a secured, superpriority revolving line of credit facility in an aggregate principal amount not to exceed $45,000,000 with (i) an aggregate principal amount of up to $2,000,000 to be available for borrowing on the Closing Date and (ii) an additional aggregate principal amount of up to $43,000,000 to be available following entry of the Final Order. |
| **Use of Proceeds:**<br><br>*DIP Credit Agreement, § 2.04* | The proceeds of the Loans shall be used by the Borrowers for (i) financing costs associated with the Chapter 11 Cases and (ii) general corporate and ongoing working capital needs.  Neither the Carve-Out nor any Loan may be used (i) to investigate or challenge the validity, perfection, priority, extent or enforceability of the DIP Credit Agreement or the Obligations, or the Liens or security interests securing the Obligations, (ii) to commence or pursue a cause of action or lawsuit against the DIP Lender or any of its affiliates, or (iii) for any purpose otherwise prohibited under section 9.04 of the DIP Credit Agreement. |
| **DIP Lender Protections:**<br><br>*DIP Credit Agreement, § 4.01* | The Loans and all other Obligations of the Borrowers shall at all times:<br><br>• pursuant to section 364(c)(1) of the Bankruptcy Code, constitute allowed superpriority administrative expense claims in the Chapter 11 Cases, having priority over all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all expenses and claims of the Borrowers, whether heretofore or hereafter incurred, including, but not limited to, the kind specified in sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 726 or 1114 of the Bankruptcy Code, subject only to the Carve-Out;<br>• pursuant to section 364(c)(2) of the Bankruptcy Code, be secured by valid, perfected, first-priority security interests in and liens on all of the Collateral that is not subject to non-avoidable, valid and perfected liens in existence as of the Petition Date, subject only to the Carve-Out; and<br>• pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by valid junior perfected security interests in and liens on all of the Collateral that is subject to non-avoidable, valid and perfected liens in existence as of the Petition Date, subject only to the Carve-Out. |
| **Maturity:**<br><br>*DIP Credit Agreement, Definitions* | The "Maturity Date" is the earliest to occur of (i) October 1, 2018, (ii) October 31, 2016, if the Final Order has not been entered on or prior to such date, (iii) the consummation of a sale of all or substantially all of the assets of the Borrowers, (iv) the filing of a plan of reorganization or liquidation that is not approved by the Lender, and (v) five (5) Business Days after the Borrowers receive written notice from the Lender that an Event of Default has occurred. |
| **Mandatory Prepayments:** | The Borrowers shall make a mandatory prepayment of the Loans within three days after receiving cash proceeds (in an amount equal to 100% of such cash proceeds) |

| | |
|---|---|
| *DIP Credit Agreement, § 3.03(b)* | upon the receipt by the Borrowers of cash proceeds from any of the following events (net of reasonable fees and out-of-pocket expenses paid to third parties other than an Affiliate of any Borrower in connection with such event determined reasonably and in good faith by a financial officer of such Borrower, but subject to the reasonable approval of the Lender):  any asset sales, Casualty Events, condemnation proceedings, litigation or other legal recovery or settlement. |
| **Conditions Precedent:**<br><br>*DIP Credit Agreement, § 6.01* | Material conditions precedent to the effectiveness of the DIP Credit Agreement and the obligation of the DIP Lender to make the Loans include, without limitation:<br><br><ul><li>the Court shall have entered an Interim Order, approving, among other things, the transactions outlined in the DIP Credit Agreement and granting the priority liens and administrative expense claims referred to therein, which order shall be in form and substance acceptable to the Lender and shall not have been stayed, reversed, vacated or otherwise modified or amended;</li><li>there shall have occurred no event or circumstance that has resulted in a Material Adverse Change;</li><li>other than the Chapter 11 Cases, there shall exist no action, suit, investigation, litigation or proceeding pending in any court or before any arbitrator or governmental instrumentality that (i) could reasonably be expected to result in a Material Adverse Change or, if adversely determined, could reasonably be expected to result in a Material Adverse Change or (ii) restrains or prevents, or imposes or could reasonably be expected to impose materially adverse conditions upon the Collateral, the Agreement, any of the other Loan Documents or the transactions contemplated hereby or thereby or threatens to do any of the foregoing;</li><li>the DIP Lender shall have received a notice from the Borrowers indicating the amount of such Loan, which notice shall constitute a representation by the Borrowers as of the date of such Loan that the conditions contained in section 6.02 of the DIP Credit Agreement have been satisfied as of the date of such Loan;</li><li>no Default shall have occurred and be continuing;</li><li>all of the representations and warranties set forth in the Loan Documents and in the Financing Orders shall be true and correct in all material respects; and</li><li>the Lender shall have received such other documents as the Lender may reasonably request.</li></ul> |

| | |
|---|---|
| **Budget:**<br><br>*DIP Credit Agreement, §§ 6.01(g) and 9.05* | • The DIP Lender shall have received a copy of the Budget acceptable to the DIP Lender in its sole discretion that describes in line-item detail the expected receipts and permitted disbursements of the Borrowers for the applicable period covered by the Budget.<br>• No Borrower will make or commit or agree to make any expenditures or disbursements not included in the Budget then in effect unless otherwise permitted as a Permitted Variance.<br>• No Borrower will make any actual expenditures or disbursements during any calendar week period beginning with the calendar week ending October 8, 2016, that, in the aggregate on a weekly cumulative basis, will be more than 20% in excess of the aggregate weekly cumulative amount of all expenditures and disbursements set forth in the then effective Budget (and, if applicable, any prior Budget covering days, weeks, months or other periods not covered by the Budget then in effect).  All such expenditures and disbursements permitted to be made in excess of amounts set forth in<br>• the Budget pursuant to Section 9.05(b) of the DIP Credit Agreement are referred to as the "Permitted Variance".  For the avoidance of doubt, the calendar week cumulative periods shall be tested as follows: for the first weekly testing period, week 1 (i.e., the calendar week ending October 8, 2016) shall be tested; for the second weekly testing period, weeks 1 – 2 shall be tested in aggregate; for the third weekly testing period, weeks 1 - 3 shall be tested in the aggregate; and the for the fourth weekly testing period, weeks 1 - 4 shall be tested in the aggregate; and so on. |
| **Events of Default:**<br><br>*DIP Credit Agreement, § 10* | Events of Default include, without limitation:<br><br>• failure to pay any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof, by acceleration or otherwise;<br>• failure to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in section 10.01(a) of the DIP Credit Agreement) payable under any Loan Document, when and as the same shall become due and payable;<br>• material inaccuracy, when made, of any representation or warranty made or deemed made by or on behalf of any Borrower in or in connection with any Loan Document or any amendment or modification of any Loan Document or waiver under such Loan Document, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder;<br>• failure to observe or perform any covenant, condition or agreement contained in the Agreement;<br>• (i) any Borrower shall fail to comply with any of the provisions of the Financing Orders; (ii) the Chapter 11 Cases shall be dismissed or converted to a case under Chapter 7; (iii) there shall be filed by any Borrower any motion to sell all or a substantial part of the Collateral to any person other than the DIP Lender or an Affiliate of the DIP Lender; (iv) without the Lender's prior written consent, any Borrower shall file any motion to alter, amend, vacate, supplement, modify, or reconsider, in any respect, the Financing Orders or, without the Lender's prior written consent, any Financing Order is amended, vacated, stayed, reversed or otherwise modified; (v) the Bankruptcy Court shall enter an order granting to any Person (other than the Lender) relief from the automatic stay to foreclose upon a Lien (or to accept a deed in lieu of foreclosure or the like) with respect to any property of any Borrower that has an aggregate book value in excess of $7,500 or to terminate or otherwise exercise remedies under any |

| | |
|---|---|
| | material agreement, document or instrument which is entered into after the Closing Date, whether or not it relates to any Debt; (vi) any Borrower shall file a motion or other request with the Bankruptcy Court seeking authority to use any cash proceeds of the Collateral or to obtain any financing under section 364(c) or section 364(d) of the Bankruptcy Code or otherwise secured by a Lien upon any Collateral or entitled to administrative priority status which is equal or senior to the obligations (in each case (A) without the DIP Lender prior written consent or (B) if such motion fails to contemplate payment in full of the Obligations); (vii) the payment by any Borrower of any pre-petition Debt, other than as approved by the Bankruptcy Court and with the Lender's prior written consent; (viii) any Borrower shall submit any motion or other pleading in any Chapter 11 Case attacking the validity or enforceability of the Financing Orders or any of the Loan Documents; or (ix) a trustee shall be appointed in the Chapter 11 Cases;<br>• the Loan Documents after delivery thereof shall for any reason, except to the extent permitted by the terms thereof, cease to be in full force and effect and valid, binding and enforceable in accordance with their terms against any Borrower or shall be repudiated by it, or cease to create a valid and perfected Lien of the priority required thereby on any of the collateral purported to be covered thereby, except to the extent permitted by the terms of the Agreement, or such Borrower shall so state in writing;<br>• the allowance of any claim under section 506(c) of the Bankruptcy Code against the Lender;<br>• the Bankruptcy Court shall not have entered a Final Order, in form and substance acceptable to the Lender, on or before the date that is 30 days after the Petition Date, approving, among other things, the transactions outlined in the Agreement and granting the priority liens and administrative expense claims referred to in the Agreement, which shall not have been stayed, reversed, vacated or otherwise modified or amended; or<br>• a Material Adverse Change shall occur. |
| **Carve-Out:**<br><br>*DIP Credit Agreement, Definitions* | The Agreement provides a carve-out for professional fees and expense (the "<u>Carve-Out</u>").  Carve-Out means an amount sufficient for payment of (a) unpaid and outstanding reasonable fees and expenses allowed pursuant to sections 326, 328, 330 or 331 of the Bankruptcy Code (the "<u>Allowed Professional Fees</u>") of attorneys, accountants and other fees and disbursements incurred by professionals retained by the Borrowers, any official committee of unsecured creditors or equity holders and any future claimants' representative under sections 327 or 1103(a) (collectively, the "<u>Professionals</u>") of the Bankruptcy Code, in each case, actually incurred (i) before the delivery date of a Carve-Out Notice, and (ii) on or after the date on which a Carve-Out Notice is delivered, provided that all Allowed Professional Fees actually incurred on or after the date on which a Carve-Out Notice is delivered (less the amount of any retainers, if any, then held by such Professionals) are in a cumulative, aggregate sum not to exceed $2,500,000 (the "<u>Post Carve-Out Notice Cap</u>"), and (b) unpaid fees payable to the Clerk of the Bankruptcy Court and to the Office of the Bankruptcy Administrator for the Western District of North Carolina (the "<u>Bankruptcy Administrator</u>") pursuant to 28 U.S.C. § 1930.<br><br>Carve-Out Notice means a written notice delivered by the DIP Lender to the Borrowers and their counsel, the Bankruptcy Administrator, lead counsel to any official committee, and lead counsel to any future claimants' representative appointed by the Court, which notice may be delivered following the occurrence of an Event of Default and stating that the Post Carve-Out Notice Cap has been invoked. |

### The Terms of the DIP Credit Agreement Are Below Market

11.      Prior to the commencement of these chapter 11 cases, the Debtors retained PricewaterhouseCoopers LLP ("PwC") as their financial advisor.  Given the circumstances of these cases and the Debtors' liquidity needs, the Debtors, with the advice of PwC and their other advisors, concluded that obtaining postpetition financing from their affiliate was in the best interest of their estates.  In that regard, the Debtors, with the assistance of PwC and their other advisors, have determined that the terms of the financing proposal from Lehigh Hanson are more favorable than those available in the financing market and superior to the terms any third party lender would provide to the Debtors.  (Kaiser Dec. ¶ 9.)  In particular, the proposed DIP Credit Agreement contains no fees, has a low interest rate of LIBOR plus 2.5% and does not mature for 24 months.  PwC advised the Debtors that in its view no third-party lender would be willing to make a similar loan to the Debtors on a secured or unsecured basis.  (Kaiser Dec. ¶ 9.)

### The Cash Collateral Guidelines

12.      The Guidelines for Consensual Cash Collateral Orders (the "Guidelines"), which are attached as Appendix A to the Local Rules, provide that certain findings of fact and decretal provisions are generally appropriate to include in emergency financing orders and identify certain provisions that should generally not be included in such orders.  The proposed Interim DIP Order does not contain any of the provisions identified as inappropriate by the Guidelines.  Although the proposed Interim DIP Order does not seek to grant the DIP Lender a postpetition lien on avoidance action, it provides that the DIP Lender shall have a lien on the proceeds of or property recovered from any successful avoidance action.  The Debtors believe that granting the DIP Lender a lien on the proceeds (as opposed to the avoidance actions themselves) is appropriate under the circumstances.

## Request for Approval of the DIP Credit Agreement

### I.     Approval Under Section 364(c) of the Bankruptcy Code

13.     Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business, and (c) obtaining credit with specialized priority or with security. See 11 U.S.C. § 364.  If a debtor in possession cannot obtain postpetition credit on an unsecured basis, pursuant to section 364(b) of the Bankruptcy Code, a court may authorize a debtor to obtain credit or to incur debt, the repayment of which is entitled to superpriority administrative expense status, or is secured by a senior lien on unencumbered property, or a junior lien on encumbered property, or a combination of the foregoing.  See 11 U.S.C. § 364(c).[4]

14.     Because the Debtors propose to obtain credit under the DIP Credit Agreement that is entitled to superpriority administrative status and secured by non-priming liens, the approval of the DIP Credit Agreement is governed by section 364(c) of the Bankruptcy Code.

15.     The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that the debtor in possession is "unable to obtain unsecured credit allowable under § 503(b)(1) of [the

---

[4]     Section 364(c) of the Bankruptcy Code provides as follows:

(c)     If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—

(1)     with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2)     secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3)     secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

Bankruptcy Code] as an administrative expense."  11 U.S.C. § 364(c); see In re Ames Dep't Stores, 115 B.R. 34, 37-38 (Bankr. S.D.N.Y. 1990) (a debtor must show that it has made a reasonable effort to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code); In re Crouse Grp., Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (debtor seeking secured credit under section 364(c) of the Bankruptcy Code must prove that it was unable to obtain unsecured credit pursuant to section 364(b) of the Bankruptcy Code), modified on other grounds, 75 B.R. 553 (Bankr. E.D. Pa. 1987).

16.     Courts have articulated a three-part test to determine whether a debtor may obtain financing under section 364(c) of the Bankruptcy Code:

  a.    the debtor is unable to obtain unsecured credit under section 364(b) (i.e., by granting a lender administrative expense priority);

  b.    the credit transaction is necessary to preserve the assets of the estate; and

  c.    the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender.

See, e.g., In re Los Angeles Dodgers LLC, 457 B.R. 308, 312 (Bankr. D. Del. 2011) (applying these factors); In re Aqua Assocs., 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (same); In re Ames Dep't Stores, 115 B.R. at 39.

**A.     The Debtors Are Unable to Obtain Unsecured Credit**

17.     To show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of section 364(c) of the Bankruptcy Code.  Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986).  Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."  Id.  Moreover, where few lenders are likely to be able and willing to extend the

necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct . . . an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

18. As set forth above and in the Kaiser Declaration, the terms of the proposed debtor in possession financing are more favorable to the Debtors than could be obtained from a third party lender. (See Kaiser Dec. ¶ 9.) No lender would be willing to make a postpetition loan to the Debtors solely on an unsecured basis for a facility of this type and magnitude and on terms as favorable as the DIP Credit Agreement. (See Kaiser Dec. ¶ 9.)

**B.      Entry into the DIP Credit Agreement is Necessary to Preserve and Protect the Assets of the Debtors' Estates**

19. As set forth above, the Debtors require the financing provided by the DIP Credit Agreement to ensure that they have sufficient funds to finance these chapter 11 cases and satisfy other corporate needs. Accordingly, entry into the DIP Credit Agreement is necessary to ensure that the Debtors are able to pursue a successful restructuring and maximize the value of their estates for the benefit of all stakeholders. See Burtch v. Ganz (In re Mushroom Transp. Co.), 382 F.3d 325, 339 (3d Cir. 2004) (debtors-in-possession have a duty to maximize their estates' assets). Timely approval of the relief requested herein is imperative to the success of the Debtors' restructuring efforts.

20. As described in the First Day Declaration, the Debtors commenced these chapter 11 cases to, among other things, fairly and permanently address their asbestos liability. To accomplish this, the Debtors must ensure they have access to adequate capital to fund all fees and expenses related to these cases. Without access to postpetition financing, and immediate approval of interim financing, the ability of the Debtors to reorganize under the Bankruptcy

Code may be jeopardized.  Approval of the DIP Credit Agreement is, therefore, necessary to

maximize the value of the Debtors' estates.

> C.    **The Terms of the DIP Credit Agreement Are Fair, Reasonable and Appropriate Under the Circumstances**

21.    As described above, the DIP Credit Agreement contains terms superior to

those available in the financing market.  Bankruptcy courts routinely defer to a debtor's business

judgment on most business decisions, including the decision to borrow money, unless such

decision is arbitrary and capricious.  See In re YL West 87th Holdings I LLC, 423 B.R. 421, 441

(Bankr. S.D.N.Y. 2010) (stating that "[c]ourts have generally deferred to a debtor's business

judgment in granting section 364 financing"); Trans World Airlines, Inc. v. Travellers Int'l AG

(In re Trans World Airlines, Inc.), 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that the

interim loan, receivables facility and asset-based facility were approved because they "reflect[ed]

sound and prudent business judgment on the part of TWA . . . [were] reasonable under the

circumstances and in the best interest of TWA and its creditors"); cf. In re Filene's

Basement, LLC, 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) (stating

"[t]ransactions under § 363 must be based upon the sound business judgment of the debtor or

trustee.").

22.    The Debtors respectfully submit that they have exercised sound business

judgment in determining that a postpetition facility is appropriate and have satisfied the legal

prerequisites to obtain credit under the DIP Credit Agreement.  The terms of the DIP Credit

Agreement are fair and reasonable, and are in the best interests of the Debtors' estates.

Accordingly, the Court should grant the Debtors authority to enter into the DIP Credit

Agreement, thereby permitting them to obtain funds from the DIP Lender on a secured and

administrative superpriority basis as described above, pursuant to section 364(c) of the

Bankruptcy Code.

### Request for Modification of the Automatic Stay

23.    Section 362 of the Bankruptcy Code provides for an automatic stay upon

the filing of a bankruptcy petition.  The DIP Credit Agreement and proposed Interim DIP Order

contemplate the modification of the automatic stay (to the extent applicable), to the extent

necessary to permit (a) the Debtors and (b) the DIP Lender to perform under the DIP Credit

Agreement and implement the terms of the Interim DIP Order.  Stay modification provisions of

this type are standard features of postpetition debtor-in-possession financing facilities and, in the

Debtors' business judgment, are reasonable under the present circumstances.  Accordingly, the

Debtors respectfully request that the Court authorize the modification of the automatic stay in

accordance with the terms set forth in the Interim DIP Order and the DIP Credit Agreement.

### Good Faith

24.    The terms and conditions of the DIP Credit Agreement are fair and

reasonable.  The Debtors and the DIP Lender were each represented by separate counsel in

discussions regarding the DIP Credit Agreement.  Therefore, the DIP Lender should be accorded

the benefits of section 364(e) of the Bankruptcy Code to the extent any or all of the provisions of

the DIP Credit Agreement, or any interim or final order of this Court pertaining thereto, are

hereafter modified, vacated, stayed or terminated by subsequent order of this or any other court.

### Request For Authority to
### Make Interim Borrowings Under the DIP Credit Agreement

25.    Pursuant to Bankruptcy Rule 4001(b), the Debtors request that the Court

(a) conduct an expedited preliminary hearing on this Motion, (b) enter the Interim DIP Order

approving the DIP Credit Agreement on an interim basis, pending the Final Hearing and entry of

the Final DIP Order, and (c) schedule the Final Hearing

      26.     Bankruptcy Rule 4001(c) provides that a final hearing on a motion to

obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than

14 days after the service of such motion.  Fed. R. Bankr. P. 4001(c).  Upon request, however, the

Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the

obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's

estate.  In examining requests for interim relief under this rule, courts apply the same business

judgment standard applicable to other business decisions.  See, e.g., In re Simasko, 47 B.R. 444,

449 (Bankr. D. Colo. 1985); see also In re Ames Dep't Stores, 115 B.R. at 38.  After the 14-day

period, the request for financing is not limited to those amounts necessary to prevent harm to the

debtor's estate, and the debtor is entitled to borrow those amounts that it believes prudent in the

operation of its business.  See, e.g., In re Simasko, 47 B.R. at 449; In re Ames Dep't Stores,

115 B.R. at 36.

      27.     Pursuant to Bankruptcy Rule 4001(c), the Debtors respectfully request that

the Court conduct a preliminary hearing on the Motion and authorize the Debtors from the entry

of the Interim DIP Order until the Final Hearing to obtain access to up to $2,000,000 million

available upon entry of the Interim DIP Order under the terms contained in the DIP Credit

Agreement and the Interim DIP Order.  Immediate approval of the interim financing will ensure

that the Debtors have sufficient liquidity to address any short term funding needs, including

capital expenditures, reclamation costs and other administrative expenses.

### Request For A Final Hearing

      28.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors

request that the Court set a date for the Final Hearing that is as soon as practicable, but in no

event later than 25 days following the entry of the Interim DIP Order, and fix the time and date prior to the Final Hearing for the parties to file objections to the Motion.

29.     The Debtors request that they be authorized to serve a copy of the Interim DIP Order, which fixes the time and date for filing objections, by first class mail on the notice parties listed below.  The Debtors further request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy 4001(c)(2).

## Waiver of Bankruptcy Rules 6004(a) and 6004(h)

30.     To implement the foregoing immediately, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## Notice

31.     Notice of this Motion has been provided to:  (a) the Bankruptcy Administrator; (b) the Debtors' largest non-asbestos creditors and the law firms with the largest number or scope of pending asbestos personal injury cases against the Debtors, as identified in the Debtors' chapter 11 petitions; (c) the DIP Lender; and (d) all entities known or reasonably believed to have asserted a security interest or lien against property of the Debtors' estates.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be provided.

## No Prior Request

32.     No prior request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter the Interim

DIP Order substantially in the form attached hereto as <u>Exhibit A</u>, granting:  (a) the relief

requested herein on an interim basis; (b) prescribing the form and manner of notice and setting

the time for the Final Hearing; and (c) such other and further relief to the Debtors as the Court

may deem proper.

Dated: September 30, 2016                Respectfully submitted,
     (Charlotte, NC)

                                   */s/ John R. Miller, Jr.*
                                    C. Richard Rayburn, Jr. (NC 6357)
                                    John R. Miller, Jr. (NC 28689)
                                    RAYBURN COOPER & DURHAM, P.A.
                                    1200 Carillon
                                    227 West Trade Street
                                    Charlotte, North Carolina  28202
                                    Telephone:  (704) 334-0891
                                    Facsimile:  (704) 377-1897
                                    E-mail:   rrayburn@rcdlaw.net
                                            jmiller@rcdlaw.net

                                  -and-

                                  Gregory M. Gordon (TX 08435300)
                                  Dan B. Prieto (TX 24048744)
                                  Amanda M. Suzuki (TX 24079422)
                                  JONES DAY
                                  2727 N. Harwood Street
                                  Dallas, Texas  75201
                                  Telephone:  (214) 220-3939
                                  Facsimile:  (214) 969-5100
                                  E-mail:  gmgordon@jonesday.com
                                          dbprieto@jonesday.com
                                          asuzuki@jonesday.com

                                  PROPOSED ATTORNEYS FOR DEBTORS

**<u>Exhibit A</u>**

**(Interim DIP Order)**

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

|  |  |  |
|---|---|---|
|  | : |  |
| In re | : | Chapter 11 |
|  | : |  |
| KAISER GYPSUM COMPANY, INC., *et al.*,[1] | : | Case No. 16-_____ (___) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS**
**TO OBTAIN POSTPETITION FINANCING ON A**
**SUPERPRIORITY, SECURED BASIS, (II) GRANTING LIENS**
**AND SUPERPRIORITY CLAIMS, (III) MODIFYING**
**THE AUTOMATIC STAY AND (IV) SCHEDULING A FINAL HEARING**

This matter coming before the Court on the Debtors' Motion For Entry of Interim and Final Orders (I) Authorizing Them To Obtain Postpetition Financing On A Superpriority, Secured Basis, (II) Granting Liens and Superpriority Claims, (III) Modifying the Automatic Stay, and (IV) Scheduling A Final Hearing (the "Motion"),[2] filed by the above captioned debtors (together, the "Debtors") seeking, among other things, entry of an interim order (this "Interim Order") authorizing, inter alia, the Debtor to:

---

[1]     The Debtors are the following entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): Kaiser Gypsum Company, Inc. (0188) and Hanson Permanente Cement, Inc. (7313). The Debtors' address is 300 E. John Carpenter Freeway, Irving, Texas 75062.

[2]     Capitalized terms not otherwise defined herein have the meanings given to them in the Motion.

(i)      Obtain credit and incur debt, pursuant to sections 363 and 364(c) of

title 11 of the United States Code (the "Bankruptcy Code"), on an interim basis for a period

(the "Interim Period") from the commencement of these cases (the "Chapter 11 Cases") through

and including the date of the Final Hearing (as defined below) up to the aggregate committed

amount of $2,000,000 (on terms and conditions more fully described herein) (A) secured,

pursuant to section 364(c)(3) of the Bankruptcy Code, by a valid, perfected, first-priority security

interests in and liens on all of the Collateral (as defined below) that is not subject to non-

avoidable, valid and perfected liens in existence as of the Petition Date, subject only to the

Carve-Out (as defined below), and (B) with priority over any and all administrative expenses as

provided in section 364(c)(1) of the Bankruptcy Code, subject to the terms and conditions

contained herein;

(ii)      (a) enter into the secured, superpriority revolving line of credit facility

(the "DIP Facility") pursuant to (I) that certain Loan and Security Agreement (the "DIP Credit

Agreement"), substantially in the form attached hereto as Exhibit 1 and incorporated herein by

reference, by and among the Debtors and Lehigh Hanson, Inc. (the "DIP Lender"), and (II) all

other agreements, documents, and instruments executed and/or delivered with, to, or in favor of

the DIP Lender, including, without limitation, deeds of trust, securities agreements, notes,

mortgages, and Uniform Commercial Code ("UCC") financing statements and all other related

agreements, documents, and instruments executed and/or delivered in connection therewith or

related thereto (collectively, as may be amended, modified or supplemented and in effect from

time to time, the "DIP Financing Agreements"); and (b) incur the "Obligations" under and as

defined in the DIP Credit Agreement (collectively, the "DIP Obligations");

(iii)     use the proceeds of the DIP Facility in a manner consistent with the terms

and conditions of the DIP Financing Agreements and in accordance with the Budget (as defined

below), subject to the Permitted Budget Variance (as defined below), solely for, to the extent set

forth in the Budget, (i) payment of costs of administration of the Chapter 11 Cases and

(ii) general corporate and ongoing working capital needs.

(iv)     grant, pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP

Lender a valid, perfected, first-priority security interests in and liens on all of the Collateral that

is not subject to non-avoidable, valid and perfected liens in existence as of the Petition Date,

subject only to the Carve-Out; and

(v)     grant, pursuant to section 364(c)(3) of the Bankruptcy Code, the DIP

Lender a junior perfected security interests in and liens on all of the Collateral that is subject to

non-avoidable, valid and perfected liens in existence as of the Petition Date, subject only to the

Carve-Out;

(vi)     grant, pursuant to section 364(c)(1) of the Bankruptcy Code, the DIP

Lender superpriority administrative claim status in respect of all DIP Obligations.

The Debtor also requests that the Court:

(i)     Vacate and modify the automatic stay imposed by section 362 of the

Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of

the DIP Financing Agreements and this Interim Order;

(ii)     Schedule a final hearing (the "Final Hearing") to consider entry of an

order (the "Final Order") granting the relief requested in the Motion on a final basis and approve

the form of notice with respect to the Final Hearing; and

(iii)     Waive the fourteen-day stay provisions of Rules 6004(a) and 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

It appearing that due and appropriate notice of the Motion, the relief requested therein, and the Interim Hearing (the "Notice") having been served by the Debtors in accordance with Rule 4001(c) on (i) the DIP Lender, (ii) Bankruptcy Administrator for the Western District of North Carolina (the "Bankruptcy Administrator"), (iii) the Debtors' largest non-asbestos creditors and the law firms with the largest number or scope of pending asbestos personal injury cases against the Debtors, as identified in the Debtors' chapter 11 petitions, (iv) the Internal Revenue Service, (v) all appropriate state taxing authorities, and (vi) certain other parties, if any, identified in the certificate of service filed with the Court, including, without limitation, all creditors, who have filed or recorded prepetition liens or security interests against any of the Debtors' assets (collectively, the "Noticed Parties"):

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A.     **Petition Date**.  On September 30, 2016 (the "Petition Date"), each of the Debtors commenced a case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are continuing in possession of their properties and are managing their businesses, as debtors in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

B.     **Jurisdiction and Venue**.  This Court has jurisdiction over these proceedings, pursuant to 28 U.S.C. §§ 157(b) and 1334, and over the persons and property affected hereby. Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2). Venue for the Chapter 11 Cases and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

C.     **Committee Formation**.  A statutory committee of unsecured creditors has not

been appointed in the Chapter 11 Cases.

D.     **Notice**.  Under the circumstances, the Notice given by the Debtors of the Motion,

the Interim Hearing and the relief granted under this Order constitutes due and sufficient notice

thereof and complies with Bankruptcy Rule 4001(c).

E.     **Findings Regarding the Post-Petition Financing**.

(i)     **Need for Post-Petition Financing**.  The Debtors do not have sufficient

resources to fund the administrative expenses of the Chapter 11 Cases in the ordinary course of

their business without the financing requested under the Motion.  The Debtors' ability to fund the

expenses of the Chapter 11 Cases is essential because the Debtors will not be able to proceed

with these Chapter 11 Cases or develop a comprehensive solution to their asbestos liabilities for

the benefit of all creditors of the Debtors.  The ability of the Debtors to obtain sufficient liquidity

through the proposed postpetition financing arrangements by and among the DIP Lender and the

Debtors as set forth in this Interim Order and the DIP Credit Agreement is vital to the Debtors'

reorganization efforts.  Accordingly, the Debtors have an immediate need to obtain the

postpetition financing in order to, among other things, assure sufficient liquidity for the Debtors,

fund the expenses of the Chapter 11 Cases and preserve and maximize the value of the assets of

the Debtors' bankruptcy estates (as defined under Section 541 of the Bankruptcy Code,

the "Estates") in order to maximize the recovery to all creditors of the Estates.

(ii)     **No Credit Available on More Favorable Terms**.  The Debtors are

unable to procure financing in the form of unsecured credit allowable under Section 503(b)(1) of

the Bankruptcy Code, as an administrative expense under Section 364(a) or (b) of the

Bankruptcy Code, or in exchange for the grant of an administrative expense priority pursuant to

Section 364(c)(1) of the Bankruptcy Code, without the grant of liens on assets.  The financing

offered by the DIP Lender pursuant to the DIP Financing Agreements is superior to the terms

any third party lender would likely provide to the Debtors.

F.     **Section 506(c) Waiver**.  The DIP Lender will request a waiver of the provisions

of sections 506(c) of the Bankruptcy Code as part of the DIP Facility and the accommodations

provided herein, which request will be delayed until the Final Hearing.

G.     **Extension of Financing**.  The DIP Lender has indicated a willingness to provide

financing to the Debtors in accordance with the DIP Credit Agreement and subject to (i) the

entry of this Interim Order and a Final Order, and (ii) findings by this Court that such financing

is essential to the Debtor's estate, that the DIP Lender is a good faith financier, and that the DIP

Lender's superpriority claims, liens and other protections granted pursuant to this Interim Order

and the DIP Facility will not be affected by any subsequent reversal, modification, vacatur or

amendment of this Interim Order or the Final Order or any other order, as provided in

section 364(e) of the Bankruptcy Code.

H.     **Business Judgment and Good Faith Pursuant to Section 364(e)**.  The terms of

the DIP Credit Agreement, the other DIP Financing Agreements and this Interim Order are fair,

just and reasonable under the circumstances, are ordinary and appropriate for secured financing

to debtors-in-possession, reflect the Debtors' exercise of their prudent business judgment

consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair

consideration.  Any credit extended under the terms of this Interim Order shall be deemed to

have been extended in good faith by the DIP Lender as that term is used in section 364(e) of the

Bankruptcy Code.

I.      **Relief Essential; Best Interest**.  The relief requested in the Motion is necessary,

essential and appropriate, and is in the best interest of and will benefit the Debtors, their

creditors and their Estates.

J.      **Entry of Interim Order**.  Sufficient cause exists for immediate entry of this

Order pursuant to Bankruptcy Rules 4001(c)(2).  No party appearing in the Chapter 11 Cases

has filed or made an objection to the relief sought in the Motion or the entry of this Order, or

any objections that were made (to the extent such objections have not been withdrawn) are

hereby overruled.

**NOW, THEREFORE**, on the Motion and the record before this Court with

respect to the Motion, and with the consent of the Debtors and the DIP Lender to the form and

entry of this Interim Order, and good and sufficient cause appearing therefor,

**IT IS ORDERED that:**

1.      **Motion Granted**.  The Motion is granted in accordance with the terms and

conditions set forth in this Interim Order and the DIP Financing Agreements.

2.      **DIP Financing Agreements**

(a)      **Approval of Entry Into the DIP Financing Agreements**.  The Debtors

are expressly and immediately authorized, empowered and directed to execute and deliver the

DIP Financing Agreements and to incur and to perform the DIP Obligations in accordance with,

and subject to, the terms of this Interim Order and the DIP Financing Agreements, and to execute

and deliver all instruments and documents that may be required or necessary for the performance

by the Debtors under the DIP Facility and the creation and perfection of the DIP Liens described

in and provided for by this Interim Order and the DIP Financing Agreements.  The Debtors are

hereby authorized and directed to do and perform all acts required by the DIP Credit Agreement

and all other DIP Financing Agreements.  Upon execution and delivery, the DIP Financing

Agreements shall represent valid and binding obligations of the Debtors enforceable against the

Debtors in accordance with their terms.

        (b)    **Authorization to Borrow**.  During the Interim Period and subject to the

terms and conditions of this Interim Order, the DIP Credit Agreement and the other DIP

Financing Agreements, the Debtors are hereby authorized under the DIP Facility to borrow up to

a maximum amount of $2,000,000.

        (c)    **Application of DIP Proceeds**.  The proceeds of the DIP Facility shall be

used, in each case, in a manner consistent with the terms and conditions of the DIP Financing

Agreements, and in accordance with the Budget, subject to the Permitted Budget Variance,

solely to pay (a) the costs and expenses of administration of the Chapter 11 Cases, and

(b) general corporate and ongoing working capital needs.

        (d)    **Conditions Precedent**.  The DIP Lender shall have no obligation to make

any loan or advance under the DIP Credit Agreement during the Interim Period unless the

conditions precedent to making such loan under the DIP Credit Agreement have been satisfied in

full or waived by the DIP Lender in its sole discretion.

        (e)    **Post-Petition Liens**.  Effective immediately upon the execution of this

Interim Order, the DIP Lender is hereby granted pursuant to sections 361, 362, 364(c)(2) and

(c)(3) of the Bankruptcy Code, a lien on all the property of the Debtors' Estates (collectively,

the "DIP Liens"), senior and superior in priority to all other secured and unsecured creditors of

the Debtor's estate except as otherwise provided in this Interim Order and the Final Order, upon

and to all property and assets of each Debtor and its Estate of every kind or type whatsoever,

tangible, intangible, real, personal and mixed, whether now owned or existing or hereafter

acquired or arising and regardless of where located, whether within the United States or in other locations (collectively, the "Collateral"); provided, however, that the Collateral shall not include any avoidance actions under Chapter 5 of the Bankruptcy Code, although the Collateral shall include any proceeds of or property recovered from any successful avoidance actions, whether by judgment, settlement or otherwise.

(f)     **DIP Lien Priority**.  The DIP Liens created pursuant to the DIP Financing Agreements and this Interim Order and granted to the DIP Lender, as provided herein, are created pursuant to section 364(c)(3) and (c)(4) of the Bankruptcy Code, and are comprised of (i) valid, perfected, first-priority security interests in and liens on all of the Collateral that is not subject to non-avoidable, valid and perfected liens in existence as of the Petition Date, subject only to the Carve-Out and (ii) a valid junior perfected security interests in and liens on all of the Collateral that is subject to non-avoidable, valid and perfected liens in existence as of the Petition Date, subject only to the Carve-Out.  The DIP Liens shall secure all DIP Obligations.  Except as provided herein, the DIP Liens shall not be made subject to or pari passu with any lien or security interest by any court order heretofore or hereafter entered in the Chapter 11 Cases and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases, upon the conversion of the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (any "Successor Cases"), and/or upon the dismissal of the Chapter 11 Cases.  The DIP Liens shall not be subject to sections 510, 549, 550 or 551 of the Bankruptcy Code, or if approved in the Final Order, section 506(c) of the Bankruptcy Code.

(g)     **Enforceable Obligations**.  The DIP Financing Agreements shall constitute and evidence the valid and binding obligations of the Debtors, which obligations shall

be enforceable against the Debtors, their Estates and any successors thereto and their creditors, in accordance with their terms.

(h)     **Protection of the DIP Lender and Other Rights**.  From and after the Petition Date, the Debtors shall use the proceeds of the extensions of credit under the DIP Facility only for the purposes specifically set forth in the DIP Credit Agreement and this Interim Order and in strict compliance with the Budget, subject to the Permitted Budget Variance.

(i)     **Superpriority Administrative Claim Status**.  All DIP Obligations shall be an allowed superpriority administrative expense claim (the "DIP Superpriority Claim" and, together with the DIP Liens, the "DIP Protections") with priority in the Chapter 11 Cases under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their Estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in, arising, or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726(b), 1113 and 1114 of the Bankruptcy Code, and, if approved in the Final Order, section 506(c) of the Bankruptcy Code. No costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these proceedings, or in any Successor Cases, and no priority claims are, or will be, senior to, prior to or on a parity with the DIP Protections or the DIP Obligations, or with any other claims of the DIP Lender arising hereunder.

3.     **Authorization to Use Proceeds of DIP Facility**.  Pursuant to the terms and conditions of this Interim Order, the DIP Facility and the DIP Credit Agreement, and in accordance with the budget attached hereto as Exhibit 2 (as the same may be modified from time

to time consistent with the terms of the DIP Credit Agreement, the "Budget"), the Debtors are authorized to use the advances under the DIP Credit Agreement during the period commencing immediately after the entry of the Interim Order and terminating upon the Termination Date. Without the DIP Lender's prior written consent, the Debtors are not authorized to make or incur any expenditures except in accordance with this Interim Order.  Without the DIP Lender's prior written consent, the Debtors are not authorized to make or commit or agree to make any expenditures or disbursements not included in the Budget and this Interim Order unless otherwise permitted as a Permitted Variance (as defined below).  No Borrower will make any actual expenditures or disbursements during any calendar week period beginning with the calendar week ending October 8, 2016, that, in the aggregate on a weekly cumulative basis, will be more than 20% in excess of the aggregate weekly cumulative amount of all expenditures and disbursements set forth in the then effective Budget (and, if applicable, any prior Budget covering days, weeks, months or other periods not covered by the Budget then in effect).  All such expenditures and disbursements permitted to be made in excess of amounts set forth in the Budget pursuant to the Section 9.05(b) of the DIP Credit Agreement are referred to herein as the "Permitted Variance".  For the avoidance of doubt, the calendar week cumulative periods shall be tested as follows: for the first weekly testing period, week 1 (i.e., the calendar week ending October 8, 2016) shall be tested; for the second weekly testing period, weeks 1 – 2 shall be tested in aggregate; for the third weekly testing period, weeks 1 - 3 shall be tested in the aggregate; and the for the fourth weekly testing period, weeks 1 - 4 shall be tested in the aggregate; and so on. The Budget may be updated (with the consent and/or at the request of the DIP Lender) from time to time, provided that such updated Budget shall be in form and substance acceptable to the DIP Lender, in its sole discretion, and the Debtors shall be required always to comply with the

Budget and the DIP Credit Agreement pursuant to the terms of the DIP Facility and this Interim

Order.

4.      **Post-Petition Lien Perfection**.  This Interim Order shall be sufficient and

conclusive evidence of the validity, perfection, and priority of the DIP Liens without the

necessity of filing or recording any financing statement, deed of trust, mortgage, or other

instrument or document which may otherwise be required under the law of any jurisdiction or the

taking of any other action (including, for the avoidance of doubt, entering into any deposit

account control agreement) to validate or perfect the DIP Liens, or to entitle the DIP Lender to

the priorities granted herein.  Notwithstanding the foregoing, the DIP Lender may, in its sole

discretion, file such financing statements, mortgages, notices of liens and other similar

documents, and is hereby granted relief from the automatic stay of section 362 of the Bankruptcy

Code in order to do so, and all such financing statements, mortgages, notices and other

documents shall be deemed to have been filed or recorded at the time and on the date of the

commencement of the Chapter 11 Cases.  The Debtors shall execute and deliver to the DIP

Lender all such financing statements, mortgages, notices and other documents as the DIP Lender

may reasonably request to evidence, confirm, validate or perfect, or to insure the contemplated

priority of, the DIP Liens granted pursuant hereto.  The DIP Lender, in its discretion, may file a

photocopy of this Interim Order as a financing statement with any recording officer designated to

file financing statements or with any registry of deeds or similar office in any jurisdiction in

which the Debtors have real or personal property, and in such event, the subject filing or

recording officer shall be authorized to file or record such copy of this Interim Order.

5.      **Carve-Out**.  Upon the written notice by the DIP Lender of the occurrence of an

Event of Default (as defined in the DIP Credit Agreement) (the "Carve-Out Notice"), the DIP

Lender's liens, claims and security interests in the Collateral and their DIP Superpriority Claim shall be subject only to the right of payment of the following expenses (the "Carve-Out Expenses"):  (a) fees payable to the Bankruptcy Administrator; (b) fees payable to the Clerk of this Court; and (c) subject to the terms and conditions of this Interim Order, the unpaid and outstanding reasonable fees and expenses of attorneys, accountants and other professionals retained by the Debtors, any committee(s) or any future claimants' representative under sections 327 or 1103(a) of the Bankruptcy Code (collectively, the "Professionals"), which fees and expenses are approved by a final order of the Court pursuant to sections 326, 328, 330, or 331 of the Bankruptcy Code (collectively, the "Allowed Professional Fees"), and which are actually incurred (i) before the delivery date of a Carve-Out Notice, and (ii) on or after the delivery date on which a Carve-Out Notice is delivered, provided that all Allowed Professional Fees actually incurred on or after the date on which a Carve-Out Notice is delivered (less the amount of any retainers, if any, then held by such Professionals) are in a cumulative, aggregate sum not to exceed $2,500,000 (the "Post-Default Carve-Out").

6.      **Payment of Carve-Out Expenses.**  The DIP Lender's obligation to fund or otherwise pay the Carve-Out Expenses shall be added to and made a part of the Obligations, secured by the Collateral, and entitle the DIP Lender to all of the rights, claims, liens, priorities and protections under this Interim Order, the DIP Credit Agreement, the Bankruptcy Code and applicable law.  Payment of any Carve-Out Expenses, whether by or on behalf of the Agent or the DIP Lender, shall not and shall not be deemed to reduce the Obligations, and shall not and shall not be deemed to subordinate any of the DIP Lender's liens and security interests in the Collateral or their Superpriority Claim to any junior pre- or post-petition lien, interest or claim in favor of any other party.  Except as otherwise provided herein with respect to the Carve-Out

Expenses, the DIP Lender shall not, under any circumstance, be responsible for the direct

payment or reimbursement of any fees or disbursements of any Professionals incurred in

connection with the Chapter 11 Cases under any chapter of the Bankruptcy Code.

7.      **Excluded Professional Fees**.  Notwithstanding anything to the contrary in this

Interim Order, no proceeds of any advances under the DIP Credit Agreement shall be used to pay

any Allowed Professional Fees or any other fees or expenses incurred by any Professional in

connection with any of the following:  (a) an assertion or joinder in any claim, counter-claim,

action, proceeding, application, motion, objection, defense or other contested matter seeking any

order, judgment, determination or similar relief: (i) challenging the legality, validity, priority,

perfection, or enforceability of the Obligations or the DIP Lender's liens on and security interests

in the Collateral; (ii) invalidating, setting aside, avoiding or subordinating, in whole or in part,

the Obligations or the DIP Lender's liens on and security interests in the Collateral, or

(iii) preventing, hindering or delaying the DIP Lender's assertion or enforcement of any lien,

claim, right or security interest or realization upon any Collateral in accordance with the terms

and conditions of this Interim Order, (b) a request for authorization to obtain debtor-in-

possession financing or other financial accommodations pursuant to section 364(c) or

section 364(d) of the Bankruptcy Code that would not indefeasibly repay the Obligations due the

DIP Lender in full in cash, other than from the DIP Lender, without the prior written consent of

the DIP Lender or (c) any act which is contrary, in a manner that is material and adverse to the

DIP Lender, to any term or condition set forth in or acknowledged by the DIP Financing

Agreements or this Interim Order and which results in the occurrence of an Event of Default

under the DIP Financing Agreements or this Interim Order.

8.      **Payment of Compensation**.  Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of the Debtors, any committee or of any person or shall affect the right of the DIP Lender to object to the allowance and payment of such fees and expenses or to permit the Debtors to pay any such amounts not set forth in the Budget.

9.      **Section 506(c) Claims**.  Nothing contained in this Interim Order shall be deemed a consent by the DIP Lender to any charge, lien, assessment or claim against the DIP Collateral under section 506(c) of the Bankruptcy Code or otherwise; provided, however, that during the pendency of this Interim Order, there shall be no waiver of section 506(c) of the Bankruptcy Code.

10.     **Collateral Rights.**  Unless the DIP Lender has provided its prior written consent or all the DIP Obligations and have been paid in full in cash (or will be paid in full in cash upon entry of an order approving indebtedness described in subparagraph (a) below), and all commitments to lend have terminated, there shall not be entered in this proceeding, or in any Successor Case, any order that authorizes any of the following:

(a)      Except as permitted in the DIP Credit Agreement, the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other lien on all or any portion of the Collateral and/or entitled to priority administrative status that is equal or senior to those granted to the DIP Lender; or

(b)      Relief from stay by any person other than the DIP Lender with respect to the foreclosure on all or any portion of the Collateral.

11.     **Disposition of Collateral**.  The Debtor shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the Collateral, without the prior written consent of the DIP Lender (and no such consent shall be implied, from any other action, inaction or acquiescence by

the DIP Lender or an order of this Court), except as otherwise provided for in the DIP Credit

Agreement and this Interim Order or as approved by the Court.

12.   **Events of Default.**  The occurrence of any of the following events shall constitute

an "Event of Default" under this Interim Order:

(a)   Any Debtor's failure to comply with any term of this Interim Order.

(b)   An " Event of Default" (as defined in the DIP Credit Agreement) under

the DIP Credit Agreement.

13.   **Rights and Remedies Upon Event of Default.**  Upon the occurrence of and

during the continuance of an Event of Default, (i) the Debtors shall be bound by all restrictions,

prohibitions and other terms as provided in this Interim Order and the DIP Credit Agreement and

(ii) the DIP Lender shall be entitled to take any act or exercise any right or remedy (subject to

Paragraph 14 below) as provided in this Interim Order or the DIP Credit Agreement, including,

without limitation, declaring all Obligations immediately due and payable, accelerating the

Obligations, ceasing to make Loans, setting off any Obligations with Collateral or proceeds in

the DIP Lender's possession, and enforcing any and all rights with respect to the Collateral.  The

DIP Lender shall have no obligation to lend or advance any additional funds to the Debtors, or

provide any other financial accommodations to or for the benefit of Debtors, immediately upon

or after the occurrence of an Event of Default.

14.   **Relief from Automatic Stay**.  The automatic stay provisions of Section 362 of

the Bankruptcy Code and any other restriction imposed by an order of the Court or applicable

law are hereby modified and vacated without further notice, application or order of the Court to

the extent necessary to permit the DIP Lender to perform any act authorized or permitted under

or by virtue of this Interim Order or the DIP Credit Agreement, including, without limitation,

(a) to implement the post-petition financing arrangements authorized by this Interim Order and pursuant to the terms of the DIP Credit Agreement, (b) to take any act to create, validate, evidence, attach or perfect any lien, security interest, right or claim in the Collateral, and (c) to assess, charge, collect, advance, deduct and receive payments with respect to the Obligations, including, without limitation, all interests, fees, costs and expenses permitted under the DIP Credit Agreement, and apply such payments to the Obligations pursuant to the DIP Credit Agreement and this Interim Order.  In addition, upon the occurrence of an Event of Default and subject to the entry of the Final Order, after providing five (5) business days prior written notice (the "Enforcement Notice") to counsel for the Debtors, counsel for any official committee (if appointed), counsel for any future claimants' representative and the Bankruptcy Administrator, the DIP Lender shall be entitled to take any action and exercise all rights and remedies provided to it by this Interim Order, the DIP Credit Agreement or applicable law as the DIP Lender may deem appropriate in its sole discretion to, among other things, proceed against and realize upon the Collateral or any other assets or properties of Debtors' Estates upon which the DIP Lender has been or may hereafter be granted liens or security interests to obtain the full and indefeasible repayment of all Obligations, provided that the Debtors shall have the right to seek a continuance of the automatic stay from the Court during such five (5) day period.

16.    **Other Rights and Obligations**.

(a)    **Good Faith Under Section 364(e) of the Bankruptcy Code.  No Modification or Stay of This Interim Order**.  Based on the findings set forth in this Interim Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facility contemplated by this Interim Order, in the event any or all of the provisions of this Interim Order are hereafter modified, amended or vacated by a subsequent order of this or any

other Court, the DIP Lender is entitled to the protections provided in section 364(e) of the

Bankruptcy Code and no such modification, amendment or vacation shall affect the validity and

enforceability of any advances made hereunder or the liens or priority authorized or created

hereby.   Notwithstanding any such modification, amendment or vacation, any claim granted to

the DIP Lender hereunder arising prior to the effective date of such modification, amendment or

vacation of any DIP Protections granted to the DIP Lender shall be governed in all respects by

the original provisions of this Interim Order, and the DIP Lender shall be entitled to all of the

rights, remedies, privileges and benefits, including the DIP Protections granted herein, with

respect to any such claim.   Since the loans made pursuant to the DIP Credit Agreement are made

in reliance on this Interim Order, the obligations owed the DIP Lender prior to the effective date

of any stay, modification or vacation of this Interim Order cannot, as a result of any subsequent

order in the Chapter 11 Cases or in any Successor Cases, be subordinated, lose their lien priority

or superpriority administrative expense claim status, or be deprived of the benefit of the status of

the liens and claims granted to the DIP Lender under this Interim Order and/or the DIP Financing

Agreements.

(b)     **Binding Effect**.  The provisions of this Interim Order shall be binding

upon and inure to the benefit of the DIP Lender, the Debtors and their respective successors and

assigns (including any trustee or other fiduciary hereinafter appointed as a legal representative of

the Debtors or with respect to the property of the Debtors' Estates) whether in the Chapter 11

Cases, in any Successor Cases, or upon dismissal of any such chapter 11 or chapter 7 Case.

(c)     **No Waiver**.  The failure of the DIP Lender to seek relief or otherwise

exercise its rights and remedies under the DIP Credit Agreement, the DIP Facility, this Interim

Order or otherwise, as applicable, shall not constitute a waiver of any of the DIP Lender's rights

hereunder, thereunder, or otherwise.  Notwithstanding anything herein, the entry of this Interim

Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or

otherwise impair the DIP Lender under the Bankruptcy Code or under non-bankruptcy law,

including without limitation, (i) the rights of the DIP Lender to (a) request conversion of the

Chapter 11 Cases to cases under Chapter 7, dismissal of the Chapter 11 Cases, or the

appointment of a trustee in the Chapter 11 Cases, or (b) propose, subject to the provisions of

section 1121 of the Bankruptcy Code, a plan or (ii) any of the rights, claims or privileges

(whether legal, equitable or otherwise) of the DIP Lender.

(d)      **No Third Party Rights**.  Except as explicitly provided for herein, this

Interim Order does not create any rights for the benefit of any third party, creditor, equity holder

or any direct, indirect, or incidental beneficiary.

(e)      **No Marshaling**.  The DIP Lender shall not be subject to the equitable

doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral.

(f)      **Amendment**.  The Debtors and the DIP Lender may amend or waive any

provision of the DIP Credit Agreement, provided that such amendment or waiver, in the

judgment of the Debtors and the DIP Lender, is either non-prejudicial to the rights of third

parties or is not material.  Except as otherwise provided herein, no waiver, modification, or

amendment of any of the provisions hereof shall be effective unless set forth in writing, signed

by on behalf of the Debtors and the DIP Lender and approved by the Court.

(g)      **Survival of Interim Order**.  The provisions of this Interim Order and any

actions taken pursuant hereto shall survive entry of any order which may be entered

(i) confirming any plan in the Chapter 11 Cases, (ii) converting the Chapter 11 Cases to cases

under chapter 7 of the Bankruptcy Code, or (iii) dismissing the Chapter 11 Cases,

(iv) withdrawing of the reference of the Chapter 11 Cases from this Court, or (v) providing for abstention from handling or retaining of jurisdiction of the Chapter 11 Cases in this Court.  The terms and provisions of this Interim Order, including the DIP Protections granted pursuant to this Interim Order, and the DIP Credit Agreement, shall continue in full force and effect notwithstanding the entry of such order, and such DIP Protections shall maintain their priority as provided by this Interim Order until all the obligations of the Debtor to the DIP Lender pursuant to the DIP Financing Agreements and this Interim Order have been indefeasibly paid in full and discharged (such payment being without prejudice to any terms or provisions contained in the DIP Facility or this Interim Order which survive such discharge by their terms).

(h)      **Inconsistency**.  In the event of any inconsistency between the terms and conditions of the DIP Credit Agreement and of this Interim Order, the provisions of this Interim Order shall govern and control.

(i)      **Enforceability**.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be fully enforceable nun pro tunc to the Petition Date immediately upon execution hereof.

(j)      **Objections Overruled**.  All objections to the Motion to the extent not withdrawn or resolved, are hereby overruled.

(k)      **No Waivers or Modification of Interim Order**.  The Debtors irrevocably waive any right to seek any modification or extension of this Interim Order without the prior written consent of the DIP Lender and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Lender.

(l)      **Waiver of the Fourteen (14) Day Stay Under Bankruptcy Rule**

**6004(h)**.  The fourteen (14) day stay provisions of Bankruptcy Rule 6004(h) are waived and shall

not apply to this Interim Order.

17.    **Final Hearing.**

(a)      The Final Hearing to consider entry of the Final Order and final approval

of the DIP Facility is scheduled for _____, 2016 at the United States

Bankruptcy Court for the Western District of North Carolina, Charlotte, North Carolina.  If no

objections to the relief sought in the Final Hearing are filed and served in accordance with this

Interim Order, no Final Hearing may be held, and a separate Final Order may be presented by the

Debtors and entered by this Court.

(b)      On or before _____, 2016, the Debtors shall serve, by United

States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final

Hearing (the "Final Hearing Notice"), together with copies of this Interim Order, the proposed

Final Order and the Motion, on:  (a) the parties having been given notice of the Interim Hearing;

(b) any party which has filed prior to such date a request for notices with this Court; (c) counsel

for any official committee; (d) the Bankruptcy Administrator, (e) the Internal Revenue Service,

(f) counsel to the proposed DIP Lender, and (g) the Securities and Exchange Commission.  The

Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed

Final Order shall file written objections with the Clerk of the Court no later than

_____, 2016, which objections shall be served so that the same are received on

or before such date by:  (a) counsel for the Debtors, Rayburn Cooper & Durham, P.A., 227 West

Trade Street, Suite 1200, Charlotte, North Carolina 28202, Attn:  John Miller, Jr., Email:

jmiller@rcdlaw.net and Jones Day, 2727 N. Harwood Street, Dallas, Texas 75201, Attn:

Gregory M. Gordon, Email:  gmgordon@jonesday.com; (b) the DIP Lender, Lehigh Hanson,

Inc., 300 E John W. Carpenter Freeway, Suite 1645, Irving, TX 75062, Attn: Vice President &

General Counsel, Email:  william.venema@lehighhanson.com; (c) counsel to any official

committee; (d) counsel for any future claimants' representative appointed by the Court; and

(e) the Bankruptcy Administrator; and shall be filed with the Clerk of the United States

Bankruptcy Court for the Western District of North Carolina , in each case to allow actual receipt

of the foregoing no later than _____, 2016, at 4:00 p.m. prevailing Eastern time.

Notwithstanding the terms of this Interim Order, this Court is not precluded from entering a Final

Order containing provisions that are inconsistent with, or contrary to any of the terms in this

Interim Order, subject to the protections under section 364(e) of the Bankruptcy Code and the

rights of the DIP Lender to terminate the DIP Credit Agreement if such Final Order is not

acceptable to it.  In the event this Court modifies any of the provisions of this Interim Order or

the DIP Credit Agreement following such further hearing, such modifications shall not affect the

rights and priorities of the DIP Lender pursuant to this Interim Order with respect to the

Collateral, and any portion of the DIP Obligations that arises or is incurred, advanced or paid

prior to such modifications (or otherwise arising prior to such modifications), and this Interim

Order shall remain in full force and effect except as specifically amended or modified at such

Final Hearing.

       (c)    **Retention of Jurisdiction**.  This Court has and will retain jurisdiction to

enforce this Interim Order according to its terms.

This Order has been signed electronically.  The judge's       United States Bankruptcy Court
signature and court's seal appear at the top of the
Order.

# EXHIBIT 1

**(DIP Credit Agreement)**

## DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT

This **DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT**, dated as of [__], 2016 (this "Agreement"), is entered into by and between Hanson Permanente Cement, Inc., an Arizona corporation ("Hanson"), Kaiser Gypsum Company, Inc., a North Carolina corporation ("Kaiser" and together with Hanson, each a "Borrower" and collectively, the "Borrowers"), and Lehigh Hanson, Inc., a Delaware corporation (the "Lender").

## RECITALS

A.     Each Borrower is a debtor under Chapter 11 of the Bankruptcy Reform Act of 1978, 11 U.S.C. §§ 101 et seq., as amended (the "Bankruptcy Code") in cases (the "Chapter 11 Cases") pending in the United States Bankruptcy Court for the Western District of North Carolina (the "Bankruptcy Court").

B.     The Borrowers have requested that the Lender provide a revolving line of credit (on a senior super-priority secured basis) to the Borrowers to finance certain general corporate and ongoing working capital needs of the Borrower and costs associated with the Chapter 11 Cases, and the Lender has agreed to make a revolving line of credit available to the Borrowers subject to the terms and conditions of this Agreement and to the terms and conditions of the Financing Orders (as hereinafter defined).

## AGREEMENT

In consideration of the premises and mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.01   Defined Terms.  As used in this Agreement, each term defined above has the meaning indicated above and the following terms have the meanings specified below:

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Agreement" has the meaning provided in the first paragraph hereof.

"Avoidance Action" means the actual claims and causes of action arising under sections 502(d), 542, 544, 545, 547, 548, 549, 550, 552, 553 or 724(a) of the Bankruptcy Code.

"Balance Due" has the meaning assigned to such term in Section 3.01(a).

"Bankruptcy Code" has the meaning assigned to such term in paragraph A. of the Recitals.

"Bankruptcy Court" has the meaning assigned to such term in paragraph A. of the Recitals.

"Bankruptcy Court Schedules" has the meaning assigned to such term in Section 7.04.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America or any successor Governmental Authority.

"Borrower" and "Borrowers" each has the meaning provided in the first paragraph of this Agreement.

"Budget" has the meaning assigned to such term in Section 6.01(g).

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in Dallas, Texas are authorized or required by law to remain closed.

"Carve-Out" means an amount sufficient for payment of (a) unpaid and outstanding reasonable fees and expenses allowed pursuant to sections 326, 328, 330 or 331 of the Bankruptcy Code (the "Allowed Professional Fees") of attorneys, accountants and other fees and disbursements incurred by professionals retained by the Borrowers, any official committee of unsecured creditors or equity holders and any future claimants' representative under sections 327 or 1103(a) (collectively, the "Professionals") of the Bankruptcy Code, in each case, actually incurred (i) before the delivery date of a Carve-Out Notice, and (ii) on or after the date on which a Carve-Out Notice is delivered, provided that all Allowed Professional Fees actually incurred on or after the date on which a Carve-Out Notice is delivered (less the amount of any retainers, if any, then held by such Professionals) are in a cumulative, aggregate sum not to exceed $2,500,000 (the "Post Carve-Out Notice Cap"), and (b) unpaid fees payable to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930.

"Carve-Out Notice" means a written notice delivered by the Lender to the Borrowers and their counsel, the United States Trustee, and lead counsel to any official committee, which notice may be delivered following the occurrence of an Event of Default and stating that the Post Carve-Out Notice Cap has been invoked.

"Casualty Event" means any loss, casualty or other insured damage to, or any nationalization, taking under power of eminent domain or by condemnation or similar proceeding of, any property of any Borrower.

"Change in Law" means (a) the adoption of any law, rule or regulation after the date of this Agreement, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement, or (c) compliance by the Lender with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement.

"Chapter 11 Case" has the meaning assigned to such term in paragraph A. of the Recitals.

"Claims" means any and all claims, demands, liabilities, obligations, losses, damages, penalties, actions, judgments, suits, awards, remedial response costs, expenses or disbursements

of any kind or nature whatsoever (including reasonable attorneys', accountants', consultants' or paralegals' fees and expenses), whether arising under or in connection with the Loan Documents, any applicable law, or otherwise, that may now or hereafter be suffered or incurred by a Person and whether suffered or incurred in or as a result of any investigation, litigation, arbitration or judicial or non-judicial proceeding, or any appeal related thereto.

"Closing Date" means the date on which the conditions specified in Section 6.01 are satisfied.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and any successor statute.

"Collateral" means all property and assets of each Borrower and its estate of every kind or type whatsoever, tangible, intangible, real, personal and mixed, whether now owned or existing or hereafter acquired or arising and regardless of where located, whether within the United States or in other locations, and including all of each Borrower's now owned or hereafter acquired right, title and interest in and to each of the following:

(a)     all Accounts;

(b)     all books and records;

(c)     all Chattel Paper (whether tangible or electronic);

(d)     all Commercial Tort Claims;

(e)     all Deposit Accounts;

(f)     all Documents;

(g)     all Equipment;

(h)     all Fixtures;

(i)     all General Intangibles and Payment Intangibles;

(j)     all Goods;

(k)     all Instruments;

(l)     all Trademarks, Copyrights, Patents and other Intellectual Property;

(m)     all Inventory;

(n)     all Investment Property;

(o)     all Letter-of-Credit Rights and Supporting Obligations;

(p)     all cash and cash equivalents;

(q)     all real property;

(r)     all property of the estate of each Borrower (within the meaning Section 541 of the Bankruptcy Code, including avoidance actions arising under Chapter 5 of the Bankruptcy Code) and all other property of such Borrower, wherever located and whether now or hereafter existing, and whether now owned or hereafter acquired, of every kind and description, whether tangible or intangible, including money and all property of such Borrower held by the Lender, including all property of every description, in the possession or custody of or in transit to the Lender for any purpose, including safekeeping, collection or pledge, for the account of such Borrower, or as to which such Borrower may have any right or power;

(t)     to the extent not otherwise included, all monies and other property of any kind which is received by each Borrower in connection with refunds with respect to taxes, assessments and governmental charges imposed on such Borrower or any of its property or income;

(u)     to the extent not otherwise included, all causes of action and all monies and other property of any kind received therefrom, and all monies and other property of any kind recovered by each Borrower; and

(v)     all Proceeds, products, rents and profits, whether tangible or intangible, of any of the foregoing, including proceeds of insurance covering any or all of the foregoing, and any and all tangible or intangible property resulting from the sale, exchange, collection, or other disposition of any of the foregoing, or any portion thereof or interest therein, and the Proceeds thereof;

*provided*, that all capitalized terms used in this definition of "Collateral" that are defined in Article 9 of the Uniform Commercial Code as in effect in the State of Texas (the "UCC") shall have the meanings ascribed to such terms in the UCC; and *provided further,* that in no event shall "Collateral" include any of any Borrower's Avoidance Actions, although "Collateral" shall include any proceeds of or property recovered from any successful Avoidance Action, whether by judgment, settlement or otherwise.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  For the purposes of this definition, and without limiting the generality of the foregoing, any Person that owns directly or indirectly 10% or more of the equity interests having ordinary voting power for the election of the directors or other governing body of a Person (other than as a limited partner of such other Person) will be deemed to "control" such other Person.  "Controlling" and "Controlled" have meanings correlative thereto.

"Debt" means, for any Person, the sum of the following (without duplication):  (a) all obligations of such Person for borrowed money or evidenced by bonds, bankers' acceptances, debentures, notes or other similar instruments; (b) all obligations of such Person (whether contingent or otherwise) in respect of letters of credit, surety or other bonds and similar instruments; (c) all accounts payable and all accrued expenses, liabilities or other obligations of such Person to pay the deferred purchase price of property or services; (d) all obligations under

all leases which shall have been, or should have been, in accordance with GAAP, recorded as capital leases on the balance sheet of such Person (whether contingent or otherwise); (e) all Debt (as defined in the other clauses of this definition) of others secured by (or for which the holder of such Debt has an existing right, contingent or otherwise, to be secured by) a Lien on any property of such Person, whether or not such Debt is assumed by such Person; (f) all Debt (as defined in the other clauses of this definition other than this clause (f)) of others guaranteed by such Person or in which such Person otherwise assures a creditor against loss of the Debt (howsoever such assurance shall be made) to the extent of the lesser of the amount of such Debt and the maximum stated amount of such guarantee or assurance against loss; (g) all obligations or undertakings of such Person to maintain or cause to be maintained the financial position or covenants of others or to purchase the Debt or property of others; (h) obligations to deliver commodities, goods or services in consideration of one or more advance payments; (i) obligations to pay for goods or services even if such goods or services are not actually received or utilized by such Person; and (j) any Debt (as defined in the other clauses of this definition) of a partnership for which such Person is liable either by agreement, by operation of law or by a Governmental Requirement but only to the extent of such liability.

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"DIP Accounts" means, collectively, the Hanson DIP Account and the Kaiser DIP Account.

"dollars" or "$" refers to lawful money of the United States of America.

"Event of Default" has the meaning assigned to such term in Section 10.01.

"Excepted Liens" means, with respect to any Collateral: (a) Liens for Taxes, assessments or other governmental charges or levies which are not delinquent or which are being contested in good faith by appropriate action as to which the stay pursuant to any Chapter 11 Case is effective; (b) Liens in connection with workers' compensation, unemployment insurance or other social security, old age pension or public liability obligations which are not delinquent or which are being contested in good faith by appropriate action; (c) statutory landlord's liens, operators', vendors', carriers', warehousemen's, repairmen's, mechanics', suppliers', workers', materialmen's, construction or other like Liens arising by operation of law in the ordinary course of business each of which is in respect of obligations that are not delinquent or which are being contested in good faith by appropriate action; (d) Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights and remedies and burdening only deposit accounts or other funds maintained with a creditor depository institution; *provided* that no such deposit account is a dedicated cash collateral account or is subject to restrictions against access by the depositor in excess of those set forth by regulations promulgated by the Board and no such deposit account is intended by the applicable Borrower to provide collateral to the depository institution; and (e) easements, restrictions, servitudes, permits, conditions, covenants, exceptions or reservations in any property of any Borrower for the purpose of roads, pipelines, transmission lines, transportation lines, distribution lines for the removal of gas, oil, coal or other minerals or timber, and other like purposes, or for the joint or common use of real estate, rights of way, facilities and equipment, that do not secure

any monetary obligations and which in the aggregate do not materially impair the use of such property for the purposes of which such property is held by any Borrower or materially impair the value of such property subject thereto; *provided* that Liens described in clauses (a) through (d) shall remain "Excepted Liens" only for so long as no action to enforce such Lien has been commenced and no intention to subordinate the first priority Lien granted in favor of the Lender is to be hereby implied or expressed by the permitted existence of such Excepted Liens.

"Final Order" has the meaning assigned to such term in Section 10.01(i).

"Financing Orders" means, collectively, the Interim Order and the Final Order.

"GAAP" means generally accepted accounting principles in the United States of America as in effect from time to time.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Governmental Requirement" means any law, statute, code, ordinance, order, determination, rule, regulation, judgment, decree, injunction, franchise, permit, certificate, license, rules of common law, authorization or other directive or requirement, whether now or hereinafter in effect, of any Governmental Authority, including any such Governmental Requirement relating to offshore drilling.

"Hanson DIP Account" means deposit account number 3359329615 at Bank of America, N.A., P.O. Box 105713, Atlanta, GA 30348.

"Highest Lawful Rate" means the maximum nonusurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the Loan or on other Obligations under laws applicable to the Lender which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable laws allow as of the date hereof.

"Indemnified Taxes" means, with respect to any Person, Taxes owing by or imposed on such Person other than Taxes imposed on (or measured by) such Person's net income or profits (however denominated) and franchise taxes imposed on it by the United States of America.

"Interim Order" has the meaning assigned to such term in Section 6.01(b).

"Kaiser DIP Account" means deposit account number 237025405660 at Bank of America, N.A., 100 N. Tryon St., Suite 170, Charlotte, North Carolina 28200.

"Lender" has the meaning provided in the first paragraph of this Agreement.

"LIBOR Rate" means the variable per annum rate of interest equal to the London Interbank Offered Rate ("LIBOR") for deposits in U.S. Dollars for a term of three months as reported by Bloomberg Business News from time to time; provided, however, that if LIBOR is no longer published in Bloomberg Business News or if the method for compiling LIBOR is, as determined in the Lender's sole discretion, materially altered, the Lender shall select such replacement of LIBOR as the Lender in its sole discretion determines most closely approximates LIBOR; provided, further, that any change in the LIBOR Rate due to a change in LIBOR as published in Bloomberg Business News or otherwise shall be effective on the effective date of such change in LIBOR.

"Lien" means any interest in property securing an obligation owed to, or a claim by, a Person other than the owner of the property, whether such interest is based on the common law, statute or contract, and whether such obligation or claim is fixed or contingent, and including but not limited to the lien or security interest arising from a mortgage, encumbrance, pledge, security agreement, conditional sale or trust receipt or a lease, consignment or bailment for security purposes.

"Loan" and "Loans" each has the meaning assigned to such term in Section 2.01.

"Loan Documents" means this Agreement, the Financing Orders and any other agreement, instrument or document executed by any Borrower in connection with this Agreement.

"Material Adverse Change" means a material adverse change in, or material adverse effect on, (a) the business, operations, properties, assets, condition (financial or otherwise) or prospects of any Borrower (other than as may customarily result as a consequence of the commencement of the Bankruptcy Cases), (b) the ability of any Borrower to perform any of its payment or other material obligations under any Financing Order or Loan Document, (c) the validity or enforceability of any Loan Document or (d) the rights and remedies of or benefits available to the Lender under any Financing Order or Loan Document.

"Maturity Date" means the earliest of (a) October 1, 2018, (b) October 31, 2016, if the Final Order has not been entered on or prior to such date, (c) the consummation of a sale of all or substantially all of the assets of the Borrowers, (d) the filing of a plan of reorganization or liquidation that is not approved by the Lender, and (e) five (5) Business Days after the Borrowers receive written notice from the Lender that an Event of Default has occurred.

"Obligations" means any and all principal, interest, fees, indemnities, reimbursement obligations and other amounts owing or to be owing by any Borrower (whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter arising) to the Lender hereunder or under any other Loan Document.

"Other Taxes" means any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement and any other Loan Document.

"Permitted Variance" has the meaning assigned to such term in Section 9.05(b).

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Petition Date" means September 30, 2016.

"Responsible Officer" means, as to any Person, the president, chief financial officer, principal accounting officer, treasurer or controller of such Person.  Unless otherwise specified, all references to a Responsible Officer herein shall mean a Responsible Officer of any Borrower.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any Governmental Authority.

Section 1.02   Terms Generally; Rules of Construction.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" as used in this Agreement shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth in the Loan Documents), (b) any reference herein to any law shall be construed as referring to such law as amended, modified, codified or reenacted, in whole or in part, and in effect from time to time, (c) any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to the restrictions contained in the Loan Documents), (d) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof (e) with respect to the determination of any time period, the word "from" means "from and including" and the word "to" means "to and including" and (f) any reference herein to Articles, Sections, Annexes, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Annexes, Exhibits and Schedules to, this Agreement.  No provision of this Agreement or any other Loan Document shall be interpreted or construed against any Person solely because such Person or its legal representative drafted such provision.

**ARTICLE II**
**THE LOAN**

Section 2.01   Generally. Subject to the terms and conditions set forth herein and in the Financing Orders and upon entry by the Bankruptcy Court of the applicable Financing Order, the Lender agrees to make revolving loans (each, a "Loan" and collectively, the "Loans") to the Borrowers at any time prior to the Maturity Date as provided herein from time to time up to a maximum principal amount outstanding not to exceed (a) $2,000,000 (or such lesser amount approved in the Interim Order) at any time during the period from the date on which the Bankruptcy Court enters the Interim Order until the earlier of the date on which the Bankruptcy Court enters the Final Order and the Maturity Date and (b) $45,000,000 (or such lesser amount

approved in the Final Order) at any time on and after the Bankruptcy Court enters the Final Order.  Amounts borrowed and repaid may be re-borrowed in accordance with the terms hereof at any time prior to the Maturity Date.

Section 2.02   Evidence of Indebtedness.   The Lender shall maintain a record of the outstanding principal amount of the Loans, the interest accrued thereon and all other details relating to payment of the Loans, which record shall be *prima facie* evidence of the existence and amounts of the Obligations recorded therein; *provided*, that the failure of the Lender to maintain such a record or any error (other than manifest error) therein shall not in any manner affect the obligation of any Borrower to repay or prepay the Loans or the other Obligations in accordance with the terms of this Agreement.

Section 2.03   Loan Requests and Funding.   The Lender shall not be required or otherwise obligated to make any Loan hereunder unless a Borrower submits a request for a Loan to the Lender's treasury department by 12:00 p.m., Dallas, Texas time, at least two Business Days in advance of the date on which such Borrower has requested such Loan to be made. Borrower will make each such request using the form attached hereto as Exhibit A. If a Loan is requested in accordance with the foregoing and is (after giving effect to the making of such Loan) not in excess of the maximum amounts available to be borrowed under Section 2.01 (or any Financing Order) and if no Default has occurred and is continuing (or would occur upon the making of any such Loan), the Lender will make such Loan available to the Borrower that has requested such Loan by promptly crediting the amount of such requested Loan, in U.S. dollars in immediately available funds, to the DIP Account of such Borrower. Neither DIP Account shall contain funds or other amounts other than proceeds of the Loans (and any interest accrued on the funds on deposit in such DIP Account). The Hanson DIP Account shall not at any time contain proceeds of Loans made to Kaiser. The Kaiser DIP Account shall not at any time contain proceeds of Loans made to Hanson.

Section 2.04   Use of Proceeds.   Proceeds of the Loans may only be used for disbursements made by the Borrowers in accordance with the Budget (subject to Permitted Variances) to finance costs associated with the Chapter 11 Cases and the general corporate and ongoing working capital needs of the Borrowers, which are, in each case, identified in the Budget.  Notwithstanding anything to the contrary herein, neither the Carve-Out nor any Loan may be used (a) to investigate or challenge the validity, perfection, priority, extent or enforceability of this Agreement or the Obligations, or the Liens or security interests securing the Obligations, (b) to commence or pursue a cause of action or lawsuit against the Lender or any of its Affiliates, or (c) for any purpose otherwise prohibited under Section 9.04.

## ARTICLE III
## PAYMENTS OF PRINCIPAL AND INTEREST

Section 3.01   Repayment.

(a)   The Loans shall mature and be due and payable on the Maturity Date, and the Borrowers hereby unconditionally promise to pay to the Lender the outstanding principal amount of the Loans, all accrued and unpaid interest thereon and any other outstanding Obligations hereunder (such aggregate amount, the "Balance Due") on the Maturity Date.

(b)      At such time as the Loans shall become due and payable, whether on the Maturity Date or, if earlier, upon acceleration of the maturity of the Loans pursuant to Section 10.02, the Balance Due shall be payable in full in dollars when due.

(c)      The Obligations of the Borrowers shall be joint and several in nature.

Section 3.02    Interest.

(a)      Loans.  Except as provided in Section 3.02(b), the outstanding principal balance of the Loans shall bear interest at a rate per annum equal to the LIBOR Rate plus 2.50%.

(b)      Default Interest.  Upon the occurrence and during the continuance of an Event of Default, the outstanding principal balance of the Loans shall bear interest at a rate per annum equal to the LIBOR Rate plus 5.00%.

(c)      Interest Payment Dates.  Accrued interest on the Loans shall be payable in cash in arrears on the first Business Day of each calendar month and on the Maturity Date.

(d)      Interest Rate Computations.  All interest hereunder shall be computed on the basis of a year of 365 days.

Section 3.03    Prepayments.

(a)      Optional Prepayments.  The Borrowers may prepay in cash all or any portion of the Loans and any interest thereon prior to the Maturity Date.  The Borrowers will notify the Lender not later than 12:00 p.m., Dallas, Texas time, on the Business Day prior to the Business Day the prepayment is to be made.

(b)      Mandatory Prepayments.  Upon the receipt by the Borrowers of cash proceeds from any of the following events (net of reasonable fees and out-of-pocket expenses paid to third parties other than an Affiliate of any Borrower in connection with such event determined reasonably and in good faith by a financial officer of such Borrower, but subject to the reasonable approval of the Lender): any asset sales, Casualty Events, condemnation proceedings, litigation or other legal recovery or settlement, the Borrowers shall make a mandatory prepayment of the Loans within three days after receiving such cash proceeds in an amount equal to 100% of such cash proceeds.

Section 3.04    Payments by the Borrowers.  The Borrowers shall make each cash payment required to be made by it hereunder (whether of principal, interest, or fees, or otherwise) prior to 4:00 p.m., Dallas, Texas time, on the date when due, in immediately available funds, without defense, deduction, recoupment, set-off or counterclaim.  Any amounts received after such time on any date may, in the discretion of the Lender, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such cash payments shall be made to a bank account designated by the Lender.  If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All cash payments hereunder shall be in dollars.

Section 3.05   <u>Application of Insufficient Payments</u>.   If at any time funds are received by and available to the Lender for payment on the Obligations are insufficient to pay fully all amounts of principal, interest, fees and expenses then due hereunder, such funds shall be applied (i) first, towards payment of interest and fees then due hereunder and (ii) second, towards payment of principal then due hereunder.

## ARTICLE IV
## COLLATERAL SECURITY AND ADMINISTRATIVE PRIORITY

Section 4.01   <u>Collateral; Security Interest</u>.

(a)   Pursuant to and as provided in the Financing Orders, as security for the full and timely payment of all of the Obligations, each Borrower collaterally assigns, pledges and transfers and grants to the Lender a security interest in and to and Lien on all of its right, title and interest in, to and under all the Collateral, whether now owned or hereafter acquired, now existing or hereafter created and wherever located.

(b)   Pursuant to and as provided in the Financing Orders, the provisions of Section 4.01(a) and the Financing Orders are effective to create in favor of the Lender legal, valid, perfected and enforceable Lien on and security interest in all right, title and interest in the Collateral, enforceable against each Borrower and any other Person and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements.

(c)   Pursuant to and as provided in the Financing Orders, the Loans and all other Obligations shall at all times:

(i)   *Super-priority*: pursuant to section 364(c)(1) of the Bankruptcy Code, constitute allowed superpriority administrative expense claims in the Chapter 11 Cases, having priority over all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all expenses and claims of the Borrowers, whether heretofore or hereafter incurred, including, but not limited to, the kind specified in sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 726 or 1114 of the Bankruptcy Code, subject only to the Carve-Out;

(ii)   *Unencumbered property*: pursuant to section 364(c)(2) of the Bankruptcy Code, be secured by valid, perfected, first-priority security interests in and liens on all of the Collateral that is not subject to non-avoidable, valid and perfected liens in existence as of the Petition Date, subject only to the Carve-Out;  and

(iii)   *Junior liens*:   pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by valid junior perfected security interests in and liens on all of the Collateral that is subject to non-avoidable, valid and perfected liens in existence as of the Petition Date, subject only to the Carve-Out.

(d)   All Liens on the Collateral in favor of the Lender shall be senior in priority to any security interests in or Liens on the Collateral, except as otherwise permitted above.

(e)       Pursuant to and as provided in the Financing Orders, (i) the Liens and security interests granted herein shall be deemed valid, enforceable and perfected by entry of the Financing Orders and (ii) no financing statement, notice of Lien, mortgage, deed of trust or similar instrument in any jurisdiction or filing office need be filed or any other action taken in order to validate and perfect the Liens and security interests granted by or pursuant to this Agreement or the Financing Orders.

## ARTICLE V
## TAXES

Section 5.01    Taxes.

(a)       Payments Free of Taxes.  Any and all payments by or on account of any obligation of any Borrower under any Loan Document shall be made free and clear of and without deduction for any Indemnified Taxes or Other Taxes; *provided* that if any Borrower shall be required to deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 5.01(a)), the Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) such Borrower shall make such deductions and (iii) such Borrower shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b)       Indemnification by the Borrowers.  The Borrowers shall indemnify the Lender, within 10 days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by the Lender on or with respect to any payment by or on account of any obligation of any Borrower hereunder (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate of the Lender as to the amount of such payment or liability under this Section shall be delivered to the Borrowers and shall be conclusive absent manifest error.

## ARTICLE VI
## CONDITIONS PRECEDENT

Section 6.01    Conditions Precedent to Effectiveness of Agreement.  This Agreement and the obligation of the Lender to make the Loans hereunder shall not become effective until the date on which each of the following conditions is satisfied:

(a)       The Lender shall have received from each party hereto counterparts of this Agreement signed on behalf of such party.

(b)       The Bankruptcy Court shall have entered an order on an interim basis, approving, among other things, the transactions outlined herein and granting the priority liens and administrative expense claims referred to above, which order shall be in form and substance acceptable to the Lender (the "Interim Order") and shall not have been stayed, reversed, vacated or otherwise modified or amended.

(c)     There shall have occurred no event or circumstance that has resulted in a Material Adverse Change.

(d)     All of the representations and warranties set forth herein or in the Interim Order shall be true and correct in all material respects.

(e)     No Default shall have occurred and be continuing.

(f)     Other than the Chapter 11 Cases, there shall exist no action, suit, investigation, litigation or proceeding pending in any court or before any arbitrator or governmental instrumentality that (i) could reasonably be expected to result in a Material Adverse Change or, if adversely determined, could reasonably be expected to result in a Material Adverse Change or (ii) restrains or prevents, or imposes or could reasonably be expected to impose materially adverse conditions upon the Collateral, this Agreement, any of the other Loan Documents or the transactions contemplated hereby or thereby or threatens to do any of the foregoing.

(g)     The Lender shall have received a copy of a budget acceptable to the Lender in its sole discretion (together with any and all updates, supplements and/or modifications to such budget that have been approved in advance by the Lender, collectively, the "Budget"), which describes in line-item detail the expected receipts and permitted disbursements of the Borrowers for the applicable period covered by the Budget. The initial Budget is attached hereto as Exhibit B.

(h)     The Lender shall have received such other documents as the Lender may reasonably request.

Section 6.02   Conditions Precedent to the Loans.  The obligation of the Lender to make each Loan hereunder shall not become effective until the date on which each of the following conditions is satisfied:

(a)     All of the conditions set forth in Section 6.01 shall have been satisfied.

(b)     The Lender shall have received a notice from the Borrowers indicating the amount of such Loan, which notice shall constitute a representation by the Borrowers as of the date of such Loan that the conditions contained in this Section 6.02 have been satisfied as of the date of such Loan.

(c)     All of the representations and warranties set forth in the Loan Documents and in the Financing Orders shall be true and correct in all material respects.

(d)     No Default shall have occurred and be continuing.

(e)     With respect to any Loan to be funded more than 30 days after the Petition Date, the Bankruptcy Court shall have entered the Final Order, which shall not have been stayed, reversed, vacated or otherwise modified or amended.

# ARTICLE VII
# REPRESENTATIONS AND WARRANTIES

The Borrowers represent and warrant to the Lender that:

Section 7.01    Organization; Powers.  Each Borrower is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, has all requisite corporate power and authority, and has all material governmental licenses, authorizations, consents and approvals necessary, to own its assets and to carry on its business as now conducted, and is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required, except where failure to have such power, authority, licenses, authorizations, consents, approvals and qualifications could not reasonably be expected to result in a Material Adverse Change.

Section 7.02    Authority; Enforceability.  The execution, delivery and performance by each Borrower of each of the Loan Documents are within its corporate powers and have been duly authorized by all necessary corporate action.  Each Loan Document has been duly executed and delivered by each Borrower party thereto and constitutes a legal, valid and binding obligation of such Borrower, as applicable, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 7.03    Approvals; No Conflicts.  The execution, delivery and performance by each Borrower of each of the Loan Documents (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority to be obtained or made by such Borrower pursuant to any statute, rule or regulation applicable to it or any other third Person (including shareholders or any class of directors, whether interested or disinterested, of such Borrower or any other Person), nor is any such consent, approval, registration, filing or other action necessary for the validity or enforceability of any Loan Document or the consummation of the transactions contemplated thereby, except such as have been obtained or made and are in full force and effect other than (i) approvals of the Bankruptcy Court, and (ii) those third party approvals or consents which, if not made or obtained, would not cause a Default hereunder, could not reasonably be expected to result in a Material Adverse Change or do not have an adverse effect on the enforceability of the Loan Documents, (b) will not violate any applicable law or regulation or the certificate of formation, operating agreement or other organizational documents of such Borrower or any order of any Governmental Authority which is binding upon such Borrower or its properties, (c) will not violate or result in a default under any indenture, agreement or other instrument binding upon such Borrower or its properties, or give rise to a right thereunder to require any payment to be made by such Borrower and (d) will not result in the creation or imposition of any Lien on any property of such Borrower (other than the Liens created by the Loan Documents and the Financing Orders).

Section 7.04    Litigation. Other than as set forth in the schedules, statements and other filings of any Borrower made with the Bankruptcy Court (collectively, the "Bankruptcy Court Schedules"), there are no actions, suits, investigations or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of any Borrower, threatened

against or affecting any Borrower (i) as to which there is a reasonable possibility of an adverse determination that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Change, or (ii) that involve any Loan Document.

Section 7.05   Compliance with the Laws and Agreements; No Defaults.

(a)   Each Borrower is in compliance with all Governmental Requirements applicable to it or its property and all agreements and other instruments binding upon it or its property, and possesses all licenses, permits, franchises, exemptions, approvals and other governmental authorizations necessary for the ownership of its property and the conduct of its business, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Change.

(b)   No Default has occurred and is continuing.

Section 7.06   Investment Company Act.  No Borrower is an "investment company" or a company "controlled" by an "investment company," within the meaning of, or subject to regulation under, the Investment Company Act of 1940, as amended.

Section 7.07   Taxes.  Each Borrower has timely filed or caused to be filed all Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it, except (a) Taxes that are being contested in good faith by appropriate proceedings and for which the applicable Borrower has set aside on its books adequate reserves in accordance with GAAP or (b) to the extent that the failure to do so could not reasonably be expected to result in a Material Adverse Change.  Except as described in Schedule D of the Bankruptcy Court Schedules, no tax lien has been filed against any Borrower in any public records, such as Uniform Commercial Code records and real property records.

Section 7.08   Disclosure; No Material Misstatements.  Each Borrower has provided to the Lender all information reasonably requested of it for timely delivery prior to the Closing Date. None of the Bankruptcy Court Schedules or the reports, financial statements, certificates or other information (including the Bankruptcy Court Schedules listing the property and debts of any Borrower) furnished by or on behalf of any Borrower to the Lender in connection with the negotiation of this Agreement or any other Loan Document or delivered hereunder or under any other Loan Document (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; *provided* that, with respect to projected financial information, if any, each Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time

Section 7.09   <u>Material Agreements</u>. All material leases, licenses and agreements necessary for the conduct of each Borrower's business during the term of this Agreement are valid and subsisting, in full force and effect, and there exists no default or event or circumstance which with the giving of notice or the passage of time or both would give rise to a default under any such agreement or agreements, which could reasonably be expected to have a Material Adverse Change.

Section 7.10   <u>Use of Loan Proceeds</u>. No Borrower is engaged principally, or as one of its or its important activities, in the business of extending credit for the purpose, whether immediate, incidental or ultimate, of buying or carrying margin stock (within the meaning of Regulation T, U or X of the Board). No part of the proceeds of the Loans will be used for any purpose which violates the provisions of Regulations T, U or X of the Board.

**ARTICLE VIII**
**AFFIRMATIVE COVENANTS**

Until the principal of and interest on the Loans and all fees payable hereunder and all other amounts payable under the Loan Documents shall have been paid in full, each Borrower covenants and agrees with the Lender that:

Section 8.01   <u>Budget and Other Reports</u>.

(a)   (i) By Wednesday of each calendar week, beginning with the report for the first full week ended after the Petition Date, the Borrowers will deliver to the Lender a report, in form and substance satisfactory to the Lender, setting forth actual cash receipts and disbursements for the preceding calendar week on a weekly and cumulative basis since the Petition Date, and (ii) upon the Lender's request, an update to the Budget, in form and substance satisfactory to the Lender, setting forth, among other things, any changes in the Budget reasonably anticipated by the Borrowers (it being understood that no such changes shall become part of the Budget unless approved in advance by the Lender in writing).

(b)   Each Borrower will furnish to the Lender promptly following any request therefor, all information regarding the operations, business affairs and financial condition of such Borrower, or compliance with the terms of this Agreement or any other Loan Document, as the Lender may reasonably request.

Section 8.02   <u>Notices of Material Events</u>. The Borrowers will promptly furnish to the Lender written notice after its knowledge of any of the following:

(a)   the occurrence of any Event of Default;

(b)   any pleading filed with the Bankruptcy Court seeking relief from stay or conversion or dismissal of any Chapter 11 Case (together with a copy of such pleading);

(c)   any proposed sale of any of the Collateral (including with such notice copies of drafts of all instruments and agreements applicable to any such sale), which shall specify the identity of the proposed purchaser, the terms of the proposed sale and the expected date of closing, subject to Bankruptcy Court approval; and

(d)   any other development that results in, or could reasonably be expected to result in, a Material Adverse Change.

Section 8.03   <u>Existence; Conduct of Business</u>.   Each Borrower will do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, privileges and franchises material to the conduct of its business and maintain, if necessary, its qualification to do business in each other jurisdiction in which the ownership of its properties requires such qualification, except where the failure to so qualify could not reasonably be expected to have a Material Adverse Change.

Section 8.04   <u>Books and Records; Inspection Rights</u>.   Each Borrower will keep proper books of record and account according to reasonable practices used by companies that are winding down a bankruptcy estate in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities. Each Borrower will permit any representatives designated by the Lender, upon reasonable prior notice, to visit and inspect its properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as reasonably requested.

Section 8.05   <u>Compliance with Laws</u>.   Each Borrower will comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Change.

Section 8.06   <u>Further Assurances</u>. Each Borrower at its sole expense will promptly execute and deliver to the Lender all such other documents, agreements and instruments reasonably requested by the Lender to comply with, cure any defects or accomplish the conditions precedent, covenants and agreements of each Borrower in the Loan Documents or to further evidence and more fully describe the collateral intended as security for the Obligations, or to correct any omissions in this Agreement or the other Loan Documents, or to state more fully the obligations secured therein, or to perfect, protect or preserve any Liens under applicable state law that have been created pursuant to this Agreement and/or the Financing Orders (including requiring control agreements with respect to deposit accounts and/or securities accounts of any Borrower) or any of the other Loan Documents or the priority thereof, or to make any recordings, file any notices or obtain any consents, all as may be reasonably necessary or appropriate, in the sole discretion of the Lender, in connection therewith. Each Borrower hereby authorizes the Lender to file one or more financing or continuation statements, and amendments thereto, relative to all or any part of the Collateral including a collateral description of "all assets" or "all property" of such Borrower.

## ARTICLE IX
## NEGATIVE COVENANTS

Until the principal of and interest on the Loans and all fees payable hereunder and all other amounts payable under the Loan Documents shall have been paid in full, each Borrower covenants and agrees with the Lender that:

Section 9.01   <u>Debt</u>.  No Borrower will incur, create, assume or suffer to exist any Debt, except (a) the Loans and any other Obligations incurred under this Agreement, (b) Debt of such Borrower existing on the date hereof that is disclosed in the Bankruptcy Court Schedules or any claim filed or asserted against such Borrower, and (c) endorsements of negotiable instruments for collection in the ordinary course of business.

Section 9.02   <u>Liens</u>.  No Borrower will create, incur, assume or permit to exist any Lien on any of its properties (now owned or hereafter acquired), except (a) Liens securing the Obligations, (b) Excepted Liens, (c) Liens of such Borrower existing on the date hereof that are disclosed in the Bankruptcy Court Schedules and (d) the Carve-Out.

Section 9.03   <u>Mergers, Acquisitions, Etc</u>.  No Borrower will (a) merge into or with or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, (b) dissolve or cease to exist, or (c) form or acquire any subsidiary or acquire or enter into any lease of any material assets.

Section 9.04   <u>Proceeds of the Loans</u>.   None of the proceeds of the Loans or the Collateral shall be used to pay any fees or expenses incurred in connection with the assertion of or joinder in any claim, counterclaim, action, contested matter, objection, defense or other proceeding, the purpose of which is to seek or the result of which would be to obtain any order, judgment, declaration, or similar relief (i) objecting or contesting the validity or enforceability of the Financing Orders or the Loan Documents, (ii) invalidating, setting aside, avoiding or subordinating, in whole or in part, the Loans or the Liens and security interests in any of the Collateral granted to the Lender hereunder or under the Loan Documents or the Financing Orders; (iii) declaring the Financing Orders and/or any of the Loan Documents to be invalid, not binding or unenforceable in any respect, (iv) objecting, preventing, enjoining, hindering or otherwise delaying the Lender's enforcement of any of its rights and remedies under the Financing Orders and/or the Loan Documents or any realization upon any Collateral (unless (x) any Borrower is contesting or disputing whether an Event of Default has occurred or (y) such enforcement or realization is in direct violation of an explicit provision in any of the Financing Orders); (v) declaring any Liens granted or purported to be granted hereunder or under the Loan Documents or the Financing Orders to have a priority other than the priority set forth herein or therein; (vi) objecting to the amount or method of calculation by the Lender of any of the principal and/or interest owed or owing on the Loans; (vii) investigating, asserting or prosecuting any claim or cause of action against the Lender or its Affiliates; or (viii) seeking to modify any of the rights of the Lender under the Financing Orders.

Section 9.05   <u>Budget</u>.

(a)      No Borrower will make or commit or agree to make any expenditures or disbursements not included in the Budget then in effect unless otherwise permitted in clause (b) below as a Permitted Variance.

(b)      No Borrower will make any actual expenditures or disbursements during any calendar week period beginning with the calendar week ending October 8, 2016, that, in the aggregate on a weekly cumulative basis, will be more than 20% in excess of the aggregate weekly cumulative amount of all expenditures and disbursements set forth in the then effective

Budget (and, if applicable, any prior Budget covering days, weeks, months or other periods not covered by the Budget then in effect).  All such expenditures and disbursements permitted to be made in excess of amounts set forth in the Budget pursuant to this Section 9.05(b) are referred to herein as the "Permitted Variance".  For the avoidance of doubt, the calendar week cumulative periods shall be tested as follows:  for the first weekly testing period, week 1 (i.e., the calendar week ending October 8, 2016) shall be tested; for the second weekly testing period, weeks 1 - 2 shall be tested in aggregate; for the third weekly testing period, weeks 1 - 3 shall be tested in the aggregate; and the for the fourth weekly testing period, weeks 1 - 4 shall be tested in the aggregate; and so on.

**ARTICLE X**
**EVENTS OF DEFAULT; REMEDIES**

Section 10.01  Events of Default.  One or more of the following events shall constitute an "Event of Default":

(a)     the Borrowers shall fail to pay any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof, by acceleration or otherwise;

(b)     the Borrowers shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in Section 10.01(a)) payable under any Loan Document, when and as the same shall become due and payable;

(c)     any representation or warranty made or deemed made by or on behalf of any Borrower in or in connection with any Loan Document or any amendment or modification of any Loan Document or waiver under such Loan Document, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect in any material respect when made or deemed made;

(d)     any Borrower shall fail to observe or perform any covenant, condition or agreement contained in Article III, Article IV, Article VIII, or Article IX;

(e)     any Borrower shall fail to observe or perform any covenant, condition or agreement contained in this Agreement (other than those specified in Section 10.01(a), Section 10.01(b), Section 10.01(c) or Section 10.01(d)) or any other Loan Document, and such failure shall continue unremedied for a period of 30 days after the earlier to occur of (A) notice thereof from the Lender to the Borrowers or (B) a Responsible Officer of the Borrowers otherwise becoming aware of such default;

(f)     (i) any Borrower shall fail to comply with any of the provisions of the Financing Orders; (ii) the Chapter 11 Cases shall be dismissed or converted to a case under Chapter 7; (iii) there shall be filed by any Borrower any motion to sell all or a substantial part of the Collateral to any person other than the Lender or an Affiliate of the Lender; (iv) without the Lender's prior written consent, any Borrower shall file any motion to alter, amend, vacate, supplement, modify, or reconsider, in any respect, the Financing Orders or, without the Lender's prior written consent, any Financing Order is amended, vacated, stayed, reversed or otherwise

modified; (v) the Bankruptcy Court shall enter an order granting to any Person (other than the Lender) relief from the automatic stay to foreclose upon a Lien (or to accept a deed in lieu of foreclosure or the like) with respect to any property of any Borrower that has an aggregate book value in excess of $7,500 or to terminate or otherwise exercise remedies under any material agreement, document or instrument which is entered into after the Closing Date, whether or not it relates to any Debt; (vi) any Borrower shall file a motion or other request with the Bankruptcy Court seeking authority to use any cash proceeds of the Collateral or to obtain any financing under Section 364(c) or Section 364(d) of the Bankruptcy Code or otherwise secured by a Lien upon any Collateral or entitled to administrative priority status which is equal or senior to the obligations (in each case (A) without the Lender prior written consent or (B) if such motion fails to contemplate payment in full of the Obligations); (vii) the payment by any Borrower of any pre-petition Debt, other than as approved by the Bankruptcy Court and with the Lender's prior written consent; (viii) any Borrower shall submit any motion or other pleading in any Chapter 11 Case attacking the validity or enforceability of the Financing Orders or any of the Loan Documents; or (ix) a trustee shall be appointed in the Chapter 11 Cases.

(g)     the Loan Documents after delivery thereof shall for any reason, except to the extent permitted by the terms thereof, cease to be in full force and effect and valid, binding and enforceable in accordance with their terms against any Borrower or shall be repudiated by it, or cease to create a valid and perfected Lien of the priority required thereby on any of the collateral purported to be covered thereby, except to the extent permitted by the terms of this Agreement, or such Borrower shall so state in writing;

(h)     the allowance of any claim under Section 506(c) of the Bankruptcy Code against the Lender;

(i)     the Bankruptcy Court shall not have entered a final order, in form and substance acceptable to the Lender, on or before the date that is 30 days after the Petition Date, approving, among other things, the transactions outlined herein and granting the priority liens and administrative expense claims referred to herein (the "Final Order"), which shall not have been stayed, reversed, vacated or otherwise modified or amended; or

(j)     a Material Adverse Change shall occur.

Section 10.02  Remedies.

(a)     In the case of an Event of Default, at any time thereafter during the continuance of such Event of Default, the Lender may, on not less than three (3) Business Days' notice to counsel for the Borrowers, the United States Trustee (and counsel to any appointed official committee of unsecured creditors), take any or all of the following actions at the same or different times without further order of or application or motion to the Bankruptcy Court and without restriction or restraint by any stay under Sections 362 or 105 of the Bankruptcy Code: (i) declare the Lender's commitment to lend under Section 2.01 terminated, whereupon such commitment of the Lender shall forthwith terminate immediately without any other notice of any kind; (ii) declare the outstanding principal amount of the Loans to be due and payable, and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other Obligations accrued hereunder and under the other Loan

Documents, shall become due and payable immediately, without presentment, demand, protest, notice of intent to accelerate, notice of acceleration or other notice of any kind, all of which are hereby waived by the Borrowers; and/or (iii) exercise all rights and remedies available to it under any of the Loan Documents, the Financing Orders and any applicable law, including, without limitation, the Bankruptcy Code and the UCC.

## ARTICLE XI
## MISCELLANEOUS

Section 11.01  Notices.

(a)     All notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

(i)     if to the Borrowers, to c/o Three Rivers Management, Inc., Manor Oak One, Suite 200, 1910 Cochran Road, Pittsburgh, PA 15220. Attn: Chief Legal Counsel, Email: charles.mcchesney@trmi.biz, Fax: 412-208-8803, with a copy to Gregory Gordon, Esq., Jones Day, 2727 North Harwood Street, Dallas, Texas 75201 (Telecopy No. 214-969-5100).

(ii)     if to the Lender, to it Lehigh Hanson, Inc., 300 E John W. Carpenter Freeway, Suite 1645, Irving, TX 75062, Attn:  Vice President & General Counsel, Email:  william.venema@lehighhanson.com, Fax:  972-653-6185.

(b)     Notices and other communications to the Lender hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Lender.

(c)     Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto.  All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

Section 11.02  Waivers; Amendments. No failure on the part of the Lender to exercise and no delay in exercising, and no course of dealing with respect to, any right, power or privilege, or any abandonment or discontinuance of steps to enforce such right, power or privilege, under any of the Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under any of the Loan Documents preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies of the Lender hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to an agreement in writing entered into by the Borrowers and the Lender.

Section 11.03  Expenses, Indemnity; Damage Waiver.

(a)     The Borrowers shall pay all out-of-pocket expenses incurred by the Lender, including the fees, charges and disbursements of any counsel for the Lender, in

connection with the enforcement of this Agreement, the Financing Orders or any other Loan Document in the event of the occurrence of an Event of Default, including, without limitation, all such out-of-pocket expenses incurred during any workout or restructuring of any Loan.

(b)     The Borrowers agree to indemnify and hold harmless the Lender and each of its affiliates, partners, officers, directors, employees, agents, advisors, controlling persons, members and successors and assigns (each, an "Indemnitee") from and against any and all losses, claims, damages, liabilities and expenses to which any such Indemnitee may become subject arising out of or in connection with this Agreement, the Financing Orders or any other Loan Document or any related transaction or any claim, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any such Indemnitee is a party thereto (and regardless of whether such matter is initiated by a third party or any Borrower or any of its affiliates or shareholders), and to reimburse each such Indemnitee upon demand for any reasonable legal or other reasonable out-of-pocket expenses incurred in connection with investigating or defending any of the foregoing; *provided* that the foregoing indemnity will not, as to any Indemnitee, apply to losses, claims, damages, liabilities or related expenses to the extent they are found by a final, nonappealable judgment of a court of competent jurisdiction to arise from the willful misconduct or gross negligence of such Indemnitee.  Notwithstanding any other provision of this Agreement, none of the Borrowers or any Indemnitee shall be liable for any indirect, special, punitive or consequential damages in connection with its activities related to this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the Loans or the use of the proceeds thereof.

Section 11.04 Successors and Assigns.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Borrower may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Lender (and any attempted assignment or transfer by any Borrower without such consent shall be null and void).

Section 11.05 Survival; Revival; Reinstatement.

(a)     All covenants, agreements, representations and warranties made by each Borrower herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the making of the Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid. The provisions of Section 5.01 and Section 11.03 shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of each Loan or the termination of this Agreement, any other Loan Document or any provision hereof or thereof.

(b)     To the extent that any payments on the Obligations or proceeds of any collateral are subsequently invalidated, declared to be fraudulent or preferential, set aside or

required to be repaid to a trustee, debtor, receiver or other Person under any bankruptcy law, common law or equitable cause, then to such extent, the Obligations so satisfied shall be revived and continue as if such payment or proceeds had not been received and the Lender's and the Lender' Liens, security interests, rights, powers and remedies under this Agreement and each Loan Document shall continue in full force and effect.  In such event, each Loan Document shall be automatically reinstated and the Borrowers shall take such action as may be reasonably requested by the Lender to effect such reinstatement.

Section 11.06   <u>Counterparts; Integration; Effectiveness</u>.

(a)     This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.

(b)     This Agreement, the Financing Orders and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and thereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof and thereof.  **THIS AGREEMENT, THE FINANCING ORDER AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES HERETO AND THERETO AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.   THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

(c)     Except as provided in Section 6.01, this Agreement shall become effective when it shall have been executed by the Lender and when the Lender shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy, facsimile or other similar electronic means shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 11.07   <u>Severability; Conflicts</u>.   Any provision of this Agreement or any other Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof or thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.  It is agreed that the provisions of this Agreement and of other Loan Documents shall be subject in all respects to the terms and provisions of the Financing Orders, and in the event that any provision in this Agreement or any other Loan Document is in direct conflict with, or inconsistent with, any provisions of the Financing Orders, the provisions of the Financing Orders shall govern and control.

Section 11.08   <u>Governing Law; Jurisdiction; Jury Trial Waiver.</u>

(a)   **THIS AGREEMENT AND THE NOTES SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS AND TO THE EXTENT APPLICABLE THE BANKRUPTCY CODE.**

(b)   All judicial proceedings brought against any Borrower arising out of or relating to this Agreement or any other Loan Document, or any Obligations hereunder and thereunder, may be brought in the Bankruptcy Court and, if the Bankruptcy Court does not have (or abstains from) jurisdiction, the courts of the State of Texas, the courts of the United States of America for the Northern District of Texas, and appellate courts from any thereof. Each Borrower hereby irrevocably and unconditionally: (a) submits for itself and its property in any such legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the non exclusive general jurisdiction of such the courts of the State of Texas, the courts of the United States of America for the Northern District of Texas, and appellate courts from any thereof; (b) consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same; (c) agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to each Borrower at its address set forth in Section 11.01 or at such other address of which the Lender shall have been notified pursuant thereto; and (d) waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section any special, exemplary, punitive or consequential damages.

(c)   **EACH BORROWER AND THE LENDER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.**

Section 11.09 <u>Headings</u>.  Article and Section headings used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 11.10 <u>Interest Rate Limitation</u>.  It is the intention of the parties hereto that the Lender shall conform strictly to usury laws applicable to it.  Accordingly, if the transactions contemplated hereby would be usurious as to the Lender under laws applicable to it (including the laws of the United States of America and the State of Texas or any other jurisdiction whose laws may be mandatorily applicable to the Lender notwithstanding the other provisions of this Agreement), then, in that event, notwithstanding anything to the contrary in any of the Loan Documents or any agreement entered into in connection with or as security for the Loans, it is agreed as follows: (i) the aggregate of all consideration which constitutes interest under law applicable to the Lender that is contracted for, taken, reserved, charged or received by the Lender under any of the Loan Documents or agreements or otherwise in connection with the Loans shall under no circumstances exceed the maximum amount allowed by such applicable law, and any excess shall be canceled automatically and if theretofore paid shall be credited by the Lender on the principal amount of the Obligations (or, to the extent that the principal amount of the

Obligations shall have been or would thereby be paid in full, refunded by the Lender to the Borrowers); and (ii) in the event that the maturity of the Loans is accelerated by reason of an election of the holder thereof resulting from any Event of Default under this Agreement or otherwise, or in the event of any required or permitted prepayment, then such consideration that constitutes interest under law applicable to the Lender may never include more than the maximum amount allowed by such applicable law, and excess interest, if any, provided for in this Agreement or otherwise shall be canceled automatically by the Lender as of the date of such acceleration or prepayment and, if theretofore paid, shall be credited by the Lender on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by the Lender to the Borrowers). All sums paid or agreed to be paid to the Lender for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by law applicable to the Lender, be amortized, prorated, allocated and spread throughout the stated term of each Loan evidenced by such Loan until payment in full so that the rate or amount of interest on account of such Loan hereunder does not exceed the maximum amount allowed by such applicable law.  If at any time and from time to time (i) the amount of interest payable to the Lender on any date shall be computed at the Highest Lawful Rate applicable to the Lender pursuant to this Section and (ii) in respect of any subsequent interest computation period the amount of interest otherwise payable to the Lender would be less than the amount of interest payable to the Lender computed at the Highest Lawful Rate applicable to the Lender, then the amount of interest payable to the Lender in respect of such subsequent interest computation period shall continue to be computed at the Highest Lawful Rate applicable to the Lender until the total amount of interest payable to the Lender shall equal the total amount of interest which would have been payable to the Lender if the total amount of interest had been computed without giving effect to this Section.

Section 11.11 <u>No Third Party Beneficiaries</u>.   This Agreement, the other Loan Documents, and the agreement of the Lender to make Loans hereunder are solely for the benefit of the Borrowers, and no other Person (including, without limitation, any obligor, contractor, subcontractor, supplier or materialman) shall have any rights, claims, remedies or privileges hereunder or under any other Loan Document against the Lender for any reason whatsoever. There are no third party beneficiaries (other than the Indemnitees as set forth in Section 11.03).

[SIGNATURES BEGIN NEXT PAGE]

The parties hereto have caused this Agreement to be duly executed as of the day and year first above written.


BORROWERS:                     **HANSON PERMANENTE CEMENT, INC.**


By: _____
Name:
Title:


**KAISER GYPSUM COMPANY, INC.**


By: _____
Name:
Title:

LENDER:                    **LEHIGH HANSON, INC.**


By: _____
Name: _____
Title: _____

EXHIBIT A
NOTICE OF BORROWING

_____, 20____

Lehigh Hanson, Inc.
300 E. John W. Carpenter Freeway, Suite 1645
Irving TX 75062
Attention: [insert name], Treasury Department
Facsimile:
Email:

Ladies and Gentlemen:

The undersigned, [_____], a [_____] corporation (the "Company"), refers to the Debtor-In-Possession Loan and Security Agreement, dated as of [_____ ___, 20__] (as the same may be amended, restated or otherwise modified from time to time, the "Loan Agreement," the terms defined therein being used herein as therein defined), among the Company and [_____], a [_____] corporation, as co-borrowers, and Lehigh Hanson, Inc., a Delaware corporation (the "Lender"), as lender, and hereby gives you notice pursuant to Section 2.03 of the Loan Agreement, that the undersigned hereby requests a the Lender to make a Loan in the amount of $_____, on the following Business Day, which is at least two Business Days after the date of this notice: _____. As required under the Loan Agreement, please fund the Loan requested above by depositing immediately available funds in the amount of the requested Loan into the DIP Account of the Company. The undersigned hereby certifies that no Default has occurred and is continuing, or would result from the making of the above requested Loan.

Very truly yours,

[INSERT NAME OF BORROWER MAKING THE REQUEST]

By:_____
___
Name:
Title:

Acknowledged and joint and several liability with respect to the Loan requested above is hereby confirmed as of the date first written above:

[INSERT NAME OF OTHER BORROWER]

By:_____
Name:
Title:

NAI-1502013650v8

EXHIBIT B

INITIAL BUDGET

(See attached)

# **EXHIBIT 2**

## **(Budget)**

**Kaiser Gypsum Company, Inc., et al**[1]
**DIP Budget**
*Updated as of 9/30/2016*
*($000's)*

| | FORECAST | FORECAST | FORECAST | FORECAST | FORECAST | FORECAST | FORECAST | FORECAST | FORECAST | FORECAST | FORECAST | FORECAST | FORECAST |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Period # | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| Week/Month Ending | 10/1/16 | 10/8/16 | 10/15/16 | 10/22/16 | 10/29/16 | 11/5/16 | 11/12/16 | 11/19/16 | 11/26/16 | 12/3/16 | 12/10/16 | 12/17/16 | 12/24/16 |
| **Receipts** | | | | | | | | | | | | | |
| Lease Income | $0.0 | $1,262.4 | $0.0 | $0.0 | $0.0 | $0.0 | $1,262.4 | $0.0 | $0.0 | $0.0 | $1,262.4 | $0.0 | $0.0 |
| **Total Collections** | 0.0 | 1,262.4 | 0.0 | 0.0 | 0.0 | 0.0 | 1,262.4 | 0.0 | 0.0 | 0.0 | 1,262.4 | 0.0 | 0.0 |
| **Operating Disbursements** | | | | | | | | | | | | | |
| Shared service fees - TRMI[2] | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Reclamation | 0.0 | 537.9 | 0.0 | 0.0 | 0.0 | 0.0 | 537.9 | 0.0 | 0.0 | 0.0 | 537.9 | 0.0 | 0.0 |
| Capex | 0.0 | 1,146.9 | 0.0 | 0.0 | 0.0 | 0.0 | 1,146.9 | 0.0 | 0.0 | 0.0 | 1,146.9 | 0.0 | 0.0 |
| Interest Expense | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| US Trustee Fees | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.9 | 0.0 | 0.0 | 0.0 | 2.1 | 0.0 | 0.0 | 0.0 |
| **Total Operating Disbursements** | 0.0 | 1,684.8 | 0.0 | 0.0 | 0.0 | 0.9 | 1,684.8 | 0.0 | 0.0 | 2.1 | 1,684.8 | 0.0 | 0.0 |
| **Operating Cash Flow** | 0.0 | (422.4) | 0.0 | 0.0 | 0.0 | (0.9) | (422.4) | 0.0 | 0.0 | (2.1) | (422.4) | 0.0 | 0.0 |
| **Non-Operating Disbursements** | | | | | | | | | | | | | |
| **Total Restructuring Professional Fees Disbursements** | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 932.8 | 0.0 | 0.0 | 0.0 | 845.2 |
| **Net Cash Inflow / (Outflow)** | $0.0 | ($422.4) | $0.0 | $0.0 | $0.0 | ($0.9) | ($422.4) | $0.0 | ($932.8) | ($2.1) | ($422.4) | $0.0 | ($845.2) |
| Beginning Cash | 103.4 | 103.4 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Increase (decrease) in Cash | 0.0 | (3.4) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Ending Cash[3] | 103.4 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Beginning, Loan Balance | $0.0 | $0.0 | $419.0 | $419.0 | $419.0 | $419.0 | $419.9 | $842.3 | $842.3 | $1,775.1 | $1,777.1 | $2,199.5 | $2,199.5 |
| Loan (Pay down) / Advance | 0.0 | 419.0 | 0.0 | 0.0 | 0.0 | 0.9 | 422.4 | 0.0 | 932.8 | 2.1 | 422.4 | 0.0 | 845.2 |
| **Ending Loan Balance** | $0.0 | $419.0 | $419.0 | $419.0 | $419.0 | $419.9 | $842.3 | $842.3 | $1,775.1 | $1,777.1 | $2,199.5 | $2,199.5 | $3,044.7 |

Footnotes
1) Kaiser Gypsum Company, Inc. and Hanson Permanente Cement, Inc.
2) Amount reflects 2015 actual shared service costs allocated to the debtor entities.
3) Assumes required cash balance of $100k.

**Kaiser Gypsum Company, Inc., et al[1]**
**DIP Budget**
*Updated as of 9/30/2016*
*($000's)*

| | FORECAST | FORECAST | FORECAST | FORECAST | FORECAST | FORECAST | FORECAST | FORECAST | FORECAST | FORECAST | FORECAST | FORECAST | FORECAST | FORECAST |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Period # | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| Week/Month Ending | 12/31/16 | 1/7/17 | 1/14/17 | 1/21/17 | 1/28/17 | 2/4/17 | 2/11/17 | 2/18/17 | 2/25/17 | 3/4/17 | 3/11/17 | 3/18/17 | 3/25/17 | 4/1/17 |
| **Receipts** | | | | | | | | | | | | | | |
| Lease Income | $0.0 | $0.0 | $1,262.4 | $0.0 | $0.0 | $0.0 | $1,262.4 | $0.0 | $0.0 | $0.0 | $1,262.4 | $0.0 | $0.0 | $0.0 |
| **Total Collections** | 0.0 | 0.0 | 1,262.4 | 0.0 | 0.0 | 0.0 | 1,262.4 | 0.0 | 0.0 | 0.0 | 1,262.4 | 0.0 | 0.0 | 0.0 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Shared service fees - TRMI[2] | 542.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Reclamation | 0.0 | 0.0 | 2,276.3 | 0.0 | 0.0 | 0.0 | 2,276.3 | 0.0 | 0.0 | 0.0 | 3,035.0 | 0.0 | 0.0 | 0.0 |
| Capex | 0.0 | 0.0 | 1,366.0 | 0.0 | 0.0 | 0.0 | 1,366.0 | 0.0 | 0.0 | 0.0 | 1,366.0 | 0.0 | 0.0 | 0.0 |
| Interest Expense | 0.0 | 7.6 | 0.0 | 0.0 | 0.0 | 13.5 | 0.0 | 0.0 | 0.0 | 22.9 | 0.0 | 0.0 | 0.0 | 0.0 |
| US Trustee Fees | 0.0 | 0.0 | 0.0 | 0.0 | 20.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Total Operating Disbursements** | 542.0 | 7.6 | 3,642.3 | 0.0 | 20.0 | 13.5 | 3,642.3 | 0.0 | 0.0 | 22.9 | 4,401.0 | 0.0 | 0.0 | 0.0 |
| **Operating Cash Flow** | (542.0) | (7.6) | (2,379.9) | 0.0 | (20.0) | (13.5) | (2,379.9) | 0.0 | 0.0 | (22.9) | (3,138.6) | 0.0 | 0.0 | 0.0 |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | |
| **Total Restructuring Professional Fees Disbursements** | 0.0 | 0.0 | 0.0 | 0.0 | 1,354.5 | 0.0 | 0.0 | 0.0 | 582.4 | 0.0 | 0.0 | 0.0 | 582.4 | 0.0 |
| **Net Cash Inflow / (Outflow)** | ($542.0) | ($7.6) | ($2,379.9) | $0.0 | ($1,374.5) | ($13.5) | ($2,379.9) | $0.0 | ($582.4) | ($22.9) | ($3,138.6) | $0.0 | ($582.4) | $0.0 |
| Beginning Cash | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Increase (decrease) in Cash | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Ending Cash[3] | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Beginning, Loan Balance | $3,044.7 | $3,586.7 | $3,594.3 | $5,974.2 | $5,974.2 | $7,348.7 | $7,362.2 | $9,742.0 | $9,742.0 | $10,324.4 | $10,347.3 | $13,485.9 | $13,485.9 | $14,068.3 |
| Loan (Pay down) / Advance | 542.0 | 7.6 | 2,379.9 | 0.0 | 1,374.5 | 13.5 | 2,379.9 | 0.0 | 582.4 | 22.9 | 3,138.6 | 0.0 | 582.4 | 0.0 |
| **Ending Loan Balance** | $3,586.7 | $3,594.3 | $5,974.2 | $5,974.2 | $7,348.7 | $7,362.2 | $9,742.0 | $9,742.0 | $10,324.4 | $10,347.3 | $13,485.9 | $13,485.9 | $14,068.3 | $14,068.3 |

Footnotes
1) Kaiser Gypsum Company, Inc. and Hanson Permanente Cement, Inc.
2) Amount reflects 2015 actual shared service costs allocated to the debtor entities.
3) Assumes required cash balance of $100k.

**Kaiser Gypsum Company, Inc., et al**[1]
**DIP Budget**
*Updated as of 9/30/2016*
*($000's)*

| | FORECAST | FORECAST | FORECAST | FORECAST | FORECAST | FORECAST |
|---|---|---|---|---|---|---|
| Period # | 1 | 2 | 3 | 4 | 5 | 6 |
| Week/Month Ending | Apr-17 | May-17 | Jun-17 | Jul-17 | Aug-17 | Sep-17 |
| | | | | | | |
| **Receipts** | | | | | | |
| Lease Income | $1,262.4 | $1,262.4 | $1,262.4 | $1,262.4 | $1,262.4 | $1,262.4 |
| **Total Collections** | 1,262.4 | 1,262.4 | 1,262.4 | 1,262.4 | 1,262.4 | 1,262.4 |
| | | | | | | |
| **Operating Disbursements** | | | | | | |
| Shared service fees - TRMI[2] | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Reclamation | 2,276.3 | 758.8 | 758.8 | 758.8 | 758.8 | 758.8 |
| Capex | 1,366.0 | 1,366.0 | 1,366.0 | 1,366.0 | 1,366.0 | 1,366.0 |
| Interest Expense | 31.7 | 39.0 | 48.6 | 53.1 | 57.3 | 62.8 |
| US Trustee Fees | 20.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Total Operating Disbursements** | 3,694.0 | 2,163.8 | 2,173.4 | 2,197.9 | 2,182.0 | 2,187.6 |
| | | | | | | |
| **Operating Cash Flow** | (2,431.6) | (901.4) | (911.0) | (935.5) | (919.6) | (925.2) |
| | | | | | | |
| **Non-Operating Disbursements** | | | | | | |
| **Total Restructuring Professional Fees Disbursements** | 1,019.2 | 728.0 | 582.4 | 1,055.6 | 728.0 | 582.4 |
| | | | | | | |
| **Net Cash Inflow / (Outflow)** | ($3,450.8) | ($1,629.4) | ($1,493.4) | ($1,991.1) | ($1,647.6) | ($1,507.6) |
| | | | | | | |
| Beginning Cash | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Increase (decrease) in Cash | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Ending Cash[3] | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| | | | | | | |
| Beginning, Loan Balance | $14,068.3 | $17,519.1 | $19,148.5 | $20,641.9 | $22,633.0 | $24,280.6 |
| Loan (Pay down) / Advance | 3,450.8 | 1,629.4 | 1,493.4 | 1,991.1 | 1,647.6 | 1,507.6 |
| **Ending Loan Balance** | $17,519.1 | $19,148.5 | $20,641.9 | $22,633.0 | $24,280.6 | $25,788.2 |

Footnotes
1) Kaiser Gypsum Company, Inc. and Hanson Permanente Cement, Inc.
2) Amount reflects 2015 actual shared service costs allocated to the debtor entities.
3) Assumes required cash balance of $100k.

**Kaiser Gypsum Company, Inc., et al[1]**
**DIP Budget**
*Updated as of 9/30/2016*
*($000's)*

| | FORECAST | FORECAST | FORECAST | FORECAST | FORECAST | FORECAST | FORECAST | FORECAST | FORECAST | FORECAST | FORECAST | FORECAST | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Period # | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | |
| Week/Month Ending | Oct-17 | Nov-17 | Dec-17 | Jan-18 | Feb-18 | Mar-18 | Apr-18 | May-18 | Jun-18 | Jul-18 | 8/2/18 | 9/2/18 | |
| **Receipts** | | | | | | | | | | | | | |
| Lease Income | $1,262.4 | $1,262.4 | $1,262.4 | $1,262.4 | $1,262.4 | $1,262.4 | $1,262.4 | $1,262.4 | $1,262.4 | $1,262.4 | $1,262.4 | $1,262.4 | $30,297.6 |
| **Total Collections** | 1,262.4 | 1,262.4 | 1,262.4 | 1,262.4 | 1,262.4 | 1,262.4 | 1,262.4 | 1,262.4 | 1,262.4 | 1,262.4 | 1,262.4 | 1,262.4 | 30,297.6 |
| **Operating Disbursements** | | | | | | | | | | | | | |
| Shared service fees - TRMI[2] | 0.0 | 0.0 | 2,168.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 2,710.2 |
| Reclamation | 758.8 | 379.4 | 379.4 | 413.0 | 413.0 | 413.0 | 413.0 | 413.0 | 413.0 | 413.0 | 413.0 | 413.0 | 20,505.5 |
| Capex | 1,366.0 | 1,366.0 | 1,366.0 | 166.7 | 166.7 | 166.7 | 166.7 | 166.7 | 166.7 | 166.7 | 166.7 | 166.7 | 21,332.6 |
| Interest Expense | 67.4 | 71.6 | 77.6 | 80.8 | 90.0 | 91.7 | 91.7 | 91.6 | 93.4 | 94.3 | 95.3 | 199.1 | 1,483.9 |
| US Trustee Fees | 20.0 | 0.0 | 0.0 | 20.0 | 0.0 | 0.0 | 20.0 | 0.0 | 0.0 | 20.0 | 0.0 | 0.0 | 140.0 |
| **Total Operating Disbursements** | 2,212.1 | 1,816.9 | 3,991.1 | 680.4 | 669.6 | 671.3 | 691.3 | 671.3 | 673.0 | 694.0 | 674.9 | 778.7 | 46,172.2 |
| **Operating Cash Flow** | (949.7) | (554.5) | (2,728.7) | 582.0 | 592.8 | 591.1 | 571.1 | 591.1 | 589.4 | 568.4 | 587.5 | 483.7 | (15,874.6) |
| **Non-Operating Disbursements** | | | | | | | | | | | | | |
| **Total Restructuring Professional Fees Disbursements** | 1,237.6 | 582.4 | 582.4 | 1,201.2 | 582.4 | 582.4 | 1,201.2 | 932.8 | 932.8 | 1,923.9 | 932.8 | 2,856.7 | 22,541.5 |
| **Net Cash Inflow / (Outflow)** | ($2,187.3) | ($1,136.9) | ($3,311.1) | ($619.2) | $10.4 | $8.7 | ($630.1) | ($341.7) | ($343.4) | ($1,355.5) | ($345.3) | ($2,373.0) | ($38,416.1) |
| Beginning Cash | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 103.4 |
| Increase (decrease) in Cash | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | (3.4) |
| Ending Cash[3] | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Beginning, Loan Balance | $25,788.2 | $27,975.5 | $29,112.5 | $32,423.6 | $33,042.8 | $33,032.4 | $33,023.7 | $33,653.8 | $33,995.5 | $34,338.9 | $35,694.4 | $36,039.7 | $0.0 |
| Loan (Pay down) / Advance | 2,187.3 | 1,136.9 | 3,311.1 | 619.2 | (10.4) | (8.7) | 630.1 | 341.7 | 343.4 | 1,355.5 | 345.3 | 2,373.0 | 38,412.7 |
| **Ending Loan Balance** | $27,975.5 | $29,112.5 | $32,423.6 | $33,042.8 | $33,032.4 | $33,023.7 | $33,653.8 | $33,995.5 | $34,338.9 | $35,694.4 | $36,039.7 | $38,412.7 | $38,412.7 |

Footnotes
1) Kaiser Gypsum Company, Inc. and Hanson Permanente Cement, Inc.
2) Amount reflects 2015 actual shared service costs allocated to the debtor entities.
3) Assumes required cash balance of $100k.

**Exhibit B**

**(Kaiser Declaration)**

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| KAISER GYPSUM COMPANY, INC., *et al.,*[1] | : | Case No. 16-_____ (___) |
| | : | |
| Debtors. | : | (Joint Administration Requested) |
| | : | |

**DECLARATION OF KEITH KAISER**
**IN SUPPORT OF THE DEBTORS' DIP FINANCING MOTION**

I, Keith Kaiser, hereby declare, under penalty of perjury as follows:

1.      I am a Director in the Business Recovery Services Practice of
PricewaterhouseCoopers LLP (collectively with its affiliates, "PwC"), and am resident in PwC's
Chicago office, which is located at One North Wacker, Chicago, Illinois 60606.  The above-
captioned debtors (together, the "Debtors") retained PwC prior to the commencement of these
chapter 11 cases to serve as their financial advisor.  I am one of the senior PwC professionals
overseeing PwC's engagement with the Debtors.

2.      Except as otherwise indicated, all facts set forth in this declaration are
based upon my personal knowledge of the Debtors' operations and finances, my discussions with
the Debtors' senior management or members of the PwC team, my review of relevant documents,
or my opinion based upon experience, knowledge and information concerning the Debtors'
operations and financial affairs and the market for debtor-in-possession ("DIP") financing.  I am
authorized to submit this declaration.  If called upon to testify, I could and would testify to the
facts set forth herein.

---

[1]      The Debtors are the following entities (the last four digits of their respective taxpayer identification
numbers follow in parentheses):  Kaiser Gypsum Company, Inc. (0188) and Hanson Permanente Cement,
Inc. (7313).  The Debtors' address is 300 E. John Carpenter Freeway, Irving, Texas 75062.

3.      I submit this declaration in support of the Debtors' Motion For Entry of

Interim and Final Orders (I) Authorizing Them To Obtain Postpetition Financing On a

Superpriority, Secured Basis, (II) Granting Liens and Superpriority Claims, (III) Modifying the

Automatic Stay, and (IV) Scheduling a Final Hearing (the "<u>DIP Motion</u>").[2]

### Experience and Education

4.      I have been employed by PwC since 1996, and have extensive experience

as an advisor in corporate restructurings.  I have advised companies, creditors and investors in

connection with numerous in-court and out-of-court restructurings.  My prior advisory roles have

included, among others, executing complex debt restructurings, placing capital, and preparing

cash flow and debt capacity analyses.  I have sourced loans to fund chapter 11 cases, including

Sea Containers Ltd's $170 million DIP loan and Techneglas, Inc.'s $25 million DIP loan, and

have assessed financial terms and covenants of DIP loans, including Smurfit Stone Container

Corporation's $750 million DIP loan and Harnischfeger Industries, Inc.'s $750 million DIP loan.

5.      Prior to joining PwC, I was a commercial lending banker at American

National Bank from 1992 to 1996.  I previously held FINRA Series 7 General Securities

Representative, Series 63 Uniform Securities Agent, and Series 24 General Securities Principal

licenses.  I hold a Bachelor of Business Administration degree in Accounting and Finance from

the University of Iowa.

6.      PwC is a leading, full-service financial services, consulting, and

accounting firm with over 75 offices and more than 30,000 employees in the United States.  PwC

---

[2]          Capitalized terms not otherwise defined herein have the meanings given to them in the DIP Motion.

is the United States-based firm of a global network of separate and independent member firms
that operate locally in countries throughout the world.[3]

### Need For DIP Financing

7.      The Debtors have a critical need to obtain financing to pay expenses
incurred in these chapter 11 cases and fund general corporate and working capital needs.
Without access to the DIP financing, the Debtors would be unable to pay, among other things,
the administrative costs of these cases, and unable to fund capital expenditures and reclamation
obligations related to the cement plant, rock plant and quarry owned by HPCI.  The Debtors have
an immediate need for interim financing in the amount of $2,000,000.  Immediate approval of
such interim financing will ensure that the Debtors have sufficient liquidity for their short term
funding needs.  The proposed DIP financing, which will provide the Debtors with the necessary
interim and longer term funding for the Debtors' operations and costs of these cases, constitutes
the best, and in view of its size likely the only, financing alternative available under the
circumstances.

8.      Although the Debtors are currently in discussions with their insurers
regarding an amended cost sharing agreement that would provide reimbursement to the Debtors
for a portion of the costs of these cases, no agreement has yet been reached.  Accordingly, the
Debtors requested, and Lehigh Hanson agreed to provide, DIP financing in an amount sufficient
to cover operating expenses and the costs of these cases irrespective of whether an amended cost
sharing agreement is ultimately negotiated with one or more of the insurers.

---

[3]      Such firms are members of PricewaterhouseCoopers International Limited ("PwC IL"), a UK membership
based company, and limited by guarantee, with no shareholders and no capital.  The member firms of PwC
IL have agreed to operate certain of their professional services in accordance with agreed standards, but
remain separate legal entities with each member firm being locally owned and managed.

**The Terms of the Proposed DIP Facility Are Below Market and Should Be Approved**

9.      Based on my experience and a review of market data, including recent DIP financings, I believe that the proposed DIP financing is below market in multiple respects. In particular, I believe that the economic terms of the proposed DIP financing are superior to the terms any third party lender would provide to the Debtors.  No third party lender would be willing to make a DIP loan to the Debtors on an unsecured basis, nor would any third party lender make a secured DIP loan to the Debtors on terms as favorable as the proposed DIP financing.

10.     Some of the key factors that lead me to these conclusion include:

    a.      the Debtors' projected cash flows are significantly negative;

    b.      the primary tangible collateral that will secure the proposed DIP financing, the HPCI cement plant, rock plant and quarry, is illiquid and subject to reclamation obligations, potential environmental liabilities and zoning restrictions;

    c.      other potential collateral includes intercompany receivables that are (i) subject to legal challenge and (ii) not the type of tangible collateral against which a third party lender would typically make a loan;

    d.      the proposed DIP financing contains no fees and the interest rate is significantly below market; and

    e.      the proposed DIP financing contains only limited covenants and milestones, in sharp contrast to the terms of other recent DIP facilities.

11.     In view of, among other things, the negative projected cash flow and the illiquidity and risks related to the Debtors' assets, we did not solicit financing proposals from third party lenders.  A solicitation process would have served no purpose and been a waste of time and the Debtors' resources.

12.     In my judgment, the proposed DIP financing is the best, and given its size likely the only, financing option available to the Debtors.  Based on management's forecasts, the proposed DIP financing should provide the Debtors with more than sufficient liquidity during these chapter 11 cases.  As a result, I believe the proposed DIP financing is in the best interests of the Debtors' estates.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  September 30, 2016

*/s/ Keith Kaiser*_____
Keith Kaiser