# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| KAISER GYPSUM COMPANY, INC., *et al.,*[1] | : | Case No. 16-_____ (___) |
|  | : |  |
| Debtors. | : | (Joint Administration Requested) |
|  | : |  |

## DECLARATION OF CHARLES E. MCCHESNEY II
## IN SUPPORT OF FIRST DAY PLEADINGS

Charles E. McChesney II, being first duly sworn, deposes and states as follows:

1.      I am a Vice President, the Secretary and a Director of both Kaiser Gypsum Company, Inc. ("Kaiser Gypsum") and Hanson Permanente Cement, Inc. ("HPCI"), which are debtors in the above-captioned chapter 11 cases (together, the "Debtors").  I have held these positions with the Debtors since October 1, 2010.

2.      I am also a Vice President, the Secretary, the Chief Legal Counsel and a Director of Three Rivers Management, Inc. ("TRMI"), an affiliate of the Debtors, and have served in those capacities since October 1, 2010.  Prior to that time, I was an Assistant Secretary of TRMI and have been an employee of TRMI since May 2005.  Pursuant to a contract with the Debtors, TRMI provides asbestos and environmental liability management services for, and acts as agent on behalf of, each of the Debtors.

3.      Prior to my employment with TRMI, I was employed by K&L Gates LLP as an attorney.

---

[1]      The Debtors are the following entities (the last four digits of their respective taxpayer identification numbers follow in parentheses):  Kaiser Gypsum Company, Inc. (0188) and Hanson Permanente Cement, Inc. (7313).  The Debtors' address is 300 E. John Carpenter Freeway, Irving, Texas 75062.

4.       I earned a bachelor of arts degree from Cornell University in 1992.  I also earned a master of arts degree in public management from The Ohio State University in 1998.  Further, I earned a juris doctorate degree from The Ohio State University in 1999.  I have been licensed to practice law since 1999 and have been employed as legal counsel in either private practice or as in-house counsel since 1999.  I have been involved in management of the Debtors' asbestos and environmental liabilities for over seven years.

5.       On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition with the Court for relief under chapter 11 of the Bankruptcy Code, as well as certain motions and other pleadings (the "First Day Pleadings").

6.       I submit this declaration in support of the First Day Pleadings.  I have reviewed each of the First Day Pleadings, and it is my belief that the relief sought therein is necessary to (a) avoid immediate and irreparable harm to the Debtors and/or (b) maximize and preserve the value of the Debtors' chapter 11 estates.

7.       In my capacities as a Vice President, the Secretary and a Director, I am familiar with the Debtors' day-to-day operations, assets, financial condition, business affairs and books and records.  Except as otherwise indicated, all facts set forth in this declaration are based upon:  (a) my personal knowledge; (b) information supplied to me by other members of the Debtors' management or the Debtors' professionals; (c) my review of relevant documents; and/or (d) my opinion based upon my experience and knowledge of the Debtors' operations and financial condition.  If called upon to testify, I could and would testify competently to the facts set forth herein.

8.       Section I of this declaration provides an overview of the Debtors' corporate and capital structure and their businesses.  Section II describes the circumstances

surrounding the commencement of these chapter 11 cases, as well as the Debtors' objectives for these cases. Section III sets forth relevant facts in support of the First Day Pleadings.

## I.
## The Debtors' Corporate and Capital Structure, and Businesses

9.    HPCI was initially incorporated in 1939 as a California corporation under the name The Permanente Corporation. HPCI has undergone several name changes in its history. Most recently, in February 1999, HPCI, then named Kaiser Cement Corporation, changed its name to Hanson Permanente Cement, Inc., its current name. HPCI has also been party to certain mergers over the years as a result of which its state of incorporation changed. HPCI is today incorporated under the laws of the state of Arizona.

10.    On or about June 19, 1952, HPCI, then known as Permanente Cement Company, formed Kaiser Gypsum Company, a California corporation, as a new, wholly-owned subsidiary. In that same year, Kaiser Gypsum Company purchased the assets of Standard Gypsum Company of California, a company that was, at that time, operated as the Gypsum Division of one of the Henry J. Kaiser family of companies.

11.    Kaiser Gypsum has remained a wholly-owned subsidiary of HPCI since its formation. As a result of a merger, Kaiser Gypsum Company later became a Washington corporation  In May 2016, Kaiser Gypsum changed its state of incorporation from Washington to North Carolina.

12.    HPCI is a wholly-owned, indirect subsidiary of non-debtor Lehigh Hanson, Inc. ("Lehigh Hanson"). HPCI is the direct parent of Kaiser Gypsum as well as non-debtor Hanson Micronesia Cement, Inc. and non-debtor Hanson Permanente Cement of Guam, Inc. (together, the "Operating Subsidiaries"). Non-debtor Permanente Cement Company, which has no assets or operations, is also a wholly-owned subsidiary of HPCI.

13.    Kaiser Gypsum holds a 41 2/3% joint venture interest in Gypsum Carrier, Inc.  In turn, Gypsum Carrier, Inc. owns 100% of Asian Carriers, Inc., and Asian Carriers, Inc. owns 100% of Mediterranean Carriers, Inc.  Gypsum Carrier, Inc. and its direct and indirect subsidiaries are inactive Panama companies with no tangible assets.

14.    As the result of a tender offer and related transactions that were commenced in 1986 and completed in 1987, an affiliate of Hanson PLC Group ("Hanson PLC"), Hanson Industries, acquired HPCI, then a publicly-traded company known as Kaiser Cement Corporation, by purchasing all of its outstanding stock.

15.    In 2007, HeidelbergCement AG ("HeidelbergCement"), a German company, acquired the stock of Hanson PLC through a subsidiary.  As a result of HeidelbergCement's purchase of Hanson PLC's stock, the Debtors (as well as various other entities) became indirect, wholly-owned subsidiaries of HeidelbergCement.  HeidelbergCement indirectly owns each of the Debtors, the Operating Subsidiaries and Lehigh Hanson.

16.    None of the Debtors or the Operating Subsidiaries has any funded indebtedness.

17.    In addition to the equity in its subsidiaries, HPCI owns a cement plant, rock plant and quarry (including the minerals) located in Santa Clara County, California (collectively, the "Permanente Property") that it leases to Lehigh Southwest Cement Company ("Lehigh Southwest"), a non-debtor affiliate.  Lehigh Southwest manages and operates the Permanente Property.  Under the leases, Lehigh Southwest pays rent, royalties and other amounts, and also is responsible for the ongoing operating costs of the Permanente Property.  For its part, HPCI funds capital expenditures for the cement plant and reclamation obligations related to the quarry.

18.     HPCI's Operating Subsidiaries distribute and sell cement in key markets in the Pacific region, including Guam and Saipan.  Any funding required by the Operating Subsidiaries has been and will continue to be provided by Lehigh Hanson and not by the Debtors.  Since before the Petition Date, efforts have been underway to sell the business operations of the Operating Subsidiaries.

19.     Kaiser Gypsum has no current business operations other than managing its legacy asbestos-related and environmental liabilities.  Kaiser Gypsum has no material tangible assets.

20.     HeidelbergCement, together with its domestic and foreign non-debtor subsidiaries, comprises one of the largest building materials companies in the world, with group revenue in 2015 of €13.5 billion.  As of end of 2015, HeidelbergCement operated in more than forty countries and employed approximately 45,450 people.  HeidelbergCement's stock is publicly traded on the Frankfurt Stock Exchange, the largest of the seven regional securities exchanges in Germany, as well as on the Stuttgart, Düsseldorf and Munich exchanges.

21.     Lehigh Hanson is, through its subsidiaries, a leading supplier of cement, aggregates, ready mixed concrete, asphalt and other building materials in key markets throughout the United States.

## II.
### Events Leading to the Commencement of
### These Cases and the Debtors' Objective for Them

## A.      The Debtors' Asbestos-Related Liabilities

22.     The Debtors' asbestos-related liabilities arise from their manufacture and sale of certain products that decades ago contained small amounts of asbestos (collectively, the "Debtors' Asbestos Products").  Asbestos was removed from these products by the end of 1976.

23.     HPCI's primary business was the manufacture and sale of portland cement products.  Portland cement is a fine powdery substance that is mixed with water and an aggregate, such as gravel or sand, to form concrete, which has a number of construction applications, including sidewalks, roads and floor slabs.

24.     Although most of the cement products manufactured by HPCI never contained asbestos, HPCI made two types of products — "masonry cement," and "plastic cement" — that in certain versions and at certain times contained small proportions of chrysotile asbestos.  In particular, HPCI sold limited quantities of masonry cement, under the trade name Masonry Cement, that contained minimal amounts of chrysotile asbestos for a period of less than eight months in 1973.  HPCI also sold certain plastic cements that contained small amounts of chrysotile asbestos.

25.     Kaiser Gypsum's principal business consisted of manufacturing and marketing gypsum plaster, gypsum lath and gypsum wallboard.  Kaiser Gypsum also manufactured and sold a number of other products, including metal products used in building construction (e.g. door frames), wood chip products for use in building construction (e.g., sheathing, sound deadening board and suspended ceilings components), and commercial paper products (e.g., packing cartons).  None of these products contained asbestos at any time.

26.     In connection with its wallboard business, Kaiser Gypsum marketed, manufactured and sold products categorized as "wallboard accessories," which included joint compounds, texture paints and other similar products used to laminate wallboard or cover radiant heat surfaces and cables.  Certain versions of these wallboard accessories, which were sold under various trade names, included minimal amounts of chrysotile asbestos during varying time periods from 1952 to 1976.  In addition to wallboard accessory products, Kaiser Gypsum

manufactured mineral fiberboard products, which are used for acoustical ceiling tile and lay-in board, that, from 1968 to 1974, contained small amounts of asbestos.  By 1978, Kaiser Gypsum had sold substantially all its assets and ceased to be involved in any products manufacturing.

27.    The Debtors have faced thousands of asbestos-related lawsuits dating back to 1978.  Since 1978, one or both of the Debtors have been named in more than 38,000 asbestos-related lawsuits.  As of August 31, 2016, the Debtors were defendants in approximately 14,000 pending asbestos-related bodily injury lawsuits filed in state courts across the country.

28.    The Debtors' non-debtor affiliates (collectively, the "Non-Debtor Affiliates"), including HeidelbergCement and Lehigh Hanson, never manufactured, sold or distributed any of the Debtors' Asbestos Products.  To date, no court has issued a ruling or made a finding that any of the Non-Debtor Affiliates is responsible for any of the Debtors' Asbestos Products or that any of the Non-Debtor Affiliates should be treated as a successor-in-interest to one or both of the Debtors.

**B.    The Debtors' Environmental Liabilities**

29.    The Debtors have environmental liabilities related to their former ownership and operation of plants in Seattle, Washington and St. Helens, Oregon.

**(a)    Seattle Plants**

30.    Both Debtors owned and operated facilities in the Seattle area from 1929 through 1987.  HPCI operated a cement plant, and owned and operated a ready-mix cement plant and a bulk cement receiving, storage and distribution facility.  Kaiser Gypsum owned and operated the same cement plant, as well as a gypsum plant, and a gypsum accessories facility. All of these facilities were on or adjacent to the Lower Duwamish Waterway, an industrial waterway near Seattle, Washington.

31.     By 1978, Kaiser Gypsum had sold all its operations in the Seattle area and by 1987, HPCI had sold all its facilities in Seattle.

32.     A five mile stretch of the Lower Duwamish Waterway is a United States Environmental Protection Agency (the "EPA") Superfund site (the "Lower Duwamish Site") involving approximately 120 potentially responsible parties ("PRPs").  In February 2010, the EPA served the Debtors with a request for information pursuant to Section 104(e) of the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9604(e) ("CERLA"), and the Debtors responded to that request the following year.

33.     Certain parties have completed a remedial investigation and feasibility study ("RI/FS") in connection with a joint Administrative Order on Consent to Conduct a RI/FS. Those parties also engaged in cleanup of various "early action areas" identified by such parties as locations that would require cleanup under any remedial scenario.  In 2013, those parties subsequently agreed to perform additional studies, which remain ongoing.  In April 2014, HPCI, for itself and Kaiser Gypsum, entered into an Alternative Dispute Resolution Memorandum of Agreement with over thirty participating parties, pursuant to which the parties agreed to a process for allocating the costs incurred in connection with remediation of the Lower Duwamish Site.  In November 2014, the EPA released a Record of Decision ("ROD") that prescribes a cleanup plan for the Lower Duwamish Site that the EPA estimates will result in remediation costs of $342 million.  The EPA is presently working with the parties that conducted the RI/FS to complete certain additional investigations in advance of implementing the remediation called for in the ROD.  In addition to the EPA, the Washington Department of Ecology is also active with respect to the Lower Duwamish Site.

(b)      **St. Helens Plant**

34.      In 1956, Kaiser Gypsum acquired a fiberboard manufacturing facility in St. Helens, Oregon that produced ceiling tiles, ceiling panels and related products.  In 1978, Kaiser Gypsum sold the plant to Owens Corning Fiberglas Corporation ("Owens Corning").  In 1987, the plant was sold again, this time to Armstrong World Industries, Inc. ("Armstrong"), which remains the current owner of the property.

35.      The Oregon Department of Environmental Quality (the "Oregon DEQ") has made a determination that hazardous substances were released from the St. Helens plant.  In October 2001, it issued an enforcement order directing Armstrong to complete a RI/FS and to take any remedial actions necessary with respect to the plant.  The Oregon DEQ then notified Kaiser Gypsum and Owens Corning that they were both considered PRPs under applicable state law.

36.      Shortly after being named as a PRP, Owens Corning entered into a stipulation and consent decree that memorialized a partial settlement with the Oregon DEQ. Subsequently, in October 2002, Armstrong entered into a response cost agreement with the Oregon DEQ pursuant to which the Oregon DEQ agreed to reimburse Armstrong for certain costs incurred in performance of the enforcement order.

37.      In January 2003, Armstrong filed suit, captioned Armstrong World Industries, Inc. v. Kaiser Gypsum Company, Inc., et al. (the "Armstrong Litigation"), against the Debtors in federal district court in Oregon seeking contribution and/or cost recovery.  Armstrong and Kaiser Gypsum ultimately reached agreement on the terms of an interim cost sharing agreement that, among other things, allocates responsibility for payment of response costs on an interim basis, subject to reallocation at some time in the future.  This agreement has subsequently

been amended by the parties. On or about August 19, 2003, the Armstrong Litigation was dismissed without prejudice.

38.     In 2007, the Oregon DEQ notified Armstrong, Owens Corning and Kaiser Gypsum that certain property near the St. Helens plant required remedial investigation. In February 2008, Armstrong, Owens Corning and Kaiser Gypsum agreed to undertake a limited investigation of the additional area. In order to share and allocate the costs of this agreed joint investigation, Kaiser Gypsum, Armstrong and Owens Corning entered into a further interim cost sharing agreement with respect to that additional area. In connection with this cost sharing agreement, Kaiser Gypsum entered into a separate agreement in which it made certain representations and covenants regarding its financial status and insurance coverage. HPCI provided a guarantee of performance, not payment, with respect to these representations and covenants.

39.     On August 23, 2010, the parties entered into an Order on Consent Requiring Remedial Investigation and Feasibility Study (DEQ No. LQSR-NWR-10-05) (the "Consent Order"), pursuant to which Armstrong, Owens Corning and Kaiser Gypsum are required to complete a full remedial investigation and feasibility study at the St. Helens site. The remedial investigation at the site remains ongoing.

40.     Armstrong, Owens Corning and Kaiser Gypsum have submitted risk assessment and remedial investigation reports to the Oregon DEQ pursuant to the Consent Order. In March 2015, the Oregon DEQ provided comments on the risk assessment and remedial investigation reports. As of the date of this declaration, the Oregon DEQ has neither approved nor disapproved of those reports.

C.    **The Debtors' Insurance Coverage and Related Litigation**

41.    The Debtors have general liability insurance that covers, among other things, all defense and indemnity costs, subject to certain limited exclusions and deductibles, related to asbestos bodily injury claims.  Specifically, Truck Insurance Exchange ("Truck"), an affiliate of Farmers Insurance, issued primary liability policies to the Debtors for the period 1965 through April 1, 1983 (collectively, the "Truck Policies").  The Truck Policies for the period 1971 to 1979 have no aggregate limits.  The per occurrence limits and deductibles under the Truck Policies vary by policy.  In virtually all cases to date, the asbestos claims against the Debtors have triggered a policy or policies with a $5,000 deductible and a $500,000 per claim limit.  The coverage also obligates Truck to defend the claims and pay the costs of defense.

42.    The Debtors also have excess insurance policies (collectively, the "Excess Policies") with various insurers that cover indemnity amounts in excess of $500,000 per occurrence.  In December 2013, certain of the Debtors' excess insurers entered into a confidential coverage-in-place agreement with the Debtors with respect to the excess coverage.

43.    In April 2001, Truck filed a lawsuit in California state court (the "Coverage Litigation") against the Debtors seeking a ruling that the Debtors' design, production and distribution of their asbestos-containing products constituted a single occurrence and, thus, the Truck Policies had already been exhausted.  In 2002, the Debtors filed a cross-complaint against Truck and their excess insurers contending, among other things, that to the extent the primary coverage was exhausted, the excess insurers were obligated to indemnify the Debtors against asbestos personal injury claims.  Based on rulings in the Coverage Litigation, it is now settled that (a) Truck must defend and indemnify the Debtors for any covered asbestos bodily injury claim up to the limits of any policy selected by the Debtors, and (b) the excess insurers are obligated to respond vertically to the policy period selected by the Debtors — i.e.

coverage under the applicable Excess Policy is triggered on a per claim basis for amounts in excess of the amounts covered by the applicable primary policy.[2]

44.     In addition, the Debtors believe that the Truck Policies and the Excess Policies provide coverage for the Debtors' environmental liabilities relating to their formerly owned plants in Seattle and St. Helens.  Although Truck and certain other primary policy issuers are currently paying certain defense costs related to these liabilities, they are doing so under a reservation of rights and they have not reimbursed the Debtors in full for all defense and indemnity costs incurred related to these environmental liabilities.  At this time, none of the primary or excess insurers has accepted the Debtors' tender of these environmental claims.

45.     On September 29, 2016, the Debtors filed suit in state court in Portland, Oregon against the Debtors' primary and excess insurers seeking, among other things, a declaratory judgment that the primary and excess insurers are obligated to defend and/or indemnify the Debtors for these environmental liabilities.

**D.     Prepetition Discussions With Representatives of Asbestos Claimants**

46.     Prior to the Petition Date, an ad hoc committee of asbestos personal injury claimants (the "Ad Hoc Committee") consisting of law firms that have filed asbestos personal injury claims against the Debtors was formed to engage in discussions with the Debtors regarding the terms of a consensual plan of reorganization.  The Ad Hoc Committee retained bankruptcy counsel, insurance counsel, a financial advisor, and an asbestos estimation consultant.  Following its formation, the Ad Hoc Committee delivered to the Debtors a series of information requests.  In response to those requests, the Debtors provided numerous documents and other information regarding their corporate history, businesses, insurance and asbestos and

---

[2]     The Debtors anticipate that certain issues adjudicated in the Coverage Litigation will be the subject of appeals.

environmental liabilities.  Prior to the Petition Date, the Debtors and the Ad Hoc Committee also

agreed on the selection of Lawrence Fitzpatrick as the representative of future asbestos claimants

(the "FCR").  Mr. Fitzpatrick retained his own counsel and an estimation consultant.  The

Debtors have provided the FCR and his professionals with the same information they furnished

to the Ad Hoc Committee.

47.      Meetings and other communications have occurred among some or all of

the Debtors, Truck, the Ad Hoc Committee and the FCR.  Communications between the Debtors

and certain of the excess carriers also took place.  Among other things, the parties discussed

these filings and potential paths forward to a consensual plan.  Although all the parties have

indicated a desire to reach agreement on a consensual reorganization plan, due to time

constraints, the parties have not yet been able to engage in substantive discussions regarding the

terms of a plan.  The Debtors remain committed, however, to continuing discussions with these

parties and pursuing a consensual agreement with representatives for current and future asbestos

claimants and the primary and excess insurers.

**E.      Cost Sharing Agreement With Truck**

48.      In June 2015, the Debtors and Truck entered into a confidential cost

sharing agreement pursuant to which Truck agreed to reimburse the Debtors for a portion of the

costs incurred by them in connection with their efforts to permanently resolve their asbestos

liability, including the reasonable fees and expenses of professionals retained by the Debtors and

by representatives of the current and future asbestos claimants.  Because the cost sharing

agreement terminates by its terms upon the filing of these cases, the Debtors and Truck have

recently been in discussions regarding an amended cost sharing agreement that, subject to the

approval of this Court, would cover costs and expenses of the Debtors' bankruptcy cases.

**F.      The Decision To File for Chapter 11 Reorganization**

49.      Although insurance covers most of their asbestos-related costs and should
cover their environmental liabilities, the Debtors have concluded that the commencement of
these chapter 11 cases is necessary because of the continuing costs, risks and administrative
burdens associated with their asbestos-related litigation and legacy environmental liabilities.  The
Debtors seek to permanently resolve their asbestos liabilities in a fair and equitable manner and
further seek to discharge and liquidate their legacy environmental liabilities.  Resolution of these
liabilities will eliminate the ongoing costs and distraction of managing these decades-old
liabilities, liquidate and discharge or permanently resolve their deductible and environmental
liabilities, and eliminate potential risks of uninsured judgments or claims (punitive damages for
example) and insurer insolvencies.  Accordingly, the Debtors intend to focus their efforts on
negotiating, and ultimately obtaining approval of, a plan of reorganization that would, among
other things, (a) provide for the creation and funding of a trust established under section 524(g)
of the Bankruptcy Code to pay asbestos claims, (b) permanently protect the Debtors and their
affiliates from any further asbestos claims arising from products manufactured and sold by the
Debtors; and (c) discharge the Debtors' legacy environmental liabilities.

### III.
### FIRST DAY PLEADINGS

50.      Concurrently with the filing of these chapter 11 cases, the Debtors filed
First Day Pleadings requesting various forms of relief.

51.      The Debtors will move for entry of an order scheduling an expedited
hearing on the First Day Pleadings.[3]  The Debtors anticipate that the Court will conduct a hearing

---

[3]      Capitalized terms used below in the descriptions of the First Day Pleadings and not otherwise defined have
the meanings given to them in the applicable First Day Pleadings.

soon after the commencement of their chapter 11 cases (the "First Day Hearing") at which the

Court will hear and consider such First Day Pleadings.

52.     Generally, the purpose of the First Day Pleadings is to (a) obtain

authorization for necessary postpetition financing and the continued use of the Debtors' bank

accounts; (b) extend and apply the automatic stay to certain non-debtors; and (c) establish

procedures for the smooth and efficient administration of these chapter 11 cases.  I have

reviewed each of the First Day Pleadings, including the exhibits thereto, and I believe that the

relief sought in each of the First Day Pleadings is tailored to meet the goals described above and,

ultimately, will be critical to the Debtors' ability to achieve a successful reorganization.

## A.     **The Case Administration Motions**

### *Joint Administration*

53.     The Debtors have filed a motion that seeks to have the Debtors'

bankruptcy cases jointly administered (but not substantively consolidated).  Joint administration

of the Debtors' cases is necessary for the administrative convenience of the Court, the Office of

the Clerk of the Court (the "Clerk's Office") and parties in interest.

### *Appointment of Claims and Noticing Clerk*

54.     The large number of creditors and other parties in interest involved in the

Debtors' chapter 11 cases may impose heavy administrative and other burdens upon the Court

and the Clerk's Office.  To relieve the Court and the Clerk's Office of these burdens, the Debtors

seek the entry of an order appointing Prime Clerk LLC ("Prime Clerk") as claims and noticing

agent in these chapter 11 cases.

*Request to (I) File (A) Consolidated Master List of Creditors, (B) Consolidated List of*
*Top Unsecured Creditors and (C) Consolidated List of the Thirty Asbestos Plaintiff*
*Firms With the Largest Number or Scope of Asbestos Cases Against the Debtors;*
*(II) Implement Certain Notice Procedures for Asbestos Claimants; and (III) Approve*
*the Form and Manner of Notice of Commencement*

55.     Given the affiliated nature of the Debtors, the fact that they share a

number of creditors in common and the manner in which the Debtors keep their records in the

ordinary course, the Debtors will seek authority to file the lists identifying their respective

creditors on a consolidated basis.  Given that the Debtors have very few unsecured creditors that

are not asbestos personal injury claimants, the Debtors also request authority to file a

consolidated Top 20 List.  The Debtors believe that a consolidated Top 20 List will provide the

Bankruptcy Administrator with the information necessary to identify potential candidates to

serve on any official committee of unsecured creditors  and will be more helpful than separate

Top 20 Lists.  In addition, the Debtors will seek Court approval to file a consolidated list of the

thirty asbestos plaintiffs' firms with the largest scope or number of asbestos cases against the

Debtors in lieu of listing the individual asbestos claimants with the largest unsecured claims

against the Debtors.  The Debtors believe that providing the Bankruptcy Administrator with the

list of asbestos plaintiff firms will assist the Bankruptcy Administrator in assessing candidates

proposed for an asbestos claimants' committee.

56.     Finally, the Debtors will seek approval to serve all notices, mailings and

other communications related to these chapter 11 cases on asbestos-related personal injury

claimants care of their counsel of record at such counsel's address.  The Debtors have the names

and addresses of counsel of record for the Asbestos Claimants.  The names and addresses of a

significant number of individual Asbestos Claimants themselves, however, are not readily

available.  It would be costly and time-consuming for the Debtors to attempt to obtain this

information.  In addition, any address information for the individual Asbestos Claimants the

Debtors have or are able to obtain is likely to be outdated and unreliable.  Consequently, the

Notice Procedures will be more efficient and reliable than providing notice to the individual

Asbestos Claimants directly.

57.    Additionally, to date, the Debtors have communicated solely with the

Asbestos Firms.  The Notice Procedures will continue that practice and avoid the confusion that

undoubtedly would arise from sending notices directly to the Asbestos Claimants.  Accordingly,

the Debtors believe that the Notice Procedures are warranted under the facts and circumstances

of these chapter 11 cases.  In order to implement these notice procedures, the Debtors intend to

list the names and addresses of the asbestos plaintiffs firms in the Debtors' creditor list in lieu of

listing the individual asbestos creditors' addresses.

### *Extension of Time to File Schedules and Statements*

58.    The Debtors believe they will need additional time beyond the time period

allotted under the Bankruptcy Code to assemble all of the information necessary for each of the

Debtors to complete and file the required schedule of assets and liabilities, schedule of current

income and expenditures, schedule of executory contracts and unexpired leases and statement of

financial affairs (collectively, the "Schedules and Statements").  The Debtors will need the

additional time because of (a) the size and complexity of these chapter 11 cases and (b) the

volume of material that must be compiled and reviewed by the Debtors' limited staff to complete

the Schedules and Statements during the hectic early days of these cases.  The Debtors have

thousands of creditors and other parties in interest, and for each of those parties, the Debtors

must ascertain the pertinent information, including addresses and claim amounts, to complete the

Schedules and Statements.  Accordingly, the Debtors will seek the entry of an order setting

November 14, 2016 as the deadline by which the Debtors must file their respective Schedules

and Statements, without prejudice to the Debtors' right to seek a further extension for cause.

**B.**      **Request to Continue Using Bank Accounts and Related Relief**

59.     In the ordinary course of business, each Debtor maintains one Bank

Account at Bank of America, N.A., which is insured by the Federal Deposit Insurance

Corporation (the "FDIC").  Each of these Bank Accounts has the capacity to make disbursements

and receive deposits.[4]  Disbursements are made and collections are received by check, ACH or

wire transfer.

60.     Funds that are borrowed by the Debtors under the DIP Credit Agreement

(described below) will be deposited into the applicable Debtor's Bank Account.

61.     Prior to the commencement of these chapter 11 cases, the Debtors

modified the manner in which cash flowed through their Bank Accounts.  Prior to the Petition

Date, all funds in HPCI's Bank Account were swept daily into a concentration account

maintained by Lehigh Hanson (the "Lehigh Concentration Account").  In the ordinary course of

business, the Lehigh Concentration Account would fund HPCI's Bank Account.  In anticipation

of the commencement of these chapter 11 cases, the Debtors modified this arrangement so that

funds in HPCI's Bank Account are no longer swept to the Lehigh Concentration Account, and

the Lehigh Concentration Account no longer funds HPCI's Bank Account.

62.     The Debtors will seek authority to continue to use their Bank Accounts.

Allowing the Debtors to continue to use their Bank Accounts will assist the Debtors in

accomplishing a smooth transition to operating as debtors in possession.

63.     The Debtors will further seek authority to open and close bank accounts as

they deem necessary (consistent with the terms of the DIP Credit Agreement).  The Debtors will

---

[4]      As noted above, HPCI leases the Permanente Plant to Lehigh Southwest.  Prior to the filing of these
chapter 11 case, payments of rent, royalties and other amounts by Lehigh Southwest were effectuated
through intercompany transactions reflected in HPCI's books.  During these chapter 11 cases, Lehigh
Southwest will pay amounts owed under the leases to HPCI in cash.

request that their Banks be authorized to honor the Debtors' requests to open or close any bank

accounts, provided, however, that any new domestic account is established at a bank that is

insured with the FDIC or the Federal Savings & Loan Insurance Corporation and is organized

under the laws of the United States or any State therein.  To protect against the possible

inadvertent payment of prepetition claims, the Debtors have advised Bank of America, N.A. not

to honor checks issued prior to the Petition Date, except as otherwise expressly permitted by an

order of the Court and directed by the Debtors.  The Debtors, moreover, have the capacity to

draw the necessary distinctions between prepetition and postpetition obligations and payments

without closing the Bank Accounts and opening new ones.

        64.     In the ordinary course of their business, the Debtors use checks and other

business forms (collectively, and as they may be modified, the "Business Forms").  To avoid

unnecessary expense, the Debtors will request that they not be required to include the legend

"D.I.P." and the corresponding bankruptcy case number on their Business Forms.  Absent this

relief, the Debtors' estates will be required to bear unnecessary expenses, which the Debtors

respectfully submit is unwarranted.  As parties that presently conduct business with the Debtors

likely will be aware of the Debtors' status as debtors in possession, the alteration of the Debtors'

checks and business forms would be unnecessary.

        65.     The Debtors will also request authority for the Banks to charge and the

Debtors to pay or honor both prepetition and postpetition service and other fees, costs, charges

and expenses to which the Banks may be entitled under the terms of and in accordance with their

contractual arrangements with the Debtors (collectively, the "Bank Fees").  The Debtors also will

request that the Court authorize the Banks to charge back returned items to the Bank Accounts in

the normal course of business.  The Debtors require this relief to minimize disruption to their

Bank Accounts and to assist them in accomplishing a smooth transition to operating in chapter 11.

## C.   Debtor in Possession Financing

66.   Prior to the commencement of these chapter 11 cases, the Debtors retained PricewaterhouseCoopers LLP ("PwC") as their financial advisor.  Given the circumstances of these cases and the Debtors' liquidity needs, the Debtors, with the advice of PwC and their other advisors, concluded that obtaining postpetition financing from their affiliate Lehigh Hanson was in the best interest of the their estates.  The Debtors and Lehigh Hanson engaged in good faith discussions regarding the terms of the proposed postpetition financing.  In those discussions, the Debtors were represented by Jones Day, and Lehigh Hanson was represented by Mr. William Venema, who is the Vice President and General Counsel of Lehigh Hanson.

67.   The Debtors require the financing provided by the DIP Credit Agreement to ensure that they have sufficient funds to finance these chapter 11 cases and certain other expenses.  Accordingly, entry into the DIP Credit Agreement is necessary to ensure that the Debtors are able to pursue a successful restructuring and maximize the value of their estates for the benefit of all stakeholders.

68.   Immediate approval of the interim financing will ensure that the Debtors have sufficient liquidity to address any short term funding needs, including capital expenditures, reclamation costs and other administrative expenses.

## D.   The Debtors' Need for Extension and Application of Automatic Stay

69.   The relief sought in the adversary proceeding commenced by the Debtors — extending and applying the automatic stay to Derivative Claims against the Protected Parties — is necessary to preserve the status quo and will enhance the Debtors' prospects of

successfully establishing a section 524(g) trust, protect the integrity of the automatic stay, and

prevent prejudice to the Debtors' estates.

70.    As a result of the automatic stay triggered by the Debtors' bankruptcy

filings, and in the absence of an injunction or declaration that prohibits the filing or continued

prosecution of Derivative Claims against the Protected Parties, I believe that:

(a)    The Defendants who have sued the Debtors and the Protected Parties in an asbestos action may attempt to proceed with their litigation against the Protected Parties while severing the Debtors from the cases;

(b)    The Defendants who have sued only the Debtors, and not the Protected Parties, may seek to amend the applicable complaints to name the Protected Parties, and may dismiss their claims against the Debtors;

(c)    The Defendants who have sued or threatened to sue the Protected Parties may attempt to proceed with their litigation against the Protected Parties; and

(d)    Defendants John and Jane Does 1-1000 may sue the Protected Parties, but not the Debtors, to assert Derivative Claims against the Protected Parties.

71.    Allowing derivative lawsuits against the Protected Parties to commence or

continue during the Debtors' bankruptcy proceeding could pose a number of problems for the

Debtors and could defeat the purpose of the automatic stay.  In my view, the Debtors could not

realistically stand by as asbestos claimants seek to establish the Debtors' liability in derivative

suits against the Protected Parties.  Rather, the Debtors would be forced to actively monitor any

ongoing lawsuits against the Protected Parties to protect their own interests.  Indeed, because the

Debtors are in effect the real-party defendants in any suit against the Protected Parties asserting

Derivative Claims, the Debtors would have to proceed as if they had been sued directly.

72.    The Debtors' need to participate in these lawsuits would distract them

from, among other things, the important task of reaching agreement on a consensual plan of

reorganization and establishment of a section 524(g) trust.  Personnel with knowledge regarding

the Debtors' Asbestos Products and the Debtors' asbestos-related liabilities who are or have been

assisting the Debtors in defense of asbestos bodily injury lawsuits may be called to attend depositions, review documents, serve as witnesses or engage in other litigation-related tasks that would distract them from their work on these cases.  Further, liquidation of Derivative Claims against the Protected Parties outside of the Debtors' bankruptcy cases would jeopardize the asbestos trust's ability to treat all current and future claims equitably.

## **CONCLUSION**

73.     For all the reasons described herein and in the First Day Pleadings, I respectfully request that the Court grant the relief requested in each of the First Day Pleadings.

[remainder of page intentionally left blank]

Dated:  September 30, 2016

/s/ Charles E. McChesney II
Charles E. McChesney II