# EXHIBIT 11

**HANSON PERMANENTE CEMENT, INC.'S (F/K/A KAISER CEMENT CORP.)**

**SUPPLEMENTAL RESPONSES TO U.S. ENVIRONMENTAL PROTECTION AGENCY**

**CERCLA SECTION 104(e) INFORMATION REQUEST**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| Respondent: | Hanson Permanente Cement, Inc. (formerly known as Kaiser Cement Corporation) |
| Site: | Lower Duwamish Waterway, Seattle, WA 5906 West Marginal Way SW 5975 East Marginal Way S. Seattle, WA |
| King County Parcels: | 1924049029 and 1924049075 |
| Date: | 1944 to present |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

On or about February 22, 2010, Hanson Permanente Cement, Inc. (f/k/a Kaiser Cement Corporation) (hereinafter referred to as "KCC") was served with a Request for Information (the "Request") from the United States Environmental Protection Agency ("USEPA") issued pursuant to Section 104(e) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9604(e), regarding the Lower Duwamish Waterway Superfund Site located in King County, Seattle, Washington ("Site"). Pursuant to an extension granted by the USEPA, the deadline for KCC's initial response to the Request was June 23, 2010. KCC submitted *Hanson Permanente Cement, Inc.'s (f/k/a Kaiser Cement Corp.) Initial Response to U.S. Environmental Protection Agency CERCLA Section 104(e) Information Request* to USEPA on June 23, 2011 (the "*Initial Response*").

In the *Initial Response*, KCC informed USEPA that its sole knowledge of KCC's involvement and activities on or near the Lower Duwamish Waterway were contained within the historical documents located in a document repository in California. It explained that the repository contained more than 7,500 boxes of documents that potentially could have contained documents responsive to the Request. Accordingly, KCC sought and received from USEPA additional time to review the apparent responsive documents in its document repository so that it could prepare and submit its supplemental response to the Request.

KCC hereby restates its objections and submits its supplemental responses to the Request (this "Supplemental Response"), and states as follows:

### REVISED INITIAL STATEMENT

Based on available information, KCC owned and operated bulk cement operations at two separate locations in the vicinity of the Site, including 5900 and/or 5906 West Marginal Way SW

-1-

(King County Parcel No. 1924049029) (the "Westside Property") and 5975 East Marginal Way S. (King County Parcel No. 1924049075) (the "Eastside Property") in Seattle, Washington (collectively referred to as the "Seattle Properties").

## Eastside

In 1944, Permanente Cement Company (a prior name for KCC) acquired the real property that comprised the Eastside Property for the purpose of constructing and operating a bulk cement storage and distribution facility. That same year KCC exercised its option to purchase 100 percent of the stock of Glacier Sand & Gravel Company ("GSG"). The stated purpose of the acquisition of GSG stock was to provide for the distribution of KCC's cement in the Seattle area. At around this time, KCC leased a portion of the Eastside Property to GSG to operate a cement distribution facility to serve the greater Seattle area. On September 30, 1985, KCC sold the Eastside Property, including all real property and equipment to Riedel International, Inc. ("Riedel").

## Westside

On January 1, 1965, KCC entered into a long-term lease with the Port of Seattle (the "Port") for the Westside Property. On May 13, 1969, KCC entered into a real estate contract with the Port and, by a fulfillment special warranty deed, acquired fee title to the Westside Property on September 17, 1973. KCC sold the Westside Property and transferred ownership by Statutory Warranty Deed to Lone Star Industries, Inc. on April 10, 1987.

KCC has gone through a number of corporate mergers and name changes over the time periods relevant to this Supplemental Response (1944 to the present). The Permanente Corporation first was incorporated in California on or about February 10, 1939. In 1943, the name of The Permanente Corporation was changed to Permanente Cement Company. In 1964, the name of the corporation was changed to Kaiser Cement & Gypsum Corporation. In 1979, the name of the corporation again was changed, this time to Kaiser Cement Corporation. In 1982, Kaiser Cement Corporation, the California corporation, was merged with and into Kaiser Cement Corporation, a Delaware corporation, with Kaiser Cement Corporation (Delaware) being the surviving corporation. On February 3, 1989, Kaiser Cement Corporation (Delaware) was merged with and into Superlite Builders Supply, Inc., an Arizona corporation, with Superlite Builders Supply, Inc. being the surviving corporation. Immediately after the 1989 merger, Superlite Builders Supply, Inc. changed its name to Kaiser Cement Corporation, but remained an Arizona corporation. In February 1999, Kaiser Cement Corporation, the Arizona corporation, changed its name to Hanson Permanente Cement, Inc., its current name. Hanson Permanente Cement, Inc. remains incorporated under the laws of the state of Arizona.[1]

To the best of its knowledge, KCC has not conducted any active business operations in the state of Washington since 1987. At or around the time that its operations ceased in the Seattle area, KCC collected certain of its business records relating to the Seattle Properties and sent them to storage facilities in California. Many of these documents are still stored in California. These stored document collections cover a variety of historical information,

---

[1] All of the foregoing entities are referred to collectively herein as "KCC."

-2-

039391-0007/VANDOCS:60149126.8

KC2011633

EXHIBIT 11 - Page 002

including documents related to KCC's historical operating facilities in multiple states, including Washington.

KCC currently has no employees in Washington. Upon information and belief, all former employees of KCC with knowledge of its operations at the Seattle Properties have either passed away, or the whereabouts of such former employees are unknown. KCC's current officers and directors were not employees of KCC or affiliated with KCC at the time KCC conducted active business operations in Washington. Therefore, this Supplemental Response is based solely on a review of historical documents, title records, and corporate tax documents by counsel for KCC.

It has been at least 24 years since KCC ceased operations and sold its Seattle operations and the Seattle Properties. All knowledge of KCC's facilities and operations, including the Seattle Properties, is contained in the document collections in California. Over the last 16 months, the process of researching and creating an understanding of the Seattle Properties' history has been a tedious and time consuming process for KCC's internal and outside counsel. This process included review of over 11,000 pages of available box indices in order to determine which boxes out of the over 7,500 boxes of documents stored in the storage facilities in California might contain information relevant to this Request. The box indices and descriptions of the historical documents in the individual boxes were not created for the purpose of responding to this Request, but were created by historic corporate operations and employees that are no longer available; therefore, developing an understanding of the common references used internally by KCC to describe its Seattle Properties and the types of documents created by it in its development and operation of the facilities was of primary importance in determining which boxes to request for review. Ultimately, more than 400,000 pages of historical documents were reviewed for responsiveness to this Request, and KCC has prepared this Supplemental Response based solely on the information gleaned from these historical documents.

## GENERAL OBJECTIONS

KCC restates the following general objections to each individually numbered and segregated request for information contained in the Request, and to the definitions and instructions contained in the Request, to the extent applicable, on the following bases, as if each of the following general objections were repeated in full in KCC's response to each individual request:

1.      KCC objects to USEPA's statement that "Incomplete, evasive or ambiguous answers shall constitute failure to respond . . . ." KCC has no way to determine in advance which types of answers USEPA will deem to be incomplete, evasive or ambiguous. KCC has made a good faith effort to provide complete, forthright and unambiguous answers.

2.      KCC objects to USEPA's statement that "regardless of the assertion of any privilege, any facts contained in the document which are responsive to the Information Request must be disclosed in your response . . . ," as contrary to law. Attorney-client privileged communications do not lose their privileged status because they contain factual information, and the entirety of any privileged communication is protected from disclosure, even the factual information contained therein. Without waiving, limiting or otherwise prejudicing the foregoing

-3-

objection, and while preserving all rights and defenses that it may have with respect to information that may be protected from disclosure under the work product doctrine, attorney-client privilege or other applicable privilege or protection from disclosure, KCC has made a good faith effort to disclose relevant facts within its possession.

3.    KCC objects to USEPA's definition of "business activities" as overly-broad, unduly burdensome and oppressive.

4.    KCC objects to USEPA's definition of the term "material" because it includes "all raw materials, commercial products, wastes, chemicals, substances, or matter of any kind." This definition is so vague, ambiguous, overly-broad and unduly burdensome that it could be interpreted to mean literally anything. As such, it is not possible for KCC to provide responses which take this definition into account. KCC has made a good faith effort to disclose relevant facts within its possession.

5.    KCC objects to USEPA's definition of "Property" on the grounds that it includes "personal property" and "fee interests, leases, licenses, rental and mineral rights." As such, the definition is vague, ambiguous, overly-broad and unduly burdensome. Answers in this Response are limited to immoveable property and fixtures thereon.

6.    KCC objects to USEPA's Request, including without limitation the instructions and definitions thereof, to the extent that it seeks or requests information, documents, or actions of KCC that go beyond the scope of USEPA's authority under CERCLA, including without limitation, 42 U.S.C. § 9604(e).

## I.    *Respondent Information*

a.    *Provide the full legal name and mailing address of the Respondent.*

**Response:** Hanson Permanente Cement, Inc., 300 E. John Carpenter Freeway, Suite 1800, Irving, Texas 75062.

b.    *For each person answering these questions on behalf of Respondent, provide:*

    i.    *full name;*

    ii.    *title;*

    iii.    *business address; and*

    iv.    *business telephone number and FAX machine number.*

**Response:** All answers contained in this Supplemental Response, except for those questions concerning property ownership and current corporate ownership and governance, were prepared by or at the instruction of in-house and outside counsel on behalf of KCC based on a review of historical documents. KCC's in-house counsel is:

-4-

039391-0007/VANDOCS:50149126.8
KC2011635

EXHIBIT 11 - Page 004

Charles E. McChesney II
Chief Legal Counsel
Three Rivers Management, Inc.
agent for Hanson Permanente Cement, Inc.
Manor Oak One, Suite 200
1910 Cochran Road
Pittsburgh, PA, 15220
Phone: 412-208-8839
Fax: 412-208-8803
charles.mcchesney@trmi.biz.

c. *If Respondent wishes to designate an individual for all future correspondence concerning this Site, please indicate here by providing that individual's name, address, telephone number, and fax number.*

**Response:** Please direct all future communications to the following:

Charles E. McChesney II
Chief Legal Counsel
Three Rivers Management, Inc.
agent for Hanson Permanent Cement, Inc.
Manor Oak One, Suite 200
1910 Cochran Road
Pittsburgh, PA, 15220
Phone:  412-208-8839
Fax:  412-208-8803
charles.mcchesney@trmi.biz.

d. *State the dates during which Respondent held any property interests at or within one-half mile of the Site.*

**Response:** KCC purchased the Eastside Property in separate transactions on June 7, 1944 and September 19, 1958. A portion of the Eastside Property acquired in 1944 was sold to Kaiser Gypsum Company, Inc. ("Kaiser Gypsum") on December 7, 1953. KCC sold the remainder of the Eastside Property on September 30, 1985 to Riedel.

On January 1, 1965, KCC entered into a long-term lease with the Port for the Westside Property. On May 13, 1969, KCC entered into a real estate contract with the Port and, by a fulfillment special warranty deed, acquired fee title to the Westside Property on September 17, 1973. KCC sold the Westside Property and transferred ownership by Statutory Warranty Deed to Lone Star Industries, Inc. on April 10, 1987.

All documents responsive to this request are contained on Disk No. 2, Folder 1.d.

e. *State the dates during which Respondent conducted any business activity at or within one-half mile of the Site.*

-5-

**Response:** KCC purchased the Eastside Property in June 1944, and commenced plans for developing the property immediately. Those plans included constructing a bulk cement storage and distribution facility. According to the historical records, in early 1946, KCC sought the necessary permits to build a "concrete mixing plant," to include "cement handling and storage, plant distribution facilities, pack house, silos, and a wharf." (See KC2008030; KC2005695-5697). Operations commenced on the Eastside Property on or about October 25, 1946 and continued to October 1985.

Based on historical records, in early 1965, KCC leased 18.59 acres from the Port for the purpose of constructing a cement manufacturing plant at a cost of a minimum of $10 million. KCC started the project by demolishing some of the existing buildings on the Westside Property in September 1965. In July 1966, KCC announced its plans to construct cement storage silos with a capacity of 260,000 barrels. Subsequently, KCC acquired title to the Westside Property and operated a bulk cement storage and distribution facility until April 1987.

KCC never actually constructed or operated the cement manufacturing plant on the Westside Property as contemplated in its original lease with the Port. During the late 1970s and early 1980s, KCC did prepare comprehensive plans to construct and operate a finish grinding facility on the Westside Property, but abandoned those plans for undetermined reasons. Ultimately, KCC only owned and operated a bulk cement receiving, storage and distribution facility on the Westside Property.

f.  *Describe the nature of Respondent's business activities at the Site or within one-half mile of the Site.*

**Response:** See response to Question 1(e) above as if fully set forth herein.

g.  *In relation to your answer to the previous question, identify all materials used or created by your activities at the Site, including raw materials, commercial products, building debris, and other wastes.*

**Response:** KCC objects to the term "activities" on the grounds that it is vague, ambiguous and overly broad. Nevertheless, without waiving the foregoing objection, KCC responds herein based on its understanding of the term "activities."

### Eastside

Based on the historical records, KCC stored various types of cement in bulk at its Eastside Property. The bulk cement was received at the Eastside Property by ship, barge, or rail and transferred to storage silos. Connected with the storage silos was a Pack House, where it appears that KCC loaded the cement into bags, which were stored on either KCC's portion of the Eastside Property or transferred to the neighboring facilities of GSG for distribution. It appears that KCC also sold or transferred the bulk cement stored in its silos to GSG's cement mixing and truck and rail loading operations.

-6-

039391-0007/VANDOCS:50149126.8
KC2011637

EXHIBIT 11 - Page 006

From the historical records, cement types shipped to or from the Eastside Property included: ASTM Types I, II and III; Portland (various types); High Early; Oil Well; Yosemite; and Fine Grain cement. The cement types are described in invoices, purchase orders, and other transactional documents. Certain historical records, including test data reports, laboratory analysis reports, and inter-office memorandums, contain data regarding the chemical makeup of the certain cement types received, stored and handled at the Eastside Property.

In addition, in 1984, KCC had a dolphin and walkway removed from its Eastside Property, which resulted in the generation of debris or waste. KCC discovered no historic records that describe how the waste from the removal of the dolphin and walkway was handled, however, KCC contracted with Manson Construction & Engineering Co. to do the work on behalf of KCC.

Additionally, KCC found Inventory Reports stating that KCC had steel strapping, wooden pallets, and straps and bags stored on the Eastside Property in July and August 1985.

<u>Westside</u>

Based on the historical records, KCC received and stored various types of cement in bulk and occasionally in bags or sacks at its Westside Property. The bulk cement was received by ship, barge, or rail and transferred to storage silos. Bulk cement was shipped out of the Westside Property via truck or rail.

Based on the historical records, the Westside Property received bulk shipments of the following cement types: ASTM Types I and II; Oil Well; Rapid Hardening; and High Early. Many of these cement types were included as part of a cement supply contract with a Japanese cement manufacturer. Certain laboratory analytical test results for certain cement shipments from foreign ports, including British Columbia and Japan, were also located in the historical records. These laboratory reports show the chemical makeup of the various cement products received, stored, and shipped from KCC's Westside Property.

All documents responsive to this request are contained on Disk No. 2, Folder 1.g.

h.  *If Respondent, its parent corporation, subsidiaries or other related or associated companies have filed for bankruptcy, provide:*

    i.  *the U.S. Bankruptcy Court in which the petition was filed;*

    ii.  *the docket numbers of such petition;*

    iii.  *the date the bankruptcy petition was filed;*

    iv.  *whether the petition is under Chapter 7 (liquidation), Chapter 11 (reorganization), or other provision; and*

039391-0007/VANDOCS:50149126.8

KC2011638

EXHIBIT 11 - Page 007

v.   *a brief description of the current status of the petition.*

**Response:** KCC objects to the terms "other related or associated companies" on the grounds that it is vague, ambiguous and overly broad and KCC does not know what meaning USEPA attaches to such terms. Nevertheless, without waiving the foregoing objection, based on available information, neither KCC, its parent corporation, or any subsidiaries have filed for bankruptcy.

2.   <u>*Site Activities and Interests*</u>

a.   *Provide all documents in your possession regarding the ownership or environmental conditions of the Site, including, but not limited to, copies of deeds, sales contracts, leases, blueprints, "as-builts" and photographs. Environmental conditions of the Site includes information related to soil, sediment, water (ground and surface), and air quality, such as, but not limited to:*

**Response:** KCC objects to the term "environmental conditions" on the grounds that it is overly broad, vague and ambiguous. Nevertheless, without waiving the foregoing objection, KCC responds herein based on its understanding of the term "environmental conditions."

After conducting an extensive review of KCC's historical documents, KCC located numerous drawings, maps, blueprints, or other documents describing or depicting the facilities constructed or to be constructed at the Seattle Properties. KCC is unable, however, to confirm or deny whether these documents reflect the "as-built" conditions at the cement distribution facilities on the Seattle Properties during any specific period of time, except where the drawing, map or blueprint expressly states that it shows existing structures or provides a date when such structures and equipment were built or installed.

KCC identified numerous aerial photographs showing both the Eastside and Westside Properties. In addition, KCC found photographs showing various construction activities, including the construction of a dock, ship unloading equipment, and cement storage silos, and building demolition during the initial development of the bulk cement storage and distribution facilities on the Westside Property. Photographs showing the office located on the Eastside Property were also discovered in the historical documents.

KCC identified certain documents, including the deed and other real estate transaction documents, relevant to KCC's acquisition of the real property comprising the Eastside Property from Thos. Carstens Investment Co. in 1944. (See KC2007948-7950). KCC also found certain documents, including the deed, describing KCC's acquisition of a portion of Slip No. 2 from the Commercial Waterway District No. 1 of the County of King, State of Washington in 1958. (See KC2002115-2120).

KCC identified certain documents, including the deed and other real estate transaction documents, relevant to KCC's initial lease and subsequent acquisition of the real property comprising the Westside Property from the Port in 1965 and 1973, respectively. (See KC2005732-5735; KC2005739-5765 and KC2005811-5815).

-8-

Additionally, KCC found press releases and news articles describing KCC's initial lease of, its agreement to purchase, and its plans for developing the Westside Property. (See KC2005663-5664; KC2007998-7999; KC2005645-5646).

KCC identified a number of lease-related documents referencing KCC's lease of its Seattle Properties to various entities. The following is a list of such known leases:

### Eastside - Leases

KCC discovered a few documents referring to leases of the Eastside Property that it had with GSG. In its extensive search of historical records, KCC only found a single page document dated April 23, 1945, which indicated that KCC was "preparing a lease covering that portion of the property occupied by Glacier Sand & Gravel Company." (See KC2005063). KCC did not locate the master lease document referring to its lease of a portion of the Eastside Property to GSG. KCC did, however, find a lease between KCC and GSG for space in the office building located on the Eastside Property commencing September 22, 1947. The original term of the lease was for one year, but continued on a month-to-month basis and was ongoing as of at least April 1966. (See KC2004870, KC2004869).

In addition, KCC leased office building space on the Eastside Property to Kaiser Aluminum & Chemical Corporation from January 1, 1971 through March 31, 1975. (See KC2006597-6605).

Finally, KCC leased a portion of its private rail trackage at the Eastside Property to Halliburton Services beginning July 1, 1979, for storage and unloading of commodities in covered hopper cars. (See KC2005881-5884).

### Westside - Leases

KCC identified numerous documents referring to leases of portions of the Westside Property. Since KCC only occupied a portion of the site for its bulk cement storage and distribution operations, the remainder of the Westside Property was regularly leased to third parties.

Prior to acquiring title to the Westside Property from the Port, KCC subleased a portion of the Westside Property to Sternoff Metals Corporation for storage of a dryer. This sublease commenced on January 1, 1965 and continued on a month-to-month basis. (See KC2008539-8541).

KCC entered into a lease of moorage space on the Duwamish River abutting the Westside Property leased from the Port with Sea-Land Freight Service, Inc. commencing on January 1, 1965. Sea-Land Freight Service, Inc., intended to use the leased area "for moorage of BCL type barges, with right of ingress and egress to and from the vessels." (See KC2008544).

KCC entered into a sublease of 10,000 feet of railroad spur track and a one-story steel construction building at the Westside Property with Delmar Painting Co. from

-9-

039391-0007/VANDOCS:50149126.8

**KC2011640**

EXHIBIT 11 - Page 009

March 10, 1966 through July 10, 1966. (See KC2004852-4854). The Port consented to this sublease. (See KC2004846-4849).

KCC leased 211,800 square feet of the Westside Property, including some railroad track, to Aleutian Constructors from December 15, 1972 through February 1, 1974, for storage of construction equipment, office buildings, and fencing. (See KC2003286, KC2003917, KC2005938).

After the title to the Westside Property was transferred to it, KCC entered into a lease with the Port from March 1, 1974 through February 28, 1975, for use for the "Port of Seattle Commerce and Storage Area." (See KC2006564-6566).

KCC entered into a lease of portions of the Westside Property with General Construction Company commencing November 1, 1974, for a three-year term plus an optional one-year extension. The use of the leased premises was described as "the construction, manufacture, fabrication and erection of modular equipment units and related equipment, pipe, steel products and other related items and for uses normally incident thereto and for no other purpose." (See KC2005848-5864, KC2005843-5845).

On August 18, 1981, KCC entered into a lease with Lynden Transport, Inc. for the storage of trailers, related equipment, and cargo at portions of the Westside Property. (See KC2006497-6500). This lease was extended to April 25, 1984. During the lease term, Lynden Transport subleased a portion of the leased premises to Sea-Land Service, Inc. (See KC2006493-6496; KC2006503-6504).

In November 1984, KCC leased space in a building on the Westside Property to Wright Schuchart Harbor Co. for storage of small tools and equipment. This lease terminated on or about February 20, 1985. (See KC2006478-6477, KC2006473). KCC also leased a portion of the Westside Property to Wright Schuchart Harbor Co. from December 14, 1985 through May 15, 1985 and from January 20, 1986, on a month-to-month basis, for parking space. (See KC2006064; KC2006061-6062; KC2006063 respectively).

In December 1984, KCC entered into a lease with Sea-Land Service, Inc., on month-to-month terms, for storage of containers and related equipment on a portion of the Westside Property. (See KC2006470).

Finally, KCC leased a small portion of the Westside Property to Universal/Land Const. Co. commencing July 17, 1986 and continuing on a month-to-month basis not exceeding three months, for setup of a portable crushing plant for crushing and stockpiling concrete pavement for use on Universal's Metro, ETS-8B project. (See KC2006060).

All documents responsive to this request are contained on Disk No. 2, Folder 2.a.

i.      *Any spill, leak, release, or discharge of a hazardous substance, waste, or material at or near the Site;*

-10-

**Response:** KCC objects to the terms "hazardous substance, waste, or material" on the grounds that they are vague, ambiguous and overly broad. Nevertheless, without waiving the foregoing objection, KCC responds herein based on its understanding of the terms "hazardous substance, waste, or material."

After conducting an extensive review of KCC's historical documents, KCC found no documents describing a spill, leak, release, or discharge of a hazardous substance, waste, or material at or near its Seattle Properties during its ownership or operation of the Seattle Properties. As described in KCC's response to Question 2.a.ii. below, KCC was issued Notices of Violations and Civil Penalties for occasional discharges of dust or other particulates from its cement loading and unloading operations at the Eastside and Westside Properties. KCC also located an undated Emissions Summary Comparison that appears to describe the existing and potential future air emissions from its dust collectors on the Westside Property. (See KC2000896). From the information available, it does not appear that these air emissions would constitute a release of a "hazardous substance, waste, or material."

KCC did find a letter to the Washington Department of Ecology ("Ecology") dated December 26, 1972 stating that the discharge of air compressor cooling water and truck wash water to the Duwamish River did not contain any of the materials listed in the Critical Materials Registry. (See KC2003934).

All documents responsive to this request are contained on Disk No. 2, Folder 2.a.i.

    ii.   *Occurrences of violations, citations, deficiencies, and/or accidents concerning the Site;*

**Response:** Notwithstanding the foregoing objections and after conducting an extensive review of KCC's historical documents, KCC identified the following information responsive to this request:

- Notice of Violation dated June 14, 1973 for failing to prevent particulate matter from becoming airborne. The alleged violation involved dust from the center bag house on the cement silos on the Eastside Property. (KC2003906). This alleged violation resulted in a Notice of Civil Penalty dated July 17, 1973 from the Puget Sound Air Pollution Control Agency. (KC2003904).

- Notice and Order of Civil Penalty dated March 11, 1981 from the Puget Sound Air Pollution Control Agency, alleging that KCC caused or allowed "the emission of an air contaminant for a period or periods aggregating more than three (3) minutes in any one hour" at the Westside Property. The allegations state that the emission opacity was 50 percent for a duration of seven minutes. (See KC2005907). KCC paid a civil penalty of $250 to resolve this alleged violation. (See KC2005915).

039391-0007/VANDOCS:50149126.8

**KC2011642**

EXHIBIT 11 - Page 011

- Notice of Violation dated March 16, 1984 for "causing or allowing particulate matter (cement) to be handled or stored such that particulate matter is emitted in sufficient quantities and of such characteristics and duration as is or is likely to be, injurious to human health, plant or animal life, or property." The alleged violation involved operations at the Eastside Property. (KC2004924).

- Notice of Violation dated March 29, 1985 for "causing or allowing particulate matter (cement) to be handled or stored such that particulate matter is emitted in sufficient quantities and of such characteristics and duration as is or is likely to be, injurious to human health, plant or animal life, or property, from cement barge unloading operation using a continuous ship unloader." The alleged violation involved operations at the Westside Property. (KC2003093). This alleged violation resulted in a Notice and Order of Civil Penalty being issued by the Puget Sound Air Pollution Control Agency, which assessed a $1,000 fine. (KC2005468). KCC paid the $1,000 fine to resolve this alleged violation. (See KC2003077).

- Notice and Order of Civil Penalty from Puget Sound Air Pollution Control Agency dated October 16, 1985 alleging "Particulate Emission from Cement Storage Baghouse Emitted in such Quantity, Characteristics and Duration to Unreasonably, Interfere with Human Health and/or Property." The alleged violation involved operations at the Westside Property and resulted in the assessment of a $1,000 fine. (KC2004912). KCC paid the $1,000 fine to resolve this alleged violation. (See KC2004910).

All documents responsive to this request are contained on Disk No. 2, Folder 2.a.ii.

iii.  *Remediation or removal of contaminated soils, sediments, or other media at the Site; and*

**Response:** Notwithstanding the foregoing objections and after conducting an extensive review of KCC's historical documents, KCC did not find any documents describing remediation or removal of contaminated soils, sediments, or other media at its Seattle Properties. The only discussion of removal of any media at the Seattle Properties is contained in a document entitled Environmental Audit dated May 1985 and prepared by Parametrix, Inc. on behalf of the Port, which was interested in reacquiring 7.6 acres of the Westside Property located south of the existing KCC cement facility. (See KC2005992-6054). The Audit Report includes a description of the excavation and removal of material from a pit that was allegedly used by KCC for disposal of waste sand, gravel, and cement slurries from the KCC bulk cement operations on the northern portion of the Westside Property. (See KC2006003). According to an Environmental Audit Report dated May 1985, USEPA concluded that these "waste pits" posed no serious hazard. (See KC2006002).

KCC did identify one privileged document that contains attorney-client privileged communications that states that here is soil with a pH level of 12.1 "around storage tanks

-12-

EXHIBIT 11 - Page 012

at Seattle." there is no corresponding laboratory data or other sources of information confirming this statement. KCC is not producing this document because it contains mostly privileged communications.

All non-privileged documents responsive to this request are contained on Disk No. 2, Folder 2.a.iii.

   iv.   *Investigations, inspections, sampling, and reports generated by Respondent and/or others regarding the Site and surrounding area.*

**Response:** In its extensive review of historical documents, KCC identified a number of documents responsive to this request. Most of the documents were generated by third parties and involved studies of the Lower Duwamish Waterway. KCC located a few documents that specifically involve investigations of the Westside Property. The most comprehensive document was an Environmental Audit dated May 1985 and prepared by Parametrix, Inc. on behalf of the Port, which was interested in reacquiring 7.6 acres of the Westside Property located south of the existing KCC cement facility. (See KC205992-6054).

The purpose of the Audit Report was to evaluate conditions related to past management of hazardous materials at the site and identify any hazards or special considerations due to such activities which might be pertinent to the Port's potential purchase and future development of this portion of the Westside Property. The report included the following details concerning the history of the Westside Property:

- King County owned the property from 1930 – 1943.

- The Federal government owned it from 1943 – 1964. The government operated a charcoal filter plant to produce activated charcoal for gas masks. The exact dates of plant operation are unknown, and Parametrix notes that it is not aware of any specific by-products of concern from the production of activated charcoal.

- From 1947 to probably 1958, the government leased the property to Reichhold Chemical, Inc. ("Reichhold"). There is conflicting information on what exactly Reichhold was doing on the Westside Property. One finding in the report is that Reichhold initially produced resins and preservatives for the lumber industry. Another statement is that Reichhold produced plastic polymers for use in the automobile industry. Chemicals and products reportedly associated with the site during Reichhold's occupation include phenol formaldehyde resins, pentachlorophenol, soya flour, dried horse blood, urea formaldehyde, and hydrochloric acid. Disposal pits associated with this operation were found on the property and it was noted that highly toxic wastewater was discharged directly into the Duwamish River until the summer of 1955.

- Aerial photography taken in 1960, 1961, and 1970 show three wastewater disposal pits. This area was eventually filled and paved over and served as a transshipment area.

- The Port owned the property from 1964 – 1969.

-13-

EXHIBIT 11 - Page 013

- KCC owned the property from 1969 to 1987.  KCC hired a contractor to demolish the old Reichhold and government buildings.

- A 1974 photo identified a pit in the southeast corner of the sale property.  This pit was allegedly used by KCC for disposal of waste sand, gravel, and cement slurries from the KCC facility to the north.  The pit was excavated and removed by a lessee to KCC.  According to the Audit Report, USEPA concluded that the "waste pits" posed no serious hazard.  (See KC2006002).

The Audit Report did include soil sampling information from 29 locations in the portion of the Westside Property not then being used by KCC for its bulk cement storage and distribution operations.  (See KC2006009).  Parametrix analyzed four composite soil samples and concluded that a "review of those components detected * * * does not indicate that any of the four areas represented by the composites is significantly contaminated." (See KC2006015).  Ultimately, the Port decided not to reacquire this portion of the Westside Property, but explained to KCC that its "decision not to purchase is in no way a result of any findings in soils sampling." (See KC2005989).

KCC also had an appraisal done on the Westside Property in 1984 to assess the fair market value of the real property, including upland and submerged land.  The site appraised totaled 13.00 acres, which was comprised of 8.74 acres of uplands and 4.26 acres of submerged land.  The total fair market value of the Westside Property in November 1984 was $2.5 million.  (See KC2002858-2936).

In 1983, in preparation for maintenance dredging around the two docks located on its Eastside Property, KCC had testing done of the sediments to be dredged.  (See KC2003852-3858).  As part of its permit application, KCC submitted the results of the sediment testing, which led USEPA in a letter to the U.S. Army Corps of Engineers to comment that the material in the northern quarter of the proposed maintenance dredging project was contaminated with PCBs in concentrations higher than 1 part per million and therefore, such material could not be disposed of using open water disposal.  The letter continues by stating that the applicant had revised the project to eliminate the contaminated material from its proposed dredging plan and that USEPA approved the revised plan.  (See KC2005592-5593).

In 1985, KCC received a letter from Ecology informing KCC that Ecology and USEPA had completed a preliminary assessment evaluation of the Westside Property, which was suspected of having received, generated, transported, or disposed of hazardous wastes prior to November 1980 (specifically, during the period of Reichhold's ownership/operations at the Westside Property).  The Assessment notes that "EPA has investigated the site and recommended no further action."  The Assessment also states that "[a]fter considerable investigation, EPA also concluded that there is no evidence that hazardous waste is, or ever was, disposed of on-site."  The Priority Assessment rating for the Site is noted as "None," which means that "no evidence has been found to suspect an environmental problem exists at the site."  (See KC2009770-9776).

Interestingly, in 1991 (more than four years after KCC sold the Westside Property), Ecology informed KCC that it had assessed the relative health and

-14-

environmental risk of the Reichhold/Long Star Cement site (5900 West Marginal Way).
In that assessment, Ecology had concluded that a risk rating for that site was 1 (the
highest) based on the presumed presence of compounds of concern including arsenic,
silver and pentachlorophenol. (See KC2004738-4739). According to Ecology,
Reichhold used pentachlorophenol and other metal based wood preserving chemicals as
part of their operation of wood treatment in the 1940s and 1950s. (See *Id.*). This
Assessment is directly contrary to the earlier assessment in 1985 by USEPA and Ecology
that concluded that there was no evidence of the release of hazardous substances on the
Westside Property.

All documents responsive to this request are contained on Disk No. 2,
Folder 2.a.iv.

b.   *Provide information on the condition of the Site when purchased or at the
beginning of the relevant time period; describe the source, volume, and content of
any fill material used during the construction of the buildings, including
waterside structures such as seawalls, wharves, docks, or marine ways.
Additionally, describe any subsequent improvements, alterations, demolitions, or
additions to the physical structures or the Site itself.*

**Response:** KCC objects to the terms "condition of the Site" on the grounds that it is
overly broad, vague and ambiguous. Nevertheless, without waiving the foregoing
objection, KCC responds herein based on its understanding of the terms "condition of the
Site."

Notwithstanding the foregoing objections and after an extensive review of KCC's
historical documents, KCC has identified a number of documents responsive to this
request. KCC did not locate any documents that expressly describe the condition of the
Eastside or Westside Properties prior to KCC's acquisition or leasing of the real property.
Nor did KCC discover the source, volume, or content of fill materials, if any, used during
the construction of buildings on the Seattle Properties. KCC did, however, identify
numerous documents describing subsequent improvements, alterations, demolitions or
additions to the physical structures or the Seattle Properties themselves. Below is a
compilation of the substantive changes, additions, or improvements to the Seattle
Properties that occurred during KCC's ownership.

### Eastside

* In a July1944 internal memorandum, KCC notes that it was advised that it
  "can construct wharves beyond its property line into Slip No. 2 to a line parllel
  [sic] with and 25 feet removed from the north line of the dredged area of Slip
  No. 2 under one or more" specified conditions. (See KC2008039). KCC did
  not find a document confirming that KCC constructed the dock located in Slip
  No. 2 at that time. A 1945 drawing shows an "Aggregates Unloading Dock"
  on the plans for the facility. (See KC2005075).

039391-0007/VANDOCS:50149126.8

KC2011646

EXHIBIT 11 - Page 015

- In November 1945, KCC applied to construct a wharf on the Duwamish River just north of Slip No. 2. (See KC2007927-7929).

- On January 17, 1946, the War Department issued a Permit to KCC to construct a wharf and 5 dolphins, with connecting bridge and camel, in the Duwamish Waterway at the east side, northerly of Slip No. 2. (See KC007921).

- On February 20, 1946, the War Department issued a Permit to KCC to dredge 75,000 cubic yards and place the dredged material on the shore above the line of mean higher high water at the Eastside Property. (See KC2005690-5691).

- On March 4, 1946, KCC applied for a Building Permit with the City of Seattle (the "City") to construct a concrete mixing plant, including cement handling and storage, plant distribution facility, pack house, silos and wharf. (See KC2008030). The City issued the requested building permit on March 6, 1946. (See KC2008031).

- During the initial construction of dock facilities, KCC determined that a sheet pile bulkhead would be needed to protect the Eastside Property. KCC applied for a building permit from the City on or about May 27, 1946. The City issued the permit that same day. (See KC2008033-8034). The reasons for the sheet pile bulkhead are described in a letter from KCC to the War Department dated May 21, 1946. (See KC2008037). In response, the War Department concluded that no War Department permit would be required. (See KC2008038).

- According to a KCC Property Ledger, the dredging for the new dock at the Eastside Property was completed in 1946. (See KC2002484).

- In September 1949, GSG proposed to construct a "Dry-Batching Plant" on its leased property. (See KC2000372). This project included construction of three steel silos for storage of aggregates and one steel silo for storage of cement, installation of shoots, and weigh batching equipment. (See KC2004956-4962). This project was completed in May 1950. (See KC2001314).

- Throughout the 1950s and early 1960s, KCC and/or its tenant made additions or improvements to the office building on the Eastside Property. (See KC2001783; KC2001786; KC2008688).

- In May 1967, GSG sought to install a 10,000 gallon underground diesel fuel tank on its leased portion of the Eastside Property. (See KC2006643).

- In June 1967, GSG authorized the expenditure of funds to install a dust collection system in its Duwamish Wetmix Plant to "collect dust from air

-16-

039391-0007/VANDOCS:50149128.8

KC2011647

EXHIBIT 11 - Page 016

emitted from all three silos while being refilled by Kaiser Cement blower system." (See KC2006641).

- In 1970, GSG authorized the expenditure of funds for "Water Pollution Control Facilities," including a 115,000 gallon open top tank and a collection sump and trough at the Eastside Property totaling $153,000. (See KC2001596; KC2001396-1397; KC2001404-1405). A second phase of the water pollution control improvements at the Eastside Property totaling $31,000 was authorized by GSG in 1973. (See KC2001595; KC2001597). Phase II of the water pollution control improvements involved constructing "settling ponds." (See KC2001541).

- In October 1975, GSG sought authorization to install a "Slury-Eez system" at the Duwamish Readymix Plant to put "concrete slimes from Truck washing back into concrete." (See KC2006638). According to the historical records, this system was in service by June 1976. (See KC2001635).

- In February 1978, KCC proposed to "[r]ebuild present dock at East Marginal Facility." The reason for this proposed project was because the dock was "deteriorating to an unsafe condition" and the "deckway and caps are rotting away to the point of being necessary to replace." (See KC2002233).

- In March 1978, KCC authorized the construction of a "Closed circuit water system for compressors at the East Marginal (Duwamish) facility." The reason for the expenditure was "to cut the cost of water usage and also eliminate the possibility of pollution in river." (See KC2002256). This system was in service by November 1978. (See KC2002250).

- In July 1980, GSG revised its plans to "Revise dock for loader unloading (aggregates) and install unloading ramp." This project had originally been proposed in 1978 but was revised to include removing a portion of the existing dock, adding a barge transfer conveyor, and increasing the lifting tower height. (See KC2006618). According to historical records, this project was completed in or around January 1981. (See KC2001750). It appears that this project involved renovations to the dock located in Slip No. 2.

- In July 1984, KCC entered into a contract with Manson Construction & Engineering Co. for "repairs to pier and dolphins at Kaiser East." This project included installing eight creosote piles and a 13-pile creosote dolphin, repairing three crushed caps, refastening ten piles to existing dolphins, repairing a broken walkway bridge, building a new untreated work walkway, and replacing the handrail. (See KC2003835). This project was completed in or around October 1984. (See KC2003836).

-17-

039391-0007/VANDOCS:50149126.8

KC2011648

EXHIBIT 11 - Page 017

## Westside

- In September 1965, KCC entered into a contract with Duwamish Shipyards to demolish a 37' x 87' steel building that adjoined the Duwamish Shipyards' property line. (KC2005648, KC2005961).

- In July 1966, KCC announced that it was going to begin construction before the end of the year on the first phase of a new cement manufacturing plant on the Westside Property. The proposed project involved constructing cement storage silos with a capacity of approximately 260,000 barrels. (See KC20005646). The proposed project was to include an underwater pneumatic transfer pipeline to transport bulk cement from the Westside Property to the existing distribution facilities on the Eastside Property. Kaiser later determined, however, that it would be more cost effective to construct a dock on the Westside Property than it would be to construct the submarine pipeline and, consequently, it abandoned its permits and plans for the pipeline. (See KC2008829-8830).

- In November 1966, the engineering contract was awarded to Kaiser Engineers for the proposed cement manufacturing plant on the Westside Property. The plans proposed constructing eight cement storage silos, minimal dock facilities to receive bulk cement from barges and ships, a distribution system to move the cement from the dock to the silos, bulk rail loadout facilities, and related utilities. (See KC2007812-7813).

- In May 1967, the contract for construction of the "eight bulk cement storage silos and related facilities" was awarded to McLaughlin, Incorporated. (See KC2007889). At the time, it was estimated that the project would be operational by March 1968. (See KC2008829-8830).

- In February 1979, KCC was in the process of permitting a finish grinding facility on the Westside Property to grind cement clinker to manufacture cement. (See KC2007683).

- In a memorandum dated February 13, 1980, KCC explained that the "Clinker Grinding Facility project was postponed October 25, 1979." (See KC2003815). Ultimately, the finish grinding facility project was abandoned. (See KC2005934).

- In March 1981, construction of a new ship unloader to serve the Westside Property started and was completed in July 1981. (See KC2000617). A photograph showing the completed ship unloader is included at KC2005391. The new ship unloader was tested, but never worked efficiently to offload clinker from barges and ships, which may have been one of the reasons why the finish grinding facility was never constructed.

All documents responsive to this request are contained on Disk No. 2, Folder 2.b.

-18-

039391-0007/VANDOCS:50149126.8

KC2011649

EXHIBIT 11 - Page 018

c.     *Provide information on past dredging or future planned dredging at this Site.*

**Response:** Notwithstanding the foregoing objections, KCC discovered historical documents describing various dredging activities associated with its construction and operation of the dock serving the Eastside Property. In 1946, KCC sought and obtained a permit from the War Department to dredge 75,000 cubic yards of material from the Duwamish Waterway adjacent to the Eastside Property and deposit the dredged material on shore. (See KC2005690-5691).

In late 1983 and early 1984, KCC applied for and obtained a permit to dredge material from the Duwamish Waterway adjacent to the main channel and Slip No. 2 to serve its Eastside Property. (See KC2005531-5535). USEPA commented that the material in the northern quarter of the project was contaminated with PCBs in concentrations higher than 1 parts per million and therefore, such material could not be disposed of using open water disposal. The letter continues by stating that the applicant had revised the project to eliminate the contaminated material from its proposed dredging plan and that USEPA approved the revised plan. (See KC2005592-5593).

KCC has not had any ownership interest in the former Seattle Properties for several decades and therefore, has no knowledge or information regarding any future planned dredging at or associated with the Seattle Properties.

All documents responsive to this request are contained on Disk No. 2, Folder 2.c.

d.     *Provide a brief summary of the activities conducted at the Site while under Respondent's ownership or operation. Include process diagrams or flow charts of the industrial activities conducted at the Site.*

**Response:** KCC objects to the terms "activities" and "industrial activities" on the grounds that they are vague, ambiguous and overly broad. Nevertheless, without waiving the foregoing objection, KCC responds herein based on its understanding of the terms "activities" and "industrial activities."

Notwithstanding the foregoing objections and after an extensive review of historical documents, KCC identified a number of documents describing, in various levels of detail, the operations that occurred on the Eastside and Westside Properties during KCC's ownership and operation. On both properties, KCC operated bulk cement storage and distribution facilities. The following is a description of the specific operations at the Seattle Properties:

### Eastside

KCC purchased the Eastside Property in June 1944, and commenced plans for developing the property immediately. Those plans included constructing a bulk cement storage and distribution facility. According to the historical records, in early 1946, KCC sought the necessary permits to build a "concrete mixing plant," to include "cement handling and storage, plant distribution facilities, pack house, silos, and a wharf." (See KC2008030; KC2005695-5697). Operations of the bulk cement storage and distribution

-19-

039391-0007/VANDOCS:50149126.8

**KC2011650**

EXHIBIT 11 - Page 019

facility commenced on the Eastside Property on or about October 25, 1946 and continued to October 1985 when the Eastside Property and operations were sold to Riedel.

KCC discovered a few documents that appear to show the packhouse process flow diagram for the Eastside Property. (See KC2004106-4114 and KC2010070). KCC found a document describing the sacking operations for the Eastside Property, which averaged 8,000 tons per year. (See KC2004007-4009; KC2004016).

### Westside

Based on historical records, in early 1965, KCC leased 18.59 acres from the Port for the purpose of constructing a cement manufacturing plant at a cost of a minimum of $10 million. KCC started the project by demolishing some of the existing buildings on the Westside Property in September 1965. The cement manufacturing plant originally proposed for the property was never constructed. In July 1966, KCC announced its plans to construct cement storage silos with a capacity of 260,000 barrels. The bulk cement receiving, storage, and distribution operations commenced on the Westside Property in or about February 1967. KCC received bulk cement from ships, barges, and railroad cars and distributed cement in the local area in 30 ton cement trucks. (See KC2005973). Subsequently, KCC acquired title to the Westside Property and operated a bulk cement storage and distribution facility until April 1987 when the Westside Property and operations were sold to Lone Star Cement.

In the late 1970s, KCC proposed to construct and operate a finish grinding mill on the Westside Property. KCC located a number of documents referring to this proposed new facility. (See e.g., KC2003639-3645; KC2005387-5388). The proposed finish grinding facility on the Westside Property, however, was never constructed nor operated by KCC. (See KC2005934).

KCC located a number of internal memorandums comparing the operations of the Westside and Eastside Properties. These memorandums confirmed that it was significantly more efficient to unload from ships and barges, store, and distribute bulk cement from the Westside Property. (See KC2003945; KC2003949; and KC2003951).

All documents responsive to this request are contained on Disk No. 2, Folder 2.d.

e.   *Provide all documents pertaining to sale, transfer, delivery, disposal, of any hazardous substances, scrap materials, and/or recyclable materials to this property.*

**Response:** KCC objects to the terms "hazardous substances," "scrap materials," and "recyclable materials" on the grounds that they are vague, ambiguous and overly broad. Nevertheless, without waiving the foregoing objection, KCC responds herein based on its understanding of the terms "hazardous substances," "scrap materials," and "recyclable materials."

After conducting an extensive review of KCC's historical documents, KCC found a few documents pertaining to the sale, transfer, delivery, and disposal of various

-20-

039391-0007/VANDOCS:50149126.8

KC2011651

EXHIBIT 11 - Page 020

substances and materials to its Seattle Properties that may or may not qualify as
hazardous substances, scrap materials, and/or recyclable materials. The majority of the
relevant documents are invoices from Bayside Disposal for monthly rental of containers
or drop boxes apparently used for disposal of solid waste during the period of December
1983 to October 1984. These invoices do not describe the nature of the waste materials
placed in these containers, however, there is no mention of any hazardous substances or
recyclable materials present. (See KC2002723-2757).

KCC found a purchase order describing KCC's purchase of liquid calcium
chloride for the period September 1, 1972 to August 31, 1975. This purchase order
indicates, however, that the purchase was intended for use by various KCC subsidiaries,
including GSG, Kaiser Gypsum, and Pacific Building Materials. (See KC2006843-
6845).

All documents responsive to this request are contained on Disk No. 2, Folder 2.e.

f.    *Provide all information on electrical equipment used at the Site, including
      transformers or other electrical equipment that may have contained
      polychlorinated biphenyls (PCBs).*

**Response:** KCC objects to the term "electrical equipment" on the grounds it is vague,
ambiguous and overly broad. Nevertheless, without waiving the foregoing objection,
KCC responds herein based on its understanding of the term "electrical equipment."

Notwithstanding the foregoing objections, KCC located some historical
documents relating to equipment that could be characterized as "electrical equipment."
Most of these documents are purchase orders or invoices for equipment purchased by
KCC for likely use at its Seattle Properties, including pumps, switches, motors,
compressors, and other electrical equipment. Specifically, KCC found a series of
Property Ledgers that refer to transformers on the Eastside Property, however, none of
these contain any information to suggest that these transformers contained PCBs. In fact,
a number of the identified transformers were listed as "dry type" transformers. (See
KC2002498-2510).

KCC found a letter dated July 16, 1973 from the City's Department of Lighting
that describes the City's installation and likely replacement of a 1,500 KVA transformer
to provide shore power for unloading ships. (KC2004027-4028). This letter does not
indicate if such transformer contained PCBs.

KCC did identify a series of documents that describe in detail the continuous bulk
cement and cement clinker ship unloading machine that KCC used at its Westside
Property, including the electrical equipment and motors that were part of this machine.
(KC2000547-0615).

KCC located one privileged document dated March 5, 1982 that contains
information responsive to this request. Because the document contains mostly privileged
opinions, analysis and recommendations, KCC is not producing the document to USEPA
and is not producing a redacted copy of the document. However, KCC does disclose the

039391-0007/VANDOCS:50149126.8
KC2011652

EXHIBIT 11 - Page 021

fact that, according to this document, PCB containing transformers were located at one or possibly both of the Seattle Properties.

All non-privileged documents responsive to this request are contained on Disk No. 2, Folder 2.f.

g.  *Provide information on the type(s) of oils or fluids used for lubrication of machinery or other industrial purposes, and any other chemicals or products which are or may contain hazardous substances which are or were used at the Site for facility operations.*

**Response:**  KCC objects to the terms "industrial purposes," "products" and "hazardous substances" on the grounds they are vague, ambiguous and overly broad. Nevertheless, without waiving the foregoing objection, KCC responds herein based on its understanding of the terms "industrial purposes," "products" and "hazardous substances."

After conducting an extensive review of KCC's historical documents, KCC located some records showing the purchase, use, and/or storage of oils, lubricants, fuels, and other petroleum products at its Seattle Properties. These records include: inventory records for the Eastside Property from 1945, 1946 and 1985; instruction, operations, and maintenance manuals; purchase orders; and invoices for gasoline, diesel and lubricants oils.

All documents responsive to this request are contained on Disk No. 2, Folder 2.g.

h.  *Provide any site drainage descriptions, plans or maps that include information about storm drainage which includes, but is not limited to, above or below surface piping, ditches, catch basins, manholes, and treatment/detention or related structures including outfalls.  If available, also include information about connections to sanitary sewer.*

**Response:**  After conducting an extensive review of KCC's historical documents, KCC located a few documents referencing storm water drainage issues.  There were communications with the City concerning the construction of a sewer connection during the initial construction of the Westside Property cement storage and distribution facility. These communications reference the fact that KGC's new sewer connection was expected to have a grade of less than the minimum two percent grade requiring KCC to enter into an indemnity agreement with the City regarding future damages resulting from such connection.  (See KC2009066).

Certain drawings, maps, or site plans referenced and provided with KCC's response to Question 2.a. above could contain information about storm drainage and storm and sanitary sewer connections.  (E.g.  KC2004965; KC2005075).  KCC found one document that describes the need to clean out a storm sewer pipe on the Westside Property because the pipe and drainage pathway did not have sufficient slope to drain water from the truck washing area and therefore, would build up with cement and other particles.  (See KC2003198).

-22-

039391-0007/VANDOCS:60149126.8

KC2011653

EXHIBIT 11 - Page 022

In 1968, the City sought to install a storm sewer drain across the southern 20 feet of the Westside Property that KCC leased from the Port. (See KC2008130-8132; KC2008140-8146).

All documents responsive to this request are contained on Disk No. 2, Folder 2.h.

i.   *With respect to past site activities, please provide copies of any stormwater or drainage studies, including data from sampling, conducted at the Site. Also provide copies of any Stormwater Pollution Prevention, Maintenance Plans, Spill Plans, and any stormwater, process water, or any other discharge permits that may have been developed or obtained for different operations during the Respondent's occupation of the property.*

**Response:** KCC objects to the term "past site activities" on the grounds it is vague, ambiguous and overly broad. Nevertheless, without waiving the foregoing objection, KCC responds herein based on its understanding of the term "past site activities."

After conducting an extensive review of KCC's historical documents, KCC located a few documents responsive to this request. In 1968, KCC filed an application for a Waste Discharge Permit for its Westside Property. The application (No. 2912) sought a "permit to discharge industrial waste effluent into the Duwamish Waterway from a cement warehouse in the amount of 4,000 gallons per day; said effluent having the following basic characteristics: non-contaminated cooling water with a maximum temperature of 90° F." (See KC2003218).

In 1972, KCC sought Waste Discharge Permits for its Eastside and Westside Properties. The application for Waste Discharge Permit No. 4032 for the Eastside Property proposed discharging "industrial waste effluent into the Duwamish River from its cement distribution plant in the amount of 5,000 gallons per day following treatment and in-plant control and in compliance with the Department's Water Quality Standards." (See KC2003134). The application for Waste Discharge Permit No. 4033 for the Westside Property proposed discharging "industrial waste effluent into the Duwamish River from its cement distribution plant in the amount of 54,000 gallons per day following treatment and in-plant control and in compliance with the Department's Water Quality Standards." (See KC2003135).

3.   *Information About Others*

a.   *Describe any business relationship you may have had regarding the property or operations thereon with the following entities:*

**Response:** KCC objects to the term "business relationship" on the grounds it is vague, ambiguous and overly broad. Nevertheless, without waiving the foregoing objection, KCC responds herein based on its understanding of the term "business relationship."

All documents responsive to this request are contained on Disk No. 2, Folder 3.a.

-23-

039391-0007/VANDOCS:50149126.8
**KC2011654**

EXHIBIT 11 - Page 023

    i.    *Ash Grove Cement Company*

**Response:** Notwithstanding the foregoing objection and after extensive review of historical documents, KCC is not aware of any relationship between KCC and Ash Grove Cement Company related to KCC's former facilities at the Seattle Properties.

    ii.    *Glacier Northwest, Inc.*

**Response:** Notwithstanding the foregoing objection and after extensive review of historical documents, KCC is not aware of any relationship between KCC and Glacier Northwest, Inc. related to KCC's former facilities at the Seattle Properties. To the best of KCC's knowledge, Glacier Northwest Inc. is not affiliated with or a successor to GSG.

    iii.    *Kaiser Cement Corporation*

**Response:** Notwithstanding the foregoing objection and after extensive review of historical documents, Kaiser Cement Corporation is the former name of Hanson Permanente Cement, Inc.

    iv.    *Kaiser Gypsum Corporation*

**Response:** Notwithstanding the foregoing objection and after extensive review of historical documents, KCC has no knowledge of an entity named "Kaiser Gypsum Corporation." KCC, however, is the one hundred percent (100%) owner of all outstanding shares of the entity known as Kaiser Gypsum Company, Inc.

    v.    *Lone Star Industries, Inc.*

**Response:** Notwithstanding the foregoing objection and after extensive review of historical documents, as discussed above, Lone Star Industries, Inc. purchased the Westside Property and associated bulk cement receiving, storage, and distribution facilities from KCC in 1987.

All documents responsive to this request are contained on Disk No. 2, Folder 2.i.

b.    *Provide the names and last known address of any tenants or lessees, the dates of their tenancy and a brief description of the activities they conducted while operating on the above mentioned Site.*

**Response:** As discussed above, from 1965 to 1973, KCC was a tenant under a long term lease with the Port at the Westside Property. KCC acquired fee title for the Westside Property by fulfillment deed in 1973.

In addition, KCC located numerous documents referring to leases or subleases of the Eastside and Westside Properties during the period of KCC's ownership. A description of these leases, the proposed use of the leased premises by the lessees, and all information known to KCC regarding names and last known addresses of the lessees are

039391-0007/VANDOCS:50149126.8
**KC2011655**

EXHIBIT 11 - Page 024

described in and the relevant documents provided with KCC's response to Questions 1.d. and 2.a. above.

All documents responsive to this request are contained on Disk No. 2, Folder 3.b.

c.    *If not already provided, identify and provide a last known address or phone number for all persons, including Respondent's current and former employees or agents, other than attorneys, who have knowledge or information about the generation, use, purchase, storage, disposal, placement, or other handling of hazardous materials at, or transportation of hazardous materials to or from, the Site.*

**Response:** KCC objects to the term "hazardous materials" on the grounds that it is vague, ambiguous and overly broad. Nevertheless, without waiving the foregoing objection, KCC responds herein based on its understanding of the term "hazardous substances."

As described in its Revised Initial Statement above, KCC has no current employees who have knowledge or information about any aspect of ownership or use of the Seattle Properties. KCC acknowledges that many of the documents provided with its *Initial Response* and this Supplemental Response contain names of what appear to be KCC employees at that time, however, KCC has no current knowledge as to the whereabouts of any of its former employees that might have information concerning KCC's former Seattle Properties or that would otherwise be responsive to this question, any of which would have last been employed by KCC nearly 25 years ago.

4.   *Financial Information*

a.    *Provide true and complete copies of all federal income tax documents, including all supporting schedules, for 2004, 2005, 2006, 2007 and 2008. Provide the federal Tax Identification Number and, if documentation is not available, explain why in detail.*

**Response:** KCC provided the requested federal income tax documents with its *Initial Response.* **The information and documents responsive to this request were designated Confidential Business Information pursuant to 42 U.S.C. §§ 9604(e)(7)(E) and 40 C.F.R. § 2.203(b) as provided by section reference on a separate disk marked "Confidential Business Information."**

b.    *Provide the Respondent's financial interest in, control of, or that the Respondent is a beneficiary of any assets (in the U.S. or in another country) that have not been identified in your federal tax returns or other financial information to be presented to EPA. If there are such assets, please identify each asset by type of asset, estimated value, and location.*

**Response:** KCC objects to the terms "financial interest in" and "assets" on the grounds that they are vague, ambiguous and overly broad. Nevertheless, without waiving the foregoing objection, KCC responds herein based on its understanding of the terms

-25-

039391-0007/VANDOCS:50149126.8
**KC2011656**

EXHIBIT 11 - Page 025

"financial interest in" and "assets." As stated in its *Initial Response* and confirmed in this Supplemental Response, to the best of KCC's knowledge, all of KCC's tangible and measurable assets were noted in the federal income tax returns described in KCC's *Initial Response* to Question 4(a) above.

c.  *If Respondent is, or was at any time, a subsidiary of, otherwise owned or controlled by, or otherwise affiliated with another corporation or entity, then describe the full nature of each such corporate relationship, including but not limited to:*

    i.  *a general statement of the nature of the relationship, indicating whether or not the affiliated entity had, or exercised, any degree of control over the daily operations or decision-making of the Respondent's business operations at the Site;*

**Response:** KCC objects to this question as overly broad, unduly burdensome, ambiguous, and unintelligible to the extent it seeks information related to "affiliated entities," and relies on the terms "affiliated with" and "any degree of control," without providing any definition of said terms or limiting the scope of their application to a reasonable set of activities or conduct. KCC responded in its *Initial Response* by applying its understanding that the terms "affiliated entities" and "affiliated with" mean ownership of all outstanding shares of a business entity, and by applying its understanding of the term "degree of control." KCC confirms in this Supplemental Response that there have been no changes in KCC's current or historical ownership since KCC submitted its *Initial Response* in June 2010 and therefore, its *Initial Response* fully responds to this question.

As previously stated, and based on a review of available information, KCC is not aware of any documents or information establishing that the relationship between KCC and the owner of the outstanding shares of KCC during the relevant time periods was anything other than the normal relationship between a shareholder and the corporation issuing the shares owned by said shareholder, with said shareholder exercising those rights and powers granted under applicable corporate and business law.

    ii.  *the dates such relationship existed;*

**Response:** KCC confirms in this Supplemental Response that there have been no changes in KCC's current or historical ownership since KCC submitted its *Initial Response* in June 2010 and therefore, its *Initial Response* fully responds to this question.

    iii.  *the percentage of ownership of Respondent that is held by such other entity(ies);*

**Response:** KCC confirms in this Supplemental Response that there have been no changes in KCC's current or historical ownership since KCC submitted its *Initial Response* in June 2010 and therefore, its *Initial Response* fully responds to this question.

-26-

iv.   *for each such affiliated entity provide the names and complete addresses
of its parent, subsidiary, and otherwise affiliated entities, as well as the
names and addresses of each such affiliated entity's officers, directors,
partners, trustees, beneficiaries, and/or shareholders owning more than
five percent of that affiliated entity's stock;*

**Response:** KCC objects to this question as overly broad, unduly burdensome,
ambiguous, and unintelligible to the extent it seeks information related to "affiliated
entities" without providing any definition of said term. KCC will respond herein by
applying its understanding that the term "affiliated entity " means ownership of all shares
of a business entity. KCC further objects to this question as overly broad and unduly
burdensome to the extent it calls for the identification, names and addresses of every
officer, director, partner, trustee, beneficiary and/or shareholder of multiple corporate
entities over a 67-year time period, a substantial portion of which involved periods of
time during which KCC did not own the Seattle Properties and did not conduct any
business activities at the Seattle Properties.

Notwithstanding the foregoing objection, KCC will provide the following
information regarding the current officers, directors, and shareholders of Hanson
Permanente Cement, Inc. and KH 1, Inc.:

**Current Officers, Directors, and Shareholders of Hanson Permanente Cement, Inc.:**

| | |
|---|---|
| Robert S. Markwell | Charles E. McChesney II |
| President & Director | Vice President & Secretary |
| Hanson Permanente Cement, Inc. | Hanson Permanente Cement, Inc. |
| Manor Oak One, Suite 200 | Manor Oak One, Suite 200 |
| 1910 Cochran Road | 1910 Cochran Road |
| Pittsburgh, PA 15220 | Pittsburgh, PA 15220 |
| | |
| Michael H. Hyer | Kathryn M. Mehta |
| Vice President & Director | Treasurer |
| Hanson Permanente Cement, Inc. | Hanson Permanente Cement, Inc. |
| 300 E. John Carpenter Freeway, Ste 1800 | Manor Oak One, Suite 200 |
| Irving, TX 75062 | 1910 Cochran Road |
| | Pittsburgh, PA 15220 |
| | |
| Mary Beth McCarthy | John M. Hutchinson |
| Assistant Secretary | Assistant Secretary |
| Hanson Permanente Cement, Inc. | Hanson Permanente Cement, Inc. |
| 300 E. John Carpenter Freeway, Ste 1800 | 300 E. John Carpenter Freeway, Ste 1800 |
| Irving, TX 75062 | Irving, TX 75062 |
| | |
| Robert D. VanBenschoten | James L. Wallmann |
| Assistant Secretary | Assistant Secretary |
| Hanson Permanente Cement, Inc. | Hanson Permanente Cement, Inc. |
| 300 E. John Carpenter Freeway, Ste 1800 | 300 E. John Carpenter Freeway, Ste 1800 |

-27-

039391-0007/VANDOCS:50149128.8
**KC2011658**

EXHIBIT 11 - Page 027

Irving, TX 75062

Amy C. Yi
Assistant Secretary
Hanson Permanente Cement, Inc.
300 E. John Carpenter Freeway, Ste 1800
Irving, TX 75062

KH 1, Inc.
Owner of 100% of shares of
Hanson Permanente Cement, Inc.
300 E. John Carpenter Freeway, Ste 1800
Irving, TX 75062

Irving, TX 75062

Mary D. Wright
Assistant Secretary
Hanson Permanente Cement, Inc.
Manor Oak One, Suite 200
1910 Cochran Road
Pittsburgh, PA 15220

### Current Officers, Directors, and Shareholders of KH 1, Inc.:

Daniel M. Harrington
President & Director
KH 1, Inc.
300 E. John Carpenter Freeway, Ste 1800
Irving, TX 75062

John M. Hutchinson
Assistant Secretary
KH 1, Inc.
300 E. John Carpenter Freeway, Ste 1800
Irving, TX 75062

Michael H. Hyer
Vice President, Secretary & Director
KH 1, Inc.
300 E. John Carpenter Freeway, Ste 1800
Irving, TX 75062

John T. Berry
Vice President & Treasurer
KH 1, Inc.
300 E. John Carpenter Freeway, Ste 1800
Irving, TX 75062

Robert D. VanBenschoten
Assistant Secretary
KH 1, Inc.
300 E. John Carpenter Freeway, Ste 1800
Irving, TX 75062

James L. Wallmann
Assistant Secretary
KH 1, Inc.
300 E. John Carpenter Freeway, Ste 1800
Irving, TX 75062

Amy C. Yi
Assistant Secretary
KH 1, Inc.
300 E. John Carpenter Freeway, Ste 1800
Irving, TX 75062

HBMA Holdings, LLC
Owner of 100% of shares of
KH 1, Inc.
300 E. John Carpenter Freeway, Ste 1800
Irving, TX 75062

　　　v.　　*provide any and all insurance policies for such affiliated entity(ies) which
　　　　　　may possibly cover the liabilities of the Respondent at the Site; and*

**Response:** KCC objects to this question as overly broad, unduly burdensome,
ambiguous, and unintelligible to the extent it seeks information related to "affiliated
entities" and it uses the phrase "might possibly cover" without providing any definition

-28-

039391-0007/VANDOCS:50149126.8
**KC2011659**

EXHIBIT 11 - Page 028

of said terms or phrases. KCC will respond herein by applying its understanding that the term "affiliated entity" means ownership of all shares of a business entity, and KCC will further respond herein by applying its understanding that the phrase "might possibly cover" means it identifies Respondent as an insured or additional insured under said insurance policy. KCC further objects to this question as calling for KCC to make a legal conclusion as to whether an insurance policy "might possibly cover" a particular liability, as that is a question of contract interpretation and may be a matter of dispute between an insured and an insurer. In addition, KCC objects to this question as overly broad and unduly burdensome to the extent that the phrase "the liabilities of Respondent at the Site" is not reasonably limited to liabilities associated with USEPA's CERCLA authority, if any such liability exists. KCC will respond herein by so limiting the term "the liabilities of Respondent at the Site."

Notwithstanding the foregoing objections, KCC responds by identifying, as if fully restated herein, those insurance policies identified in KCC's *Initial Response* and Supplemental Response to Question 5(a) below.

    vi.    *provide any and all corporate financial information of such affiliated entities, including but not limited to total revenue or total sales, net income, depreciation, total assets and total current assets, total liabilities and total current liabilities, net working capital (or net current assets), and net worth.*

**Response:** KCC objects to this question as overly broad, unduly burdensome, ambiguous, and unintelligible to the extent it seeks information related to "affiliated entities" and seeks "corporate financial information" without providing any definition of said terms, and to the extent it is not reasonably limited in time. KCC will respond herein by applying its understanding that the term "affiliated" means ownership of all shares of a business entity.

KCC provided the requested corporate financial information regarding Hanson Permanente Cement, Inc. and KH 1, Inc. with its *Initial Response*. **The information and documents responsive to this request were designated Confidential Business Information pursuant to 42 U.S.C. §§ 9604(e)(7)(E) and 40 C.F.R. § 2.203(b) as provided by section reference on a separate disk marked "Confidential Business Information."**

5.    *Insurance Coverage*

    a.    *Provide copies of all property, casualty and/or liability insurance policies, and any other insurance contracts referencing the site or facility and/or Respondent's business operations (including, but not limited to, Comprehensive General Liability, Environmental Impairment Liability, Pollution Legal Liability, Cleanup Cost Cap or Stop Loss Policies). Include, without limitation, all primary, excess, and umbrella policies which could be applicable to costs of environmental investigation and/or cleanup, and include the years such policies were in effect.*

039391-0007/VANDOCS:50149126.8

KC2011660

EXHIBIT 11 - Page 029

**Response:** KCC objects to this question as overly broad, unduly burdensome, ambiguous, and unintelligible to the extent it uses the phrase "could be applicable to" without providing any definition of said phrase. KCC will respond herein by applying its understanding that the term "could be applicable to" means, under applicable law, that an insurance policy should provide a legal defense to and/or indemnification of a particular liability. KCC further objects to this question as calling for KCC to make a legal conclusion as to whether an insurance policy "could be applicable to" a particular liability, as that is a question of contract interpretation and may be a matter of dispute between an insured and an insurer.

Notwithstanding the foregoing objections, KCC is supplementing its production of insurance policies disclosed in its *Initial Response* and producing additional known records in its possession with its Supplemental Response that are responsive to this request. **The information and documents responsive to this request are hereby designated Confidential Business Information pursuant to 42 U.S.C. §§ 9604(e)(7)(E) and 40 C.F.R. § 2.203(b) as provided by section reference on a separate disk marked "Confidential Business Information."**

b.   *If there are any such policies from question "5a" above which existed, but for which copies are not available identify each such policy by providing as much of the following information as possible:*

　　　i.   *the name and address of each insurer and of the insured;*

　　　ii.   *the type of policy and policy numbers;*

　　　iii.   *the per occurrence policy limits of each policy; and*

　　　iv.   *the effective dates for each policy.*

**Response:** KCC has revised its draft spreadsheet containing information responsive to this request and is producing the revised draft spreadsheet with its Supplemental Response. (See KC2011568-1577). The prior draft spreadsheet produced with the *Initial Response* should be removed and replaced with the revised draft spreadsheet. **The information and documents responsive to this request are hereby designated Confidential Business Information pursuant to 42 U.S.C. §§ 9604(e)(7)(E) and 40 C.F.R. § 2.203(b) as provided by section reference on a separate disk marked "Confidential Business Information."**

c.   *Identify all insurance brokers or agents who placed insurance for the Respondent at any time during the period being investigated, as identified at the beginning of this request, and identify the time period during which such broker or agent acted in this regard.*

**Response:** KCC has revised its draft spreadsheet containing information responsive to this request and is producing the revised draft spreadsheet with its Supplemental Response. (See KC2011568-1577). The prior draft spreadsheet produced with the *Initial Response* should be removed and replaced with the revised draft spreadsheet. **The**

-30-

039391-0007/VANDOCS:50149126.8

**KC2011661**

EXHIBIT 11 - Page 030

**information and documents responsive to this request are hereby designated
Confidential Business Information pursuant to 42 U.S.C. §§ 9604(e)(7)(E) and
40 C.F.R. § 2.203(b) as provided by section reference on a separate disk marked
"Confidential Business Information."**

d.     *Identify all communication and provide all documents that evidence, refer, or
       relate to claims made by or on behalf of the Respondent under any insurance
       policy in connection with the site.  Include any responses from the insurer with
       respect to any claims.*

**Response:**  KGC objects to this question as overly broad, unduly burdensome, and vague
in that it requests documents that "evidence, refer, or relate to" claims made by or on
behalf of the Respondent.

       Notwithstanding the foregoing objections, KCC is providing copies of its initial
notices letters to all known insurers regarding any possible claim against KCC associated
with the Lower Duwamish Waterway Superfund Site.  In addition, KCC is providing
copies of all substantive written responses from KCC's insurers to the initial notice letters
and any subsequent substantive written communications from or to the insurers regarding
any possible claim against KCC associated with the Lower Duwamish Waterway
Superfund Site.

       **The information and documents responsive to this request are hereby
designated Confidential Business Information pursuant to 42 U.S.C. §§
9604(e)(7)(E) and 40 C.F.R. § 2.203(b) as provided by section reference on a
separate disk marked "Confidential Business Information."**

e.     *Identify any previous settlements with any insurer in connection with the site, or
       for any claims for environmental liabilities during the time period under
       investigation.  Include any policies surrendered or cancelled by the Respondent
       or insurer.*

**Response:**  To date, KCC has not entered into any settlements with any insurers
regarding any claims related to the Lower Duwamish Waterway in Seattle, Washington.

f.     *Identify any and all insurance, accounts paid or accounting files that identify
       Respondent's insurance policies.*

**Response:**  After an extensive review of historical records, KCC located a limited
number of internal lists and memoranda, letters, invoices, accounting records, and other
documents that identify KCC's insurance policies.  KCC is providing copies of these
responsive historical records with this Supplemental Response.  **The information and
documents responsive to this request are hereby designated Confidential Business
Information pursuant to 42 U.S.C. §§ 9604(e)(7)(E) and 40 C.F.R. § 2.203(b) as
provided by section reference on a separate disk marked "Confidential Business
Information."**

g.     *Identify Respondent's policy with respect to document retention.*

039391-0007/VANDOCS:50149126.8

KC2011662

EXHIBIT 11 - Page 031

**Response:** Most KCC records that existed during the 1985 to 1987 time frame when KCC sold all assets related to its active business operations at the Seattle Properties were transferred to storage facilities located in California and continue to be stored in California. Due to various pending litigations in other matters since that time, KCC has retained at least one copy of all such records that were transferred to California for storage and that may be related to the subject matter of the pending litigations. To the extent there are KCC historical records in the California storage facilities that are not subject to retention for litigation purposes, those records are subject to the applicable corporate record retention policy. Until approximately October 2010, KCC records not otherwise subject to a litigation hold were subject to retention obligations contained in the Lehigh Hanson July 2008 Records Management and Retention Policy provided with KCC's *Initial Response*. After October 2010, KCC records not otherwise subject to a litigation hold have been subject to retention and disposition obligations contained in the Three Rivers Management, Inc. Records Management and Retention Policy, the most recent revision of which is produced with this Supplemental Response. (See KC2011578).

     **The information and documents responsive to this request are hereby designated Confidential Business Information pursuant to 42 U.S.C. §§ 9604(e)(7)(E) and 40 C.F.R. § 2.203(b) as provided by section reference on a separate disk marked "Confidential Business Information."**

6.    _Compliance with This Request_

    a.    _Describe all sources reviewed or consulted in responding to this request, including, but not limited to:_

        i.    _the name and current job title of all individuals consulted;_

        ii.    _the location where all documents reviewed are currently kept._

**Response:** Other than the corporate ownership and governance documents reviewed in preparing this Supplemental Response to the Request, the sole source of information used to prepare the Supplemental Response to the Request are the historical documents provided with this Supplemental Response. Four disks containing the responsive documents are enclosed with this Supplemental Response. The name and current job title of those individuals, other than outside counsel for KCC, that were consulted in preparing this Supplemental Response are provided in KCC's response to Question 1.b., which is incorporated as if fully set forth herein.

-32-

039391-0007/VANDOCS:50149126.8
**KC2011663**

EXHIBIT 11 - Page 032

I am an officer of Hanson Permanente Cement, Inc., formerly known as Kaiser Cement Corporation ("Kaiser Cement") and hereby represent that Kaiser Cement conducted a reasonable search for records and information in response to the United States Environmental Protection Agency's request for information and the foregoing response contains all non-privileged, relevant information discovered during Kaiser Cement's search.

Executed on: _Dec. 28 2011_

_Signature_

Charles E. McChesney II

Vice President & Secretary

KC2011664

EXHIBIT 11 - Page 033