**UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| KAISER GYPSUM COMPANY, INC., *et al.,*[1] | : | Case No. 16-31602 (JCW) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |

**DEBTORS' MOTION FOR AN ORDER APPROVING
<u>SETTLEMENT WITH OWENS CORNING FIBERGLAS CORPORATION</u>**

Hanson Permanente Cement, Inc. ("<u>HPCI</u>") and Kaiser Gypsum Company, Inc.

("<u>Kaiser Gypsum</u>"), debtors in the above-captioned cases (together, the "<u>Debtors</u>"), hereby move

the Court for entry of an order, pursuant to Rule 9019 of the Federal Rules of Bankruptcy

Procedure (the "<u>Bankruptcy Rules</u>"), approving a settlement between Owens-Corning Fiberglas

Corporation ("<u>Owens Corning</u>") and the Debtors resolving Owen Corning's claims against the

Debtors related to the fiberboard manufacturing facility in St. Helens, Oregon (the "<u>Site</u>").

In support of this motion, the Debtors submit the Declaration of Charles E. McChesney II,

attached hereto as <u>Exhibit A</u>, and respectfully represent as follows:

<u>**Background**</u>

1.      On September 30, 2016, each of the Debtors commenced a case by filing a

voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are

continuing in possession of their properties and are managing their businesses, as debtors in

possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.[2]

---

[1]     The Debtors are the following entities (the last four digits of their respective taxpayer identification numbers follow in parentheses):  Kaiser Gypsum Company, Inc. (0188) and Hanson Permanente Cement, Inc. (7313).  The Debtors' address is 300 E. John Carpenter Freeway, Irving, Texas 75062.

[2]     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core

2.    On October 14, 2016, the Court entered an order appointing an official committee of unsecured creditors (the "Creditors' Committee") in these chapter 11 cases [D.I. 84].  On October 19, 2016, the Court entered orders appointing (a) an official committee of asbestos personal injury claimants (the "Asbestos Committee") [D.I. 100] and (b) a legal representative for future asbestos personal injury claimants (the "Future Claimants' Representative") [D.I. 99].

3.    Debtor HPCI is a wholly-owned, indirect subsidiary of non-debtor Lehigh Hanson, Inc.  HPCI is the direct parent of Debtor Kaiser Gypsum and certain additional domestic non-debtor subsidiaries.  The ultimate parent of the Debtors and Lehigh Hanson, Inc. is non-debtor HeidelbergCement AG, a German company.

## Background on the Site

### I.    The Site

4.    The St. Helens Site consists of approximately 175 acres with approximately 38 acres identified as the "uplands," which have been developed and used for manufacturing operations.  The remainder of the Site consists of an undeveloped area identified as the "lowlands" that includes submerged land, tide lands, wetlands, and seasonally inundated lands.  Scappoose Bay borders the Site on the south and southeast, Milton Creek is on the eastern border, and McNulty Creek is to the west.

### II.    History of Ownership and Operations

#### A.    Fir-Tex Insulation Board Company (1930-1956)

5.    Fir-Tex Insulation Board Company ("Fir-Tex") built the fiberboard plant

---

proceeding pursuant to 28 U.S.C. § 157(b).  Venue for this matter is proper in this district pursuant to 28 U.S.C. § 1409.

at the Site in 1930 and operated it for over 26 years.  Fir-Tex produced sheet and fiberboard

products, including wood fiber ceiling board that at times included additives such as asphalt or

resins.  Fir-Tex received wood chips via rail, truck, and barge and operated a log pond and

chipped logs for a source of wood fiber at a wood chipper located on the dock.  Fir-Tex used

Bunker C as a fuel source and burned oil in retorts to create steam for digesters.  Western

Insulation Products Company, a wholly owned subsidiary of Fir-Tex, operated a hot-dip process

for asphalt coating of roofing insulation and sheathing and insulated siding and shingles on a

portion of the Site.  It also operated a plant that manufactured expansion joints for concrete

construction using asphalt dipping and drying.  Dant & Russell acquired the stock of Fir-Tex in

1938, and the facility continued to be operated as Fir-Tex until 1956.

### B.    Kaiser Gypsum (1956-1978)

6.    Kaiser Gypsum purchased the property and certain physical assets of

Fir-Tex in early November 1956.  At the time it purchased the plant, Kaiser Gypsum completed a

conversion to natural gas for producing steam in the retorts for the digesters.  For just under 22

years, from November 1956 until August 1978, Kaiser Gypsum owned and operated the

fiberboard plant and produced sheet products from wood fiber and mineral fiber, including

sheathing, expansion joints, ceiling tiles and panels, mobile home ceiling board, carpet board and

roof insulation.  Kaiser Gypsum used virgin wood fiber, sawdust, mineral fiber, soda ash, starch

and clay as primary raw materials.

### C.    Owens-Corning (1978-1987)

7.    Owens Corning purchased the plant and property from Kaiser Gypsum in

August 1978.  Owens Corning operated the plant for just over 3 years, during which time the

plant manufactured wood fiber and mineral fiber sheet products until Owens Corning closed the

plant in late 1981 or early 1982.  During its period of production, Owens Corning used virgin

wood fiber, sawdust, mineral fiber, soda ash, starch and clay as primary raw materials.  Between

1983 and 1987, Owens Corning continued to own the property and removed and sold certain

portions of the mineral fiber and wood fiber processing equipment.

### D.   Armstrong World Industries, Inc. (1987-2018)

8.      Armstrong World Industries, Inc. ("Armstrong") purchased the Site from

Owens Corning in 1987 and began its operations in 1990 following renovation of the plant.

Armstrong continues to own the Site today, and operated it for over 28 years until it ceased

operations earlier this year.  As part of its plant renovations, Armstrong replaced most of the

production equipment and changed the wastewater treatment system.  Armstrong introduced new

processes to use recycled newsprint to manufacture ceiling tile fiberboard.  Armstrong uses

mineral fiber, ball clay, newsprint, perlite and starch as primary raw materials.

### Environmental Liability At the Site

9.      In October 2001, the DEQ issued an enforcement order against Armstrong

to complete an investigation and feasibility study of potential environmental contamination at the

site, and to take any remedial actions necessary.  In December 2001, the DEQ notified Kaiser

Gypsum and Owens Corning that, under Oregon law, they were both potentially responsible

parties ("PRPs") for these efforts.  Armstrong, Owens Corning, and Kaiser Gypsum are the only

remaining PRPs for the Site.  Under Oregon law, all liable parties are jointly and severally liable

for the entire cost of clean-up.  See ORS 465.255.  To ensure no party pays more than its fair

share, the statute grants contribution rights to PRPs and instructs courts to use equitable factors

to allocate liability among multiple liable parties.  ORS 465.257(1)(a)-(k).  Each PRP has a right

of contribution against the others.  See ORS 465.325(6)(a) ("Any person may seek contribution

from any other person who is liable or potentially liable" for the costs of hazardous-waste

remediation).[3]

10.    In October 2000, approximately 13 years after Owens Corning sold the Site to Armstrong but prior to DEQ's enforcement order, Owens Corning filed for chapter 11 relief in the United States Bankruptcy Court for the District of Delaware.  In 2002, during the pendency of the chapter 11 case, Owens Corning entered into a stipulation and consent decree that memorialized a partial settlement with the DEQ.

11.    In December 2000, which was during the time Armstrong was the owner and operator of the Site, Armstrong also filed for chapter 11 relief and, like Owens Corning, filed its case in the United States Bankruptcy Court for the District of Delaware.  In 2003, while Armstrong was still in bankruptcy, Armstrong filed suit against Kaiser Gypsum and HPCI seeking contribution and/or cost recovery for clean-up efforts at the St. Helens Site.  Kaiser Gypsum and Armstrong ultimately resolved that dispute under a cost-sharing agreement.  Although the Armstrong bankruptcy concluded in 2006 with the confirmation of a reorganization plan, the plan did not discharge Armstrong's liability for contamination at the Site, as Armstrong acknowledged in a contemporaneous SEC filing.  Armstrong World Indus., Form 10-K for the Period Ending 12/31/2006, at 12; see also id. at 118.

12.    In 2016, Armstrong, Owens Corning and Kaiser Gypsum submitted a feasibility study for the upland portion of the Site.  In June 2018, the DEQ issued a Record of Decision selecting a remedial action to be implemented for the upland portion of the Site at an estimated cost of approximately $1.44 million.  To date, no feasibility study has been completed for the lowland and in-water portions of the Site, and the DEQ has not issued either a draft or

---

[3]    The PRPs have a similar right to contribution under the federal Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA").  See 42 U.S.C. § 9613(f)(1).

final selection of remedy for those portions of the Site.

## Efforts to Resolve the Liabilities at the Site

13.    In 2017 and 2018, a number of mediation sessions were held to resolve the

obligations of Armstrong, Owens Corning, Kaiser Gypsum, and HPCI regarding the St. Helens

Site clean-up costs.  In November 2017, the DEQ reached agreements with Armstrong and

Owens Corning.  Armstrong agreed to pay $8.62 million in cash, plus a commitment for

additional remediation costing approximately $1.38 million. Owens Corning agreed to pay $1.5

million (the "DEQ/Owens Corning Settlement").  These agreements provide that Armstrong and

Owens Corning will be released from any further liability to the State of Oregon for the Site.

14.    The Debtors, with the mediator's assistance, have reached agreements in

principle with the DEQ and the United States on the treatment of the Debtors' liabilities at the

Site and the Lower Duwamish site.  The Debtors have also reached agreements in principle with

a number of insurers.

## The Proposed Consent Judgments

15.    The Armstrong and Owens Corning settlements with the DEQ are

memorialized in Proposed Consent Judgments, which are not effective until they are approved by

an Oregon state court.  On February 1, 2018, the DEQ gave public notice of the proposed

consent judgments with Armstrong and Owens Corning (the "Owens Corning Consent

Judgment").  On March 2, 2018, Kaiser Gypsum objected to the proposed consent judgments on

various grounds, chief among them that Armstrong's equitable share of liability at the Site should

be much greater and, as a consequence, had the potential effect of imposing a disproportionate

and significantly higher liability share on Kaiser Gypsum than is justified by Oregon law.

16.    On March 28, 2018, the Debtors notified the DEQ, Armstrong and

Owens Corning that, in the Debtors' view, entry into the consent judgments would violate the

automatic stay.  On May 22, 2018, the DEQ filed a motion in this Court seeking confirmation

that the automatic bankruptcy stay does not apply to the applications for entry of the Proposed

Consent Judgments in Oregon state court [D.I. 984].  In the alternative, the DEQ requested

(and later withdrew its request) that the automatic stay be lifted for cause [D.I. 1056].  On

September 6, 2018, the Court entered an order granting the DEQ's motion but staying the effect

of the order for 45 days [D.I. 1140] (the "DEQ Order").  On September 19, 2018, the Debtors

filed a notice of appeal of the Court's order [D.I. 1163] (the "Appeal").  On October 3, 2018, the

Debtors filed a motion for a stay pending appeal and a motion to expedite the appeal.  On

October 10, 2018, the United States District Court for the Western District of North Carolina

(the "District Court") entered an order staying the DEQ Order pending the appeal (the "Stay

Pending Appeal Order").

## Owens Corning's Proofs of Claim

17.    On September 13, 2017, Owens Corning filed identical proofs of claim

against each Debtor for $600,000 for (a) reimbursement of environmental costs, including

investigation and feasibility study costs, DEQ oversight costs, and other expenses related to the

Consent Order and (b) remedial action costs for the investigation of the Site (the "Proofs of

Claim").  See Claims No. 61 and 450.  The Proofs of Claim also assert a claim for

reimbursement of any future costs Owens Corning is required to pay at the Site.

## Proposed Settlement

18.    Following arms-length negotiations, the Debtors and Owens Corning have

agreed to resolve the Proofs of Claim and the appeal of the DEQ Order on the following terms

(the "Settlement"):

      a.    Within 7 days after entry of an order approving this Motion, the
           Debtors will file with the District Court a motion seeking to modify the Stay

Pending Appeal Order to permit the DEQ and Owens Corning to proceed with implementation of the DEQ/Owens Corning Settlement and the entry of the Owens Corning Consent Judgment in any appropriate forum (the "<u>Amended Order</u>").

        b.       Upon the entry of the Amended Order:  (a) the Debtors will be deemed to withdraw, with prejudice, their objections to the DEQ/Owens Corning Settlement and entry of the Owens Corning Consent Judgment; and (b) Owens Corning will withdraw, with prejudice, the Proofs of Claim and will be deemed to waive and release any claims against either Debtor related to the Site.

## Basis for Relief Requested

19.      This Court has authority to approve the Settlement pursuant to Bankruptcy Rule 9019.  <u>Key3Media Grp., Inc. v. Puliver.com Inc. (In re Key3Media Grp., Inc.)</u>, 336 B.R. 87, 92 (Bankr. D. Del. 2005).  Bankruptcy Rule 9019(a) provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  Fed. R. Bankr. P. 9019(a).  Compromises, such as the resolution of the claim set forth in the Settlement, "are favored in bankruptcy" because they "minimize litigation and expedite the administration of a bankruptcy case."  <u>Myers v. Martin (In re Martin)</u>, 91 F.3d 389, 393 (3d Cir. 1996); <u>see</u> <u>also</u> <u>In re Southern Hosiery Mill, Inc.</u>, 2012 Bankr. LEXIS 802, at *3 (Bankr. W.D.N.C. 2012) ("It is well established that compromises are favored in bankruptcy.").

20.      In evaluating the proposed settlement, the Court "need conduct neither an exhaustive investigation into the validity of, nor a mini-trial on, the merits of the claims sought to be compromised."  <u>In re Southern Hosiery Mill, Inc.</u>, 2012 Bankr. LEXIS at *3-4.  Rather, the Court should merely examine "whether the compromise is fair, reasonable, and in the best interest of the estate."  <u>In re Louise's Inc.</u>, 211 B.R. 798, 801 (Bankr. D. Del. 1997); <u>see</u> <u>In re Marvel Entm't Grp., Inc.</u>, 222 B.R. 243, 250 (D. Del. 1998) (concluding that the proposed settlement was in the best interest of the estate).  The "best interest" test requires that the proposed settlement be "fair and equitable."  <u>Protective Comm. for Indep. Stockholders of TMT</u>

Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968); In re Martin, 91 F.3d at 393;

Key3Media Grp., 336 B.R. at 92.  In evaluating the fairness of a settlement, a court does not

have to be convinced that the settlement is the best possible compromise, but only that the

settlement "falls within the reasonable range of litigation possibilities."  In re Washington

Mutual, Inc., 442 B.R. 314, 328 (Bankr. D. Del. 2011); In re Coram Healthcare Corp., 315 B.R.

321, 330 (Bankr. D. Del. 2004); see also In re Worldcom, Inc., 347 B.R. 123, 137 (Bankr.

S.D.N.Y. 2006) (finding the bankruptcy court "need only 'canvass the issues' to determine if the

'settlement falls below the lowest point in the range of reasonableness'") (quoting In re Teltronics

Serv., Inc., 762 F.2d 185, 189 (2d Cir. 1985)).

21.    This Court has identified four factors that courts should consider in

determining whether a settlement falls within the lowest point in the range of reasonableness:

(a) the probability of success in litigation; (b) the likely difficulties in collection; (c) the

complexity of the litigation involved, and the expense, inconvenience, and the delay necessarily

attending it; and (d) the paramount interest of the creditors.  In re Southern Hosiery Mill, Inc.,

2012 Bankr. LEXIS at *4 (citing In re Martin, 91 F.3d at 393).

***Application of Relevant Standards***

22.    The Debtors' entry into the Settlement is a sound exercise of their business

judgment and in the best interests of their estates and creditors.  The Settlement is the result of

arms' length bargaining between the Debtors and Owens Corning, and it provides for a beneficial

and fair resolution of the disputes between the parties.

23.    Although the Debtors believe they have viable contribution claims against

Owens Corning, the merits of such claims are uncertain for several reasons.  As an initial matter,

Owens Corning has asserted that all contributions claims against it were discharged in its

chapter 11 case.  Owen Corning has also argued that, even if such contribution claims were not

discharged, it has limited liability for environmental damages at the Site. Among other things, Owens Corning operated the plant at the Site for just over three years, as compared to 28 years for Armstrong and 22 years for the Debtors. Moreover, Owens Corning reached a partial settlement with the DEQ in 2002 that provides contribution protection against certain contribution claims.

24.    In addition, while the Debtors believe that they have defenses to the Proofs of Claim, given the history of operations at the Site and the terms of Owens Corning's 2002 partial settlement with the DEQ, there is no assurance that any objections to the Proofs of Claim would be sustained.

25.    Finally, although the Debtors believe that they have meritorious arguments on the merits of the Appeal, there is no assurance that the Debtors will succeed in overturning this Court's ruling that the automatic stay under 11 U.S.C. § 362(a) does not apply to enjoin the DEQ from consummating the DEQ/Owens Corning Settlement. In addition, even if the Debtors were to succeed in the Appeal, for the reasons discussed above, the value of any contribution claims against Owens Corning is unclear.

26.    Further, litigation of these issues would be complex, time-consuming and expensive, and could potentially delay the Debtors' chapter 11 cases. Although the Debtors do not anticipate any difficulty in collecting on a claim against Owens Corning, they believe that the settlement with Owens Corning is in the paramount interest of the creditors because it will avoid the cost, delay and uncertainty of litigation and fully and finally resolve all disputes between the Debtors and Owens Corning related to the Site.[4]

---

[4]    The Debtors believe that they have significant claims against Armstrong and intend to continue pursuing the Appeal as against Armstrong.

27.     Accordingly, the Debtors respectfully submit that the Settlement (a) is fair and reasonable, (b) is in the best interests of their chapter 11 estates and creditors and (c) should be approved pursuant to Bankruptcy Rule 9019.

## Notice

28.     Notice of this motion has been provided to:  (a) the Bankruptcy Administrator; (b) counsel to the Asbestos Committee; (c) Lehigh Hanson, Inc.; (d) counsel to the Creditors' Committee; (e) counsel to the Future Claimants' Representative; (f) Owens Corning; (g) the DEQ; (h) Armstrong; and (i) all parties entitled to notice pursuant to Bankruptcy Rule 2002.  The Debtors  submit that, in light of the nature of the relief requested, no other or further notice need be provided.

## No Prior Request

29.     No prior request for the relief sought herein has been made to this Court or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as Exhibit B, granting:  (i) the relief requested herein; and (ii) such other and further relief as the Court may deem proper.

Dated:   December 21, 2018
          (Charlotte, NC)

Respectfully submitted,

*/s/* John R. Miller, Jr.
C. Richard Rayburn, Jr. (NC 6357)
John R. Miller, Jr. (NC 28689)
RAYBURN COOPER & DURHAM, P.A.
1200 Carillon
227 West Trade Street
Charlotte, North Carolina  28202
Telephone:  (704) 334-0891
Facsimile:  (704) 377-1897
E-mail:   rrayburn@rcdlaw.net
               jmiller@rcdlaw.net

-and-

Gregory M. Gordon (TX 08435300)
Dan B. Prieto (TX 24048744)
Amanda S. Rush (TX 24079422)
JONES DAY
2727 N. Harwood Street
Dallas, Texas  75201
Telephone:  (214) 220-3939
Facsimile:  (214) 969-5100
E-mail:  gmgordon@jonesday.com
              dbprieto@jonesday.com
              asrush@jonesday.com

ATTORNEYS FOR DEBTORS

**<u>EXHIBIT A</u>**


**(Declaration)**

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| KAISER GYPSUM COMPANY, INC., *et al.,*[1] | : | Case No. 16-31602 (JCW) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |

**DECLARATION OF CHARLES E. MCCHESNEY II**
**IN SUPPORT OF DEBTORS' MOTION FOR AN ORDER APPROVING**
**SETTLEMENT WITH OWENS CORNING FIBERGLAS CORPORATION**

Charles E. McChesney II declares and states:

1.    I am a Vice President, the Secretary and a Director of both Kaiser Gypsum

Company, Inc. ("Kaiser Gypsum") and Hanson Permanent Cement, Inc. ("HPCI"), which are

debtors in the above-captioned chapter 11 cases (together, the "Debtors").  I have held these

positions with the Debtors since October 1, 2010.

2.    I am also a Vice President, the Secretary, the Chief Legal Counsel and a

Director of Three Rivers Management, Inc. ("TRMI"), an affiliate of the Debtors, and have

served in those capacities since October 1, 2010.  Prior to that time, I was an Assistant Secretary

of TRMI and have been an employee of TRMI since May 2005.  Pursuant to a contract with the

Debtors, TRMI provides asbestos and environmental liability management services for, and acts

as agent on behalf of, each of the Debtors.

3.    I submit this declaration in support of the Debtors' Motion for an Order

---

[1]    The Debtors are the following entities (the last four digits of their respective taxpayer identification numbers follow in parentheses):  Kaiser Gypsum Company, Inc. (0188) and Hanson Permanent Cement, Inc. (7313).  The Debtors' address is 300 E. John Carpenter Freeway, Irving, Texas 75062.

Approving Settlement with Owens Corning Fiberglas Corporation (the "Motion").[2]

4.      All facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents and/or information supplied to me by other members of the Debtors' management or the Debtors' professionals.  If called upon to testify, I could and would testify competently to the facts set forth herein.

### Background on the Site

5.      The St. Helens Fiberboard Facility located at 1645 Railroad Avenue in St. Helens, Oregon (the "Site") consists of approximately 175 acres with approximately 38 acres identified as the "uplands," which have been developed and used for manufacturing operations. The remainder of the Site consists of an undeveloped area identified as the "lowlands" that includes submerged land, tide lands, wetlands, and seasonally inundated lands.  Scappoose Bay borders the Site on the south and southeast, Milton Creek is on the eastern border, and McNulty Creek is to the west.

6.      Fir-Tex Insulation Board Company ("Fir-Tex") built the fiberboard plant at the Site in 1930 and operated it for over 26 years.  Fir-Tex produced sheet and fiberboard products, including wood fiber ceiling board that at times included additives such as asphalt or resins.  Fir-Tex received wood chips via rail, truck, and barge and operated a log pond and chipped logs for a source of wood fiber at a wood chipper located on the dock.  Fir-Tex used Bunker C as a fuel source and burned oil in retorts to create steam for digesters.  Western Insulation Products Company, a wholly owned subsidiary of Fir-Tex, operated a hot-dip process for asphalt coating of roofing insulation and sheathing and insulated siding and shingles on a portion of the Site.  It also operated a plant that manufactured expansion joints for concrete

---

[2]      All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

construction using asphalt dipping and drying. Dant & Russell acquired the stock of Fir-Tex in

1938, and the facility continued to be operated as Fir-Tex until 1956.

7.     Kaiser Gypsum purchased the property and certain physical assets of

Fir-Tex in early November 1956. At the time it purchased the plant, Kaiser Gypsum completed a

conversion to natural gas for producing steam in the retorts for the digesters. For just under 22

years, from November 1956 until August 1978, Kaiser Gypsum owned and operated the

fiberboard plant and produced sheet products from wood fiber and mineral fiber, including

sheathing, expansion joints, ceiling tiles and panels, mobile home ceiling board, carpet board and

roof insulation. Kaiser Gypsum used virgin wood fiber, sawdust, mineral fiber, soda ash, starch

and clay as primary raw materials.

8.     Owens-Corning Fiberglas Corporation ("Owens Corning") purchased the

plant and property from Kaiser Gypsum in August 1978. Owens Corning operated the plant for

just over 3 years, during which time the plant manufactured wood fiber and mineral fiber sheet

products until Owens Corning closed the plant in late 1981 or early 1982. During its period of

production, Owens Corning used virgin wood fiber, sawdust, mineral fiber, soda ash, starch and

clay as primary raw materials. Between 1983 and 1987, Owens Corning continued to own the

property and removed and sold certain portions of the mineral fiber and wood fiber processing

equipment.

9.     Armstrong World Industries, Inc. ("Armstrong") purchased the Site from

Owens Corning in 1987 and began its operations in 1990 following renovation of the plant.

Armstrong continues to own the Site today, and operated it for over 28 years until it ceased

operations earlier this year. As part of its plant renovations, Armstrong replaced most of the

production equipment and changed the wastewater treatment system. Armstrong introduced new

processes to use recycled newsprint to manufacture ceiling tile fiberboard. Armstrong uses

mineral fiber, ball clay, newsprint, perlite and starch as primary raw materials.

### Environmental Liability At the Site

10.     In October 2001, the DEQ issued an enforcement order against Armstrong

to complete an investigation and feasibility study of potential environmental contamination at the

site, and to take any remedial actions necessary. In December 2001, the DEQ notified Kaiser

Gypsum and Owens Corning that, under Oregon law, they were both potentially responsible

parties ("PRPs") for these efforts. Armstrong, Owens Corning, and Kaiser Gypsum are the only

remaining PRPs for the Site.

11.     In October 2000, Owens Corning filed a chapter 11 case, In re Owens

Corning, et al., Case No. 00-03837, in the United States Bankruptcy Court for the District of

Delaware. In 2002, during the pendency of the chapter 11 case, Owens Corning entered into a

stipulation and consent decree that memorialized a partial settlement with the DEQ.

12.     In December 2000, Armstrong filed a chapter 11 case, In re Armstrong

World Industries, Inc., et al., Case No. 00-4471, in the United States Bankruptcy Court for the

District of Delaware. In 2003, while Armstrong was still in bankruptcy, Armstrong filed suit

against Kaiser Gypsum and HPCI seeking contribution and/or cost recovery for clean-up efforts

at the St. Helens Site. Kaiser Gypsum and Armstrong ultimately resolved that dispute under a

cost-sharing agreement. Although the Armstrong bankruptcy concluded in 2006 with the

confirmation of a reorganization plan, I understand that the plan did not discharge Armstrong's

liability for contamination at the Site, as Armstrong acknowledged in a contemporaneous SEC

filing.

13.     In 2016, Armstrong, Owens Corning and Kaiser Gypsum submitted a

feasibility study for the upland portion of the Site. In June 2018, the DEQ issued a Record of

Decision selecting a remedial action to be implemented for the upland portion of the Site at an

estimated cost of approximately $1.44 million.  To date, I understand that no feasibility study has

been completed for the lowland and in-water portions of the Site, and the DEQ has not issued

either a draft or final selection of remedy for those portions of the Site.

### Efforts to Resolve the Liabilities at the Site

14.      In 2017 and 2018, a number of mediation sessions were held to resolve the

obligations of Armstrong, Owens Corning, Kaiser Gypsum, and HPCI regarding the St. Helens

Site clean-up costs.  In November 2017, the DEQ reached agreements with Armstrong and

Owens Corning.  Armstrong agreed to pay $8.62 million in cash, plus a commitment for

additional remediation costing approximately $1.38 million. Owens Corning agreed to pay $1.5

million (the "DEQ/Owens Corning Settlement").  These agreements provide that Armstrong and

Owens Corning will be released from any further liability to the State of Oregon for the Site.

15.      The Debtors, with the mediator's assistance, have reached agreements in

principle with the DEQ and the United States on the treatment of the Debtors' liabilities at the

Site and the Lower Duwamish site.  The Debtors have also reached agreements in principle with

a number of insurers.

### The Proposed Consent Judgments

16.      Armstrong and Owens Corning settlements with the DEQ are

memorialized in Proposed Consent Judgments, which are not effective until they are approved by

an Oregon state court.  On February 1, 2018, the DEQ gave public notice of the proposed

consent judgments with Armstrong and Owens Corning (the "Owens Corning Consent

Judgment").  On March 2, 2018, Kaiser Gypsum objected to the proposed consent judgments on

various grounds, chief among them that Armstrong's equitable share of liability at the Site should

be much greater and, as a consequence, had the potential effect of imposing a disproportionate

and significantly higher liability share on Kaiser Gypsum than is justified by Oregon law.

17.    On March 28, 2018, the Debtors notified the DEQ, Armstrong and

Owens Corning that, in the Debtors' view, entry into the consent judgments would violate the

automatic stay.  On May 22, 2018, the DEQ filed a motion in this Court seeking confirmation

that the automatic bankruptcy stay does not apply to the applications for entry of the Proposed

Consent Judgments in Oregon state court [D.I. 984].   In the alternative, the DEQ requested (and

later withdrew its request) that the automatic stay be lifted for cause [D.I. 1056].  On

September 6, 2018, the Court entered an order granting the DEQ's motion but staying the effect

of the order for 45 days [D.I. 1140] (the "DEQ Order").  On September 19, 2018, the Debtors

filed a notice of appeal of the Court's order [D.I. 1163] (the "Appeal").  On October 3, 2018, the

Debtors filed a motion for a stay pending appeal and a motion to expedite the appeal.  On

October 10, 2018, the United States District Court for the Western District of North Carolina

entered an order staying the DEQ Order pending the appeal.

### Owens Corning's Proofs of Claim

18.    On September 13, 2017, Owens Corning filed identical proofs of claim

against each Debtor for $600,000 for (a) reimbursement of environmental costs, including

investigation and feasibility study costs, DEQ oversight costs, and other expenses related to the

Consent Order and (b) remedial action costs for the investigation of the Site (the "Proofs of

Claim").  See Claims No. 61 and 450.  The Proofs of Claim also assert a claim for

reimbursement of any future costs Owens Corning is required to pay at the Site.

### Proposed Settlement

19.    Following arm's length negotiations, the Debtors and Owens Corning have

agreed to resolve the Proofs of Claim and the Appeal on the terms of the Settlement.  I believe

that the Debtors' entry into the Settlement is a sound exercise of their business judgment and in

the best interest of their estates and creditors.  I further believe that the Settlement will avoid the

cost, delay and uncertainty of litigation and fully and finally resolve all disputes between the

Debtors and Owens Corning related to the Site.

        I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  December 21, 2018

                    */s/ Charles E. McChesney II*
                    Charles E. McChesney II

## EXHIBIT B

**(Proposed Order)**

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| In re | Chapter 11 |
| KAISER GYPSUM COMPANY, INC., *et al.*,[1] | Case No. 16-31602 (JCW) |
| Debtors. | (Jointly Administered) |

**ORDER APPROVING**
**SETTLEMENT WITH OWENS CORNING FIBERGLAS CORPORATION**

This matter coming before the Court on the Debtors' Motion for an Order Approving

Settlement With Owens Corning Fiberglas Corporation. (the "Motion"),[2] filed by the above-

captioned debtors (together, the "Debtors"); the Court having reviewed the Motion; and the

Court having found that (i) the Court has jurisdiction over this matter pursuant to 28

---

[1]     The Debtors are the following entities (the last four digits of their respective taxpayer identification
numbers follow in parentheses): Kaiser Gypsum Company, Inc. (0188) and Hanson Permanente Cement,
Inc. (7313).  The Debtors' address is 300 E John Carpenter Freeway, Irving, Texas 75062.

[2]     Capitalized terms not otherwise defined herein have the meanings given to them in the Motion.

1

U.S.C.§§ 157 and 1334, (ii) venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and

1409, (iii)  this is a core proceeding pursuant to 28 U.S.C. § 157(b), (iv) notice of the Motion was

sufficient under the circumstances and (v) the Settlement was negotiated at arms' length and in

good faith; and the Court having determined that the relief requested in the Motion is in the best

interests of the Debtors, their estates and creditors; and good and sufficient cause having been

shown;

IT IS HEREBY ORDERED THAT:

1.    The Motion is GRANTED.

2.    The Settlement is approved.

3.    The Debtors are authorized to perform their obligations under the Settlement.

4.    Within 7 days of the entry of this Order, the Debtors shall file with the District

Court a motion seeking to modify the Stay Pending Appeal Order to permit the DEQ and Owens

Corning to proceed with implementation of the DEQ/Owens Corning Settlement and the entry of

the Owens Corning Consent Judgment in any appropriate forum (the "Amended Order").

5.    Upon entry of the Amended Order:

a.    The Debtors shall be deemed to withdraw, with prejudice, their objections

to the DEQ/Owens Corning Settlement and entry of the Owens Corning Consent Judgment, and

the Debtors shall not appear in any such forum to oppose the entry of the Owens Corning

Consent Judgment; and

b.    Owens Corning's Proofs of Claim Nos. 61 and 450 shall be deemed

withdrawn, with prejudice, and Owens Corning shall be deemed to waive and release any claims

against either Debtor related to the Site.

2

6.      The Debtors' notice, claims and solicitation agent, Prime Clerk LLC, is hereby

directed to take and perform all actions necessary to implement and effectuate the relief granted

in Paragraph 5.b.

7.      Nothing in this Order shall affect the Debtors' right to pursue the Appeal as to

Armstrong and to object to the proposed DEQ/Armstrong settlement and the proposed

Armstrong Consent Judgment.

**This Order has been signed electronically.**     **United States Bankruptcy Court**
**The judge's signature and the court's seal**
**appear at the top of the order.**