**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| KAISER GYPSUM COMPANY, INC., *et al.,*[1] | : | Case No. 16-31602 (JCW) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |

**DEBTORS' MOTION FOR AN ORDER**
**APPROVING SETTLEMENT WITH KING COUNTY, WASHINGTON**

Hanson Permanente Cement, Inc. ("HPCI") and Kaiser Gypsum Company, Inc.

("Kaiser Gypsum"), debtors in the above-captioned cases (together, the "Debtors"), hereby move

the Court for entry of an order, pursuant to Rule 9019 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), approving a settlement between King County, Washington

(the "County") and the Debtors resolving disputes related to that certain five mile stretch

designated by the United States Environmental Protection Agency (the "EPA") as the Lower

Duwamish Waterway Superfund Site (the "Site"). In support of this motion, the Debtors submit

the Declaration of Charles E. McChesney II, attached hereto as Exhibit A, and respectfully

represent as follows:

**Background**

1.      On September 30, 2016, each of the Debtors commenced a reorganization

case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The

Debtors are continuing in possession of their properties and are managing their businesses, as

---

[1]      The Debtors are the following entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): Kaiser Gypsum Company, Inc. (0188) and Hanson Permanente Cement, Inc. (7313). The Debtors' address is 300 E. John Carpenter Freeway, Irving, Texas 75062.

debtors in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.[2]

2.     On October 14, 2016, the Court entered an order appointing an official

committee of unsecured creditors (the "Creditors' Committee") in these chapter 11 cases

[D.I. 84].  On October 19, 2016, the Court entered orders appointing (a) an official committee of

asbestos personal injury claimants (the "Asbestos Committee") [D.I. 100] and (b) a legal

representative for future asbestos personal injury claimants (the "Future Claimants'

Representative") [D.I. 99].

3.     Debtor HPCI is a wholly-owned, indirect subsidiary of non-debtor Lehigh

Hanson, Inc.  HPCI is the direct parent of Debtor Kaiser Gypsum and certain additional domestic

non-debtor subsidiaries.  The ultimate parent of the Debtors and Lehigh Hanson, Inc. is

non-debtor HeidelbergCement AG, a German company.

## Background on the Site

4.     Each Debtor owned and operated facilities in the Seattle area at various

times between 1929 and 1987.  All of the facilities were on or adjacent to the Site, an industrial

waterway located in Seattle, Washington.  For 29 months between 1947 and 1949, a predecessor

of HPCI (referred to collectively with HPCI as "HPCI") leased and operated a cement

manufacturing plant located at 3801 East Marginal Way, Seattle, Washington.  From 1944 to

1987, HPCI owned and operated a bulk cement receiving, storage and distribution facility at

5975 East Marginal Way, Seattle, Washington.  Additionally, from 1965 to 1987, HPCI leased

and then owned property at 5906 West Marginal Way SW, Seattle, Washington, where HPCI

operated a second bulk cement receiving, storage and distribution facility.

---

[2]     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core
proceeding pursuant to 28 U.S.C. § 157(b).  Venue for this matter is proper in this district pursuant to
28 U.S.C. § 1409.

5.      In 1927 and 1928, Kaiser Gypsum procured the land for and constructed a cement manufacturing facility at 3801 East Marginal Way, which Kaiser Gypsum then operated for 31 months before leasing the facility to other operators and selling the facility in 1949.  In 1952 and 1953, Kaiser Gypsum procured the land for and constructed a gypsum products manufacturing facility at 5931 East Marginal Way, Seattle, Washington, which Kaiser Gypsum owned and operated from 1954 until the facility was sold in 1978.  Additionally, from 1969 to 1976, Kaiser Gypsum leased the land and operated a gypsum accessories manufacturing facility at 6335 First Avenue South, Seattle, Washington.

6.      By 1978, Kaiser Gypsum had sold all of its operations in the Seattle area, and by 1987, HPCI had ceased operations or sold all of its facilities in the Seattle area.

7.      The Site involves over 100 potentially responsible parties ("PRPs"), including the County and the Debtors.  In February 2010, the EPA served each of the Debtors with a request for information pursuant to Section 104(e) of the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9604(e) ("CERCLA"), and each of the Debtors responded to that request with an initial response in June 2010 and a supplemental response the following year, in December 2011.

8.      The County, The Boeing Company, the Port of Seattle and the City of Seattle (collectively, the "LDW Claimants") completed a remedial investigation and feasibility study ("RI/FS") of the Site pursuant to the requirements of a joint Administrative Order on Consent to Conduct a RI/FS between the LDW Claimants and the EPA.  The LDW Claimants also engaged in cleanup of various "early action areas" identified as locations that would require cleanup under any remedial scenario.  In 2013, the LDW Claimants also agreed to perform additional studies of the Site, which remain ongoing.

9.      In April 2014, HPCI, for itself and for Kaiser Gypsum, entered into an Alternative Dispute Resolution Memorandum of Agreement (the "MOA") with over thirty participating parties, including the County, pursuant to which the MOA signatories agreed to a process for allocating the response costs incurred in connection with investigation and remediation of the Site.  In November 2014, the EPA released a Record of Decision ("ROD") that prescribes a cleanup plan for the Site and currently, is working with the LDW Claimants to complete certain additional investigations in advance of implementing the remediation called for in the ROD.  In addition to the EPA, the Washington Department of Ecology is also active with the Site.

### Proofs of Claim Related to the Site

10.      On March 31, 2017, the United States, at the request of the EPA and the United States Department of Interior, acting through the U.S. Fish and Wildlife Service, and the United States Department of Commerce, acting through the National Oceanic and Atmospheric Administration, each filed identical proofs of claim against each Debtor based on alleged CERCLA liability in connection with the Site.  See Proofs of Claim Nos. 6, 7, 8, 9, 10 and 11. Each claim asserts that the Debtor is responsible for some undetermined portion of (a) no less than $6,474,217.49 in past response costs and natural resource damages, including assessment costs, incurred by the United States and (b) future response costs and natural resource damages, including future natural resource damage assessment costs, to be incurred by the United States.

11.      On September 13, 2017, the County filed a proof of claim against each Debtor (Proofs of Claim Nos. 71 and 88) in an unliquidated amount (together, the "Claims"). Each of the Claims asserts that the applicable Debtor is responsible for some portion of (a) more than $15 million in investigation, cleanup, source control, remediation and response costs

allegedly incurred by the County at the Site and (b) undetermined future investigation, cleanup, source control, remediation and response costs relating to the Site that have not yet been incurred by the County.  On November 1, 2018, the Debtors filed an objection to the Claims [D.I. 1280].

12.     In addition to the County, each of the LDW Claimants filed proofs of claim against the Debtors.  See The Boeing Company's proofs of claim (Proofs of Claim Nos. 68, 281, 447 and 645); the Port of Seattle's proofs of claim (Proofs of Claim Nos. 23 and 24); the City of Seattle's proofs of claim (Proofs of Claim Nos. 28 and 33).

13.     The Debtors have reached a settlement in principle with the U.S, and the parties are in the process of documenting this agreement.  Additionally, the Debtors have filed or will soon file motions seeking approval of executed settlement agreements with the City of Seattle, the Port of Seattle and The Boeing Company.  See D.I. 1564, 1568.

## **Proposed Settlement**

14.     Following extensive arm's-length negotiations, the Debtors and the County (collectively, the "Parties") have agreed to resolve the Claims.  The Debtors and the County have memorialized their agreement in the settlement agreement attached hereto as Exhibit B (the "Settlement Agreement").  The Settlement Agreement contains the following terms, among others (the "Settlement"):[3]

        a.     Proof of claim number 88 will be allowed as a general unsecured claim in the amount of $85,255.87 against HPCI in its bankruptcy case.

        b.     Proof of claim number 71 will be allowed as a general unsecured claim in the amount of $85,255.87 against Kaiser Gypsum in its bankruptcy case.

        c.     The Claims shall not be allowed as set forth above until each of the following conditions is satisfied:  (i) the entry of a consent decree or settlement agreement concerning the Debtors' liabilities at the Site pursuant to the terms of

---

[3]     All capitalized terms not otherwise defined in this paragraph shall have the meanings ascribed to them in the Settlement Agreement.

the US Settlement, (ii) Bankruptcy Court approval of an agreement resolving the proofs of claim filed by The Port of Seattle, (iii) Bankruptcy Court approval of an agreement resolving the proofs of claim filed by The City of Seattle, and (iv) the occurrence of the effective date of a plan of reorganization confirmed in the Debtors' chapter 11 cases that provides for payment in full in cash, without interest, of the allowed amount of the Claims; provided however, on or following the Plan Effective Date, Claimant may waive the condition set forth in (i) in Claimant's sole discretion.  In the event that any of the conditions in (ii)-(iv) are not satisfied, or the Claimant elects not to waive the condition in (i), the Parties' rights with respect to the Claims are fully reserved.

Additionally, the Parties have agreed to certain other terms and conditions, each set forth in the

Settlement Agreement.

## **Basis for Relief Requested**

15.     This Court has authority to approve the Settlement pursuant to Bankruptcy

Rule 9019.  Key3Media Grp., Inc. v. Puliver.com Inc. (In re Key3Media Grp., Inc.), 336 B.R. 87,

92 (Bankr. D. Del. 2005).  Bankruptcy Rule 9019(a) provides that "[o]n motion by the trustee

and after notice and a hearing, the court may approve a compromise or settlement."  Fed. R.

Bankr. P. 9019(a).  Compromises, such as the resolution of the claims set forth in the Settlement,

"are favored in bankruptcy" because they "minimize litigation and expedite the administration of

a bankruptcy case."  Myers v. Martin (In re Martin), 91 F.3d 389, 393 (3d Cir. 1996) (citation

omitted); see also In re Southern Hosiery Mill, Inc., 2012 Bankr. LEXIS 802, at *3 (Bankr.

W.D.N.C. 2012) ("It is well established that compromises are favored in bankruptcy.").

16.     In evaluating the proposed Settlement, the Court "need conduct neither an

exhaustive investigation into the validity of, nor a mini-trial on, the merits of the claims sought to

be compromised."  In re Southern Hosiery Mill, Inc., 2012 Bankr. LEXIS at *3-4.  Rather, the

Court should merely examine "if the compromise is fair, reasonable, and in the best interest of

the estate."  In re Louise's Inc., 211 B.R. 798, 801 (Bankr. D. Del. 1997); see In re Marvel Entm't

Grp., Inc., 222 B.R. 243, 250 (D. Del. 1998) (concluding that the proposed settlement was in the

best interest of the estate).  The "best interest" test requires that the proposed settlement be "fair

and equitable."  Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v.

Anderson, 390 U.S. 414, 424 (1968) (analyzing settlement of claims under the Bankruptcy Act);

In re Martin, 91 F.3d at 393; Key3Media Grp., 336 B.R. at 92.  In evaluating the fairness of a

settlement, a court does not have to be convinced that the settlement is the best possible

compromise, but only that the settlement "falls within the reasonable range of litigation

possibilities."  In re Washington Mutual, Inc., 442 B.R. 314, 328 (Bankr. D. Del. 2011); In re

Coram Healthcare Corp., 315 B.R. 321, 330 (Bankr. D. Del. 2004); see also In re Worldcom,

Inc., 347 B.R. 123, 137 (Bankr. S.D.N.Y. 2006) (finding the bankruptcy court "need only

'canvass the issues' to determine if the 'settlement falls below the lowest point in the range of

reasonableness'" (quoting In re Teltronics Serv., Inc., 762 F.2d 185, 189 (2d Cir. 1985))).

17.     This Court has identified four factors that courts should consider in

determining whether a settlement falls within the lowest point in the range of reasonableness:

(a) the probability of success in litigation; (b) the likely difficulties in collection; (c) the

complexity of the litigation involved, and the expense, inconvenience and the delay necessarily

attending it; and (d) the paramount interest of the creditors.  In re Southern Hosiery Mill, Inc.,

2012 Bankr. LEXIS at *4 (citing In re Martin, 91 F.3d at 393).

***Application of Relevant Standards***

18.     The Debtors' entry into the Settlement is a sound exercise of their business

judgment and in the best interests of their estates and creditors.  The Settlement is the result of

arm's length bargaining between the Debtors and the County, and it provides for a beneficial and

fair resolution of the disputes between the Parties.

19.     The Debtors believe they have viable arguments regarding the extent of

their liability at the Site and, therefore, the amount of the claims that may be recoverable from

the Debtors.  However, based on their review of information provided by the County and other

parties, as well as information the Debtors have independently developed, the Debtors believe

that the proposed allowed amounts of the Claims establish their liability to the County in an

amount that is fair and reasonable under the circumstances, and accordingly, the Debtors do not

anticipate they would obtain a materially more favorable result in litigation.

20.     Additionally, the parties have been negotiating and working with the

United States and the LDW Claimants regarding environmental liabilities at the Site for years, in

large part due to the complexities of the parties' claims and the environmental conditions at the

Site.  The Settlement is related to and contingent on similar settlements between the Debtors and

the United States, the Port of Seattle and the City of Seattle.  Engaging in further negotiations or

litigation of the County's claims would be expensive, inconvenient and unlikely to result in a

better outcome for the Debtors.  Moreover, any changes to the Settlement would jeopardize the

beneficial settlements that the Debtors have entered into with the Port of Seattle and the City of

Seattle.

21.     Finally, continued negotiations or litigation of the Claims would further

delay the progression of the Debtors' chapter 11 cases, in each instance, to the detriment of the

Debtors' estates and other creditors.

22.     Accordingly, the Debtors respectfully submit that the Settlement (a) is fair

and reasonable, (b) is in the best interests of their chapter 11 estates and creditors and (c) should

be approved pursuant to Bankruptcy Rule 9019.

### Notice

23.     Notice of this motion has been provided to:  (a) the Bankruptcy

Administrator; (b) counsel to the Asbestos Committee; (c) Lehigh Hanson, Inc.; (d) counsel to

the Creditors' Committee; (e) counsel to the Future Claimants' Representative; (f) counsel to

the County; (g) counsel to the Port of Seattle; (h) counsel to the City of Seattle; (i) the EPA; and

(j) all parties entitled to notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in

light of the nature of the relief requested, no other or further notice need be provided.

## No Prior Request

24.     No prior request for the relief sought herein has been made to this Court or

any other court.

WHEREFORE, the Debtors respectfully request that the Court enter an order,

substantially in the form attached hereto as Exhibit C, granting:  (i) the relief requested herein;

and (ii) such other and further relief as the Court may deem proper.

Dated:   March 26, 2019         Respectfully submitted,
(Charlotte, NC)

 /s/ John R. Miller, Jr.
C. Richard Rayburn, Jr. (NC 6357)
John R. Miller, Jr. (NC 28689)
RAYBURN COOPER & DURHAM, P.A.
1200 Carillon
227 West Trade Street
Charlotte, North Carolina  28202
Telephone:  (704) 334-0891
Facsimile:  (704) 377-1897
E-mail:   rrayburn@rcdlaw.net
          jmiller@rcdlaw.net

-and-

Gregory M. Gordon (TX 08435300)
Amanda S. Rush (TX 24079422)
JONES DAY
2727 N. Harwood Street
Dallas, Texas  75201
Telephone:  (214) 220-3939
Facsimile:  (214) 969-5100
E-mail:  gmgordon@jonesday.com
         asrush@jonesday.com

ATTORNEYS FOR DEBTORS

**<u>Exhibit A</u>**

**Declaration of Charles E. McChesney II**

NAI-1506776118v2

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| KAISER GYPSUM COMPANY, INC., *et al.*,[1] | : | Case No. 16-31602 (JCW) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

**DECLARATION OF CHARLES E. MCCHESNEY II**
**IN SUPPORT OF DEBTORS' MOTION FOR AN ORDER**
**APPROVING SETTLEMENT WITH KING COUNTY, WASHINGTON**

1.      I am a Vice President, the Secretary and a Director of both Kaiser Gypsum

Company, Inc. ("Kaiser Gypsum") and Hanson Permanente Cement, Inc. ("HPCI"), which are

debtors in the above-captioned chapter 11 cases (together, the "Debtors").  I have held these

positions with the Debtors since October 1, 2010.

2.      I am also a Vice President, the Secretary, the Chief Legal Counsel and a

Director of Three Rivers Management, Inc. ("TRMI"), an affiliate of the Debtors, and have

served in those capacities since October 1, 2010.  Prior to that time, I was an Assistant Secretary

of TRMI and have been an employee of TRMI since May 2005.  Pursuant to a contract with the

Debtors, TRMI provides asbestos and environmental liability management services for, and acts

as agent on behalf of, each of the Debtors.

3.      I submit this declaration in support of the Debtors' Motion for an Order

Approving Settlement with King County, Washington (the "Motion").[2]  All facts set forth in this

---

[1]      The Debtors are the following entities (the last four digits of their respective taxpayer identification numbers follow in parentheses):  Kaiser Gypsum Company, Inc. (0188) and Hanson Permanente Cement, Inc. (7313).  The Debtors' address is 300 E. John Carpenter Freeway, Irving, Texas 75062.

[2]      All capitalized terms not otherwise defined in this declaration shall have the meanings ascribed to them in the Motion.

declaration are based upon my personal knowledge, my review of relevant documents and/or

information supplied to me by other members of the Debtors' management or the Debtors'

professionals.  If called upon to testify, I could and would testify competently to the facts set

forth herein.

### Background on the Site

4.      Each Debtor owned and operated facilities in the Seattle area at various

times between 1929 and 1987.  All of the facilities were on or adjacent to the Site, an industrial

waterway located in Seattle, Washington.  For 29 months between 1947 and 1949, a predecessor

of HPCI (referred to collectively with HPCI as "HPCI") leased and operated a cement

manufacturing plant located at 3801 East Marginal Way, Seattle, Washington.  From 1944 to

1987, HPCI owned and operated a bulk cement receiving, storage and distribution facility at

5975 East Marginal Way, Seattle, Washington.  Additionally, from 1965 to 1987, HPCI leased

and then owned property at 5906 West Marginal Way SW, Seattle, Washington, where HPCI

operated a second bulk cement receiving, storage and distribution facility.

5.      In 1927 and 1928, Kaiser Gypsum procured the land for and constructed a

cement manufacturing facility at 3801 East Marginal Way, which Kaiser Gypsum then operated

for 31 months before leasing the facility to other operators and selling the facility in 1949.  In

1952 and 1953, Kaiser Gypsum procured the land for and constructed a gypsum products

manufacturing facility at 5931 East Marginal Way, Seattle, Washington, which Kaiser Gypsum

owned and operated from 1954 until the facility was sold in 1978.  Additionally, from 1969 to

1976, Kaiser Gypsum leased the land and operated a gypsum accessories manufacturing facility

at 6335 First Avenue South, Seattle, Washington.

6.      By 1978, Kaiser Gypsum had sold all of its operations in the Seattle area,

and by 1987, HPCI had ceased operations or sold all of its facilities in the Seattle area.

7.      I understand that the Site involves over 100 PRPs, including the County

and the Debtors.  In February 2010, the EPA served each of the Debtors with a request for

information pursuant to Section 104(e) of <u>CERCLA</u>, and each of the Debtors responded to that

request with an initial response in June 2010 and a supplemental response the following year, in

December 2011.

8.      I understand that the LDW Claimants completed a RI/FS of the Site

pursuant to the requirements of a joint Administrative Order on Consent to Conduct a RI/FS

between the LDW Claimants and the EPA.  The LDW Claimants also engaged in cleanup of

various "early action areas" identified as locations that would require cleanup under any remedial

scenario.  In 2013, the LDW Claimants also agreed to perform additional studies of the Site,

which remain ongoing.

9.      In April 2014, HPCI, for itself and for Kaiser Gypsum, entered into a

MOA with over thirty participating parties, including the County, pursuant to which the MOA

signatories agreed to a process for allocating the response costs incurred in connection with

investigation and remediation of the Site.  In November 2014, the EPA released a ROD that

prescribes a cleanup plan for the Site and currently, is working with the LDW Claimants to

complete certain additional investigations in advance of implementing the remediation called for

in the ROD.  In addition to the EPA, the Washington Department of Ecology is also active with

the Site.

## <u>Proofs of Claim Related to the Site</u>

10.      I understand that, in addition to the County, the United States, The Boeing

Company, the Port of Seattle and City of Seattle each filed at least one claim against each of the

Debtors related to the Site.

11.     Following extensive and ongoing arm's-length negotiations, the Debtors have reached a settlement in principle with the U.S, and the parties are in the process of documenting this agreement.  In addition, I understand that the Debtors have filed or will soon file motions seeking approval of executed settlement agreements with The Boeing Company, the Port of Seattle and the City of Seattle.

**Proposed Settlement**

12.     I believe that the Debtors' entry into the Settlement is a sound exercise of their business judgment and in the best interests of their estates and creditors.  The Settlement is the result of arm's length bargaining between the Debtors and the County, and it provides for a beneficial and fair resolution of the disputes between the Parties.

13.     I believe that the Debtors have viable arguments regarding the extent of their liability at the Site and, therefore, the amount of the claims that may be recoverable from the Debtors.  However, based on review of information provided by the County and other parties, as well as information the Debtors have independently developed, I believe that the proposed allowed amounts of the Claims establish the Debtors' liability to the County in an amount that is fair and reasonable under the circumstances, and accordingly, I do not anticipate that the Debtors would obtain a materially more favorable result in litigation.

14.     Additionally, the parties have been negotiating and working with the United States and the LDW Claimants regarding environmental liabilities at the Site for years, in large part due to the complexities of the parties' claims and the environmental conditions at the Site.  The Settlement is related to and contingent on similar settlements between the Debtors and the United States, the Port of Seattle and the City of Seattle.  I believe that engaging in further

negotiations or litigation of the County's claims would be expensive, inconvenient and unlikely to result in a better outcome for the Debtors.  Moreover, any changes to the Settlement would jeopardize the beneficial settlements that the Debtors have entered into with the City of Seattle and the Port of Seattle.

15.     Finally, I believe that continued negotiations or litigation of the Claims would further delay the progression of the Debtors' chapter 11 cases, in each instance, to the detriment of the Debtors' estates and other creditors.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  March 26, 2019

  /s/ Charles E. McChesney II                         
Charles E. McChesney II

# EXHIBIT B

**Settlement Agreement**

## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| KAISER GYPSUM COMPANY, INC., *et al.*,[1] | : | Case No. 16-31602 (JCW) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

## SETTLEMENT AGREEMENT REGARDING
## KING COUNTY, WASHINGTON'S GENERAL UNSECURED CLAIMS

### RECITALS

A.      On September 30, 2016, Kaiser Gypsum Company, Inc. ("Kaiser Gypsum") and Hanson Permanente Cement, Inc. ("HPCI" and together with Kaiser Gypsum, the "Debtors"), commenced reorganization cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Western District of North Carolina (the "Bankruptcy Court").

B.      On March 31, 2017, the United States, at the request of the United States Environmental Protection Agency (the "EPA") and the United States Department of Interior, acting through the U.S. Fish and Wildlife Service, and the United States Department of Commerce, acting through the National Oceanic and Atmospheric Administration, each filed identical proofs of claim (proof of claim numbers 6, 7, 8, 9, 10 and 11) against each Debtor based on alleged liability under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") in connection with the Lower Duwamish Waterway Superfund Site (the "Site"). These claims are based on Section 107 of CERCLA, 42 U.S.C. §9607, and seek recovery from the Debtors for: (a) a portion of unreimbursed past response costs incurred by the EPA in the amount of $5,690,299.30; (b) a portion of future response costs based on a Record of Decision released by the EPA in November 2014 that selects the CERCLA remedy for the Site, which the EPA estimates will result in remedial costs of $342 million; and (c) a portion of Site natural resource damages, including past and future assessment costs. The Debtors are but two of the approximately 120 potentially responsible parties ("PRPs") that the EPA has identified at the Site.

C.      On September 13, 2017, King County, Washington (the "Claimant" and collectively with the Debtors, the "Parties"), another PRP at the Site, filed proof of claim number 88 in an unliquidated amount against HPCI ("Claim No. 88") and proof of claim number 71 in an unliquidated amount against Kaiser Gypsum ("Claim No. 71" and together with Claim

---

[1]      The Debtors are the following entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): Kaiser Gypsum Company, Inc. (0188) and Hanson Permanente Cement, Inc. (7313). The Debtors' address is 300 E. John Carpenter Freeway, Irving, Texas 75062.

No. 88, the "Claims").  Each of the Claims asserts that the applicable Debtor is responsible for some portion of (i) more than $15 million in investigation, cleanup, source control, remediation and response costs allegedly incurred by the Claimant at the Site and (ii) undetermined future investigation, cleanup, source control, remediation and response costs relating to the Site that have not yet been incurred by the Claimant.  On November 1, 2018, the Debtors filed an objection to the Claims [Docket No. 1280].

      D.      The Port of Seattle and The City of Seattle, additional PRPs at the Site, each filed proofs of claim against the Debtors asserting that the applicable Debtor is responsible for some portion of (i) the investigation, cleanup, source control, remediation and response costs allegedly incurred by each of those PRPs at the Site and (ii) undetermined future investigation, cleanup, source control, remediation and response costs relating to the Site that have not yet been incurred by each of those PRPs.  On November 1, 2018, the Debtors filed objections to each of the claims asserted by The Port of Seattle and The City of Seattle [Docket Nos. 1278, 1279].

      E.      The Claimant, The Port of Seattle, The City of Seattle and The Boeing Company (collectively, the "LDW Claimants") have completed a remedial investigation and feasibility study ("RI/FS") of the Site pursuant to the requirements of a joint Administrative Order on Consent to Conduct a RI/FS between the aforementioned entities, the EPA and the Washington Department of Ecology.  The LDW Claimants have also engaged in cleanup of various "early action areas" identified as locations at the Site that would require cleanup under any remedial scenario and agreed to perform additional studies of the Site.  In 2013, the LDW Claimants also agreed to perform additional pre-remedial design investigations and studies of the Site, which remain ongoing.

      F.      In April 2014, HPCI, for itself and for Kaiser Gypsum, entered into an Alternative Dispute Resolution Memorandum of Agreement (the "MOA") with over thirty participating parties, including the LDW Claimants, pursuant to which the MOA signatories agreed to participate in a non-judicial process for allocating the response costs incurred in connection with investigation and remediation of the Site.

      G.      The Debtors and the Claimant agree for purposes of this Settlement Agreement, as a reasonable compromise of their respective positions, that the Claimant has incurred $18,236,549.00 in total costs at the Site (the "Past Costs").  These Past Costs are comprised of (a) $11,736,549.00 for the Claimant's portion of shared costs incurred by the LDW Claimants at the Site, and (b) $6,500,000.00 in direct costs incurred by the Claimant at the Site.

      H.      The Debtors have reached an agreement in principle with the United States, on behalf of the EPA and the United States Department of Interior, acting through the U.S. Fish and Wildlife Service, and the United States Department of Commerce, acting through the National Oceanic and Atmospheric Administration, to liquidate and pay in full an allowed general unsecured claim in a certain amount (the "US Settlement").

      I.      The Parties engaged in extensive good faith negotiations regarding the Claims.  As a result of the Parties' arm's-length negotiations, the Parties have agreed to resolve the claims on the following terms.

**NOW, THEREFORE**, in consideration of the mutual promises and terms contained herein, and other good and valuable consideration, the receipt and sufficiency of which is acknowledged by the Parties hereto, the Parties, intending to be legally bound, agree as follows:

1. **Allowance of Claims**.

  a. <u>Proof of Claim No. 88</u>.  Subject to the satisfaction of the conditions set forth in Section 1.c., Proof of Claim No. 88 is hereby allowed as a general unsecured claim in the amount of $85,255.87 against HPCI in its bankruptcy case.

  b. <u>Proof of Claim No. 71</u>.  Subject to the satisfaction of the conditions set forth in Section 1.c., Proof of Claim No. 71 is hereby allowed as a general unsecured claim in the amount of $85,255.87 against Kaiser Gypsum in its bankruptcy case.

  c. <u>Conditions to Allowance of Claims</u>.  The Claims shall not be allowed pursuant to Sections 1.a. and 1.b. until each of the following conditions is satisfied: (i) the entry of a consent decree or settlement agreement concerning the Debtors' liabilities at the Site pursuant to the terms of the US Settlement, (ii) Bankruptcy Court approval of an agreement resolving the proofs of claim filed by The Port of Seattle, (iii) Bankruptcy Court approval of an agreement resolving the proofs of claim filed by The City of Seattle, and (iv) the occurrence of the effective date of a plan of reorganization confirmed in the Debtors' chapter 11 cases (the "<u>Plan Effective Date</u>") that provides for payment in full in cash, without interest, of the allowed amount of the Claims stated in Sections 1.a and 1.b above; provided however, on or following the Plan Effective Date, Claimant may waive the condition set forth in (i) in Claimant's sole discretion.  In the event that any of the conditions in Section 1.c.ii-iv are not satisfied, or the Claimant elects not to waive the condition in Section 1.c.i, the Parties' rights with respect to the Claims are fully reserved.

2. **Effectiveness of the Settlement Agreement**.  This Settlement Agreement shall be effective (the "<u>Effective Date</u>") upon the later of (a) the date that the Settlement Agreement is signed by all Parties (the "<u>Execution Date</u>") and (b) its approval by the Bankruptcy Court.

3. **Court Approval**.  On or before seven business days after the Execution Date, the Debtors will file a motion seeking entry of an order pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure approving this Settlement Agreement with the Bankruptcy Court.

4. **Most Favored Nation**.  If the Debtors enter into an agreement with either The Port of Seattle or The City of Seattle that provides for the allowance of that claimant's proofs of claim related to the Site in an amount that is more than 0.935% of that claimant's direct costs and portion of shared costs incurred at the Site (a "<u>More Favorable Settlement</u>"), then the allowed amount of the Claims set forth in Section 1 will equal (a) the Past Costs times (b) the percentage share of The Port of Seattle's or The City of Seattle's costs allowed under the More Favorable Settlement.

3

5.    **Law; Jurisdiction**.  This Settlement Agreement shall be governed by and construed according to the laws of the State of North Carolina.  The Parties agree that the Bankruptcy Court shall have exclusive jurisdiction, and the parties hereby submit to such jurisdiction, of any dispute arising under or related to this Settlement Agreement.

6.    **Representations**.  Each of the Parties, in order to induce each other to enter into this Settlement Agreement, hereby covenants, represents and warrants to each other with the intent and understanding that the other Parties are expressly relying thereon as a material inducement to enter into this Settlement Agreement as follows:  (a) each Party has full rights, powers and authority to execute this Settlement Agreement; and (b) upon the Effective Date, this Settlement Agreement will be a valid, binding, subsisting and enforceable obligation of such Party.

7.    **Miscellaneous Provisions**.

a.    Construction of Terms.  This Settlement Agreement has been drafted jointly by the Parties in full consultation with their respective attorneys, and no ambiguity in this Settlement Agreement shall be interpreted or construed against any of the Parties on the basis that such Party was the drafter.

b.    Entire Agreement.  This Settlement Agreement constitutes the entire agreement between the Parties relating to the subject matter hereof and is the final and complete expression of their intent.  No prior or contemporaneous negotiations, promises, agreements, covenants or representations of any kind or nature, whether made orally or in writing, have been made by the Parties, or any of them, in negotiations leading to this Settlement Agreement or relating to the subject matter hereof, which are not expressly stated herein, or which have not become merged and finally integrated into this Settlement Agreement.

c.    Modification.  This Settlement Agreement can only be changed, modified or discharged if consented to in writing and executed by the Parties hereto.

d.    Binding Effect.  This Settlement Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors or assigns.

e.    Counterparts.  This Settlement Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement.

[Signature Page Follows]

NAI-1506283133v4

**IN WITNESS WHEREOF**, the undersigned have duly executed and delivered this Agreement as of the date set forth below.

KING COUNTY, WASHINGTON

Dated: _Merch 26, 2019_

By:  Raymond E. Lemisch

Title:  Attorney for King County, Washington

KAISER GYPSUM COMPANY, INC.

Dated:_____

By:_____

Title:_____

HANSON PERMANENTE CEMENT, INC.

Dated:_____

By:_____

Title:_____

NAI-1506283133v4

**IN WITNESS WHEREOF**, the undersigned have duly executed and delivered this Agreement as of the date set forth below.

KING COUNTY, WASHINGTON

Dated:_____

_____

By:  Raymond E. Lemisch

Title:  Attorney for King County, Washington

KAISER GYPSUM COMPANY, INC.

Dated: _March 26, 2019_

By: _Charles E. McChesney II_

Title: _Vice President & Secretary_

HANSON PERMANENTE CEMENT, INC.

Dated: _March 26, 2019_

By: _Charles E. McChesney II_

Title: _Vice President & Secretary_

5

## **EXHIBIT C**

**Proposed Order**

NAI-1506776118v2

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| In re | Chapter 11 |
| KAISER GYPSUM COMPANY, INC., *et al.*,[1] | Case No. 16-31602 (JCW) |
| Debtors. | (Jointly Administered) |

## ORDER APPROVING SETTLEMENT WITH KING COUNTY, WASHINGTON

This matter coming before the Court on the Debtors' Motion for an Order

Approving Settlement with King County, Washington (the "Motion"),[2] filed by the above-

captioned debtors (together, the "Debtors"); the Court having reviewed the Motion; and the

Court having found that (i) the Court has jurisdiction over this matter pursuant to 28

---

[1]    The Debtors are the following entities (the last four digits of their respective taxpayer identification
       numbers follow in parentheses): Kaiser Gypsum Company, Inc. (0188) and Hanson Permanente Cement,
       Inc. (7313).  The Debtors' address is 300 E John Carpenter Freeway, Irving, Texas 75062.

[2]    All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

U.S.C.§§ 157 and 1334, (ii) venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and

1409, (iii) this is a core proceeding pursuant to 28 U.S.C. § 157(b), (iv) notice of the Motion was

sufficient under the circumstances and (v) the Settlement was negotiated at arm's length and in

good faith; and the Court having determined that the relief requested in the Motion is in the best

interests of the Debtors, their estates and creditors; and good and sufficient cause having been

shown;

IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED.

2.      The Settlement Agreement and the Settlement therein are approved.

3.      The Debtors are authorized to perform their obligations under the

Settlement Agreement.

4.      The Debtors' noticing and claims agent, Prime Clerk LLC, is hereby

authorized and directed to take and perform all actions necessary to implement and effectuate the

relief granted in this Order.

**This Order has been signed electronically.**              **United States Bankruptcy Court**
**The judge's signature and the court's seal**
**appear at the top of the order.**