B104 (FORM 104) (08/07)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| **PLAINTIFFS**<br><br>Truck Insurance Exchange | **DEFENDANTS**<br><br>Kaiser Gypsum Company, Inc. and Hanson Permanente Cement, Inc. |
|---|---|
| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br><br>Michael L. Martinez, Grier Wright Martinez, PA, 101 N. Tryon St., Ste. 1240, Charlotte, NC 28246, 704/332.0209 | **ATTORNEYS** (If Known)<br><br>John R. Miller, Jr., Rayburn Cooper & Durham, P.A., 227 W. Trade St., Ste. 1200, Charlotte, NC 28202, 704/334.0891 |
| **PARTY** (Check One Box Only)<br>☐ Debtor ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor ☑ Other  Plan proponent/creditor/party-in-interest<br>☐ Trustee | **PARTY** (Check One Box Only)<br>☑ Debtor ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor ☐ Other<br>☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Declaratory relief regarding breach of contract and breach of implied covenant concerning insurance policies.

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property – §542 turnover of property
☐ 12-Recovery of money/property – §547 preference
☐ 13-Recovery of money/property – §548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner – § 363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge – §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability – §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability – §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability – §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability – §523(a)(5), domestic support
☐ 68-Dischargeability – §523(a)(6), willful and malicious injury
☐ 63-Dischargeability – §523(a)(8), student loan
☐ 64-Dischargeability – §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability – other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☑ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☑ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☑ Check if a jury trial is demanded in complaint | Demand $ |
| Other Relief Sought  n/a | |

B104 (FORM 104) (08/07), Page 2

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Kaiser Gypsum Company, Inc. | BANKRUPTCY CASE NO.<br>16-31602 | |
| DISTRICT IN WHICH CASE IS PENDING<br>Western District of North Carolina | DIVISION OFFICE<br>Charlotte ▼ | NAME OF JUDGE<br>Whitley ▼ |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br>/s/ Michael L. Martinez | | |
| DATE<br><br>08/28/2019 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br><br>Michael L. Martinez | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 104, the Adversary Proceeding Cover Sheet. CM/ECF captures the information on Form 104 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### Charlotte Division

| | |
|---|---|
| In re | Case No. 16-31602 |
| KAISER GYPSUM COMPANY, INC., et al.,[1] | Chapter 11 |
| Debtors. | (Jointly Administered) |
| | |
| TRUCK INSURANCE EXCHANGE | |
| Plaintiff, | Adversary Proceeding No.: 19-_____ |
| v. | |
| KAISER GYPSUM COMPANY, INC. and HANSON PERMANENTE CEMENT, INC., | |
| Defendants. | |

## TRUCK INSURANCE EXCHANGE'S COMPLAINT FOR DECLARATORY RELIEF

---

[1] The Debtors are the following entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): Kaiser Gypsum Company, Inc. (0188); and Hanson Permanente Cement, Inc. (7313). The Debtors' address is 300 E. John Carpenter Freeway, Irving, Texas 75062.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

JURISDICTION AND VENUE ............................................................................................... 2

THE PARTIES ....................................................................................................................... 3

FACTUAL ALLEGATIONS .................................................................................................... 3

I. Background to Defendants' Asbestos Litigation Crisis ......................................... 3

II. The Truck Policies and Defendants' Duty to Assist and Cooperate ...................... 4

III. The *Garlock* Estimation Decision ......................................................................... 5

IV. The *Garlock* Claims Resolution Procedures ......................................................... 7

V. Defendants Seek Truck's Assistance—and Funding—to Obtain a *Garlock*-Type Resolution of Their Asbestos Liabilities Through a Prepackaged Bankruptcy ............................................................................................................. 9

VI. Defendants Abandon the Stated Purpose of the Cost Sharing Agreement and File for Bankruptcy Relief in Advance of Any Negotiations .............................. 12

VII. The Debtors Condition Their Continued Assistance and Cooperation with Truck on Truck's Unconditional Agreement to Fund the Fees and Costs of the Bankruptcy .................................................................................................... 14

VIII. Notwithstanding Contrary Representations to the Court, the Debtors and the Claimants' Lawyers Exclude Truck from the Plan Negotiations ........................ 15

IX. The Debtors Agree to a Deal with the Claimants that Shields Them from Future Fraud, but Leaves Truck Fully Exposed and Without Adequate Means to Prevent a Resumption of the Evidence Suppression Scheme, in Plain Violation of the Assistance and Cooperation Condition of the Truck Policies ............................................................................................................... 16

X. Two Competing Plans of Reorganization Move Forward—the Truck Plan, Which Settles Claims Through a Trust and Includes Fraud Prevention Procedures, and the Joint Plan, Which Neither Settles Claims Nor Incorporates Fraud Prevention Measures ............................................................ 18

XI.   Truck Sends a Reservation of Rights Letter to the Debtors, Reserving Its Contractual Right to Deny Coverage Unless the Debtors' Reorganization Plan Is Modified to Make It Compliant with the Assistance and Cooperation Condition of the Truck Policies .......................................................... 19

XII.   The Debtors Seek to Avoid Liability for Their Failure to Comply with the Assistance and Cooperation Condition Through a Confirmation Finding ........... 19

FIRST CAUSE OF ACTION: DECLARATORY JUDGMENT FOR BREACH OF CONTRACT ....................... 20

SECOND CAUSE OF ACTION: DECLARATORY JUDGMENT FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING .......................................................... 22

PRAYER FOR RELIEF.......................................................................................................... 24

DEMAND FOR A JURY TRIAL ............................................................................................. 25

Truck Insurance Exchange ("**Truck**") hereby brings this action against Kaiser Gypsum Company, Inc. ("**Kaiser**") and Hanson Permanente Cement, Inc. ("**HPCI**" and, together with Kaiser, "**Defendants**" or "**Debtors**"), and respectfully alleges as follows:

### PRELIMINARY STATEMENT

1.      Truck brings this adversary proceeding to secure a declaration of its rights and obligations under various general liability insurance policies that Truck issued to Defendants that, among other things, provide primary coverage for Defendants' defense and indemnity costs related to certain asbestos bodily injury claims (the "**Truck Policies**").  Defendants owe Truck a variety of duties and obligations under the Truck Policies.  Among them, the Truck Policies require Defendants to cooperate with Truck in its defense of those asbestos bodily injury claims; to assist Truck in effecting settlements of, securing and giving evidence for use in, litigation over covered asbestos bodily injury claims; to deal with Truck fairly, honestly, and in good faith; and to refrain from colluding with Defendants and Truck's shared litigation adversaries.

2.      Defendants have breached and threaten to continue to breach all of those duties. After inducing Truck to pay millions of dollars of the professional fees and costs of the Defendants and asbestos claimants pursuant to a cost sharing agreement, the stated purpose of which was to pre-negotiate a Chapter 11 plan of reorganization that would resolve Defendants' asbestos bodily injury liabilities, Defendants abandoned the agreement without scheduling a single negotiating session.  Then, after filing their Chapter 11 cases, Defendants froze Truck out of negotiations with representatives of current and future asbestos claimants and agreed to a collusive deal that fails to resolve the Defendants' insured asbestos liabilities and also fails to secure critical evidence necessary to defend the asbestos bodily injury claims and to prevent a resumption of a scheme to fraudulently inflate the value of such claims.  Even worse, Defendants have acknowledged their awareness of the fraudulent scheme, but have stated that their only interest is in protecting the

1

bankruptcy estates, and not Truck or other insurers, from a resumption of the scheme.  They have failed to cooperate with Truck at every turn in attempting to resolve the insured claims or to secure necessary evidence, all while colluding with the very asbestos claimants (and their representatives) who are prosecuting these claims against Defendants and Truck in the tort system.

3.      Defendants' misconduct has been flagrant, extensive, and deliberate.  Through this adversary proceeding, Truck seeks a declaratory judgment that: (a) Defendants' misconduct violates and threatens to continue to violate their express duties under the Truck Policies to assist and cooperate as well as their implied covenant of good faith and fair dealing; and (b) as result of their misconduct, Defendants have forfeited their right to coverage under the Truck Policies and released Truck from any duty or liability to provide primary coverage for Defendants' defense and indemnity costs related to asbestos bodily injury claims.

4.      In an effort to escape the consequences of their misconduct, Defendants have recently requested, as condition precedent to confirmation of the plan of reorganization they have proposed, that this Court and the District Court make a finding that would effectively strip away Truck's contractual right under state law to assert as defense to coverage that Defendants have violated the terms of the Truck Policies.  Because of this request, litigation over Defendants' breach and threatened breach of the Truck Policies and forfeiture of their insurance coverage cannot wait until proceedings in the underlying Chapter 11 cases have concluded.  Defendants' requested finding creates a real, immediate, and substantial adversity of legal interests between Defendants and Truck that must be resolved through this adversary proceeding before the underlying Chapter 11 cases can proceed to confirmation.

### JURISDICTION AND VENUE

5.      This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 157 and 1334.  This adversary proceeding is a non-core proceeding under 28 U.S.C. § 157.

6.      Truck does not consent to entry of a final order by this Court.

7.      Venue is proper in this district under 28 U.S.C. § 1409 and Federal Rule of Bankruptcy Procedure 5005(a) because this proceeding is related to a case under title 11 that is pending in this Court.

## THE PARTIES

8.      At all times herein mentioned, Truck was and is an inter-insurance exchange, organized and existing under the laws of the State of California with its principal place of business in Los Angeles County, California, and was at all times relevant authorized to conduct the business of insurance in the State of California.

9.      Kaiser is a corporation organized under the laws of the state of North Carolina, with its principal place of business in Texas.

10.     HPCI is an Arizona corporation with its principal place of business in Texas.

11.     Kaiser and HPCI are the Defendants in this action and the Debtors in the underlying Chapter 11 cases.

## FACTUAL ALLEGATIONS

### I.      Background to Defendants' Asbestos Litigation Crisis

12.     During the 1970s, it was determined that exposure to asbestos could cause certain diseases, including mesothelioma.  This discovery led to the removal of asbestos products from the marketplace, but as asbestos-related illness began to manifest, the entities that had sold asbestos products were targeted in lawsuits across the country that began to overwhelm both the defendants and the tort system.  Most of the lawsuits from 1980-2000 were brought against manufacturers and sellers of insulation and other products containing a particularly toxic and lethal form of asbestos known as amphibole asbestos.

13.     Virtually all of the large manufacturers of amphibole asbestos who were initially

targeted sought bankruptcy relief due to the massive number of lawsuits they faced and the crippling related liability.  They typically emerged from bankruptcy by establishing settlement trusts, funded by the debtors and their insurers, to pay the asbestos claims.  The trusts are charged with establishing criteria for evaluating the asbestos claims and offering settlement payments to asbestos victims.  Over time, more than 60 asbestos settlement trusts have been created out of the asbestos bankruptcies.

14.     Those asbestos defendants whose products contained amphibole asbestos and who filed for bankruptcy relief and established settlement trusts to pay the asbestos liabilities generally disappeared from the tort system.  In the early 2000s, as the manufacturers and sellers of insulation and other asbestos products containing amphibole asbestos exited the tort system, asbestos plaintiffs' lawyers began targeting manufacturers and sellers of products containing chrysotile asbestos, a form of asbestos that may not cause asbestos-related disease at all.

15.     At varying times from 1952 to 1976, Defendants manufactured and sold certain products that contained small amounts of chrysotile asbestos.  Like other sellers of chrysotile products, litigation against Defendants prior to the early 2000s was limited, but thereafter Defendants faced tens of thousands of lawsuits.

## II.    The Truck Insurance Policies and Defendants' Duty to Assist and Cooperate

16.     Truck issued the Truck Policies to Defendants.  The Truck Policies are general liability policies for the period December 31, 1964 through April 1, 1983 that, among other things, provide primary coverage for Defendants' defense and indemnity costs related to asbestos bodily injury claims.  Truck Policies for the periods April 1, 1971 through April 1, 1980 have no aggregate limits.  Virtually all asbestos litigation claims brought against Defendants have been tendered by Defendants to Truck for defense and indemnity under policies with a $5,000 deductible and a

$500,000 per claim liability limit.

17.     The Truck Policies contain a number of conditions to Truck's coverage obligations.

One of those conditions is titled Assistance and Cooperation of the Insured.  It provides:

> The insured shall cooperate with [Truck], and upon [Truck's] request, shall attend hearings and trials **and shall assist in effecting settlements, securing and giving evidence,** obtaining the attendance of witnesses and in the conduct of suits.  The insured shall not, except at [its] own cost, voluntarily make any payment, assume any obligation or incur any expense other than for such immediate medical and surgical relief to others as shall be imperative at the time of the occurrence.

(Emphasis added)

18.     Implicit in every insurance policy is an implied covenant of good faith and fair dealing.  This covenant requires the insured to cooperate with the insurer in the defense of any claims covered by the policy.

### III.   The *Garlock* Estimation Decision

19.     Garlock Sealing Technologies, LLC ("*Garlock*") was, like Defendants, a manufacturer and seller of products that contained the less toxic type of asbestos, chrysotile. Following a huge influx of asbestos lawsuits in the early 2000s, Garlock sought bankruptcy relief in the United States Bankruptcy Court for the Western District of North Carolina.

20.     During the bankruptcy, Garlock filed a motion to estimate its liability for present and future mesothelioma claims.  The Asbestos Creditors' Committee and Future Claims Representative argued that Garlock's asbestos liability was in the range of $1 billion to $1.3 billion, based upon Garlock's history in the tort system.

21.     Garlock, however, posited that its tort system payments had been inflated by an evidence suppression scheme whereby asbestos plaintiffs and their lawyers concealed evidence of exposure to asbestos products of others and misrepresented that there had been no such other exposures.  Asbestos plaintiffs typically were exposed to asbestos products manufactured by

multiple entities.  Any one defendant's proportionate share of liability depends upon the number of different asbestos products to which the plaintiff was exposed.  Moreover, a manufacturer of chrysotile products may have a complete defense if a plaintiff was also exposed to the far more toxic amphibole asbestos.  Thus, full access to a plaintiff's asbestos exposure history is critical to valuing any one defendant's liability.  In order to assess whether asbestos exposure evidence had been suppressed or misrepresented in prior tort system cases, Bankruptcy Judge George Hodges of the United States Bankruptcy Court for the Western District of North Carolina permitted Garlock to obtain full discovery on 15 cases it had settled in the tort system.

22.    On January 10, 2014, Judge Hodges issued a groundbreaking ruling on Garlock's motion to estimate.  *See In re Garlock Sealing Technologies, LLC,* 504 B.R. 71 (Bankr. W.D.N.C. 2014).  In the opinion, Judge Hodges rejected the use of Garlock's tort system history as a basis to value its asbestos personal injury liabilities.

23.    Noting that "[i]t was a regular practice by many plaintiffs' firms to delay filing Trust claims for their clients so that remaining tort system defendants would not have that information," Judge Hodges found as follows with respect to the 15 cases:

> Garlock demonstrated that exposure evidence was withheld in *each and every one* of them.  These were cases Garlock had settled for large sums.  The discovery in this proceeding showed what had been withheld in the tort cases—on average plaintiffs disclosed only about 2 exposures to [bankrupt] companies' products, but after settling with Garlock made claims against 19 such companies' trusts.

(Emphasis in original)

24.    After detailing numerous specific examples of evidence suppression, false testimony by plaintiffs and false representations by their lawyers, Judge Hodges found that while the 15 cases were not purported to be a random or representative sample, the fact that "*each and every one of them* contains such demonstrable misrepresentation is surprising and persuasive . . . [and] the fact pattern exposed in these cases appears to have been sufficiently widespread to have

a significant impact on Garlock's settlement practices and results . . . . It appears certain that more extensive discovery would have shown more extensive abuse." Judge Hodges further noted that there were several cases where "Garlock obtained evidence of Trust claims that had been filed and used them in its defense at trial. In three such trials, Garlock won defense verdicts, and in a fourth it was assigned only a 2% liability share."

25.     The Court concluded that the withholding of exposure evidence "was sufficiently widespread to render Garlock's settlements unreliable as a predictor of its true liability." Instead, the Court agreed with Garlock's expert economist, who applied an econometric analysis of the likely value of pending and future claims with full disclosure of asbestos exposure history, and concluded that $25 million was a reasonable and reliable estimate of Garlock's liability to pending claimants and $100 million a reasonable and reliable estimate of liability to future claimants.

26.     Ultimately, a settlement was reached between Garlock and the claimants that resulted in a settlement trust funded at an amount that was in excess of the estimated liability as found by Judge Hodges but still dramatically less than the $1 billion+ estimate that was based upon Garlock's tort system history.

## IV.   The *Garlock* Claims Resolution Procedures

27.     The Court in *Garlock* approved a plan that established an asbestos settlement trust (the "***Garlock Trust***") and Settlement Facility Claims Resolution Procedures that govern the payments to be made by the Trust. Those procedures include specific requirements designed to prevent further evidence suppression and misrepresentation. Garlock asbestos claimants have a choice between an Expedited Claim Review and an Extraordinary Claim Review. Expedited Claims require only limited documentation but also provide for limited recoveries. Those claimants seeking larger recoveries must comply with the Extraordinary Claim Review procedures

which require, among other things: (a) identification and information concerning other claims filed or resolved which relate to the claims asserted against the Garlock Trust, (b) certifications under penalty of perjury by the claimant's attorney (or by the claimant if not represented) that a full investigation has been made of the injuries that form the basis of the claim against the Garlock Trust and that no basis exists to bring additional claims against any entity not identified and (c) execution of a release of information form authorizing all other asbestos trusts to release to the Garlock Trust all information submitted to the other trusts concerning the claimant, including payments made by those other trusts. The Garlock procedures further provide for periodic audits by the Garlock Trust, and should those audits reveal that fraudulent information has been provided to the Trust, the trustee of the Garlock Trust can, among other things, reject the claim, seek prosecution of the claimant or the claimant's attorney, seek sanctions from the Bankruptcy Court and file complaints for disciplinary action with appropriate State Bar organizations.

28.    The fraud prevention procedures that the Bankruptcy Court approved in *Garlock* are significant for two reasons. First, the requirement that claimants provide authorizations to obtain information from other asbestos trusts coupled with the ability to impose significant sanctions and punishment for fraudulent conduct if that information reveals lack of full disclosure of all relevant asbestos exposures should substantially, if not completely, put an end to the evidence suppression scheme uncovered in *Garlock.*

29.    Second, these procedures provide critical information that is virtually impossible for asbestos defendants and their insurers to obtain in the tort system. The courts in the tort system where the asbestos cases are filed lack jurisdiction over the asbestos trusts, unless a trust happens to be domiciled in the same state. Thus, defendants would need to go to the states where the trusts are domiciled and obtain and enforce, over likely strenuous objections from the trusts and the

8

claimants, subpoenas against each of the 60+ asbestos trusts currently in existence, plus any others that may be created in the future. Even if such subpoenas could be obtained and enforced, they would fail to identify any claims that had yet to be filed per the practice uncovered in *Garlock*. Moreover, there would be no practical way in an already-resolved case for an asbestos defendant or its insurer to later obtain information about claims filed with trusts after the settlement was reached or the case tried to verdict. The Bankruptcy Court, with jurisdiction over all pending asbestos claimants as well as claim-holders whose injuries have not yet manifested, and nationwide service of process, is uniquely positioned to prevent a continuation of the evidence suppression scheme through mandated disclosures and authorizations by claimants who want to proceed with settlement or litigation of their claims.

## V.    Defendants Seek Truck's Assistance—and Funding—to Obtain a *Garlock*-Type Resolution of Their Asbestos Liabilities Through a Prepackaged Bankruptcy

30.    Defendants, which like Garlock sold products containing a less toxic type of asbestos, were unquestionably victimized by the same evidence suppression scheme that was uncovered in *Garlock*. Indeed, some of the 15 settled cases examined in *Garlock* involved claimants who also filed asbestos personal injury lawsuits against one or both of the Defendants.

31.    Shortly after Judge Hodges issued his estimation ruling, Defendants requested a meeting with Truck. On June 3, 2014, attorneys for Defendants met with representatives of Truck in California. At that meeting, Defendants informed Truck that they were considering negotiations with representatives of the asbestos plaintiffs on a pre-packaged bankruptcy filing to implement a settlement trust under section 524(g) of the Bankruptcy Code (a special provision of the Bankruptcy Code that allows broader protection against asbestos claims than can be obtained through other provisions of the Bankruptcy Code), to be funded by Truck and Defendants' excess carriers. Defendants' representatives expressed their view that the proper way to value the funding

necessary for the trust was the legal liability econometric approach adopted by the court in *Garlock*, as opposed to Defendants' payment history in the tort system. Defendants stated that this proposed prepackaged resolution of its asbestos bodily injury claims through a settlement trust would benefit Truck. Accordingly, Defendants stated that they expected Truck to finance the majority of the bankruptcy costs. Defendants suggested a timeline of up to 10 months to reach a negotiated agreement.

32.    Defendants' proposal to work jointly with Truck on an appropriate resolution of their covered asbestos liabilities was fully consistent with the Assistance and Cooperation condition of the Truck Policies, and with the implied covenant of good faith and fair dealing. On June 23, 2014, Defendants and Truck entered into a Common Interest and Confidentiality Agreement detailing the parties' common interest with regard to Defendants "filing for Chapter 11 bankruptcy protection to fully and finally resolve thousands of current and anticipated future lawsuits alleging asbestos bodily injury claims…arising from exposure to Kaiser's asbestos-containing products."

33.    In August 2014, Defendants indicated an interest in "jump start[ing]" the prepackaged bankruptcy process and suggested a 12 month timeline to move from preliminary steps to a negotiated deal with bankruptcy court approval. However, at least as far as Truck was aware, there was little if any activity over the next several months.

34.    In February 2015, Defendants again met with Truck and informed Truck that they would move forward with the bankruptcy strategy as previously discussed. Defendants reiterated that Truck should bear much of the bankruptcy costs, including Defendants' own legal fees, the fees for the current and future asbestos claimants' representatives, and the costs of financial advisors and expert witnesses. Defendants estimated the total fees and costs to be in the range of

10

$2 million to $5 million.   Truck asked Defendants to present a cost sharing proposal, and Defendants agreed to prepare one.   Once an agreement on costs was reached, representatives of current and future asbestos claimants were to be selected and negotiations commenced.   (In most if not all asbestos bankruptcies, claimants whose claims have already manifested are represented by a committee comprised of plaintiff personal injury lawyers, and claimants whose claims have not manifested are represented by a "future claims representative.")

35.    On June 15, 2015, Defendants and Truck entered into a Cost Sharing Agreement under which Truck agreed to pay 90 percent of the first $1 million, and up to 82 percent of the first $5 million of Bankruptcy Costs, which were defined as including the legal and other professional fees of Defendants, a committee of holders of asbestos bodily injury claims ("**ABIC**") and a Future Claimants' Representative ("**FCR**"), as well as filing fees and other out-of-pocket expenses. Defendants' stated objective under the Cost Sharing Agreement was to negotiate a prepackaged or prenegotiated plan of reorganization with the ABIC committee and the FCR.

36.    Transparently consistent with its stated belief that its asbestos bodily injury liabilities should be valued pursuant to the principles set forth in the *Garlock* estimation proceeding, in May 2016, Kaiser changed its state of incorporation *from the state of Washington to North Carolina*.   Under the venue rules applicable to bankruptcy cases, this made it possible for Kaiser to file its bankruptcy case in the same bankruptcy court in North Carolina that had issued the *Garlock* decision.

37.    In mid-July 2016, Defendants advised Truck that they were targeting a September 30, 2016 filing date for bankruptcy.   Defendants stated that they hoped the deadline would move the now-titled Asbestos Claimants Committee ("**ACC**") towards a prompt resolution, although in the 13 months since Truck had agreed to the Cost Sharing Agreement, Defendants had not

scheduled a single negotiating session with the ACC, no FCR had been selected, and the ACC had

not retained a claims estimation expert.

## VI.    Defendants Abandon the Stated Purpose of the Cost Sharing Agreement and File for Bankruptcy Relief in Advance of Any Negotiations

38.    Despite having not having scheduled a single negotiating session in the 27 months

since the Common Interest Agreement was entered into or the 15 months since the Cost Sharing

Agreement was entered into, on September 15, 2016, Defendants informed Truck that on

instructions from Defendants' ultimate parent in Germany, Defendants would be filing for

bankruptcy in North Carolina on September 30, 2016.  Defendants further informed Truck that an

FCR had finally been nominated, and that they would be setting up a process to conduct

negotiations with the ACC and the FCR.  Defendants also requested a modification to the Cost

Sharing Agreement, which by its terms was going to automatically terminate upon the bankruptcy

filing.  Defendants asked Truck to extend the agreement, lift the $5 million cap, and to pay 95%

of the bankruptcy fees and costs.  Subsequent to the September 15 meeting, Defendants provided

Truck with an estimation of those fees and costs—projecting more than $4.5 million in the first

six months, and more than $24 million over two years.

39.    On September 30, 2016, Kaiser and HPCI filed petitions under Chapter 11 of the

Bankruptcy Code in the United States Bankruptcy Court for the Western District of North

Carolina.

40.    Truck had agreed to enter into the Cost Sharing Agreement in June of 2015 based

upon Defendants' stated commitment to attempt to negotiate a prepackaged bankruptcy that would

resolve their insured asbestos bodily injury liabilities.  Pursuant to that commitment, as of mid-

September 2016, Truck had incurred more than $2.5 million of payment obligations, primarily for

the fees of lawyers and other professionals working for Defendants and the ACC, and Truck had

not even received the billings for September 2016, the month the cases were commenced. Yet, during that entire 15 month period, *not one single negotiation session had taken place.* In fact, counsel for the ACC told counsel for Truck that Defendants had asked the ACC *not* to speak with Truck before the filing of the bankruptcy. Moreover, upon information and belief, the majority of the fees charged to Truck for Defendants' professionals were for the preparation of the bankruptcy filing, an event that automatically *terminated* the Cost Sharing Agreement. At Defendants' request, Truck agreed on September 30, 2016, to a one-month extension of the automatic termination of the agreement.

41.    At the "First Day" hearing in the bankruptcy, conducted on October 4, 2016, Debtors' counsel set forth the background to the filing of the bankruptcy cases. Counsel explained that "the idea from the beginning was to pursue a pre-packaged or pre-negotiated bankruptcy . . . that was intended to be a collective effort that included Truck and any excess carriers that would be interested in negotiating a 524(g) plan," that he believed that all of the parties still had "a strong desire to pursue a consensual plan," but that "unfortunately, we just ran out of time" because the debtors had a need to file by September 30, 2016 due to "accounting considerations." Counsel emphasized that the debtors "are very much committed to working as hard as we can on a consensual plan to resolve the asbestos liabilities, in particular" and that while he could not rule out the possibility of a *Garlock*-like estimation proceeding, their intent was to "work as hard as we can to negotiate a consensual plan." Counsel further added that the Debtors' intent was "to put in place and to assemble the parties we need to engage in the negotiations that we believe Section 524(g) contemplated" because a 524(g) resolution would benefit all of the parties including the debtors, the asbestos claimants and the insurers.

13

**VII.    The Debtors Condition Their Continued Assistance and Cooperation with Truck on Truck's Unconditional Agreement to Fund the Fees and Costs of the Bankruptcy**

42.    Notwithstanding deep concerns over the Debtors' failure to fulfill their obligations under the Cost Sharing Agreement to attempt to pre-negotiate a Chapter 11 plan that resolved the Debtors' asbestos liabilities, Truck remained willing, based upon Debtors' stated intention to pursue those negotiations in the bankruptcy, to continue to bear the great majority of Debtors' bankruptcy costs—including the professional fees for the Debtors, the ACC, the FCR and the Unsecured Creditors' Committee, and other bankruptcy costs—provided that the end result would be a plan acceptable to Truck.  However, having already paid several million dollars to facilitate a prenegotiated plan, only to have no negotiations take place, Truck was reluctant to make a much more substantial and open-ended commitment unless tied to confirmation of a plan acceptable to Truck.

43.    The Debtors rejected any such condition to Truck's funding.  Instead, on November 1, 2016, they proposed that Truck continue to fund the bankruptcy costs, and that in return, the debtors would "afford Truck a full opportunity to negotiate with the claimant representatives . . . ." In other words, the Debtors expected Truck to pay millions more simply and exclusively for the opportunity to participate in the negotiations that (1) the Debtors had long ago committed to conduct under the June 2015 Cost Sharing Agreement, and (2) the Debtors had told the Bankruptcy Court post-filing that it was still "committed" to conduct.  Moreover, the Debtors expected Truck to fund the Debtors' Chapter 11 cases without any right to consent to the outcome.  Tellingly, the Debtors threatened that "if Truck is unwilling to continue cost sharing on these or other terms, then Kaiser would have no choice but to commence negotiations with the claimant representatives on a plan of reorganization that would include (a) a contribution by Kaiser to an asbestos trust, which contribution would resolve Kaiser's limited liability with respect to current and future claims and

14

(b) an assignment to that trust of Kaiser's rights under the Truck policies." Ultimately, no new cost sharing agreement was entered into. The Debtors instead carried through on their threat to exclude Truck from the negotiations.

## VIII. Notwithstanding Contrary Representations to the Court, the Debtors and the Claimants' Lawyers Exclude Truck from the Plan Negotiations

44.     In April 2017, six months after the Chapter 11 cases had been filed, the Debtors informed the Court that they expected shortly to commence plan negotiations with representatives of the current and future asbestos claimants, and that "Debtors further anticipate that negotiations with insurers, including Truck, regarding the terms of a plan will also occur in the near term."

45.     In a July 19, 2017 hearing, the lawyer for the Asbestos Creditors Committee informed the Court that the "first phase of the negotiations was to see if the FCR, the ACC and the debtor . . . can reach a resolution between those parties as to the amount the debtor should contribute. When that process has made progress, then the next stage would be to reach out to Truck, in particular, and other insurance companies and see if there's anything that can be worked out on those fronts."

46.     Although agreement was reached between the Debtors, the ACC and the FCR on a funding amount from the Debtors, there was no "next stage." The Debtors, the ACC and the FCR engaged in negotiations from which Truck was excluded and which culminated in a Settlement Term Sheet dated February 15, 2018. The Settlement Term Sheet, which was made public on March 6, 2018, outlined the terms of a proposed plan of reorganization for the Debtors. On information and belief, the Debtors entered into the Settlement Term Sheet at the direction of Lehigh Hanson.

IX. **The Debtors Agree to a Deal with the Claimants that Shields Them from Future Fraud, but Leaves Truck Fully Exposed and Without Adequate Means to Prevent a Resumption of the Evidence Suppression Scheme, in Plain Violation of the Assistance and Cooperation Condition of the Truck Policies**

47.     The key terms of the Settlement Term Sheet were (1) the Debtors agreed to immediately move to lift the automatic stay to allow all 14,000 pending and all future asbestos personal injury claims to resume in the tort system; and (2) in connection with a joint Chapter 11 plan of reorganization to be filed by the Debtors, with the ACC and the FCR (the "***Joint Plan***"), (a) the Debtors agreed to provide a $1 million note, and Lehigh Hanson agreed to provide $49 million in cash to a trust for the purpose of funding the Debtors' uninsured asbestos liabilities, primarily $5,000 deductibles owed on each accepted asbestos claim; (b) the claimants agreed to look solely to the Debtors' insurance for payment of insured claims litigated in the tort system and (c) the Debtors and Lehigh Hanson were to receive the benefits of a channeling injunction under section 524(g) of the Bankruptcy Code.

48.     Besides making no attempt to resolve Debtors' asbestos liabilities, nothing in the Settlement Term sheet, nor anything in the subsequently filed Joint Plan, obligates the claimants to make any of the disclosures or provide any of the authorizations mandated in *Garlock* to prevent a resumption of the scheme to suppress evidence of exposure to asbestos products of other entities. Indeed, by agreeing to have the bankruptcy claims resolved in the tort system without any of the fraud prevention disclosures and authorizations, the Joint Plan appears specifically designed to avoid the involvement and oversight of the Bankruptcy Court in the resolution of the claims and to deny Truck access to the exposure evidence necessary to adequately defend and value claims against the Debtors and pay only meritorious, non-fraudulent claims.

49.     Pursuant to the Settlement Term Sheet, on April 6, 2018, the Debtors, the ACC and the FCR filed a motion to lift the stay to immediately allow the litigation of asbestos personal

16

injury claims to resume in the tort system.  Truck objected to the motion to lift the stay on several

grounds, one of which was that lifting the stay would result in a resumption of the fraud exposed

in *Garlock.*

50.     At a May 10, 2018 preliminary hearing on the motion to lift the stay, counsel for

the Debtors addressed the fraud argument.  He acknowledged the fraud issue, and candidly stated

that the Debtors' only concern in this regard was that the plan settlement with the claimants'

representatives protected the Debtors, as opposed to their insurer, from the further effects of the

fraud:

> [D]o the debtors think they . . . were fairly treated in the tort system?  No . . . .  [A]re
> the debtors suspicious that maybe they were subject of misconduct in the tort
> system?  Yes.  But the…important point is, Your Honor, that we've negotiated an
> agreement . . . .  So, you know, a lot can be said about fraud, a lot . . . of references
> can be made to Garlock and the like, but the point is there's nothing inconsistent in
> that regard.  We don't think we were treated fairly either.  It is what it is.  We've
> settled and this agreement takes the debtors out of the tort system.  And that's the
> only . . . point that matters from an estate perspective.

51.     The Bankruptcy Court preliminarily found that Truck was likely to prevail on its

objection to the motion to lift stay, but eventually did grant the motion at a July 2018 hearing.  The

Court made clear that it was not addressing any plan confirmation issues, and it did not address

the fraud issue.

52.     Since the automatic stay was lifted, more than 300 pre-bankruptcy cases against

one or both Defendants have been reopened in the tort system, and more than 450 new cases have

been filed.  More than 50 cases are set to go to trial before the end of 2019.  Truck has been and is

being forced to defend these cases.  Truck's ability to defend these cases is materially and

substantially prejudiced by the absence of any fraud prevention procedures governing the

submission of claims against the Debtors, a lack of access to evidence of other asbestos exposures

that could be and would have been obtained through the use of mandatory disclosure mechanisms

and, on information and belief, the continued suppression of exposure evidence by asbestos claimants and their counsel.

**X.   Two Competing Plans of Reorganization Move Forward—the Truck Plan, Which Settles Claims Through a Trust and Includes Fraud Prevention Procedures, and the Joint Plan, Which Neither Settles Claims Nor Incorporates Fraud Prevention Measures**

53.    Until the end of March 2018, the Debtors had the exclusive right to file a plan of reorganization, but they failed to do so.  Thereafter, in April 2018, Truck filed a proposed plan on behalf of the Debtors.  The plan filed by Truck, as amended, would ensure the full payment of all valid asbestos claims through a settlement trust to be funded by Truck.  The plan also includes the same fraud protection safeguards—mandatory disclosures, authorizations allowing the trust to confirm whether claimants had made or in the future make filings against other settlement trusts, and sanctions for misrepresentations—as were ultimately agreed to and approved in *Garlock*.  Nearly identical fraud protection measures were recently insisted upon by the judge in a Delaware bankruptcy case, *In re Maremont,* and then agreed to by the debtor and the asbestos claimants and FCR, after the United States, through the U.S. Trustee's office, objected to a fully consensual plan that omitted such protections.

54.    The Debtors finally filed the Joint Plan in September 2018, and have since filed several amended versions.  The Debtors' plan mandates that all asbestos personal injury claims be resolved in the tort system, and is devoid of any disclosure or authorization requirements that would prevent a resumption by the claimants of the evidence suppression scheme uncovered in *Garlock*.  As noted, the Department of Justice, on behalf of the United States, has objected to the Debtors' plan for, among other reasons, failing to include adequate fraud prevention safeguards, such as those ultimately adopted in *In re Garlock* and *In re Maremont*. The Debtors have refused to support the plan proposed by Truck, or to insist upon or negotiate for the inclusion of fraud

18

prevention safeguards in their own plan.

**XI.   Truck Sends a Reservation of Rights Letter to the Debtors, Reserving Its Contractual Right to Deny Coverage Unless the Debtors' Reorganization Plan Is Modified to Make It Compliant with the Assistance and Cooperation Condition of the Truck Policies**

55.     On April 3, 2019, counsel for Truck issued a reservation of rights letter to counsel for the Debtors.  The letter (1) reminded the Debtors of their obligation under the Truck Policies to cooperate and assist Truck in "effecting settlement" and "securing and giving evidence"; (2) noted that the Debtors' bankruptcy filing presented an opportunity to obtain the disclosures and authorizations necessary to prevent a continuation of the manipulation of exposure evidence that had inflated recoveries against Garlock and Kaiser; (3) noted that the Truck-filed plan contained such fraud-prevention measures but the Joint Plan filed by the Debtors under their agreement with asbestos plaintiffs' lawyers did not; (4) stated that the agreement with the plaintiffs' lawyers and subsequent Joint Plan, which shields the Debtors and their related entities from future fraudulent conduct by the claimants' lawyers but leave Truck and other insurers fully exposed to the fraud, appear to be collusive and in violation of the Debtors' duty to cooperate and assist; and (5) reserved Truck's right to deny coverage if the Debtors' Joint Plan were not modified to comply with the duty to cooperate and assist.

**XII.   The Debtors Seek to Avoid Liability for Their Failure to Comply with the Assistance and Cooperation Condition Through a Confirmation Finding**

56.     The Debtors did not directly respond to the reservation of rights letter.  Nor did they modify, or propose to modify the Joint Plan to address the concerns raised by Truck.  Instead, they amended the Joint Plan to include a new condition to confirmation of the Joint Plan—a finding by the Bankruptcy Court and the District Court that would effectively strip away Truck's contractual right under state law to assert that the Debtors' failure and refusal to comply with the duty to cooperate and assist violated the terms of the Truck Policies.  The proposed finding (the "***Plan***

19

***Finding***") is as follows:

> The Debtors' conduct in connection with and throughout these Reorganization
> Cases, including, but not limited to, their negotiations with the ad hoc committee
> of asbestos personal injury claimants and the prepetition future claimants'
> representative, and the commencement of these Reorganization Cases, as well as
> the drafting, negotiation, proposing, confirmation and consummation of the Plan,
> and their opposition to any other plan of reorganization, does not and has not
> violated any Asbestos Insurer Cooperation Obligations contained in any Asbestos
> Insurance Policies.

57.     The Debtors are not entitled to the Plan Finding.  As detailed herein, the Debtors

have committed numerous breaches of multiple obligations under the Truck Policies.

58.     By requesting that the Bankruptcy Court and the District Court make the Plan

Finding as a condition to the confirmation of the Joint Plan, the Debtors have created an immediate,

real, and substantial controversy between themselves and Truck over whether the Debtors have

complied with their duties under the Truck Policies or breached them.  The Debtors and Truck

have adverse legal interests with respect to the Plan Finding, because the Plan Finding is designed

to eliminate Truck's right to assert a defense to coverage under the Truck Policies in future

litigation against the Debtors alleging asbestos bodily injury claims.

### FIRST CAUSE OF ACTION: DECLARATORY JUDGMENT FOR BREACH OF CONTRACT

59.     Truck repeats and re-alleges each and every allegation in the foregoing paragraphs

as if fully set forth herein.

60.     There exists a justiciable case or controversy between Defendants and Truck as to

whether Defendants' conduct to date has breached their duty of assistance and cooperation under

the Truck Policies.

61.     There exists a justiciable case or controversy between Defendants and Truck as to

whether Defendants will further breach their duty of assistance and cooperation under the Truck

Policies by seeking and securing confirmation of the Joint Plan.

62.     The Truck Policies are valid, presently existing contracts between Truck and Defendants.

63.     Truck has performed or tendered performance of all of its obligations under the Truck Policies.

64.     The Truck Policies impose a duty on Defendants to assist Truck and cooperate with it in the defense of asbestos bodily injury claims and in effecting settlement of and securing and giving evidence for use in the defense asbestos bodily injury claims. Truck has satisfied all conditions precedent to Defendants' duty of assistance and cooperation.

65.     Through the conduct described herein, Defendants have breached their duty of assistance and cooperation.  Defendants have colluded with the ACC and the FCR and in bad faith have refused and neglected to cooperate with Truck, to assist in effecting settlements, or to assist in securing and giving evidence by, among other things: failing to schedule or hold any negotiating sessions with the ACC and Truck before filing their Chapter 11 petitions, despite having entered into the Cost Sharing Agreement (and receiving millions of dollars in payment from Truck under that Agreement) for the express purpose of doing so; requesting that the ACC not speak with Truck before the filing of the petitions; excluding Truck from their negotiating sessions with the ACC and the FCR after the petitions were filed; agreeing to allow the resumption of the litigation of the asbestos claims in the tort system without insisting upon fraud prevention measures such as mandatory asbestos exposure disclosures and trust authorization; colluding with the ACC and the FCR after the Chapter 11 petitions were filed to abandon the stated goal of fully and finally resolving (primarily by effecting settlement of) the thousands of current and anticipated future lawsuits alleging asbestos bodily injury claims arising from exposure to Defendants' asbestos-containing products; and colluding with the ACC and the FCR to instead agree to, sponsor, and

21

seek approval of a collusive deal that has the purpose (and, if allowed to go forward, will have the effect) of enabling the resumption of rampant evidence suppression in the tort system.  These failures to assist and cooperate are substantial and material.

66.     Defendants' breaches of their duty of assistance and cooperation have caused and will continue to cause substantial detriment and prejudice to Truck's preparation of a defense to the asbestos bodily injury claims covered by the Truck Policies.

67.     Because of their multiple breaches of their duty of assistance and cooperation, the Debtors' conduct in connection with and throughout the underlying Chapter 11 cases has violated and is violating the Asbestos Insurer Cooperation Obligations (as that term is defined in the Joint Plan) contained in the Truck Policies.

68.     Defendants' breaches of their duty of assistance and cooperation relieve and/or release Truck from any duty, liability, or further obligation to provide any coverage under the Truck Policies for Defendants' defense and indemnity costs related to asbestos bodily injury claims.

### SECOND CAUSE OF ACTION: DECLARATORY JUDGMENT FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

69.     Truck repeats and re-alleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

70.     There exists a justiciable case or controversy between Defendants and Truck as to whether Defendants' conduct to date has breached their duty of good faith and fair dealing under the Truck Policies.

71.     There exists a justiciable case or controversy between Defendants and Truck as to whether Defendants will further breach their duty of good faith and fair dealing under the Truck Policies by seeking and securing confirmation of the Joint Plan.

22

72.     The Truck Policies are valid, presently existing contracts between Truck and Defendants.

73.     Truck has performed or tendered performance of all of its obligations under the Truck Policies.

74.     As the insureds under the Truck Policies, Defendants owe Truck a duty of good faith and fair dealing.  Truck has satisfied all  conditions precedent to Defendants' duty of good faith and fair dealing.

75.     Through the conduct described herein, Defendants have breached their duty of good faith and fair dealing.  Defendants have entered into a collusive agreement with the ACC and the FCR to manipulate the presentation, litigation, and resolution of the asbestos bodily injury claims covered by the Truck Policies by, among other things: failing to schedule or hold any negotiating sessions with the ACC and Truck before filing their Chapter 11 petitions, despite having entered into the Cost Sharing Agreement (and receiving millions of dollars in payment from Truck under that Agreement) for the express purpose of doing so; requesting that the ACC not speak with Truck before the filing of the petitions; excluding Truck from their negotiating sessions with the ACC and the FCR after the petitions were filed; agreeing to allow the resumption of the litigation of the asbestos claims in the tort system without insisting upon fraud prevention measures such as mandatory asbestos exposure disclosures and trust authorization; colluding with the ACC and the FCR after the Chapter 11 petitions were filed to abandon the stated goal of fully and finally resolving (primarily by effecting settlement of) the thousands of current and anticipated future lawsuits alleging asbestos bodily injury claims arising from exposure to Defendants' asbestos-containing products; and colluding with the ACC and the FCR to instead agree to, sponsor, and seek approval of a collusive deal that has the purpose (and, if allowed to go forward, will have the

23

effect) of enabling the resumption of rampant evidence suppression in the tort system

76.     Defendants' breaches of their duty of good faith and fair dealing, their collusion with the ACC and the FCR, and their manipulation of the presentation, litigation, and resolution of the asbestos bodily injury claims covered by the Truck Policies have been and will continue to be to Truck's substantial detriment and prejudice.

77.     Defendants' breaches of their duty of good faith and fair dealing relieve and/or release Truck of any duty, liability, or further obligation to provide any coverage under the Truck Policies for Defendants' defense and indemnity costs related to asbestos bodily injury claims.

## PRAYER FOR RELIEF

WHEREFORE, as to all causes of action, Truck respectfully requests that the Court enter each of the following forms of relief:

a)     A declaration under 28 U.S.C. § 2201 that Defendants have breached their duty of assistance and cooperation under the Truck Policies and that, as a consequence, Truck is relieved and/or released of any duty, liability, or further obligation to provide any coverage under the Truck Policies for Defendants' defense and indemnity costs related to asbestos bodily injury claims.

b)     A declaration under 28 U.S.C. § 2201 that Defendants are not entitled to the Plan Finding because they have violated and are continuing to violate the Asbestos Insurer Cooperation Obligations (as that term is defined in the Joint Plan) contained in the Truck Policies.

c)     A declaration under 28 USC § 2201 that Defendants have breached the implied covenant of good faith and fair dealing under the Truck Policies and that, as a consequence, Truck is relieved and/or released of any duty, liability, or further

obligation to provide any coverage under the Truck Policies for Defendants' defense

and indemnity costs related to asbestos bodily injury claims.

d)      Reasonable costs and attorneys' fees incurred herein; and

e)      Such other relief as is just and proper.

### DEMAND FOR A JURY TRIAL

Truck hereby demands a jury trial of all issues in this action.

Dated: August 28, 2019           */s/ Michael L. Martinez*
           GRIER WRIGHT MARTINEZ, PA
           Michael L. Martinez (N.C. State Bar No. 39885)
           101 North Tryon Street, Suite 1240
           Charlotte, NC 28246
           Phone:  (704) 332-0209; Fax:  (704) 332-0215
           Email:  mmartinez@grierlaw.com

           – and –

           GIBSON, DUNN & CRUTCHER LLP
           Michael A. Rosenthal (admitted *pro hac vice*)
           Robert B. Krakow (admitted *pro hac vice*)
           Alan Moskowitz (admitted *pro hac vice*)
           Matthew G. Bouslog (admitted *pro hac vice*)
           Dylan S. Cassidy (admitted *pro hac vice*)
           200 Park Avenue
           New York, NY 10166-0193
           Phone:  (212) 351-4000; Fax:  (212) 351-4035
           Email:  MRosenthal@gibsondunn.com
           Email:  RKrakow@gibsondunn.com
           Email:  AMoskowitz@gibsondunn.com
           Email:  MBouslog@gibsondunn.com
           Email:  DCassidy@gibsondunn.com

           – and –

           PIA ANDERSON MOSS HOYT, LLC
           Scott R. Hoyt (admitted *pro hac vice*)
           136 E. South Temple, 19th Floor
           Salt Lake City, UT 84111
           Phone: (817) 454-5678; Fax: (801) 350-9010
           Email: SHoyt@pamhlaw.com

           *Counsel for Truck Insurance Exchange*