# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| | : | |
| **Kaiser Gypsum Company, Inc.,** *et al.,* | : | **Case No. 16-31602 (JCW)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |
| | : | |
| **Kaiser Gypsum Company, Inc.** | : | **Case No. 16-31602 (JCW)** |
| **Hanson Permanente Cement, Inc.** | : | **Case No. 16-31614 (JCW)** |
| | : | |
| | : | **DISCLOSURE STATEMENT FOR THIRD** |
| | : | **AMENDED JOINT PLAN OF** |
| | : | **REORGANIZATION OF KAISER GYPSUM** |
| | : | **COMPANY, INC. AND HANSON** |
| | : | **PERMANENTE CEMENT, INC.** |

Edwin Harron
Sharon Zieg
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801

- and -

Felton Parrish
HULL & CHANDLER
1001 Morehead Square Drive, Suite 450
Charlotte, North Carolina 28203

ATTORNEYS FOR FUTURE CLAIMANTS'
REPRESENTATIVE

Kevin Maclay
Todd E. Phillips
CAPLIN & DRYSDALE, CHARTERED
One Thomas Circle N.W., Suite 1100
Washington, D.C. 20005

- and -

Sally Higgins
HIGGINS & OWENS
524 East Boulevard
Charlotte, North Carolina 28203

ATTORNEYS FOR OFFICIAL COMMITTEE OF
ASBESTOS PERSONAL INJURY CLAIMANTS

Ben Hawfield, Jr.
MOORE & VAN ALLEN
100 North Tryon Street, Suite 4700
Charlotte, North Carolina 28202

ATTORNEYS FOR LEHIGH HANSON, INC.


Dated : October 14, 2019

C. Richard Rayburn, Jr. (NC 6357)
John R. Miller, Jr. (NC 28689)
RAYBURN COOPER & DURHAM, P.A.
1200 Carillon
227 West Trade Street
Charlotte, North Carolina 28202
Telephone: (704) 334-0891
Facsimile: (704) 377-1897
E-mail:  rrayburn@rcdlaw.net
          jmiller@rcdlaw.net

-and-

Gregory M. Gordon (TX 08435300)
Amanda Rush (TX 24079422)
JONES DAY
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
E-mail:  gmgordon@jonesday.com
          asrush@jonesday.com

-and-

Paul M. Green (TX 24059854)
JONES DAY
717 Texas, Suite 3300
Houston, Texas  77002
Telephone:  (832) 239-3939
Facsimile:  (832) 239-3600
E-mail:  pmgreen@jonesday.com

ATTORNEYS FOR DEBTORS

## DISCLOSURE STATEMENT DATED OCTOBER 14, 2019[1]

## SOLICITATION OF VOTES WITH RESPECT TO THE THIRD AMENDED JOINT PLAN OF REORGANIZATION OF KAISER GYPSUM COMPANY, INC. AND HANSON PERMANENTE CEMENT, INC.

————————

The only Class entitled to vote on the Third Amended Joint Plan of Reorganization of Kaiser Gypsum Company, Inc. and Hanson Permanente Cement, Inc., dated October 14, 2019 and attached hereto as Exhibit I (the "Plan") is Class 4 (Asbestos Personal Injury Claims). All creditors holding Asbestos Personal Injury Claims in Class 4 are encouraged to read and carefully consider this Disclosure Statement, including the Plan and the matters described under "Risk Factors" in Section V prior to submitting ballots in response to this solicitation. Other than Class 4 (Asbestos Personal Injury Claims), all Classes of Claims and Interests are unimpaired under the Plan; i.e., the Plan does not modify, other than by curing defaults and reinstating maturity, the legal, equitable or contractual rights of the holders of such Claims or Interests. This Disclosure Statement is being delivered to you because you are the holder of, or have otherwise asserted, either a Claim or Claims against, or an Interest or Interests in, Kaiser Gypsum Company, Inc. or Hanson Permanente Cement, Inc. (together, the "Debtors").

————————

The boards of directors of the Debtors believe that the Plan is in the best interests of creditors and other stakeholders. All claimants in Class 4 (Asbestos Personal Injury Claims) are urged to vote in favor of the Plan. A summary of the voting instructions is set forth beginning on page 7 of this Disclosure Statement. More detailed instructions are included in the ballots distributed to the claimants holding Asbestos Personal Injury Claims. To be counted, your ballot must be duly completed, executed and received by the Debtors' voting agent by 5:00 p.m., prevailing Eastern Time, on February 20, 2020 (the "Voting Deadline"), unless extended by the Debtors in consultation with the Asbestos Personal Injury Committee and the Future Claimants' Representative.

————————

The Confirmation and the Effective Date of the proposed Plan are subject to material conditions precedent. See Section II. There is no assurance that these conditions will be satisfied or waived.

No person is authorized by any of the Debtors in connection with the Plan or the solicitation of acceptances of the Plan to give any information or to make any representation other than as contained in this Disclosure Statement and the Exhibits attached hereto or

---

[1] Capitalized terms used herein and not otherwise defined have the meanings ascribed to them in the Third Amended Joint Plan of Reorganization of Kaiser Gypsum Company, Inc. and Hanson Permanente Cement, Inc., dated October 14, 2019.

incorporated by reference or referred to herein.  If such information or representation is given or made, it may not be relied upon as having been authorized by any of the Debtors.  The Debtors will make available to creditors entitled to vote on acceptance of the Plan such additional information as may be required by applicable law prior to the Voting Deadline.

———————————

The summaries of the Plan and other documents contained in this Disclosure Statement are qualified by reference to the Plan itself, the Exhibits thereto and documents described therein. In the event that any inconsistency or conflict exists between this Disclosure Statement and the Plan, the terms of the Plan will control.  Except as otherwise indicated, the Debtors will file all Exhibits to the Plan with the Bankruptcy Court and make them available for review on the website of Prime Clerk LLC ("Prime Clerk") at https://cases.primeclerk.com/kaisergypsum, no later than ten (10) days before the deadline to object to confirmation of the Plan.  The Debtors also will serve such Exhibits to the Plan on their then current Bankruptcy Rule 2002 service list no later than ten (10) days before the deadline to object to confirmation of the Plan.

———————————

The information contained in this Disclosure Statement, including the information regarding the history, businesses and operations of the Debtors, the historical and projected financial information regarding the Debtors and the liquidation analyses relating to the Debtors, is included for purposes of soliciting acceptances of the Plan, but, as to contested matters and adversary proceedings, is not to be construed as admissions or stipulations, but rather as statements made in settlement negotiations.

———————————

**FORWARD-LOOKING STATEMENTS**

This Disclosure Statement contains forward-looking statements based primarily on the current expectations of the Debtors and projections about future events and financial trends affecting the financial condition of the Debtors' or the Reorganized Debtors' businesses.  The words "believe," "may," "estimate," "continue," "anticipate," "intend," "expect" and similar expressions identify these forward-looking statements.  These forward-looking statements are subject to a number of risks, uncertainties and assumptions, including those described below under the caption "Risk Factors" in Section V.  In light of these risks and uncertainties, the forward-looking events and circumstances discussed in this Disclosure Statement may not occur, and actual results could differ materially from those anticipated in the forward-looking statements.  Neither the Debtors nor the Reorganized Debtors undertake any obligation to update or revise publicly any forward-looking statements, whether as a result of new information, future events or otherwise.

———————————

This Disclosure Statement has not been approved or disapproved by the Securities and Exchange Commission (the "SEC"), any state securities commission or any securities exchange

or association nor has the SEC, any state securities commission or any securities exchange or association passed upon the accuracy or adequacy of the statements contained herein.

--------------------------------

# TABLE OF CONTENTS

**Page**

I.   PRELIMINARY STATEMENT ................................................................... 1

II.  OVERVIEW OF THE PLAN ..................................................................... 2

    A.   Introduction ................................................................................. 2

    B.   Summary of Classes and Treatment of Claims and Interests ................ 3

    C.   Voting on and Confirmation of the Plan ........................................... 7

        1.   Voting Procedures and Requirements ........................................ 7

        2.   Confirmation Hearing ............................................................ 8

        3.   Confirmation ....................................................................... 8

        4.   Section 524(g) of the Bankruptcy Code..................................... 9

        5.   Acceptance .......................................................................... 10

        6.   Feasibility .......................................................................... 10

        7.   Best Interests Test; Liquidation Analysis ................................. 11

            a.   Generally.................................................................. 11

            b.   Liquidation Analysis ................................................. 11

        8.   Alternatives to Confirmation and Consummation of the Plan................ 11

    D.   Formation of Asbestos Personal Injury Trust ................................... 12

        1.   Creation of Asbestos Personal Injury Trust............................... 12

        2.   Authority of the Asbestos Personal Injury Trust ....................... 12

        3.   Qualified Settlement Fund ..................................................... 12

        4.   Appointment of Asbestos Personal Injury Trustee ..................... 13

        5.   Appointment of Delaware Trustee............................................ 15

        6.   Trust Advisory Committee ..................................................... 15

        7.   Future Claimants' Representative ............................................ 15

    E.   Document Repository .................................................................. 16

    F.   Transfers of Property to and Assumption of Certain Liabilities by the
Asbestos Personal Injury Trust ..................................................... 17

        1.   Expenses of the Asbestos Personal Injury Trust......................... 17

        2.   Funding the Asbestos Personal Injury Trust.............................. 17

            a.   Initial Payment ......................................................... 17

            b.   Payment Note............................................................ 17

# TABLE OF CONTENTS

(continued)

|   |   |   |   |
|---|---|---|---|
| | c. | Phase 1 Claims | 17 |
| | d. | Asbestos Personal Injury Insurance Assets | 17 |
| | e. | Interest Trigger Date | 18 |
| 3. | | Assumption of Certain Liability and Responsibility by the Asbestos Personal Injury Trust | 18 |
| 4. | | Indemnification by the Asbestos Personal Injury Trust | 18 |
| 5. | | Authority of the Debtors | 18 |
| G. | | Cooperation with Respect to Insurance Matters | 18 |
| 1. | | Obligation to Cooperate with Respect to Insurance Matters | 18 |
| 2. | | Enforcement of Reorganized Debtors' Obligations to Cooperate with Respect to Insurance Matters | 19 |
| H. | | Compromise of Insurance Policies | 22 |
| 1. | | Dual Policies | 22 |
| 2. | | Separate Limit Policies | 22 |
| 3. | | Insurance Policies that Provide Coverage for Asbestos Personal Injury Claims but not for Environmental Claims | 22 |
| 4. | | Insurance Policies that Provide Coverage for Environmental Claims but not for Asbestos Personal Injury Claims | 23 |
| 5. | | Amendment of Insurance Policy Exhibits | 23 |
| I. | | Truck Obligations Regarding Deductibles | 23 |
| J. | | Liquidation of Asbestos Personal Injury Claims | 23 |
| 1. | | Insured Asbestos Claims | 23 |
| 2. | | Uninsured Asbestos Claims | 24 |
| K. | | Limitations On Judgment Recovery From Non-Settling Asbestos Insurers | 24 |
| L. | | Insurance Neutrality | 25 |
| M. | | Asbestos Personal Injury Trust Distribution Procedures | 25 |
| N. | | Conditions Precedent to Confirmation and Consummation of the Plan | 27 |
| 1. | | Conditions to Confirmation | 27 |
| 2. | | Conditions to the Effective Date | 30 |
| 3. | | Waiver of Conditions to Confirmation or the Effective Date | 32 |
| 4. | | Effect of Nonoccurrence of Conditions to the Effective Date | 32 |

# TABLE OF CONTENTS
(continued)

**Page**

III.   HISTORY OF THE DEBTORS ..................................................................... 32

    A.   Historical Overview ..................................................................... 32

        1.   Corporate History.................................................................. 32

        2.   Business Operations and Corporate Governance.................................. 33

            a.   Kaiser Gypsum.................................................................. 33

            b.   HPCI ................................................................................. 34

    B.   General Overview of the Debtors' Manufacture and Sale of Products Alleged to Contain Asbestos.............................................................. 34

    C.   History of the Debtors' Asbestos Personal Injury Litigation ............................... 35

    D.   Asbestos Personal Injury Insurance and Coverage Litigation ............................ 35

    E.   The Debtors' Environmental Liabilities .................................................. 36

        1.   Seattle Plants ....................................................................... 36

        2.   St. Helens Plant.................................................................... 37

    F.   Environmental Insurance and Coverage Litigation ...................................... 39

    G.   Prepetition Discussions With Representatives of Asbestos Claimants................. 40

    H.   Determination to File Reorganization Cases ............................................. 41

IV.   EVENTS DURING REORGANIZATION CASES................................................. 41

    A.   Commencement of Reorganization Cases ............................................... 41

    B.   First Day Relief............................................................................. 41

        1.   First Day Motions .................................................................. 41

        2.   Injunction Enjoining Parties From Pursuing Derivative Claims Against Certain Parties ........................................................... 42

    C.   Appointment of the Creditors' Committee, the Asbestos Personal Injury Committee and the Future Claimants' Representative......................... 42

    D.   Certain Claimants' Motion to Transfer Venue of the Reorganization Cases....... 45

    E.   Cost Sharing Agreement .................................................................. 46

    F.   Services Agreement ....................................................................... 46

    G.   Discovery Requests and the Related Case Management Order......................... 46

    H.   Motions to Approve Settlements ......................................................... 47

        1.   Construction Settlement........................................................... 47

        2.   Insolvent Insurers Settlement.................................................... 47

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| I. | Bar Dates (For Claims Other Than Asbestos Personal Injury Claims) | 48 |
| J. | The Debtors' Exclusive Right to File and Seek Confirmation of a Plan | 48 |
| K. | Mediations of the Reorganization Cases | 49 |
| | 1. | Environmental Liabilities Mediation | 49 |
| | 2. | Asbestos-Related Mediation | 49 |
| L. | Motion of the Creditors' Committee for Standing to Pursue Certain Estate Claims | 49 |
| M. | Removal Period | 51 |
| N. | Motions to Lift Automatic Stay | 51 |
| | 1. | Asbestos Coverage Litigation | 51 |
| | 2. | Environmental Coverage Litigation | 51 |
| | 3. | Costs Lift Stay Motion | 52 |
| | 4. | Untermann Lift Stay Motions | 52 |
| | 5. | ICSOP's Lift Stay Motion | 53 |
| | 6. | Joint Lift Stay Motion | 53 |
| O. | Assumption of Excess CIP Agreement | 54 |
| P. | Motions to Dismiss the Reorganization Cases | 54 |
| Q. | Resolution of the Reorganization Cases | 55 |
| | 1. | Fairness of Settlement of Dispute Regarding Asbestos Personal Injury Claims | 55 |
| | 2. | Comprehensive Settlement of the Debtors' Primary Environmental Liabilities | 55 |
| R. | Truck Coverage Defense Allegations | 57 |
| V. | RISK FACTORS | 58 |
| A. | Plan Confirmation | 59 |
| B. | The Effective Date May Not Occur | 59 |
| VI. | REORGANIZED DEBTORS | 59 |
| A. | Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors | 59 |
| B. | Restructuring Transactions | 59 |
| C. | Business of the Reorganized Debtors: Transfers and Lease Transactions | 60 |

# TABLE OF CONTENTS
(continued)

**Page**

D. Corporate Governance, Directors and Officers, Employment-Related Agreements and Compensation Programs and Corporate Action ...................... 60

    1. Certificates of Incorporation and By-Laws of the Reorganized Debtors ................................................................................................ 60

    2. Directors and Officers of the Reorganized Debtors ................................ 60

    3. Employee Arrangements of the Reorganized Debtors ............................ 61

    4. Corporate Action ................................................................................... 61

E. Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes ............................................................................................ 61

F. Determination of the Insolvent Insurers Proceeds Dispute ............................ 62

G. Compliance with QSF Regulations ............................................................... 62

H. Surety Bond Obligations .............................................................................. 62

VII. DISTRIBUTIONS UNDER THE PLAN .................................................................. 63

A. Unclassified Claims ..................................................................................... 63

    1. Payment of Administrative Claims .......................................................... 63

        a. Administrative Claims in General .............................................. 63

        b. Statutory Fees ............................................................................ 63

        c. Ordinary Course Liabilities ........................................................ 63

        d. Bar Dates for Administrative Claims .......................................... 63

    2. Payment of Priority Tax Claims ............................................................. 64

        a. Priority Tax Claims in General ................................................... 64

        b. Other Provisions Concerning Treatment of Priority Tax Claims ....................................................................................... 64

B. Obtaining Cash for Plan Distributions ........................................................... 65

C. Distributions for Claims Allowed as of the Effective Date .............................. 65

D. Method of Distributions to Holders of Claims ................................................ 65

E. Compensation and Reimbursement for Services Related to Distributions .......... 65

F. Delivery of Distributions and Undeliverable or Unclaimed Distributions .......... 66

    1. Delivery of Distributions ....................................................................... 66

    2. Undeliverable Distributions Held by Disbursing Agents ........................ 66

        a. Holding and Investment of Undeliverable Distributions ............. 66

# TABLE OF CONTENTS

(continued)

**Page**

|  |  | b. | After Distributions Become Deliverable | 66 |
|  |  | c. | Failure to Claim Undeliverable Distributions | 66 |
| G. | Distribution Record Date | | | 67 |
|  | 1. | No Recognition of Transfers after the Distribution Record Date | | 67 |
|  | 2. | Treatment of Certain Transfers | | 67 |
| H. | Means of Cash Payments | | | 67 |
| I. | Timing and Calculation of Amounts to Be Distributed | | | 67 |
|  | 1. | Timing of Distributions Under the Plan | | 67 |
|  | 2. | Allowed Claims | | 67 |
|  | 3. | Compliance with Tax Requirements | | 68 |
|  |  | a. | Withholding and Reporting | 68 |
|  |  | b. | Backup Withholding | 68 |
|  |  | c. | Obligations of Distribution Recipients | 69 |
| J. | Setoffs | | | 69 |
| K. | Allocation of Payments | | | 69 |
| L. | Prosecution of Objections to Claims | | | 69 |
|  | 1. | Objections to Claims | | 69 |
|  | 2. | Authority to Prosecute Objections | | 69 |
|  | 3. | Authority to Amend Schedules | | 70 |
| M. | Treatment of Disputed Claims | | | 70 |
| N. | Distributions on Account of Disputed Claims Once Allowed | | | 70 |
| O. | Preservation of Rights of Action; Settlement of Claims and Releases | | | 70 |
|  | 1. | Preservation of Rights of Action by the Reorganized Debtors | | 70 |
|  | 2. | Settlement of Certain Estate Claims | | 70 |
|  | 3. | Releases | | 71 |
|  |  | a. | General Releases of Debtors and Reorganized Debtors | 71 |
|  |  | b. | Release by the Debtors, Reorganized Debtors and Lehigh Hanson | 71 |
|  |  | c. | General Releases by Holders of Claims or Interests | 72 |
|  |  | d. | Injunction Related to Releases | 73 |

# TABLE OF CONTENTS
(continued)

**Page**

P.    Release of Encumbrances ................................................................. 73

Q.    Discharge, Injunction and Subordination Rights ............................. 73

    1.    Discharge of Claims ................................................................ 73

    2.    Injunctions .............................................................................. 74

        a.    General Injunctions ......................................................... 74

        b.    Asbestos Permanent Channeling Injunction ................... 75

        c.    Environmental Injunction ............................................... 75

    3.    Subordination Rights .............................................................. 76

VIII.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........ 77

A.    Executory Contracts and Unexpired Leases to Be Assumed ............ 77

    1.    Assumption Generally ............................................................ 77

    2.    Assumptions of Executory Contracts and Unexpired Leases ................. 77

    3.    Approval of Assumptions and Assumption Procedures ......... 77

B.    Payments Related to the Assumption of Executory Contracts and Unexpired Leases ............................................................................. 78

C.    Executory Contracts and Unexpired Leases to Be Rejected and Rejection Procedures ......................................................................... 79

D.    Obligations to Indemnify Directors, Officers and Employees ........... 79

E.    Contracts and Leases Entered Into After the Petition Date ............... 80

F.    Insurance Policies ............................................................................. 80

    1.    Assumed Insurance Policies ................................................... 80

    2.    Reservation of Rights ............................................................. 80

IX.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE PLAN ........................................................... 81

A.    The Asbestos Personal Injury Trust .................................................. 81

B.    U.S. Federal Income Tax Consequences to Holders of Asbestos Claims .......... 82

C.    Information Reporting and Backup Withholding ............................... 82

X.    ADDITIONAL INFORMATION ................................................................... 82

XI.    RECOMMENDATION AND CONCLUSION .................................................. 82

## TABLE OF EXHIBITS

| | |
|---|---|
| EXHIBIT I | Third Amended Joint Plan of Reorganization of Kaiser Gypsum Company, Inc. and Hanson Permanente Cement, Inc. |
| EXHIBIT II | Voting Procedures |
| EXHIBIT III | Projections |
| EXHIBIT IV | Liquidation Analysis |
| EXHIBIT V | List of Asbestos-Containing Products Manufactured or Sold by Either Kaiser Gypsum Company, Inc. or Hanson Permanente Cement, Inc. |

## I.      PRELIMINARY STATEMENT

The Debtors, Lehigh Hanson, the Asbestos Personal Injury Committee and the Future Claimants' Representative are seeking approval of the Plan, a copy of which is attached hereto as Exhibit I.  The purpose of this Disclosure Statement is to provide to creditors who have a right to vote on the Plan adequate information to make an informed determination as to whether to accept (i.e., vote in favor of) or reject (i.e., vote against) the Plan.

Although insurance covers most of their asbestos-related costs and should cover their environmental liabilities, the Debtors commenced these chapter 11 cases because of the continuing costs, risks and administrative burdens associated with asbestos-related litigation and legacy environmental liabilities.  Since the inception of the Reorganization Cases, the Debtors, Lehigh Hanson, the Asbestos Personal Injury Committee and the Future Claimants' Representative discussed potential paths forward to a consensual plan of reorganization and the terms of a plan of reorganization.  Following extensive discussions, in February 2018 the Debtors and Lehigh Hanson reached agreement on a settlement term sheet (the "Term Sheet") with the Asbestos Personal Injury Committee and the Future Claimants' Representative that sets forth the Parties' agreement in principle on a consensual plan of reorganization that would resolve all present and future Asbestos Personal Injury Claims.  The Plan implements the settlement by, among other things, providing for the creation and funding of a trust under section 524(g) of the Bankruptcy Code that addresses all Asbestos Personal Injury Claims.

The asbestos trust to be created under the Plan will be funded with a $49 million cash payment by the Debtors and Lehigh Hanson, plus a $1 million note, as well as the assignment of the Debtors' rights under insurance policies covering Asbestos Personal Injury Claims.  The Plan provides that, with respect to the Debtors' insured asbestos liabilities, asbestos claimants may continue to assert actions against the Reorganized Debtors in name only in the tort system to collect available insurance.  The Asbestos Personal Injury Trust will satisfy the uninsured portions of Asbestos Personal Injury Claims in accordance with the Asbestos Personal Injury Trust Distribution Procedures.  In that regard, the Plan includes Asbestos Personal Injury Trust Distribution Procedures for Asbestos Personal Injury Claims against the Debtors that describe a detailed process for treating all claimants asserting Asbestos Personal Injury Claims fairly and equitably.  The Asbestos Personal Injury Trust Distribution Procedures are attached as Exhibit I.A.19 to the Plan and are summarized below in this Disclosure Statement.  The agreement that will govern the operation of the Asbestos Personal Injury Trust is also attached to the Plan as Exhibit I.A.16 and is summarized below in this Disclosure Statement.

**Pursuant to the Plan and section 524(g) of the Bankruptcy Code, holders of Asbestos Personal Injury Claims against the Debtors will no longer have any right to assert Asbestos Personal Injury Claims against the Debtors or certain other parties identified in the Plan except that such holders may initiate, continue and/or prosecute suit against the Reorganized Debtors in name only in the tort system to obtain the benefit of insurance coverage under the Asbestos Insurance Policies.**

All other Classes of creditors and Interest holders of the Debtors are unimpaired by the Plan because it does not modify the legal, equitable or contractual rights of the holders of the Claims or Interests in those Classes, other than by curing defaults and reinstating maturities.  The

specific treatments of other Classes of creditors and Interest holders of the Debtors are set forth in the Plan and summarized below in this Disclosure Statement.

———————

The only Class that is entitled to vote on the Plan is Class 4 (Asbestos Personal Injury Claims).  All holders of Asbestos Personal Injury Claims in this class are urged to vote in favor of the Plan by no later than 5:00 p.m., prevailing Eastern Time, on February 20, 2020.  See Section II.C. below for voting instructions.

The Debtors, Lehigh Hanson, the Asbestos Personal Injury Committee and the Future Claimants' Representative are the proponents of the Plan.  The Debtors' boards of directors believe that the Plan is in the best interests of the Debtors' creditors and other stakeholders because it resolves the Debtors' liability for Asbestos Personal Injury Claims on a fair and equitable basis.

A combined letter from the Asbestos Personal Injury Committee and the Future Claimants' Representative expressing their views on the Plan is included in the solicitation package you have received.

## II.    OVERVIEW OF THE PLAN

### A.    Introduction

The following is a brief overview of certain material provisions of the Plan.  This overview is qualified by reference to the provisions of the Plan, which is attached hereto as Exhibit I, and the Exhibits thereto, as amended from time to time.  In the event that any inconsistency or conflict exists between this Disclosure Statement and the Plan, the terms of the Plan will control.  All Exhibits to the Plan not presently attached to the Plan will be filed with the Bankruptcy Court and made available for review on Prime Clerk's website at https://cases.primeclerk.com/kaisergypsum, no later than ten (10) days before the deadline to object to confirmation of the Plan.  The Debtors also will serve such Exhibits on their then current Bankruptcy Rule 2002 service list no later than ten (10) days before the deadline to object to confirmation of the Plan.

By an order of the Bankruptcy Court dated [•], 2019, this Disclosure Statement has been approved as containing "adequate information" for creditors and equity security holders of the Debtors in accordance with section 1125 of the Bankruptcy Code.  The Bankruptcy Code defines "adequate information" as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and the history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan . . . ."  11 U.S.C. § 1125(a)(1).

The requirements for Confirmation, including the vote of creditors entitled to vote on the Plan and certain of the statutory findings that must be made by the Bankruptcy Court for a plan to be confirmed, are set forth in Section II.C.  Confirmation of the Plan and the occurrence of the

Effective Date are subject to a number of significant conditions, which are summarized in Section II.N.  There is no assurance that these conditions will be satisfied or waived.

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the applicable requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation of a plan of reorganization are that the plan:  (1) is accepted by the requisite holders of claims and interests in impaired classes of such debtor; (2) is in the "best interests" of each holder of a claim or interest in each impaired class under the plan for such debtor; (3) is feasible; and (4) complies with the applicable provisions of the Bankruptcy Code. In this instance, only Class 4 (Asbestos Personal Injury Claims) is impaired, and therefore, only holders of Asbestos Personal Injury Claims are entitled to vote to accept (i.e., vote in favor of) or reject (i.e., vote against) the Plan.  Because each of the other Classes of Claims is unimpaired, each of these Classes of Claims is deemed to vote to accept the Plan.  In addition, because the Plan provides for the issuance of the Asbestos Permanent Channeling Injunction pursuant to section 524(g) of the Bankruptcy Code, the Plan must satisfy the requirements of that section of the Bankruptcy Code as well.  See Section II.C. for a discussion of the applicable Bankruptcy Code requirements for Plan Confirmation.

### B.    Summary of Classes and Treatment of Claims and Interests

The classification of Claims and Interests, the estimated aggregate amount of Claims in each Class and the amount and nature of distributions to holders of Claims or Interests in each Class are summarized in the table below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified.  For a discussion of certain additional matters related to Administrative Claims and Priority Tax Claims, see Sections VII.A.1 and 2.

### SUMMARY OF CLASSIFICATION AND TREATMENT UNDER THE PLAN

| CLASS | TREATMENT | STATUS/ ENTITLED TO VOTE? | ESTIMATED AGGREGATE AMOUNT OF CLAIMS | ESTIMATED PERCENTAGE RECOVERY |
|---|---|---|---|---|
| Class 1<br><br>Priority Claims | On the Effective Date, each holder of an Allowed Claim in Class 1 shall receive cash in an amount equal to such Allowed Claim unless the holder of such Claim agrees to less favorable treatment. | **Unimpaired**<br><br>Deemed to Accept the Plan<br><br>Not Entitled to Vote | None | 100% |
| Class 2<br><br>Secured Claims | On the Effective Date, unless otherwise agreed by the holder of an Allowed Claim in Class | **Unimpaired** | None | 100% |

| CLASS | TREATMENT | STATUS/ ENTITLED TO VOTE? | ESTIMATED AGGREGATE AMOUNT OF CLAIMS | ESTIMATED PERCENTAGE RECOVERY |
|---|---|---|---|---|
| | 2 and the applicable Debtor or Reorganized Debtor, each holder of a Claim in Class 2 shall receive treatment in accordance with Option A or B below, at the option of the applicable Debtor or Reorganized Debtor.  Any Allowed Deficiency Claim of a holder of an Allowed Secured Claim shall be entitled to treatment as an Allowed Class 3 Claim.<br><br>Option A:  Claims in Class 2 that are Allowed Claims and with respect to which the applicable Debtor or Reorganized Debtor elects Option A shall be paid in full in cash.<br><br>Option B:  Claims in Class 2 that are Timely Claims and with respect to which the applicable Debtor or Reorganized Debtor elects Option B shall be Reinstated. | Deemed to Accept the Plan<br><br>Not Entitled to Vote | | |
| Class 3<br><br>General Unsecured Claims | On the Effective Date, each holder of an Allowed Claim in Class 3 shall receive cash in an amount equal to such Allowed Claim including any post-petition interest as | **Unimpaired**<br><br>Deemed to Accept the Plan<br><br>Not Entitled to Vote | $72,055,928 | 100% |

| CLASS | TREATMENT | STATUS/ ENTITLED TO VOTE? | ESTIMATED AGGREGATE AMOUNT OF CLAIMS | ESTIMATED PERCENTAGE RECOVERY |
|---|---|---|---|---|
| | ordered by the Bankruptcy Court unless the holder of such Claim agrees to less favorable treatment. | | | |
| Class 4

Asbestos Personal Injury Claims | On the Effective Date, all Asbestos Personal Injury Claims shall be channeled to the Asbestos Personal Injury Trust, which shall be funded pursuant to Section IV.K.2. of the Plan.  All Asbestos Personal Injury Claims shall be resolved pursuant to the terms of Section IV.O.1 and Section IV.O.2 of the Plan, the Asbestos Personal Injury Trust Agreement, the Asbestos Personal Injury Trust Distribution Procedures and any other Asbestos Personal Injury Trust Document.  Except as provided in Section IV.O.1, pursuant to section 524(g) of the Bankruptcy Code, the Plan and the Confirmation Order shall permanently and forever stay, restrain and enjoin any Entity from taking any actions against any Protected Party for the purpose of, directly or indirectly, collecting, recovering or | **Impaired**

Entitled to Vote | N/A | As determined by the Asbestos Personal Injury Trust Distribution Procedures (see Exhibit I.A.19 to the Plan) and the extent of funding pursuant to Section IV.K.2. of the Plan. |

| CLASS | TREATMENT | STATUS/ ENTITLED TO VOTE? | ESTIMATED AGGREGATE AMOUNT OF CLAIMS | ESTIMATED PERCENTAGE RECOVERY |
|---|---|---|---|---|
| | receiving payment of, on or with respect to any Asbestos Personal Injury Claim. | | | |
| Class 5 Surety Bond Claims | On the Effective Date, each Surety Bond Claim in Class 5 shall be Reinstated. | **Unimpaired** Deemed to Accept the Plan Not Entitled to Vote | N/A | 100% |
| Class 6 Intercompany Claims | On the Effective Date, each Intercompany Claim in Class 6 shall be Reinstated. | **Unimpaired** Deemed to Accept the Plan Not Entitled to Vote | N/A | 100% |
| Class 7 Stock Interests | On the Effective Date, Stock Interests of the Debtors shall be Reinstated, and holders of such Stock Interests shall retain such Interests, subject to the Restructuring Transactions provisions of Section IV.B. of the Plan. | **Unimpaired** Deemed to Accept the Plan Not Entitled to Vote | N/A | N/A |

The estimated amounts of Claims shown in the table above are based upon the Debtors' review of their books and records and may be revised following the Debtors' analysis of the Claims Filed. Further, the amount of any Disputed Claim that ultimately is allowed by the Bankruptcy Court may be significantly more or less than the estimated amount of such Claim.

While the Asbestos Personal Injury Claims (Class 4) are impaired, the table does not include an estimate of the aggregate amount of such Claims or the recoveries of holders of such Claims in respect thereof because the amounts of such claims will later be determined pursuant

to the procedures set forth in the Plan and the Asbestos Personal Injury Trust Distribution Procedures.

### C.      Voting on and Confirmation of the Plan

#### 1.      Voting Procedures and Requirements

Pursuant to the Bankruptcy Code, only classes of claims against or equity interests in a debtor that are "impaired" under the terms of a plan of reorganization are entitled to vote to accept or reject a plan.  A class is "impaired" if the legal, equitable or contractual rights attaching to the claims or interests of that class are modified, other than by curing defaults and reinstating maturities.  Classes of claims and equity interests that are not impaired are not entitled to vote on a plan and are conclusively presumed to have accepted that plan.  Because all Classes other than Class 4 (Asbestos Personal Injury Claims) are unimpaired, only holders of Asbestos Personal Injury Claims may vote on the Plan.  For a summary of the classifications of Claims and Interests pursuant to the Plan, together with an indication of whether each Class of Claims or Interests is impaired or unimpaired under the terms of the Plan, see Section II.B.

Pursuant to section 502 of the Bankruptcy Code and Bankruptcy Rule 3018, the Bankruptcy Court may estimate and temporarily allow a Claim for voting or other purposes.  By order of the Bankruptcy Court, voting procedures have been established, which include certain vote tabulation rules that temporarily allow or disallow certain Claims for voting purposes only.  These voting procedures, including the tabulation rules, are described in the solicitation materials provided with your ballot and on Exhibit II to this Disclosure Statement.

**The voting procedures attached hereto as Exhibit II set forth detailed instructions concerning the voting of Class 4 (Asbestos Personal Injury Claims).  Please refer to Exhibit II for more information regarding the voting of Asbestos Personal Injury Claims.**

**Voting on the Plan by each holder of an Asbestos Personal Injury Claim in Class 4 is important.  Please carefully follow all of the instructions contained on the ballot or ballots provided to you.  All ballots must be completed and returned in accordance with the instructions provided.**

**To be counted, your ballot or ballots must be received by 5:00 p.m., prevailing Eastern Time, on February 20, 2020 at the address set forth on the preaddressed envelope provided to you.  It is of the utmost importance to the Debtors that you vote promptly to accept the Plan.**

**If you are entitled to vote and you did not receive a ballot, received a damaged ballot or lost your ballot, please call the Debtors' voting agent, Prime Clerk, at (855) 855-7644.**

**Votes cannot be transmitted orally or by facsimile or electronic mail.  Accordingly, you are urged to return your signed and completed ballot, by hand delivery, overnight service or regular United States mail, promptly, so that it is <u>received</u> by Prime Clerk before the deadline to vote on the Plan.**

### 2.       Confirmation Hearing

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on whether the Debtors have fulfilled the confirmation requirements of section 1129 of the Bankruptcy Code.  The Confirmation Hearing has been scheduled for March 30, 2020 to April 4, 2020 before the Honorable J. Craig Whitley, United States Bankruptcy Judge for the Western District of North Carolina.  Judge Whitley will convene the Confirmation Hearing on March 30, 2020 at 9:30 a.m., prevailing Eastern Time in the United States Bankruptcy Court, 401 West Trade Street, Charlotte, North Carolina 28202 in Courtroom C1-4.  A District Court Judge for the United States District Court for the Western District of North Carolina may jointly preside with Judge Whitley at the Confirmation Hearing or hold a separate Confirmation Hearing in which case the Debtors will provide separate notice of that hearing.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court and/or the District Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing.  Any objection to Confirmation must be made in writing and must specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim or Interest held by the objector.  Any such objections must be Filed and served upon the persons designated in the notice of the Confirmation Hearing and in the manner and by the deadline described therein.

### 3.       Confirmation

To confirm the Plan, the Bankruptcy Code requires that the Bankruptcy Court make a series of findings concerning the Plan and the Debtors, including that:

- the Plan has classified Claims and Interests in a permissible manner;

- the Plan complies with the applicable provisions of the Bankruptcy Code;

- the Debtors have complied with the applicable provisions of the Bankruptcy Code;

- the Plan has been proposed in good faith and not by any means forbidden by law;

- the disclosure required by section 1125 of the Bankruptcy Code has been made;

- the Plan has been accepted by the requisite votes of creditors and equity interest holders;

- the Plan is feasible and Confirmation will not likely be followed by the liquidation or the need for further financial reorganization of the Debtors or the Reorganized Debtors;

- the Plan is in the "best interests" of all holders of Claims or Interests in an impaired Class by providing to creditors or interest holders on account of

such Claims or Interests property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain in a chapter 7 liquidation, unless each holder of a Claim or Interest in such Class has accepted the Plan;

- all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of such fees on the Effective Date; and

- the disclosures required under section 1129(a)(5) concerning the identity and affiliations of persons who will serve as officers, directors and voting trustees of the Reorganized Debtors have been made.

### 4.      Section 524(g) of the Bankruptcy Code

The Plan contemplates establishing the Asbestos Personal Injury Trust pursuant to section 524(g) of the Bankruptcy Code to be funded by the Debtors or Lehigh Hanson or both. Asbestos Personal Injury Claims that are covered by insurance will be liquidated in the tort system, while uninsured portions of Asbestos Personal Injury Claims will be determined and paid by the Asbestos Personal Injury Trust.  The Plan contains an injunction preventing any Entity from, directly or indirectly, pursuing any Asbestos Personal Injury Claim against any Protected Party, except that no Entity is prevented from initiating or continuing a suit or other proceeding against any Debtor in name only for the purpose of recovery on an Asbestos Personal Injury Claim from a Non-Settling Asbestos Insurer.  In order to confirm a plan of reorganization containing a trust with all of the features provided in section 524(g), the Bankruptcy Court must find, among other things, the following:  (a) that the trust is to assume the liabilities of a debtor that "has been named as a defendant in personal injury, wrongful death, or property-damage actions seeking recovery for damages allegedly caused by" asbestos; (b) "the debtor is likely to be subject to substantial future demands for payment arising out of the same or similar conduct or events that gave rise to the claims that are addressed by the injunction;" (c) "the actual amounts, numbers, and timing of such future demands cannot be determined;" and (d) "pursuit of such demands outside the procedures prescribed by such plan is likely to threaten the plan's purpose to deal equitably with claims and future demands."

To issue a section 524(g) channeling injunction, the Bankruptcy Court also must find that the channeling injunction is to be implemented in connection with a trust that pursuant to the plan meets the following requirements:  (a) the trust must "assume the liabilities of a debtor which . . . has been named as a defendant in personal injury, wrongful death, or property damage actions" seeking damage caused by asbestos or asbestos-containing products; (b) the trust must "be funded in whole or in part by the securities of 1 or more of the debtors involved in such plan and by the obligation of such debtor or debtors to make future payments, including dividends;" (c) the trust must "own, or by the exercise of rights granted under such plan would be entitled to own if specified contingencies occur, a majority of the voting shares of . . . each such debtor; . . . the parent corporation of each such debtor; or . . . a subsidiary of each such debtor that is also a debtor;" (d) the trust must "use its assets or income to pay claims or demands;" and (e) the trust will "operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of present

claims and future demands, or other comparable mechanisms, that provide reasonable assurance that the trust will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner."

If a debtor can obtain the required findings from the Bankruptcy Court and structure the trust to satisfy each of the above requirements, section 524(g) authorizes the issuance of a channeling injunction.

Section 524(g)(4)(B)(ii) provides, however, that the injunction is applicable against future claimants only if a future claims representative is appointed in the bankruptcy cases and only if the Bankruptcy Court and/or the District Court determines that the application of the injunction to future claimants is "fair and equitable . . . in light of the benefits provided, or to be provided, to such trust on behalf of such debtor or debtors or such third party." Further, to obtain the channeling injunction provided in section 524(g), a separate class or classes of claimants whose claims are to be addressed by the trust must be established and vote, by at least 75 percent of those voting, in favor of the plan. Finally, assuming the plan satisfies these criteria, then "any proceeding that involves the validity, application, construction, or modification of such injunction . . . may be commenced only in the district court in which such injunction was entered, and such court shall have exclusive jurisdiction over any such proceeding without regard to the amount in controversy." If the time for appeal of the order that issues or affirms the plan has expired, the injunction shall be valid and enforceable and may not be revoked or modified by any court.

### 5.    Acceptance

A plan is accepted by an impaired class of claims if holders of at least two-thirds in dollar amount and a majority in number of claims of that class vote to accept/in favor of the plan. Only those holders of claims who actually vote (and are entitled to vote) to accept or to reject a plan count in this tabulation. In addition to this voting requirement, section 1129 of the Bankruptcy Code requires that a plan be accepted by each holder of a claim or interest in an impaired class or that the plan otherwise be found by the Bankruptcy Court to be in the best interests of each holder of a claim or interest in an impaired class. Further, to the extent that confirmation of a plan is sought pursuant to section 524(g) of the Bankruptcy Code, a class of asbestos claims is deemed to accept if at least two-thirds in dollar amount and 75 percent in number of claims vote to accept/in favor of the plan. Only those holders of claims who actually vote (and are entitled to vote) to accept or to reject a plan count in this tabulation.

### 6.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires a finding that Confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors (unless such liquidation or reorganization is proposed in the Plan). For purposes of determining whether the Plan meets this requirement, the Debtors have prepared the projections set forth in Exhibit III hereto. Based upon the Projections, the Debtors believe that their reorganization under the Plan will meet the feasibility requirements of the Bankruptcy Code.

### 7.      Best Interests Test; Liquidation Analysis

#### a.      Generally

Notwithstanding acceptance of a plan by each impaired class, for a plan to be confirmed, the Bankruptcy Court must determine that the plan is in the best interest of each holder of a claim who is in an impaired class and has not voted to accept the plan.  Accordingly, if an impaired class does not unanimously accept a plan, the best interests test requires the Bankruptcy Court to find that the plan provides to each member of such impaired class a recovery on account of the class member's claim that has a value, as of the date such plan is consummated, at least equal to the value of the distribution that such class member would receive if the debtors proposing the plan were liquidated under chapter 7 of the Bankruptcy Code on such date.  The Debtors have considered the effect that the conversion of the Reorganization Cases to cases under chapter 7 of the Bankruptcy Code would have and have concluded that the Plan provides value to holders of Asbestos Personal Injury Claims at least equal to the value such holders would receive under a chapter 7 liquidation.  The Debtors therefore believe that the Plan satisfies the best interests test for each class of impaired Claims.

#### b.      Liquidation Analysis

The information contained in Exhibit IV hereto contains a liquidation analysis that assumes a hypothetical chapter 7 liquidation of the Debtors in which a trustee appointed by the Bankruptcy Court would liquidate the respective Debtors' properties and interests in property.  The liquidation analysis reflects the potential range of recoveries in a liquidation net of the costs associated with the liquidation.  As shown in the analysis, in certain cases the proceeds from the sales of the Debtors' assets will be substantially reduced by buyers' likely concerns regarding asbestos liability risk and by the expedited time frame for selling the Permanente Property.  In addition, the analysis shows the significant costs associated with the asset sales and the liquidation process in certain cases, including trustee fees, professional fees and additional brokerage fees.  These costs must be paid from the proceeds of the liquidation.

As the liquidation analysis demonstrates, a chapter 7 liquidation of the Debtors would result in recoveries to holders of Class 4 (Asbestos Personal Injury Claims) that are no greater than the potential range of recoveries under the Plan.  The Debtors accordingly believe that the Plan satisfies the best interests test.

### 8.      Alternatives to Confirmation and Consummation of the Plan

The Debtors have evaluated other alternatives to the Plan, including alternative structures and terms of the Plan.  While the Debtors have concluded that the Plan is the best alternative given the current circumstances of their chapter 11 cases and will maximize recoveries by holders of Claims, if the Plan is not confirmed, the Debtors, individually or collectively, or any other party in interest in the Reorganization Cases, could attempt to formulate and propose a different plan or plans of reorganization.

### D.    Formation of Asbestos Personal Injury Trust

### 1.    Creation of Asbestos Personal Injury Trust

As of the Effective Date, the Asbestos Personal Injury Trust will be created.  The Asbestos Personal Injury Trust is intended to be one or more "qualified settlement funds" within the meaning of the Treasury Regulations issued under section 468B of the Internal Revenue Code of 1986, as amended (the "IRC").  The purpose of the Asbestos Personal Injury Trust shall be to, among other things:  (a) resolve all asserted Asbestos Personal Injury Claims in accordance with the Plan, Asbestos Personal Injury Trust Agreement, the Asbestos Personal Injury Trust Distribution Procedures and the Confirmation Order; (b) preserve, hold, manage, maximize and liquidate the assets of the Asbestos Personal Injury Trust for use in resolving Asbestos Personal Injury Claims; and (c) qualify at all times as one or more qualified settlement funds.  On the Effective Date, all right, title, and interest in and to the Asbestos Personal Injury Trust Assets, and any proceeds thereof, will be transferred to, and vested in, the Asbestos Personal Injury Trust, free and clear of all Claims, Demands, Stock Interests, Encumbrances, and other interests of any Entity, without any further action of the Bankruptcy Court or any Entity.

### 2.    Authority of the Asbestos Personal Injury Trust

As of the Effective Date, without any further action of the Bankruptcy Court or any Entity, except as otherwise expressly set forth in the Plan, the Asbestos Personal Injury Trust shall be empowered to initiate, prosecute, defend, and resolve all legal actions and other proceedings related to or arising from any asset, liability, or responsibility of the Asbestos Personal Injury Trust, including but not limited to any actions arising from or related to the Asbestos Personal Injury Insurance Assets and the Phase 1 Claims.

As reflected in the Plan, on and after the Effective Date, the Asbestos Personal Injury Trust shall have the authority to settle, with the consent of the TAC and the Future Claimants' Representative, Asbestos Insurance Policies.  Such a settlement with an Asbestos Insurer, including Truck, if reached, could entail requiring holders of Asbestos Personal Injury Claims who would have otherwise initiated, continued, and/or prosecuted their suits in the tort system to obtain the benefit of the Asbestos Insurer's insurance coverage to instead pursue payment of their Asbestos Personal Injury Claims from the Asbestos Personal Injury Trust in accordance with the Asbestos Personal Injury Trust Distribution Procedures.

### 3.    Qualified Settlement Fund

The Asbestos Personal Injury Trust is intended to be treated for United States federal income Tax purposes as one or more "qualified settlement funds" as described within section 1.468B-1 *et seq.* of the Treasury Regulations promulgated under section 468B of the IRC.  For all U.S. federal income Tax purposes, transfers to the Asbestos Personal Injury Trust will be treated as transfers to a trust satisfying the requirements of section 1.468B-l(c) of the Treasury Regulations by the Debtors and the Reorganized Debtors, as transferors, for Distribution to holders of Asbestos Personal Injury Claims and in complete settlement of their Asbestos Personal Injury Claims.  Any income on the assets of the Asbestos Personal Injury Trust will be treated as subject to Tax on a current basis, and all distributions pursuant to the Plan will be

made net of provision for Taxes and subject to applicable Tax withholding and reporting requirements.

The Asbestos Personal Injury Trustees will be the "administrator" (as defined in section 1.468B-2(k) of the Treasury Regulations) of the Asbestos Personal Injury Trust and will be required by the Asbestos Personal Injury Trust Agreement to (a) timely file such income Tax and other returns and statements of the Asbestos Personal Injury Trust and timely pay all Taxes required to be paid from the assets of the Asbestos Personal Injury Trust as required by law, (b) comply with all Tax withholding obligations, as required under the applicable provisions of the IRC, any state law and the respective regulations promulgated thereunder, (c) meet all other requirements necessary to qualify and maintain qualification of the Asbestos Personal Injury Trust as a "qualified settlement fund" within the meaning of section 1.468B-1 *et seq.* of the Treasury Regulations promulgated under section 468B of the IRC, and (d) take no action that could cause the Asbestos Personal Injury Trust to fail to qualify as a "qualified settlement fund" within the meaning of section 1.468B-1 *et seq.* of the Treasury Regulations promulgated under section 468B of the IRC.  The Debtors, the Reorganized Debtors and Lehigh Hanson will have no rights to any refund or reversion with respect to any assets of the Asbestos Personal Injury Trust or any earnings thereon, within the meaning of section 1.468B-3(c)(2) of the Treasury Regulations.

Following the funding of the Asbestos Personal Injury Trust (and in no event later than February 15th of the calendar year following the date of the Asbestos Personal Injury Trust Agreement), the Reorganized Debtors will provide, or cause to be provided, to the Asbestos Personal Injury Trustees a "§ 1.468B-3 Statement" in accordance with section 1.468B-3 of the Treasury Regulations.  Following any subsequent transfers of cash or other property to the Asbestos Personal Injury Trust, the transferor will provide, or cause to be provided, to the Asbestos Personal Injury Trustees a "§ 1.468B-3 Statement" on or before February 15th of the calendar year following the date of each such transfer.

### 4.      Appointment of Asbestos Personal Injury Trustee

David F. Levi has been proposed as the initial Asbestos Personal Injury Trustee pursuant to the terms of the Asbestos Personal Injury Trust Agreement.

Mr. Levi is the Levi Family Professor of Law and Judicial Studies and Director of the Bolch Judicial Institute at the Duke University School of Law.  Mr. Levi was previously the James B. Duke and Benjamin N. Duke Dean of the School of Law from 2007 to 2018.  Before arriving at Duke University School of Law, he was the Chief United States District Judge for the Eastern District of California with chambers in Sacramento.  He was appointed as a United States district judge by President George H. W. Bush in 1990.  Prior to serving on the bench, he was the United States Attorney for the Eastern District of California.  He was appointed to that position by President Ronald Reagan in 1986.

A native of Chicago, Mr. Levi earned his A.B. in history and literature, *magna cum laude*, from Harvard College.  He entered Harvard's graduate program in history, specializing in English legal history and serving as a teaching fellow in English history and literature.  He graduated Order of the Coif in 1980 from Stanford Law School, where he was also president of

the Stanford Law Review.  Following graduation, he was a law clerk to Judge Ben C. Duniway of the U.S. Court of Appeals for the Ninth Circuit, and then to Justice Lewis F. Powell, Jr., of the U.S. Supreme Court.

Mr. Levi has served as chair of two Judicial Conference committees by appointment of the Chief Justice.  He was chair of the Civil Rules Advisory Committee (2000-2003) and chair of the Standing Committee on the Rules of Practice and Procedure (2003-2007); he was reappointed to serve as the academic member of the Standing Committee (2009-2015).  He was the first president and a founder of the Milton L. Schwartz American Inn of Court, now the Schwartz-Levi American Inn of Court, at the King Hall School of Law, University of California at Davis.  He was chair of the Ninth Circuit Task Force on Race, Religious and Ethnic Fairness and was an author of the report of the Task Force.  He was president of the Ninth Circuit District Judges Association (2003-2005).

In 2007, Mr. Levi was elected a fellow of the American Academy of Arts and Sciences.  From 2010 to 2013, he served on the board of directors of Equal Justice Works.  In 2014, he was appointed chair of the American Bar Association's Standing Committee on the American Judicial System, and in 2015, he was named co-chair of the North Carolina Commission on the Administration of Law and Justice.  He currently serves on the Board of the National Parks Conservation Association.

Mr. Levi became president of the American Law Institute (ALI) in 2017 after serving as a member of the ALI Council and an advisor to the ALI's Federal Judicial Code Revision and Aggregate Litigation projects.

Mr. Levi is an independent director of the Las Vegas Sands Corporation.  He is chair of the board's nominating and governance committee and a member of its compliance committee.  Mr. Levi is also one of three court-appointed trustees of each of the ASARCO Asbestos Personal Injury Settlement Trust and the T H Agriculture & Nutrition, L.L.C. Asbestos Personal Injury Trust.  In addition, he serves as the court-appointed Future Representative of the J.T. Thorpe Settlement Trust, the Thorpe Insulation Company Asbestos Settlement Trust, the Western Asbestos Settlement Trust and the Plant Asbestos Settlement Trust.  Mr. Levi is also a member of FedArb, which provides mediation and arbitration services.

Mr. Levi is the co-author of Federal Trial Objections (James Publishing 2002) and Federal Civil Procedure Manual (Juris 2015) as well as several law review articles.  At the Duke University School of Law, he has taught courses on judging, ethics, and legal history.

Mr. Levi's appointment shall be effective as of the Effective Date.  All subsequent Asbestos Personal Injury Trustees shall be appointed in accordance with the Asbestos Personal Injury Trust Agreement.

The Asbestos Personal Injury Trustee will be, and will act as, the fiduciary to the Asbestos Personal Injury Trust in accordance with the provisions of the Asbestos Personal Injury Trust Documents and the Plan.  Subject to the Plan and the Asbestos Personal Injury Trust Documents, the Asbestos Personal Injury Trustee shall have the power to take any and all actions that he or she considers necessary, appropriate or desirable to fulfill the purpose of the Asbestos

Personal Injury Trust, including receiving and holding the assets of the Asbestos Personal Injury Trust and exercising all rights and powers with respect thereto and entering into arrangements with third parties.

Mr. Levi and each subsequent Asbestos Personal Injury Trustee will serve until the earliest of the end of his or her term, his or her death, his or her resignation, his or her removal or the termination of the Asbestos Personal Injury Trust.

### 5.    Appointment of Delaware Trustee

Wilmington Trust, National Association has been proposed as the initial Delaware Trustee for the Asbestos Personal Injury Trust pursuant to the terms of the Asbestos Personal Injury Trust Agreement.  As set forth in the Asbestos Personal Injury Trust Agreement, the Delaware Trustee's role is limited to (i) accepting legal process served on the Asbestos Personal Injury Trust in the State of Delaware and (ii) the execution of any certificates required to be filed with the Secretary of State of the State of Delaware that the Delaware Trustee is required to execute under Delaware law (acting solely at the written direction of the Asbestos Personal Injury Trustee).

Wilmington Trust, National Association's appointment shall be effective as of the Effective Date.  All subsequent Delaware Trustees shall be appointed in accordance with the Asbestos Personal Injury Trust Agreement.

### 6.    Trust Advisory Committee

On the Effective Date, the TAC will be established pursuant to the terms of the Asbestos Personal Injury Trust Agreement.  The TAC will have eleven (11) members and shall serve in a fiduciary capacity representing holders of present Asbestos Personal Injury Claims.  The TAC will have the functions, duties and rights provided in the Asbestos Personal Injury Trust Documents.  The initial members of the TAC that have been selected by the Asbestos Personal Injury Committee are Joseph W. Belluck of Belluck & Fox, LLP, Matthew P. Bergman of Bergman Draper Oslund, PLLC, Alan R. Brayton of Brayton Purcell, LLP, Perry J. Browder of Simmons Hanly Conroy LLC, John D. Cooney of Cooney & Conway, James L. Ferraro of Kelley & Ferraro, LLP, Christina L. Hutchins of The Gori Law Firm, Steven Kazan of Kazan, McClain, Satterley & Greenwood, Peter A. Kraus of Waters, Kraus & Paul, Joseph F. Rice of Motley Rice LLC and Armand J. Volta of The Law Offices of Peter G. Angelos, P.C.  Each of the foregoing law firms represents a member of the Asbestos Personal Injury Committee.  Each of the members of the TAC and/or other members of their law firms have served as counsel to members of asbestos claimants committees in other asbestos chapter 11 cases and as members of trust advisory committees of trusts formed at the conclusions of such cases.

### 7.    Future Claimants' Representative

Lawrence Fitzpatrick, the Future Claimants' Representative, shall serve as the legal representative for the purpose of protecting the shared interests of holders of Demands pursuant to the terms of the Asbestos Personal Injury Trust Agreement on and after the Effective Date and shall have the functions, duties and rights provided in the Asbestos Personal Injury Trust Documents.  Mr. Fitzpatrick has over 38 years of experience handling asbestos bankruptcy

matters.  He has served as vice president-law for the Asbestos Claims Facility and the president and chief executive officer of the Center for Claims Resolution, Inc., which handled asbestos related claims on behalf of member companies and their insurers from 1986 to 1998. Mr. Fitzpatrick has also served as the future claimants' representative in numerous other asbestos chapter 11 cases and in the trusts formed at the conclusions of such cases.

### E.    Document Repository

Prior to or on the Effective Date, the Debtors shall establish a repository containing all the books and records of the Debtors that are necessary for the defense of Asbestos Personal Injury Claims, including without limitation the historical asbestos personal injury claims database maintained by the Debtors, deposition transcripts, product identification evidence, information regarding sale and use of the products, claims settlement and payment information, and indexes and summaries relating to any such documents, and shall make that repository available to the Entities that are responsible for the processing or defense of Asbestos Personal Injury Claims, and that are entitled to review, copy or use such documents.  For the avoidance of doubt, the Asbestos Personal Injury Trust shall have access to materials in this repository only to the extent it is the Entity defending or processing (which term shall not include the mere payment of the deductible portion of an Asbestos Personal Injury Claim) an Uninsured Asbestos Claim or a particular Asbestos Personal Injury Claim, and such determination shall be made by the Reorganized Debtors on a claim-by-claim basis.  Any dispute over whether the Asbestos Personal Injury Trust shall have access to the materials in this repository shall be resolved by the Bankruptcy Court.  Notwithstanding anything to the contrary herein, holders of Asbestos Personal Injury Claims may pursue and obtain information stored in this repository through discovery to the full extent permitted by applicable law.  The Asbestos Personal Injury Trust shall be obligated to compensate the Reorganized Debtors for all out-of-pocket costs reasonably incurred after the Effective Date in connection with establishing and maintaining the repository.

Notwithstanding the foregoing or any other provisions of the Plan, the sole and exclusive remedy for the Asbestos Personal Injury Trust's failure to reimburse such out-of-pocket costs, or for its failure to pay any other amounts due to the Reorganized Debtors, shall be the right of the Reorganized Debtors to assert money damage claims against the Asbestos Personal Injury Trust, and such failure shall not relieve the Reorganized Debtors of any of their obligations hereunder, or otherwise, to the extent such obligations exist.

Pursuant to the Plan and the Confirmation Order, to the extent the Debtors or Reorganized Debtors, as applicable, provide access to the Asbestos Personal Injury Trust to any privileged books and records, such access shall not result in the destruction or waiver of any applicable privileges pertaining to such books and records.  If the preservation of privilege pertaining to such books and records is challenged or disapproved by the Bankruptcy Court or the District Court and if the Asbestos Personal Injury Trust determines that it needs access to such information, the Reorganized Debtors will, at the sole cost and expense of the Asbestos Personal Injury Trust (which cost and expense shall be reasonable), enter into arrangements to permit the Asbestos Personal Injury Trust to have access to such books and records, to the extent such access does not result in the destruction or waiver of any applicable privileges.  Further, pursuant to the Plan and the Confirmation Order, none of the Debtors, the Reorganized Debtors, Lehigh Hanson, or any Affiliates shall be liable for violating any confidentiality or privacy

protections as a result of providing the Asbestos Personal Injury Trust access to the books and records, and the Asbestos Personal Injury Trust shall take appropriate steps to comply with any such applicable protections.

### F. Transfers of Property to and Assumption of Certain Liabilities by the Asbestos Personal Injury Trust

#### 1. Expenses of the Asbestos Personal Injury Trust

The Asbestos Personal Injury Trust shall pay all Asbestos Personal Injury Trust Expenses.  The Reorganized Debtors shall have no obligation to pay such expenses, except for Debtor Appellate Costs.

#### 2. Funding the Asbestos Personal Injury Trust

On the Effective Date, the Reorganized Debtors and/or Lehigh Hanson, as applicable, shall transfer to the Asbestos Personal Injury Trust the Asbestos Personal Injury Trust Assets as follows:

##### a. Initial Payment

One or more of the Reorganized Debtors and/or Lehigh Hanson on behalf of and as a contribution to such Reorganized Debtors will pay an aggregate of $49.0 million in cash to the Asbestos Personal Injury Trust.

##### b. Payment Note

The Reorganized Debtors, as co-obligors, shall issue the Payment Note to the Asbestos Personal Injury Trust.

##### c. Phase 1 Claims

The Reorganized Debtors shall transfer to the Asbestos Personal Injury Trust the Phase 1 Claims, free and clear of any liens, claims or encumbrances, including any rights of setoff based on any liability of the Debtors.  The Debtors or the Reorganized Debtors shall pay all Debtor Appellate Costs.  The Asbestos Personal Injury Trust shall pay all Asbestos Personal Injury Trust Appellate Costs.  If the Asbestos Personal Injury Trust ultimately obtains any recovery with respect to Phase 1 Claims, whether as a result of settlement or judgment that exceeds $12 million, the Asbestos Personal Injury Trust shall remit to the Debtors or the Reorganized Debtors any amounts remaining, in excess of $12 million, after the Asbestos Personal Injury Trust Appellate Costs have been deducted from the full recovery amount.

##### d. Asbestos Personal Injury Insurance Assets

The Reorganized Debtors shall transfer to the Asbestos Personal Injury Trust the Asbestos Personal Injury Insurance Assets.

### e.      Interest Trigger Date

In the event the Reorganized Debtors fail to pay the Payment Note in full on or before the first anniversary of the Effective Date, then interest will accrue at a per annum rate of 10 percent on the amount of the unpaid principal.

### 3.      Assumption of Certain Liability and Responsibility by the Asbestos Personal Injury Trust

Subject to the provisions of the Plan, and in consideration for the transfer of the Asbestos Personal Injury Trust Assets to the Asbestos Personal Injury Trust pursuant to Section IV.K.3. of the Plan and in furtherance of the purposes of the Asbestos Personal Injury Trust and the Plan, the Asbestos Personal Injury Trust shall assume all liability and responsibility, financial and otherwise, for all Asbestos Personal Injury Claims.  The Asbestos Personal Injury Trust shall have all defenses, cross-claims, offsets and recoupments, as well as rights of indemnification, contribution, subrogation and similar rights, and any other rights regarding Uninsured Asbestos Claims that any Debtor, Reorganized Debtor or Protected Party has or would have had under applicable law.

### 4.      Indemnification by the Asbestos Personal Injury Trust

The Asbestos Personal Injury Trust shall protect, defend, indemnify and hold harmless each Protected Party from and against any Asbestos Personal Injury Claim; provided, however, the sole and exclusive remedy for the Asbestos Personal Injury Trust's failure to satisfy the indemnification, defense and hold harmless obligations under this Section shall be the right of the Protected Parties to assert money damage claims against the Asbestos Personal Injury Trust.

### 5.      Authority of the Debtors

Effective on the Confirmation Date, the Debtors shall be empowered and authorized to take or cause to be taken, prior to the Effective Date, all actions necessary or appropriate to enable the Reorganized Debtors to implement effectively the provisions of the Plan and the Asbestos Personal Injury Trust Agreement.

### G.      Cooperation with Respect to Insurance Matters

### 1.      Obligation to Cooperate with Respect to Insurance Matters

The Reorganized Debtors will cooperate with the Asbestos Personal Injury Trust and use reasonable efforts to take or cause to be taken all actions and to do or cause to be done all things that the Asbestos Personal Injury Trust may reasonably consider necessary to effectuate the transfer of the Asbestos Personal Injury Insurance Assets to the Asbestos Personal Injury Trust. By way of illustration and not limitation, the Reorganized Debtors will be obligated:  (a) to provide the Asbestos Personal Injury Trust with copies of insurance policies and settlement agreements included within or relating to the Asbestos Personal Injury Insurance Assets; (b) to provide the Asbestos Personal Injury Trust with other information in the Reorganized Debtors' possession, custody or control that is reasonably necessary to the Asbestos Personal Injury Trust's efforts with respect to insurance coverage for Asbestos Personal Injury Claims; (c) to

execute further assignments or allow the Asbestos Personal Injury Trust to pursue claims relating to the Asbestos Personal Injury Insurance Assets in a Reorganized Debtor's name (subject to appropriate disclosure of the fact that the Asbestos Personal Injury Trust is doing so and the reasons why it is doing so), including by means of arbitration, alternative dispute resolution proceedings or litigation; and (d) to facilitate actions to enforce judgments obtained by the claimants or the Asbestos Personal Injury Trust against Asbestos Insurers, if necessary.

To the extent that any transfer or portion of a transfer of the Asbestos Personal Injury Insurance Assets to the Asbestos Personal Injury Trust is determined to be invalid by a court of competent jurisdiction, upon request of the Asbestos Personal Injury Trust and at the cost of the Asbestos Personal Injury Trust, the Reorganized Debtors shall: (a) take all reasonable actions, including those as may be requested by the Asbestos Personal Injury Trust, with respect to such assets, including, but not limited to, prosecution of any insurance coverage and/or breach of contract action or other action, for the benefit of, and to the extent reasonably requested by, the Asbestos Personal Injury Trust; and (b) immediately transfer any amounts recovered under or on account of any such assets to the Asbestos Personal Injury Trust. The Asbestos Personal Injury Trust will be obligated to compensate the Reorganized Debtors for all out-of-pocket costs reasonably incurred on or after the Effective Date in connection with providing assistance to the Asbestos Personal Injury Trust pursuant to this Section, including without limitation out-of-pocket costs and expenses, consultant and expert fees, and attorneys' fees. Any acts taken pursuant to this Section shall not be deemed to waive and shall not constitute a waiver of any applicable privilege, confidence, or work product protection as against any third party. The Reorganized Debtors shall have a continuing obligation to satisfy the Assistance and Cooperation, Inspection and Audit, and Notice of Occurrence Provisions set out in the Asbestos Insurance Policies. Any out-of-pocket costs incurred by the Reorganized Debtors in carrying out such obligations shall be reimbursed by the Asbestos Personal Injury Trust. The sole and exclusive remedy for the Asbestos Personal Injury Trust's failure to reimburse such out-of-pocket costs shall be the right of the Reorganized Debtors to assert money damage claims against the Asbestos Personal Injury Trust.

> **2.      Enforcement of Reorganized Debtors' Obligations to Cooperate with Respect to Insurance Matters**

a.      The Reorganized Debtors shall have a continuing obligation to satisfy the Asbestos Insurer Cooperation Obligations. Any out-of-pocket costs incurred by the Reorganized Debtors in carrying out the Asbestos Insurer Cooperation Obligations shall be reimbursed by the Asbestos Personal Injury Trust. The Reorganized Debtors' obligations under this provision shall be ongoing until such time when all Asbestos Insurance Policies have either been settled or exhausted.

b.      If an Asbestos Personal Injury Insurance Asset does not provide coverage for an Asbestos Personal Injury Claim pursued against the Reorganized Debtors in the tort system pursuant to Section IV.O.1. of the Plan because a court determines in a Final Order that the Reorganized Debtors failed to satisfy or otherwise perform any of the Asbestos Insurer Cooperation Obligations, the Asbestos Personal Injury Trust, the TAC, the Future Claimants' Representative, and the holder (the "Denied Asbestos Personal Injury Claimant") of the applicable Asbestos Personal Injury Claim (the "Denied

<u>Asbestos Personal Injury Claim</u>"), each individually or in any combination jointly, may seek (1) specific performance directing the Reorganized Debtors to cure their breach of the Asbestos Insurer Cooperation Obligations, and/or (2) payment from the Reorganized Debtors for the judgment or settlement amount of the Denied Asbestos Personal Injury Claim.  Regardless of which remedy is sought, the party may also seek payment from the Reorganized Debtors for reasonable attorneys' fees expended in pursuing such relief from the Reorganized Debtors.

c.      Within forty-five (45) calendar days of receiving notice that an Asbestos Insurer contests coverage for an Asbestos Personal Injury Claim asserted against the Reorganized Debtors because the Reorganized Debtors are alleged to have failed to satisfy or otherwise perform the Asbestos Insurer Cooperation Obligations (a "<u>Notice</u>"), the Asbestos Personal Injury Trust and the holder of such Asbestos Personal Injury Claim shall provide to the Reorganized Debtors any documents or information they respectively received from the Asbestos Insurer denying, rejecting or disclaiming coverage.  If such information is not provided to the Reorganized Debtors within forty-five (45) days of receipt, then the Reorganized Debtors shall have no obligations under Section IV.L.2. of the Plan with respect to such Asbestos Personal Injury Claim, unless the failure to provide such information as required did not unfairly prejudice the Reorganized Debtors.

d.      Within forty-five (45) calendar days of receiving a Notice, the Reorganized Debtors shall provide to the Asbestos Personal Injury Trust and the holder of the applicable Asbestos Personal Injury Claim (1) any documents or information they received from the Asbestos Insurer denying, rejecting or disclaiming coverage and (2) any documentation or other information they have within their possession, custody, or control regarding the Reorganized Debtors' efforts to satisfy any of the Asbestos Insurer Cooperation Obligations in respect of the applicable Asbestos Personal Injury Claim. The Asbestos Personal Injury Trust or the holder of the Asbestos Personal Injury Claim or both may assert an action against the Asbestos Insurer seeking coverage for the Asbestos Personal Injury Claim, and shall provide timely notice to the Reorganized Debtors of any action seeking such coverage.  The Reorganized Debtors agree that a finding that they failed to satisfy or otherwise perform any of the Asbestos Insurer Cooperation Obligations may be made regardless of whether they are a named party in any such action and agree to be bound by any such finding in a Final Order.  In the event that the action brought against the Asbestos Insurer pursuant to Section IV.L.2.d. of the Plan results in a Final Order providing that the Asbestos Insurer does not have a coverage obligation for the Asbestos Personal Injury Claim and the basis for the finding that there is no such coverage obligation may be because the Reorganized Debtors failed to satisfy or otherwise perform any of the Asbestos Insurer Cooperation Obligations, then the Asbestos Personal Injury Trust or the holder of the Asbestos Personal Injury Claim or both may bring a subsequent direct action against the Reorganized Debtors for the sole purpose of seeking the finding described in Section IV.L.2.b. of the Plan.

e.      In the event any of the parties identified in Section IV.L.2.b of the Plan as having rights with respect to a Denied Asbestos Personal Injury Claim seeks payment or specific performance related to a Denied Asbestos Personal Injury Claim, the Reorganized Debtors shall, within thirty (30) calendar days of receiving notice of the

Denied Asbestos Personal Injury Claim, either (a) remit payment of (i) the judgment or settlement amount of the Denied Asbestos Personal Injury Claim to the Asbestos Personal Injury Trust or the Denied Asbestos Personal Injury Claimant, as applicable, and if payment of the amount of the Denied Asbestos Personal Injury Claim is made to the Asbestos Personal Injury Trust, the Asbestos Personal Injury Trust shall in turn remit payment to the Denied Asbestos Personal Injury Claimant, and (ii) reasonable attorneys' fees expended in enforcing the rights provided in Section IV.L.2 of the Plan, except for any attorneys' fees expended in connection with a direct action against the Reorganized Debtors permitted by Section IV.L.2.d of the Plan (collectively, the "Legal Fees") to the appropriate party, or (b) attempt to cure the breach of the Asbestos Insurer Cooperation Obligations. If the Reorganized Debtors successfully cure their breach such that the Asbestos Insurer reverses its previous denial of coverage and pays the Denied Asbestos Personal Injury Claim in full, the Reorganized Debtors shall have no obligation to pay the Denied Asbestos Personal Injury Claim; the Reorganized Debtors shall, however, remain liable for paying the Legal Fees, and shall remit payment of such Legal Fees to the appropriate party. If the Reorganized Debtors are unable to cure their breach of the Asbestos Insurer Cooperation Obligations, the Reorganized Debtors shall pay to the Asbestos Personal Injury Trust or the Denied Asbestos Personal Injury Claimant, as applicable, the judgment or settlement amount of the Denied Asbestos Personal Injury Claim and shall remit the Legal Fees to the appropriate party.

f.      Lehigh Hanson shall fully guarantee the Reorganized Debtors' performance of any payment obligations they incur with respect to the Asbestos Insurance Policies, including, but not limited to, any obligations the Reorganized Debtors incur under Section IV.L.2 of the Plan and shall pay directly to the Reorganized Debtors, within fourteen (14) calendar days of receiving notice of the Reorganized Debtors' failure to pay a Denied Asbestos Personal Injury Claim and related Legal Fees or otherwise, the amount of any such payment obligation so that the Reorganized Debtors may distribute the funds. Notwithstanding the foregoing, payment obligations of the Reorganized Debtors under this paragraph shall not include any obligation the Asbestos Personal Injury Trust has expressly assumed under the Plan, including the Deductibles and any obligations for which the Asbestos Personal Injury Trust has agreed under the Plan to reimburse the Reorganized Debtors.

g.      Nothing in Section IV.L.2 of the Plan is intended to preclude, limit, or otherwise impair, any other claims, causes of action, or remedies that may be available to the Asbestos Personal Injury Trust, the TAC, the Future Claimants' Representative, or any holders of Asbestos Personal Injury Claims, under otherwise applicable non-bankruptcy law or the Plan and its Exhibits, related to Asbestos Personal Injury Claims. In particular, nothing in Section IV.L.2 of the Plan is intended to bar or preclude holders of Asbestos Personal Injury Claims from pursuing any action directly against Asbestos Insurers related to Asbestos Personal Injury Claims or Denied Asbestos Personal Injury Claims, including actions under Section 11580 of the California Insurance Code and its subdivisions, or any related or similar statute in any jurisdiction.

### H.    Compromise of Insurance Policies

### 1.    Dual Policies

The Reorganized Debtors or their assignee(s) shall not compromise any part of the Dual Policies absent the prior written consent of the TAC, the Future Claimants' Representative and the Asbestos Personal Injury Trust, such consent not to be unreasonably withheld, and the Asbestos Personal Injury Trust (conditioned on the express consent of the TAC and the Future Claimants' Representative) shall not compromise any part of the Dual Policies absent the prior written consent of the Reorganized Debtors or their assignee(s), such consent not to be unreasonably withheld.  If a dispute arises as to whether a party's lack of consent is reasonable, such dispute may be presented to the Bankruptcy Court for resolution.  After the Effective Date, should the Bankruptcy Court or appellate court, if applicable, find in favor of the party withholding consent, the other party shall pay the reasonable attorneys' fees and costs of the party withholding consent.

### 2.    Separate Limit Policies

The Reorganized Debtors or their assignee(s) are entitled to settle that portion of the Separate Limit Policies that does not provide coverage for Asbestos Personal Injury Claims.  The TAC, Future Claimants' Representative and the Asbestos Personal Injury Trust are entitled to notice and review of any proposed settlement but may only object on the grounds that the proposed settlement releases or otherwise impairs coverage for Asbestos Personal Injury Claims.  Also with respect to Separate Limit Policies, the Asbestos Personal Injury Trust (conditioned on the express consent of the TAC and the Future Claimants' Representative) is entitled to settle that portion of the Separate Limit Policies that does not provide coverage for Environmental Claims.  The Reorganized Debtors or their assignee(s) are entitled to notice and review of any proposed settlement but may object only on the grounds that the proposed settlement releases or otherwise impairs coverage for Environmental Claims.  If a dispute arises as to whether a proposed settlement releases or otherwise impairs coverage for Asbestos Personal Injury Claims, or Environmental Claims, as applicable, such dispute may be presented to the Bankruptcy Court for resolution.  After the Effective Date, should the Bankruptcy Court, or appellate court if applicable, find in favor of the objecting party, the other party shall pay the reasonable attorneys' fees and costs of the objecting party.

### 3.    Insurance Policies that Provide Coverage for Asbestos Personal Injury Claims but not for Environmental Claims

With respect to insurance policies that provide coverage for Asbestos Personal Injury Claims but not for Environmental Claims (a list of such policies is attached as Exhibit IV.M.3 to the Plan), and also any policies that may provide coverage for Asbestos Personal Injury Claims, but not for Environmental Claims that are not included on Exhibits I.A.60, I.A.113, IV.M.3 and IV.M.4 to the Plan, the Asbestos Personal Injury Trust (conditioned on the express consent of the TAC and the Future Claimants' Representative) may settle such Asbestos Personal Injury Insurance Assets and the Reorganized Debtors or their assignee(s) shall have no standing to object.

4.      **Insurance Policies that Provide Coverage for Environmental Claims but not for Asbestos Personal Injury Claims**

With respect to insurance policies that provide coverage for Environmental Claims but not for Asbestos Personal Injury Claims (a list of such policies is attached as Exhibit IV.M.4 to the Plan) and any policies that may provide coverage for Environmental Claims but not for Asbestos Personal Injury Claims that are not included on Exhibits I.A.60, I.A.113, IV.M.3 and IV.M.4 to the Plan, the Reorganized Debtors or their assignee(s) may settle such policies and the TAC, Future Claimants' Representative and the Asbestos Personal Injury Trust shall have no standing to object.

5.      **Amendment of Insurance Policy Exhibits**

If a dispute regarding the lists of Dual Policies and Separate Limit Policies arises after the Confirmation Hearing, it may be presented to the Bankruptcy Court.  After the Confirmation Hearing, Exhibits I.A.60, I.A.113, IV.M.3 and IV.M.4 to the Plan may only be amended by written agreement of the Parties, or, if after the Effective Date, the Asbestos Personal Injury Trust, the Reorganized Debtors and Lehigh Hanson.  For any Insurance Policy not previously included as an Exhibit to the Plan that the Asbestos Personal Injury Trust, the Reorganized Debtors or Lehigh Hanson contend should be added to Exhibits I.A.60, I.A.113, IV.M.3 and IV.M.4 of the Plan after Confirmation, and about which there is a dispute among such parties, such dispute may be presented to the Bankruptcy Court for resolution.

**I.      Truck Obligations Regarding Deductibles**

Notwithstanding any provision in any Asbestos Insurance Policy to the contrary, Truck shall have no obligation to pay, and shall not pay, any Deductible under any applicable Asbestos Insurance Policy to holders of Asbestos Personal Injury Claims or any other Entity.  The Asbestos Personal Injury Trust shall satisfy such Deductible to holders of Insured Asbestos Claims in accordance with the terms, provisions and procedures of the Asbestos Personal Injury Trust Agreement and the Asbestos Personal Injury Trust Distribution Procedures.  Other than with respect to Deductibles, the Asbestos Personal Injury Trust shall not assume responsibility pursuant to the Plan for any other expenses owed to Truck, or that may become owed to Truck in the future, in connection with Asbestos Personal Injury Claims.

**J.      Liquidation of Asbestos Personal Injury Claims**

1.      **Insured Asbestos Claims**

Holders of Insured Asbestos Claims may initiate, continue and/or prosecute suit against the Reorganized Debtors in name only in the tort system to obtain the benefit of insurance coverage under the Asbestos Insurance Policies, unless and until the Asbestos Personal Injury Trust, with the consent of the TAC and the Future Claimants' Representative, has settled (other than pursuant to the Excess CIP Agreement) all rights to coverage for Asbestos Personal Injury Claims applicable to the Asbestos Personal Injury Claim of a particular holder, in which event such holder shall pursue payment of its Asbestos Personal Injury Claim from the Asbestos Personal Injury Trust in accordance with the Asbestos Personal Injury Trust Distribution Procedures.  In the event that a holder of an Insured Asbestos Claim commences such an action,

the complaint may name the applicable Reorganized Debtor(s) as a defendant(s) and shall be deemed by operation of law to be an action against the applicable Reorganized Debtor(s). Notwithstanding the foregoing, the Reorganized Debtors shall have no obligation to answer, appear or otherwise participate in the action in any respect other than as set forth in the Plan and as may be necessary to maintain coverage under the Asbestos Insurance Policies, and any judgment that may be obtained in the action cannot be enforced against the assets of the Reorganized Debtors, other than from the Asbestos Insurance Policies. Such actions may be filed in any court where the applicable Debtor would have been subject to *in personam* jurisdiction as of the Petition Date or any other court of competent jurisdiction and process may be served upon a person or entity appointed by the Reorganized Debtors to serve as agent, who shall tender such actions to Truck or, if appropriate, to any other applicable Asbestos Insurers in compliance with the notice provisions of the applicable Asbestos Insurance Policies. Nothing in Section IV.O of the Plan is intended to affect any cause of action or right to bring a cause of action held by any holder of an Asbestos Personal Injury Claim directly against any Asbestos Insurer. The portion of any Insured Asbestos Claim that is not covered by any Asbestos Insurance Policy shall be paid in accordance with the terms, provisions and procedures of the Asbestos Personal Injury Trust Agreement and the Asbestos Personal Injury Trust Distribution Procedures.

**2.     Uninsured Asbestos Claims**

Each Uninsured Asbestos Claim will be determined and paid in accordance with the terms, provisions and procedures of the Asbestos Personal Injury Trust Agreement and the Asbestos Personal Injury Trust Distribution Procedures. As further provided in Article IV.O.2 of the Plan, the sole recourse of a holder of an Uninsured Asbestos Claim on account of such Claim will be to the Asbestos Personal Injury Trust and such holder will have no right whatsoever at any time to assert its Uninsured Asbestos Claim against any Protected Party.

**K.     Limitations On Judgment Recovery From Non-Settling Asbestos Insurers**

To the extent that any Non-Settling Asbestos Insurer has an Asbestos Insurance Policy Claim against one or more Settling Asbestos Insurers with respect to an Asbestos Personal Injury Claim that it could have asserted against such Settling Asbestos Insurers but for the Asbestos Permanent Channeling Injunction provided under the Plan (hereafter, "Contribution Claims"), the judgment liability (if any) of the Non-Settling Asbestos Insurer to the holder of such Asbestos Personal Injury Claim shall be reduced dollar-for-dollar by the amount (if any) of the Contribution Claims established pursuant to Section IV.P. of the Plan. The court hearing the Asbestos Personal Injury Claim shall employ such procedures as that court determines are appropriate to determine prior to entry of judgment the validity and amount of any Contribution Claims (and the corresponding reduction in the amount of the holder's recovery) as if, and to the same extent, they were asserted against the Settling Asbestos Insurers. The holder of the Asbestos Personal Injury Claim may assert the legal or equitable rights, if any, of the Settling Asbestos Insurers in the action.

### L.    Insurance Neutrality

Nothing in the Plan, any Exhibit to the Plan, the Confirmation Order, any finding of fact and/or conclusion of law with respect to the Confirmation of the Plan, or any order or opinion entered on appeal from the Confirmation Order shall limit the right of any Asbestos Insurer to assert any Insurer Coverage Defense; provided, however, that (a) the transfer of rights in and under the Asbestos Personal Injury Insurance Assets to the Asbestos Personal Injury Trust is valid and enforceable and transfers such rights under the Asbestos Personal Injury Insurance Assets as the Debtors may have, and that such transfer shall not affect the liability of any Asbestos Insurer, and (b) the discharge and release of the Debtors and Reorganized Debtors from all Claims and the injunctive protection provided to the Debtors, Reorganized Debtors and Protected Parties with respect to Claims as provided herein shall not affect the liability of any Asbestos Insurer, except to the extent that any such Asbestos Insurer is also a Settling Asbestos Insurer.  Notwithstanding anything in Section IV.Q. of the Plan to the contrary, nothing in Section IV.Q. of the Plan shall affect or limit, or be construed as affecting or limiting, (a) the binding effect of the Plan and the Confirmation Order on the Debtors, the Reorganized Debtors, the Asbestos Personal Injury Trust or the beneficiaries of the Asbestos Personal Injury Trust or (b) the protection afforded to any Settling Asbestos Insurer by the Asbestos Permanent Channeling Injunction.  Further, nothing in Section IV.Q. of the Plan is intended or shall be construed to preclude otherwise applicable principles of res judicata or collateral estoppel from being applied against any Asbestos Insurer with respect to any issue that is actually litigated by such Asbestos Insurer as part of its objections to Confirmation of the Plan.

### M.    Asbestos Personal Injury Trust Distribution Procedures

The Asbestos Personal Injury Trust Distribution Procedures, which are attached to the Plan as Exhibit I.A.19, set forth procedures for processing and paying both the uninsured portions of Insured Asbestos Claims and the Uninsured Asbestos Claims that would have been paid by the Debtors prior to the Petition Date ("Pre-Petition").  These procedures will be binding on the holders of all Asbestos Personal Injury Claims.  The Asbestos Personal Injury Trust Distribution Procedures are designed to provide fair, equitable and substantially similar treatment by the Asbestos Personal Injury Trust or all Asbestos Personal Injury Claims that may presently exist or may arise in the future.  The Asbestos Personal Injury Trust Distribution Procedures allow claimants with Insured Asbestos Claims to pursue their claims in the tort system and provide for processing and paying both the uninsured portions of such claims, as well as the Uninsured Asbestos Claims that would have been paid by the Debtors Pre-Petition, on an impartial, first-in-first-out basis, with the intention of paying all claimants over time as equivalent a share as possible of the value of (a) subject to Section 7.2 of the Asbestos Personal Injury Trust Distribution Procedures, the portions of their Insured Asbestos Claims that are not covered by any Asbestos Insurance Policy and (b) their Uninsured Asbestos Claims that would have been paid by the Debtors Pre-Petition.

Insured Asbestos Claims will be resolved primarily in the tort system as described in Section 5.3 of the Asbestos Personal Injury Trust Distribution Procedures.  Once claimants obtain payment on a settlement, judgment, or some other final resolution of their claim in their favor in the tort system, they may then submit evidence of such payment or final resolution to the Asbestos Personal Injury Trust, which will resolve the portions of the Insured Asbestos Claims

that are not covered by any Asbestos Insurance Policy except that punitive or exemplary, i.e., damages other than compensatory damages, shall not be considered or paid by the Asbestos Personal Injury Trust on any Asbestos Personal Injury Claim, notwithstanding their availability, or award, in the tort system.

Unresolved disputes involving the Asbestos Personal Injury Trust and the resolution of its liability with respect to Asbestos Personal Injury Claims will be subject to binding or non-binding arbitration as set forth in Section 5.8 of the Asbestos Personal Injury Trust Distribution Procedures, at the election of the claimant, under alternative dispute resolution procedures established by the Asbestos Personal Injury Trust. Asbestos Personal Injury Claims that cannot be resolved by non-binding arbitration may enter the tort system as provided in Section 5.9 of the Asbestos Personal Injury Trust Distribution Procedures. If a claimant obtains a judgment against the Asbestos Personal Injury Trust in the tort system, such judgment shall be payable as provided in Section 7.4 of the Asbestos Personal Injury Trust Distribution Procedures.

The initial Payment Percentage (as defined and described in Sections 4.1 and 4.2 of the Asbestos Personal Injury Trust Distribution Procedures) for all claims, or portions of claims, paid by the Asbestos Personal Injury Trust will be established by the Asbestos Personal Injury Trustee with the consent of the TAC and the Future Claimants' Representative promptly after the Asbestos Personal Injury Trust is established. After the uninsured amount of an Insured Asbestos Claim or the value of an Uninsured Asbestos Claim is determined pursuant to the procedures set forth in the Asbestos Personal Injury Trust Distribution Procedures, the claimant will ultimately receive a pro-rata share of that amount (subject to Section 7.2 of the Asbestos Personal Injury Trust Distribution Procedures) based on the Payment Percentage.

Each Asbestos Personal Injury Indirect Claim is either an Insured Asbestos Claim or an Uninsured Asbestos Claim, depending upon the facts underlying the particular Asbestos Personal Injury Indirect Claim, and the portion of the value of any such claim for which the Asbestos Personal Injury Trust is responsible shall be subject to the Payment Percentage. An Asbestos Personal Injury Indirect Claim that is an Insured Asbestos Claim will be subject to all of the procedures set forth in the Asbestos Personal Injury Trust Distribution Procedures with respect to Insured Asbestos Claims. An Asbestos Personal Injury Indirect Claim that is an Uninsured Asbestos Claim will be subject to all of the procedures set forth in the Asbestos Personal Injury Trust Distribution Procedures with respect to Uninsured Asbestos Claims and to the requirements set forth in Section 5.7 of the Asbestos Personal Injury Trust Distribution Procedures.

Potential claimants should be aware that any funds they recover against the Asbestos Personal Injury Trust, or against any "primary plan" as defined in the Medicare Secondary Payer Statute, 42 U.S.C. § 1395y(b) (the "MSPS"), could be subject to repayment obligations owing or potentially owing under the MSPS or related rules, regulations, or guidelines.

Potential claimants should also be aware that, as a condition of receiving payment from the Asbestos Personal Injury Trust or any "primary plan" as defined by the MSPS, the claimants may be asked to certify that they will comply with any obligations owing or potentially owing under the MSPS or related rules, regulations, or guidelines.

### N.    Conditions Precedent to Confirmation and Consummation of the Plan

### 1.    Conditions to Confirmation

The following shall be conditions to Confirmation unless such conditions shall have been duly waived pursuant to Section VIII.C. of the Plan:

a.    The Confirmation Order shall have been entered by the Bankruptcy Court and the District Court acting jointly, or by the Bankruptcy Court or the District Court acting separately (and, if the Confirmation Order is entered separately by the Bankruptcy Court, shall have been fully affirmed by the District Court), and shall be reasonably acceptable in form and substance to the Parties.

b.    The Plan shall be acceptable in all respects to the Parties, and all Exhibits to the Plan shall be (a) acceptable in all respects to the Parties and (b) consistent with section 524(g) of the Bankruptcy Code and the terms of the Plan.

c.    The Bankruptcy Court and the District Court acting jointly, or the Bankruptcy Court or the District Court acting separately shall have made the following findings, each of which shall be contained in the Confirmation Order and each of which, if the Confirmation Order is entered separately by the Bankruptcy Court, shall be fully affirmed by the District Court:

i.    The Asbestos Permanent Channeling Injunction is to be implemented in connection with the Plan and the Asbestos Personal Injury Trust.

ii.    The Asbestos Personal Injury Trust, as of the Effective Date, shall assume all liability and responsibility, financial and otherwise, for all Asbestos Personal Injury Claims, and, upon such assumption, no Protected Party shall have any liability or responsibility, financial or otherwise, therefor.

iii.    As of the Petition Date, each Debtor had been named as a defendant in a personal injury or wrongful death action seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products.

iv.    The Asbestos Personal Injury Trust will be funded in whole or in part by securities of the Reorganized Debtors and by the obligation of the Reorganized Debtors to make future payments, which payments may be funded by contributions from Lehigh Hanson to the Reorganized Debtors.

v.    The Asbestos Personal Injury Trust, by the exercise of rights granted under the Plan, would be entitled to own, if specified contingencies occur, a majority of the voting shares of each of the Reorganized Debtors.

vi.    The Asbestos Personal Injury Trust shall use its assets or income to pay Asbestos Personal Injury Claims, including Demands.

vii.     Each of the Debtors is likely to be subject to substantial future Demands for payment arising out of the same or similar conduct or events that gave rise to the Claims that are addressed by the Asbestos Permanent Channeling Injunction.

viii.     The actual amounts, numbers and timing of such future Demands cannot be determined.

ix.     Pursuit of such Demands outside the procedures prescribed by the Plan is likely to threaten the Plan's purpose to deal equitably with Claims and future Demands.

x.     The terms of the Asbestos Permanent Channeling Injunction, including any provisions barring actions against third parties pursuant to section 524(g)(4)(A) of the Bankruptcy Code, are set out in the Plan.

xi.     The Plan establishes, in Class 4 (Asbestos Personal Injury Claims), a separate class of the claimants whose Claims are to be addressed by the Asbestos Personal Injury Trust.

xii.     At least two-thirds (2/3) in amount and 75% in number of those voting Claims in Class 4 (Asbestos Personal Injury Claims) have voted in favor of the Plan.

xiii.     Pursuant to court orders or otherwise, the Asbestos Personal Injury Trust shall operate through mechanisms, such as structured, periodic or supplemental payments, pro rata distributions, matrices or periodic review of estimates of the numbers and values of Asbestos Personal Injury Claims, that provide reasonable assurance that the Asbestos Personal Injury Trust shall value, and be in a financial position to pay, Asbestos Personal Injury Claims, including Demands, in substantially the same manner.

xiv.     Each Protected Party is identifiable from the terms of the Asbestos Permanent Channeling Injunction by name or as part of an identifiable group, and each Protected Party is or may be alleged to be directly or indirectly liable for the conduct of, Claims against or Demands on a Debtor to the extent that such alleged liability arises by reason of one or more of the following:

(A)     such Entity's ownership of a financial interest in any Debtor, Reorganized Debtor, any past or present Affiliate of any Debtor or Reorganized Debtor, or any predecessor in interest of any Debtor or Reorganized Debtor;

(B)     such Entity's involvement in the management of any Debtor, Reorganized Debtor or predecessor in interest of any Debtor or Reorganized Debtor;

(C)     such Entity's service as an officer, director or employee of any Debtor, Reorganized Debtor, any past or present Affiliate of any Debtor or Reorganized Debtor, or any predecessor in interest of any Debtor or Reorganized Debtor or Entity that owns or at any time has owned a financial interest in any Debtor, Reorganized Debtor, any past or present Affiliate of any Debtor or Reorganized Debtor, or any predecessor in interest of any Debtor or Reorganized Debtor; or

(D)     such Entity's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of any Debtor, Reorganized Debtor, any past or present Affiliate of any Debtor or Reorganized Debtor, any predecessor in interest of any Debtor or Reorganized Debtor or of an Entity that owns or at any time has owned a financial interest in any Debtor, Reorganized Debtor, any past or present Affiliate of any Debtor or Reorganized Debtor, or any predecessor in interest of any Debtor or Reorganized Debtor, including (1) involvement in providing financing (debt or equity) or advice to an Entity involved in such a transaction or (2) acquiring or selling a financial interest in any Entity as part of such transaction.

xv.     The Future Claimants' Representative was appointed as part of the proceedings leading to the issuance of the Asbestos Permanent Channeling Injunction for the purpose of protecting the rights of all persons, whether known or unknown, that might subsequently assert, directly or indirectly, against any Debtor an Asbestos Personal Injury Claim that is a Demand addressed in the Asbestos Permanent Channeling Injunction and channeled to the Asbestos Personal Injury Trust.

xvi.     Identifying each Protected Party (by name or as part of an identifiable group, as applicable) in the Asbestos Permanent Channeling Injunction is fair and equitable with respect to individuals that might subsequently assert Demands against each such Protected Party, in light of the benefits provided, or to be provided, to the Asbestos Personal Injury Trust by or on behalf of any such Protected Party.

xvii.     The Plan and the Asbestos Personal Injury Trust Documents comply with section 524(g) of the Bankruptcy Code in all respects.

xviii.     The Plan and its Exhibits are a fair, equitable and reasonable resolution of the liability of the Debtors for the Asbestos Personal Injury Claims.

xix.     The Future Claimants' Representative has adequately and completely fulfilled his duties, responsibilities and obligations as the representative for the individuals referred to in the finding set forth in Section VIII.A.3.o. of the Plan in accordance with section 524(g) of the Bankruptcy Code.

xx.      Adequate and sufficient notice of the Plan and the Confirmation Hearing, as well as all deadlines for objecting to the Plan, has been given to (1) all known creditors and holders of Interests, (2) parties that requested notice in accordance with Bankruptcy Rule 2002 (including the Asbestos Personal Injury Committee and the Future Claimants' Representative), (3) all parties to Executory Contracts and Unexpired Leases, (4) all taxing authorities listed on the Debtors' Schedules or in the Debtors' Claims database, in each case, (5) the Department of the Treasury by service upon the District Director of the IRS, (6) state attorney generals and state departments of revenue for states in which any of the Debtors have conducted business, and (7) the Securities and Exchange Commission, (a) in accordance with the solicitation procedures governing such service and (b) in substantial compliance with Bankruptcy Rules 2002(b), 3017 and 3020(b).  Such transmittal and service were adequate and sufficient to bind, among other parties, any holder of an Asbestos Personal Injury Claim, and no other or further notice is or shall be required.

xxi.      The Debtors' conduct in connection with and throughout these Reorganization Cases, including, but not limited to, their negotiations with the ad hoc committee of asbestos personal injury claimants and the pre-petition future claimants' representative, and the commencement of these Reorganization Cases, as well as the drafting, negotiation, proposing, confirmation, and consummation of the Plan, and their opposition to any other plan of reorganization, does not and has not violated any Asbestos Insurer Cooperation Obligations contained in any Asbestos Insurance Policies, nor was such conduct a breach of any express or implied covenant of good faith and fair dealing.

d.      The Bankruptcy Court and the District Court, as required, shall have entered the Asbestos Permanent Channeling Injunction, which may be included in the Confirmation Order, and the Asbestos Permanent Channeling Injunction and the Confirmation Order are reasonably acceptable to the Parties.

e.      The settlement with the United States, on behalf of the Environmental Protection Agency and the United States Department of Interior, acting through the U.S. Fish and Wildlife Service, and the United States Department of Commerce, acting through the National Oceanic and Atmospheric Administration, the DEQ Settlement and the agreements with certain insurers related to such Claims have been approved by the Bankruptcy Court.

## 2.      Conditions to the Effective Date

The Effective Date shall not occur and the Plan shall not be consummated unless and until each of the following conditions has been satisfied or duly waived pursuant to Section VIII.C. of the Plan:

a.      The District Court or the Bankruptcy Court and the District Court acting jointly shall have entered an order (contemplated to be part of the Confirmation Order) in form and substance reasonably acceptable to the Parties approving and authorizing the

Debtors and the Reorganized Debtors to take all actions necessary or appropriate to effectuate, implement and consummate the Plan and the Restructuring Transactions, including the execution, delivery and performance of contracts, instruments, releases and other agreements or documents created in connection with the Plan and the Restructuring Transactions.

b.     The Confirmation Order shall have been entered by the Bankruptcy Court and the District Court acting jointly, or by the Bankruptcy Court or the District Court acting separately (and, if the Confirmation Order is separately entered by the Bankruptcy Court, has been fully affirmed by the District Court) and shall have become a Final Order.

c.     No request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending.

d.     The Confirmation Order and the Asbestos Permanent Channeling Injunction shall be in full force and effect.

e.     No fact or circumstance shall prevent the Asbestos Personal Injury Trust from receiving the Asbestos Personal Injury Trust Assets upon occurrence of the Effective Date.

f.     The Asbestos Personal Injury Trustees shall have been selected and shall have executed and delivered the Asbestos Personal Injury Trust Agreement.

g.     The Asbestos Personal Injury Trust shall have been funded in accordance with Section IV.K.2. of the Plan.

h.     Each of the documents and agreements contemplated by the provisions and Exhibits of the Plan to be executed and delivered as of the Effective Date shall have been fully executed and delivered in form and substance acceptable to the Debtors and to the Asbestos Personal Injury Committee and Future Claimants' Representative and shall be fully enforceable in accordance with their terms.

i.     A settlement agreement in a form acceptable to the Debtors regarding the Lower Duwamish Waterway site and a consent judgment in a form acceptable to the Debtors regarding the St. Helens site have each been approved by a court with jurisdiction to approve such settlement agreement or enter such consent judgment.

j.     All terms and conditions to the effectiveness of the DEQ Settlement, other than the occurrence of the Effective Date, shall have been satisfied or waived in writing.

The Effective Date shall occur as of 12:01 a.m., prevailing Eastern Time on the date that the Debtors or Reorganized Debtors file a notice with the Bankruptcy Court stating that the Effective Date has occurred because each of the conditions to the Effective Date has been satisfied or waived in accordance with the Plan.

### 3.    Waiver of Conditions to Confirmation or the Effective Date

The conditions to Confirmation set forth in Section VIII.A. of the Plan and the conditions to the Effective Date set forth in Section VIII.B. of the Plan may be waived in whole or part in writing by the Debtors, subject to the consent of Lehigh Hanson, the Asbestos Personal Injury Committee and the Future Claimants' Representative, at any time without an order of the Bankruptcy Court or the District Court; provided, however, waiver of the condition to the Effective Date set forth in Section VIII.B.10. of the Plan also requires DEQ's consent. Confirmation and the Effective Date will occur irrespective of whether any claims allowance process or related litigation has been completed.

### 4.    Effect of Nonoccurrence of Conditions to the Effective Date

If each of the conditions to the Effective Date is not satisfied or duly waived in accordance with Section VIII.C. of the Plan, then upon motion by the Debtors, Lehigh Hanson, the Asbestos Personal Injury Committee and/or the Future Claimants' Representative made before the time that each of such conditions has been satisfied or duly waived and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order shall be vacated by the Bankruptcy Court; provided, however, that, notwithstanding the Filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is either satisfied or duly waived before the Bankruptcy Court enters an order granting such motion.  If the Confirmation Order is vacated pursuant to Section VIII.D. of the Plan, (a) the Plan shall be null and void in all respects, including with respect to the discharge of Claims; and (b) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interest in, the Debtors or (ii) prejudice in any manner the rights, including any claims or defenses, of the Parties or any other party in interest.

## III.    HISTORY OF THE DEBTORS

### A.    Historical Overview

### 1.    Corporate History

Debtor Kaiser Gypsum was incorporated in the State of Washington under the name Pacific Coast Cement Company on November 28, 1927.  In 1947, Permanente Cement Company (now known as HPCI) acquired a controlling interest in the direct parent company of Pacific Coast Cement Company, and Kaiser Gypsum has remained a subsidiary of HPCI since that time. On June 19, 1952, a separate company owned by Permanente Cement Company was incorporated in the State of California, and was named Kaiser Gypsum Company, a California corporation.  On December 1, 1952, Kaiser Gypsum Company, the California corporation, was merged into Pacific Coast Cement Company, the Washington corporation, with Pacific Coast Cement Company, the Washington corporation being the survivor.  The name of Pacific Coast Cement Company was immediately thereafter changed to Kaiser Gypsum Company, Inc., its current name.  Kaiser Gypsum existed under the same name and state of incorporation until May 2016, when Kaiser Gypsum completed a corporate conversion, moving its state of incorporation from Washington to North Carolina.

As of the date hereof, Kaiser Gypsum holds 41 2/3 percent of the capital stock of non-Debtor Gypsum Carrier, Inc. In turn, Gypsum Carrier, Inc. owns 100 percent of non-Debtor Asian Carriers, Inc., and Asian Carriers, Inc. owns 100 percent of Mediterranean Carriers, Inc. Gypsum Carrier, Inc. and its direct and indirect subsidiaries are inactive Panama companies with no tangible assets.

Debtor HPCI was incorporated in the State of California as The Permanente Corporation in 1939. Thereafter, in 1943, The Permanente Corporation underwent a name change to Permanente Cement Company. Approximately 20 years later, in 1964, Permanente Cement Company changed its name to Kaiser Cement & Gypsum Corporation. In 1979, the name was changed again to Kaiser Cement Corporation. In 1982, Kaiser Cement Corporation of California was merged into a separate Delaware corporation named Kaiser Cement Corporation, with the Delaware corporation being the surviving entity. As a result of a tender offer and related transactions that were commenced in 1986 and completed in 1987, a US-based indirect subsidiary of Hanson PLC Group ("Hanson PLC") acquired the stock of the corporate predecessor to HPCI, Kaiser Cement Corporation, then a publicly-traded Delaware corporation. In 1989, Kaiser Cement Corporation of Delaware was merged into a separate Arizona corporation named Superlite Builders Supply, Inc., with Superlite Builders Supply, Inc. being the surviving entity. Immediately after this merger, Superlite Builders Supply, Inc. changed its name to Kaiser Cement Corporation. Finally, in February 1999, Kaiser Cement Corporation, the Arizona corporation, changed its name to Hanson Permanente Cement, Inc., its current name.

In 2007, HeidelbergCement AG, a German Company, through a subsidiary, acquired the stock of Hanson PLC, a publicly-traded UK company. Hanson PLC was at that time the ultimate parent company owner of both HPCI and Kaiser Gypsum. As a result of HeidelbergCement AG's purchase of Hanson PLC's stock, both HPCI and Kaiser Gypsum (together with various other companies and entities) became indirect, wholly-owned subsidiaries of HeidelbergCement AG. HeidelbergCement AG, together with its domestic and foreign non-Debtor subsidiaries, comprises one of the largest building materials companies in the world.

HPCI is a wholly-owned, indirect subsidiary of non-Debtor Lehigh Hanson. HPCI is the 100 percent direct owner of all capital stock of Kaiser Gypsum. HPCI also directly owns 100 percent of the equity in the following three non-Debtor entities: (a) Hanson Micronesia Cement, Inc. (an operating company); (b) Hanson Permanente Cement of Guam, Inc. (an operating company); and (c) Permanente Cement Company (a non-operating company with no tangible assets).

## 2. Business Operations and Corporate Governance

### a. Kaiser Gypsum

By 1978, Kaiser Gypsum had sold substantially all its assets and ceased to be involved in any products manufacturing. Kaiser Gypsum has no current business operations other than managing its legacy asbestos-related and environmental liabilities and no material tangible assets. There are nine officers of Kaiser Gypsum: Rebecca Robbins, Treasurer; Gregory J. Ronczka, President; Carol L. Lowry, Vice President; Robert D. VanBenschoten, Assistant Secretary; Thaddius Haas, Assistant Secretary; James L. Wallmann, Assistant Secretary; Mary

D. Wright, Assistant Secretary; Amy C. Yi, Assistant Secretary; and Charles E. McChesney II, Vice President and Secretary. The Board of Directors of Kaiser Gypsum consists of the following directors: Gregory J. Ronczka and Charles E. McChesney II. It is currently anticipated that the compensation and employee benefit arrangements for Kaiser Gypsum's officers in 2019 will be paid for and provided by one or more non-debtor subsidiaries of Lehigh Hanson. It is also currently anticipated that Kaiser Gypsum's directors will not be separately compensated for serving as directors in 2019.

### b.    HPCI

HPCI owns equity in its subsidiaries and the Permanente Property. HPCI leases the Permanente Property to Lehigh Southwest Cement Company, a non-Debtor affiliate ("Lehigh Southwest"). Under the leases, Lehigh Southwest pays rent, royalties and other amounts, and also is responsible for the ongoing operating costs of the Permanente Property. For its part, HPCI is obligated to fund capital expenditures for the cement plant and reclamation obligations related to the Permanente Property, although, pursuant to an agreement reached in the Reorganization Cases, HPCI is currently not making these payments.

HPCI's operating subsidiaries (Hanson Micronesia Cement, Inc. and Hanson Permanente Cement of Guam, Inc.) distribute and sell cement in key markets in the Pacific region, including Guam and Saipan. All funding required by these operating subsidiaries has been and continues to be provided by Leigh Hanson.

There are nine officers of HPCI: Thaddius Haas, Assistant Secretary; Gregory J. Ronczka, President; Rebecca Robbins, Treasurer; Robert D. VanBenschoten, Assistant Secretary; Carol L. Lowry, Vice President; James L. Wallmann, Assistant Secretary; Mary D. Wright, Assistant Secretary; Amy C. Yi, Assistant Secretary; and Charles E. McChesney, Vice President and Secretary. The Board of Directors of HPCI consists of the following directors: Gregory J. Ronczka; Charles E. McChesney II; and Carol L. Lowry. It is currently anticipated that the compensation and employee benefit arrangements for HPCI's officers in 2019 will be paid for and provided by one or more non-debtor subsidiaries of Lehigh Hanson. It is also currently anticipated that HPCI's directors will not be separately compensated for serving as directors in 2019.

### B.    General Overview of the Debtors' Manufacture and Sale of Products Alleged to Contain Asbestos

The Debtors' asbestos-related liabilities arise from their manufacture and sale of certain products that decades ago contained small amounts of asbestos (collectively, the "Debtors' Asbestos Products"). Asbestos was removed from these products by the end of 1976.

Kaiser Gypsum's principal business consisted of manufacturing and marketing gypsum plaster, gypsum lath and gypsum wallboard. Kaiser Gypsum also manufactured and sold a number of other products, including metal products used in building construction (e.g. door frames), wood chip products for use in building construction (e.g., sheathing, sound deadening board and suspended ceilings components) and commercial paper products (e.g., packing cartons). None of these products contained asbestos at any time.

In connection with its wallboard business, Kaiser Gypsum marketed, manufactured and sold products categorized as "wallboard accessories," which included joint compounds, texture paints and other similar products used to laminate wallboard or cover radiant heat surfaces and cables.  Certain versions of these wallboard accessories, which were sold under various trade names, included minimal amounts of chrysotile asbestos during varying time periods from 1952 to 1976.  In addition to wallboard accessory products, Kaiser Gypsum manufactured mineral fiberboard products, which are used for acoustical ceiling tile and lay-in board, that, from 1968 to 1974, contained small amounts of asbestos.  By 1978, Kaiser Gypsum had sold substantially all its assets and ceased to be involved in any products manufacturing.

HPCI's primary business was the manufacture and sale of portland cement products. Portland cement is a fine powdery substance that is mixed with water and an aggregate, such as gravel or sand, to form concrete, which has a number of construction applications, including sidewalks, roads and floor slabs.  Although most of the cement products manufactured by HPCI never contained asbestos, HPCI made two types of products — "masonry cement," and "plastic cement" — that in certain versions and at certain times contained small proportions of chrysotile asbestos.  In particular, HPCI sold limited quantities of masonry cement, under the trade name Masonry Cement, that contained minimal amounts of chrysotile asbestos for a period of less than eight months in 1973.  HPCI also sold certain plastic cements that contained small amounts of chrysotile asbestos.

A list of the asbestos-containing products sold by either Kaiser Gypsum or HPCI and, based upon information and belief, the years during which each product was sold is attached hereto as Exhibit V.

### C.        History of the Debtors' Asbestos Personal Injury Litigation

The Debtors have faced thousands of asbestos-related lawsuits dating back to 1978. Since 1978, one or both of the Debtors have been named in more than 38,000 asbestos-related lawsuits.  As of August 31, 2016, the Debtors were defendants in approximately 14,000 pending asbestos-related bodily injury lawsuits filed in state courts across the country.

### D.        Asbestos Personal Injury Insurance and Coverage Litigation

The Debtors have general liability insurance that covers, among other things, all defense and indemnity costs, subject to certain limited exclusions and deductibles, related to asbestos bodily injury claims.  Specifically, Truck, an affiliate of Farmers Insurance, issued primary liability policies to the Debtors for the period 1965 through April 1, 1983.  The Truck Policies for the period 1971 to 1979 have no aggregate limits.  The per occurrence limits and deductibles under the Truck Policies vary by policy.  The vast majority of claims give rise to a $5,000 deductible, which applies to all paid claims with a first exposure date on or before December 31, 1975, and a $500,000 per claim limit.  For those paid claims with a first exposure date between January 1, 1976 and March 31, 1981, inclusive, the deductible is $50,000.  For those paid claims with a first exposure date between April 1, 1981 and March 31, 1983, inclusive, the deductible is $100,000.  The coverage also obligates Truck to defend the claims and pay the costs of defense.

The Debtors also have excess insurance policies (collectively, the "Excess Policies") with various insurers that cover indemnity amounts in excess of $500,000 per occurrence.  In December 2013, certain of the Debtors' excess insurers entered into a confidential coverage-in-place agreement with the Debtors with respect to the excess coverage.  As discussed below, the Debtors assumed this agreement as of October 29, 2018.  See Section IV.O.

In April 2001, Truck filed the Asbestos Coverage Litigation, which seeks a ruling that the Debtors' design, production and distribution of their asbestos-containing products constituted a single occurrence and, thus, the Truck Policies had already been exhausted.  In 2002, the Debtors filed a cross-complaint against Truck and their excess insurers contending, among other things, that to the extent the primary coverage was exhausted, the excess insurers were obligated to indemnify the Debtors against asbestos personal injury claims.  Based on rulings in the Asbestos Coverage Litigation, it is now settled that (1) Truck must defend and indemnify the Debtors for each covered asbestos bodily injury claim up to the limits of any policy selected by the Debtors, and (2) the excess insurers are obligated to respond vertically to the policy period selected by the Debtors — i.e. coverage under the applicable Excess Policy is triggered on a per claim basis for amounts in excess of the amounts covered by the applicable primary policy.  While certain issues in the Asbestos Coverage Litigation are currently subject to an appeal pending in California state court at California Court of Appeal No. B278091, that appeal does not address (and will not alter) the Debtors' coverage for asbestos bodily injury claims under the applicable Truck Policies.

### E.    The Debtors' Environmental Liabilities

The Debtors have environmental liabilities related to their former ownership and operation of plants in Seattle, Washington and St. Helens, Oregon.

### 1.    Seattle Plants

Both Debtors owned and operated facilities in the Seattle area during periods between 1929 and 1987.  HPCI operated a cement plant, and owned and operated a ready-mix cement plant and a bulk cement receiving, storage and distribution facility.  Kaiser Gypsum owned and operated the same cement plant, as well as a gypsum plant, and a gypsum accessories facility. All of these facilities were on or adjacent to the Lower Duwamish Waterway, an industrial waterway near Seattle, Washington.

By 1978, Kaiser Gypsum had sold all its operations in the Seattle area and by 1987, HPCI had sold all its facilities in Seattle.

A five mile stretch of the Lower Duwamish Waterway is a United States Environmental Protection Agency (the "EPA") Superfund site (the "Lower Duwamish Superfund Site") involving approximately 120 potentially responsible parties ("PRPs").  In February 2010, the EPA served the Debtors with a request for information pursuant to Section 104(e) of the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9604(e), and the Debtors responded to that request the following year.

Certain parties have completed a remedial investigation and feasibility study ("RI/FS") in connection with a joint Administrative Order on Consent to Conduct a RI/FS.  Those parties also

engaged in cleanup of various "early action areas" identified by such parties as locations that would require cleanup under any remedial scenario. In 2013, those parties subsequently agreed to perform additional studies, which remain ongoing. In April 2014, HPCI, for itself and Kaiser Gypsum, entered into an Alternative Dispute Resolution Memorandum of Agreement with over thirty participating parties, pursuant to which the parties agreed to a process for allocating the costs incurred in connection with remediation of the Lower Duwamish Superfund Site. In November 2014, the EPA released a Record of Decision ("ROD") that prescribes a cleanup plan for the Lower Duwamish Superfund Site that the EPA estimates will result in remediation costs of $342 million. The EPA is presently working with the parties that conducted the RI/FS to complete certain additional investigations in advance of implementing the remediation called for in the ROD. In addition to the EPA, the Washington Department of Ecology is also active with respect to the Lower Duwamish Superfund Site.

There were more than forty (40) proofs of Claim related to the Lower Duwamish Superfund Site filed against the Debtors, including a proof of Claim filed by the United States against each Debtor in an amount of at least $6,474,217.49 based on alleged CERCLA response cost and natural resource damage liability in connection with the Lower Duwamish Superfund Site. In addition, at least one proof of Claim filed against the Debtors alleged that the Debtors were responsible for upland cleanup costs on a property located adjacent to the Lower Duwamish Superfund Site. The Debtors dispute each of these proofs of Claim that has not been resolved as described below and in Section IV.Q.2.

On November 1, 2018, the Debtors filed omnibus objections to the proofs of claim filed by The Boeing Company [D.I. 1277], the Port of Seattle [D.I. 1278], the City of Seattle [D.I. 1279] and King County, Washington [D.I. 1280]. Each of these claimants asserts that the Debtors are responsible for (a) certain costs allegedly incurred by the claimants to investigate contamination at the Lower Duwamish Superfund Site and (b) undetermined future costs that have not yet been incurred by the claimants. The Debtors assert in the omnibus objections, among other things, that the Claims for past costs are unsubstantiated and must be equitably apportioned under applicable law among the approximately 120 PRPs that the EPA has identified at the site. The Debtors also assert that, pursuant to section 502(e)(1)(B) of the Bankruptcy Code, the Claims should be disallowed to the extent they seek future costs.

The Debtors and each of these claimants worked in good faith to consensually resolve these omnibus objections to the claimants' proofs of Claim. As a result, the Debtors reached agreements that have been approved by the Bankruptcy Court to resolve the proofs of Claim filed by The Boeing Company, the Port of Seattle, the City of Seattle, King County, Washington and the United States. See Section IV.Q.2.

### 2.      St. Helens Plant

In 1956, Kaiser Gypsum acquired a fiberboard manufacturing facility in St. Helens, Oregon that produced ceiling tiles, ceiling panels and related products. In 1978, Kaiser Gypsum sold the plant to Owens Corning Fiberglas Corporation ("Owens Corning"). In 1987, the plant was sold again, this time to Armstrong World Industries, Inc. ("Armstrong"), which remains the current owner of the property.

The Oregon Department of Environmental Quality (the "DEQ") has made a determination that hazardous substances were released from the St. Helens plant. In October 2001, it issued an enforcement order directing Armstrong to complete a RI/FS and to take any remedial actions necessary with respect to the plant. The DEQ then notified Kaiser Gypsum and Owens Corning that they were both considered PRPs under applicable state law.

On October 5, 2000, Owens Corning commenced a chapter 11 case in the United States Bankruptcy Court for the District of Delaware that was captioned In re Owens Corning, et al., Case No. 00-03837. After being identified as a PRP and during the pendency of its chapter 11 case, Owens Corning entered into a December 2002 stipulation and consent decree that memorialized a partial settlement with the DEQ.

On December 6, 2000, Armstrong commenced a chapter 11 case in the United States Bankruptcy Court for the District of Delaware that was captioned In re Armstrong World Industries, Inc., et al., Case No. 00-4471. In January 2003, during the pendency of its chapter 11 case, Armstrong filed suit, captioned Armstrong World Industries, Inc. v. Kaiser Gypsum Company, Inc., et al. (the "Armstrong Litigation"), against the Debtors in federal district court in Oregon seeking contribution and/or cost recovery. Armstrong and Kaiser Gypsum ultimately reached agreement on the terms of an interim cost sharing agreement that, among other things, allocates responsibility for payment of response costs incurred prior to DEQ's selection of a remedy on an interim basis, subject to reallocation at some time in the future. This agreement was subsequently amended by the parties. On or about August 21, 2003, the Armstrong Litigation was dismissed without prejudice.

In 2007, the DEQ notified Armstrong, Owens Corning and Kaiser Gypsum that certain property near the St. Helens plant required remedial investigation. In February 2008, Armstrong, Owens Corning and Kaiser Gypsum agreed to undertake a limited investigation of the additional area. In order to share and allocate the costs of this agreed joint investigation, Kaiser Gypsum, Armstrong and Owens Corning entered into a further interim cost sharing agreement with respect to that additional area. In connection with this cost sharing agreement, Kaiser Gypsum entered into a separate agreement in which it made certain representations and covenants regarding its financial status and insurance coverage. HPCI provided a guarantee of performance, not payment, with respect to these representations and covenants.

On August 23, 2010, the parties entered into an Order on Consent Requiring Remedial Investigation and Feasibility Study (DEQ No. LQSR-NWR-10-05) (the "Consent Order"), pursuant to which Armstrong, Owens Corning and Kaiser Gypsum are required to complete a full remedial investigation and feasibility study at the St. Helens site. The remedial investigation at the site remains ongoing.

Armstrong, Owens Corning and Kaiser Gypsum have submitted risk assessment and remedial investigation reports to the DEQ pursuant to the Consent Order. In March 2015, the DEQ provided comments on the risk assessment and remedial investigation reports. As of the date hereof, the DEQ has neither approved nor disapproved of those reports.

Each of the DEQ, Armstrong and Owens Corning has filed a proof of Claim against Kaiser Gypsum or HPCI or both with respect to liabilities at the St. Helens site. See Proofs of

Claim Nos. 61, 65, 67, 70, 450 and 654.  In particular, the DEQ filed a proof of Claim against
Kaiser Gypsum in the amount of up to $150 million for remedial investigation, feasibility study,
remedial action and related costs that the DEQ has incurred and will occur at the St. Helens site.
See Proof of Claim No. 70.  Armstrong filed a proof of Claim against HPCI on behalf of the
DEQ in the amount $150 million.  See Proof of Claim No. 654.  Owens Corning filed identical
proofs of Claim against each of the Debtors in the amount of $600,000 based on (a) a cost
sharing agreement and (b) remedial action costs at the St. Helens site.  See Proof of Claim
Nos. 61, 450.  In addition, Armstrong filed a proof of Claim against Kaiser Gypsum in the
amount $4,164,101.54 plus unknown amounts, based on (a) a cost sharing agreement and
(b) remedial action costs at the St. Helens site.  See Proof of Claim No. 65.  Finally, Armstrong
also filed a proof of Claim against HPCI in the amount of $4,380,630.34 plus unknown amounts,
based on (a) a cost sharing agreement and (b) remedial action costs at the St. Helens site.
See Proof of Claim No. 67.  The Debtors dispute each of these proofs of Claim.

On November 27, 2018, the Debtors filed an objection to proof of Claim number 65 filed
by Armstrong [D.I. 1337].  The Debtors assert in their objection, among other things, that (a) the
claim for past costs is unsubstantiated, (b) Armstrong has liability at the St. Helens site
notwithstanding the confirmation of its own plan of reorganization in 2006, (c) liability for the
St. Helens site should be equitably apportioned between the Debtors and Armstrong under
applicable law and (d) the claim should be disallowed under section 502(e)(1)(B) of the
Bankruptcy Code to the extent it seeks future costs.  In addition, on November 26, 2018, Kaiser
Gypsum filed an adversary complaint [D.I. 1336] against Armstrong for cost recovery and
contribution from Armstrong pursuant to CERCLA and Oregon cleanup law, and for declaratory
judgment in connection with environmental response, removal, cleanup and remedial action
costs incurred by Kaiser Gypsum and for which Kaiser Gypsum is alleged to be liable as a result
of discharges, releases or threatened releases or disposal of hazardous substances at the
St. Helens site.

The Debtors have reached agreements that have been approved by the Bankruptcy Court
to resolve the proofs of Claim filed by Owens Corning, Armstrong and the DEQ.  See Section
IV.O.2.

## F.     Environmental Insurance and Coverage Litigation

The Debtors believe that they have liability insurance that provides coverage for the
Debtors' environmental liabilities relating to their formerly owned plants in Seattle and
St. Helens.  Although certain insurers are currently paying certain defense costs related to these
liabilities, they are doing so under a reservation of rights and they have not reimbursed the
Debtors in full for all defense and indemnity costs incurred related to these environmental
liabilities.  At this time, none of the primary or excess insurers has accepted the Debtors' tender
of these environmental claims.

On September 29, 2016, the Debtors filed suit in state court in Portland, Oregon against
the Debtors' primary and excess insurers seeking, among other things, a declaratory judgment
that the primary and excess insurers are obligated to defend and/or indemnify the Debtors for
these environmental liabilities.

On September 29, 2016, the Debtors filed suit against their primary and excess insurers, commencing a case captioned <u>Kaiser Gypsum Co., Inc., et al. v. AIU Ins. Co., et al.</u>, Oregon Circuit Court, Multnomah County Case No. 16CV32181 (the "<u>Oregon Environmental Coverage Litigation</u>"). The Oregon Environmental Coverage Litigation seeks, among other things, a declaratory judgment that the defendant insurers are obligated to defend and/or indemnify Kaiser Gypsum for certain environmental liabilities associated the St. Helens site and both of the Debtors for certain environmental liabilities associated with and/or in proximity to the Lower Duwamish Superfund Site.

On September 30, 2016, certain insurers filed suit in the Los Angeles County Superior Court, State of California against Kaiser Cement and Gypsum Corporation (now known as HPCI), commencing a case captioned <u>Certain Underwriters at Lloyd's London v. Kaiser Cement and Gypsum Corp., et al.</u>, Los Angeles County Superior Court Case No. BC635906 (the "<u>California Environmental Coverage Litigation</u>"). The California Environmental Coverage Litigation sought, among other things, a declaratory judgment that such insurers are not obligated to defend and/or indemnity HPCI for certain environmental liabilities.

For a discussion of the current status of the Oregon Environmental Coverage Litigation and the California Environmental Coverage Litigation, see Section IV.N.2.

### G.     Prepetition Discussions With Representatives of Asbestos Claimants

Prior to the Petition Date, in January 2016 an ad hoc committee of asbestos personal injury claimants (the "<u>Ad Hoc Committee</u>") consisting of law firms that have filed Asbestos Personal Injury Claims against the Debtors was formed to engage in discussions with the Debtors regarding the terms of a consensual plan of reorganization. Following its formation, the Ad Hoc Committee retained bankruptcy counsel, insurance counsel, a financial advisor, and an asbestos estimation consultant. Much of the Ad Hoc Committee's work prepetition related to the gathering, review and analysis of information regarding the Debtors, including their corporate history, corporate structure, liabilities, insurance and financial condition. In that regard, the Ad Hoc Committee delivered to the Debtors a series of information requests and, in response thereto, the Debtors provided the Ad Hoc Committee with documents and other information. Prior to the Petition Date, the Debtors and the Ad Hoc Committee also agreed on the selection of Lawrence Fitzpatrick as the legal representative of future asbestos claimants. Mr. Fitzpatrick retained his own counsel and an estimation consultant. The Debtors provided the Future Claimants' Representative and his professionals with the same information they furnished to the Ad Hoc Committee.

The Debtors met with the Ad Hoc Committee and had numerous telephone calls and other communications, including in-person meetings, with the Ad Hoc Committee's professionals regarding the Debtors' efforts to restructure their liabilities. Communications between the Debtors and certain of the excess carriers also took place. Among other things, the parties discussed the filing of the Reorganization Cases and potential paths forward to a consensual plan. Although all the parties indicated a desire to reach agreement on a consensual reorganization plan, due to time constraints, the parties were not able to engage in substantive discussions regarding the terms of a plan prior to the Petition Date.

### H.    Determination to File Reorganization Cases

Although insurance covers most of their asbestos-related costs and should cover their environmental liabilities, the Debtors determined the Reorganization Cases were necessary because of the continuing costs, risks and administrative burdens associated with their asbestos-related litigation and legacy environmental liabilities.  Resolution of these liabilities will eliminate the ongoing costs and distraction of managing these decades-old liabilities, liquidate and discharge or permanently resolve their deductible and environmental liabilities and eliminate potential risks of uninsured judgments or claims (punitive damages for example) and insurer insolvencies.

## IV.    EVENTS DURING REORGANIZATION CASES

### A.    Commencement of Reorganization Cases

On September 30, 2016, the Debtors each commenced a reorganization case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. The Reorganization Cases are being jointly administered as In re Kaiser Gypsum Company, Inc., Case No. 16-31602 (JCW).  None of the Debtors' affiliates or subsidiaries is a debtor in the Reorganization Cases.  The Reorganization Cases were assigned to U.S. Bankruptcy Judge J. Craig Whitley of the United States Bankruptcy Court for the Western District of North Carolina.

### B.    First Day Relief

#### 1.    First Day Motions

On the Petition Date, the Debtors filed a number of motions seeking typical "first-day" relief in chapter 11 cases (collectively, the "First Day Motions"), as well as a declaration in support thereof.  The purpose of these motions was to establish procedures for the smooth and efficient administration of these cases.  In particular, the "first day" motions sought authority to: (a) administer the Reorganization Cases of the Debtors jointly for procedural purposes; (b) appoint a noticing, claims and solicitation agent; (c) (1) file a consolidated master list of creditors, (2) file a consolidated list of unsecured creditors, (3) file a consolidated list of the thirty asbestos plaintiffs' firms with the largest number or scope of asbestos cases and (4) establish notice procedures for asbestos claimants; (d) (1) continue use of the existing bank accounts and business forms and (2) authorize the banks to charge bank fees and other amounts in accordance with their contractual arrangements with the Debtors; and (e) extend the time within which the Debtors must file their schedules of assets and liabilities and statements of financial affairs.  The relief sought in each of these motions was granted by the Bankruptcy Court.

The Debtors also filed a "first-day" motion seeking authority to obtain debtor in possession financing.  The Bankruptcy Court entered an interim order [D.I. 82] (the "Interim DIP Order") granting the relief requested in that motion on an interim basis.  Pursuant to the Interim Order, the Debtors were authorized to borrow up to a maximum amount of $2 million from Lehigh Hanson in accordance with the Debtor-In-Possession Loan and Security Agreement, attached as Exhibit 1 to the Interim DIP Order.  The final hearing on the proposed debtor in possession financing was adjourned from time to time to provide the parties additional time to

attempt to consensually resolve certain issues raised by the Creditors' Committee, the Asbestos Personal Injury Committee and the Future Claimants' Representative.  Ultimately, the Debtors, Lehigh Hanson, the Creditors' Committee, the Asbestos Personal Injury Committee, the Future Claimants' Representative and certain insurers who objected to the proposed debtor in possession financing agreed on the terms of an order that, among other things, amends certain terms of the Debtors' interim financing order and post-petition credit agreement [D.I. 444] (the "Agreed DIP Order").  Pursuant to the Agreed DIP Order, among other things, the Debtors are not required to pay any reclamation obligations or capital expenditures in respect of the leases related to HPCI cement plant absent an order from the Bankruptcy Court.  The nonpayment of reclamation obligations and capital expenditures is without prejudice to the rights of Lehigh Southwest and Lehigh Hanson with respect to such nonpayment.  There are no outstanding amounts owed under the debtor in possession financing facility.

2.      **Injunction Enjoining Parties From Pursuing Derivative Claims Against Certain Parties**

On the Petition Date, the Debtors filed a complaint [Adv. Pro. D.I. 1][2] and a motion [Adv. Pro. D.I. 2] (together, the "Debtors' 105 Motion") for injunctive relief extending and applying the automatic stay to certain non-debtor Affiliates and the Debtors' insurers that provide coverage for Asbestos Personal Injury Claims.  Specifically, the Debtors' 105 Motion requested an order prohibiting and enjoining current and potential claimants from filing or continuing to prosecute derivative claims against the Debtors' non-debtor Affiliates or insurers that provide coverage for Asbestos Personal Injury Claims.  On October 7, 2016, the Bankruptcy Court entered a temporary restraining order [Adv. Pro. D.I. 10] granting the requested relief for 28 days.  The Bankruptcy Court entered an order [Adv. Pro. D.I. 18] granting a preliminary injunction on November 4, 2016.

C.      **Appointment of the Creditors' Committee, the Asbestos Personal Injury Committee and the Future Claimants' Representative**

On October 14, 2016, the Bankruptcy Court entered an order appointing the Creditors' Committee pursuant to section 1102 of the Bankruptcy Code.  [D.I. 84].  On August 30, 2019, the Creditors' Committee filed a motion [D.I. 1771] indicating that members Owens Corning and Armstrong are retiring and requesting Ash Grove Cement Company be substituted as a member of the committee for such retiring members.  On October 17, 2019, the Court entered an order [D.I. 1864] grating the Creditors' Committee motion.  On October 19, 2016, the Bankruptcy Court entered an order appointing the Asbestos Personal Injury Committee pursuant to section 1102 of the Bankruptcy Code.  [D.I. 100].  In addition, by order dated October 19, 2016 [D.I. 99], the Bankruptcy Court approved the appointment of Lawrence Fitzpatrick as the Future Claimants' Representative in the Reorganization Cases.  The current membership of the Creditors' Committee and the Asbestos Personal Injury Committee, and the professional advisors

---

[2]        The adversary proceeding is styled Kaiser Gypsum Company, Inc. and Hanson Permanente Cement, Inc. v. Those Parties Listed on Appendix A to Complaint and John and Jane Does 1-1000, Case No. 16-03313 (JCW) (Bankr. W.D.N.C.).

to the Creditors' Committee, the Asbestos Personal Injury Committee and the Future Claimants'
Representative, are as follows:

1.    **CREDITORS' COMMITTEE**

**Creditors' Committee Members:**

Ash Grove Cement Company
11011 Cody Street
Overland Pak, KS 66210

The Boeing Company
PO Box 3707 MC 71-XP
Seattle, WA 98124-2207

**Special Oregon Counsel:**

Sussman Shank LLP
Howard M. Levine, Esq.
1000 SW Broadway, Suite 1400
Portland, OR 97205-3089

**Financial Advisor:**

Alvarez & Marsal North America, LLC
Kelly Stapleton
600 Madison Avenue, 8th Floor
New York, NY 10022

**Counsel:**

Blank Rome LLP
Ira L. Herman, Esq.
Evan J. Zucker, Esq.
The Chrysler Building
405 Lexington Avenue
New York, NY 10174-0208

Blank Rome LLP
Regina Stango Kelbon, Esq.
1201 Market Street, Suite 800
Wilmington, DE 19801

Blank Rome LLP
Jeffrey Rhodes, Esq.
1825 Eye Street NW
Washington, DC 20006

Moon Wright & Houston, PLLC
Andrew T. Houston, Esq.
121 W. Trade Street, Suite 1950
Charlotte, NC 28202

2.    **ASBESTOS PERSONAL INJURY COMMITTEE**

**Asbestos Personal Injury Committee Members and Their Respective Counsel:**

Cleophus Rice
c/o Armand J. Volta, Jr.
The Law Offices of Peter G. Angelos, P.C.

Larry Eugene Watson
c/o Alan R. Brayton
Brayton Purcell LLP

Jerry Gabrel
c/o John D. Cooney
Cooney & Conway

Bernard Kunes, II, Individually and as Special Administrator of the Estate of Bernard Kunes, Deceased
c/o Beth Gori
Gori Julian & Associates, P.C.

Margaret Tocco, Individually and as Special Administrator of the Estate of Peter Tocco, Deceased
c/o Perry J. Browder
Simmons Hanly Conroy LLC

Ronald Earl Auen and Sherrie Auen
c/o Steven Kazan
Kazan, McClain, Satterley & Greenwood

Stanley J. Anderson c/o Connie J. Anderson – POA
c/o James L. Ferraro
Kelley & Ferraro, LLP

Lauren Lougher, as Administratrix of the Estate of John Lougher, Deceased
c/o Joseph W. Belluck
Belluck & Fox, LLP

Marta Poling-Goldenne, As Successor-In-Interest to David Poling-Goldenne, Deceased
c/o Peter A. Kraus
Waters & Kraus, LLP

**Counsel:**

Caplin & Drysdale, Chartered
Kevin C. Maclay, Esq.
Todd E. Phillips, Esq.
One Thomas Circle, NW
Suite 1100
Washington, DC 20005

Higgins & Owens, PLLC
Sara W. Higgins, Esq.
524 East Boulevard
Charlotte, NC 28203

**Special Insurance Counsel:**

Anderson Kill P.C.
Robert M. Horkovich, Esq.
1251 Avenue of the Americas
New York, NY 10020-1182

**Financial Advisor:**

Charter Oak Financial Consultants, LLC
James P. Sinclair
430 Center Avenue
Mamaroneck, NY 10543

**Valuation Consultant:**

Legal Analysis Systems
Mark A. Peterson
970 Calle Arroyo
Thousand Oaks, CA 91360

Patricia Hoff, Individually and as Personal
Representative of David Hoff, Deceased
c/o Matthew P. Bergman
Bergman Draper Ladenburg, PLLC

Lois Annette Beach
c/o Joseph F. Rice
Motley Rice LLC

## 3.    ASBESTOS PERSONAL INJURY FUTURE CLAIMANTS' REPRESENTATIVE

| **Future Claimants' Representative:** | **Counsel:** |
|---|---|
| Lawrence Fitzpatrick | Young Conaway Stargatt & Taylor, LLP |
| | James L. Patton, Jr., Esq. |
| **Special Insurance Counsel:** | Edwin J. Harron, Esq. |
| | Sharon M. Zieg, Esq. |
| Anderson Kill P.C. | Rodney Square |
| Robert M. Horkovich, Esq. | 1000 North King Street |
| 1251 Avenue of the Americas | Wilmington, DE 19801 |
| New York, NY 10020-1182 | |
| | Hull & Chandler, P.A. |
| **Claims Evaluation Consultant:** | Felton E. Parrish, Esq. |
| | 1001 Morehead Square Drive, Suite 450 |
| Ankura Consulting Group, LLC | Charlotte, NC 28203 |
| Dr. Thomas Vasquez | |
| 1220 19th Street, NW | |
| Washington, DC 20036 | |

### D.    Certain Claimants' Motion to Transfer Venue of the Reorganization Cases

On October 7, 2016, certain alleged claimants of Kaiser Gypsum filed a motion to transfer the Reorganization Cases from the Western District of North Carolina to the United States District Court for the Western District of Washington [D.I. 62] (the "Motion to Transfer"). The Motion to Transfer was opposed by the Debtors [D.I. 128]; Certain Underwriters at Lloyd's, London and Certain London Market Companies [D.I. 104]; First State Insurance Company and New England Reinsurance Corporation [D.I. 105]; Allianz Underwriters Insurance Company f/k/a Allianz Underwriters Inc., Fireman's Fund Insurance Company, and Westchester Fire Insurance Company [D.I. 137]; Allstate Insurance Company, solely as successor-in-interest to Northbrook Excess & Surplus Insurance Company, formerly Northbrook Insurance Company [D.I. 152]; Truck [D.I. 212]; and the Creditors' Committee [D.I. 233].  On November 22, 2016, the Bankruptcy Court held a hearing on the Motion to Transfer.  On January 30, 2017, the Bankruptcy Court entered an order [D.I. 348] denying the Motion to Transfer.

### E.    Cost Sharing Agreement

In June 2015, the Debtors and Truck entered into a cost sharing agreement pursuant to which Truck agreed to reimburse a portion of the costs incurred by the Debtors in connection with their efforts to permanently resolve their asbestos liability, including the reasonable fees and expenses of professionals retained by the Debtors and by representatives of current and future asbestos claimants, up to $5 million.  Because the cost sharing agreement would have terminated by its terms upon the filing of the Reorganization Cases, in the days leading up to the Petition Date, the Debtors and Truck engaged in discussions regarding a continuation of cost sharing.  On the Petition Date, the Debtors and Truck agreed to enter into an amendment to the cost sharing agreement, which, among other things, extended the agreement for an additional thirty (30) days following the Petition Date.  On November 23, 2016, the Bankruptcy Court entered an order [D.I. 258] authorizing the Debtors to enter into the amended cost sharing agreement.  Pursuant to its terms, the cost sharing agreement terminated on October 30, 2016.  Since that time, the Debtors have funded all costs of the Reorganization Cases.

### F.    Services Agreement

On January 1, 2011, Three Rivers Management, Inc. ("TRMI"), a non-debtor affiliate, entered into a services agreement (the "Services Agreement") with HPCI under which TRMI provides management services to the Debtors and certain non-debtor Affiliates including: management and defense of asbestos liability, management of environmental remediation, technical and consulting services, and additional litigation and legal services.  In anticipation of the filing of the Reorganization Cases, the Services Agreement was amended on September 29, 2016 to modify the method by which TRMI's annual fee is calculated and paid under the Services Agreement to a fee based on the time TRMI personnel spent on services for the Debtors.  On February 3, 2017, the Debtors filed a motion for an order authorizing them to perform under the Services Agreement [D.I. 351].  No formal objections were filed to that motion, but the Creditors' Committee raised issues regarding the proposed order.  On March 24, 2017, the Bankruptcy Court entered an order approving the motion [D.I. 423], which authorized performance under the Services Agreement.

### G.    Discovery Requests and the Related Case Management Order

On November 21, 2017, the Creditors' Committee filed a motion [D.I. 692] (the "UCC Discovery Motion") for an order authorizing and directing examinations and the production of documents and providing for related case management procedures.  The next day, Certain Underwriters at Lloyd's, London, Certain London Market Companies, Columbia Casualty Company, National Fire Insurance Company of Hartford and The Continental Insurance Company (collectively, the "Certain Insurers") filed two motions:  (a) a motion [D.I. 701] (the "Rule 2004 I Motion") for an order directing the production of documents from and examination of the Debtors, pursuant to Bankruptcy Rule 2004; and (b) a motion [D.I. 703] (the "Rule 2004 II Motion," and together with the Rule 2004 I Motion, the "Rule 2004 Motions") for an order directing the production of documents from and examination of the DEQ, pursuant to Bankruptcy Rule 2004.

First State Insurance Company and New England Reinsurance Corporation filed a joinder [D.I. 709] to the Rule 2004 Motions. The Creditors' Committee filed a response [D.I. 712] to the Rule 2004 Motions, requesting permission to participate in any discovery conducted pursuant to an order granting the Rule 2004 Motions. The DEQ responded [D.I. 714] to the Rule 2004 II Motion and objected to the Certain Insurers' discovery requests. Likewise, the Debtors responded [D.I. 715, 718] to the Rule 2004 Motions and objected to the discovery sought by the Certain Insurers. The Asbestos Personal Injury Committee and the Future Claimants' Representative also filed objections to the Rule 2004 Motions [D.I. 716, 717]. The Certain Insurers [D.I. 719] filed a reply in support of the Rule 2004 Motions.

On December 13, 2017, the Bankruptcy Court held a hearing to consider, among other matters, the Rule 2004 Motions. At the hearing, the Bankruptcy Court did not grant or deny the Rule 2004 Motions and instead permitted the parties to attempt to resolve their disputes. On December 19, 2017, the Bankruptcy Court entered an agreed order [D.I. 730] granting the UCC Discovery Motion, which authorized examinations and established related case management procedures. On February 15, 2018, the Certain Insurers withdrew the Rule 2004 II Motion [D.I. 835], which withdrawal coincided with the receipt of public information from the DEQ. The Debtors produced documents in response to Certain Insurers' requests regarding environmental claims. On February 21, 2018, the Bankruptcy Court entered an order [D.I. 841] denying, in part, the Rule 2004 I Motion.

## H.    Motions to Approve Settlements

### 1.    Construction Settlement

On May 3, 2013, a condominium association brought an action in the Superior Court of California, County of Santa Clara, against several defendants, including San Jose Construction Co. ("SJC"). On December 4, 2014, SJC filed a cross-complaint against, among others, Aberle-Scrodin, Inc. SJC subsequently added Central Concrete Supply Co., Inc. and HPCI as cross-defendants (all parties collectively, the "Construction Settlement Parties"). Some parties to the action subsequently settled, but HPCI was not among them. During the Reorganization Cases, however, HPCI agreed to a settlement with the other Construction Settlement Parties. On April 17, 2017, HPCI filed a motion for an order approving the settlement [D.I. 447]. Under the settlement, HPCI's insurer agreed to pay $125,000 to SJC under an insurance policy with a deductible of $10 million which has not yet been met. Since the insurance policy was issued to Lehigh Hanson, Lehigh Hanson would be required to reimburse the insurer for the amount of the payment. On May 3, 2017, the Court entered an order approving the settlement [D.I. 470].

### 2.    Insolvent Insurers Settlement

Prior to the Petition Date, the Debtors asserted a claim for insurance coverage against OIC Run-Off Limited (formerly The Orion Insurance Company plc) and The London and Overseas Insurance Company Limited (formerly The London and Overseas company plc), insurance and reinsurance companies incorporated in England and Wales (together, the "Insolvent Insurers"). The Insolvent Insurers have been in "run-off" — i.e. they ceased writing new insurance policies and instead seek to determine, settle, and pay all liquidated claims — for approximately 25 years. As part of the runoff, they have implemented a scheme of

arrangement (approved by the High Court of Justice of England and Wales and later modified and approved as modified), which imposed deadlines on creditors to assert claims against the Insolvent Insurers.  The Debtors submitted a claim against the Insolvent Insurers and, after good faith negotiations, reached a settlement of the claim with the individuals appointed to manage the Insolvent Insurers' run-off.  On November 1, 2017, the Debtors filed a motion seeking approval of the proposed settlement [D.I. 681], under which the Debtors' claim would be fixed at $3,786,882 on a net present value basis.  The proposed settlement allocates the settlement amount between asbestos-related claims and coverage for environmental liabilities; however, it does not allocate the amounts between the Estates.  The Debtors instead proposed that the amounts paid by the Insolvent Insurers would be held by the Debtors in a segregated bank account pending a further order of the Bankruptcy Court providing for an allocation of the proceeds between their respective Estates.

The Insurance Company of the State of Pennsylvania ("ICSOP") and other insurers filed a limited objection to the motion [D.I. 685], which was joined by additional insurance companies [D.I. 686, 688].  In addition, the Creditors' Committee filed a limited objection and reservation of rights to the motion [D.I. 710].  On January 3, 2018, the Bankruptcy Court entered an order granting the motion to approve the settlement agreement [D.I. 837].  The order provides that the Debtors are required to hold all proceeds of their claims against the Insolvent Insurers in a separate bank account pending a further order of the Bankruptcy Court, and that all rights and claims of all parties with respect to such proceeds are preserved in all respects.

## I.        Bar Dates (For Claims Other Than Asbestos Personal Injury Claims)

On November 23, 2016, the Debtors filed their Schedules, identifying the assets and liabilities of their Estates [D.I. 254, 255, 256, 257].  On April 17, 2017, the Debtors filed a motion seeking, among other things, a bar date for Claims other than Asbestos Personal Injury Claims against the Debtors.  On June 14, 2017, the Bankruptcy Court entered an order [D.I. 553] establishing the following Bar Dates for the filing of proofs of Claim in the Reorganization Cases:  (1) September 13, 2017, as the general Bar Date for the filing of proofs of Claim (other than Asbestos Personal Injury Claims); (2) the later of (a) the general Bar Date and (b) thirty (30) days after the effective date of rejection of an Executory Contract or Unexpired Lease as the general Bar Date for claims arising out of the rejection of Executory Contracts or Unexpired Leases relating to such Executory Contracts or Unexpired Leases; and (3) the later of (a) the general Bar Date and (b) twenty-one (21) days after the date that a notice of an amendment to the Schedules is served on a claimant as the Bar Date for such claimant to file a proof of Claim in respect of the amended scheduled Claim.

## J.        The Debtors' Exclusive Right to File and Seek Confirmation of a Plan

The Debtors sought and obtained five extensions of the periods during which they could propose and solicit acceptances of a chapter 11 plan of reorganization beyond the initial 120-day and 180-day periods for plan proposal and solicitation set forth in section 1121 of the Bankruptcy Code. The Bankruptcy Court extended the exclusive period during which the Debtors could propose a plan of reorganization through March 30, 2018, and extended the solicitation period for acceptances of such a plan through May 30, 2018.  Following the expiration of the Debtors' exclusivity period, Truck filed a plan of reorganization [D.I. 887,

1203, 1268, 1342, 1413 and 1665] (as amended, the "Truck Plan").  Likewise, the Debtors, the Asbestos Personal Injury Committee, the Future Claimants' Representative and Lehigh Hanson filed a joint plan of reorganization [D.I. 1085, 1271 and 1668].  On October 7, 2019, the Court entered an order [D.I. 1834] denying the solicitation of the Truck Plan.

### K.    Mediations of the Reorganization Cases

#### 1.    Environmental Liabilities Mediation

On November 8 and 9, 2017, representatives of the Debtors, the Creditors' Committee, the DEQ, Armstrong, Owens Corning and numerous insurers, attended a mediation in Portland, Oregon with respect to the St. Helens site.  Eric Van Loon of JAMS served as the mediator.  The mediation sessions concluded without a resolution of the Debtors' liability at the St. Helens site.

The parties attended a second mediation on January 23 and 25, 2018, in Portland, Oregon which again concluded without a resolution of Kaiser Gypsum's liability at the St. Helens site. Timothy Gallagher of The Gallagher Group served as mediator.

A third mediation session with Mr. Gallagher with respect to the St. Helens and Lower Duwamish Waterway sites was held on July 19 and 20, 2018 in Portland, Oregon. Representatives of the Debtors, the Creditors' Committee, the DEQ, the Oregon Department of Justice, the United States Environmental Protection Agency, the United States Department of Justice, Lehigh Hanson and a number of the Debtors' insurers attended the mediation.  Although no comprehensive agreement was reached, conditional settlements in principle were reached with certain of the Debtors' insurers.  Subsequently, the Debtors, with Mr. Gallagher's assistance, reached an agreement with the DEQ and an agreement in principle with the United States on the treatment of the Debtors' liabilities at the St. Helens and Lower Duwamish Waterway sites under a plan of reorganization.  The Debtors also reached agreements in principle with certain additional insurers.  See Section IV.Q.2.

#### 2.    Asbestos-Related Mediation

The Debtors, the Asbestos Personal Injury Committee, the Future Claimants' Representative, the Creditors' Committee, Lehigh Hanson, Truck and various other insurers agreed to participate in a mediation, in which Mr. Gallagher served as mediator, in an effort to achieve a consensual resolution of issues with respect to the Debtors' current and future asbestos liability, including with respect to the Truck Plan and First State Insurance Company and New England Reinsurance Corporation (together, "First State") motion to dismiss.  The parties attended mediation sessions with Mr. Gallagher on July 16 and 17, 2018 in Chicago, Illinois and on September 17, 2018 in New York, New York.  To date, no resolution has been reached. Details with respect to the First State motions to dismiss are set forth in Section IV.P.

### L.    Motion of the Creditors' Committee for Standing to Pursue Certain Estate Claims

On May 16, 2018, the Creditors' Committee filed a motion for standing to prosecute certain claims on behalf of the Debtors' Estates [D.I. 952] (the "Standing Motion"), which included a draft complaint.  Both the Standing Motion and the draft complaint were filed under

seal.  On June 8, 2018, the Creditors' Committee filed a partially unsealed copy of the Standing Motion and the draft complaint [D.I. 1009].  The Creditors' Committee later filed an amended draft complaint [D.I. 1118, Ex. A].  The claims asserted in the draft complaint primarily related to the leases related to the Permanente Property and intercompany claims and included claims for (i) breach of fiduciary duty and aiding and abetting a breach of fiduciary duty, (ii) constructive fraud, (iii) unjust enrichment, (iv) corporate waste, (v) civil conspiracy, (vi) fraudulent conveyance, (vii) preferential transfers, (viii) avoidance of setoff, (ix) turnover of property and (x) alter ego and successor liability.  The draft complaint named numerous potential defendants, including Lehigh Hanson, Lehigh Southwest Cement Company and 23 current and former officers and directors of the Debtors.

Prior to the filing of the Standing Motion, the Debtors discussed with Lehigh Hanson, the Asbestos Personal Injury Committee, the Future Claimants' Committee and the Creditors' Committee the use of tolling agreements to both (a) ensure that no potential claim of the Debtors' Estates became time-barred and (b) avoid the commencement of potentially unnecessary litigation.  The Debtors drafted a form of tolling agreement and circulated that form to Lehigh Hanson, the Asbestos Personal Injury Committee, the Future Claimants' Committee and the Creditors' Committee for their review and input.  Although the Debtors received and incorporated comments on the form tolling agreement from Lehigh Hanson, the Asbestos Personal Injury Committee and the Future Claimants' Committee, the Debtors received no comments from the Creditors' Committee.

On August 10, 2018, the Debtors [D.I. 1113], the Asbestos Personal Injury Committee and the Future Claimants' Representative, jointly, [D.I. 1112] and Lehigh Hanson [D.I. 1114] each filed a response to the Standing Motion.  On August 13, 2018, the Creditors' Committee filed a reply in support of the Standing Motion [D.I. 1118].  On August 16, 2018, the Bankruptcy Court held a hearing on the Standing Motion.  Although the Bankruptcy Court did not finally rule on the Standing Motion, at the conclusion of the hearing it indicated it would deny the Standing Motion and not authorize the Creditors' Committee to file the draft complaint if the Debtors were able to obtain signed tolling agreements from the potential defendants.  In order to provide the Debtors adequate time to pursue and collect executed tolling agreements, the Bankruptcy Court continued the hearing on the Standing Motion to September 13, 2018.  In addition to directing the Debtors to collect signed tolling agreements by September 13, the Bankruptcy Court also instructed the Debtors to provide the tolling agreements to the Debtors' D&O insurers for the insurers' consideration.

Following the August 16, 2018 hearing, the Debtors collected signed tolling agreements from each of the non-debtor Affiliates that was a potential defendant and each of the current or former directors or officers that are potential defendants with the exception of one former officer whose employment with the Debtors ended prior to the transactions regarding HPCI's cement plant that were the subject of the Creditors' Committee's draft complaint.  In addition, at the Debtors' request, Lehigh Hanson provided the tolling agreements to the Debtors' primary and excess D&O insurers for the insurers' review and consideration.  At the request of the Creditors' Committee, the Debtors filed a motion seeking the entry of an order authorizing the Debtors to enter into the tolling agreements [D.I. 1131] and submitted a declaration in support of the motion [D.I. 1147].  At a hearing held on September 13, 2018, the Bankruptcy Court approved the motion authorizing the Debtors to enter into tolling agreements and denied the Standing Motion.

Pursuant to the Plan, all claims of the Debtors' Estates, including the claims identified in the draft complaint, against the Protected Parties are deemed settled, released and extinguished.

### M.    Removal Period

The Debtors filed several motions seeking an extension of the period within which the Debtors may remove actions pursuant to 28 U.S.C. § 1452 and Bankruptcy Rule 9027.  On September 27, 2019, the Bankruptcy Court entered an order [D.I. 1822] extending such period within which the Debtors may remove actions through and including December 30, 2019 to the extent that the time period for filing such notices of removal expired on or before such date.

### N.    Motions to Lift Automatic Stay

#### 1.    Asbestos Coverage Litigation

The Debtors, Truck, and multiple excess insurers have been parties to the Asbestos Coverage Litigation for over 15 years.  Truck filed a motion for relief from the automatic stay [D.I. 397] to pursue its appeals in the Asbestos Coverage Litigation.  The Asbestos Personal Injury Committee, the Future Claimants' Representative, and the Debtors objected to the lift stay motion, and certain insurers supported the motion so long as the stay was lifted for all parties to the Asbestos Coverage Litigation.  On October 12, 2017, the Bankruptcy Court entered an order [D.I. 669] granting the lift stay motion and permitting the Debtors, Truck, the excess insurers, and any other parties to the Asbestos Coverage Litigation to proceed with the appeals, provided that the stay was not lifted to permit any party to collect on a Claim against the Debtors.

#### 2.    Environmental Coverage Litigation

As described above, on September 29, 2016, the Debtors commenced the Oregon Environmental Coverage Litigation against certain insurance company defendants, seeking declaratory relief and damages for breach of contract for environmental costs.  The next day, certain insurers (the "London Market Insurers") filed the California Environmental Coverage Litigation, which was stayed by the Reorganization Cases.  The Oregon Environmental Coverage Litigation was removed to the United States Bankruptcy Court for the District of Oregon and subsequently transferred to the Bankruptcy Court.  On March 27, 2017, the Bankruptcy Court granted the Debtors' motion to remand the action to the Circuit Court for the State of Oregon for the County of Multnomah; an order evidencing the court's ruling was entered May 16, 2017.  The Oregon Environmental Coverage Litigation was reactivated by the Oregon state court on June 22, 2017.

On March 27, 2017, the Bankruptcy Court granted the motion of First State Insurance Company, London & Edinburgh Insurance Co., Ltd., New England Reinsurance Corporation and Twin City Fire Insurance Company for relief from the automatic stay to permit the parties to proceed in the California Environmental Coverage Litigation; an order [D.I. 477] memorializing the court's ruling was entered May 16, 2017.  The automatic stay in the California Environmental Coverage Litigation was lifted on June 22, 2017 and an amended complaint was filed June 23, 2017 that, among other things, added Kaiser Gypsum as a defendant.

Following remand of the Oregon Environmental Coverage Litigation, on June 22, 2017, the Debtors filed a motion in the Oregon Environmental Coverage Litigation seeking a preliminary injunction prohibiting certain defendant insurers from pursing the California Environmental Coverage Litigation, and at the same time, the Debtors filed a motion for summary judgment seeking a ruling that Oregon law would apply to interpretation of all insurance contracts at issue in the Oregon Environmental Coverage Litigation. Shortly thereafter, certain defendant insurers filed a motion to dismiss the Oregon Environmental Coverage Litigation on the grounds of *forum non conveniens* and because there was another action pending in California. Later, in the California Environmental Coverage Litigation, HPCI filed a motion seeking a stay or dismissal on the grounds of *forum non conveniens* and comity, and Kaiser Gypsum filed a motion to quash service of process on the grounds that the California state court did not have personal jurisdiction over Kaiser Gypsum, a foreign corporation, in litigation regarding insurance coverage for non-California situated environmental liabilities. Ultimately, the court in the California Environmental Coverage Litigation denied Kaiser Gypsum's personal jurisdiction motion, but granted HPCI's *forum non conveniens* motion in part, staying the California Environmental Coverage Litigation pending the outcome of the Oregon Environmental Coverage Litigation.

On December 13, 2017, the court in the Oregon Environmental Coverage Litigation denied the Debtors' motion for preliminary injunction and denied certain defendant insurers' motion to dismiss based on *forum non conveniens*. The Oregon Environmental Coverage Litigation is now the only active coverage litigation addressing the defendant insurers' obligation to defend or indemnify the Debtors for their liabilities arising out of the alleged environmental conditions at the St. Helens and Lower Duwamish Waterway sites.

On January 3, 2018, the court in the Oregon Environmental Coverage Litigation entered a case management order scheduling certain pre-trial deadlines and setting a tentative trial date in February 2020. The parties are engaged in discovery.

### 3.   Costs Lift Stay Motion

In connection with the Asbestos Coverage Litigation, the London Market Insurers prevailed on certain actions against Truck, and along with other insurers filed a memorandum of costs in the Asbestos Coverage Litigation on September 27, 2016. The London Market Insurers filed a Motion for an Order Finding that the Automatic Stay Does Not Apply, or in the Alternative, for Relief from the Automatic Stay to Pursue Costs against Truck (the "Costs Lift Stay Motion") [D.I. 672 and 672-1] on October 24, 2017. The Costs Lift Stay Motion was joined by several other insurance companies [D.I. 683]. On December 27, 2017, the Bankruptcy Court entered an order granting the Costs Lift Stay Motion [D.I. 736].

### 4.   Untermann Lift Stay Motions

On December 15, 2017, Cheryl Untermann, as successor-in-interest to Melvin Desin, an asbestos claimant, filed a Motion for Relief from Automatic Stay to Pursue Appeal of State Court Action [D.I. 728]. The Debtors and various insurers objected to the motion. On March 26, 2018, the Bankruptcy Court entered an order denying the motion without prejudice [D.I. 876].

On May 15, 2018, Cheryl Untermann filed a renewed motion for relief from the automatic stay [D.I. 942]. The Debtors and Truck objected to the motion [D.I. 994 and 1007]. On July 3, 2018, the Bankruptcy Court entered an order [D.I. 1067] granting the motion.

### 5.   ICSOP's Lift Stay Motion

In December 2013, the Debtors, ICSOP, Granite State Insurance Company, Lexington Insurance Company and certain other excess insurers of the Debtors entered into that certain Excess Coverage In Place Settlement Agreement (the "Excess CIP Agreement"). On February 13, 2018, ICSOP filed a motion for relief from the automatic stay to permit it to pursue reimbursement for consummated and contemplated settlements in accordance with Excess CIP Agreement [D.I. 824]. The Excess CIP Agreement provides, among other things, that ICSOP and the other insurers share in the indemnity payments for the Debtors' asbestos claims. The London Market Insurers joined in the lift stay motion on February 26, 2018 [D.I. 845]. On March 6, 2018, ICSOP filed a supplement to the motion [D.I. 856] indicating that the parties had reached a consensual resolution of the motion and requesting entry of a revised proposed order approving the lift stay motion. On March 7, 2018, the Bankruptcy Court entered the proposed order [D.I 860], which permits reimbursement of ICSOP by the other insurers for certain settlements in accordance with the Excess CIP Agreement, and authorizes ICSOP to apply all available credits against amounts owed by HPCI for those settlements pursuant to the Excess CIP Agreement.

### 6.   Joint Lift Stay Motion

As required by the Term Sheet, on April 6, 2018 the Debtors, the Asbestos Personal Injury Committee and the Future Claimants' Representative filed a joint lift stay motion [D.I. 881] seeking to modify the stay to permit any asbestos claimant to pursue his or her claim in the tort system but only if the claimant first agrees to limit his or her recovery to insured amounts and waives and releases his or her uninsured claim against the Debtors and certain other parties. The following parties filed responses to the joint lift stay motion: (i) ICSOP, Granite State Insurance Company and Lexington Insurance Company [D.I. 903]; (ii) First State Insurance Company and New England Reinsurance Corporation [D.I. 906]; (iii) Certain Underwriters at Lloyd's, London, Certain London Market Companies, Columbia Casualty Company, National Fire Insurance Company of Hartford and The Continental Insurance Company [D.I. 907]; and (iv) Truck [D.I. 904, 916, 926]. Replies in support of the joint lift stay motion were filed by the Debtors [D.I. 922] and the Asbestos Personal Injury Committee and the Future Claimants' Representative [D.I. 923, 1086].

The Bankruptcy Court held a preliminary hearing on the joint lift stay motion on May 10, 2018. To address the Bankruptcy Court's comments made at the conclusion of the preliminary hearing, the Debtors, the Asbestos Personal Injury Committee and the Future Claimants' Representative agreed to adjourn the joint lift stay motion until July 31, 2018 for the purpose of providing the parties, including Truck and the Debtors' other insurers, an opportunity to discuss a potential resolution of the disputes. On July 31, 2018, the Bankruptcy Court held a final hearing on the joint lift stay motion at the conclusion of which the Bankruptcy Court granted the motion. On August 9, 2018, the Bankruptcy Court entered an order granting the joint lift stay motion [D.I. 1108]. Pursuant to the Bankruptcy Court's order, among other things, the

automatic stay is lifted, effective as of October 29, 2018, pursuant to section 362(d) of the Bankruptcy Code, to permit only those holders of Asbestos Personal Injury Claims who first agree to limit their recovery to insured amounts and waive and release their uninsured claims against the Debtors and certain other parties to file or continue their Asbestos Personal Injury Claims in the tort system against one or both of the Debtors, solely for the purpose of pursuing claims that are covered by, or enforcing settlements or judgments solely against, the Debtors' available insurance.

### O.      Assumption of Excess CIP Agreement

On July 12, 2018, the Debtors filed a motion for an order authorizing them to assume the Excess CIP Agreement solely if and when the Bankruptcy Court approved the joint lift stay motion filed by the Debtors, the Asbestos Personal Injury Committee and the Future Claimants' Representative.  The Excess CIP Agreement addresses certain key issues, including that (a) the excess insurers party to the Excess CIP Agreement agreed to provide coverage for the Debtors' liabilities associated with Asbestos Personal Injury Claims in amounts above Truck's primary policy limit of $500,000, notwithstanding the insolvencies of certain insurers and (b) it resolved issues related to contributions that the Debtors were required to make from any distributions received from insolvent insurers.  On August 9, 2018, the Bankruptcy Court entered an order authorizing the Debtors to assume the Excess CIP Agreement and deemed the agreement to be assumed as of October 29, 2018.

### P.      Motions to Dismiss the Reorganization Cases

On February 21, 2017, First State, together with ICSOP, Lexington Insurance Company, Granite State Insurance Company, National Union Fire Insurance Company of Pittsburgh, Pennsylvania (as successor in interest to Landmark Insurance Company), AIU Insurance Company, Associated International Insurance Co. and TIG Insurance Co. (f/k/a Transamerica Company as successor by merger to International Insurance Company) filed a motion and supporting memorandum of law to dismiss the Reorganization Cases [D.I. 391, 392].  By agreement, the motion to dismiss was adjourned until the hearing on confirmation of a plan of reorganization.

Subsequently, on May 7, 2018, First State filed a renewed motion to dismiss the Reorganization Cases [D.I. 919] and a memorandum of law in support of the motion [D.I. 920].  First State argued that the Reorganization Cases should be dismissed because they were not filed in good faith and do not serve a valid reorganization purpose.  First State also argued that there was cause for dismissal under section 1112(b)(4) of the Bankruptcy Code.  On April 5, 2017, Allstate Insurance Company (as successor in interest to Northbrook Excess & Surplus Insurance Company, formerly Northbrook Insurance Company) filed a joinder to the renewed motion to dismiss [D.I. 1053].  On July 27, 2018, Truck filed an objection to the renewed motion to dismiss [D.I. 1083].  The Debtors and the Creditors' Committee also filed responses to the renewed motion to dismiss [D.I. 1360 and D.I. 1372].  The Bankruptcy Court held a hearing on the renewed motion to dismiss on December 13, 2018.  By consent, a decision on the motion was deferred until the Confirmation Hearing.

Q.    **Resolution of the Reorganization Cases**

1.    **Fairness of Settlement of Dispute Regarding Asbestos Personal Injury Claims**

On October 20, 2017, the Debtors reached an agreement in principle regarding the terms of a plan of reorganization with the Asbestos Personal Injury Committee, the Future Claimants' Representative and Lehigh Hanson.  On February 15, 2018, the Debtors and Lehigh Hanson entered into the Term Sheet with the Asbestos Personal Injury Committee and the Future Claimants' Representative setting forth the Parties' agreement in principle on a consensual plan of reorganization that would resolve all present and future Asbestos Personal Injury Claims.

The Debtors, Lehigh Hanson, the Asbestos Personal Injury Committee and the Future Claimants' Representative believe that the resolution set forth in the Term Sheet is fair and reasonable and, as a result, holders of Asbestos Personal Injury Claims should vote to accept (i.e., vote in favor of) the Plan that incorporates the resolution.  The resolution includes a contribution of $50 million dollars to the Asbestos Personal Injury Trust ($49 million in cash, and $1 million pursuant to the Payment Note), in addition to a contribution of the Asbestos Personal Injury Insurance Assets and the Phase 1 Claims.  The $50 million contribution is intended to pay Uninsured Asbestos Claims, including the Deductibles (the substantial majority of which, historically, have been $5,000 per claim), and the operating expenses of the Asbestos Personal Injury Trust.  The $50 million contribution represents the result of extensive arm's- length negotiations among the Debtors, Lehigh Hanson, the Asbestos Personal Injury Committee and the Future Claimants' Representative, each of whom utilized expert analysis in informing their negotiating positions, and represents a fair and reasonable compromise among those parties regarding the funding of the Asbestos Personal Injury Trust.

The Parties have concluded that the resolution reflected in the Term Sheet is a fair and appropriate resolution of the dispute.  Among other things, the settlement permits holders of Asbestos Personal Injury Claims to continue to sue the Reorganized Debtors in name only in the tort system to collect available insurance and makes available to holders of Asbestos Personal Injury Claims a fund of money from which such claimants can seek payment from the Asbestos Personal Injury Trust for the uninsured portion of their Claims, and enables the Debtors and others to be permanently relieved from the continuing cost of ongoing litigation of this legacy liability.  While the Parties believe that the overall resolution, including the $50 million contribution and the other assets to be contributed to the Asbestos Personal Injury Trust, is fair, reasonable and in the best interests of present and future asbestos personal injury claimants, there can be no assurance that any particular claimant will be paid the full amount of any Uninsured Asbestos Claim, including any Deductible, and the payment of any such amounts will be subject to the payment percentage that will be established by the Trustee in accordance with Section 2.3 of the Asbestos Personal Injury Trust Distribution Procedures.

2.    **Comprehensive Settlement of the Debtors' Primary Environmental Liabilities**

The Debtors have reached a comprehensive settlement of their primary environmental liabilities, and certain components of the comprehensive settlement remain subject to the

approval of the Bankruptcy Court.  In particular, the Bankruptcy Court has already approved the Debtors' settlements with (a) Armstrong [D.I. 1556], pursuant to which Armstrong will withdraw its proofs of Claim and pay $1 million to the Debtors, (b) Owens Corning [D.I. 1558], pursuant to which Owens Corning's proofs of Claim will be deemed withdrawn and Owens Corning will be deemed to waive and release any Claims against the Debtors related to the St. Helens site, (c) the DEQ [D.I. 1625], which is subject to the entry of a consent judgment in a form acceptable to the parties, and pursuant to which the Debtors agreed to liquidate and pay in full an allowed general unsecured Claim in amount of $67 million, (d) the City of Seattle [D.I. 1602], pursuant to which the City of Seattle will have an allowed general unsecured Claim in the amount of $80,951.87 against each of the Debtors, (e) the Port of Seattle [D.I. 1603], pursuant to which the Port of Seattle will have an allowed general unsecured Claim in the amount of $81,815.22 against each of the Debtors, (f) King County, Washington [D.I. 1604], pursuant to which King County, Washington will have an allowed general unsecured Claim in the amount of $85,255.87 against each of the Debtors and (g) The Boeing Company [D.I. 1601], pursuant to which The Boeing Company will have an allowed general unsecured Claim in the amount of $137,500.00 against each of the Debtors.

The Debtors have reached an agreement with the United States, on behalf of the EPA and the United States Department of Interior, acting through the U.S. Fish and Wildlife Service (the "DOI"), and the United States Department of Commerce, acting through the National Oceanic and Atmospheric Administration (the "NOAA"), to liquidate and pay in full the following general unsecured claims:  (a) Proof of Claim No. 10, EPA in the amount of $1,300,000 against Kaiser Gypsum; (b) Proof of Claim No. 11, EPA in the amount of $1,300,000 against HPCI; (c) Proof of Claim No. 9, NOAA in the amount of $200,000 against Kaiser Gypsum; (d) Proof of Claim No. 6, NOAA in the amount of $200,000 against HPCI; (e) Proof of Claim No. 7, DOI in the amount of $200,000 against Kaiser Gypsum; and (f) Proof of Claim No. 8, DOI in the amount of $200,000 against HPCI.  The Debtors' agreement with the United States also resolved the following claims filed by the Ash Grove Cement Co. on behalf of the United States:  (a) Proof of Claim No. 648, EPA in the amount of $325,000 against Kaiser Gypsum; (b) Proof of Claim No. 653, EPA in the amount of $325,000 against HPCI; (c) Proof of Claim No. 651, NOAA in the amount of $50,000 against Kaiser Gypsum; (d) Proof of Claim No. 650, NOAA in the amount of $50,000 against HPCI; (e) Proof of Claim No. 649, DOI in the amount of $50,000 against Kaiser Gypsum; and (f) Proof of Claim No. 652, DOI in the amount of $50,000 against HPCI.  The Debtors filed a motion to approve the settlement with the United States on June 12, 2019 [D.I. 1735].  On September 16, 2019, the Court entered an order [D.I. 1789] approving the settlement.

In connection with the settlements with the State of Oregon and the United States, the Debtors will receive contribution protection with respect to both sites, although for costs already incurred at the Lower Duwamish Superfund Site such protection will not apply to the claims of parties other than the United States, including The Boeing Company, the Port of Seattle, the City of Seattle and King County, Washington.

In addition, the Debtors have reached agreements with the following insurers to resolve the Debtors' claims for environmental insurance coverage against the insurers:  AIG Property Casualty, Westchester Fire Insurance Company, the solvent and represented certain London Market Insurers, Continental Insurance Company, Columbia Casualty Company, National Fire

Insurance Company of Hartford and Truck.  Pursuant to the agreements and agreements in principle, the insurers will pay a total of $50.1 million to the Debtors.

Each insurance settlement is contingent on the execution of a mutually acceptable settlement agreement, which will provide for the applicable insurer to buy back its environmental insurance policies pursuant to section 363 of the Bankruptcy Code.  The Debtors intend to file motions seeking Bankruptcy Court approval of the agreements pursuant to Bankruptcy Rule 9019 and schedule the motions for a hearing prior to or at the Confirmation Hearing.  Each motion will seek approval of an injunction pursuant to section 105 of the Bankruptcy Code enjoining parties from pursuing the applicable insurer based on claims against the purchased environmental insurance policies, and the injunctions will not apply to claims for coverage for asbestos bodily injury.  Additionally, these injunctions will be incorporated into the Plan and the Confirmation Order.

Finally, Lehigh Hanson has agreed to contribute up to $28.15 million to the Reorganized Debtors on the Effective Date, as necessary to satisfy Allowed General Unsecured Claims.

The Debtors believe that the agreements described in this Section IV.Q.2 ensure that the Reorganized Debtors will have sufficient cash to fund all payments to be made pursuant to the Plan.  In particular, the estimated aggregate Allowed amount of General Unsecured Claims is $72,055,928.  Pursuant to the settlements with insurers resolving the Debtors' claims for environmental insurance coverage, the insurers will pay a total of $50.1 million to the Debtors.  The Debtors believe that this amount, together with Lehigh Hanson's agreed contribution of up to $28.15 million, will be sufficient to satisfy the estimated aggregate Allowed amount of General Unsecured Claims.

### R.    Truck Coverage Defense Allegations

On a number of occasions, Truck has indicated that it believes that the Debtors' actions in pursuing the Plan could trigger a coverage defense under the insurance policies.  See D.I. 1302, 1415 and 1682.  On April 3, 2019, Truck's counsel sent to the Debtors' counsel a letter regarding "All Asbestos Bodily Injury Claims Against Kaiser Tendered to Truck Insurance Exchange for Defense and Indemnity" (the "Truck Letter") wherein Truck raised further concerns and issues related to allegations of coverage defenses.  In the Truck Letter, Truck has taken the following position:

> Truck has filed a plan of reorganization on Kaiser's behalf that is designed (1) to obtain the disclosures and authorizations necessary to prevent further fraudulent conduct by asbestos plaintiffs and their lawyers and (2) to implement claims resolution procedures that would facilitate settlements outside the tort system.  Kaiser has refused to support the Truck-filed plan, and has instead proposed a plan of reorganization that contains no fraud-protection measures and makes no attempt to settle any of the asbestos claims. Moreover, Kaiser has filed its plan pursuant to an agreement with representatives of the asbestos plaintiffs' lawyers that shields Kaiser and its related entities from any future fraudulent conduct

by those lawyers, but leaves Truck and other insurers completely exposed. That agreement and the resulting plan of reorganization appear to be collusive and in violation of Kaiser's duty to cooperate and assist. Should the Kaiser plan be confirmed without modifications necessary to comply with Kaiser's duty to cooperate and assist, Truck reserves its right to deny coverage.

Therefore, Truck's defense of Kaiser in all ABIC is subject to its reservation of rights in this letter.

On August 28, 2019, Truck commenced adversary case number 19-03052 in the Bankruptcy Court by filing a complaint requesting a declaratory judgment that the Debtors breached their Asbestos Insurer Cooperation Obligations and duties of good faith and fair dealing under the Asbestos Insurance Policies issued by Truck and, as a result, Truck is relieved of its coverage obligations with respect to Asbestos Personal Injury Claims (the "Truck Adversary"). On September 19, 2019, Truck filed a motion to withdraw the reference of the Truck Adversary to the District Court. On October 1, 2019, the District Court entered an order staying the Truck Adversary until the Bankruptcy Court ruled on the Plan. On October 9, 2019, Truck filed a motion for reconsideration of the stay order.

The Debtors believe that Truck's allegations, including those set forth in the Truck Letter and the Truck Adversary, are baseless. They are further evidence of Truck's intention to continue its misguided effort to hijack the plan process for its own benefit to the detriment of the Debtors, their Estates and creditors, and all parties in interest. The Debtors will seek an affirmative ruling by the Bankruptcy Court and/or the District Court that the objections and reservations advanced by Truck, including those set forth in the Truck Letter, are without merit, do not provide a basis for denying Confirmation of the Plan and do not trigger any coverage defense under the Truck Policies.

## V.    RISK FACTORS

Prior to voting on the Plan, holders of Asbestos Personal Injury Claims, as well as Entities in non-voting Classes, should consider carefully the risk factors described below, as well as all of the information contained in this Disclosure Statement, including the Exhibits hereto. These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and its implementation. See Section IX for a discussion of certain U.S. federal income Tax consequences of consummation of the Plan.

Truck believes that the Debtors have violated their Asbestos Insurer Cooperation Obligations and intends to vigorously contest the finding sought pursuant to Section VIII.A.3.u of the Plan. In this regard, Truck commenced the Truck Adversary. If such litigation is not resolved quickly, then the Debtors may be unable to timely satisfy their obligations under the DEQ Settlement, which would threaten the Debtors' ability to consummate the Plan. The Debtors also will be unable to consummate the Plan if a court determines that the Debtors have violated their Asbestos Insurer Cooperation Obligations. The Debtors, the Asbestos Personal Injury Committee, the Future Claimants' Representative and Lehigh Hanson submit that Truck's

position is without merit and  that the Bankruptcy Court and/or District Court, as applicable, will rule in the Debtors' favor and confirm the Plan.

### A.     Plan Confirmation

There is no guarantee that that the Plan will be confirmed.  If the Plan, or a substantially similar plan, is not confirmed, the Debtors will remain in chapter 11, the amount of the Debtors' present and future asbestos personal injury liabilities will be unresolved and the terms and timing of any plan of reorganization ultimately confirmed in the Reorganization Cases and the treatment of Claims and Interests will be unknown.

### B.     The Effective Date May Not Occur

The Plan provides that there are several conditions precedent to the occurrence of the Effective Date.  There is no guarantee as to the timing of the Effective Date.  Additionally, if the conditions precedent to the Effective Date are not satisfied or waived, the Bankruptcy Court may vacate the Confirmation Order.  In that event, the Plan would be deemed null and void and the Debtors or any other party may propose or solicit votes on an alternative plan of reorganization that may not be as favorable to parties in interest as the Plan.

## VI.     REORGANIZED DEBTORS

### A.     Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors

Except as otherwise provided herein (and subject to the Restructuring Transactions provisions of Section IV.B. of the Plan), each Debtor will, as a Reorganized Debtor, continue to exist after the Effective Date as a separate corporate or other legal Entity, with all the powers of a corporation or other legal Entity under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger, dissolution or otherwise) under applicable state law.  Except as otherwise provided herein (and subject to the Restructuring Transactions provisions of Section IV.B. of the Plan), as of the Effective Date, all property of the respective Estates of the Debtors, and any property acquired by a Debtor or Reorganized Debtor under the Plan, will vest in the applicable Reorganized Debtor, free and clear of all Claims, Encumbrances and Interests.  On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire and dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order.  Without limiting the foregoing, each Reorganized Debtor may pay the charges that it incurs on or after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including fees and expenses relating to the preparation of Professional fee applications) without application to the Bankruptcy Court.

### B.     Restructuring Transactions

On or after the Confirmation Date, the applicable Debtor or Reorganized Debtor may take such actions as the Debtors or Reorganized Debtors determine to be necessary or appropriate to effectuate, implement and consummate the Restructuring Transactions, including

without limitation the Restructuring Transactions set forth on Exhibit IV.B of the Plan; provided, however, that no Restructuring Transactions other than the Restructuring Transactions set forth on Exhibit IV.B of the Plan shall be implemented prior to the Effective Date without the written consent of the Asbestos Personal Injury Committee and the Future Claimants' Representative, which consent shall not be unreasonably withheld.  The actions to effectuate, implement and consummate the Restructuring Transactions may include: (1) the execution and delivery of appropriate agreements or other documents that carry out the provisions of the Plan and that satisfy the applicable requirements of applicable state law; and (2) the filing of appropriate instruments pursuant to applicable state law.

### C.      Business of the Reorganized Debtors: Transfers and Lease Transactions

On or after the Confirmation Date, non-debtor Lehigh Cement Company LLC will transfer its interest in certain real property located in Kosse, Limestone County, Texas and Kunkletown, Monroe County, Pennsylvania (together, the "Real Properties"), together with its rights under certain leases related to the Real Properties, to Kaiser Gypsum.  The actions to effectuate, implement and consummate these transactions may include:  (a) the execution and delivery of appropriate agreements or other documents containing terms that are consistent with the provisions of the Plan and that satisfy the applicable requirements of applicable state law; and (b) the filing of appropriate instruments pursuant to applicable state law.

The leases related to the Real Properties are expected to generate net cash flows for Kaiser Gypsum in excess of $90,000 per year, as demonstrated in the Projections.  HPCI will continue to own its non-Debtor operating subsidiaries (Hanson Micronesia Cement, Inc. and Hanson Permanente Cement of Guam, Inc.), and the Permanente Property.  As set forth in the Projections, net cash flows of HPCI will be in excess of $2.6 million per year.

### D.      Corporate Governance, Directors and Officers, Employment-Related Agreements and Compensation Programs and Corporate Action

#### 1.      Certificates of Incorporation and By-Laws of the Reorganized Debtors

As of the Effective Date, the Certificate of Incorporation and the By-Laws of each Reorganized Debtor will be in such form as the Debtors may determine.  The initial Certificate of Incorporation and By-Laws of each Reorganized Debtor, among other things, shall prohibit the issuance of nonvoting equity securities to the extent required by section 1123(a) of the Bankruptcy Code.  After the Effective Date, each such Entity shall be permitted to amend and restate its Certificate of Incorporation or By-Laws pursuant to applicable state law and the terms and conditions of such constituent documents.

#### 2.      Directors and Officers of the Reorganized Debtors

Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, the initial directors and officers of each Reorganized Debtor shall be the directors and officers of such Debtor immediately prior to the Effective Date.  Each such director and officer shall serve from and after the Effective Date until his or her successor is duly elected or appointed and qualified or until his or her earlier death, resignation, or removal in accordance

with the terms of the Certificate of Incorporation and By-Laws of the relevant Reorganized Debtor (as the same may be amended after the Effective Date) and applicable state law.

### 3.    Employee Arrangements of the Reorganized Debtors

As of the Effective Date, the Reorganized Debtors shall be authorized to:  (a) maintain, amend or revise existing employment, indemnification and other arrangements with their active and retired directors, officers and employees, subject to the terms and conditions of any such agreement; and (b) enter into new employment, indemnification and other arrangements with active and retired directors, officers and employees; all as determined by the board of directors of the applicable Reorganized Debtor.

### 4.    Corporate Action

Pursuant to section 1142 of the Bankruptcy Code, section 10-1008 of the Arizona Revised Statutes and section 55-14A-01 of the North Carolina Business Corporation Act, the following (which shall occur and be deemed effective as of the date specified in the documents effectuating the same or, if no date is so specified, the Effective Date) shall be authorized and approved in all respects and for all purposes without any requirement of further action by stockholders or directors of any of the Debtors or the Reorganized Debtors or by any other Entity:  (a) the initial Certificates of Incorporation and By-Laws of the Reorganized Debtors; (b) the initial directors and officers of the Reorganized Debtors; (c) the Distribution of cash pursuant to the Plan; (d) the creation of the Asbestos Personal Injury Trust, and the funding thereof; (e) other corporate actions that are necessary or appropriate to effectuate, implement and consummate the provisions of the Plan, including the Restructuring Transactions provisions of Section IV.B. of the Plan; and (f) the adoption, execution, delivery and performance of all contracts, instruments, releases and other agreements and documents related to any of the foregoing (including the Asbestos Personal Injury Trust Agreement and the Payment Note).

### E.    Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes

Each officer of each Debtor and Reorganized Debtor shall be authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements and documents and take such actions as may be necessary or appropriate to effect and implement the provisions of the Plan, including the Restructuring Transactions provisions of Section IV.B of the Plan.  The secretary or any assistant secretary of each Debtor or Reorganized Debtor shall be authorized to certify or attest to any of the foregoing actions.  Pursuant to section 1146(a) of the Bankruptcy Code, the following shall not be subject to any stamp Tax or similar Tax:  (a) the creation of any Encumbrances; (b) the making or assignment of any lease or sublease; (c) the execution and implementation of the Asbestos Personal Injury Trust Agreement, including the creation of the Asbestos Personal Injury Trust and any transfers to or by the Asbestos Personal Injury Trust; (d) any Restructuring Transaction; or (e) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including any merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale or assignments, applications, certificates or statements executed or filed in connection with any of the foregoing or pursuant to the Plan.

### F.     Determination of the Insolvent Insurers Proceeds Dispute

The Bankruptcy Court shall determine the Insolvent Insurers Proceeds Dispute unless it is resolved by agreement among the Debtors, the Asbestos Personal Injury Committee, the Future Claimants' Representative, ICSOP, First State, Associated International Insurance Company, and, if prior to the Effective Date, the Creditors' Committee.  The Confirmation Order shall establish a schedule, acceptable to the Debtors, the Asbestos Personal Injury Committee, the Future Claimants' Representative, ISCOP, First State, Associated International Insurance Company, and, if prior to the Effective Date, the Creditors' Committee, for the litigation of the Insolvent Insurers Proceeds Dispute in the Bankruptcy Court.

### G.     Compliance with QSF Regulations

The Debtors and the Reorganized Debtors shall take all actions required of them as "transferor," and the Asbestos Personal Injury Trustees shall take all actions required of them as "administrator," pursuant to Treasury Regulations promulgated under section 468B of the IRC. Pursuant to such Treasury Regulations, the Asbestos Personal Injury Trustees as "administrator" shall be responsible for all tax reporting and withholding requirements in respect of distributions made from the Asbestos Personal Injury Trust.

### H.     Surety Bond Obligations

Notwithstanding any other provisions of the Plan, on the Effective Date, all rights of any party related to the Surety Bond Program shall not be altered by the Plan.  The applicable Reorganized Debtor hereby reaffirms and ratifies the Surety Bond Obligations arising under the Surety Bond Program, which shall continue to be in full force and effect, and the Surety Bond Obligations are not discharged or released by the Plan in any way.  On the Effective Date, all liens and security interests, if any, granted pursuant to or in connection with the Surety Bond Program shall have the priorities established in respect thereof under applicable non-bankruptcy law, and shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination pursuant to the Plan or the Confirmation Order.  The Surety Bond Program and all Surety Bond Obligations shall be treated by the Reorganized Debtors in the ordinary course of business as if the Reorganization Cases had not been commenced.  For the avoidance of any doubt, and with a reservation of rights to all parties, any agreements related to the Surety Bond Program to which a Debtor is party will vest in the applicable Reorganized Debtor, and to the extent such agreements are considered to be executory contracts, then, notwithstanding anything contained in Article V of the Plan to the contrary, the Plan will constitute a motion to assume such agreements, and, subject to the occurrence of the Effective Date, the entry of the Confirmation Order shall constitute approval of such assumption pursuant to section 365(a) of the Bankruptcy Code.  Nothing in the Plan shall affect in any way any surety's rights against any non-debtor, or any non-debtor's rights against a surety, including under the Surety Bond Program or with regard to the Surety Bond Obligations.

## VII.    DISTRIBUTIONS UNDER THE PLAN

### A.    Unclassified Claims

#### 1.    Payment of Administrative Claims

##### a.    Administrative Claims in General

Except as specified in Section III.A.1. of the Plan, and subject to the bar date provisions in the Plan, unless otherwise agreed by the holder of an Administrative Claim and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Administrative Claim shall receive, in full satisfaction of its Administrative Claim, cash equal to the allowed amount of such Administrative Claim either (i) as soon as practicable after the Effective Date or (ii) if the Administrative Claim is not allowed as of the Effective Date, thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order or a Stipulation of Amount and Nature of Claim is executed by the applicable Reorganized Debtor and the holder of the Administrative Claim.

##### b.    Statutory Fees

On or before the Effective Date, Administrative Claims for fees payable pursuant to 28 U.S.C. § 1930, as determined at the Confirmation Hearing by the Bankruptcy Court or the District Court, as applicable, shall be paid in cash equal to the amount of such Administrative Claims.  All fees payable pursuant to 28 U.S.C. § 1930 shall be paid by the Reorganized Debtors in accordance therewith until the closing of the Reorganization Cases pursuant to section 350(a) of the Bankruptcy Code.

##### c.    Ordinary Course Liabilities

Allowed Administrative Claims based on liabilities incurred by a Debtor in the ordinary course of its business (including any Intercompany Claims that are Administrative Claims, Administrative Claims of governmental units for Taxes and Administrative Claims arising from those contracts and leases of the kind described in Section V.E. of the Plan) shall be satisfied by the applicable Reorganized Debtor pursuant to the terms and conditions of the particular transaction giving rise to such Administrative Claims, without any further action by the holders of such Administrative Claims or further approval of the Bankruptcy Court.

##### d.    Bar Dates for Administrative Claims

###### (1)    General Bar Date Provisions

Except as otherwise provided in Section III.A.1.d.ii. of the Plan, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Reorganized Debtors, pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order, no later than sixty (60) days after the Effective Date.  Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request by the applicable Bar Date shall be forever barred from asserting such Administrative Claims against the Debtors, the

Reorganized Debtors or their respective property and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests must be Filed and served on the requesting party no later than 120 days after the Effective Date.

### (2)     Bar Dates for Certain Administrative Claims

#### (a)     Professional Compensation

Professionals or other Entities asserting a Fee Claim for services rendered before the Effective Date must File and serve on the Reorganized Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, the Fee Order or other order of the Bankruptcy Court a Final Fee Application no later than ninety (90) days after the Effective Date. A Professional may include any outstanding, non-Filed monthly or interim request for payment of a Fee Claim pursuant to the Fee Order in its Final Fee Application. Objections to any Final Fee Application must be Filed and served on the Reorganized Debtors and the requesting party by the later of (1) eight (80) days after the Effective Date or (2) thirty (30) days after the Filing of the applicable Final Fee Application. To the extent necessary, the Confirmation Order shall amend and supersede any previously entered order of the Bankruptcy Court, including the Fee Order, regarding the payment of Fee Claims. Any pending, Filed interim requests for a Fee Claim pursuant to the Fee Order shall be resolved in the ordinary course in accordance with the Fee Order or, if sooner, in connection with the particular Professional's Final Fee Application.

#### (b)     Ordinary Course Liabilities

Holders of Administrative Claims based on liabilities incurred by a Debtor in the ordinary course of its business, including any Intercompany Claims that are Administrative Claims, Administrative Claims of governmental units for Taxes and Administrative Claims arising from those contracts and leases of the kind described in Section V.E. of the Plan, shall not be required to File or serve any request for payment of such Administrative Claims. Such Administrative Claims shall be satisfied pursuant to Section III.A.1.c. of the Plan.

### 2.     Payment of Priority Tax Claims

#### a.     Priority Tax Claims in General

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the holder of a Priority Tax Claim and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Priority Tax Claim shall receive, in full satisfaction of its Priority Tax Claim, payment in full of the allowed amount of the Priority Tax Claim on the later of the Effective Date or as soon as practicable after the date when such Claim becomes an Allowed Claim.

#### b.     Other Provisions Concerning Treatment of Priority Tax Claims

Notwithstanding the provisions of Section III.A.2.a. of the Plan, any Claim on account of any penalty arising with respect to or in connection with an Allowed Priority Tax Claim that does not compensate the holder for actual pecuniary loss shall be treated as a Class 3 Claim, and

the holder (other than as the holder of a Class 3 Claim) may not assess or attempt to collect such penalty from the Reorganized Debtors or their respective property.

### B.       Obtaining Cash for Plan Distributions

All cash payments to be made pursuant to the Plan shall be funded by the applicable Reorganized Debtor.  All cash necessary for a Reorganized Debtor to fund such cash payments pursuant to the Plan shall be obtained through a combination of one or more of the following: (1) such Reorganized Debtor's cash balances and cash generated by the operations of such Reorganized Debtor; (2) any Tax refunds actually received by such Reorganized Debtor; (3) contributions to or on behalf of such Reorganized Debtor by Lehigh Hanson, including pursuant to Section IV.E of the Plan; (4) proceeds of certain of the Debtors' insurance policies or (5) such other means of financing or funding as determined by the board of directors of such Reorganized Debtor.

On the Effective Date, Lehigh Hanson shall contribute to the Reorganized Debtors, as necessary to satisfy Allowed General Unsecured Claims, up to $28.15 million in cash minus the amount of the Insolvent Insurers Proceeds to which the Debtors are determined to be entitled.

### C.       Distributions for Claims Allowed as of the Effective Date

Except as otherwise provided in the Plan, Distributions to be made on the Effective Date to holders of Claims that are Allowed Claims as of the Effective Date shall be deemed made on the Effective Date if made on the Effective Date or as promptly thereafter as practicable, but in any event no later than:  (1) sixty (60) days after the Effective Date or (2) such later date when the applicable conditions of Section V.B. of the Plan (regarding cure payments for Executory Contracts and Unexpired Leases being assumed), Section VI.D.2. of the Plan (regarding undeliverable Distributions) or Section VI.G.3. of the Plan (regarding compliance with Tax requirements) are satisfied.  Distributions on account of Claims that become Allowed Claims after the Effective Date shall be made pursuant to Section VI.G.2. of the Plan.  Any Claim that is disallowed by order of the Bankruptcy Court (or the District Court) prior to the Effective Date shall be deemed expunged (to the extent not already expunged) as of the Effective Date without the necessity for further Bankruptcy Court approval and the holder of any such Claim shall not be entitled to any Distribution under the Plan.

### D.       Method of Distributions to Holders of Claims

The Reorganized Debtors or Third Party Disbursing Agents as the Reorganized Debtors may employ in their sole discretion shall make all Distributions of cash and other instruments or documents required under the Plan.  Each Disbursing Agent shall serve without bond, and any Disbursing Agent may employ or contract with other Entities to assist in or make the Distributions required by the Plan.

### E.       Compensation and Reimbursement for Services Related to Distributions

Each Third Party Disbursing Agent providing services related to Distributions pursuant to the Plan shall receive from the Reorganized Debtors, without further Bankruptcy Court approval, reasonable compensation for such services and reimbursement of reasonable out-of-pocket

expenses incurred in connection with such services.  These payments shall be made on terms agreed to with the Reorganized Debtors and shall not be deducted from Distributions to be made pursuant to the Plan to holders of Allowed Claims receiving Distributions.

### F.    Delivery of Distributions and Undeliverable or Unclaimed Distributions

### 1.    Delivery of Distributions

Distributions to holders of Allowed Claims (other than Asbestos Personal Injury Claims) shall be made by a Disbursing Agent (a) at the addresses set forth on the respective proofs of Claim Filed by holders of such Claims; (b) at the addresses set forth in any written certification of address change delivered to the Disbursing Agent (including pursuant to a letter of transmittal delivered to a Disbursing Agent) after the date of Filing of any related proof of Claim; or (c) at the addresses reflected in the applicable Debtor's Schedules if no proof of Claim has been Filed and the Disbursing Agent has not received a written notice of a change of address.

### 2.    Undeliverable Distributions Held by Disbursing Agents

### a.    Holding and Investment of Undeliverable Distributions

If any Distribution to a holder of an Allowed Claim is returned to a Disbursing Agent as undeliverable, no further Distributions shall be made to such holder unless and until the applicable Disbursing Agent is notified by written certification of such holder's then-current address.  Undeliverable Distributions shall remain in the possession of the applicable Disbursing Agent pursuant to Section VI.D.2.a. of the Plan until such time as a Distribution becomes deliverable.  Undeliverable cash shall be held in segregated bank accounts in the name of the applicable Disbursing Agent for the benefit of the potential claimants of such funds.  Any Disbursing Agent holding undeliverable cash shall invest such cash in a manner consistent with the Reorganized Debtors' investment and deposit guidelines.

### b.    After Distributions Become Deliverable

On each Quarterly Distribution Date, the applicable Disbursing Agent shall make all Distributions that become deliverable to holders of Allowed Claims (other than Asbestos Personal Injury Claims) during the preceding calendar quarter, to the extent not distributed earlier at the discretion of the applicable Disbursing Agent.

### c.    Failure to Claim Undeliverable Distributions

Any holder of an Allowed Claim that does not assert a claim pursuant to the Plan for an undeliverable Distribution to be made by a Disbursing Agent within one year after the later of (i) the Effective Date and (ii) the last date on which a Distribution was attempted to be made to such holder shall have its claim for such undeliverable Distribution discharged and shall be forever barred from asserting any such claim against the Reorganized Debtors or their respective property.  Unclaimed Distributions shall become property of the respective Reorganized Debtor, free of any restrictions thereon, including the right of any state or other government to escheat such property, and any such Distributions held by a Third Party Disbursing Agent shall be returned to the applicable Reorganized Debtor.  Nothing contained in the Plan shall require any

Debtor, Reorganized Debtor or Disbursing Agent to attempt to locate any holder of an Allowed Claim.

### G.     Distribution Record Date

#### 1.     No Recognition of Transfers after the Distribution Record Date

A Disbursing Agent shall have no obligation to recognize the transfer or sale of any interest or participation in, any Claim that occurs after the close of business on the Distribution Record Date and shall be entitled for all purposes herein to recognize and make Distributions only to those holders of Allowed Claims that are holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date.

#### 2.     Treatment of Certain Transfers

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Distribution Record Date shall be treated as the holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date.

### H.     Means of Cash Payments

Except as otherwise specified herein, cash payments made pursuant to the Plan to holders of Claims shall be in United States currency by checks drawn on a domestic bank selected by the Reorganized Debtors or Lehigh Hanson, as applicable, or, at the option of the Reorganized Debtors or Lehigh Hanson, as applicable, by wire transfer from a domestic bank; provided, however, that cash payments to foreign holders of Allowed Claims may be made, at the option of the Reorganized Debtors or Lehigh Hanson, as applicable, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

### I.     Timing and Calculation of Amounts to Be Distributed

#### 1.     Timing of Distributions Under the Plan

Any Distribution to be made by any Debtor or Reorganized Debtor pursuant to the Plan shall be deemed to have been timely made if made within sixty (60) days after the time therefor specified in the Plan. Except as otherwise provided in the Plan, no interest shall accrue or be paid with respect to any Distribution as a consequence of such Distribution not having been made on the Effective Date. However, and for the avoidance of doubt, the funding of the Asbestos Personal Injury Trust pursuant to Section IV.K.2. of the Plan shall occur on the Effective Date.

#### 2.     Allowed Claims

On the Effective Date, each holder of an Allowed Claim (other than an Asbestos Personal Injury Claim) shall receive the full amount of the Distributions that the Plan provides for Allowed Claims in the applicable Class. On each Quarterly Distribution Date, Distributions also

shall be made pursuant to Section VII.C. of the Plan to holders of Disputed Claims in any such Class that were allowed during the preceding calendar quarter, to the extent not distributed earlier at the discretion of the applicable Disbursing Agent.  Such quarterly Distributions also shall be in the full amount that the Plan provides for Allowed Claims in the applicable Class.

### 3.     Compliance with Tax Requirements

#### a.     Withholding and Reporting

In connection with the Plan, to the extent applicable, each Disbursing Agent shall comply with all Tax withholding and reporting requirements imposed on it by any governmental unit, and all Distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision of the Plan to the contrary, each Disbursing Agent shall be authorized to take any actions that may be necessary or appropriate to comply with such withholding and reporting requirements, including applying a portion of any cash Distribution to be made under the Plan to pay applicable Tax withholding, requiring Claim holders to submit appropriate certifications or establishing other mechanisms such Disbursing Agent believes are reasonable and appropriate.  To the extent that any Claim holder fails to submit appropriate certifications required by a Disbursing Agent or to comply with any other mechanism established by a Disbursing Agent to comply with Tax withholding requirements, such Claim holder's Distribution may, in such Disbursing Agent's reasonable discretion, be deemed undeliverable and subject to Section VI.D.2. of the Plan.

#### b.     Backup Withholding

Without limiting the generality of the foregoing, in accordance with the Internal Revenue Code's backup withholding rules, a holder of a Claim may be subject to backup withholding with respect to Distributions made pursuant to the Plan, unless the holder (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (ii) provides at the applicable Disbursing Agent's request a completed IRS Form W-9 (or substitute therefor) on which the holder includes a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income.  Among other things, to receive any post-petition interest, if requested by a Disbursing Agent, a holder of an Allowed Claim shall be required to establish an exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.  Non-U.S. Allowed Claim holders may be required by the applicable Disbursing Agent to provide a completed IRS Form W-8BEN or W-8BEN-E, as applicable (or other applicable Form W-8 or successor form), to establish an exemption from or a treaty-reduced rate of withholding on interest distributed pursuant to the Plan.  Unless a Disbursing Agent, in its discretion, determines otherwise, no Distributions on account of post-petition interest shall be made to a holder of an Allowed Claim until such time as the holder of such Claim establishes exemption from withholding or provides the applicable IRS Form.

### c. Obligations of Distribution Recipients

Notwithstanding any other provision of the Plan, each Entity receiving a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any Tax obligations imposed on it by any governmental unit on account of such Distribution, including income, withholding and other Tax obligations.

### J. Setoffs

Except with respect to claims of a Debtor or Reorganized Debtor released pursuant to the Plan or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Reorganized Debtors or, as instructed by the applicable Reorganized Debtor, a Third Party Disbursing Agent may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the Distributions to be made pursuant to the Plan on account of such Claim (before any Distribution is made on account of such Claim) the claims, rights and causes of action of any nature that the applicable Debtor or Reorganized Debtor may hold against the holder of such Allowed Claim; provided, however, that neither the failure to effect a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the applicable Debtor or Reorganized Debtor of any claim, right or cause of action that the Debtor or Reorganized Debtor may possess against such a Claim holder.

### K. Allocation of Payments

Amounts paid to holders of Claims in satisfaction thereof shall be allocated first to the principal amounts of such Claims, with any excess being allocated to accrued but unpaid interest on such Claims.

### L. Prosecution of Objections to Claims

### 1. Objections to Claims

Objections to Claims (other than Asbestos Personal Injury Claims) must be Filed and served on the holders of such Claims by the Claims Objection Bar Date, and, if Filed prior to the Effective Date, such objections shall be served on the parties on the then-applicable service list in the Reorganization Cases. If an objection has not been Filed to a proof of Claim or an amendment has not been made to the Schedules with respect to a scheduled Claim by the Claims Objection Bar Date, the Claim to which the proof of Claim or Schedules relates shall be treated as an Allowed Claim if such Claim has not been earlier allowed.

### 2. Authority to Prosecute Objections

After the Effective Date, the Reorganized Debtors shall have the authority to File (if applicable), settle, compromise, withdraw or litigate to judgment objections to all Claims (other than Asbestos Personal Injury Claims), including pursuant to any alternative dispute resolution or similar procedures approved by the Bankruptcy Court. After the Effective Date, the Reorganized Debtors may settle, compromise or otherwise resolve any Disputed Claim or any objection or controversy relating to any Claim without approval of the Bankruptcy Court.

### 3. Authority to Amend Schedules

The Debtors or the Reorganized Debtors shall have the authority to amend the Schedules with respect to any Claim (other than Asbestos Personal Injury Claims) and to make Distributions based on such amended Schedules without approval of the Bankruptcy Court. If any such amendment to the Schedules reduces the amount of or changes the nature or priority of such Claim, the Debtor or Reorganized Debtor shall provide the holder of such Claim with notice of such amendment and such holder shall have twenty (20) days to File an objection to such amendment with the Bankruptcy Court. If no such objection is Filed, the Debtor or Reorganized Debtor may proceed with Distributions based on such amended Schedules without approval of the Bankruptcy Court.

### M. Treatment of Disputed Claims

Notwithstanding any other provisions of the Plan, no payments or Distributions shall be made on account of a Disputed Claim until such Claim becomes an Allowed Claim.

### N. Distributions on Account of Disputed Claims Once Allowed

On each Quarterly Distribution Date, the applicable Disbursing Agent shall make all Distributions on account of any Disputed Claim that has become an Allowed Claim during the preceding calendar quarter, to the extent not distributed earlier at the discretion of the applicable Disbursing Agent. Such Distributions shall be made pursuant to the provisions of the Plan governing the applicable Class.

### O. Preservation of Rights of Action; Settlement of Claims and Releases

### 1. Preservation of Rights of Action by the Reorganized Debtors

Except as provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code and to the fullest extent possible under applicable law, the Reorganized Debtors shall retain and may enforce, and shall have the right to enforce, any claims, demands, rights and causes of action that any Debtor or Estate may hold against any Entity, including any Recovery Actions. The Reorganized Debtors or their successors or assignees may pursue such retained claims, demands, rights or causes of action, as appropriate, in accordance with the best interests of the Reorganized Debtors or their successors or assignees holding such claims, demands, rights or causes of action. Further, the Reorganized Debtors retain their right to File and pursue, and shall have the sole right to File and pursue, any adversary proceedings against any trade creditor or vendor related to debit balances or deposits owed to any Debtor.

### 2. Settlement of Certain Estate Claims

a. Pursuant to Bankruptcy Rule 9019 and in consideration for the Distributions and other benefits provided under the Plan, any and all claims against the Protected Parties that are or would have been property of the Debtors' Estates or could have been brought by the Debtors' Estates, including without limitation Recovery Actions and any claims based upon a legal or equitable theory of liability in the nature of veil

piercing, alter ego, successor liability, vicarious liability, fraudulent transfer, malpractice, breach of fiduciary duty, waste, fraud or conspiracy, except for Intercompany Claims, shall be deemed settled, released and extinguished.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims and the Bankruptcy Court's finding that such compromise or settlement is in the best interest of the Debtors, Reorganized Debtors and their respective Claim and Interest holders and is fair, equitable and reasonable.

b.      Pursuant to Bankruptcy Rule 9019 and in consideration for the releases and other benefits provided under the Plan, any and all claims against the holders of Asbestos Personal Injury Claims who received payments in respect of their claims from the Debtors, Lehigh Hanson, or any predecessor or Affiliate of the Debtors or Lehigh Hanson prior to Petition Date, and their professionals (but only with respect to their representation of or work for such holders in connection with such payments), that are or would have been property of any of the Debtors' Estates or could have been brought by any of the Debtors' Estates or any Protected Party, including without limitation Recovery Actions, and any claims based upon a legal or equitable theory of liability, in each case arising out of, based upon or resulting from payments to holders of Asbestos Personal Injury Claims from the Debtors, Lehigh Hanson or any predecessor or Affiliate of the Debtors or Lehigh Hanson prior to Petition Date, shall be deemed settled, released and extinguished.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims and the Bankruptcy Court's finding that such compromise or settlement is in the best interest of the Debtors, the Reorganized Debtors and their respective Claim and Interest holders and is fair, equitable and reasonable.

3.      **Releases**

a.      **General Releases of Debtors and Reorganized Debtors**

**Except as otherwise expressly set forth in the Plan, and except to the extent it would diminish, reduce or eliminate the duties or obligations of any Asbestos Insurer under any Asbestos Personal Injury Insurance Asset, as of the Effective Date, the Debtors and the Reorganized Debtors are released from all claims, commitments, obligations, suits, judgments, damages, demands, debts, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, arising out of, based upon or resulting from, directly or indirectly, in whole or in part, any act, omission, transaction or other occurrence taking place on or prior to the Effective Date.**

b.      **Release by the Debtors, Reorganized Debtors and Lehigh Hanson**

**1.      Without limiting any other provision of the Plan, as of the Effective Date, the Debtors and the Reorganized Debtors, on behalf of themselves and their respective affiliates, Estates and successors and assigns, and any and all Entities who may purport to**

claim by, through, for or because of them, shall be deemed to forever release, waive and discharge all claims, commitments, obligations, suits, judgments, damages, demands, debts, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, against each of the present and former directors, officers, employees, attorneys, accountants, investment bankers, financial advisors, appraisers, representatives and agents of the Debtors, the DIP Lender and DEQ, in each case acting in such capacity, arising out of, based upon or resulting from, directly or indirectly, in whole or in part, any act, omission, transaction or other occurrence taking place on or prior to the Effective Date with respect to the Reorganization Cases, the Plan or the DEQ Settlement, except for the liability of any Entity that would otherwise result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct.

2.      Without limiting any other provision of the Plan, as of the Effective Date, the Debtors, the Reorganized Debtors and Lehigh Hanson, on behalf of themselves and their respective affiliates, Estates and successors and assigns, and any and all Entities who may purport to claim by, through, for or because of them, shall be deemed to forever release, waive and discharge all claims, commitments, obligations, suits, judgments, damages, demands, debts, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, against holders of Asbestos Personal Injury Claims who received payments in respect of their claims from the Debtors, Lehigh Hanson, or any predecessor or affiliate of the Debtors or Lehigh Hanson prior to Petition Date, and their professionals (but only with respect to their representation of or work for such holders in connection with such payments), including without limitation Recovery Actions, in each case arising out of, based upon or resulting from payments to holders of Asbestos Personal Injury Claims from the Debtors, Lehigh Hanson or any predecessor or affiliate of the Debtors or Lehigh Hanson prior to Petition Date.

c.      General Releases by Holders of Claims or Interests

Without limiting any other provision of the Plan or the Bankruptcy Code, as of the Effective Date, in consideration for, among other things, the obligations of the Debtors and the Reorganized Debtors under the Plan, each holder of a Claim or Interest that votes in favor of the Plan or is deemed to accept the Plan shall be deemed to forever release, waive and discharge all claims, commitments, obligations, suits, judgments, damages, demands, debts, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, against any of the Parties or any Reorganized Debtor, or any of their respective present or former directors, officers, employees, members, subsidiaries, predecessors, successors, attorneys, accountants, investment bankers, financial advisors, appraisers, representatives and agents, or the DIP Lender, in each case acting in such capacity, arising out of, based upon or resulting from, directly or indirectly, in whole or in part, any act, omission, transaction

**or other occurrence taking place on or prior to the Effective Date and in any way relating to the Reorganization Cases or the Plan (which release shall be in addition to the discharge of Claims provided herein and under the Confirmation Order and the Bankruptcy Code). Notwithstanding the foregoing, no release or discharge of any of the Parties or any Reorganized Debtor, or any of their respective present or former directors, officers, employees, members, subsidiaries, predecessors, successors, attorneys, accountants, investment bankers, financial advisors, appraisers, representatives and agents, or the DIP Lender, in each case acting in such capacity, shall diminish, reduce or eliminate the duties or obligations of any Asbestos Insurer under any Asbestos Personal Injury Insurance Asset.**

### d.    Injunction Related to Releases

**Except as otherwise expressly provided in the Plan, including in Section IV.O.1. of the Plan, the Confirmation Order shall permanently enjoin the commencement or prosecution by any Entity, whether directly, derivatively or otherwise, of any claims, commitments, obligations, suits, judgments, damages, demands, debts, causes of action and liabilities released pursuant to the Plan.**

### P.    Release of Encumbrances

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable Distributions made pursuant to Article VI of the Plan, all Encumbrances against the property of any Estate shall be fully released and discharged, and all of the right, title and interest of any holder of such Encumbrances, including any rights to any collateral thereunder, shall revert to the applicable Reorganized Debtor and its successors and assigns.

### Q.    Discharge, Injunction and Subordination Rights

### 1.    Discharge of Claims

Except as provided in the Plan or in the Confirmation Order, the rights afforded under the Plan and the treatment of Claims and Interests under the Plan shall be in exchange for and in complete satisfaction and discharge of all Claims, and including any interest accrued on Claims from the Petition Date.  Except as provided in the Plan or in the Confirmation Order, Confirmation shall, as of the Effective Date, discharge the Debtors from all Claims or other liabilities that arose on or before the Effective Date and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a proof of Claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (b) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code or (c) the holder of a Claim based on such debt has accepted the Plan.

In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination, as of the Effective Date, of a discharge of all Claims and other debts and liabilities against the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained

against a Debtor at any time, to the extent that such judgment relates to a discharged Claim, debt or liability.  Nothing contained in the foregoing discharge shall, to the full extent provided under section 524(e) of the Bankruptcy Code, affect the liability of any other Entity on, or the property of any other Entity for, any debt of the Debtors that is discharged under this Plan.

Notwithstanding any provision of the Plan to the contrary, Confirmation shall not discharge the Debtors from any debt of a kind specified in 11 U.S.C. § 1141(d)(6).

### 2.    Injunctions

#### a.    General Injunctions

##### (1)    No Actions on Account of Discharged Claims

Except as provided in the Plan, including in Section IV.O.1. of the Plan, or the Confirmation Order, as of the Effective Date, all Entities that have held, currently hold or may hold a Claim or other debt or liability that is discharged pursuant to the terms of the Plan shall be permanently enjoined from taking any of the following actions on account of any such discharged Claim, debt or liability:  (a) commencing or continuing in any manner any action or other proceeding against any Debtor or Reorganized Debtor, or any of its property, other than to enforce any right to a Distribution pursuant to the Plan; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against any Debtor or Reorganized Debtor, or any of its property, other than as permitted pursuant to (a) above; (c) creating, perfecting or enforcing any lien or encumbrance against any Debtor or Reorganized Debtor, or any of its property; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to any Debtor or Reorganized Debtor; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

##### (2)    No Actions on Account of Released Claims

Except as provided in the Plan, including in Section IV.O.1. of the Plan, or the Confirmation Order, as of the Effective Date, all Entities that have held, currently hold or may hold any claims, commitments, obligations, suits, judgments, damages, demands, debts, causes of action or liabilities that are released pursuant to the Plan shall be permanently enjoined from taking any of the following actions against any released Entity, or any of its property, on account of such released claims, commitments, obligations, suits, judgments, damages, demands, debts, causes of action or liabilities:  (a) commencing or continuing in any manner any action or other proceeding; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (c) creating, perfecting or enforcing any Encumbrance; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to any released Entity; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

### (3)     Recipients of Distribution Deemed to Consent

By accepting Distributions pursuant to the Plan, each holder of an Allowed Claim receiving Distributions pursuant to the Plan shall be deemed to have specifically consented to the injunctions set forth in Section IX.B. of the Plan.

### b.     Asbestos Permanent Channeling Injunction

**Pursuant to section 524(g) of the Bankruptcy Code, and except as otherwise provided in the Plan, including Section IV.O.1. of the Plan, the Plan and the Confirmation Order shall permanently and forever stay, restrain and enjoin any Entity from taking any actions against any Protected Party for the purpose of, directly or indirectly, collecting, recovering or receiving payment of, on or with respect to any Asbestos Personal Injury Claim, all of which shall be channeled to the Asbestos Personal Injury Trust for resolution as set forth in the Asbestos Personal Injury Trust Agreement and the related Asbestos Personal Injury Trust Distribution Procedures, including permanently and forever staying, restraining and enjoining any Entity from any of the following:**

**1.     commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including a judicial, arbitral, administrative or other proceeding) in any forum against any Protected Party or any property or interests in property of any Protected Party;**

**2.     enforcing, levying, attaching (including any prejudgment attachment), collecting or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree or other order against any Protected Party or any property or interests in property of any Protected Party;**

**3.     creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against any Protected Party or any property or interests in property of any Protected Party;**

**4.     setting off, seeking reimbursement of, contribution from or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Protected Party or any property or interests in property of any Protected Party; and**

**5.     proceeding in any manner in any place with regard to any matter that is subject to resolution pursuant to the Asbestos Personal Injury Trust Documents, except in compliance therewith.**

**For the avoidance of doubt, the Asbestos Permanent Channeling Injunction shall not affect any claims or causes of action under Sections IV.L.1. and IV.L.2. of the Plan.**

### c.     Environmental Injunction

**In consideration of the undertakings of the Settled Environmental Insurers, and other consideration, and pursuant to their respective settlements with the Debtors and to**

preserve and promote further the agreements between and among the Debtors and any Settled Environmental Insurers, and pursuant to section 105 of the Bankruptcy Code:

1.      any and all Environmental Claims shall be treated, administered, determined and resolved under the procedures and protocols under the Plan as the sole and exclusive remedy with respect to Environmental Claims; and

2.      all Entities are hereby permanently stayed, enjoined, barred and restrained from doing any of the following against the Settled Environmental Insurers:

a.      commencing or continuing in any manner any action or other proceeding of any kind with respect to any Environmental Claim against any of the Settled Environmental Insurers or against the property of any of Settled Environmental Insurers;

b.      commencing or continuing in any manner any contribution, indemnity or other equitable action or other similar proceeding relating to the environmental settlements made in this bankruptcy case against any of the Settled Environmental Insurers or against the property of any of Settled Environmental Insurers;

c.      enforcing, attaching, collecting or recovering, by any manner or means, from any of the Settled Environmental Insurers, or the property of any of the Settled Environmental Insurers, any judgment, award, decree, payment or order relating to any Environmental Claim against any of the Settled Environmental Insurers; and

d.      creating, perfecting or enforcing any lien of any kind relating to any Environmental Claim against any of the Settled Environmental Insurers, or the property of the Settled Environmental Insurers.

The injunction set forth set forth in Section IX.B.3 of the Plan (the "Environmental Injunction") is an integral part of the Plan and is essential to the Plan's consummation and implementation.  The Environmental Injunction shall inure to the benefit of the Settled Environmental Insurers, but shall not apply to any Debtor or Reorganized Debtor.

For the avoidance of doubt, the Environmental Injunction shall not apply to Asbestos Personal Injury Claims, or to Asbestos Insurance Policy Claims arising from the payment of, or obligations arising from, Asbestos Personal Injury Claims.

### 3.      Subordination Rights

The classification and manner of satisfying Claims and Interests under the Plan does not take into consideration subordination rights, and nothing in the Plan or Confirmation Order shall affect any subordination rights that a holder of a Claim may have with respect to any Distribution to be made pursuant to the Plan, whether arising under general principles of equitable subordination, contract, section 510(c) of the Bankruptcy Code or otherwise.

## VIII.   TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.      Executory Contracts and Unexpired Leases to Be Assumed

#### 1.      Assumption Generally

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into in connection with the Plan, including the Restructuring Transactions provisions of Section IV.B. of the Plan, on the Effective Date, pursuant to section 365 of the Bankruptcy Code, the applicable Debtor or Reorganized Debtor shall assume each of its respective Executory Contracts and Unexpired Leases other than those listed on Exhibit V.C of the Plan; provided, however, that the Debtors reserve the right, at any time prior to the Effective Date, to amend Exhibit V.C to the Plan to:  (a) delete any Executory Contract or Unexpired Lease listed therein, thus providing for its assumption pursuant hereto; or (b) add any Executory Contract or Unexpired Lease to Exhibit V.C of the Plan, thus providing for its rejection pursuant to Section V.A.1 of the Plan.  The Debtors shall provide notice of any amendments to Exhibit V.C to the Plan to the parties to the Executory Contracts or Unexpired Leases affected thereby and to the parties on the then-applicable service list in the Reorganization Cases.  Nothing herein shall constitute an admission by a Debtor or Reorganized Debtor that any contract or lease is an Executory Contract or Unexpired Lease or that a Debtor or Reorganized Debtor has any liability thereunder.

#### 2.      Assumptions of Executory Contracts and Unexpired Leases

Each Executory Contract or Unexpired Lease assumed under Section V.A.1. of the Plan shall include any modifications, amendments, supplements or restatements to such contract or lease.

#### 3.      Approval of Assumptions and Assumption Procedures

The Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions described in Section V.A.1. of the Plan, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date.  The procedures for assumption of an Executory Contract or Unexpired Lease are as follows:

  a.      After the entry of the Confirmation Order, the Debtors shall serve upon each party to an Executory Contract or Unexpired Lease being assumed pursuant to the Plan notice of:  (i) the contract or lease being assumed or assumed and assigned; (ii) the Cure Amount Claim, if any, that the applicable Debtor believes it would be obligated to pay in connection with such assumption; and (iii) the procedures for such party to object to the assumption or assumption and assignment of the applicable contract or lease or the amount of the proposed Cure Amount Claim.

  b.      Any Entity wishing to object to (i) the proposed assumption of an Executory Contract or Unexpired Lease under the Plan or (ii) the proposed amount of the related Cure Amount Claim must File and serve on counsel to the Debtors a written objection setting forth the basis for the objection within twenty (20) days of service of the notice described in Section V.A.3.a. of the Plan.

c.     If no objection to the proposed assumption or Cure Amount Claim is properly Filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease: (i) the proposed assumption of the Executory Contract or Unexpired Lease shall be approved in accordance with the Plan and the Confirmation Order, effective as of the Effective Date, without further action of the Bankruptcy Court; and (ii) the Cure Amount Claim identified by the Debtors in the notice shall be fixed and shall be paid in accordance with the Plan on or after the Effective Date, without further action of the Bankruptcy Court, to the appropriate contract or lease party identified on the notice.

d.     If an objection to the proposed assumption or Cure Amount Claim is properly Filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease, the Debtors or Reorganized Debtors, as applicable, and the objecting party may resolve such objection by stipulation, without further action of the Bankruptcy Court.

e.     If an objection to the proposed assumption or Cure Amount Claim is properly Filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease and the parties are unable to resolve such objection: (i) the Debtors or Reorganized Debtors may File a reply to such objection no later than thirty (30) days after the Filing and service of such objection and ask the Bankruptcy Court to schedule a hearing on the particular objection and the related reply at an appropriate time; or (ii) the Debtors or Reorganized Debtors, as applicable, may designate the Executory Contract or Unexpired Lease underlying such objection for rejection pursuant to Section V.C. of the Plan and amend Exhibit V.C to the Plan accordingly.

**B.     Payments Related to the Assumption of Executory Contracts and Unexpired Leases**

To the extent that a Cure Amount Claim constitutes a monetary default, such Cure Amount Claim associated with each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, at the option of the Debtor or Reorganized Debtor assuming such contract or lease or the assignee of such Debtor or Reorganized Debtor, if any: (1) by payment of the Cure Amount Claim in cash on the Effective Date or (2) on such other terms as are agreed to by the parties to such Executory Contract or Unexpired Lease. Pursuant to section 365(b)(2)(D) of the Bankruptcy Code, no Cure Amount Claim shall be allowed for a penalty rate or other form of default rate of interest. If there is a dispute regarding: (1) the amount of any Cure Amount Claim; (2) the ability of the applicable Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed; or (3) any other matter pertaining to assumption of such contract or lease, the payment of any Cure Amount Claim required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption. For assumptions of Executory Contracts or Unexpired Leases between Debtors, the Reorganized Debtor assuming such contract may cure any monetary default (1) by treating such amount as either a direct or indirect contribution to capital or

Distribution (as appropriate) or (2) through an intercompany account balance in lieu of payment
in cash.

### C.     Executory Contracts and Unexpired Leases to Be Rejected and Rejection Procedures

On the Effective Date, each Executory Contract and Unexpired Lease listed on
Exhibit V.C to the Plan shall be rejected pursuant to section 365 of the Bankruptcy Code.  Each
contract and lease listed on Exhibit V.C to the Plan shall be rejected only to the extent that any
such contract or lease constitutes an Executory Contract or Unexpired Lease.  Listing a contract
or lease on Exhibit V.C to the Plan shall not constitute an admission by a Debtor or Reorganized
Debtor that such contract or lease is an Executory Contract or Unexpired Lease or that a Debtor
or Reorganized Debtor has any liability thereunder.  The Confirmation Order shall constitute an
order of the Bankruptcy Court approving such rejections, pursuant to section 365 of the
Bankruptcy Code, as of the Effective Date.  The appropriate procedures for rejection of an
Executory Contract or Unexpired Lease are as follows:

1.     After the entry of the Confirmation Order, the Debtors shall serve upon each party
to an Executory Contract or Unexpired Lease being rejected pursuant to the Plan notice of such
proposed rejection.

2.     Any Entity wishing to object to the proposed rejection of an Executory Contract
or Unexpired Lease under the Plan must File and serve on counsel to the Debtors a written
objection setting forth the basis for the objection within twenty (20) days of service of the notice
described in Section V.C.1. of the Plan.

3.     If no objection to the proposed rejection is properly Filed and served prior to the
objection deadline with respect to an Executory Contract or Unexpired Lease, the proposed
rejection of the applicable Executory Contract or Unexpired Lease shall be approved in
accordance with the Plan and the Confirmation Order, effective as of the Effective Date, without
further action of the Bankruptcy Court.

4.     If an objection to the proposed rejection is properly Filed and served prior to the
objection deadline with respect to an Executory Contract or Unexpired Lease, the Debtors or
Reorganized Debtors, as applicable, and the objecting party may resolve such objection by
stipulation, without further action of the Bankruptcy Court.

5.     If an objection to the proposed rejection is properly Filed and served prior to the
objection deadline with respect to an Executory Contract or Unexpired Lease and the parties are
unable to resolve such objection, the Debtors or Reorganized Debtors, as applicable, may File a
reply to such objection no later than thirty (30) days after the Filing and service of such objection
and ask the Bankruptcy Court to schedule a hearing on the particular objection and the related
reply at an appropriate time.

### D.     Obligations to Indemnify Directors, Officers and Employees

The obligations of each Debtor or Reorganized Debtor to indemnify any individual
serving as one of its directors, officers or employees prior to or following the Petition Date by

reason of such individual's prior or future service in such a capacity or as a director, officer or employee of any Debtor or other Entity, to the extent provided in the applicable Certificate of Incorporation or By-Laws, by statutory law or by written agreement, policies or procedures of or with such Debtor, shall be deemed and treated as executory contracts that are assumed by the applicable Debtor or Reorganized Debtor pursuant to the Plan and section 365 of the Bankruptcy Code as of the Effective Date. Accordingly, such indemnification obligations shall survive and be unaffected by entry of the Confirmation Order, irrespective of whether such indemnification is owed for an act or event occurring before or after the Petition Date.

### E.    Contracts and Leases Entered Into After the Petition Date

Notwithstanding any other provision of the Plan, and subject to the Restructuring Transactions provisions of Section IV.B. of the Plan, contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, shall be performed by the Debtor or Reorganized Debtor liable thereunder in accordance with the terms and conditions of such contracts and leases in the ordinary course of its business. Accordingly, such contracts and leases and other obligations (including any assumed Executory Contracts and Unexpired Leases) shall survive and remain unaffected by entry of the Confirmation Order.

### F.    Insurance Policies

#### 1.    Assumed Insurance Policies

The Debtors do not believe that the insurance policies issued to any Debtor, including the Insurance Policies, prior to the Petition Date constitute executory contracts. To the extent such insurance policies are considered to be executory contracts, then, notwithstanding anything contained in Article V of the Plan to the contrary, the Plan will constitute a motion to assume such insurance policies, which include but are not limited to the Debtors' workers' compensation and liability, product and property insurance policies maintained by The Home Insurance Company, and authorize the Reorganized Debtors to pay all future obligations, if any, in respect thereof. Subject to the occurrence of the Effective Date, the entry of the Confirmation Order will constitute approval of such assumption pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interest of the Debtors, their respective Estates and all parties in interest in the Reorganization Cases. Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective date, no payments are required to cure any defaults of any Debtor existing as of the Confirmation Date with respect to each such insurance policy.

#### 2.    Reservation of Rights

Nothing contained in the Plan will constitute a waiver of any claim, right or cause of action that a Debtor, Reorganized Debtor or the Asbestos Personal Injury Trust, as the case may be, may hold against the insurer under any policy of insurance or insurance agreement, except to the extent the insurer is a Settling Asbestos Insurer.

IX.   **CERTIFIED FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE PLAN**

IX.   **CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE PLAN**

A DESCRIPTION OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN IS PROVIDED BELOW. THE DESCRIPTION IS BASED ON THE IRC, TREASURY REGULATIONS, JUDICIAL DECISIONS AND ADMINISTRATIVE DETERMINATIONS, ALL AS IN EFFECT ON THE DATE OF THIS DISCLOSURE STATEMENT AND ALL SUBJECT TO CHANGE, POSSIBLY WITH RETROACTIVE EFFECT. CHANGES IN ANY OF THESE AUTHORITIES OR IN THEIR INTERPRETATION COULD CAUSE THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO DIFFER MATERIALLY FROM THE CONSEQUENCES DESCRIBED BELOW.

THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN IMPORTANT RESPECTS, UNCERTAIN. NO RULING HAS BEEN REQUESTED FROM THE IRS; NO OPINION HAS BEEN REQUESTED FROM DEBTORS' COUNSEL CONCERNING ANY TAX CONSEQUENCE OF THE PLAN; AND NO TAX OPINION IS GIVEN BY THIS DISCLOSURE STATEMENT.

THE DESCRIPTION THAT FOLLOWS DOES NOT COVER ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS. FOR EXAMPLE, THE DESCRIPTION DOES NOT ADDRESS ISSUES OF SPECIAL CONCERN TO CERTAIN TYPES OF TAXPAYERS, SUCH AS DEALERS IN SECURITIES, LIFE INSURANCE COMPANIES, FINANCIAL INSTITUTIONS, TAX EXEMPT ORGANIZATIONS AND NON-U.S. TAXPAYERS, NOR DOES IT ADDRESS HOLDERS OF CLAIMS OR INTERESTS THAT ARE NOT ENTITLED TO VOTE ON THE PLAN.  IN ADDITION, THE DESCRIPTION DOES NOT DISCUSS STATE, LOCAL OR NON-U.S. TAX CONSEQUENCES.

FOR THESE REASONS, THE DESCRIPTION THAT FOLLOWS IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND PROFESSIONAL TAX ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR INTEREST. HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.

A.   **The Asbestos Personal Injury Trust**

As discussed in Section II.D.1. above and in Section IV.F. of the Plan, the Asbestos Personal Injury Trust is intended to be one or more "qualified settlement funds" within the meaning of the Treasury Regulations issued under section 468B of the IRC.  If the Asbestos Personal Injury Trust so qualifies, then the Asbestos Personal Injury Trust will not have taxable income on receipt of the Asbestos Personal Injury Trust Assets, it will take an initial basis in the Phase 1 Claims and the Asbestos Personal Injury Insurance Assets equal to the fair market value of such assets on the Effective Date, and it will not be entitled to deduct payments to claimants as such payments are made.  In addition, any income on the assets of the Asbestos Personal

Injury Trust generally will be treated as subject to Tax on a current basis (in the case of the Phase 1 Claims and the Asbestos Personal Injury Insurance Assets, generally to the extent recoveries exceed the Asbestos Personal Injury Trust's initial basis in such assets) and all distributions pursuant to the Plan will be made net of provision for Taxes and subject to applicable Tax withholding and reporting requirements.

### B.      U.S. Federal Income Tax Consequences to Holders of Asbestos Claims

To the extent that payments from the Asbestos Personal Injury Trust to holders of Asbestos Personal Injury Claims represent damages on account of personal physical injuries or sickness of such holders, such holders should not recognize gross income under section 104 of the IRC, except to the extent that such payments are attributable to medical expense deductions allowed under section 213 of the IRC for a prior taxable year.

### C.      Information Reporting and Backup Withholding

As described above in Section VII.I.3.a., all Distributions under the Plan shall be subject to applicable federal income tax withholding and reporting.

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS ABOUT THE FEDERAL, STATE, LOCAL AND NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

## X.      ADDITIONAL INFORMATION

Any statements in this Disclosure Statement concerning the provisions of any document are not necessarily complete, and in each instance reference is made to such document for the full text thereof.  Certain documents described or referred to in this Disclosure Statement have not been attached as Exhibits because of the impracticability of furnishing copies of these documents to all recipients of this Disclosure Statement.  The Debtors will File all Exhibits to the Plan with the Bankruptcy Court that are currently not attached as Exhibits to the Plan and make them available for review on the website of Prime Clerk at https://cases.primeclerk.com/kaisergypsum no later than ten (10) days before the deadline to vote on the Plan.  The Debtors also will serve such Exhibits to the Plan on the parties on their then current Bankruptcy Rule 2002 service list no later than ten (10) days before the deadline to vote on the Plan.  Further, all of the Exhibits may be obtained from the copy services identified in the notice of the Confirmation Hearing.

## XI.      RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtors, Lehigh Hanson, the Asbestos Personal Injury Committee and the Future Claimants' Representative believe that

the Confirmation and consummation of the Plan is preferable to all other alternatives. Consequently, the Debtors, Lehigh Hanson, the Asbestos Personal Injury Committee and the Future Claimants' Representative urge all holders of Claims in the voting class to vote to accept (i.e., vote in favor of) the Plan and to evidence their acceptance by duly completing and returning their ballots so that they will be received on or before the deadline to vote on the Plan.

Date:  October 14, 2019                    Respectfully submitted,

                                           HANSON PERMANENTE CEMENT
                                           COMPANY (for itself and on behalf of
                                           Kaiser Gypsum Company, Inc.)


                                           By:  _/s/ Charles E. McChesney II_____
                                                Charles E. McChesney II
                                                Vice President, Secretary and Director

## EXHIBIT I

**THIRD AMENDED JOINT PLAN OF REORGANIZATION OF
KAISER GYPSUM COMPANY, INC. AND HANSON PERMANENTE CEMENT, INC.**

[Filed Separately]

# EXHIBIT II

## VOTING PROCEDURES

NAI-1505612704v13

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| KAISER GYPSUM COMPANY, INC., *et al.*,[1] | : | Case No. 16-31602 (JCW) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |

---

## VOTING PROCEDURES

C. Richard Rayburn, Jr. (NC 6357)
John R. Miller, Jr. (NC 28689)
RAYBURN COOPER & DURHAM, P.A.
1200 Carillon
227 West Trade Street
Charlotte, North Carolina 28202
Telephone: (704) 334-0891
Facsimile: (704) 377-1897
E-mail: rrayburn@rcdlaw.net
          jmiller@rcdlaw.net

-and-

Gregory M. Gordon (TX 08435300)
Amanda Rush (TX 24079422)
JONES DAY
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
E-mail: gmgordon@jonesday.com
          asrush@jonesday.com

-and-

Paul M. Green (TX 24059854)
JONES DAY
717 Texas, Suite 3300
Houston, Texas 77002
Telephone: (832) 239-3939
Facsimile: (832) 239-3600
E-mail: pmgreen@jonesday.com

ATTORNEYS FOR DEBTORS

---

[1]     The Debtors are the following entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): Kaiser Gypsum Company, Inc. (0188) and Hanson Permanente Cement, Inc. (7313). The Debtors' address is 300 E. John Carpenter Freeway, Irving, Texas 75062.

1.    DEFINITIONS.................................................................................................1

    a.    "2002 List"..........................................................................................1

    b.    "Asbestos Personal Injury Claims Solicitation Notice"..................................1

    c.    "Ballot"...............................................................................................1

    d.    "Bankruptcy Court".............................................................................1

    e.    "Certified Plan Solicitation Directive"...................................................1

    f.    "Clients"..............................................................................................1

    g.    "Confirmation Hearing"........................................................................1

    h.    "Confirmation Hearing Notice"............................................................1

    i.    "Confirmation Objection Deadline".......................................................1

    j.    "Debtors".............................................................................................1

    k.    "Disclosure Statement".........................................................................1

    l.    "Firm".................................................................................................1

    m.    "General Publication Notice".................................................................1

    n.    "Master Ballot"....................................................................................2

    p.    "Publications".....................................................................................2

    q.    "Rule 3018 Motion".............................................................................2

    r.    "Solicitation Package"..........................................................................2

    s.    "Voting Agent"....................................................................................2

    t.    "Voting Deadline"...............................................................................2

    u.    "Voting Record Date"..........................................................................2

2.    PUBLICATION NOTICE................................................................................2

3.    AVAILABILITY OF PLAN-RELATED DOCUMENTS ON THE INTERNET ......2

4.    DISTRIBUTION OF CERTAIN DOCUMENTS ON CD-ROM OR USB FLASH
    DRIVE .........................................................................................................3

5.    DISTRIBUTION OF SOLICITATION PACKAGES.............................................3

    a.    Asbestos Personal Injury Claims ...........................................................3

    b.    Asbestos Personal Injury Indirect Claims................................................3

    c.    Holders of Claims or Interests other than Asbestos Personal Injury Claims ....3

    d.    Other Parties .......................................................................................3

    e.    Distribution of Solicitation Packages to Undeliverable Addresses Not Required;
    Procedures for Returned Solicitation Packages .........................................3

6.    SPECIAL PROCEDURES RELATING TO ASBESTOS PERSONAL INJURY
    CLAIMS ......................................................................................................3

    a.    Procedures Related to Asbestos Personal Injury Indirect Claims....................3

    b.       Procedures Related to Asbestos Personal Injury Claims (Other than Asbestos Personal Injury Indirect Claims) ................................................................................... 3

7.    RETURN OF BALLOTS ........................................................................................... 7

    a.       Authority to Complete and Execute Ballots ....................................................... 7

    b.       Method for Transmitting, and Place to Send, Completed Ballots ...................... 7

    c.       Deadline for Receiving Completed Ballots ........................................................ 7

8.    TABULATION OF BALLOTS ................................................................................. 7

    a.       Claimants That Are Entitled to Vote .................................................................. 7

    b.       General Tabulation Rules .................................................................................... 7

**KAISER GYPSUM COMPANY, INC., ET AL.**
**VOTING PROCEDURES**

The following procedures (the "Voting Procedures")[1] have been approved by the Bankruptcy Court in connection with (a) the distribution of solicitation materials for voting to accept (i.e., voting in favor of) or reject (i.e., voting against) the Plan (as hereinafter defined) and (b) the return and tabulation of Ballots and Master Ballots (as hereinafter defined).

**1.    Definitions**

a.    "**2002 List**" means the general service list maintained by the Debtors in their chapter 11 cases pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure and related orders of the Bankruptcy Court.

b.    "**Asbestos Personal Injury Claims Solicitation Notice**" means the notice sent to all known Firms that (i) details proposed procedures for soliciting votes on the Plan from each Entity holding or asserting on behalf of another Entity an Asbestos Personal Injury Claim; and (ii) requests that each Firm complete and return the Certified Plan Solicitation Directive to the Voting Agent on or before December 14, 2019.

c.    "**Ballot**" means the form or forms distributed to each holder of an Asbestos Personal Injury Claim (or the Firm representing each such holder) entitled to vote on the Plan.

d.    "**Bankruptcy Court**" means the United States Bankruptcy Court for the Western District of North Carolina.

e.    "**Certified Plan Solicitation Directive**" means the certified plan solicitation directive, pursuant to which, among other things, each Firm representing one or more holders of Asbestos Personal Injury Claims will direct the Debtors and the Voting Agent as to the preferred method for the solicitation of votes on the Plan by such Firm's Clients.

f.    "**Clients**" means holders of Asbestos Personal Injury Claims (other than Asbestos Personal Injury Indirect Claims) who are the clients of Firms.

g.    "**Confirmation Hearing**" means the hearing on the confirmation of the Plan, as such hearing may be adjourned from time to time.

h.    "**Confirmation Hearing Notice**" means a notice, substantially in the form approved by the Bankruptcy Court, setting forth, among other things, the time fixed for voting to accept or reject the Plan, the Confirmation Objection Deadline, and the date and time on which the Confirmation Hearing is scheduled to begin.

i.    "**Confirmation Objection Deadline**" means the date that is established by the Bankruptcy Court as the deadline for filing objections to confirmation of the Plan.

j.    "**Debtors**" means, together, Kaiser Gypsum Company, Inc. and Hanson Permanente Cement, Inc.

k.    "**Disclosure Statement**" means the Disclosure Statement for the Third Amended Joint Plan of Reorganization of Kaiser Gypsum Company, Inc. and Hanson Permanente Cement, Inc. (including all exhibits) that relates to the Plan, as the same may be amended.

l.    "**Firm**" means an attorney or law firm that represents one or more Clients.

m.    "**General Publication Notice**" means a published notice substantially in the form approved by the Bankruptcy Court of: (i) the Voting Deadline, (ii) the Confirmation Objection Deadline, (iii) the Confirmation Hearing and (iv) the procedure to obtain a Solicitation Package.

---

[1]    Capitalized terms not otherwise defined herein have the meanings given to them in the Third Amended Joint Plan of Reorganization of Kaiser Gypsum Company, Inc. and Hanson Permanente Cement, Inc., dated October 14, 2019 (as it may be amended, the "Plan").

n.      **"Master Ballot"** means a Ballot submitted on behalf of one or more Clients pursuant to section 6 of these Voting Procedures.

o.      **"Plan Confirmation Notice Plan"** means the plan confirmation notice plan designed by Hilsoft Notifications, the Debtors' plan notice consultant.

p.      **"Publications"** means the national and regional publications identified on Exhibit F to the Motion of Debtors for an Order (I) Approving the Disclosure Statement, (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Proposed Joint Plan of Reorganization and (III) Scheduling a Hearing on Confirmation of Proposed Joint Plan of Reorganization and Approving Related Notice Procedures.

q.      **"Rule 3018 Motion"** means a motion, pursuant to Bankruptcy Rule 3018(a), seeking an order temporarily allowing a Claim, solely for purposes of voting to accept or reject the Plan, in an amount or classification different from the amount or classification allowed in accordance with Voting Procedures.

r.      **"Solicitation Package"** means, and will consist of, all of the following:

    i.      A Confirmation Hearing Notice;

    ii.      The Disclosure Statement;[2]

    iii.      For potential holders of Asbestos Personal Injury Claims, an appropriate form of Ballot, voting instructions and a Ballot-return envelope;

    iv.      If requested pursuant to section 6.b(iii), letters or other communications from a Firm to its Clients; and

    v.      Any other materials authorized by the Bankruptcy Court to be included as part of the Solicitation Package.

s.      **"Voting Agent"** means Prime Clerk LLC, maintaining an address at Kaiser Gypsum Company, Inc. Ballot Processing, c/o Prime Clerk, 830 3rd Avenue, 3rd Floor, New York, New York 10022, phone number of (855) 855-7644 and email address of Kaisergypsumballots@PrimeClerk.com.

t.      **"Voting Deadline"** means February 20, 2020.

u.      **"Voting Record Date"** means October 17, 2019.

**2.      Publication Notice**

The Debtors will, on a date not less than twenty-five days prior to the Confirmation Objection Deadline, or as soon as possible thereafter, cause the General Publication Notice to be published once in the Publications. In addition, on a date not less than twenty days prior to the Confirmation Objection Deadline, the Debtors will publish the Asbestos Publication Notice in those newspapers, magazines, websites, mailings and press releases set forth in the Plan Confirmation Notice Plan.

**3.      Availability of Plan-Related Documents on the Internet**

All Plan-related documents, including the Disclosure Statement, are available via the Internet on the Voting Agent's website at https://cases.primeclerk.com/kaisergypsum and on the Bankruptcy Court's docket at www.ncwb.uscourts.gov [PACER log-in required].

---

[2]      The Plan is an Exhibit to the Disclosure Statement.

**4.     Distribution of Certain Documents on CD-ROM or USB Flash Drive**

The Solicitation Packages will include a CD-ROM or USB Flash Drive containing the Disclosure Statement and the Exhibits thereto, including the Plan.  Any party in interest may obtain a paper copy of the applicable documents by sending a request, in writing, to the Voting Agent either though mail, overnight delivery or electronic mail to Kaiser Gypsum Company, Inc. Ballot Processing, c/o Prime Clerk, 830 3rd Avenue, 3rd Floor, New York, New York 10022, Kaisergypsumballots@PrimeClerk.com.  Any such request must be received by the Voting Agent at least ten Business Days prior to the Voting Deadline.  The Voting Agent will make reasonable effort to cause a paper copy of the applicable documents to be deposited with the United States Postal Service or overnight delivery service within two Business Days of receiving the written request.

**5.     Distribution of Solicitation Packages**

a.     Asbestos Personal Injury Claims

The Voting Agent will cause Solicitation Packages to be served in connection with Asbestos Personal Injury Claims (other than Asbestos Personal Injury Indirect Claims) in the manner described in section 6 hereof.

b.     Asbestos Personal Injury Indirect Claims

The Voting Agent will cause Solicitation Packages to be served upon holders of Asbestos Personal Injury Indirect Claims as identified by the Debtors based on their records.

c.     Holders of Claims or Interests other than Asbestos Personal Injury Claims

The Voting Agent will cause Solicitation Packages without Ballots to be served on holders of Claims or Interests in classes other than Class 4 as of the Voting Record Date.

d.     Other Parties

The Voting Agent will cause a Solicitation Package to be served on counsel to the Asbestos Personal Injury Committee, counsel to the Future Claimants' Representative, the Bankruptcy Administrator and each party on the 2002 List.

e.     Distribution of Solicitation Packages to Undeliverable Addresses Not Required; Procedures for Returned Solicitation Packages

If a Solicitation Package is returned as undeliverable, the Voting Agent shall resend such Solicitation Package only once, provided that the United States Postal Service has included a forwarding address at least five Business Days before the Voting Deadline.

**6.     Special Procedures Relating to Asbestos Personal Injury Claims**

a.     Procedures Related to Asbestos Personal Injury Indirect Claims

i.     Service on Holders of Asbestos Personal Injury Indirect Claims

The Voting Agent will cause a Solicitation Package to be served upon each holder of an Asbestos Personal Injury Indirect Claim as identified by the Debtors based on their records.

ii.     Tabulation of Votes

Each holder of an Asbestos Personal Injury Indirect Claim will have a single vote in the amount, for voting purposes only, of $1.00.

b.     Procedures Related to Asbestos Personal Injury Claims (Other than Asbestos Personal Injury Indirect Claims)

(i)     Initial Distribution of Solicitation Packages and Mailing of Asbestos Personal Injury Claims Solicitation Notice and Certified Plan Solicitation Directives

On or before October 31, 2019, the Voting Agent will serve an Asbestos Personal Injury Claims Solicitation Notice and a Certified Plan Solicitation Directive on all known Firms.

(ii)   Certified Plan Solicitation Directive

(A)   Each Firm returning the Certified Plan Solicitation Directive must deliver it to the Voting Agent.

(B)   Each Firm returning the Certified Plan Solicitation Directive must deliver it so that it is received no later than December 14, 2019.

(C)   Pursuant to the Certified Plan Solicitation Directive, each Firm will direct the Voting Agent to solicit votes on the Plan from its Clients, according to one of the following procedures:

(1)   Master Ballot Solicitation Method.  If a Firm certifies that it has the authority under applicable law to vote on behalf of its Clients, the Firm may direct the Voting Agent to serve the Firm with one Solicitation Package and one Master Ballot on which the Firm must record the votes on the Plan for each of its Clients.  If the Firm elects this procedure, the Firm may also request that, for informational purposes, the Voting Agent serve Solicitation Packages (without Ballots) on its Clients.

(2)   Direct Solicitation Method.  If a Firm does not have the authority to vote on behalf of its Clients, or if a Firm prefers to have each of its Clients cast his or her own vote on the Plan, such Firm may direct the Voting Agent to solicit votes on the Plan directly from its Clients.

(3)   Indirect Solicitation Method.  If a Firm does not have the authority to vote on behalf of its Clients or the attorney prefers to have the Clients cast their own votes on the Plan, the attorney may direct the Voting Agent to deliver the Solicitation Packages to the Firm, which will, in turn, deliver the Solicitation Packages to its Clients.  If the Firm selects this method:  (i) the Voting Agent will cause the requested number of Solicitation Packages, including appropriate Ballots, to be served on the Firm; (ii) the Firm must deliver the Solicitation Packages to the Clients within three Business Days after receipt; and (iii) the Firm must file an affidavit of service with the Bankruptcy Court, and send a copy of such affidavit to the Voting Agent, within three Business Days of such service.  The names and addresses of the Clients served, however, do not need to be listed on the affidavit of service.  The affidavit of service only needs to state that service was completed, the date(s) that service was completed and the attorney has provided or will provide the Voting Agent with the required lists of clients, as described in subsection 6.b.(ii)(D) below.

(4)   Hybrid Solicitation Method.  If a Firm certifies that it has the authority under applicable law to vote, and intends to exercise that power, only for certain of the Clients (collectively, the "Master Ballot Clients"), the Firm may direct the Voting Agent to serve the Firm with one Solicitation Package and one Master Ballot on which the Firm must record the votes with respect to the Plan for the Master Ballot Clients.  The Firm also may request that, for informational purposes, the Voting Agent serve Solicitation Packages (without a Ballot) on the Master Ballot Clients.  With respect to such Firm's other Clients that are not Master Ballot Clients (collectively, the "Individual Ballot Clients"), the Firm must elect the procedure under either the Direct Solicitation Method (subsection (2) above) or the Indirect Solicitation Method (subsection (3) above).

(5)   If a Firm fails to timely return the Certified Plan Solicitation Directive to the Voting Agent, or otherwise fails to select a solicitation method by December 14, 2019, the Firm shall be deemed to have directed the Voting Agent to solicit votes on the Plan from the Clients according to the Master Ballot Solicitation

Method described in subsection (1) above without informational packages unless otherwise agreed to among the Debtors, the Voting Agent and the Firm.

(6)     If a Firm certifies that it does not represent any Clients, such Firm may direct the Voting Agent to omit such Firm from the Debtors' solicitation of votes on the Plan and may request that it be removed from the service list in the above-captioned cases.

(D)     Client Lists

To facilitate the solicitation of votes on the Plan, each Firm should submit, as applicable, one or two lists of Clients (the "Client List") to the Voting Agent, which lists are subject to the following requirements:

(1)     The Client List(s) must be in Excel or a comparable electronic format on CD-ROM or USB Flash Drive.  If a Firm returning the Certified Plan Solicitation Directive has fewer than 100 Clients, then such Firm may provide the Client List in hard copy.  Firms may contact the Voting Agent at (855) 855-7644 with any technical questions or to arrange for special delivery of the Client List(s).

(2)     The Client List(s) must contain the name and last four digits of the social security number for each of the Clients.  If the Firm is returning its Client List as an exhibit to a Master Ballot, such Client List must also indicate (A) whether each Client voted to accept (i.e., voted in favor of) or reject (i.e., voted against) the Plan and (B) the appropriate Disease Category.  If the Firm is requesting that the Voting Agent directly serve Solicitation Packages on some or all of its Clients, the Client List must also include an address for each of those Clients.  If a Firm selects the Hybrid Solicitation Method described in section 6.b(ii)(C)(4), the attorney must return two Client Lists:  one for the Master Ballot Clients and one for the Individual Ballot Clients.

(3)     Firms are required to submit their Client List(s) as follows:

i.      Client List(s) must be submitted to the Voting Agent, Kaiser Gypsum Company, Inc. Ballot Processing, c/o Prime Clerk, 830 3rd Avenue, 3rd Floor, New York, New York 10022.

ii.     If a Firm selects the Master Ballot Solicitation Method described in section 6.b(ii)(C)(1), the Client List must be submitted as the exhibit to the Master Ballot on or before the Voting Deadline.

iii.    If a Firm selects the Direct Solicitation Method described in section 6.b(ii)(C)(2), the Client List (which must include addresses) must be submitted on or before December 14, 2019. To the extent that the Client List is not submitted by the deadline, the Debtors and the Voting Agent will distribute Solicitation Packages for the affected Clients as soon as practicable after the receipt of such Client List.

iv.     If a Firm selects the Indirect Solicitation Method described in section 6.a(ii)(C)(3), the Client List must be submitted on or before December 14, 2019.

v.      If a Firm selects the Hybrid Solicitation Method described in section 6.b(ii)(C)(4), the Master Ballot Client List must be submitted as the exhibit to the Master Ballot on or before the Voting Deadline and the Individual Ballot Client List must be submitted on or before December 14, 2019, for both the Direct Solicitation Method and Indirect Solicitation Method.

(iii)   Distribution of Solicitation Packages Pursuant to Certified Plan Solicitation Directives

(A)   The Voting Agent will serve the Solicitation Packages in accordance with the instructions set forth in the Certified Plan Solicitation Directives on the later of five Business Days after receipt thereof or thirty-five days prior to the Voting Deadline.  If a Certified Plan Solicitation Directive instructs the Voting Agent to serve the Solicitation Packages directly or indirectly on the Firm's Clients, the five Business Day period will not begin until the Voting Agent receives the Client List required in section 6.b(ii)(D).

(B)   A Firm electing to vote by Master Ballot may, via the Certified Plan Solicitation Directive, request that the Voting Agent serve non-voting Solicitation Packages on such Firm's Clients for informational purposes only.  The Firm must provide the Voting Agent with a list of such Client addresses on or before December 14, 2019.

(C)   A Firm may elect to include a letter or other communication from the Firm to its Clients with the Solicitation Packages.  If the Voting Agent is to serve Solicitation Packages (either for voting or for informational purposes) directly on a Firm's Clients, such Firm must so notify the Voting Agent via the Certified Plan Solicitation Directive if the Firm desires to include a letter or other communication and provide the letter or other communication to the Voting Agent on or before December 14, 2019.

(D)   If a Firm chooses to transmit the Solicitation Packages to the Clients directly:

(1)   The Firm must serve the Solicitation Packages on its Clients within three Business Days after receipt of such packages and, within three Business Days thereafter, file an affidavit of service with the Bankruptcy Court and provide a copy of such affidavit to the Voting Agent.  The affidavit of service does not need to list the names and addresses of the Clients served, but should state that service was completed, the date(s) service was completed and that, for the Clients served, the Firm has provided the Voting Agent with the required Client List.

(2)   The Debtors will reimburse such Firm for the actual postage incurred by the Firm in transmitting such Solicitation Packages by regular, first-class mail.  Firms seeking reimbursement shall submit reasonable evidence of postage expenses incurred in order to obtain such reimbursement to Jones Day, Attn:  Amanda S. Rush, 2727 North Harwood Street, Dallas, Texas 75201.

(iv)   Completion and Return of Master Ballots by the Firms

Firms shall be permitted to cast Master Ballots for Clients, but only to the extent that those Firms (A) have the authority under applicable law to vote on behalf of its Clients and (B) indicate such on the Certified Plan Solicitation Directive returned to the Voting Agent.  Each Firm voting on behalf of individual Clients shall complete a Master Ballot, which will set forth the votes cast by such Firm on behalf of any such Clients.  The following procedures shall govern the completion and return of a Master Ballot:

(A)   Summarizing Votes on the Master Ballot

Each Firm completing a Master Ballot must indicate one of the following: (1) all of the Clients listed on the exhibit described below voted to accept the Plan; (2) all of the Clients listed on the exhibit voted to reject the Plan; or (3) some of the Clients voted to accept the Plan, while other of the Clients voted to reject the Plan.  The Firms completing such Ballots also must summarize the votes cast by the Clients listed on the exhibit, according to such Clients' Disease Category.

(B)   Exhibit to the Master Ballot

(1)   Each Firm shall prepare an exhibit to the Master Ballot that lists the name, the last four digits of the social security number, the address and the Disease Category for each Client on whose behalf the Firm is submitting a vote and

indicates whether each Client voted to accept (<u>i.e.</u>, voted in favor of) or reject (<u>i.e.</u>, voted against) the Plan.

(2)    The exhibit must be in Excel or a comparable electronic format on CD-ROM or USB Flash Drive. If the Firm completing the Master Ballot has less than 100 Clients, then such Firm may provide the exhibit to the Master Ballot in hard copy.

(3)    The exhibit and the completed Master Ballot must be submitted to the Voting Agent in accordance with section 7 of these Voting Procedures.

**7.**    **Return of Ballots**

a.    Authority to Complete and Execute Ballots

If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation or any other entity acting in a fiduciary or representative capacity, such person must indicate such capacity when signing. The authority of the signatory of each Ballot to complete and execute the Ballot shall be presumed, but each such signatory shall certify, by executing the Ballot, that he or she has such authority and shall provide evidence of such authority upon request of the Voting Agent.

b.    Method for Transmitting, and Place to Send, Completed Ballots

All Ballots should be returned by mail, overnight or hand-delivery service to the Debtors' Voting Agent. The Voting Agent will not accept Ballots submitted by facsimile or electronic transmission.

c.    Deadline for Receiving Completed Ballots

All Ballots must be ***received*** by the Voting Agent by 5:00 p.m. (prevailing Eastern Time) on the Voting Deadline. The Voting Agent will date and time-stamp all Ballots when received. In addition, the Voting Agent will retain a copy of all Ballots for a period of one year after the Effective Date of the Plan, unless otherwise ordered by the Bankruptcy Court.

**8.**    **Tabulation of Ballots**

a.    Claimants That Are Entitled to Vote

Except as otherwise provided in section 8.b, each claimant that holds an Asbestos Personal Injury Claim is entitled to vote to accept (<u>i.e.</u>, vote in favor of) or reject (<u>i.e.</u>, vote against) the Plan. Holders of Claims or Interests in all other Plan classes are unimpaired and are deemed to accept the Plan.

b.    General Tabulation Rules

(i)    Asbestos Personal Injury Indirect Claims

(A)    Each holder of an Asbestos Personal Injury Indirect Claim will have a single vote in the amount, for voting purposes only, of $1.00

(B)    The temporary allowance of Asbestos Personal Injury Indirect Claims in the amount of $1.00 is solely for voting purposes and does not constitute an allowance of such Claims for purposes of distribution under the Asbestos Personal Injury Trust and is without prejudice to the rights of the holders of Asbestos Personal Injury Indirect Claims or the Debtors and the Asbestos Personal Injury Trust in any other context.

(ii)    Asbestos Personal Injury Claims (Other Than Asbestos Personal Injury Indirect Claims)

(A)    Each holder of an Asbestos Personal Injury Claim will have a single vote in the amount, for voting purposes only, that corresponds to such holder's Disease Category, as indicated on a Ballot cast by such holder or on a Master Ballot cast on behalf of such Client. If a

holder of an Asbestos Personal Injury Claim or a Firm is unable to certify on a Ballot that the claimant meets the medical and exposure criteria for any of the Disease Categories but otherwise certifies on the Ballot that the claimant has been exposed to an asbestos-containing product such that claimant holds an Asbestos Personal Injury Claim as defined in the Plan, the claimant will, for voting purposes only, be considered to have a claim in the amount of $1.00.

(B)     The Disease Categories applicable to Asbestos Personal Injury Claims, along with the corresponding medical and exposure criteria and the allowed amount for such Claims for voting purposes, which are based on criteria in the respective Asbestos Personal Injury Trust Distribution Procedures are as follows:

(1)     Asbestosis/Pleural Disease (Level I) Requires a diagnosis of an asbestos related nonmalignant disease – Claim amount for voting purposes only:  $36,000.

(2)     Other Cancer (Level II) Requires a diagnosis of a primary colorectal, laryngeal, esophageal, pharyngeal, or stomach cancer – Claim amount for voting purposes only:  $84,000.

(3)     Lung Cancer (Level III) Requires a diagnosis of a primary lung cancer – Claim amount for voting purposes only:  $126,000.

(4)     Mesothelioma (Level IV) Requires a diagnosis of mesothelioma   Claim amount for voting purposes only:  $600,000.

(C)     For purposes of computing votes, each holder of an Asbestos Personal Injury Claim shall be deemed to have voted the full amount of such Asbestos Personal Injury Claim according to the Disease Category specified for such Asbestos Personal Injury Claim.

(D)     The temporary allowance of an Asbestos Personal Injury Claim in the amount corresponding to the Disease Category designated by, or on behalf of, the holder of such Claim is solely for voting purposes and does not constitute an allowance of such Claim for purposes of distribution under the Asbestos Personal Injury Trust Distribution Procedures and is without prejudice to the rights of the holder of an Asbestos Personal Injury Claim or the Asbestos Personal Injury Trust in any other context.

(E)     If no Disease Category is selected for an Asbestos Personal Injury Claim, the Voting Agent shall treat the claimant as having, for voting purposes only, a Claim in the amount of $1.00.

(F)     If more than one Disease Category is selected for any Asbestos Personal Injury Claim, the Voting Agent shall count the vote cast in respect of such Asbestos Personal Injury Claim in the amount corresponding to the Disease Category with the highest allowed amount from those Disease Categories selected.

(G)     Multiple Master Ballots may be completed and delivered to the Voting Agent.  Votes reflected by multiple Master Ballots will be counted except to the extent that they are duplicative of other Master Ballots.  If two or more Master Ballots are inconsistent, the latest dated Master Ballot received prior to the Voting Deadline will, to the extent of such inconsistency, govern unless otherwise ordered by the Bankruptcy Court.  If more than one Master Ballot is submitted and the later Master Ballot(s) supplement(s), rather than supersede(s), the earlier Master Ballot(s), the Firm submitting such Master Ballot should mark the subsequent Master Ballot(s) as "Supplement" and clearly mark which of those votes reflected thereon are additional votes.

(H)     If two or more Master Ballots are received from separate Firms, each of whom purports to represent the same Client, the vote for the Client appearing on both Master Ballots will be counted only once and only if such votes are consistent with respect to acceptance or rejection of the Plan.  In the event that the votes are not consistent, none of the votes will

be counted.  In the event the Disease Category asserted with respect to the Client is inconsistent, the Disease Category with the highest allowed amount will be counted.

(iii)    Additional Rules for the Tabulation of Ballots

(A)    Only Ballots cast by those entitled to vote, pursuant to section 8.a of these Voting Procedures, will be counted as votes to accept or votes to reject the Plan.

(B)    Only those Ballots that are received by the Voting Agent in the manner set forth in section 7.b by the Voting Deadline will be counted as votes to accept or to reject the Plan.

(C)    Any Ballot that (i) is incomplete (including, without limitation, a Master Ballot on which the attorney fails to make the required certification or fails to include the required exhibit), (ii) is unsigned, (iii) is illegible or (iv) contains insufficient information to identify the Client/individual casting the Ballot, will not be counted as a vote to accept (i.e., vote in favor of) or reject (i.e., vote against) the Plan.

(D)    Any Ballot that is properly completed, executed, and timely returned to the Voting Agent but does not indicate an acceptance or rejection of the Plan or indicates both an acceptance and a rejection of the Plan will not be counted as either a vote to accept (i.e., vote in favor of) or a vote to reject (i.e., vote against) the Plan.

(E)    If more than one Ballot is cast for the same Asbestos Personal Injury Claim before the Voting Deadline, the latest dated Ballot received before the Voting Deadline will be deemed to reflect the voter's intent and thus will supersede any prior Ballots.

(F)    If multiple Ballots are cast for the same Asbestos Personal Injury Claim from an individual and someone purporting to be such individual's attorney or agent, only the Ballot received from the individual will be counted.

(iv)    Additional Procedures and Standard Assumptions

(A)    The Voting Agent, in its discretion, may contact voters to cure any defects in the Ballots or Master Ballots.

(B)    Any voter that delivers a valid Ballot may withdraw such Ballot by delivering a written notice of withdrawal to the Voting Agent before the Voting Deadline.  To be valid, the notice of withdrawal must (i) be signed by the party who signed the Ballot to be revoked and (ii) be received by the Voting Agent before the Voting Deadline.  The Debtors may contest the validity of any withdrawals.

(C)    There shall be a rebuttable presumption that any claimant who submits a properly completed superseding Ballot or withdrawal of Ballot on or before the Voting Deadline has sufficient cause, within the meaning of Bankruptcy Rule 3018(a), to change or withdraw such claimant's acceptance or rejection of the Plan.

(D)    If, for voting purposes, any claimant seeks to challenge the allowed amount of its Claim as set forth in these Voting Procedures, such claimant must file a Rule 3018 Motion and serve such motion on the Debtors so that it is received on or before February 10, 2020.  In accordance with Bankruptcy Rule 3018, any Ballot submitted by a creditor that files a Rule 3018 Motion will be counted solely in accordance with these Voting Procedures unless and until, after notice and a hearing, the underlying Claim is temporarily allowed by the Court for voting purposes only in a different amount.

# **EXHIBIT III**

## **PROJECTIONS**

NAI-1505612704v13

## A.    Introduction

HPCI[1] owns a cement plant, rock plant, quarry and the real property associated therewith located in Santa Clara County, California (the "Permanente Plant") that it leases to affiliate Lehigh Southwest Cement Company.  HPCI also owns interests in Kaiser Gypsum and two operating subsidiaries:  non-debtor Hanson Micronesia Cement, Inc.; and non-debtor Hanson Permanente Cement of Guam, Inc.  Kaiser Gypsum has no business operations currently, but on or before the Effective Date non-debtor Lehigh Cement Company LLC will transfer its interest in certain real property located in McLennan County, Texas and Kunkletown, Monroe County, Pennsylvania (together, the "Real Properties"), together with its rights under certain leases with non-affiliated lessees related to the Real Properties, to Kaiser Gypsum.  The Debtors, with the assistance of PricewaterhouseCoopers ("PwC"), prepared the following financial projections (the "Projections"), which reflect the expected future operating performance of the Debtors, including HPCI's operating subsidiaries, on a separate and on a consolidated basis, for the years ended December 31, 2020 and December 31, 2021.

As the Projections demonstrate, the Debtors will have the ability to fund their ongoing operations from cash flow generated by the businesses they directly or indirectly own.  Kaiser Gypsum's lease arrangements for the Real Properties will ensure that it will generate positive cash flow into the future.  HPCI's Permanente Plant lease arrangement with non-debtor Lehigh Southwest Cement Company, coupled with cash flow from its non-debtor subsidiaries, similarly shows that HPCI will generate positive cash flow into the future.  Additionally, each of the Debtors is ultimately owned by Lehigh Hanson, which has the financial wherewithal to provide any additional funding needed by either entity.  Finally, the Debtors have sufficient cash and access to financing, in combination with (a) Lehigh Hanson's cash and access to financing and (b) the proceeds of insurance, to fund the obligations imposed by the Plan.

## B.    Projections

The following Projections include consolidated statements of income and statements of cash flows forecasted for the years ended December 31, 2020 and December 31, 2021.  The Projections should be read in conjunction with the assumptions, qualifications and explanations set forth herein and in the Disclosure Statement.

The assumptions disclosed herein are those that the Debtors believe to be significant to the Projections.  Although the Debtors are of the opinion that these assumptions are reasonable under current circumstances, such assumptions are subject to inherent uncertainties, such as cement, limestone and greenstone plant production volumes associated with the operations of the lessees of the Permanente Plant and the Real Properties, the regulatory and permitting environment associated with the Debtors' and their lessees' respective businesses, general economic conditions and any other factors that could affect the Debtors' or their lessees' businesses.  The impact of a change in any of these factors cannot be predicted with certainty.  Because events and

---

[1]    Capitalized terms not defined herein have the meanings ascribed to them in the Plan.

circumstances frequently do not occur as expected, there could be differences between the projected results and actual results.  These differences may be material to the Projections herein.

THE DEBTORS DO NOT, AS A MATTER OF COURSE, PUBLISH THEIR BUSINESS PLANS, BUDGETS OR STRATEGIES, OR MAKE PUBLIC ANY EXTERNAL PROJECTIONS OR FORECASTS OF THEIR ANTICIPATED FINANCIAL POSITIONS OR RESULTS OF OPERATIONS.  ACCORDINGLY, THE DEBTORS DO NOT ANTICIPATE THAT THEY WILL, AND DISCLAIM ANY OBLIGATION TO, FURNISH UPDATED BUSINESS PLANS, BUDGETS OR PROJECTIONS TO HOLDERS OF CLAIMS OR INTERESTS AFTER THE DATE HEREOF, OR TO INCLUDE SUCH INFORMATION IN DOCUMENTS REQUIRED TO BE FILED WITH THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR OTHERWISE MAKE SUCH INFORMATION PUBLIC.

THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (THE "AICPA"), THE FINANCIAL ACCOUNTING STANDARDS BOARD (THE "FASB"), OR THE RULES AND REGULATIONS OF THE SEC REGARDING PROJECTIONS.  FURTHERMORE, THE PROJECTIONS HAVE NOT BEEN AUDITED OR REVIEWED BY AN INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM. THE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE BASED UPON A VARIETY OF ESTIMATES AND ASSUMPTIONS, WHICH MAY NOT BE REALIZED, AND ARE SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, WHICH ARE BEYOND THE CONTROL OF THE DEBTORS.  CONSEQUENTLY, THE PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE DEBTORS, OR ANY OTHER PERSON, AS TO THE ACCURACY OF THE PROJECTIONS OR THAT THE PROJECTIONS WILL BE REALIZED.  ACTUAL RESULTS MAY DIFFER MATERIALLY FROM THOSE PRESENTED IN THESE PROJECTIONS.  HOLDERS OF CLAIMS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE PROJECTIONS IN MAKING THEIR DETERMINATIONS OF WHETHER TO ACCEPT OR REJECT THE PLAN, TO THE EXTENT SUCH CLAIMS ARE ENTITLED TO VOTE.

## The Projections

**Hanson Permanente Cement and Non-Debtor Subsidiaries' Forecasted Income Statement**

| $ in 000's | 2020 Forecast | 2021 Forecast |
|---|---:|---:|
| Revenue | 3,863 | 3,941 |
| Lease Income | 18,617 | 18,990 |
| **Total Revenue** | **22,481** | **22,930** |
| Cost of Goods Sold | 1,047 | 1,068 |
| **Gross profit** | **21,434** | **21,862** |
| Lease Expense | 163 | 166 |
| Operating Expenses | 739 | 754 |
| TRMI Expense | 197 | 268 |
| Depreciation & Amortization | 26,694 | 27,228 |
| **Operating profit** | **(6,359)** | **(6,554)** |
| Other Income (Expense) | (765) | (780) |
| **Net income** | **(7,125)** | **(7,334)** |

**Hanson Permanente Cement and Non-Debtor Subsidiaries' Consolidated Forecasted Cash Flow**

| $ in 000's | 2020 Forecast | 2021 Forecast |
|---|---:|---:|
| **Cash Flow From Operating Activities** | | |
| Net Income | (7,125) | (7,334) |
| Depreciation & Amortization | 26,694 | 27,228 |
| Reclamation Cash Cost | (11,475) | (15,606) |
| (Increase)/Decrease in Working Capital | (75) | (77) |
| **Net Cash Flows from Operating Activities** | **8,019** | **4,211** |
| | | |
| **Cash Flows from Investing Activities** | | |
| Capital Expenditures | (1,524) | (1,555) |
| **Net Cash Flows from Investing Activities** | **(1,524)** | **(1,555)** |
| | | |
| **Cash Flows from Financing Activities** | | |
| Financing Activities | - | - |
| **Net Cash Flows from Financing Activities** | **-** | **-** |
| | | |
| **Total Net Cash Flow** | **6,495** | **2,656** |

**Kaiser Gypsum Forecasted Income Statement**

| $ in 000's | 2020 Forecast | 2021 Forecast |
|---|---|---|
| Revenue | - | - |
| Lease Income | 107 | 145 |
| **Total Revenue** | **107** | **145** |
| Cost of Goods Sold | - | - |
| **Gross profit** | **107** | **145** |
| Lease Expense | - | - |
| Operating Expenses | 39 | 52 |
| Depreciation & Amortization | - | - |
| **Operating profit** | **68** | **93** |
| Other Income (Expense) | - | - |
| **Net income** | **68** | **93** |

**Kaiser Gypsum Forecasted Cash Flow**

| $ in 000's | 2020 Forecast | 2021 Forecast |
|---|---|---|
| **Cash Flow From Operating Activities** | | |
| Net Income | 68 | 93 |
| Depreciation & Amortization | - | - |
| Reclamation Cash Cost | - | - |
| (Increase)/Decrease in Working Capital | - | - |
| **Net Cash Flows from Operating Activities** | **68** | **93** |
| **Cash Flows from Investing Activities** | | |
| Capital Expenditures | - | - |
| **Net Cash Flows from Investing Activities** | **-** | **-** |
| **Cash Flows from Financing Activities** | | |
| Financing Activities | - | - |
| **Net Cash Flows from Financing Activities** | **-** | **-** |
| **Total Net Cash Flow** | **68** | **93** |

**Summary of Significant Assumptions**

The Projections are based on numerous assumptions regarding the anticipated future business performance of the Debtors and their lessees, the anticipated future business performance of HPCI's non-debtor operating subsidiaries, the regulatory and permitting environment associated with the Debtors' and their lessees' respective businesses, general business and economic conditions, and any other factors that could affect the Debtors' or their lessees' businesses. Most of these assumptions are beyond the control of the Debtors and their management. Therefore, although the Projections are necessarily presented with numerical specificity, the actual results achieved during the projection period may vary from the projected results. These variations may be material. Although the Debtors believe that the assumptions underlying the Projections, when considered on an overall basis, are reasonable in light of current circumstances, no representation can be or is being made with respect to the accuracy of the Projections or the ability of the Debtors to achieve the Projections. Additional information relating to the principal assumptions used in preparing the projections is set forth below:

Revenues and Cost of Goods Sold:

HPCI's revenues are associated with cement and greenstone production and sales, together with other payments due under the leases with Lehigh Southwest Cement Company, at the Permanente Plant, including royalties, reclamation fees and lease payments. It is assumed that the current leases are renewed on the existing terms and that production and sales volumes do not materially change from past performance. Kaiser Gypsum's revenues consist of proceeds from lease payments in respect of the Real Properties which are expected to begin following the Effective Date. Lastly, revenues and related cost of goods sold from the sale and distribution of cement by Hanson Permanente Cement of Guam and Hanson Micronesia Cement are incorporated in HPCI's revenues and cost of goods sold.

Lease and Operating Expenses:

HPCI has no lease or operating expenses as the Permanente Plant is operated by Lehigh Southwest Cement Company and day-to-day property management expenses of the Permanente Plant are the lessee's responsibility. Projected lease and operating expenditures incurred by Hanson Permanente Cement of Guam and Hanson Micronesia Cement are incorporated in HPCI's operating expenses. Upon the Effective Date, Kaiser Gypsum will be responsible for the property taxes relating to the Real Properties. The Projections consider the estimated property tax amounts within operating expenses as provided by management.

TRMI Expense:

TRMI expenses relate to the Debtors' compliance with certain asbestos insurance cooperation duties, including without limitation, the receipt and tender to insurers of asbestos bodily injury claims, witness preparation and attendance at depositions or trials,

verification of written discovery, and related services performed on behalf of the Debtors. Projected TRMI expenses were based on management estimates.  TRMI expenses are projected to be incurred as of the Effective Date.

Depreciation and Amortization:

Depreciation and Amortization was estimated for HPCI's cement plant, rock plant and related equipment located at the Permanente Plant.  The Projections also include depreciation and amortization for the terminals of Hanson Permanente Cement of Guam and Hanson Micronesia Cement.

Reclamation Cash Costs:

Projected reclamation costs for 2020 reflect an estimated $1.275 million per month to reclaim the mine and land in Santa Clara, California owned by HPCI starting on the Effective Date. Projected 2021 reclamation costs were projected to grow by 2.0 percent.

Capital Expenditures:

Projected capital expenditures for HPCI were estimated to be $1.52 million and $1.54 million for years ending 2020 and 2021.  Capital expenditures are projected to decrease as the quarry is estimated to be at or near the end of its useful life in 2022, unless pending permits seeking to access additional quarry reserves are granted and minerals can be extracted at such additional quarry areas using commercially reasonable methods.  There were no projected capital expenditures for Kaiser Gypsum, Hanson Permanente Cement of Guam, and Hanson Micronesia Cement.

## **EXHIBIT IV**

## **LIQUIDATION ANALYSIS**

# LIQUIDATION ANALYSIS

## INTRODUCTION

Pursuant to section 1129(a)(7) of the Bankruptcy Code,[1] each holder of an impaired Claim or equity interest must either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such non-accepting holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code (often referred to as the "Best Interest Test").  In connection with this requirement, the following hypothetical liquidation analysis (the "Liquidation Analysis") has been prepared so that the Bankruptcy Court may determine that the Plan is in the best interest of creditors or equity holders who reject the Plan.

THE LIQUIDATION ANALYSIS IS AN ESTIMATE OF THE PROCEEDS THAT MAY BE GENERATED AS A RESULT OF A HYPOTHETICAL CHAPTER 7 LIQUIDATION OF THE ASSETS OF THE DEBTORS.  UNDERLYING THE LIQUIDATION ANALYSIS ARE A NUMBER OF ESTIMATES AND ASSUMPTIONS THAT ARE INHERENTLY SUBJECT TO UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF MANAGEMENT AND ITS ADVISORS.  ADDITIONALLY, VARIOUS LIQUIDATION DECISIONS UPON WHICH CERTAIN ASSUMPTIONS ARE BASED ARE SUBJECT TO CHANGE.  ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE ASSUMPTIONS AND ESTIMATES EMPLOYED IN DETERMINING THE LIQUIDATION VALUES OF THE DEBTORS' ASSETS WILL PRODUCE THE AMOUNTS OF PROCEEDS ESTIMATED IN THE LIQUIDATION ANALYSIS, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE.

## GENERAL ASSUMPTIONS

### Methodology

To estimate what holders of Class 4 Asbestos Personal Injury Claims would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code, the Bankruptcy Court must first determine the aggregate dollar amount that would be available if the Reorganization Cases were converted to chapter 7 cases under the Bankruptcy Code and the respective Debtors' assets were liquidated by a chapter 7 trustee (for each Reorganization Case, the "Liquidation Value").  The Liquidation Value of a Debtor would consist of the net proceeds from the disposition of the assets of the Debtor, including any net proceeds from the orderly liquidation of the equity in any non-debtor subsidiaries, augmented by any cash held by the Debtor.

The Liquidation Analysis, which was prepared by PricewaterhouseCoopers ("PwC"), the financial advisor for the Debtors, is presented for Kaiser Gypsum and HPCI.  It is based on the

---

[1]    All capitalized terms used in this Liquidation Analysis that are not otherwise defined herein shall have the meanings ascribed to them in the Plan.

assumption that the Debtors would cease operations on March 31, 2020, when confirmation of the Plan is expected to occur.  The Liquidation Analysis assumes that the assets to be liquidated are the assets reflected on the Debtors' June 30, 2019 balance sheets.  It also assumes that the liquidation of the Debtors would commence under the direction of a court-appointed chapter 7 trustee and continue for six months, during which time all of the Debtors' assets would be sold and the cash proceeds, net of liquidation-related costs, would then be distributed to creditors. The liquidation period would allow for the collection of receivables, sales of the assets, and sales of HPCI's non-debtor subsidiaries.  The Liquidation Analysis does not include recoveries in respect of any potential avoidable preferences, fraudulent conveyances or other causes of action.

The value realized from the sale of HPCI's Permanente Property is based on PwC's valuation of the property as of September 30, 2018.  This valuation was utilized because it is the most recent valuation of the Permanente Property available.  This value was discounted to take into account the uncertain salability of the property and the expedited time frame for the sale process.  The value is also assumed to be reduced because of buyer concern regarding asbestos liability risk resulting from the absence of a channeling injunction in a chapter 7 liquidation.

The value realized from the sale of the HPCI's operating subsidiary businesses is based on PwC's valuation of Hanson Micronesia Cement and Hanson Permanente Cement of Guam as of September 30, 2018.  This valuation was utilized because (a) it is the most recent valuation of such businesses available and (b) PwC believes it continues to reflect the fair market values of such businesses.  This value is assumed to be reduced by (i) buyer concern regarding asbestos liability risk given that a channeling injunction would not be available in a chapter 7 liquidation and (ii) the expedited timeline for selling two separate businesses in an unfavorable marketing environment.

In a liquidation of HPCI's assets, it is possible that the sale proceeds could be further reduced by taxes on the transactions.  The amount of potential taxes would depend on the level of taxable gains, if any, for each transaction (sale proceeds less cost basis and costs of sale), but is subject to the use of any available losses.  The Liquidation Analysis does not reflect this potential deduction for taxes.

**Intercompany Accounts**

Potential recoveries on intercompany accounts have been excluded from the Liquidation Analysis.  These recoveries are excluded for two primary reasons.  First, the amounts of any recoveries are uncertain.  Second, because the Plan provides for reinstatement of all intercompany accounts, the value of any recoveries would be captured both in a chapter 11 reorganization and a chapter 7 liquidation.

**Estimates of Cost of Liquidation**

Conversion of the chapter 11 cases to chapter 7 would result in additional costs to the Debtors' estates.  These costs would include compensation for the chapter 7 trustee and professionals retained by the trustee, including attorneys, financial advisors and consultants; asset disposition expenses; and unpaid expenses incurred by the Debtors in the chapter 11 cases that are allowed in the chapter 7 cases.

In addition, liquidation costs could be higher, and the value of any distributions correspondingly lower, if the asset sales cannot be completed within the six-month period assumed in the Liquidation Analysis.

**Hanson Permanente Cement, Inc.**

*Estimated Liquidation Proceeds as of 3/31/2020*

| $ Actuals | Notes | Book Value | % Realizable Low | % Realizable High | $ Realizable Low | $ Realizable High |
|---|---|---|---|---|---|---|
| **Current Assets** | | | | | | |
| Cash | (1) | 7,580,838 | 100% | 100% | 7,580,838 | 7,580,838 |
| Accounts Receivable | (2) | 2,126,395 | 65% | 65% | 1,374,854 | 1,374,854 |
| Insurance Receivable | (3) | 108,075,513 | 0% | 0% | - | - |
| Prepaid Expenses | (4) | 12,785 | 100% | 100% | 12,785 | 12,785 |
| **Total Current Assets** | | **117,795,532** | **8%** | **8%** | **8,968,478** | **8,968,478** |
| | | | | | | |
| **Non-Current Assets** | | | | | | |
| Net Property, Plant and Equipment | (5) | 179,663,999 | 10% | 29% | 18,116,818 | 52,136,495 |
| Net Intangible Assets | (6) | 649,979 | 0% | 1% | - | 6,270 |
| Investment in Subsidiaries | (7) | 4,363,414 | 87% | 111% | 3,814,157 | 4,854,382 |
| Receivable from Debtor Affiliates | (8) | 33,624,795 | 2% | 2% | 717,621 | 785,537 |
| **Total Non-Current Assets** | | **218,302,187** | **10%** | **26%** | **22,648,596** | **57,782,684** |
| | | | | | | |
| **Total Proceeds from Assets** | | **336,097,719** | | | **31,617,073** | **66,751,162** |
| | | | | | | |
| Chapter 7 Trustee Fees | (9) | | | | (721,087) | (1,775,110) |
| Chapter 7 Professional Fees | (10) | | | | (4,865,698) | (4,938,973) |
| | | | | | | |
| **Net Proceeds Available for Distribution** | | | | | **26,030,288** | **60,037,079** |

| | | $ Claim Low | $ Claim High | % Recovery Low | % Recovery High | $ Recovery Low | $ Recovery High |
|---|---|---|---|---|---|---|---|
| **Administrative Claims** | (11) | | | | | | |
| Reclamation and Capex | | 119,079,457 | 119,079,457 | | | 25,744,714 | 59,378,421 |
| Accrued and Unpaid Professional Fees | | 948,307 | 948,307 | | | 205,022 | 472,869 |
| TRMI Expense | | 372,588 | 372,588 | | | 80,553 | 185,789 |
| Payable to Debtor Affiliate | | - | - | | | | |
| **Total Administrative Claims** | | **120,400,352** | **120,400,352** | **22%** | **50%** | **26,030,288** | **60,037,079** |
| | | | | | | | |
| **Value Available after Administrative Claims** | | | | | | **-** | **-** |
| | | | | | | | |
| **General Unsecured Claims** | (12) | | | | | | |
| Uninsured Asbestos Obligations | | 16,666,667 | 16,666,667 | | | - | - |
| Miscellaneous Unsecured Claims | | 946,159 | 946,159 | | | - | - |
| Environmental Obligations | | Unliquidated | Unliquidated | | | - | - |
| **Total Unsecured Claims** | | **17,612,826** | **17,612,826** | **0%** | **0%** | **-** | **-** |
| | | | | | | | |
| **Value Available after Unsecured Claims** | | | | | | **-** | **-** |

**Kaiser Gypsum Company, Inc.**
*Estimated Liquidation Proceeds as of 3/31/2020*

| $ Actuals | Notes | Book Value | Chapter 7 Liquidation | | | |
| | | | % Realizable | | $ Realizable | |
| | | | Low | High | Low | High |
|---|---|---|---|---|---|---|
| **Current Assets** | | | | | | |
| Cash | (1) | 861,542 | 100% | 100% | 861,542 | 861,542 |
| Accounts Receivable | (2) | 1,700,668 | 0% | 0% | - | - |
| Insurance Receivable | (3) | 227,958,346 | 0% | 0% | - | - |
| Prepaid Expenses | (4) | 55,493 | 100% | 100% | 55,493 | 55,493 |
| **Total Current Assets** | | **230,576,049** | **0%** | **0%** | **917,034** | **917,034** |
| | | | | | | |
| **Non-Current Assets** | | | | | | |
| Net Property, Plant and Equipment | (5) | - | 0% | 0% | - | - |
| Net Intangible Assets | (6) | - | 0% | 0% | - | - |
| Investment in Subsidiaries | (7) | 332,446 | 0% | 0% | - | - |
| Receivable from Debtor Affiliates | (8) | - | 0% | 0% | - | - |
| **Total Non-Current Assets** | | **332,446** | **0%** | **0%** | | |
| | | | | | | |
| **Total Proceeds from Assets** | | **230,908,495** | | | **917,034** | **917,034** |
| | | | | | | |
| Chapter 7 Trustee Fees | (9) | | | | (1,665) | (1,665) |
| Chapter 7 Professional Fees | (10) | | | | (141,127) | (67,852) |
| | | | | | | |
| **Net Proceeds Available for Distribution** | | | | | **774,243** | **847,518** |

| | | $ Claim | | % Recovery | | $ Recovery | |
| | | Low | High | Low | High | Low | High |
|---|---|---|---|---|---|---|---|
| **Administrative Claims** | (11) | | | | | | |
| Reclamation and Capex | | - | - | | | - | - |
| Accrued and Unpaid Professional Fees | | 1,896,614 | 1,896,614 | | | 40,478 | 44,308 |
| TRMI Expense | | 756,468 | 756,468 | | | 16,145 | 17,672 |
| Payable to Debtor Affiliate | | 33,624,795 | 33,624,795 | | | 717,621 | 785,537 |
| **Total Administrative Claims** | | **36,277,876** | **36,277,876** | **2%** | **2%** | **774,243** | **847,518** |
| | | | | | | | |
| **Value Available after Administrative Claims** | | | | | | **-** | **-** |
| | | | | | | | |
| **General Unsecured Claims** | (12) | | | | | | |
| Uninsured Asbestos Obligations | | 33,333,333 | 33,333,333 | | | - | - |
| Miscellaneous Unsecured Claims | | 408 | 408 | | | - | - |
| Environmental Obligations | | Unliquidated | Unliquidated | | | - | - |
| **Total Unsecured Claims** | | **33,333,741** | **33,333,741** | **0%** | **0%** | **-** | **-** |
| | | | | | | | |
| **Value Available after Unsecured Claims** | | | | | | **-** | **-** |

## NOTES TO LIQUIDATION ANALYSIS

**Note 1 - Cash:**  Cash includes petty cash and short-term deposits, projected to be available as of March 31, 2020.

**Note 2 - Accounts Receivable:**  HPCI's accounts receivable consist of (a) lease payments due under a lease between HPCI and Lehigh Southwest Cement Company ("LSCC") related to the Permanente Property and (b) amounts due from Truck Insurance Exchange ("Truck") to reimburse HPCI for certain costs under a cost sharing agreement with the Debtors.  Kaiser Gypsum's account receivable consists solely of amounts due from Truck under the cost sharing agreement.  It is assumed that the account receivable from LSCC will be paid in full.  Pursuant to the terms of the cost sharing agreement, the accounts receivable from Truck have already been fully set off against unpaid obligations owed by the Debtors to Truck.  Accordingly, the Liquidation Analysis assumes that no additional amounts will be collected from Truck in respect of the Truck accounts receivable.

**Note 3 - Insurance Receivable:**  The insurance receivable is the estimated value of insurance coverage for Asbestos Personal Injury Claims on the Debtors' balance sheets.  It is assumed that the asbestos insurance coverage (a) will not generate any proceeds available to the Debtors for distribution to general unsecured creditors but (b) will continue to cover Asbestos Personal Injury Claims in a chapter 7 liquidation.  Asbestos insurance receivable figures were set off against the uninsured asbestos obligations discussed in note 12 as they are only available to settle Asbestos Personal Injury Claims.

**Note 4 - Prepaid Expenses:**  Prepaid expenses consist of professional retainers, which are assumed to be fully returned to the Debtors.

**Note 5 – Net Property, Plant, and Equipment:** Property, Plant & Equipment consists of HPCI's land, land improvements, building and improvements, plant, machinery and equipment, furniture and fixtures, and quarries at the Permanente Property.  Estimated recoveries for the property, plant, and equipment are based on the fair market value of the PP&E reflected in PwC's September 30, 2018 valuation.  The value of the commercial land is net of projected reclamation costs.  The fair market value of the PP&E is then discounted by 30% to 45% to account for (a) limited marketing caused by the expedited timeline for the sales and (b) a lower purchase price due to asbestos liability risk resulting from the absence of a section 524(g) channeling injunction.

**Note 6 - Intangible Assets:**  Intangible assets comprise software and permitting for engineered exhaust stacks.  The recovery on the software is estimated to range from 0% to 20% due to its mature age.  The permitting is assumed to have no value in a chapter 7 liquidation because it is not transferrable.

**Note 7 - Investment in Subsidiaries:** The HPCI liquidation analysis assumes that HPCI's non-debtor subsidiaries, Hanson Micronesia Cement, Inc. and Hanson Permanente Cement of Guam, Inc., are sold on a going concern basis for cash in separate transactions.  The proceeds from these sale transactions are assumed to (a) all be available to HPCI through its equity interest in the

subsidiaries and (b) equal the fair market value of those entities based on PwC's valuation as of September 30, 2018, less a discount factor of 30% to 45%, which discount is required due to the following risks:

- **Asbestos Liability Risk:** Unlike a chapter 11 reorganization, a chapter 7 liquidation would not provide for the issuance of an asbestos channeling injunction or a discharge of asbestos claims. Although HPCI's operating subsidiaries do not have direct asbestos liability exposure, buyers would likely still have concerns purchasing businesses owned by an entity with asbestos liability exposure. As a result, a discount is applied to reflect the probability that the businesses could only be sold at amounts less than fair value.

- **Marketing Environment/Expedited Timeline:** In a chapter 7 liquidation, HPCI would face a market environment in which buyers seek to capitalize on the forced nature of the divestitures. In addition, HPCI would face the challenge of selling its assets and its non-debtor subsidiaries' businesses in a relatively short timeframe.

**Note 8 -- Receivable from Debtor Affiliate:** During the chapter 11 case, HPCI has made cash transfers to Kaiser Gypsum in an aggregate amount of $25,014,557 (as of July 31, 2019) to fund the cost of Kaiser Gypsum's chapter 11 case. Based on projected professional fees, it is estimated that such cash transfers will be in a total amount of $33,624,795 as of March 31, 2020. The Liquidation Analysis assumes that these postpetition transfers constitute administrative expense claims against Kaiser Gypsum.

**Note 9 – Trustee Fees:** It is assumed that the chapter 7 trustee would receive payments equal to 3.0% of the estimated total proceeds from the sale of the businesses (excluding cash).

**Note 10 – Professional Fees:** The costs associated with a chapter 7 liquidation of Kaiser Gypsum and HPCI are assumed to include fees and expenses for professionals retained by the chapter 7 trustee, including legal and financial advisors and brokers. It is assumed that legal fees will be $300,000 per month and financial advisor fees will be $100,000 per month during the chapter 7 liquidation. Brokerage fees are calculated at 5.0% of estimated total proceeds from the sales of HPCI's PP&E. As a result, total fees are estimated to be $5.0 million, which are then allocated to each Debtor based on their relative share of total proceeds.

**Note 11 – Administrative Expense Claims:** Administrative expense claims comprise (a) estimated claims of LSCC for reimbursement of reclamation and capital expenditure costs in respect of the Permanente Plant paid by LSCC during the chapter 11 case, (b) accrued and unpaid chapter 11 professional fees and expenses estimated to be due and owing upon the commencement of a chapter 7 case for each Debtor, (c) the estimated unpaid fees and costs owed by the Debtors to non-debtor Three Rivers Management, Inc. under a services agreement between the parties and (d) HPCI's postpetition account receivable from Kaiser Gypsum. Any administrative expense claim asserted by LSCC would be subject to the rights of any party in interest, including the Creditors' Committee, the Asbestos Personal Injury Committee and the Future Claimants' Representative, to oppose such administrative expense claims. The Debtors reserve all rights with respect to any administrative expense claim asserted by LSCC.

**Note 12 – General Unsecured Claims:**  General unsecured claims consist of the uninsured portion of Asbestos Personal Injury Claims, miscellaneous unsecured claims, and environmental obligations.  The Debtors' uninsured asbestos obligations are assumed to be $50 million (net of insurance amounts as addressed in note 3), which is the amount that will be contributed to the asbestos trust under the Plan, excluding the disputed claim of the Debtors against Truck.  Consistent with past allocations of shared expenses between the Debtors, the uninsured asbestos obligations are assumed to be allocated as follows:  one-third to HPCI; and two-thirds to Kaiser Gypsum.

The amounts and recoveries on account of environmental liabilities in a chapter 7 are unknown.  While the Debtors have reached settlements with respect to claims filed at the Lower Duwamish and St. Helens sites, (1) the settlements with claimants at the Lower Duwamish site are predicated upon confirmation of a chapter 11 plan that satisfies such claims in full, and (2) the source of funds available to satisfy the claims at both sites is only available in the context of the Plan.  Indeed, the satisfaction of environmental claims under the Plan is based upon settlements with certain insurers and a significant contribution from Lehigh Hanson.  The Debtors believe that it is unlikely that the insurers would be willing to agree to the same or similar settlements in the context of a chapter 7 conversion, and Lehigh Hanson has indicated that it would not be willing to provide any funding on account of the environmental claims in the context of a chapter 7 conversion.  Accordingly, the Liquidation Analysis makes no assumption regarding the amounts or recoveries on account of the Debtors' environmental liabilities in the context of a chapter 7 conversion.

## EXHIBIT V

**LIST OF ASBESTOS-CONTAINING PRODUCTS
MANUFACTURED OR SOLD BY EITHER KAISER GYPSUM
COMPANY, INC. OR HANSON PERMANENTE CEMENT, INC.**

| Product/Trade Name | Product Description | Date Manufacturing Activity With Respect to Asbestos-Containing Product Ceased |
|---|---|---|
| **HANSON PERMANENTE CEMENT, INC.** | | |
| Plastic Gun Cement | <u>Purpose</u>: Used to make stucco for the exterior of houses and other buildings (applied by gun)<br><br><u>Description</u>: Grey colored powder. Packaged and sold generally in sacks of 96 lbs. | October 1973 |
| Plastic Cement (Hand) | <u>Purpose</u>: Used to make stucco for the exterior of houses and other buildings (applied by gun)<br><br><u>Description</u>: Grey colored powder. Packaged and sold generally in sacks of 96 lbs. | July 1973 |
| Masonry Cement | <u>Purpose</u>: Used to make masonry mortar for building construction.<br><br><u>Description</u>: Grey colored powder. Packaged and sold generally in sacks of 78 lbs. | October 1973 |
| Plastite | <u>Purpose</u>: Used to make stucco for building exteriors (applied manually).<br><br><u>Description</u>: Packaged and sold generally in sacks of 100 lbs. net. | 1945 |
| Plasti-Spread | <u>Purpose</u>:  Used to make stucco for the exterior of houses and other buildings (applied manually).<br><br><u>Description</u>:  Grey colored powder.  Packaged and sold generally in sacks of 96 pounds. | 1971 |
| **KAISER GYPSUM COMPANY, INC.** | | |
| Cover-Tex Texture Paint | <u>Purpose</u>: Used to produce texture effects over gypsum wallboard surfaces.<br><br><u>Description</u>: White to off-white powder. Packaged and sold in sacks of 25 and 50 lbs. | Cover-Tex became asbestos-free in 1975 |

| Product/Trade Name | Product Description | Date Manufacturing Activity With Respect to Asbestos-Containing Product Ceased |
|---|---|---|
| Spray-Tex/ Cover-Tex Spray Texture Paint | Purpose: Used to produce texture effects over gypsum wallboard surfaces.<br><br>Description: White to off-white powder. Packaged and sold in sacks of 25 and 50 lbs. | 1967 |
| Kaiser-Tex Texture Paint | Purpose: Used to produce texture effects over gypsum wallboard surfaces.<br><br>Description: White to off-white powder. Packaged and sold in sacks of 10 and 25 lbs. | 1967 |
| Kaiser Gypsum Cover-Tex (TSS) Wall Texture | Purpose: Used to produce texture effects over gypsum wallboard surfaces.<br><br>Description: White to off-white powder. Packaged and sold in sacks of 50 lbs. | 1975 |
| Kaiser Gypsum K-Spray Ceiling Texture (including K-Spray Ceiling Texture, K-Spray Ceiling Texture Paint (Polystyrene), K-Spray Texture Paint with mineral filler, K-Spray Texture with mineral aggregate, and K-Spray Ceiling Texture Paint (mineral aggregate)) | Purpose: Used to produce textured ceilings.<br><br>Description: White powder with mineral aggregate. Generally packaged and sold in sacks of 32 lbs. | 1975 |
| Kaiser Joint Compound-Powder (also known as " Kaiser Joint Cement") | Purpose: Used to fill gypsum wallboard joints, embed joint reinforcing tape, finish joints and to cover and finish nailheads and metal cornerbead.<br><br>Description: Off-white powder. Packaged and sold in sacks of 10 and 25 lbs. and in cartons of 5 and 10 lbs. | 1975 |
| Kaiser Gypsum Finishing (Topping) Compound-Powder (Separate product bulletins exist for casein-based, vinyl-based, and polymeric-based versions of this product) | Purpose: Used to top and finish gypsum wallboard joints.<br><br>Description: White to off-white powder. Packaged and sold in sacks of 25 lbs. | 1975 |

| Product/Trade Name | Product Description | Date Manufacturing Activity With Respect to Asbestos-Containing Product Ceased |
|---|---|---|
| Kaiser Gypsum 3-Purpose Wallboard/Joint Compound (Separate product bulletins exist for casein-based, vinyl-based, and polymeric-based versions of this product) | <u>Purpose</u>:  Used to tape, top, and finish gypsum wallboard joints, nail heads, and metal cornerbead.<br><br><u>Description</u>:  White to off-white powder. Packaged and sold in sacks of 25 lbs. | 1976 |
| Kaiser Gypsum One-Day Joint Compound | <u>Purpose</u>:  Used to fill gypsum wallboard joints, embed joint reinforcing tape, finish joints and to cover and finish nail heads and metal cornerbead.<br><br><u>Description</u>:  White to off-white powder packaged and sold in 25 lb sacks. | 1975 |
| Kaiser Gypsum Pre-Mix Joint Compound | <u>Purpose</u>:  Used to finish gypsum wallboard joints, embed joint reinforcing tape, finish joints and to cover and finish nail heads and metal cornerbead.<br><br><u>Description</u>:  White to off-white or light buff-colored paste. | 1975 |
| Kaiser Gypsum Pre-Mix Finishing Compound | <u>Purpose</u>:  Used to finish gypsum wallboard joints and to cover and finish nail heads and metal cornerbead.<br><br><u>Description</u>:  White to off-white colored paste. Packaged and sold in cans of 4 or 5 gallons and in cartons of 5 gallons. | Unknown |

| Product/Trade Name | Product Description | Date Manufacturing Activity With Respect to Asbestos-Containing Product Ceased |
|---|---|---|
| Kaiser Gypsum Pre-Mix Taping Compound | <u>Purpose</u>: Used to embed reinforcing tape and conceal joints and nailheads.<br><br><u>Description</u>: Product color is unknown. In 1972, the product was packaged in Pre-Mix Dual Purpose contained marked with an X. In 1973, the product was ordered in 4 gallon cartons and 5 gallon buckets. The Packaging Material Bulleting referenced 5 gallon cans and plastic pails, as well as 5 gallon cartons and 5 quart pails. | Exact date unknown, but no later than October 7, 1974 |
| Kaiser Gypsum Dual Purpose Premix Compound | <u>Purpose</u>: Used to fill gypsum wallboard joints, embed joint reinforcing tape, finish joints and to cover and finish nail heads and metal cornerbead.<br><br><u>Description</u>: White to off-white or light buff colored paste. Packaged and sold in metal and plastic buckets of 4 or 5 gallons and in cartons of 4 or 5 gallons. Also packaged in 5 quart plastic buckets under the name Three Purpose Premix Compound. | 1975 |
| Pre-Mix Topping Compound/Kaiser Gypsum PreMix Topping Compound | <u>Purpose</u>: Used to top and finish gypsum wallboard joints.<br><br><u>Description</u>: White to off-white or light buff colored paste. Packaged and sold in metal and plastic buckets of 4 or 5 gallons and in cartons of 4 gallons. | 1975 |
| Kaiser Gypsum Laminating Compound | <u>Purpose</u>: Adhesive used to laminate wallboard to wallboard or to sound deadening board.<br><br><u>Description</u>: White to off-white powder. Packaged and sold in sacks of 25 lbs. | 1972 |

| Product/Trade Name | Product Description | Date Manufacturing Activity With Respect to Asbestos-Containing Product Ceased |
|---|---|---|
| Spackling Compound (Kaiser Gypsum cannot confirm nor refute that this product contained chrysotile asbestos) | <u>Purpose</u>:  Designed for use in home remodeling projects.<br><br><u>Description</u>:  N/A, may be the same as One-Day Joint Compound. | 1971 |
| Kaiser Gypsum Filler Compound | <u>Purpose</u>:  Used to cover radiant heat system ceiling surfaces.<br><br><u>Description</u>:  White to off-white powder. Packaged and sold in sacks of 50 lbs. | 1972 |
| Kaiser Gypsum Radiant Heat Joint Compound | <u>Purpose</u>:  Used to cover radiant heat cables stapled to ceiling surfaces.<br><br><u>Description</u>:  White to off-white powder. Packaged and sold in sacks of 60 lbs. | 1974 |
| Kaiser Gypsum Radiant Heat Scrimless Surfacing Compound | <u>Purpose</u>:  Used to cover radiant heat cables stapled to ceiling surfaces.<br><br><u>Description</u>:  Greenish powder packaged and sold in 25 lb and 50 lb sacks. | 1974 |
| Kaiser Gypsum Radiant Heat Compound | <u>Purpose</u>:  Used to cover radiant heat cables stapled to ceiling surfaces.<br><br><u>Description</u>:  White to off-white powder packaged and sold in sacks of 60 lbs. | 1974 |
| Kaiser Gypsum Radiant Heat Surfacing Compound | <u>Purpose</u>:  Used to cover radiant heat cables embedded in ceiling surfaces.<br><br><u>Description</u>:  Greenish powder packaged and sold in sacks of 25 lbs. | 1974 |
| Kaiser Gypsum Pre-mix Radiant Heat Joint Compound | <u>Purpose</u>:  Used to cover radiant heat cables embedded in ceiling surfaces.<br><br><u>Description</u>:  N/A | Unknown |

| Product/Trade Name | Product Description | Date Manufacturing Activity With Respect to Asbestos-Containing Product Ceased |
|---|---|---|
| Kaiser Gypsum Joint Compound (Casein Based) Radiant Heat Surfacing Compound | <u>Purpose:</u>  Used to cover radiant heat cables stapled to ceiling surfaces.<br><br><u>Description:</u>  N/A | Unknown |
| Kaiser Gypsum X-Terior Premix Prefill | <u>Purpose:</u>  Used to prefill joints in gypsum wallboard installed on building exteriors.<br><br><u>Description:</u> White to off-white paste. Packaged and sold in metal cans and plastic buckets of 60 lbs. and cartons of 48 and 60 lbs. | 1975 |
| Kaiser Gypsum X-Terior Premix Wall Texture Compound | <u>Purpose:</u>  Used to provide surface texture to gypsum wallboard on building exteriors.<br><br><u>Description:</u>  White to off-white paste. Packaged and sold in 58 lb. metal cans, plastic buckets and cartons. | 1975 |
| 2-Hour Fire Rated Kaiser Gypsum Mineral Fiberboard UL Fire- Rated (Underwriters Laboratories, Inc. design) (Also known as Kaiser Mineral Fiberboard – U.L. Fire-Rated (Underwriters' Laboratories, Inc. Design)) | <u>Purpose:</u>  Used for acoustical ceiling tile and lay-in board.<br><br><u>Description:</u>  5/8" thick by 12" x 12" with tongue and groove edges; 5/8" thick by  24" x 24" or 24" x 48"; and ½" thick by 24" x 48".  Face side white or colored and with fissured design for acoustical treatment. Packaged and sold in boxes of various quantities. | 1974 |
| Kaiser Gypsum Null-A-Fire Type-X Gypsum Wallboard (vermiculite from W.R. Grace may have been contaminated with asbestiform tremolite) | <u>Purpose:</u>  Thick Gypsum wallboard that was fire-rated.<br><br><u>Description:</u>  N/A | N/A |