**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| KAISER GYPSUM COMPANY, INC., *et al.*,[1] | : | Case No. 16-31602 (JCW) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |
| | : | |

**DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF**
**CONFIRMATION OF THE JOINT PLAN OF REORGANIZATION OF**
**KAISER GYPSUM COMPANY, INC. AND HANSON PERMANENTE CEMENT, INC.**

C. Richard Rayburn, Jr. (NC 6357)
John R. Miller, Jr. (NC 28689)
RAYBURN COOPER & DURHAM, P.A.
1200 Carillon
227 West Trade Street
Charlotte, North Carolina 28202

-and-

Gregory M. Gordon (TX 08435300)
Amanda Rush (TX 24079422)
JONES DAY
2727 N. Harwood Street
Dallas, Texas 75201

-and-

Paul M. Green (TX 24059854)
JONES DAY
717 Texas, Suite 3300
Houston, Texas  77002

ATTORNEYS FOR DEBTORS

---

1    The Debtors are the following entities (the last four digits of their respective taxpayer identification numbers follow in parentheses):  Kaiser Gypsum Company, Inc. (0188) and Hanson Permanente Cement, Inc. (7313).  The Debtors' address is 300 E. John Carpenter Freeway, Irving, Texas 75062.

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ................................................................ 1

II.   BACKGROUND AND OVERVIEW OF THE PLAN .................................. 3

    A.    The Debtors.................................................................................... 3

        1.    Corporate History.............................................................. 3

        2.    Overview of the Debtors' Asbestos Liability and Asbestos
            Insurance Policies ............................................................. 4

        3.    Overview of the Debtors' Environmental Liability................. 6

    B.    The Reorganization Cases............................................................ 6

        1.    Commencement of the Reorganization Cases ........................ 6

        2.    Settlements Reached During the Reorganization Cases ......... 7

    C.    Overview of the Treatment of Stakeholders ................................ 11

III.  MODIFICATIONS TO THE PLAN; OBJECTIONS THAT HAVE BEEN
    WITHDRAWN OR RESOLVED................................................................ 11

    A.    The Objections Filed by the Objecting Excess Insurers ................ 12

    B.    The Limited Objection Filed by the UCC........................................ 13

    C.    Informal Objection of the Department of Justice ............................. 13

IV.   TRUCK LACKS STANDING TO OBJECT TO THE PLAN......................... 15

    A.    The Plan is Insurance Neutral ..................................................... 15

    B.    Truck Lacks Standing to Object to the Structure and Funding of the
        Asbestos Personal Injury Trust .................................................... 18

V.    THE PLAN SHOULD BE CONFIRMED .................................................. 23

    A.    The Plan Meets Each Requirement for Confirmation Under
        Section 1129(a) of the Bankruptcy Code....................................... 23

        1.    Section 1129(a)(1) — The Plan Complies with the Applicable
            Provisions of the Bankruptcy Code ...................................... 23

        2.    Section 1129(a)(2) — The Proponents of the Plan Have Complied
            with the Applicable Provisions of Title 11 .............................. 30

        3.    Section 1129(a)(3) — The Plan Has Been Proposed in Good Faith........ 33

        4.    Section 1129(a)(4) — All Payments To Be Made by the Debtors in
            Connection With These Reorganization Cases Are Subject to Court
            Approval .......................................................................... 36

## TABLE OF CONTENTS
### (continued)

**Page**

| | | |
|---|---|---|
| 5. | Section 1129(a)(5) — The Plan Discloses All Required Information Regarding Post-Confirmation Management and Insiders | 37 |
| 6. | Section 1129(a)(6) — The Plan Does Not Provide for Any Rate Change Subject to Regulatory Approval | 38 |
| 7. | Section 1129(a)(7) — The Plan Is in the Best Interests of Creditors | 39 |
| 8. | Section 1129(a)(8) — The Plan Has Been Accepted by the Requisite Classes of Claims and Interests | 40 |
| 9. | Section 1129(a)(9) — The Plan Provides for the Payment of Priority Claims | 42 |
| 10. | Section 1129(a)(10) — The Plan Has Been Accepted by at Least One Impaired, Non-Insider Class | 43 |
| 11. | Section 1129(a)(11) — The Plan Is Feasible | 43 |
| 12. | Section 1129(a)(12) — The Plan Provides for the Payment of Fees | 45 |
| 13. | Section 1129(a)(13) — The Plan Provides for the Continuation of the Debtors' Obligations To Pay Retiree Benefits | 46 |
| 14. | Section 1129(d) — The Plan's Purpose Is Consistent with the Bankruptcy Code | 46 |
| VI. | THE ASSUMPTION, ASSUMPTION AND ASSIGNMENT OR REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES UNDER THE PLAN SHOULD BE APPROVED | 46 |
| VII. | THE ASBESTOS PERSONAL INJURY TRUST'S ACCESS TO CERTAIN DOCUMENTS IN THE DOCUMENT REPOSITORY DOES NOT DESTROY OR WAIVE ANY PRIVILEGES OR PROTECTIONS | 48 |
| VIII. | THE PLAN SATISFIES THE REQUIREMENTS OF SECTION 524(G) OF THE BANKRUPTCY CODE AND THE OBJECTIONS ASSERTED WITH RESPECT TO SECTION 524(G) SHOULD BE OVERRULED | 51 |
| | A. The Asbestos Personal Injury Trust Satisfies the Structure and Funding Requirements of Section 524(g)(2)(B)(i) of the Bankruptcy Code | 51 |
| | 1. The Plan Satisfies Section 524(g)(2)(B)(i)(I) | 51 |
| | 2. The Plan Satisfies Section 524(g)(2)(B)(i)(II) | 53 |
| | 3. The Plan Satisfies Section 524(g)(2)(B)(i)(III) | 58 |
| | 4. The Plan Satisfies Section 524(g)(2)(B)(i)(IV) | 61 |
| | 5. The Debtors Are Entitled to a Discharge | 62 |

# TABLE OF CONTENTS
(continued)

**Page**

| | | | |
|---|---|---|---|
| | B. | The Debtors' History, the Nature of Asbestos-Related Litigation and the Facts of These Reorganization Cases Support the Findings Required for Issuance of the Asbestos Permanent Channeling Injunction | 62 |
| | C. | The Court May Extend the Asbestos Permanent Channeling Injunction to Third Parties | 67 |
| | D. | The Court Has Appointed a Legal Representative to Protect the Rights of Persons Who Might Subsequently Assert Demands | 69 |
| | E. | Entry of the Asbestos Permanent Channeling Injunction Is Fair and Equitable With Respect to Future Asbestos Claimants | 69 |
| IX. | | REPLY TO TRUCK'S OTHER OBJECTIONS | 71 |
| | A. | Truck's Litigation Tactics Do Not Divest the Court of Authority to Enter the Plan Finding | 71 |
| | B. | Truck's Confirmation Objection and the Plan Finding Are Core Matters | 73 |
| | | 1. Truck's Confirmation Objection and the Plan Finding "Arise In" the Reorganization Cases Because the Debtors' Alleged Breaches of the Truck Policies Would Not Exist But For the Bankruptcy | 74 |
| | | 2. Truck's Confirmation Objection and the Plan Finding Also "Arise Under" the Bankruptcy Code | 79 |
| | | 3. This Court Also Has Constitutional Authority to Rule on Truck's Confirmation Objection and Enter the Plan Finding | 80 |
| | C. | An Adversary Proceeding Is Not Necessary to Resolve Truck's Objection or Enter the Plan Finding | 81 |
| | D. | Truck Has Waived Any Potential Right to a Jury Trial | 82 |
| | E. | The Court May Enter the Plan Finding Based Solely on the Terms of the Plan, the Asbestos Insurance Policies and Applicable Case Law | 85 |
| | F. | The Debtors Have Not Breached Their Duties to Truck Under the Truck Policies | 87 |
| | | 1. The Plan Does Not Constitute a Breach of the Assistance and Cooperation Clause | 87 |
| | | 2. The Plan Does Not Constitute a Breach of the Truck Policies' Implied Covenant of Good Faith and Fair Dealing | 94 |
| | G. | Truck's Allegations of Bad Faith Are Meritless and Self-Serving | 96 |
| X. | | REQUEST FOR AUTHORITY TO CONSUMMATE AND IMPLEMENT THE PLAN NOTWITHSTANDING 14-DAY STAY OF THE CONFIRMATION ORDER IMPOSED BY OPERATION OF BANKRUPTCY RULE 3020(E) | 99 |

# TABLE OF CONTENTS

(continued)

**Page**

XI.    CONCLUSION ................................................................................................................. 99

# TABLE OF AUTHORITIES

**Page**

CASES

Acequia, Inc. v. Clinton (In re Acequia, Inc.),
   787 F.2d 1352 (9th Cir. 1986) ......................................................................26, 28

Allied Tech., Inc. v. R.B. Brunemann & Sons, Inc.,
   25 B.R. 484 (Bankr. S.D. Ohio 1982)....................................................................47

Andrade v. Jennings,
   54 Cal. App. 4th 307 (1997) ...................................................................................93

Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm.,
   321 B.R. 147 (D.N.J. 2005) ...................................................................................16

Benjamin v. Aroostook Med. Ctr., Inc.,
   57 F.3d 101 (lst Cir. 1995).....................................................................................22

Bergstrom v. Dalkon Shield Claimants Trust (In re A.H. Robins Co.),
   86 F.3d 364 (4th Cir. 1996) .......................................................................74, 76, 77

Billington v. Interins. Exch. of S. Cal.,
   71 Cal.2d 728 (1969) .............................................................................................90

Borman's, Inc. v. Allied Supermarkets, Inc.,
   706 F.2d 187 (6th Cir. 1983) .................................................................................47

Bowles v. Massey Energy Co.,
   2012 WL 6628953 (S.D. W. Va. Dec. 19, 2012).....................................................74

Catholic Bishop of N. Alaska v. Continental Ins. Co. (In re Catholic Bishop of N.
   Alaska),
   2008 WL 8657847 (Bankr. D. Alaska Sept. 16, 2008)............................................75

Century Indemn. Co. v. Special Metals Corp. (In re Special Metals Corp.),
   317 B.R. 326 (Bankr. E.D. Ky. 2004) ..............................................................78, 79

City of Covington v. Covington Landing Ltd. P'ship,
   71 F.3d 1221 (6th Cir. 1995) .................................................................................47

Comunale v. Traders & Gen. Ins. Co.,
    50 Cal.2d 654 (1958) ................................................................................................95

Campbell v. Allstate Ins. Co.,
    60 Cal.2d 303 (1963) .........................................................................................89, 90

Egan v. Mut. of Omaha Ins. Co.,
    24 Cal.3d 809 (1979) ..............................................................................................95

Endurance Amer. Specialty Ins. Co. v. Lance-Kashian & Co.,
    2010 WL 3619476 (E.D. Cal. Sept. 13, 2010)........................................................94

Fin. Sec. Assur. Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd.
    P'ship),
    116 F.3d 790 (5th Cir. 1997) ..................................................................................34

Friends of the Earth, Inc. v. Laidlaw Envtl. Servo (TOC), Inc.,
    528 U.S. 167 (2000)................................................................................................20

G-I Holdings, Inc. v. Hartford Accident & Indemn. Co. (In re G-I Holdings Inc.),
    278 B.R. 376 (Bankr. D. Del. 2002) .......................................................................75

Granfinanciera, S.A. v. Nordberg,
    492 U.S. 33 (1989)............................................................................................82, 83

Grausz v. Englander,
    321 F.3d 467 (4th Cir. 2003) .............................................................................73, 77

Grp. of Inst'l Investors v. Chi., M., St. P., & P.R. Co.,
    318 U.S. 523 (1943)................................................................................................47

Hale v. Provident Life & Acc. Ins. Co.,
    2003 WL 1510463 (Cal. Ct. App. Mar. 25, 2003)...................................................94

Hall v. Travelers Ins. Cos.,
    15 Cal. App. 3d 304 (1971) ....................................................................................89

Hanson v. First Bank of S.D.,
    828 F.2d 1310 (8th Cir. 1987) ................................................................................33

Harlan v. Rosenberg & Assocs., LLC (In re Harlan),
    402 B.R. 703 (Bankr. W.D. Va. 2009) ....................................................................73

NAI-1508961146

In re A.P.I., Inc.,
331 B.R. 828 (Bankr. D. Minn. 2005), aff'd sub nom. OneBeacon Am. Ins.
Co. v. A.P.I., Inc., 2006 WL 1473004 (D. Minn. May 25, 2006).............................................23

In re ABB Lummus Glob. Inc.,
2006 WL 2052409 (Bankr. D. Del. 2006) ...............................................................................60

In re Adelphia Commc'ns Corp.,
307 B.R. 404 (Bankr. S.D.N.Y. 2004).....................................................................................84

In re Am. Capital Equip., LLC,
688 F.3d 145 (3d Cir. 2012)........................................................................................... passim

In re AOV Indus.,
31 B.R. 1005 (D.D.C. 1983), aff'd in part, rev'd in part,
792 F.2d 1140 (D.C. Cir. 1986)...............................................................................................39

In re Applied Safety, Inc.,
200 B.R. 576 (Bankr. E.D. Pa. 1996) .....................................................................................20

In re Babcock & Wilcox, Co.,
2001 WL 1018366 (E.D. La. July 2, 2001) ...............................................................75, 76, 77

In re Babcock & Wilcox Co.,
2004 WL 4945985 (Bankr. E.D. La. Nov. 9, 2004) ................................................................79

In re Burns & Roe Enters., Inc.,
2009 WL 438694 (D.N.J. Feb. 23, 2009) ...................................................................52, 59, 97

In re Catholic Bishop of N. Alaska,
2009 WL 8412175 (Bankr. D. Alaska Sept. 11, 2009)............................................................16

In re Cellular Info. Sys., Inc.,
171 B.R. 926 (Bankr. S.D.N.Y. 1994).....................................................................................44

In re Celotex Corp.,
204 B.R. 586 (Bankr. M.D. Fla. 1996) ...................................................................................14

In re Century Glove, Inc.,
1993 WL 239489 (D. Del. Feb. 10, 1993) ..............................................................................34

In re Chapel Gate Apartments, Ltd.,
64 B.R. 569 (Bankr. N.D. Tex. 1986)......................................................................................36

NAI-1508961146

In re China Fishery Grp. Ltd.,
   2017 WL 3084397 (Bankr. S.D.N.Y. July 19, 2017) ...............................................84

In re Combustion Eng'g, Inc.,
   391 F.3d 190 (3d Cir. 1994).......................................................................... passim

In re Combustion Eng'g, Inc.,
   2005 Bankr. LEXIS 2623 (Bankr. D. Del. Dec. 19, 2005)....................................56

In re Congoleum Corp.,
   362 B.R. 167 (Bankr. D.N.J. 2007) .....................................................................61

In re Crowthers McCall Pattern, Inc.,
   120 B.R. 279 (Bankr. S.D.N.Y. 1990)..................................................................39

In re Drexel Burnham Lambert Grp. Inc.,
   138 B.R. 723 (Bankr. S.D.N.Y. 1992).............................................................25, 44

In re Duncan,
   448 F.3d 725 (4th Cir. 2006) ...............................................................................82

In re Eagle-Picher Indus., Inc.,
   203 B.R. 256 (Bankr. S.D. Ohio 1996).......................................................24, 36, 39

In re Econ. Lodging Sys., Inc.,
   205 B.R. 862 (Bankr. N.D. Ohio 1997)................................................................39

In re First Interregional Equity Corp.,
   218 B.R. 731 (Bankr. D.N.J. 1997) .....................................................................25

In re Flintkote,
   Case No. 04-11300 (Bankr. D. Del. July 20, 2009)..............................................57

In re Flintkote,
   Case No. 04-11300 (Bankr. D. Del. Dec. 21, 2012,
   as Modified Nov. 16, 2011) .................................................................................58

In re Flintkote Co.,
   486 B.R. 99 (Bankr. D. Del. 2012), aff'd, 526 B.R. 515 (D. Del. 2014) ...........15, 57

In re Fuller-Austin Insulation,
   1998 U.S. Dist. LEXIS 18340 (D. Del. Nov. 10, 1998) ........................................19

NAI-1508961146

In re Fuller-Austin Insulation,
    1998 WL 812388 (D. Del. Nov. 10, 1998) ...............................................................21

In re G-I Holdings, Inc.,
    2009 U.S. Dist. LEXIS 108339 (Bankr. D.N.J. Nov. 12, 2009) ...............................56

In re Garlock Sealing Techs., LLC,
    504 B.R. 71 (Bankr. W.D.N.C. 2014) ......................................................................87

In re Garlock Sealing Techs. LLC,
    2017 WL 2539412 (W.D.N.C. June 12, 2017) .............................................52, 54, 60

In re Glob. Indus. Tech., Inc.,
    645 F.3d 201 (3d Cir. 2011) ..............................................................................15, 16

In re Grand Jury Subpoenas 89-3 & 89-4, John Doe 89-129 (Under Seal),
    902 F.2d 244 (4th Cir. 1990) ...................................................................................50

In re Grand Traverse Dev. Co. Ltd. P'ship,
    150 B.R. 176 (Bankr. W.D. Mich. 1993) .................................................................93

In re J T Thorpe Co.,
    308 B.R. 782 (Bankr. S.D. Tex. 2003) .............................................................21, 54

In re Jersey City Med. Ctr.,
    817 F.2d 1055 (3d Cir. 1987) ...................................................................................25

In re Johns-Manville Corp.,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986), affd, 78 B.R. 407 (S.D.N.Y. 1987), affd
    sub nom. Kane v. Johns-Manville Corp., 843 F.2d 636 (2d Cir. 1988)......................20, 36, 44

In re Lackawanna Detective Agency, Inc.,
    82 B.R. 336 (Bankr. D. Del. 1988) ..........................................................................23

In re Lapworth,
    1998 WL 767456 (Bankr. E.D. Pa. Nov. 2, 1998) ...................................................31

In re Leslie Controls, Inc.,
    Case No. 10-12199 (CSS) (Bankr. D. Del. Jan. 10, 2011) ................................15, 55

In re Leslie Controls, Inc.,
    2011 WL 1901547 (Bankr. D. Del. Jan. 18, 2011), aff'd, 2011 WL 1226402
    (D. Del. Mar. 25, 2011).............................................................................................60

In re Market Square Inn, Inc.,
    978 F.2d 116 (3d Cir. 1992).........................................................................47

In re Martin,
    66 B.R. 921 (Bankr. D. Mont. 1986) .........................................................43

In re Michener,
    342 B.R. 428 (Bankr. D. Del. 2006) ...........................................................35

In re Mid-Valley, Inc.,
    305 B.R. 425 (Bankr. W.D. Pa. 2004) ........................................................23

In re Mid-Valley, Inc.,
    Case No. 03-35592(JKF) (Bankr. W.D. Pa. July 16, 2004) .......................59

In re Mount Carbon Metro. Dist.,
    1999 Bankr. LEXIS 1643 (Bankr. D. Colo. July 20, 1999).......................20

In re Mount Vernon Plaza Cmty. Urban Redevelopment Corp. I,
    79 B.R. 305 (Bankr. S.D. Ohio 1987)........................................................15

In re MPM Silicones, LLC,
    2014 WL 4637175 (Bankr. S.D.N.Y. Sept. 17, 2014)..............................94

In re New Valley Corp.,
    168 B.R. 73 (Bankr. D.N.J. 1994) ..............................................................33

In re Pittsburgh Corning Corp.,
    417 B.R. 289 (Bankr. W.D. Pa. 2006) ........................................................15

In re Pittsburgh Corning Corp.,
    453 B.R. 570 (Bankr. W.D. Pa. 2011) ........................................................16

In re Placid Oil Co.,
    92 B.R. 183 (Bankr. N.D. Tex. 1988).........................................................15

In re Plant Insulation Co.,
    485 B.R. 203 (N.D. Cal. 2012), rev'd on other grounds,
    734 F.3d 900 (9th Cir. 2013) ............................................................. passim

In re Plant Insulation Co.,
    734 F.3d 900 (9th Cir. 2013) .....................................................................61

NAI-1508961146

In re Plant Insulation Co.,
    Case No. 09-31347 (Bankr. N.D. Cal. Mar. 3, 2014) .............................................98

In re Prof'l Facilities Mgmt. Inc.,
    2015 WL 6501231 (Bankr. M.D. Ala. Oct. 27, 2015) ...........................................84

In re Public Servo Co.,
    88 B.R. 546 (Bankr. D.N.H. 1988) ......................................................................22

In re PWS Holding Corp.,
    228 F.3d 224 (3d Cir. 2000) .................................................................................23

In re Quigley Co.,
    391 B.R. 695 (Bankr. S.D.N.Y. 2008) .................................................................23

In re Quigley Co., Inc.,
    437 B.R. 102 (Bankr. S.D.N.Y. 2010) .................................................................55

In re Richard Buick, Inc.,
    126 B.R. 840 (Bankr. E.D. Pa. 1991) ..................................................................23

In re Rimsat, Ltd.,
    193 B.R. 499 (Bankr. N.D. Ind. 1996) .................................................................18

In re Rivers End Apartments, Ltd.,
    167 B.R. 470 (Bankr. S.D. Ohio 1994) ................................................................44

In re S. Indus. Banking Corp.,
    41 B.R. 606 (Bankr. E.D. Tenn. 1984) ................................................................36

In re SGL Carbon Corp.,
    200 F.3d 154 (3d Cir. 1999) .................................................................................33

In re Sherwood Square Assocs.,
    107 B.R. 872 (Bankr. D. Md. 1989) .....................................................................38

In re Shoen,
    193 B.R. 302 (Bankr. D. Ariz. 1996) ...................................................................20

In re Sound Radio, Inc.,
    93 B.R. 849 (Bankr. D.N.J. 1988), aff'd in part, remanded in part on other
    grounds, 103 B.R. 521 (D.N.J. 1989), aff'd, 908 F.2d 964 (3d Cir. 1990) .......34, 44

NAI-1508961146

In re Specialty Prods. Holding Corp.,
    Case No. 10-11780 (PJW) (Bankr. D. Del. Oct. 20, 2014) ..................................................57

In re Specialty Prods. Holding Corp.,
    Case No. 10-11780 (PJW) (Bankr. D. Del. Dec. 10, 2014).............................................52, 57

In re Texaco Inc.,
    84 B.R. 893 (Bankr. S.D.N.Y. 1988)......................................................................31, 38, 44

In re Thorpe Insulation Co.,
    677 F.3d 869 (9th Cir. 2012) .................................................................................................15

In re Thorpe Insulation Co.,
    Case No. 07-19271(BB) (Bankr. C.D. Cal. May 8, 2013)................................................52, 98

In re Toy & Sports Warehouse, Inc.,
    37 B.R. 141 (Bankr. S.D.N.Y. 1984)..................................................................24, 31, 41, 44

In re Trans World Airlines, Inc.,
    185 B.R. 302 (Bankr. E.D. Mo. 1995)...................................................................................14

In re U.S. Brass Corp.,
    110 F.3d 1261 (7th Cir. 1997) ........................................................................................74, 82

In re Victory Constr. Co.,
    42 B.R. 145 (Bankr. C.D. Cal. 1984)....................................................................................39

In re W. Asbestos Co.,
    313 B.R. 832 (Bankr. N.D. Cal. 2003) .......................................................................54, 56, 60

In re W.E. Parks Lumber Co.,
    19 B.R. 285 (Bankr. W.D. La. 1982).....................................................................................37

In re W.R. Grace & Co.,
    729 F.3d 311 (3d Cir. 2013)..................................................................................................97

In re Wonder Corp. of Am.,
    70 B.R. 1018 (Bankr. D. Conn. 1987) ...................................................................................19

In re Yarway Corp.,
    Case No. 13-11025 (Bankr. D. Del. Dec. 22, 2014)..............................................................57

In re Yarway Corp.,
    Case No. 13-11025 (Bankr. D. Del. Apr. 8, 2015) .................................................................57

NAI-1508961146

In re Zenith Elecs. Corp.,
    241 B.R. 92 (Bankr. D. Del. 1999) ..........................................................................33

Kane v. Johns-Manville Corp.,
    843 F.2d 636 (2d Cir. 1987)..................................................................22, 24, 44

Kartzman v. Utica Nat'l Ins. Co. (In re John A. Rocco Co.),
    2015 WL 1727474 (Bankr. D.N.J. Apr. 13, 2015) ...................................................75

Kransco v. Amer. Empire Surplus Lines Ins. Co.,
    23 Cal.4th 390 (2000) .......................................................................87, 88, 94, 95

Kwok v. Transnation Title Ins. Co.,
    170 Cal. App. 4th 1562 (2009) ..............................................................................91, 92

Langenkamp v. Culp,
    498 U.S. 42 (1990).......................................................................................83

Logan v. Westchester Fire Ins. Co. (In re PRS Ins. Grp.),
    445 B.R. 402 (Bankr. D. Del. 2011) ........................................................................75

McCormick v. Bane One Leasing Corp. (In re McCormick),
    49 F.3d 1524 (11th Cir. 1995) ...............................................................................34

Mt. McKinley Ins. Co. v. Pittsburgh Corning Corp.,
    518 B.R 307 (W.D. Pa. 2014)..........................................................................16, 21

Nat'l Century Fin. Enters. v. Gulf Ins. Co. (In re Nat'l Century Fin. Enters.),
    312 B.R. 344 (Bankr. S.D. Ohio 2004)...................................................................75

NLRB v. Bildisco & Bildisco,
    465 U.S. 513 (1984)..........................................................................................47

NLRB v. Bildisco & Bildisco (In re Bildisco),
    682 F.2d 72 (3d Cir. 1982), aff'd, 465 U.S. 513 (1984)..........................................47

Official Comm. of Unsecured Creditors of Hechinger Inv. Co. of Del, Inc. v. Fleet
    Retail Fin. Grp.,
    285 B.R. 601 (D. Del. 2002)..................................................................................49

Official Comm. of Unsecured Creditors v. Michelson (In re Michelson),
    141 B.R. 715 (Bankr. E.D. Cal. 1992)....................................................................31

NAI-1508961146

Opt-Out Lenders v. Millennium Lab Holdings II, LLC (In re Millennium Lab
     Holdings II, LLC),
     591 B.R. 559 (D. Del. 2018) ................................................................80, 81

Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.),
     4 F.3d 1095 (2d Cir. 1993) ...........................................................................75

Owens-Illinois Inc. v. Rapid Am. Corp (In re The Celotex Corp.),
     124 F.3d 619 (4th Cir. 1997) .........................................................................49

Prudential Ins. Co. of Am. v. Monnier (In re Monnier Bros.),
     755 F.2d 1336 (8th Cir. 1985) .......................................................................44

Rosen v. Tenn. Comm'r of Fin. & Admin.,
     288 F.3d 918 (6th Cir. 2002) .........................................................................20

Safeco Ins. Co. of Amer. v. Parks,
     170 Cal. App. 4th 992 (2009) ........................................................................93

Sentinel Trust Co. v. Newcare Health Corp. (In re Newcare Health Corp.),
     244 B.R. 167 (BAP 1st Cir. 2000) .................................................................20

Spokeo, Inc. v. Robins,
     136 S. Ct. 1540 (2016) ...........................................................................21, 76

State Farm Fire & Cas. Co. v. Miller,
     5 Cal. App. 3d 837 (1970) .............................................................................89

Stern v. Marshall,
     564 U.S. 462 (2011) ................................................................................80, 81

Stolrow v. Stolrow's, Inc. (In re Stolrow's Inc.),
     84 B.R. 167 (B.A.P. 9th Cir. 1988) ...............................................................35

The Pitt News v. Fisher,
     215 F.3d 354 (3d Cir. 2000) ..........................................................................22

Tranel v. Adams Bank & Trust Co. (In re Tranel),
     940 F.2d 1168 (8th Cir. 1991) .......................................................................39

Travelers Cas. and Sur. Co. v. Skinner Engine Co., Inc. (In re Am. Capital Equip.,
     LLC),
     325 B.R. 372 (W.D. Pa. 2005) .................................................................78, 79

NAI-1508961146

Truck Ins. Exch. v. Unigard Ins. Co.,
79 Cal. App. 4th 966 (2000) ............................................................................2, 90

Trustgard Ins. Co. v. Collins,
942 F.3d 195 (4th Cir. 2019) ...............................................................................22

U.S. Bank Nat'l Ass'n v. U.S. Timberlands Klamath Falls, L.L.C.,
2005 WL 2037353 (Del. Ct. Ch. June 9, 2005) .......................................................50

U.S. Lines, Inc. v. Am. Steamship Owners Mut. Protection & Indemnity Assoc.
(In re U.S. Lines Inc.),
197 F.3d 631 (2d Cir. 1999)...............................................................................75

United Servs. Auto. Ass'n v. Martin,
120 Cal. App. 3d 963 (1981) ...............................................................................90

United States v. Doe,
429 F.3d 450 (3d Cir. 2005)...............................................................................50

Warth v. Seldin,
422 U.S. 490 (1975).........................................................................................18

Wellman Thermal Sys. Corp. v. Columbia Cas. Co.,
2005 WL 4880619 (S.D. Ind. Oct. 5, 2005) .........................................................75

Wellness Intern. v. Sharif,
135 S. Ct. 1932 (2015).....................................................................................85

Westinghouse Elec. Corp. v. Republic of the Philippines,
951 F.2d 1414 (3d Cir. 1991)...............................................................................50

Whyte v. Williams (In re Williams),
152 B.R. 123 (Bankr. N.D. Tex. 1992)...................................................................49

**STATUTES**

11 U.S.C. § 101...............................................................................................43, 54

11 U.S.C. § 105.....................................................................................................49

11 U.S.C. § 109.....................................................................................................73

11 U.S.C. § 365.....................................................................................30, 46, 47, 76

NAI-1508961146

11 U.S.C. § 503................................................................................................................42

11 U.S.C. § 507.........................................................................................................25, 42

11 U.S.C. §§ 524(b)........................................................................................................73

11 U.S.C. 524(g)(1)...................................................................................................51, 63

11 U.S.C. § 524(g)(2).............................................................................................. passim

11 U.S.C. § 524(g)(3)................................................................................................67, 99

11 U.S.C. § 524(g)(4)..............................................................................67, 68, 69, 71

11 U.S.C. § 1109..............................................................................................................19

11 U.S.C. § 1114..............................................................................................................46

11 U.S.C. § 1122.......................................................................................................14, 24

11 U.S.C. § 1123...................................................................................................... passim

11 U.S.C. § 1125...............................................................................................14, 31, 33

11 U.S.C. § 1126.......................................................................................................40, 41

11 U.S.C. § 1127..............................................................................................................14

11 U.S.C. § 1128..............................................................................................................19

11 U.S.C. §§ 1129................................................................................................... passim

11 U.S.C. § 1141..............................................................................................................62

28 U.S.C. § 157.........................................................................................43, 73, 76, 79

28 U.S.C. § 1334..............................................................................................................77

28 U.S.C. § 1930.......................................................................................................45, 46

Securities Act of 1933 § 5...............................................................................................46

**OTHER AUTHORITIES**

Del. R. Evid. 502.............................................................................................................49

NAI-1508961146

FED. R. CIV. P ...................................................................................................................87, 88

FED. R. BANKR. P. 3017 ..............................................................................................................33

FED. R. BANKR. P. 3018 ..............................................................................................................33

FED. R. BANKR. P. 3019(a) ..........................................................................................................14

FED. R. BANKR. P. 3020(e) ..........................................................................................................99

FED. R. BANKR. P. 7001 ..........................................................................................................81, 82

H.R. Rep. No. 95-595 (1977), reprinted in 1978 U.S.C.C.A.N. 5962 .........................................24

H.R. Rep. No. 95-595 (1977), reprinted in 1978 U.S.C.C.A.N. 5963 .........................................31

Kallis, et al., Policyholder's Guide to the Law of Ins. Coverage (1st ed. 2019
    Supp. 2012) ..........................................................................................................................89, 90

S. Rep. No. 95-989 (1978), reprinted in 1978 U.S.C.C.A.N. 5787 ........................................24, 31

NAI-1508961146

Kaiser Gypsum Company, Inc. ("Kaiser Gypsum") and Hanson Permanente

Cement, Inc. ("HPCI") (together, the "Debtors") submit this Memorandum of Law:  (i) in support

of confirmation of the Joint Plan of Reorganization of Kaiser Gypsum Company, Inc. and

Hanson Permanente Cement, Inc. (as it may be further modified, the "Plan"),[2] pursuant to

section 1129 of the Bankruptcy Code and (ii) in reply to objections to the Plan.

## I.    PRELIMINARY STATEMENT

Prior to filing these Reorganization Cases, the Debtors were defendants in

approximately 14,000 asbestos-related bodily injury lawsuits pending in courts across the

country.  Since 1978, the Debtors had been sued in more than 38,000 asbestos-related lawsuits

and expected that these claims would continue for decades more.  In addition to these significant

asbestos-related claims, the Debtors were also burdened by substantial environmental claims

related to two sites:  the St. Helens site in St. Helens, Oregon and the Lower Duwamish

Waterway Superfund site in Seattle, Washington (together, the "Two Sites").  Although

long-standing litigation had established the availability of insurance coverage for a substantial

portion of the Debtors' asbestos-related liabilities, the Debtors were engaged in disputes with

their insurers over coverage for environmental claims, and litigation to resolve those disputes

was initiated by both the Debtors and certain of their insurers prior to the commencement of

these Reorganization Cases.  The continuing costs, risks and burdens associated with both the

asbestos claims and the environmental claims caused the Debtors to seek bankruptcy protection

on September 30, 2016.

The Debtors filed their Reorganization Cases with two primary goals:  (a) to fully,

fairly and permanently resolve their current and future liability on account of Asbestos Personal

---

[2]        Capitalized terms not otherwise defined herein have the meanings given to such terms in the Plan.

Injury Claims through consummation of a consensual plan of reorganization and the

establishment of a section 524(g) trust; and (b) to discharge, liquidate and pay their legacy

environmental liabilities.  After extensive negotiations with multiple parties, the Debtors have

proposed a Plan that, if confirmed, will achieve both of these goals.

With respect to Asbestos Personal Injury Claims, the Debtors reached an

agreement with the Official Committee of Asbestos Personal Injury Claimants (the "ACC") and

the Future Claimants' Representative (the "FCR") that will (a) establish a trust, funded with

$49 million in cash and a Payment Note for an additional $1 million, to pay the Uninsured

Asbestos Claims, (b) permit the holders of Insured Asbestos Claims to pursue the Debtors'

Asbestos Insurance Policies and (c) permanently protect the Debtors from all current and future

Asbestos Personal Injury Claims.  The Plan will also implement multiple settlement agreements

that provide for the liquidation and payment in full of the Debtors' legacy environmental

liabilities and generate over $50 million in insurance proceeds to assist in the funding of those

liabilities.  In sum, the Plan will enable the Debtors to reorganize having fully resolved and paid

all the legacy liabilities that had been burdening them for years leading up to the commencement

of these Reorganization Cases.

Critically, asbestos claimants — the only impaired creditors — have unanimously

voted to accept the Plan.  And, although the Debtors have thousands of creditors, the only

unresolved objections to Plan confirmation are: (a) an objection filed by Truck Insurance

Exchange ("Truck") [D.I. 2070] (the "Truck Objection") and (b) a limited objection filed by the

Official Committee of Unsecured Creditors (the "UCC") [D.I. 2076].  The Debtors have resolved

all other formal and informal objections to the Plan and have proposed Plan modifications that

they are optimistic will resolve the limited objection raised by the UCC. This leaves Truck, an

entity that lacks standing to raise its meritless objections, as the sole objecting creditor.

The unanimous acceptance of the Plan by the only impaired Class, the proposed

payment in full of all other unsecured creditors, including environmental creditors, the Plan's

insurance neutrality and the absence of any meaningful creditor opposition to the Plan

demonstrate that the Plan is in the best interests of all the Debtors' stakeholders. As will be

discussed in more detail below and shown at the Confirmation Hearing, the Plan satisfies all

applicable requirements of the Bankruptcy Code and should be confirmed.

## II.     BACKGROUND AND OVERVIEW OF THE PLAN

### A.     The Debtors

#### 1.     Corporate History

Debtor HPCI owns the Permanente Property, which consists of more than

3,400 acres of land and includes a cement plant, rock plant and quarry (including the minerals)

located in Santa Clara County, California. HPCI leases the Permanente Property to Lehigh

Southwest Cement Company ("Lehigh Southwest"), a non-debtor affiliate. Under the lease

agreements, HPCI receives rent, royalties and other payments from Lehigh Southwest, while

Lehigh Southwest operates the cement plant, rock plant and quarry and is responsible for the

ongoing operating costs associated with the Permanente Property. The lease agreements further

provide that HPCI is obligated to fund capital expenditures for the cement plant and reclamation

obligations related to the quarry. As a result of an agreement reached with the ACC, the FCR

and the UCC to provide needed funding for the costs of these Reorganization Cases, HPCI has

not been paying its obligations to fund capital expenditures and reclamation under the leases,

subject to Lehigh Southwest's right to accrue those ongoing obligations. See Agreed Order

Amending the Interim DIP Financing Order [D.I. 444] ¶¶ 9-10; see, generally, Monthly Status Reports of HPCI.

HPCI also is the direct parent of two operating non-debtor subsidiaries, Hanson Micronesia Cement, Inc. and Hanson Permanente Cement of Guam, Inc. (together, the "Operating Subsidiaries"), which distribute and sell cement in key markets in the Pacific region, including Saipan and Guam. Funding required by the Operating Subsidiaries has been provided by non-debtor Lehigh Hanson, Inc. ("Lehigh Hanson").

Kaiser Gypsum currently has no material tangible assets or business operations, other than managing its significant legacy asbestos-related and environmental liabilities described below. Under the Plan, non-debtor Lehigh Cement Company LLC ("Lehigh Cement") will transfer to Kaiser Gypsum its interests in certain real property located in Kosse, Limestone County, Texas and Kunkletown, Monroe County, Pennsylvania (together, the "Real Properties"), together with Lehigh Cement's rights under certain leases related to the Real Properties.

    2.    Overview of the Debtors' Asbestos Liability and Asbestos Insurance Policies[3]

The Debtors' asbestos-related liabilities arise from their manufacture and sale of certain products that, decades ago, contained small amounts of asbestos (collectively, the "Asbestos Products"). Although asbestos was removed from these products by 1976, the Debtors have been the subject of thousands of lawsuits. Since 1978, one or both of the Debtors have been named in more than 38,000 asbestos-related lawsuits. As of August 31, 2016, the Debtors were defendants in approximately 14,000 asbestos-related bodily injury lawsuits pending in courts across the country.

---

[3] The following is a summary of the Debtors' asbestos liabilities and related matters that are discussed in detail on pages 32-41 of the Debtors' Disclosure Statement.

Truck issued a Comprehensive General Liability primary insurance policy, renewed annually, that covered the Debtors from January 1, 1965 through April 1, 1983 (collectively, the "Truck Policies").  After more than 15 years of litigation,[4] it is now settled that: (a) Truck must defend each covered Asbestos Personal Injury Claim (without eroding coverage); (b) Truck must indemnify the Debtors for such claims up to the $500,000 per claim limit of the Truck policy year selected by the Debtors;[5] and (c) the Debtors' excess insurers are obligated under their policies (each, an "Excess Policy") to respond to an Asbestos Personal Injury Claim and indemnify the Debtors for amounts in excess of the $500,000 applicable Truck policy per claim limit.  The specific Excess Policy obligated to respond to such claims is the Excess Policy in force during the Truck policy year selected by the Debtors.

In December 2013, the Debtors and certain of the Debtors' excess insurers entered into a confidential coverage-in-place agreement (the "Excess CIP Agreement") concerning the Debtors' excess coverage for Asbestos Personal Injury Claims.  The Excess CIP Agreement provides, among other things, that:  (a) the excess insurers that are parties to the Excess CIP Agreement will provide full coverage for the Asbestos Personal Injury Claims in amounts above Truck's primary policy per claim limit of $500,000, notwithstanding the insolvencies of certain excess insurers; and (b) the Debtors will make distributions to the excess insurers of funds they receive from insolvent asbestos insurers, if any.

---

[4]   Certain issues decided in asbestos coverage litigation remain the subject of an appeal pending in the California Court of Appeal (No. B278091); however, none of those remaining appellate issues addresses (and none will alter) the fundamental aspects of the Debtors' coverage for Asbestos Personal Injury Claims under the Truck Policies, as summarized here.

[5]   Although the per-occurrence limit and deductibles under the Truck Policies vary, virtually all Asbestos Personal Injury Claims have trigged a policy year with a $5,000 deductible and a $500,000 per claim primary product liability insurance limit.  However, certain of the Truck Policy years trigger higher deductible amounts, some as high as $100,000 per claim.

Although the Debtors successfully established insurance coverage for virtually all of the Asbestos Personal Injury Claims before filing for bankruptcy, they still faced substantial costs and risks associated with asbestos-related lawsuits.  The Debtors were obligated to pay policy deductibles to Truck, owing it more than $3 million in deductibles for settled cases as of the Petition Date.  The Debtors also were exposed to liability for uninsured claims and judgments, including the potential for punitive damages.  In at least three prepetition cases, juries awarded punitive damages against the Debtors in amounts ranging from $100,000 to $20,000,000.

### 3.   Overview of the Debtors' Environmental Liability[6]

One or both of the Debtors also have alleged environmental liabilities arising from formerly owned and/or operated properties located in St. Helens, Oregon[7] and Seattle, Washington.  The Debtors have worked diligently throughout these Reorganization Cases to resolve these environmental liabilities and, with the help of a mediator, have succeeded in reaching multiple settlements that are described in detail below and which resolve almost every environmental claim filed against the Debtors in these Reorganization Cases.

### B.   The Reorganization Cases

### 1.   Commencement of the Reorganization Cases

The Debtors filed these Reorganization Cases to fairly and permanently resolve their legacy asbestos and environmental liabilities.  Resolving these liabilities in accordance with the Plan will benefit both the Debtors and their creditors by, among other things, (a) eliminating the ongoing costs, administrative burdens, risks and distractions that the Debtors have been

---

[6]   The following is a summary of the Debtors' environmental liabilities and related matters that are discussed in detail on pages 32-41 of the Debtors' Disclosure Statement.

[7]   HPCI never owned or operated the St. Helens plant.

subjected to from these decades-old liabilities, and (b) providing for (i) the liquidation in the tort

system and payment from the Asbestos Personal Injury Trust and the insurers of current and

future Asbestos Personal Injury Claims and (ii) the payment in full on the Plan's Effective Date

of all other Allowed General Unsecured Claims, including Allowed Environmental Claims.

2.    Settlements Reached During the Reorganization Cases

The Debtors worked cooperatively with multiple parties, including through

numerous mediation sessions, to formulate a consensual Plan.  Although agreements were

reached with many parties, as discussed further below, certain disputes remain.

a.    Settlement Regarding Asbestos Personal Injury Claims

On October 20, 2017, the Debtors and Lehigh Hanson reached an agreement in

principle with the FCR and the ACC on the treatment of present and future Asbestos Personal

Injury Claims.  The Plan implements that settlement by, among other things, providing for the

creation and funding of a section 524(g) trust.  The Asbestos Personal Injury Trust to be created

under the Plan will be funded with a $49 million cash contribution by the Debtors or Lehigh

Hanson, a $1 million Payment Note and the assignment of the Debtors' rights under insurance

policies covering Asbestos Personal Injury Claims.  The Plan provides that, with respect to

Insured Asbestos Claims, the insurer's defense rights will be preserved and asbestos claimants

will be permitted to continue to assert actions against the Reorganized Debtors in name only in

the tort system to collect available insurance.  The Asbestos Personal Injury Trust will satisfy the

Uninsured Asbestos Claims in accordance with the Asbestos Personal Injury Trust Distribution

Procedures described below.

b.    Settlements Regarding Environmental Claims

The Debtors successfully negotiated settlement agreements with the Oregon

Department of Environmental Quality (the "DEQ") regarding the St. Helens site and the United

States regarding the Lower Duwamish Waterway site.  The Debtors also reached settlement

agreements with other environmental creditors, multiple insurers and several co-"potentially

responsible parties" at both the St. Helens and the Lower Duwamish Waterway sites.

In particular, the Debtors have negotiated, and the Court has approved,

settlements with (a) Armstrong World Industries, Inc. ("Armstrong") [D.I. 1556], pursuant to

which Armstrong withdrew its proofs of Claim with respect to the St. Helens site and paid the

Debtors $1 million; (b) Owens Corning Fiberglas Corporation ("Owens Corning") [D.I. 1558],

pursuant to which Owens Corning's proofs of Claim were deemed withdrawn and Owens

Corning was deemed to waive and release any Claims against the Debtors related to the

St. Helens site; (c) the DEQ [D.I. 1625], pursuant to which the Debtors agreed to pay in full an

Allowed General Unsecured Claim in the amount of $67 million; (d) the City of Seattle

(the "City") [D.I. 1602], pursuant to which the City will have an Allowed General Unsecured

Claim in the amount of $80,951.87 against each of the Debtors; (e) the Port of Seattle

(the "Port") [D.I. 1603], pursuant to which the Port will have an Allowed General Unsecured

Claim in the amount of $81,815.22 against each of the Debtors; (f) King County, Washington

(the "County") [D.I. 1604], pursuant to which the County will have an Allowed General

Unsecured Claim in the amount of $85,255.87 against each of the Debtors; (g) The Boeing

Company ("Boeing") [D.I. 1601], pursuant to which Boeing will have an Allowed General

Unsecured Claim in the amount of $137,500.00 against each of the Debtors; and (h) Ash Grove

Cement Company ("Ash Grove") [D.I. 1908], pursuant to which Ash Grove will have an

Allowed General Unsecured Claim in the amount of $8,618.42 against each of the Debtors.

In addition, the Court entered an order [D.I. 1789] approving the Debtors'

settlement with the United States, on behalf of the EPA and the United States Department of

Interior, acting through the U.S. Fish and Wildlife Service (the "DOI"), and the United States

Department of Commerce, acting through the National Oceanic and Atmospheric Administration

(the "NOAA"), pursuant to which the Debtors agreed to the allowance and payment in full of the

following General Unsecured Claims:  (a) Proof of Claim No. 10 (EPA) in the amount of

$1,300,000 against Kaiser Gypsum; (b) Proof of Claim No. 11 (EPA) in the amount of

$1,300,000 against HPCI; (c) Proof of Claim No. 9 (NOAA) in the amount of $200,000 against

Kaiser Gypsum; (d) Proof of Claim No. 6 (NOAA) in the amount of $200,000 against HPCI;

(e) Proof of Claim No. 7 (DOI) in the amount of $200,000 against Kaiser Gypsum; and (f) Proof

of Claim No. 8 (DOI) in the amount of $200,000 against HPCI.  The Debtors' agreement with the

United States also resolved the following claims filed by Ash Grove on behalf of the United

States:  (a) Proof of Claim No. 648 (EPA) in the amount of $325,000 against Kaiser Gypsum;

(b) Proof of Claim No. 653 (EPA) in the amount of $325,000 against HPCI; (c) Proof of Claim

No. 651 (NOAA) in the amount of $50,000 against Kaiser Gypsum; (d) Proof of Claim No. 650

(NOAA) in the amount of $50,000 against HPCI; (e) Proof of Claim No. 649 (DOI) in the

amount of $50,000 against Kaiser Gypsum; and (f) Proof of Claim No. 652 (DOI) in the amount

of $50,000 against HPCI.

Under the settlements with the DEQ and the United States, the Debtors received

contribution protection with respect to the Two Sites.  As for costs already incurred at the Lower

Duwamish Waterway Superfund site by entities other than the EPA, however, such protection

will not apply to the Claims of parties other than the United States, including Boeing, the Port,

the City and the County.

The Debtors also reached settlement agreements with the following insurers to

resolve disputes with respect to environmental insurance coverage, which have been  approved

by the Court subject to the entry of acceptable forms of order (the "Environmental Insurance
Settlements"):[8]  (a) London Market Insurers and Continental Insurance Company, Columbia
Casualty Company and National Fire Insurance Company of Hartford; (b) Insurance Company of
the State of Pennsylvania and National Union Fire Insurance Company of Pittsburgh, PA;
(c) Truck; (d) Westchester Fire Insurance Company and Westchester Surplus Lines Insurance
Company; (e) Hartford Fire Insurance Company, First State Insurance Company, New England
Insurance Company and Twin City Fire Insurance Company; (f) Munich Reinsurance America,
Inc. and Executive Risk Indemnity, Inc.; (g) Transport Insurance Company, as successor in
interest to Transport Indemnity Company; (h) Allstate Insurance Company, as successor in
interest to Northbrook Excess and Surplus Insurance Company f/k/a Northbrook Insurance
Company; (i) Westport Insurance Corporation, formerly known as Employers Reinsurance
Corporation; and (j) Allianz Underwriters Insurance Company and Fireman's Fund Insurance
Company.  In addition, the Debtors negotiated a further settlement agreement with Associated
International Insurance Company and Transamerica Premier Ins. Co. and TIG Insurance
Company [D.I. 2136], which has been  approved by the Court subject to the entry of an
acceptable form of order.[9]  Pursuant to these settlements, the insurers will pay the Debtors a total
of approximately $50.8 million to buy back the Debtors' rights to environmental insurance
coverage free and clear of all liens, claims, encumbrances and interests.  These settlements will
not affect coverage for Asbestos Personal Injury Claims.

---

[8]      The Debtors are finalizing the terms of the orders, which they expect to upload prior to the Confirmation
Hearing.

[9]      The Debtors are finalizing the terms of the order, which they expect to upload prior to the Confirmation
Hearing.

Finally, the Debtors reached an agreement with Lehigh Hanson, pursuant to which Lehigh Hanson has agreed to contribute up to $28.15 million for the payment of Allowed General Unsecured Claims under the Plan.

As a result of all the agreements described above, the Debtors will have sufficient funds to pay all Allowed General Unsecured Claims in full.  The Debtors estimate that the aggregate amount of Allowed General Unsecured Claims is approximately $72,982,000[10] and, as a result of the Environmental Insurance Settlements and the agreement with Lehigh Hanson, the Debtors will have available funds sufficient to pay that amount.

C.      **Overview of the Treatment of Stakeholders**

The Plan provides for the payment in full on the Effective Date of all Allowed Claims other than Class 4 Asbestos Personal Injury Claims, which is the only impaired Class under the Plan.[11]  All Asbestos Personal Injury Claims will be resolved pursuant to the terms of the Asbestos Personal Injury Trust Agreement and the Asbestos Personal Injury Trust Distribution Procedures.  Class 4 claimants unanimously voted in favor of the Plan.

III.    **MODIFICATIONS TO THE PLAN; OBJECTIONS THAT HAVE BEEN WITHDRAWN OR RESOLVED**

The Debtors have made certain non-material modifications to the Plan (the "Modifications") in their continuing review of the Plan and in response to formal and informal objections that have been consensually resolved.  Prior to the Confirmation Hearing, the Debtors will file a blackline draft of the Plan highlighting  the Modifications.

---

[10]     This figure does not include any amounts with respect to currently disputed Claims held by Glacier Northwest, Inc. and Truck.

[11]     The Debtors' equity holders will retain their interests.

A.      **The Objections Filed by the Objecting Excess Insurers**

To resolve the objections filed by certain excess insurers (collectively, the "Objecting Excess Insurers"),[12] the Debtors have agreed to modify the Plan to expressly preserve the Objecting Excess Insurers' rights with respect to any post-confirmation settlement that may be reached between Truck and the Asbestos Personal Injury Trust.[13]  Pursuant to the agreement, the relief available to the Objecting Excess Insurers, if one or more of them prevails on such an objection, shall be limited to:  (a) denying the  motion to approve the settlement with Truck; (b) granting the Objecting Excess Insurers adequate protection of inter-insurer rights, if any, against Truck; and/or (c) modifying the Asbestos Permanent Channeling Injunction to exclude any restriction on the Objecting Excess Insurers pursuing their inter-insurer rights, if any, against Truck, in all cases subject to the Court's determination that such relief is appropriate under principles of law and equity.  None of the Objecting Excess Insurers' objections will be deemed moot because of substantial consummation of the Plan, confirmation of the Plan, the Plan becoming final and non-appealable or the closing of the Reorganization Cases.[14]  Any

---

[12]     See D.I. 2066 filed by Certain Underwriters at Lloyd's, London, Certain London Market Companies, Columbia Casualty Company, National Fire Insurance Company of Hartford, and The Continental Insurance Company; D.I. 2067 filed by The Insurance Company of the State of Pennsylvania, Granite State Insurance Company, and Lexington Insurance Company; D.I. 2069 filed by TIG Insurance Company (formerly known as Transamerica Insurance Company and as successor by merger to International Insurance Company), and Evanston Insurance Company as successor by merger with Associated International Insurance Company; D.I. 2071 filed by Allstate Insurance Company, solely as successor-in-interest or Northbrook Excess & Surplus Insurance Company, formerly Northbrook Insurance Company; D.I. 2073 filed by First State Insurance Company and New England Reinsurance Corporation; and D.I. 2075 filed by Allianz Underwriters Insurance Company f/k/a Allianz Underwriters Inc., Fireman's Fund Insurance Company, and Westchester Fire Insurance Company.

[13]     The description of the agreement between the Debtors and the Objecting Excess Insurers contained herein is general in nature and fully qualified by the terms of the modified Plan that will be filed with the Court prior to the Confirmation Hearing.

[14]     For the avoidance of doubt, the Objecting Excess Insurers shall not be entitled to, and shall not seek, any other relief with respect to a settlement with Truck against the Debtors, the Reorganized Debtors, Lehigh Hanson or any of their affiliates, nor any relief with respect to the implementation, effectiveness, or consummation of the Plan (as long as the Plan is not materially altered before confirmation).  The Objecting Excess Insurers' agreement not to seek such relief, however, shall not operate to limit the relief

settlement between the Asbestos Personal Injury Trust and Truck shall not contain any provision

that excuses Truck from its obligation to continue to defend the underlying asbestos personal

injury cases until such time as any order approving such settlement (if any such order is entered)

has become a Final Order.

**B.      The Limited Objection Filed by the UCC**

In an effort to resolve the UCC's objections, the Debtors have agreed to hold the

following funds in escrow as of the Effective Date:  (a) $50.8 million in proceeds from the

Environmental Insurance Settlements and (b) a contribution of up to $28.15 million from Lehigh

Hanson.  The Debtors will offer evidence at the Confirmation Hearing to establish that the

escrow funds will be sufficient to fulfill the Debtors' obligations to holders of Allowed General

Unsecured Claims under the Plan.  The Debtors are in discussions with the UCC regarding these

proposed Modifications and are optimistic that this objection will be fully resolved by the

Confirmation Hearing.

**C.      Informal Objection of the Department of Justice**

The Debtors received an informal objection from the Department of Justice,

requesting clarification regarding the post-confirmation rights of certain governmental entities.

The Debtors have resolved this informal objection by agreeing to add the following language to

the Confirmation Order:

> Nothing in this Order or the Plan discharges, releases, precludes or
> enjoins:  (i) any police or regulatory liability to a governmental
> unit as defined in 11 U.S.C. § 101(27) ("Governmental Unit") of
> the United States or of a State that is not a Claim as defined in
> paragraph I.A.32 of the Plan; (ii) any Claim of a Governmental
> Unit of the United States arising on or after the Effective Date;
> (iii) any liability to a Governmental Unit of the United States or of
> a State under police and regulatory statutes or regulations that any

---

that may be available to the Objecting Excess Insurers against the Asbestos Personal Injury Trust or to the
Asbestos Personal Injury Trust.

entity would be subject to as the owner or operator of property
after the Effective Date; or (iv) any liability to a Governmental
Unit on the part of any Person other than the Debtors or
Reorganized Debtors.  Nor shall anything in this Order or the Plan
enjoin or otherwise bar a Governmental Unit of the United States
or of a State from asserting or enforcing, outside this Court, any
liability described in the preceding sentence.  Nothing in this Order
or the Plan shall affect any valid setoff or recoupment rights of the
United States.  Nothing in this Order divests any tribunal of any
jurisdiction it may have under police or regulatory law to interpret
this Order or the Plan or to adjudicate any defense asserted under
this Order or the Plan.  Notwithstanding the foregoing, nothing in
this paragraph will in any way limit or alter the terms of the
Asbestos Permanent Channeling Injunction set forth in
Article IX.B.2 of the Plan or the Environmental Injunction set forth
in Article IX.B.3 of the Plan.

A plan proponent may modify its plan prior to confirmation so long as the

modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code.

11 U.S.C. § 1127(a).  If the proposed modification "does not adversely change the treatment of

the claim of any creditor or the interest of any equity security holder who has not accepted in

writing the modification, it shall be deemed accepted by all creditors and equity security holders

who have previously accepted the plan."  FED. R. BANKR. P. 3019(a).

Courts consistently have held that a proposed plan modification will be deemed

accepted by all creditors and equity holders who previously accepted the plan where the

proposed modification does not cause a material adverse change in the treatment of the claim of

any creditor or the interest of any equity holder.  See, e.g., In re Celotex Corp., 204 B.R. 586,

608-09 (Bankr. M.D. Fla. 1996) (holding that creditors and equity holders who had accepted the

debtor's plan of reorganization were deemed to have accepted modifications that did not

adversely change the treatment under the plan of any claims or interests); In re Trans World

Airlines, Inc., 185 B.R. 302, 322 (Bankr. E.D. Mo. 1995) ("In light of the immaterial nature of

the Modifications, no additional disclosure under section 1125 is required and, pursuant to

Bankruptcy Rule 3019, all Holders of Claims and Interests that have accepted the Plan prior to

the Modifications are conclusively presumed to have accepted the Plan, as amended by the

Modifications."); In re Placid Oil Co., 92 B.R. 183, 190 (Bankr. N.D. Tex. 1988); In re Mount

Vernon Plaza Cmty. Urban Redevelopment Corp. I, 79 B.R. 305, 306 (Bankr. S.D. Ohio 1987).

The Modifications comply with these requirements.  None of the proposed

Modifications will adversely affect or change the treatment of any Claim against or Interest in

any Debtor.  In particular, Class 4, the only impaired Class entitled to vote on the Plan, will not

be adversely affected in any way.

## IV.    TRUCK LACKS STANDING TO OBJECT TO THE PLAN

### A.    The Plan is Insurance Neutral

Truck lacks standing to pursue the Truck Objection because the Plan is insurance

neutral.  See Leslie Controls, Case No. 10-12199 (CSS) (Bankr. D. Del. Oct. 28, 2010) [D.I. 382]

(granting motion to strike insurers' objections for lack of standing because plan insurance

neutral); In re Pittsburgh Corning Corp., 417 B.R. 289, 317 (Bankr. W.D. Pa. 2006) (finding plan

insurance neutral and, therefore, insurers had no standing to object to confirmation).

There is no legal requirement that a plan be "insurance neutral" to be confirmed.

See In re Glob. Indus. Tech., Inc., 645 F.3d 201, 211-12 (3d Cir. 2011) (discussing the

relationship between insurance neutrality and standing); In re Plant Insulation Co., Case

No. 09-31347 TEC, 2012 Bankr. LEXIS 1716, at *13 (Bankr. N.D. Cal. Mar. 15, 2012), rev'd on

other grounds, 734 F.3d 900 (9th Cir. 2013).[15]  Insurance neutrality speaks not to confirmation,

but rather to an insurer's standing to be heard on a plan.  See, e.g., In re Thorpe Insulation Co.,

---

[15]      On page 32 of the Truck Objection, Truck cites to In re Flintkote Co., 486 B.R. 99, 117 (Bankr. D. Del.
2012), aff'd, 526 B.R. 515 (D. Del. 2014), for the proposition that "[t]o be confirmable, the plan must be
insurance neutral:  'all contractual rights and coverage defenses [must] be fully preserved.'"  The Flintkote,
court, however, did not rule that only insurance neutral plans may be confirmed.

677 F.3d 869, 891 (9th Cir. 2012) (finding plan not insurance neutral; insurers had standing to object); In re Glob. Indus. Techs., Inc., 645 F.3d 201, 216 (3d Cir. 2011) (same); Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm., 321 B.R. 147, 158-59 (D.N.J. 2005) (same); In re Catholic Bishop of N. Alaska, 2009 WL 8412175, at *5 (Bankr. D. Alaska Sept. 11, 2009) (declining "to mandate the insertion of a neutrality provision," noting insurers' objections would be considered at confirmation). Thus, even if a court were to conclude that a plan alters an insurer's rights, that plan may still be confirmed.

"A plan is considered to be insurance neutral if it neither increases an insurer's pre-petition obligations nor impairs its pre-petition contractual rights under the subject insurance policies." In re Pittsburgh Corning Corp., 453 B.R. 570, 584 (Bankr. W.D. Pa. 2011) (citing cases). Here, the Plan is insurance neutral. Plan § IV.Q ("Insurance Neutrality"); see also Combustion Eng'g. Inc., 391 F.3d at 202 (describing "neutrality" provision as "protect[ing] the debtor's and insurers' prepetition rights under certain insurance policies"); Mt. McKinley Ins. Co. v. Pittsburgh Corning Corp., 518 B.R. at 329 (explaining that plan was insurance neutral where it "did not dramatically increase the 'quantum of liability,' harm . . . [the insurer's] contractual rights, or increase its administrative burdens"). Specifically, the Plan's "Insurance Neutrality" provision expressly preserves all "Insurer Coverage Defenses," which include "all defenses at law or in equity that any Asbestos Insurer may have under applicable non-bankruptcy law to provide insurance coverage to or for Asbestos Personal Injury Claims" and states that the transfer of insurance rights to the Asbestos Personal Injury Trust "shall not affect the liability of any Asbestos Insurer." Plan §§ I.A.83 ("Insurer Coverage Defenses"), IV.Q. The Plan simply restores insurers to their respective positions immediately prior to the Petition Date.

Despite this, Truck complains that the Plan is not insurance neutral because the Plan Finding would prevent it from arguing that confirmation or consummation of the Plan breached the Assistance and Cooperation Clause under the Truck Policies or the implied covenant of good faith and fair dealing under those policies. See, e.g., Truck Obj. at 32-33. This argument fails for at least two reasons.

First, as explained in section IX.F below, allegations that the Debtors breached the Assistance and Cooperation Clause or the implied covenant of good faith and fair dealing fail as a matter of law. Because Truck's allegations are baseless, the Plan Finding will not alter, materially or otherwise, Truck's rights and obligations under the Truck Policies.

Second, the Plan expressly provides that the Reorganized Debtors will continue to fulfill their cooperation obligations arising under the Truck Policies. See Plan §§ IV.L.1 ("The Reorganized Debtors shall have a continuing obligation to satisfy the Assistance and Cooperation, Inspection and Audit, and Notice of Occurrence Provisions set out in the Asbestos Insurance Policies."), IV.L.2 ("Enforcement of Reorganized Debtors' Obligations to Cooperate with Respect to Insurance Matters"). Thus, although Truck may not argue post-confirmation that the Debtors' conduct in prosecuting these Reorganization Cases and pursuing the restructuring provided under Plan breached the Truck Policies, its right to pursue coverage defenses as to individual Asbestos Personal Injury Claims in state court for any alleged post-confirmation violations by the Reorganized Debtors remains intact. Put differently, the Plan restores Truck to the position it was in immediately prior to the Petition Date, with its rights and obligations under the Truck Policies left undisturbed, as if the Debtors' bankruptcy had never occurred. Such treatment "does not diminish the rights of the insurers or increase their burdens under the subject insurance policies." Combustion Eng'g, Inc., 391 F.3d at 217. Rather, Truck will only be

required to continue defending against (and/or paying) Asbestos Personal Injury Claims in the same manner in which it has for decades, subject to the same rights, obligations, terms and conditions.

**B.      Truck Lacks Standing to Object to the Structure and Funding of the Asbestos Personal Injury Trust**

Even if the Plan were not insurance neutral (though it clearly is), Truck would still lack standing to raise its objections, including to the structure and funding of the Asbestos Personal Injury Trust. See Truck Obj. at 16-23 (objecting on § 524(g)(2)(B)(i)(I)-(III), (g)(2)(B)(ii)(III) and (g)(4)(B)(ii) grounds). The only parties with an interest in the Asbestos Personal Injury Trust are the asbestos personal injury claimants. Those claimants unanimously voted in favor of the Plan. Further, neither the ACC, the FCR nor any individual asbestos personal injury claimant has objected to the Plan. Instead, it is Truck that argues that the Asbestos Personal Injury Trust does not comply with the structure and funding requirements of section 524(g) of the Bankruptcy Code. But whether the Plan satisfies the applicable requirements is of no consequence to Truck, who will not be entitled to any Distributions from the Asbestos Personal Injury Trust and whose obligations will be unaffected by the Plan. Due to the absence of any injury to its interests, Truck lacks standing to argue that the Asbestos Personal Injury Trust fails to satisfy the requirements of section 524(g) of the Bankruptcy Code.

Standing is a threshold issue in every federal case. Warth v. Seldin, 422 U.S. 490, 498 (1975). Standing constraints are particularly important in bankruptcy cases, "where clouds of persons indirectly affected by the acts and entitlements of others may buzz about, delaying final resolution of cases." In re Rimsat, Ltd., 193 B.R. 499, 501 (Bankr. N.D. Ind. 1996). The burden of alleging sufficient facts to establish standing falls upon the party seeking to invoke the court's jurisdiction. Warth, 422 U.S. at 518. To meet that burden here, Truck must establish that

it (a) is a "party in interest," as that term is used in section 1109(b) of the Bankruptcy Code, and

(b) otherwise satisfies minimum constitutional standing requirements.  As set forth below, Truck

has failed to do so.

Pursuant to section 1109(b) of the Bankruptcy Code, only parties in interest "may

appear and be heard on any issue in a case under this chapter."  11 U.S.C. § 1109(b).  Although

"party in interest" is undefined in the Bankruptcy Code, courts have generally held that

qualification as a party in interest requires more than a generalized interest in the outcome of a

case; it requires a direct legal or pecuniary interest that is adversely affected by the outcome of

the particular bankruptcy matter.  In re Fuller-Austin Insulation, No. 98-2038-JJF, 1998 U.S.

Dist. LEXIS 18340, at *11 (D. Del. Nov. 10, 1998) (citing Kane v. Johns-Manville Corp.,

843 F.2d 636, 641-42 (2d Cir. 1987)).  Truck is unable to satisfy this requirement because it has

no legal or pecuniary interest in how the Asbestos Personal Injury Trust is structured or funded.

Even if Truck could somehow establish that it is a "party in interest" under the

Bankruptcy Code, it would still lack standing to assert its section 524(g) (and other) objections to

the Plan.[16]  In the context of confirmation objections, numerous courts have held that, although

sections 1109(b) and 1128(b) of the Bankruptcy Code define "party in interest" broadly and

provide that parties in interest may object to confirmation of a plan, those sections do not grant

parties in interest standing to object to *all* aspects of a plan.  See In re Wonder Corp. of Am.,

70 B.R. 1018, 1023 (Bankr. D. Conn. 1987) ("The broad language of §§ 1109 and 1128 cannot

be construed to provide standing to all creditors on the issues involved in the confirmation of a

reorganization plan.").  Instead, courts have generally limited the standing of parties to object to

---

[16]    To the extent Truck holds an Allowed General Unsecured Claim, it will be paid in full under the Plan,
rendering Truck unimpaired.

confirmation only to those provisions that directly affect that party's interests.  See In re Applied

Safety, Inc., 200 B.R. 576, 587 (Bankr. E.D. Pa. 1996) ("Generally, it is only an aggrieved party,

whose own interests are impacted by particular plan provisions, [who] may object to those

provisions at confirmation."); In re Mount Carbon Metro. Dist., No. 97-20215, 1999 Bankr.

LEXIS 1643, at *16 (Bankr. D. Colo. July 20, 1999) ("All parties in interest do not necessarily

have standing with respect to every issue in a bankruptcy case."); Orlando Inv'rs L.P., 103 B.R.

at 596 (quoting In re Evans Prod. Co., 65 B.R. 870, 874 (S.D. Fla. 1986) ("Courts have even

concluded that parties 'have standing only to challenge those parts of a reorganization plan that

affect their direct interests'"); In re Shoen, 193 B.R. 302, 311 (Bankr. D. Ariz. 1996) (to have

standing to object to plan confirmation, objector needed to establish "direct and adverse

pecuniary effect" of particular plan provisions); In re Johns-Manville Corp., 68 B.R. at 623-24

("[A] party who is not directly 'aggrieved' by the construction of a provision of the Plan would

lack the requisite standing to be heard."), affd, 78 B.R. 407 (S.D.N.Y. 1987), affd sub nom. Kane

v. Johns-Manville Corp., 843 F.2d 636 (2d Cir. 1988).  Thus, while Truck may maintain that it

has plenary standing to object to confirmation based on its purported status as a party in interest,

such a position is contrary to prevailing case law and should be rejected.

Instead, Truck must demonstrate its standing with respect to each particular

objection asserted.  See Friends of the Earth, Inc. v. Laidlaw Envtl. Servo (TOC), Inc., 528 U.S.

167, 185 (2000) (standing is determined on an ad hoc basis, and party "must demonstrate

standing separately for each form of relief sought"); accord Rosen v. Tenn. Comm'r of Fin. &

Admin., 288 F.3d 918, 928 (6th Cir. 2002) ("It is black-letter law that standing is a claim-by-

claim issue."); Sentinel Trust Co. v. Newcare Health Corp. (In re Newcare Health Corp.),

244 B.R. 167, 172 (BAP 1st Cir. 2000) ("In bankruptcy, a party may have standing for some

matters and not for others.") (citing In re Tascosa Petroleum Corp., 196 B.R. 856 (D. Kan.

1996)). See, e.g., In re Combustion Eng'g, Inc., 391 F.3d at 218, as amended (Feb. 23, 2005)

(holding that insurers lacked standing insofar as the plan did not affect their rights);

Mt. McKinley Ins. Co. v. Pittsburgh Corning Corp., 518 B.R. 307, 329 (W.D. Pa. 2014)

(concluding that the insurer's "arguments that it has standing are without merit" because "[t]he

plan did not dramatically increase the 'quantum of liability,' harm . . . [insurer's] contractual

rights, or increase its administrative burdens"); In re Fuller-Austin Insulation, No. 98-2038-JJF,

1998 WL 812388, at *1 (D. Del. Nov. 10, 1998) (holding that insurers lacked standing to object

to both the approval of the disclosure statement and the plan itself because the plan preserved

insurers' rights in coverage litigation); J T Thorpe Co., No. 02-41487-H5-11, 2003

WL 23354129, at *1 (Bankr. S.D. Tex. Jan. 30, 2003) (noting that the district court had affirmed

the bankruptcy court's prior ruling sustaining the debtors' objection to insurers' standing to object

to the disclosure statement and the plan).  Here, there is nothing about the funding or structure of

the Asbestos Personal Injury Trust (or any other provision of the Plan) that directly affects

Truck's legal or pecuniary interests.  Thus, Truck lacks standing to raise its objections.

        Truck also lacks standing to assert its section 524(g) (and other) objections

because it cannot establish the minimum constitutional standing requirements.  The Supreme

Court has delineated three requirements that constitute the "irreducible constitutional minimum."

The plaintiff must have:  (a) suffered an injury in fact, (b) that is fairly traceable to the

challenged conduct of the defendant and (c) that is likely to be redressed by a favorable juridical

decision.  Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016).  As mentioned above, Truck has

suffered no injury in fact, and points to nothing resembling a "concrete," "distinct" or "imminent"

injury in fact that will befall it as a result of the Plan or the establishment and funding of the

Asbestos Personal Injury Trust.  See Trustgard Ins. Co. v. Collins, 942 F.3d 195, 199 (4th Cir.

2019) ("The 'irreducible constitutional minimum of standing' requires the petitioner to allege a

concrete injury that is 'actual or imminent, not conjectural or hypothetical.'") (quoting Lujan v.

Defs. of Wildlife, 504 U.S. 555, 560 (1992)).

        In addition to the constitutional limitations on standing, federal courts have also

recognized certain prudential limitations on standing, including the traditional prohibition against

asserting the rights and interests of a third party.  Benjamin v. Aroostook Med. Ctr., Inc., 57 F.3d

101, 104 (lst Cir. 1995).  As the Third Circuit has stated, "[e]ven when th[e] constitutional

[standing] minimum has been met, judicially created prudential limitations may defeat a party's

standing to maintain a suit."  The Pitt News v. Fisher, 215 F.3d 354, 359 (3d Cir. 2000) (citing

Fair Hous. Council of Suburban Philadelphia v. Montgomery Newspapers, 141 F.3d 71, 75 (3d

Cir. 1998)).  Such prudential limitations accord with common sense.  If any party in interest

could be heard on any issue in a chapter 11 case, one party with a tangential interest in the

proceedings could slow a debtor's reorganization indefinitely and cripple or defeat the

rehabilitative purpose of chapter 11.  See In re Public Servo Co., 88 B.R. 546, 554 (Bankr.

D.N.H. 1988) (courts must "take care not to be so liberal in granting applications as to

over-burden the reorganization process by allowing numerous parties to interject themselves into

the case on every issue, to the extent that the goal of a speedy and efficient reorganization is

hampered").  Subject to certain exceptions not applicable here, litigants are generally barred from

asserting the statutory rights of others to secure relief for themselves.  In re Johns Manville

Corp., 843 F.2d at 643.  By objecting to the Plan on the basis that the structure and funding of the

Asbestos Personal Injury Trust do not satisfy the requirements of section 524(g), Truck, who has

no rights to Distributions from the Asbestos Personal Injury Trust, is effectively asserting the

rights of the asbestos claimants.[17]  Those parties could have objected to the Plan, but they did

not.[18]  Instead, they unanimously voted in favor of the Plan.  Truck lacks standing to raise

objections on behalf of asbestos claimants.

## V.    THE PLAN SHOULD BE CONFIRMED

### A.    The Plan Meets Each Requirement for Confirmation Under Section 1129(a) of the Bankruptcy Code

To confirm the Plan, the Court must find that both the Plan and the Debtors are in

compliance with each of the requirements of section 1129(a) of the Bankruptcy Code.  See In re

Lackawanna Detective Agency, Inc., 82 B.R. 336, 337 (Bankr. D. Del. 1988) ("Section 1129(a)

of title 11 recites the standards which must be met before a plan can be confirmed."); In re

Richard Buick, Inc., 126 B.R. 840, 846 (Bankr. E.D. Pa. 1991).  As set forth below, both the Plan

and the Debtors meet all the requirements of section 1129(a) of the Bankruptcy Code and,

therefore, the Plan should be confirmed.

#### 1.    Section 1129(a)(1) — The Plan Complies with the Applicable Provisions of the Bankruptcy Code

Section 1129(a)(1) of the Bankruptcy Code provides that a plan of reorganization

may be confirmed only if "[t]he plan complies with the applicable provisions of this title."

---

[17]    See Combustion Eng'g, Inc. 391 F.3d at 248 ("While . . . [insurers] argue that § 524(g)(2)(B)(i)(II) is not satisfied, they do not have standing to raise this matter."); In re A.P.I., Inc., 331 B.R. 828, 867 (Bankr. D. Minn. 2005) ("[T]he insurers cannot be heard in objection to the plan on its conformity with either § 524(g)(2)(B)(i)(II) or (i)(III)."), aff'd sub nom. OneBeacon Am. Ins. Co. v. A.P.I., Inc., 2006 WL 1473004 (D. Minn. May 25, 2006).

[18]    Notably, Truck's interests are directly at odds with those of the asbestos claimants and, as such, it would be entirely inappropriate for Truck to be permitted to represent such claimants' interests.  See In re PWS Holding Corp., 228 F.3d 224, 248 (3d Cir. 2000) ("Third-party standing is of special concern in the bankruptcy context where, as here, one constituency before the court seeks to disturb a plan of reorganization based on the rights of third parties who apparently favor the plan."); In re Quigley Co., 391 B.R. 695, 705 (Bankr. S.D.N.Y. 2008) (observing third-party standing limitations particularly necessary where objecting insurers' interests directly in conflict with rights of creditors with standing); In re Mid-Valley, Inc., 305 B.R. 425, 434 (Bankr. W.D. Pa. 2004) (finding insurer "interests are entirely adverse to those of the asbestos claimants," and [insurers] "cannot . . . act on [asbestos claimants'] behalf, any more than any other adverse entity could").

11 U.S.C. § 1129(a)(1); In re Eagle-Picher Indus., Inc., 203 B.R. 256, 270-73 (Bankr. S.D. Ohio

1996) (examining each requirement of chapter 11 to demonstrate that section 1129(a)(1) was

satisfied); In re Toy & Sports Warehouse, Inc., 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984) ("[I]n

order for a plan of reorganization to pass muster . . . it must comply with all the requirements of

Chapter 11….").

      The legislative history of section 1129(a)(1) indicates that the primary focus of

this requirement is to ensure that the Plan complies with sections 1122 and 1123 of the

Bankruptcy Code, which govern classification of claims and interests and the contents of a plan,

respectively.  See S. Rep. No. 95-989, at 126 (1978), reprinted in 1978 U.S.C.C.A.N. 5787,

5913; H.R. Rep. No. 95-595, at 412 (1977), reprinted in 1978 U.S.C.C.A.N. 5962, 6368; see also

Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.), 843 F.2d 636, 648-49 (2d Cir. 1988)

(holding that legislative history indicates that section 1129(a)(1) was intended to require

compliance with sections 1122 and 1123).

## Classification of Claims and Interests

      Section 1122 of the Bankruptcy Code provides that the claims or interests within

a given class must be "substantially similar" to the other claims or interests in that class:

> (a) Except as provided in subsection (b) of this section, a plan may
> place a claim or an interest in a particular class only if such claim
> or interest is substantially similar to the other claims or interests of
> such class.
>
> (b) A plan may designate a separate class of claims consisting only
> of every unsecured claim that is less than or reduced to an amount
> that the court approves as reasonable and necessary for
> administrative convenience.

11 U.S.C. § 1122.

      Although section 1122(a) of the Bankruptcy Code prohibits the inclusion of

dissimilar claims in the same class, it does not require the placement of all similar claims in one

class.  See In re Jersey City Med. Ctr., 817 F.2d 1055, 1061 (3d Cir. 1987) ("[W]e agree with the

general view which permits the grouping of similar claims in different classes."); In re First

Interregional Equity Corp., 218 B.R. 731, 738-39 (Bankr. D.N.J. 1997) (same); In re Drexel

Burnham Lambert Grp. Inc., 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992) ("Courts have found that

the Bankruptcy Code only prohibits the identical classification of dissimilar claims.  It does not

require that similar classes be grouped together….").

　　　　The Plan meets these requirements.  Article II of the Plan classifies Claims and

Interests into seven separate Classes:  Priority Claims (Class 1), Secured Claims (Class 2),

General Unsecured Claims (Class 3), Asbestos Personal Injury Claims (Class 4), Surety Bond

Claims (Class 5), Intercompany Claims (Class 6) and Stock Interests (Class 7).[19]  The number of

Classes reflects the diverse characteristics of those Claims and Interests, and the legal rights

under the Bankruptcy Code of each of the holders of Claims or Interests within a particular Class

are substantially similar to other holders of Claims or Interests within that Class.

　　　　Due to their entitlement to priority status under section 507 of the Bankruptcy

Code, Priority Claims have been separately classified in Class 1.  Based on their secured status,

Secured Claims have been separately classified in Class 2.  Asbestos Personal Injury Claims

have been separately classified in Class 4 due to the distinctive bases for such Claims and the

fact that, unlike all other Classes of Claims, Asbestos Personal Injury Claims are impaired.

Moreover, due to their unique nature and issues specific to them, Class 6 Intercompany Claims

have been classified separately from the Class 3 General Unsecured Claims.  Finally, the

Interests in the Debtors have been separately classified to reflect their status as Interests.

---

[19]　　In accordance with section 1123(a)(l) of the Bankruptcy Code, Administrative Claims and Priority Tax
Claims have not been classified.

### Mandatory Contents of the Plan

Section 1123(a) of the Bankruptcy Code identifies seven requirements for the contents of a plan of reorganization.  Specifically, this section requires that a plan:  (a) designate classes of claims and interests; (b) specify unimpaired classes of claims and interests; (c) specify treatment of impaired classes of claims and interests; (d) provide for equality of treatment within each class; (e) provide adequate means for the plan's implementation; (f) provide for the prohibition of nonvoting equity securities and provide an appropriate distribution of voting power among the classes of securities; and (g) contain only provisions that are consistent with the interests of the creditors and equity security holders and with public policy with respect to the manner of selection of the reorganized company's officers and directors.  See 11 U.S.C. § 1123(a).  In analyzing a plan's provisions with respect to the selection of officers and directors, a court is to consider "the shareholders' interest in participating in the corporation, the desire to preserve the debtor's reorganization, and the overall fairness of the provisions."  Acequia, Inc. v. Clinton (In re Acequia, Inc.), 787 F.2d 1352, 1362 (9th Cir. 1986).

The Plan fully complies with each requirement of section 1123(a) described above.  As previously noted with respect to the Plan's compliance with section 1122, Article II of the Plan designates seven separate Classes of Claims and Interests, as required by section 1123(a)(1) of the Bankruptcy Code.  Section III.B of the Plan specifies that Classes 1, 2, 3, 5, 6 and 7 are not impaired under the Plan, as required by section 1123(a)(2) of the Bankruptcy Code.  Section III.B of the Plan specifies that Claims in Class 4 are impaired and describes the treatment of such Claims in accordance with section 1123(a)(3) of the Bankruptcy Code.  Further, as required by section 1123(a)(4) of the Bankruptcy Code, the treatment of each Claim or Interest within a Class is the same as the treatment of each other Claim or Interest in

such Class, unless the holder of a Claim or Interest has agreed to less favorable treatment on account of its Claim or Interest.

In accordance with the requirements of section 1123(a)(5) of the Bankruptcy Code, Article IV of the Plan and various other provisions of the Plan provide adequate means for the Plan's implementation. Specifically, the Plan provides for: (a) except as otherwise provided in the Plan and subject to the Restructuring Transactions, the Debtors' continued corporate existence and the vesting of all property of the Debtors' respective Estates and any property acquired by a Debtor or Reorganized Debtor under the Plan in the appropriate Reorganized Debtor under Section IV.A of the Plan; (b) the consummation of the Restructuring Transactions under Section IV.B of the Plan; (c) certain real estate and lease transactions under Section IV.C of the Plan; (d) the adoption of the corporate constituent documents that will govern the Reorganized Debtors and the identification of the initial boards of directors of the Reorganized Debtors under Section IV.D of the Plan; (e) sufficient cash resources to make all Distributions pursuant to Section IV.E of the Plan; (f) the creation of, and transfer of certain assets to, the Asbestos Personal Injury Trust under Section IV.F of the Plan; (g) the appointment of the Asbestos Personal Injury Trustee under Section IV.H of the Plan; (h) the funding of the Asbestos Personal Injury Trust under Section IV.K.2 of the Plan; (i) the transfer of and preservation of rights of action by the Reorganized Debtors, and the release of certain rights of action against the Debtors under Section IV.R of the Plan; (j) the release of all mortgages, deeds of trust, liens or other security interests against the property of the Estate under Section IV.R of the Plan; (k) the authorization to execute various documents and to enter into various transactions to effectuate the Plan and exemption from certain transfer taxes under Section IV.T of the Plan; and (l) the direction to comply with QSF Regulations under Section IV.V of the Plan.

Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate constituent documents prohibit the issuance of nonvoting equity securities.  In accordance with that requirement, Section IV.D.1 of the Plan provides that the certificates of incorporation of each Reorganized Debtor will prohibit the issuance of nonvoting equity securities to the extent required under section 1123(a) of the Bankruptcy Code.

Finally, section 1123(a)(7) of the Bankruptcy Code requires that a plan of reorganization "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan…."  11 U.S.C. § 1123(a)(7).  This provision is supplemented by section 1129(a)(5) of the Bankruptcy Code, which directs courts to scrutinize the methods by which the reorganized corporation's management is to be chosen in order to provide adequate representation of those whose investments are involved in the reorganization—i.e., creditors and equity holders.  See 7 Lawrence P. King et al., Collier on Bankruptcy ¶ 1123.01[7] (16th ed. rev. 2019); see also In re Acequia, 787 F.2d at 1361-62.

The Plan complies with section 1123(a)(7) and ensures that the selection of the officers and directors of each of the Reorganized Debtors is consistent with the interests of creditors and equity security holders and with public policy.  Section IV.D.2 of the Plan provides that the initial boards of directors of each of the Reorganized Debtors will consist of the directors and officers of each Debtor immediately prior to the Effective Date.  Further, this section of the Plan provides that directors and officers will serve from and after the Effective Date until a successor is duly elected or appointed and qualified or until their earlier death, resignation or removal in accordance with the terms of the certificates of incorporation and by-laws or similar constituent documents of the applicable Reorganized Debtor and applicable state law.  The Plan's

provisions with respect to the selection of directors and officers are consistent with the interests

of creditors and public policy.

**Discretionary Contents of the Plan**

Section 1123(b) of the Bankruptcy Code identifies various discretionary

provisions that may be included in a plan of reorganization but are not required.  For example, a

plan may impair or leave unimpaired any class of claims or interests and provide for the

assumption or rejection of executory contracts and unexpired leases.  11 U.S.C. § 1123(b)(l)-(2).

A plan also may provide for:  (a) "the settlement or adjustment of any claim or interest belonging

to the debtor or to the estate;" (b) "the retention and enforcement by the debtor, by the trustee, or

by a representative of the estate appointed for such purpose, of any such claim or interest,"

11 U.S.C. § 1123(b)(3)(A)-(B); or (c) "the sale of all or substantially all of the property of the

estate, and the distribution of the proceeds of such sale among holders of claims or interests."

11 U.S.C. § 1123(b)(4).  Finally, a plan may "modify the rights of holders of secured claims . . .

or . . . unsecured claims, or leave unaffected the rights of holders of any class of claims" and may

"include any other appropriate provision not inconsistent with the applicable provisions of

[title 11]."  11 U.S.C. § 1123(b)(5)-(6).

As described above, the Plan provides for the impairment of Class 4, while

leaving all other Classes of Claims and Interests unimpaired.  The Plan thus modifies the rights

of the holders of certain Claims and leaves the rights of others unaffected.  See Plan Art. III. In

particular, Asbestos Personal Injury Claims will be channeled to the Asbestos Personal Injury

Trust for resolution, as set forth in the Asbestos Personal Injury Trust Agreement and the related

Asbestos Personal Injury Trust Distribution Procedures.  See Plan § III.B.4.  The Plan also

provides for (a) the assumption, assumption and assignment or rejection of executory contracts

and unexpired leases to which the Debtors are parties (see Plan Art. V); and (b) the retention and

enforcement of certain claims by the Debtors (see Plan § IV.R).[20]

   Finally, in accordance with section 1123(b)(6) of the Bankruptcy Code, the Plan

includes numerous other provisions necessary for its implementation, which are consistent with

the Bankruptcy Code, including:  (a) Article IV of the Plan providing for (i) the creation of the

Asbestos Personal Injury Trust and (ii) the appointment of the Asbestos Personal Injury Trustee;

(b) Article VI of the Plan governing Distributions on account of Allowed Claims; (c) Article VII

of the Plan establishing procedures for resolving Disputed Claims and making Distributions on

account of such Disputed Claims once resolved; (d) Article IX of the Plan regarding the

discharge of Claims and injunctions against certain actions; and (e) Article X of the Plan

regarding retention of jurisdiction by the Bankruptcy Court over certain matters after the

Effective Date.

   Accordingly, the Plan fully complies with the applicable provisions of the

Bankruptcy Code and, therefore, meets the requirements of section 1129(a)(l) of the Bankruptcy

Code.

   2.  Section 1129(a)(2) — The Proponents of the Plan
     Have Complied with the Applicable Provisions of Title 11

   Section 1129(a)(2) of the Bankruptcy Code requires that the proponent of a plan

comply with applicable provisions of the Bankruptcy Code.  The legislative history to

section 1129(a)(2) indicates that the principal purpose of this section is to ensure compliance

---

[20]  In accordance with section 1123(d) of the Bankruptcy Code, Section V.B of the Plan provides for the
satisfaction of Cure Amount Claims associated with each Executory Contract and Unexpired Lease to be
assumed pursuant to the Plan in accordance with section 365(b)(l) of the Bankruptcy Code.  Additionally,
in accordance with Article III of the Plan, certain Claims may be Reinstated.  All Cure Amount Claims and
Reinstated Claims will be determined in accordance with the underlying agreements and applicable
non-bankruptcy law, and pursuant to the procedures established in the Plan or, to extent applicable, any
separate orders of the Bankruptcy Court.  See Plan §§ III.B and V.B.

with the disclosure and solicitation requirements set forth in section 1125 of the Bankruptcy

Code.  S. Rep. No. 95-989, at 126 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5912

("Paragraph (2) [of section 1129(a)] requires that the proponent of the plan comply with the

applicable provisions of chapter 11, such as section 1125 regarding disclosure."); H.R. Rep.

No. 95-595, at 412 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6368; see . In re Lapworth,

No. 97-34529DWS, 1998 WL 767456, at *3 (Bankr. E.D. Pa. Nov. 2, 1998) ("The legislative

history of [section] 1129(a)(2) specifically identifies compliance with the disclosure

requirements of [section] 1125 as a requirement of [section] 1129(a)(2)."); Official Comm. of

Unsecured Creditors v. Michelson (In re Michelson), 141 B.R. 715, 719 (Bankr. E.D. Cal. 1992);

In re Texaco Inc., 84 B.R. 893, 906-07 (Bankr. S.D.N.Y. 1988); Toy & Sports Warehouse, 37

B.R. at 149.  The Debtors have complied with the applicable provisions of the Bankruptcy Code,

including the provisions of section 1125 regarding disclosure and plan solicitation.

　　　　　Section 1125 prohibits the solicitation of acceptances or rejections of a plan of

reorganization from holders of claims or interests "unless, at the time of or before such

solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written

disclosure statement approved…by the court as containing adequate information."  11 U.S.C.

§ 1125(b).  In these Reorganization Cases, the Court entered the Order (I) Approving the

Debtors' Disclosure Statement, (II) Establishing Procedures for Solicitation and Tabulation of

Votes to Accept or Reject Proposed Joint Plan of Reorganization and (III) Scheduling a Hearing

on Confirmation of Proposed Joint Plan of Reorganization and Approving Related Notice

Procedures [D.I. 1875] (the "Disclosure Statement Order"), which, among other things,

specifically found that the Disclosure Statement contained adequate information within the

meaning of section 1125 of the Bankruptcy Code.  In addition, the Court considered and, in the

Disclosure Statement Order, approved (a) all materials to be transmitted to those creditors

entitled to vote on the Plan (collectively, the "Solicitation Materials"), (b) the timing and method

of delivery of the Solicitation Materials, (c) the rules for tabulating votes to accept or reject the

Plan and (d) the timing and method of publication of a notice of the Confirmation Hearing and

related matters (the "Confirmation Notice").

Thereafter, the Debtors transmitted solicitation packages to holders of Claims and

Interests and other parties in interest that contained:  (a) the Disclosure Statement; (b) the Plan

(without certain exhibits thereto); (c) the Confirmation Notice; (d) for parties entitled to vote on

the Plan, an appropriate Ballot with a return envelope; and (e) certain other approved Solicitation

Materials.  These Solicitation Materials were distributed promptly after the entry of the

Disclosure Statement Order and in accordance with the Court's instructions.  In addition, the

Debtors caused the General Publication Notice and the Asbestos Publication Notice (as defined

in Annex C to the Disclosure Statement Order) to be published in certain newspapers and

magazines in accordance with the instructions set forth in the Disclosure Statement Order.[21]  See

Disclosure Statement Order ¶¶ 12-13.  As attested to in the Declaration of James Daloia of Prime

Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Third

Amended Joint Plan of Reorganization of Kaiser Gypsum Company, Inc. and Hanson

Permanente Cement, Inc. (the "Voting Declaration"), after the Solicitation Materials were

distributed and the General Publication Notice and the Asbestos Publication Notice were

---

[21]    As described in the Declaration of Cameron R. Azari (the "Asbestos Notice Declaration"), Hilsoft
Notifications designed the Confirmation Notice to provide fair and adequate notice of the Plan to holders of
existing or future Asbestos Personal Injury Claims against the Debtors.  In accordance with the Disclosure
Statement Order, a version of the Confirmation Notice specifically directed at holders of Asbestos Personal
Injury Claims was published in various national consumer publications, trade publications and union
publications.  Notice was also published in a widely-distributed press release and on several high-traffic
websites and advertising networks.

published, the returned Ballots of parties entitled to vote on the Plan were tabulated in

accordance with the rules and procedures provided in the Disclosure Statement Order. Class 4,

the only Class entitled to vote, unanimously voted to accept the Plan. See Voting Declaration,

filed contemporaneously herewith.

Thus, the Debtors have complied with the applicable provisions of the Bankruptcy

Code, including section 1125 of the Bankruptcy Code, and Rules 3017 and 3018 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). Accordingly, the Plan meets the

requirements of section 1129(a)(2) of the Bankruptcy Code.

  3.  <u>Section 1129(a)(3) — The Plan Has Been Proposed in Good Faith</u>

Section 1129(a)(3) of the Bankruptcy Code requires that a plan of reorganization

be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). A

plan is considered proposed in good faith "if there is a reasonable likelihood that the plan will

achieve a result consistent with the standards prescribed under the [Bankruptcy] Code." Hanson

v. First Bank of S.D., 828 F.2d 1310, 1315 (8th Cir. 1987); see also In re SGL Carbon Corp.,

200 F.3d 154, 165 (3d Cir. 1999) (the good faith standard in section 1129(a)(3) requires that

there must be "'some relation'" between the chapter 11 plan and the "reorganization-related

purposes" that chapter 11 was designed to serve); In re Zenith Elecs. Corp., 241 B.R. 92, 107

(Bankr. D. Del. 1999) ("The good faith standard requires that the plan be proposed with honesty,

good intentions and a basis for expecting that a reorganization can be effected with results

consistent with the objectives and purposes of the Bankruptcy Code." (quotation marks

omitted)); In re New Valley Corp., 168 B.R. 73, 80 (Bankr. D.N.J. 1994) ("It is generally held

that a plan is proposed in good faith if there is a reasonable likelihood that the plan will achieve a

result consistent with the objectives and purpose of the Bankruptcy Code."). The requirement of

good faith must be viewed in light of the totality of the circumstances surrounding the

formulation of a chapter 11 plan.  See McCormick v. Bane One Leasing Corp. (In re

McCormick), 49 F.3d 1524, 1526 (11th Cir. 1995) ("The focus of a court's inquiry is the plan

itself, and courts must look to the totality of the circumstances surrounding the plan . . . keeping

in mind the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make

a fresh start.").

　　　　　In determining whether the plan will succeed and accomplish goals consistent

with the Bankruptcy Code, courts look to the terms of the reorganization plan itself.  See In re

Sound Radio, Inc., 93 B.R. 849, 853 (Bankr. D.N.J. 1988) (concluding that the good faith test

provides the court with significant flexibility and is focused on an examination of the plan itself,

rather than other, external factors), aff'd in part, remanded in part on other grounds, 103 B.R. 521

(D.N.J. 1989), aff'd, 908 F.2d 964 (3d Cir. 1990).  The plan proponent must show, therefore, that

the plan has not been proposed by any means forbidden by law and that the plan has a reasonable

likelihood of success.  See In re Century Glove, Inc., Civ. A. Nos. 90-400-SLR, 90-401-SLR,

1993 WL 239489, at *4 (D. Del. Feb. 10, 1993) ("A court may only confirm a plan for

reorganization if . . . the 'plan has been proposed in good faith and not by any means forbidden

by law . . . .'  Moreover, 'where the plan is proposed with the legitimate and honest purpose to

reorganize and has a reasonable hope of success, the good faith requirement of

section 1129(a)(3) is satisfied[.]'"); see also Fin. Sec. Assur. Inc. v. T-H New Orleans Ltd. P'ship

(In re T-H New Orleans Ltd. P'ship), 116 F.3d 790, 802 (5th Cir. 1997) (same).

　　　　　Whether a plan has been proposed in good faith turns on whether it "'will fairly

achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'"  In re Am.

Capital Equip., LLC, 688 F.3d 145, 156 (3d Cir. 2012).  Here, the Plan serves valid bankruptcy

objectives — it is the product of extensive arms'-length negotiations among the ACC, the FCR,

the Debtors and numerous other parties, reflects a consensual resolution of the Debtors' asbestos

and environmental liabilities and maximizes the value of assets available to satisfy Claims.  In re

Michener, 342 B.R. 428, 434 (Bankr. D. Del. 2006); Am. Capital Equip., LLC, 688 F.3d at 156

(explaining that the two "'recognized' policies, or objectives, [of Chapter 11] are 'preserving

going concerns and maximizing property available to satisfy creditors'").  That the Plan

maximizes the value of assets is demonstrated by the fact that creditor recoveries are

substantially greater than could be realized if the Debtors were to liquidate.

To arrive at this juncture in these Reorganization Cases, the Debtors actively

involved their creditor constituencies in the Plan-formulation process.[22]  See Stolrow v.

Stolrow's, Inc. (In re Stolrow's Inc.), 84 B.R. 167, 172 (B.A.P. 9th Cir. 1988) (holding that good

faith in proposing a plan "also requires a fundamental fairness in dealing with one's creditors").

The Debtors provided substantial information to all constituencies and, thereafter, reached

numerous settlements that will be implemented through the Plan.  As described above and in the

Disclosure Statement, the Debtors engaged in arms'-length negotiations with many parties in

interest over the course of these Reorganization Cases, including Truck, and the Plan reflects

agreements among the Debtors, Lehigh Hanson, the ACC, the FCR, the EPA, the DEQ and the

Debtors' other insurers and constituents.  The Debtors' good faith in proposing the Plan is

evidenced by these negotiations, the numerous consensual settlements with stakeholders, and the

unanimous support of the holders of Class 4 Claims, the only Class entitled to vote on the Plan.

---

[22]     Truck indicated near the outset of the cases that it was not interested in pursuing a consensual, global
resolution of the Debtors' asbestos liabilities.  When Truck later  expressed an interest in participating in
such discussions, the Debtors organized mediation sessions that included Truck.  Although those sessions
occurred on July 16 and 17, 2018 in Chicago, Illinois and on September 17, 2018 in New York, New York,
and later discussions between Truck the ACC and the FCR took place, no agreement could be reached with
Truck with respect to the Debtors' asbestos liabilities.  Notably, however, an agreement was reached with
Truck with respect to its environmental insurance coverage responsibilities.

See Voting Declaration; see also Eagle-Picher, 203 B.R. at 274 (finding that a plan of

reorganization was proposed in good faith when, among other things, it was based on extensive

arms'-length negotiations among the plan proponents and other parties in interest).  Accordingly,

the requirements of section 1129(a)(3) of the Bankruptcy Code have been fully satisfied.[23]

> 4.      Section 1129(a)(4) — All Payments To Be Made by the Debtors in
>         Connection With These Reorganization Cases Are Subject to Court
>         Approval

Section 1129(a)(4) of the Bankruptcy Code requires that:

> Any payment made or to be made by the proponent, by the debtor,
> or by a person issuing securities or acquiring property under the
> plan, for services or for costs and expenses in or in connection with
> the case, or in connection with the plan and incident to the case,
> has been approved by, or is subject to the approval of, the court as
> reasonable.

11 U.S.C. § 1129(a)(4).  In essence, this subsection requires that any and all fees promised or

received in connection with, or in contemplation of, a chapter 11 case must be disclosed and

subject to the court's review.  See In re Johns-Manville Corp., 68 B.R. 618, 623 (Bankr.

S.D.N.Y. 1986), rev'd in part on other grounds, 78 B.R. 407 (S.D.N.Y. 1987), aff'd, Kane v.

John-Manville Corp., 843 F.2d 636 (2d Cir. 1988); In re Chapel Gate Apartments, Ltd., 64 B.R.

569, 573 (Bankr. N.D. Tex. 1986) (before a plan may be confirmed, "there must be a provision

for review by the Court of any professional compensation"); In re S. Indus. Banking Corp.,

41 B.R. 606, 612 (Bankr. E.D. Tenn. 1984) (even absent challenge, a court has an independent

duty to determine the reasonableness of professional fees).

In accordance with section 1129(a)(4) of the Bankruptcy Code, all fees to which

parties may be entitled in connection with the Reorganization Cases, including Professionals' Fee

Claims, are subject to the approval of the Court.  Section III.A.1 of the Plan provides for the

---

[23]      Truck's unsupported allegations of collusion and bad faith are addressed below.  See § IX.G.

payment of Professionals' Fee Claims and makes all such payments subject to Court approval

and the standards of the Bankruptcy Code.  The Court has authorized the interim payment of the

fees and expenses incurred by Professionals in connection with these Reorganization Cases.  All

such fees and expenses, however, remain subject to final review for reasonableness by the Court.

Finally, Article X of the Plan provides that the Court will retain jurisdiction after the Effective

Date to hear and determine all applications for allowance of compensation or reimbursement of

expenses authorized pursuant to the Bankruptcy Code or the Plan.

Accordingly, the Plan fully complies with the requirements of section 1129(a)(4)

of the Bankruptcy Code.

5.     Section 1129(a)(5) — The Plan Discloses All Required
       Information Regarding Post-Confirmation Management and Insiders

Section 1129(a)(5) of the Bankruptcy Code provides that a plan of reorganization

may be confirmed only if the proponent discloses the identity of those individuals who will serve

as management of the reorganized debtor, the identity of any insider to be employed or retained

by the reorganized debtor and the compensation proposed to be paid to such insider.  In addition,

under section 1129(a)(5)(A)(ii), the appointment or continuation in office of existing

management must be consistent with the interests of creditors, equity security holders and public

policy.

In determining whether the post-confirmation management of a debtor is

consistent with the interests of creditors, equity security holders and public policy, a court must

consider proposed management's competence, discretion, experience and affiliation with entities

having interests adverse to the debtor.  See In re W.E. Parks Lumber Co., 19 B.R. 285, 292

(Bankr. W.D. La. 1982) (a court should consider whether "the initial management and board of

directors of the reorganized corporation will be sufficiently independent and free from conflicts

and the potential of post-reorganization litigation so as to serve all creditors and interested parties

on an even and loyal basis" (emphasis omitted)).  In general, however, "[t]he [d]ebtor should

have first choice of its management, unless compelling cause to the contrary exists. . . ."  In re

Sherwood Square Assocs., 107 B.R. 872, 878 (Bankr. D. Md. 1989).  The case law also is clear

that a plan may contemplate the retention of the debtor's existing directors and officers.

See, e.g., Texaco, 84 B.R. at 908 (holding that section 1129(a)(5) was satisfied where notice was

provided that the debtor's existing directors and officers would continue to serve in office after

plan confirmation).

        The Debtors have fully satisfied the requirements of section 1129(a)(5) by

disclosing all necessary information regarding the Reorganized Debtors' proposed officers and

directors, each of whom is highly qualified and experienced.  See Disclosure Statement § III.A.2;

Plan § IV.D.2 (providing that the initial directors and officers of each Reorganized Debtor shall

be the directors and officers of such Debtor prior to the Effective Date).

        In sum, the appointment of the proposed directors and officers is consistent with

public policy and the interests of the holders of Claims and Interests because the management

team and directors are well-positioned to serve adequately the interests of all parties.

Accordingly, the Plan satisfies the requirements of section 1129(a)(5) of the Bankruptcy Code.

        6.      Section 1129(a)(6) — The Plan Does Not Provide
                for Any Rate Change Subject to Regulatory Approval

        Section 1129(a)(6) of the Bankruptcy Code is not applicable here because the

Debtors' businesses do not involve the establishment of rates over which any regulatory

commission has jurisdiction or will have jurisdiction after confirmation.  11 U.S.C. § 1129(a)(6).

7.      Section 1129(a)(7) — The Plan Is in the Best Interests of Creditors

The "best interests of creditors" test is set forth in section 1129(a)(7) of the Bankruptcy Code.  This test requires that, with respect to each impaired class of claims or interests, each holder of such claims or interests (a) has accepted the plan or (b) will receive or retain property of a value not less than what such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.  See Tranel v. Adams Bank & Trust Co. (In re Tranel), 940 F.2d 1168. 1172 (8th Cir. 1991); In re AOV Indus., 31 B.R. 1005, 1008-13 (D.D.C. 1983), aff'd in part, rev'd in part, 792F.2d 1140, 1144 (D.C. Cir. 1986) (if no impaired creditor receives less than liquidation value, a plan of reorganization is in best interests of creditors), vacated in light of new evidence, 797 F.2d 1004 (D.C. Cir. 1986); In re Econ. Lodging Sys., Inc., 205 B.R. 862, 864-65 (Bankr. N.D. Ohio 1997); Eagle-Picher, 203 B.R. at 266.  When making this determination, a court is not required to consider any alternative to the plan other than the dividend projected in a liquidation of all the debtor's assets under chapter 7 of the Bankruptcy Code.  See, e.g., In re Victory Constr.  Co., 42 B.R. 145, 151 (Bankr. C.D. Cal. 1984); see also In re Crowthers McCall Pattern, Inc., 120 B.R. 279, 298 (Bankr. S.D.N.Y. 1990).

As section 1129(a)(7) itself makes clear, the best interests of creditors test is applicable only to non-accepting holders of *impaired* claims and interests (here, the non-voting members of Class 4).  See 11 U.S.C. § 1129(a)(7).  The test requires that each holder of a claim either must accept the plan or receive or retain under the plan property having a present value, as of the effective date of the plan, not less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7.

To estimate the value that impaired creditors would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code, the Court must first determine the aggregate dollar amount that would be available if each of the Reorganization Cases was converted to a

case under chapter 7 of the Bankruptcy Code and each of the respective Debtor's assets were

liquidated by a chapter 7 trustee (the "Liquidation Value").  The Liquidation Value of the

Debtors would consist of the net proceeds from the disposition of the Debtors' assets, augmented

by any cash held by the Debtors at the commencement of their chapter 7 cases.

As shown by the liquidation analysis attached as Exhibit IV to the Disclosure

Statement, the best interests test is satisfied because a chapter 7 liquidation of the Debtors'

estates would result in recoveries to holders of Class 4 Asbestos Personal Injury Claims that are

no greater than the potential range of recoveries provided under the Plan.  See Disclosure

Statement, Ex. IV (liquidation analysis); Plan § III.B. (Class 4 is the sole impaired Class under

the Plan).  The methodology used by the Debtors and their financial advisors to estimate the total

liquidation proceeds available for Distribution and the principal assumptions and considerations

underlying the liquidation analysis are described in the Disclosure Statement and Exhibit IV

attached thereto.

Based on the liquidation analysis, no non-accepting holder of a Class 4 Asbestos

Personal Injury Claim will receive less under the Plan than such holder would receive in a

liquidation of the Debtors' assets.  As a result, the Plan, which was unanimously approved by all

holders of Class 4 Claims who voted on the Plan, satisfies the requirements of section 1129(a)(7)

of the Bankruptcy Code.

8.      Section 1129(a)(8) — The Plan Has Been Accepted
        by the Requisite Classes of Claims and Interests

Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or

interests under a plan has either accepted the plan or is not impaired under the plan.  Under

section 1126(f) of the Bankruptcy Code, a class of claims or interests that is not impaired under a

plan is "conclusively presumed" to have accepted the plan and need not be further examined

under section 1129(a)(8).  11 U.S.C. § 1126(f); see also Toy & Sports Warehouse, 37B.R. at 150.

Acceptance of a plan of reorganization by an impaired class of claims or interests

is determined by reference to section 1126, which identifies the members of a class that may vote

on a plan and the number and amount of votes necessary for the acceptance of a plan by a class

of claims or interests, and section 524(g), which specifies the number of votes necessary for the

acceptance of a plan by a class of asbestos-related claims where the plan contemplates the entry

of a channeling injunction with respect to such claims and related future demands.  In particular:

(a) section 1126 provides that a plan is accepted (i) by a class of impaired claims if the class

members accepting hold at least two-thirds in amount and more than one-half in number of the

claims held by the class members that have cast votes on the plan and (ii) by a class of impaired

interests if the class members accepting hold at least two-thirds in amount of the interests held by

the class members that have cast votes on the plan; and (b) section 524(g) provides that, as part

of confirmation, a plan must designate a separate class of claims to be addressed by a 524(g)

trust and be accepted by at least 75 percent of those voting in such class.  Under section 1126(g)

of the Bankruptcy Code, however, impaired classes that neither receive nor retain property under

the plan are deemed to have rejected the plan.

Applying these standards here demonstrates that the Plan complies with

section 1129(a)(8) for all Classes established by the Plan.  Specifically, Class 4 has unanimously

accepted the Plan.  See Voting Declaration.  All other Classes are unimpaired under the Plan and,

therefore, are deemed to have accepted the Plan.  Accordingly, section 1129(a)(8) of the

Bankruptcy Code has been satisfied with respect to all Classes of Claims and Interests.

9.     Section 1129(a)(9) — The Plan
       Provides for the Payment of Priority Claims

Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan and that the holders of certain other priority claims receive deferred cash payments.  In particular, pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, unless otherwise agreed by the holder, holders of claims of a kind specified in section 507(a)(l) of the Bankruptcy Code — administrative claims allowed under section 503(b) of the Bankruptcy Code — must receive cash equal to the allowed amount of such claims on the effective date of the plan.  Section 1129(a)(9)(B) of the Bankruptcy Code allows deferred cash payments for certain kinds of employee claims.  In addition, section 1129(a)(9)(C) of the Bankruptcy Code provides for the payment of tax priority claims in cash in regular installments.

Section III.A.1 of the Plan provides that, subject to certain bar dates and unless otherwise agreed by the holder of an Administrative Claim and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Administrative Claim shall receive, in full satisfaction of its Administrative Claim, cash equal to the allowed amount of such Administrative Claim either:  (a) as soon as practicable after the Effective Date; or (b) if the Administrative Claim is not allowed as of the Effective Date, 30 days after the date on which such Administrative Claim becomes allowed by a Final Order or a Stipulation of Amount and Nature of Claim.  In addition, Administrative Claims based on ordinary course liabilities shall be satisfied by the applicable Reorganized Debtor pursuant to the terms and conditions of the particular transaction giving rise to such Administrative Claims, without any further action by the holder of such Administrative Claims or further approval of the Bankruptcy Court.

Further, Section III.B.l of the Plan provides that Priority Claims against any Debtor (which include Claims entitled to priority other than Administrative Claims and Priority

Tax Claims) will be paid on the Effective Date in an amount equal to the Allowed Claim.

Section III.A.2 of the Plan provides that, unless otherwise agreed by the holder of a Priority Tax

Claim and the applicable Debtor or Reorganized Debtor, on the Effective Date or as soon as

practicable after the date when such Claim becomes an Allowed Claim, each Allowed Priority

Tax Claim will receive payment in full of the allowed amount of the Priority Tax Claim.

Accordingly, the Plan satisfies the requirements set forth in section 1129(a)(9) of the Bankruptcy

Code with respect to the payment of Priority Claims.

> 10.     Section 1129(a)(10) — The Plan Has Been
>          Accepted by at Least One Impaired, Non-Insider Class

Section 1129(a)(10) of the Bankruptcy Code provides that:

> If a class of claims is impaired under the plan, at least one class of
> claims that is impaired under the plan has accepted the plan,
> determined without including any acceptance of the plan by any
> insider.

11 U.S.C. § 1129(a)(10); see In re Martin, 66 B.R. 921, 924 (Bankr. D. Mont. 1986) (holding

that acceptance by three classes of impaired creditors, exclusive of insiders, satisfied requirement

of section 1129(a)(10)).  The Plan satisfies this requirement.  As indicated in the Voting

Declaration, Class 4 has accepted the Plan, and no "insider," as such term is defined in

section 101(31) of the Bankruptcy Code, voted in Class 4.

> 11.     Section 1129(a)(11) — The Plan Is Feasible

Pursuant to section 1129(a)(11) of the Bankruptcy Code, a plan of reorganization

may be confirmed only if "confirmation of the plan is not likely to be followed by the

liquidation, or the need for further financial reorganization, of the debtor or any successor to the

debtor under the plan, unless such liquidation or reorganization is proposed in the plan."

11 U.S.C. § 1129(a)(11).  One commentator has stated that this section "requires courts to

scrutinize carefully the plan to determine whether it offers a reasonable prospect of success and

is workable."  7 Lawrence P. King et al., Collier on Bankruptcy ¶ 1129.02[11] (16th ed. rev.

2019); accord In re Cellular Info. Sys., Inc., 171 B.R. 926, 945 (Bankr. S.D.N.Y. 1994); In re

Rivers End Apartments, Ltd., 167 B.R. 470, 476 (Bankr. S.D. Ohio 1994); Johns-Manville,

68 B.R. at 635.

Section 1129(a)(11), however, does not require a guarantee of the plan's success;

rather, the proper standard is whether the plan offers a "reasonable assurance" of success.

See Johns-Manville, 843 F.2d at 649 (a plan may be feasible although its success is not

guaranteed); Prudential Ins. Co. of Am. v. Monnier (In re Monnier Bros.), 755 F.2d 1336, 1341

(8th Cir. 1985) (same); Rivers End, 167 B.R. at 476 (to establish feasibility, a "plan proponent

must demonstrate that its plan offers a reasonable prospect of success and is workable"); In re

Drexel Burnham, 138 B.R. at 762 ("'Feasibility does not, nor can it, require the certainty that a

reorganized company will succeed.'").

Courts have identified a number of factors relevant to evaluating the feasibility of

a proposed plan of reorganization, including (a) the prospective earnings or earning power of the

debtor's business, (b) the soundness and adequacy of the capital structure and working capital for

the debtor's post-confirmation business, (c) the debtor's ability to meet its capital expenditure

requirements, (d) economic conditions, (e) the ability of management and the likelihood that

current management will continue and (f) any other material factors that would affect the

successful implementation of the plan.  See, e.g., Sound Radio, 93 B.R. at 856; Texaco, 84 B.R.

at 910; Toy & Sports Warehouse, 37 B.R. at 151.

As reflected in the Plan and the projections attached as Exhibit III to the

Disclosure Statement (the "Projections"), HPCI owns the Permanente Property, which consists of

more than 3,400 acres of land and includes a cement plant, rock plant and quarry (including the

minerals) located in Santa Clara County, California. Under various lease agreements covering the Permanente Property, HPCI receives rent, royalties and other payments from Lehigh Southwest. HPCI will also continue to own its Operating Subsidiaries. Additionally, on or about the Effective Date, Lehigh Cement will transfer to Kaiser Gypsum its interest in the Real Properties, together with Lehigh Cement's rights under certain leases related to the Real Properties.

Thus, as the Projections demonstrate, the Reorganized Debtors will have the ability to fund their ongoing operations from cash flow generated by the businesses they directly or indirectly own. The lease arrangements for the Real Properties will ensure that Kaiser Gypsum generates positive cash flow into the future. HPCI's Permanente Property-related lease arrangement with Lehigh Southwest, coupled with cash flow from its Operating Subsidiaries, similarly shows that HPCI will generate positive cash flow into the future. Additionally, each of the Debtors is ultimately owned by Lehigh Hanson, which has the financial wherewithal to provide any additional funding needed by either entity. Finally, the Debtors have sufficient cash and access to financing, in combination with (a) Lehigh Hanson's cash and access to financing and (b) the proceeds of insurance, to fund the obligations imposed by the Plan.

Overall, the Projections demonstrate that: (a) the Plan provides a feasible means of completing the Debtors' reorganization; and (b) the Reorganized Debtors will have more than sufficient funds to satisfy their obligations under the Plan. Accordingly, the Plan satisfies the feasibility standard of section 1129(a)(11) of the Bankruptcy Code.

12.     Section 1129(a)(12) — The Plan Provides for the Payment of Fees

Section 1129(a)(12) of the Bankruptcy Code requires that "[a]ll fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of

the plan." 11 U.S.C. § 1129(a)(12).  The Plan complies with section 1129(a)(12) by providing

that all fees payable pursuant to 28 U.S.C. § 1930 will be paid in cash on or before the Effective

Date.  See Plan § III.A.l.b.

13.     Section 1129(a)(13) — The Plan Provides for the Continuation
of the Debtors' Obligations To Pay Retiree Benefits

Section 1129(a)(13) of the Bankruptcy Code is applicable only to debtors that

maintain retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code.

Section 1129(a)(13) of the Bankruptcy Code is not applicable because the Debtors do not

maintain any retiree benefits, as defined in section 1114 of the Bankruptcy Code.

14.     Section 1129(d) — The Plan's Purpose
Is Consistent with the Bankruptcy Code

Section 1129(d) of the Bankruptcy Code provides that a court may not confirm a

plan if the principal purpose of the plan is to avoid taxes or the application of section 5 of the

Securities Act of 1933.  The Plan meets these requirements because the principal purpose of the

Plan is not avoidance of taxes or avoidance of the requirements of section 5 of the Securities Act

of 1933, and there has been no filing by any governmental agency asserting otherwise.

**VI.    THE ASSUMPTION, ASSUMPTION AND ASSIGNMENT OR
REJECTION OF EXECUTORY CONTRACTS AND
UNEXPIRED LEASES UNDER THE PLAN SHOULD BE APPROVED**

The Plan proposes that the Debtors assume certain executory contracts.  Except as

otherwise provided in the Plan or in any contract, instrument, release or other agreement or

document entered into in connection with the Plan, on the Effective Date, pursuant to section 365

of the Bankruptcy Code, the applicable Debtor or Reorganized Debtor shall assume each of its

respective Executory Contracts and Unexpired Leases other than those listed on Exhibit V.C to

the Plan.  The Debtors reserve the right, however, at any time prior to the Effective Date, to

amend Exhibit V.C to:  (a) delete any Executory Contract or Unexpired Lease listed therein, thus

providing for its assumption pursuant to Section V.A.1 of the Plan, or (b) add any Executory

Contract or Unexpired Lease to Exhibit V.C, thus providing for its rejection under Section V.A.1

of the Plan.

Section 365(a) provides that a debtor, "subject to the court's approval, may

assume or reject any executory contract or unexpired lease."  11 U.S.C. § 365(a).  Courts

routinely approve motions to assume, assume and assign or reject executory contracts or

unexpired leases upon a showing that the debtor's decision to take such action will benefit the

debtor's estate and is an exercise of sound business judgment.  See, e.g., NLRB v. Bildisco &

Bildisco, 465 U.S. 513, 523 (1984); Grp. of Inst'l Investors v. Chi., M., St. P., & P.R. Co.,

318 U.S. 523, 550 (1943); City of Covington v. Covington Landing Ltd. P'ship, 71 F.3d 1221,

1226 (6th Cir. 1995); In re Market Square Inn, Inc., 978 F.2d 116, 121 (3d Cir. 1992)

(the "resolution of th[e] issue of assumption or rejection will be a matter of business judgment by

the bankruptcy court").

The "business judgment" test is not a strict standard; it merely requires a showing

that either assumption or rejection of the executory contract or unexpired lease will benefit the

debtor's estate.  See Allied Tech., Inc. v. R.B. Brunemann & Sons, Inc., 25 B.R. 484, 495 (Bankr.

S.D. Ohio 1982) ("As long as assumption of a lease appears to enhance a debtor's estate, Court

approval of a debtor in possession's decision to assume the lease should only be withheld if the

debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the

Bankruptcy Code…."); see also Borman's, Inc. v. Allied Supermarkets, Inc., 706 F.2d 187, 189

(6th Cir. 1983); NLRB v. Bildisco & Bildisco (In re Bildisco), 682 F.2d 72, 79 (3d Cir. 1982),

aff'd, 465 U.S. 513 (1984).  Because the Debtors have reviewed their Executory Contracts and

Unexpired Leases and made the determination, in their sound business judgment, to assume the

contracts and leases other than those listed on Exhibit V.C to the Plan, the assumption,

assumption and assignment and rejection of executory contracts proposed by the Plan should be

approved.

## VII.   THE ASBESTOS PERSONAL INJURY TRUST'S ACCESS TO CERTAIN DOCUMENTS IN THE DOCUMENT REPOSITORY DOES NOT DESTROY OR WAIVE ANY PRIVILEGES OR PROTECTIONS

Section IV.J. of the Plan provides that, prior to the Effective Date, the Debtors

will establish a repository containing their books and records that are necessary for the defense

of Asbestos Personal Injury Claims, and shall make that repository available to the Entities that

are responsible for the processing or defense of Asbestos Personal Injury Claims and that are

entitled to review, copy or use such documents.[24]  Pursuant to the Plan, to the extent the Debtors

or Reorganized Debtors provide the Asbestos Personal Injury Trust access to any privileged

documents in the document repository, such access shall not result in the destruction or waiver of

any applicable privileges pertaining to the documents.  Further pursuant to the Plan, none of the

Debtors, the Reorganized Debtors, Lehigh Hanson or any Affiliates will be liable for violating

any confidentiality or privacy protections as a result of providing the Asbestos Personal Injury

Trust access to the documents in the repository, and the Asbestos Personal Injury Trust shall take

appropriate steps to comply with any applicable protections.  This relief is appropriate for

numerous reasons.

The Asbestos Personal Injury Trust is the Debtors' successor in interest with

respect to the Debtors' asbestos personal injury liabilities, and the law is clear that a successor in

---

[24]   For the avoidance of doubt, the Asbestos Personal Injury Trust shall have access to materials in the repository only to the extent that it is the Entity defending or processing (which term shall not include the mere payment of the deductible portion of an Asbestos Personal Injury Claim) an Uninsured Asbestos Claim or a particular Asbestos Personal Injury Claim, and such determination shall be made by the Reorganized Debtors on a claim-by-claim basis.

interest retains and may assert any applicable privileges.  See Owens-Illinois Inc. v. Rapid Am.

Corp (In re The Celotex Corp.), 124 F.3d 619, 624 (4th Cir. 1997) ("Under the Confirmed Plan,

the Asbestos Claims Trust is deemed the successor for all purposes to the liabilities of Celotex

with respect to allowed amounts of asbestos related claims."); see also Del. R. Evid. 502(c)[25]

(stating that "[t]he privilege under this rule may be claimed by the client . . . or the successor,

trustee or similar representative of a corporation, association or other organization, whether or

not in existence").  The Court also has the authority under sections 105(a) and 1123(b)(6) of the

Bankruptcy Code to order that the documents will remain subject to privilege if they are

provided the Asbestos Personal Injury Trust.  11 U.S.C. §§ 105(a), 1123(b)(6).  Thus, in

analogous situations, courts have held that liquidating trusts established by confirmed plans can

assert the attorney-client privilege of their predecessor debtor corporations.  See, e.g., Official

Comm. of Unsecured Creditors of Hechinger Inv. Co. of Del, Inc. v. Fleet Retail Fin. Grp.,

285 B.R. 601, 613 (D. Del. 2002) (holding that the liquidating trust could assert and waive the

attorney-client privilege of the debtor corporation); Whyte v. Williams (In re Williams),

152 B.R. 123, 129 (Bankr. N.D. Tex. 1992) (holding that the liquidating trustee had the power to

invoke or waive evidentiary privileges in connection with the causes of action transferred to the

trust under the confirmed plan).

The Reorganized Debtors and the Asbestos Personal Injury Trust will also have a

common interest in the privilege attaching to the documents in the repository.  Rule 502(b) of the

Delaware Uniform Rules of Evidence ensures that the attorney-client privilege will protect

confidential communications involving separate clients so long as the clients share a common

interest sufficient to justify invocation of such privilege.  See Del. R. Evid. 502(b)(3) (stating

---

[25]     The Asbestos Personal Injury Trust is a statutory trust under Delaware law.

that "[a] client has a privilege to refuse to disclose and to prevent any other person from

disclosing confidential communications made for the purpose of facilitating the rendition of

professional legal services to the client . . . by the client or the client's representative or the

client's lawyer or a representative of the lawyer to a lawyer or a representative of a lawyer

representing another in a matter of common interest"); see, e.g., United States v. Doe, 429 F.3d

450, 453 (3d Cir. 2005) (stating that the common interest privilege allows for two clients to

discuss their affairs "so long as they have an 'identical (or nearly identical) legal interest as

opposed to a merely similar interest'"); U.S. Bank Nat'l Ass'n v. U.S. Timberlands Klamath Falls,

L.L.C., C.A. No. 112-N, 2005 WL 2037353, at *1 (Del. Ct. Ch. June 9, 2005) (stating that the

common-interest privilege extends to the protection of confidential communications involving

separate clients "so long as the clients share a 'common interest' sufficient to justify invocation of

the privilege"); see also In re Grand Jury Subpoenas 89-3 & 89-4, John Doe 89-129 (Under

Seal), 902 F.2d 244, 249 (4th Cir. 1990) (holding that "persons who share a common interest in

litigation should be able to communicate with their respective attorneys and with each other to

more effectively prosecute or defend their claims").  Thus, the transfer of privileged information

between two parties that share a common interest does not waive or destroy privilege.

   Further, the work-product doctrine protects the transfer of any privileged material

from the Reorganized Debtors to the Asbestos Personal Injury Trust.  The work-product doctrine

protects the confidentiality of papers prepared by or on behalf of attorneys in anticipation of

litigation.  Most courts hold that to waive the protection of the work-product doctrine, the

disclosure must enable an adversary to gain access to the information.  See Westinghouse Elec.

Corp. v. Republic of the Philippines, 951 F.2d 1414, 1428 (3d Cir. 1991).  Here, the Asbestos

Personal Injury Trust and the Reorganized Debtors will be non-adverse with respect to the

subject Claims and share a common interest.  Thus, providing certain documents to the Asbestos

Personal Injury Trust in accordance with the Plan will not destroy, impair or waive the

work-product privilege or any other privileges that may exist with respect to the documents.

It is essential to the Plan's implementation that the Asbestos Personal Injury Trust

have the ability to evaluate the merits of certain Asbestos Personal Injury Claims to preserve

assets for all such Claim holders.  Thus, it is necessary and appropriate for the Confirmation

Order to contain language holding that the Asbestos Personal Injury Trust's access to documents

in the document repository will not result in the destruction or waiver of any privileges or

protections applicable thereto.

## VIII.   THE PLAN SATISFIES THE REQUIREMENTS OF SECTION 524(G) OF THE BANKRUPTCY CODE AND THE OBJECTIONS ASSERTED WITH RESPECT TO SECTION 524(G) SHOULD BE OVERRULED

### A.   The Asbestos Personal Injury Trust Satisfies the Structure and Funding Requirements of Section 524(g)(2)(B)(i) of the Bankruptcy Code

Section 524(g)(l)(A) authorizes a court to issue, in connection with confirmation

of a plan of reorganization, an injunction to enjoin entities from taking legal action to recover,

directly or indirectly, payment in respect of asbestos-related claims or demands if the plan of

reorganization establishes a trust to resolve and pay such claims.  11 U.S.C. § 524(g)(l).  To

obtain an injunction, the trust to which such claims and demands are channeled must meet the

structure and funding requirements of section 524(g)(2)(B)(i) of the Bankruptcy Code.  As

described below, the Asbestos Personal Injury Trust comports with those requirements.

#### 1.   The Plan Satisfies Section 524(g)(2)(B)(i)(I)

Section 524(g)(2)(B)(i)(I) requires that an asbestos trust assume the liabilities of a

debtor that, as of the petition date, has been named as a defendant in actions to recover damages

for asbestos-related claims.  11 U.S.C. § 524(g)(2)(B)(i)(I).  The Plan plainly satisfies this

requirement by its terms, which provide that "the Asbestos Personal Injury Trust shall assume

liability and responsibility, financial and otherwise, for all Asbestos Personal Injury Claims."

See Plan § IV.K.3.

Despite the straightforward assumption of liabilities set forth in the Plan, Truck

asserts that the Asbestos Personal Injury Trust "fails to assume the Debtors' asbestos liabilities"

and argues that any such assumption is "illusory" or, given purported contingent liabilities of the

Debtors, is the "opposite of an assumption of the Debtors' asbestos liability."  Truck Obj.

at 16-17.  These contentions are  without merit.  The Asbestos Personal Injury Trust is assuming

the Debtors' liability for Asbestos Personal Injury Claims and, in exchange for this assumption,

the Debtors and their parent are contributing, among other things, the Debtors' rights to asbestos

insurance coverage, $49 million in cash and the $1 million Payment Note.[26]

That the asbestos claimants are permitted to commence or continue litigation in

the tort system to pursue available insurance coverage does not alter the fact that the Asbestos

Personal Injury Trust is fully assuming the Debtors' liability for asbestos claims.  Indeed,

multiple courts have confirmed plans that allow asbestos claimants to return to the tort system.[27]

---

[26]   Numerous courts, including those in this district, have confirmed plans pursuant to section 524(g) in which
the respective trusts were funded primarily by a finite amount of cash and a note.  See, e.g., In re Garlock
Sealing Techs. LLC, No. 3:17-CV-00275-GCM, 2017 WL 2539412, at *20 (W.D.N.C. June 12, 2017)
(confirming plan in which the trust is to be funded  by, among other things, cash contributions and a
deferred contribution to be paid by a reorganized debtor no later than the first anniversary of the plan's
effective date); In re Specialty Prods. Holding Corp., Case No. 10-11780 (PJW) (Bankr. D. Del. Dec. 10,
2014), Order Confirming the Joint Plan of Reorganization of Specialty Products Holding Corp., Bondex
International, Inc., Republic Powdered Metals, Inc. an NMBFiL, Inc., as Modified [D.I. 5261] (confirming
plan in which the trust is to be funded by, among other things, cash contributions and payment notes).

[27]   See, e.g., In re Thorpe Insulation Co., Case No. 07-19271(BB) (Bankr. C.D. Cal. May 8, 2013) (providing
that asbestos claimants can commence actions in the tort system, consistent with the other provisions of the
plan and distribution procedures); In re Plant Insulation Co., 485 B.R. 203, 213 (N.D. Cal. 2012), rev'd on
other grounds, 734 F.3d 900 (9th Cir. 2013), and aff'd, 544 F. App'x 669 (9th Cir. 2013) ("Alternatively,
under the Plan, asbestos injury claimants retain their right to pursue Plant and Non–Settling Insurers by
filing a tort action, subject to several conditions."); In re Burns & Roe Enters., Inc., Nos. 00-41610, 05-
47946 (RG) 2009 WL 438694, at *4 (D.N.J. Feb. 23, 2009) ("The Trust may authorize individual
claimants, whose claims are potentially covered by policies issued by CNA, to commence litigation in the
tort system.").

Courts have even expressly found that section 524(g) "does not suggest . . . that asbestos claims may not be returned to the tort system, where appropriate, as a part of the reorganization [p]lan." See, e.g., In re Plant Insulation Co., 485 B.R. 203, 231 (N.D. Cal. 2012), rev'd on other grounds, 734 F.3d 900 (9th Cir. 2013), aff'd, 544 F. App'x 669 (9th Cir. 2013).  This Court has agreed that there are no cases "that hold that 524(g) prohibits plans that allow asbestos claimants to go back to the tort system to pursue insurance.  There are, as noted, several courts that have done that." Sept. 4, 2019 Hr'g Tr. 49:16-50:3.  By assuming the Debtors' asbestos liability, the Asbestos Personal Injury Trust will be responsible for the payment of all uninsured claims and the uninsured portions of Asbestos Personal Injury Claims, including deductibles and claims that are not covered by insurance.

Additionally, that the Plan protects the claimants in the event the Reorganized Debtors breach their duty of assistance and cooperation under the Truck Policies is not the "opposite of an assumption" as Truck contends.  The Debtors' liability for asbestos claims is still being assumed by the Asbestos Personal Injury Trust notwithstanding this provision and, in addition, the asbestos claimants will receive assurance that, should the Debtors cause a vitiation of coverage with respect to a particular claim, the insured portion of that claim will be covered by the Reorganized Debtors.

The plain language of section 524(g) requires only that the asbestos trust assume the liabilities of the debtor.  That requirement is clearly met here.

2.    The Plan Satisfies Section 524(g)(2)(B)(i)(II)

The Plan also satisfies section 524(g)(2)(B)(i)(II) of the Bankruptcy Code, which requires that the trust "be funded in whole or in part by the securities of 1 or more debtors involved in such plan and by the obligation of such debtor or debtors to make future payments, including dividends."  11 U.S.C. § 524(g)(2)(B)(i)(II).  The Plan satisfies this requirement by

providing that the Asbestos Personal Injury Trust will be funded in part by the Payment Note.

Plan § IV.K.2.b.  Pursuant to section 101(49) of the Bankruptcy Code, a "security" includes,

among other things, a note.  The Payment Note requires the Reorganized Debtors to make a

payment of $1 million on or before the fifth anniversary of the Effective Date.  This obligation is

secured by the pledge of 100% of the equity of each Reorganized Debtor.  Accordingly, the

issuance of the Payment Note, under which the Debtors are co-obligors, plainly satisfies the

requirement under section 524(g)(2)(B)(i)(II) that the Asbestos Personal Injury Trust be funded

"in part by the securities of 1 or more debtors and by the obligation of such debtor or debtors to

make future payments, including dividends."  Indeed, this Court previously confirmed a

section 524(g) plan with a similar funding provision.  See In re Garlock Sealing Techs. LLC,

No. 3:17-CV-00275-GCM, 2017 WL 2539412, at *20 (W.D.N.C. June 12, 2017) (confirming

plan where the trust was to be funded, in part, by deferred contributions in the amount of

$60 million which was to be paid by a reorganized debtor no later than the first anniversary of

the plan's effective date and cash contributions totaling $400 million (citing Plan §§ 7.3.2 and

7.8(1); Plan Ex. H, I, and J)); see also In re W. Asbestos Co., 313 B.R. 832, 851 (Bankr. N.D.

Cal. 2003) (in the context of a plan in which an insurer was contributing approximately

$740 million in cash to the asbestos trust, noting that "the Plan also provides that MacArthur will

contribute to the Trust a promissory note for $500,000, payable over five years… [and] requires

MacArthur to make payments to the Trust pursuant to the note" and concluding that the note and

payment pursuant thereto "are sufficient to satisfy 11 U.S.C. § 524(g)(2)(B)(i)(II)."); In re J T

Thorpe Co., 308 B.R. 782, 788-89 (Bankr. S.D. Tex. 2003) (finding that the "[p]lan complies

with Section 524(g)(2)(B)(i)" when trust is "to be funded in part by a Promissory Note for

$2.3 million" and "in part by proceeds received pursuant to the terms of the Asbestos Insurance

Action Recoveries, the Asbestos In-Place Insurance Coverage, the Asbestos Insurance

Settlement Agreements, and by the Asbestos Insurance Policies"); In re Leslie Controls, Inc.,

Case No. 10-12199 (CSS) (Bankr. D. Del. Jan. 10, 2011), Second Conformed First Amended

Plan of Reorganization of Leslie Controls, Inc. §§ 1.93, 1.94, 9.3(h), (i) (in the context of a trust

funded with, among other things, $74 million in cash, satisfying section 524(g)(2)(B)(i)(II), in

part, through the contribution of a $1 million promissory note) and In re Leslie Controls, Inc.,

Case No. 10-12199 (CSS) (Bankr. D. Del. Jan. 10, 2011), Findings of Fact, Conclusions of Law,

and Order Confirming the Second Conformed First Amended Plan of Reorganization of Leslie

Controls, Inc. § U.3 (concluding that plan complies with section 524(g)(2)(B)(i)(II) of the

Bankruptcy Code and confirming plan).

Truck contends that the Plan fails to satisfy an implicit "ongoing business"

requirement that some courts have suggested or assumed exists.  Truck Obj. at 17-18 (citing In re

Combustion Eng'g, Inc., 391 F.3d, 190, 248 (3d Cir. 2004)).[28]  However, at least one court has

indicated that the provision should be read narrowly to avoid duplicating the requirements of

section 1129(a)(11) of the Bankruptcy Code.  See In re Quigley Co., Inc., 437 B.R. 102, 141

(Bankr. S.D.N.Y. 2010) (noting that a "broad interpretation that imposes an ongoing business

requirement could transform the funding requirement into a feasibility test" and focusing

narrowly on whether the debtor generally could "make payments into the future").

Assuming that such a requirement exists, the Plan satisfies it.  As an initial matter,

the text of the statute applies to "1 or more" debtors — suggesting that any ongoing business

requirement would need to be satisfied by only one debtor.  Courts have approved plans of

---

[28]    Combustion Eng'g suggests, in dicta, that an ongoing business/going concern requirement exists.  Id. at
248.  The court, however, ultimately held that the objecting insurers did not have standing to raise the issue
and declined to rule on it .

reorganization consistent with this reading.  See In re W. Asbestos Co., 313 B.R. 832, 851

(Bankr. N.D. Cal. 2003) (finding that a plan satisfies the requirements of

section 524(g)(2)(B)(i)(II) even if one of the debtors involved did not have ongoing operations

and therefore could not independently satisfy the requirements of the statute); In re G-I Holdings,

Inc., No. 09-CV-05031, 2009 U.S. Dist. LEXIS 108339, at *143 (Bankr. D.N.J. Nov. 12, 2009)

(noting that an asbestos trust must be funded by the securities of "an involved debtor" and

finding that "the delivery of the Trust Note on the Effective Date" by one of the two debtors

involved in the plan satisfied the statutory requirement).

Here, both Debtors have ongoing business operations.  As set forth above, HPCI

owns the Permanente Property, a more than 3,400-acre property in California that includes a

cement plant, rock plant and quarry, which HPCI leases to Lehigh Southwest.  HPCI also owns

equity in Operating Subsidiaries that produce and distribute cement in the Pacific region.  The

Permanente Property and these equity interests will vest in Reorganized HPCI, which will

continue to manage these assets.  Plan § IV.A.  Additionally, on the Effective Date, Lehigh

Cement will transfer to Kaiser Gypsum its interest in the Real Properties, together with its rights

under certain leases related to the Real Properties.  Plan § IV.C.  The Projections demonstrate

that the Reorganized Debtors' businesses will generate positive future cash flow.

Truck's contention that the Reorganized Debtors will have no ongoing businesses

are therefore belied by the facts.  And, numerous courts have found that owning and managing

real property satisfies any ongoing business requirement of section 524(g) — including the

bankruptcy court in Combustion Engineering.  See In re Combustion Eng'g, Inc., Case

No. 03-10495-JKF, 2005 Bankr. LEXIS 2623, at *52–55 (Bankr. D. Del. Dec. 19, 2005)

(confirming plan where debtor would own and lease one piece of property as its ongoing

business);[29] see also In re Yarway Corp., Case No. 13-11025 (Bankr. D. Del. Dec. 22, 2014),

Disclosure Statement With Respect to Plan of Reorganization for Yarway Corporation Under

Chapter 11 of the Bankruptcy Code Proposed By Yarway Corporation and Tyco International

PLC [D.I. 704] at 13 (proposing passive interest in real estate venture as ongoing business) and

In re Yarway Corp., Case No. 13-11025 (Bankr. D. Del. Apr. 8, 2015), Order Confirming the

Plan of Reorganization for Yarway Corporation Under Chapter 11 of the Bankruptcy Code

[D.I. 859]; In re Specialty Prods. Holding Corp., Case No. 10-11780 (PJW) (Bankr. D. Del.

Oct. 20, 2014), Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code for the

Joint Plan of Reorganization of Specialty Products Holding Corp., Bondex International, Inc.,

Republic Powdered Metals, Inc. an NMBFiL, Inc., Ex. III [D.I. 5118] (describing ongoing

businesses of debtors, one of which was a holding company that owned an interest in a non-

operating co-debtor as well as six operating non-debtor subsidiaries, and two of which had no

business operations but would enter into leases on or before the effective date of the plan

pursuant to which they would lease real property from their non-debtor ultimate parent and

re-lease the property to an operating affiliate at a profit) and In re Specialty Prods. Holding

Corp., Case No. 10-11780 (PJW) (Bankr. D. Del. Dec. 10, 2014), Order Confirming the Joint

Plan of Reorganization of Specialty Products Holding Corp., Bondex International, Inc.,

Republic Powdered Metals, Inc. an NMBFiL, Inc., as Modified [D.I. 5261] (confirming plan); In

re Flintkote, Case No. 04-11300 (Bankr. D. Del. July 20, 2009), Supplemental Disclosure

Document Regarding Amended Joint Plan of Reorganization (As Modified) [D.I. 4392] at 7

---

[29]     On remand, the bankruptcy court "held that Combustion Engineering's business activity was sufficient for
obtaining a discharge under § 1141(d) and that the funding requirements of § 524(g)(2)(B)(i)(II) were
satisfied, which was affirmed by the District Court." In re Flintkote Co., 486 B.R. at 129-30 (citing In re
Combustion Eng'g, Inc., No. 03-10495, 2005 Bankr. LEXIS 2623, *54-*57 (Bankr. D. Del.
Dec. 19, 2005)).

(describing debtor's acquisition and leasing of real property for commercial casual dining use as

ongoing business) and In re Flintkote, Case No. 04-11300 (Bankr. D. Del. Dec. 21, 2012),

(1) Findings of Fact, (2) Conclusions of Law, (3) Order and Notice of Certain Bar Dates, and

(4) Order Regarding Confirmation of the Amended Joint Plan of Reorganization in Respect of

the Flintkote Company and Flintkote Mines Limited (as Modified Nov. 16, 2011) [D.I. 7254]

(confirming plan).

Truck's purported concerns regarding the Debtors' future funding for the Asbestos

Personal Injury Trust are simply misplaced.  Together, $49 million in cash, the $1 million

Payment Note and assignment of the Debtors' rights to insurance coverage, will ensure that there

is substantial funding for asbestos personal injury claimants, the trust beneficiaries who have

voted unanimously in favor of the Plan.  Truck, quoting Combustion Engineering, argues that

"the reorganized debtor must be a going concern, such that it is able to make future payments

into the trust to provide an 'evergreen' funding source for future asbestos claimants."  Truck Obj.

at 17-18.  The Debtors' insurance, however, provides such a funding source.

3.    The Plan Satisfies Section 524(g)(2)(B)(i)(III)

The Plan also satisfies section 524(g)(2)(B)(i)(III)'s "ownership requirement"—

i.e., that the Asbestos Personal Injury Trust "own, or by the exercise of rights granted under such

plan would be entitled to own if specified contingencies occur, a majority of the voting shares"

of each Debtor.  In particular, the Plan provides that, upon the Effective Date, the Asbestos

Personal Injury Trust will receive a Payment Note in the principal amount of $1 million secured

by a pledge of 100% of the equity in the Reorganized Debtors (the "Pledge").  Plan §§ IV.K.2.b,

I.A.95 & 102.  If the Reorganized Debtors fail to pay the Payment Note in full on or before the

fifth anniversary of the Effective Date, the Asbestos Personal Injury Trust can foreclose on the

Pledge of the Reorganized Debtors' equity and become the 100% owner of the Reorganized

Debtors.  Id.  This structure complies with the plain language of section 524(g)(2)(B)(i)(III).

Like insurers in other asbestos-related bankruptcies, Truck argues that the Plan

fails to satisfy section 524(g)(2)(B)(i)(III).  Truck Obj. at 18-19.  As set forth above, and as

courts considering similar arguments by insurers have found, Truck lacks standing to raise these

arguments.[30]  For this reason alone, Truck's objection should be disregarded.  However, even if

the Court is inclined to consider Truck's objection, it should be overruled.

As Truck recognizes, the purpose of this provision is to ensure that an asbestos

trust is sufficiently funded to compensate its beneficiaries. Truck Obj. at 18.  Truck, though,

largely ignores (as it must)  the simple reality that the Plan (a) provides for payment in full of

Allowed General Unsecured Claims and (b) will be funded by $49 million in cash, the Payment

Note and the Debtors' rights to, among other things, unlimited insurance coverage for Asbestos

Personal Injury Claims.  Thus, the purpose of section 524(g)(2)(B)(i)(iii) is easily satisfied.

The Plan also satisfies the technical requirements of section 524(g)(2)(B)(i)(iii).

Truck argues that the "specified contingencies" which, if triggered, would result in the Asbestos

Personal Injury Trust owning the equity of the Reorganized Debtors is an "obvious sham." Truck

Obj. at 18.  Contrary to those assertions, courts on myriad occasions have found similar

contingent note provisions sufficient to satisfy section 524(g).  See, e.g., In re Burns & Roe

Enters., Inc., No. 00-41610, 2009 WL 438694, at *31–32 (D.N.J. Feb. 23, 2009) (confirming

---

[30]     See, e.g., In re Mid-Valley, Inc., Case No. 03-35592(JKF) (Bankr. W.D. Pa. July 16, 2004), Findings of
Fact and Conclusions of Law Regarding (I) Debtors' Disclosure Statement and Solicitation Procedures, and
(II) Confirmation of Debtors' Fourth Amended and Restated Joint Prepackaged Plan of Reorganization
(declining to address insurers' confirmation objections, including that the "specified contingency" set forth
in the plan was "illusory," because the insurers lacked standing to object to the plan); see also In re
Combustion Eng'g, Inc., 391 F.3d 190, 217-18 (3d Cir. 2004) (holding that insurers lacked standing and
refusing to consider arguments raised by them with respect to the satisfaction of
section 524(g)(2)(B)(i)(II)).

plan where the trust received a promissory note that was secured by the pledge of 51% of the

voting shares of the debtors' parent company and the trust was entitled to foreclose on the shares

upon the occurrence of an event of default); Garlock, 2017 WL 2539412, at *20 (confirming

plan where the trust received a possessory lien on 50.1% on the debtors' securities and the plan

provided that ownership of those interests would pass to the trust upon an event of default (Plan

§§ 7.3.2 and 7.8(1); Plan Ex. H, I, and J)); In re Leslie Controls, Inc., No. 10-12199 (CSS),

2011 WL 1901547, at *13 (Bankr. D. Del. Jan. 18, 2011) (confirming a plan where the trust

received a promissory note from the reorganized debtor and a pledge from the parent whereby

the parent granted a security interest in 100% of the outstanding voting shares of the reorganized

debtor as security for the promissory note), aff'd, No. 11-0013 JBS, 2011 WL 1226402 (D. Del.

Mar. 25, 2011); In re ABB Lummus Glob. Inc., No. 06–10401–JKF, 2006 WL 2052409, at *6

(Bankr. D. Del. 2006) (confirming plan where trust received note that was convertible into

51% of the shares of the company upon default); see also In re W. Asbestos Co., 313 B.R. 832,

852 (Bankr. N.D. Cal. 2003) (finding that the contingency that would trigger the trust's

ownership of 51 percent of the voting stock of a reorganized debtor — the nonpayment of a

$500,000 promissory note — was "clearly of the nature intended by the statute" and overruling

objections of insurers that, given the "insubstantial" amount of the note, the contingency was

unlikely to occur).

   While section 524(g) provides multiple options for fulfilling the "specified

contingencies," including by using the voting shares of a subsidiary of the debtor, in no place

does it contain requirements regarding the assets of any such company or provide specific

guidance on the types of "contingencies" that would fulfill this requirement.  Rather, as explicitly

recognized by the primary case relied upon by Truck, what is required is that the "contingency"

not be "completely untethered to the realities of the case." In re Congoleum Corp., 362 B.R. 167, 177 (Bankr. D.N.J. 2007).

Congoleum is "an inapt comparison to this case." Id. at 178.  In Congoleum, the court expressly distinguished that case from cases where the trust funding is "substantial" and even non-asbestos creditors are paid in full. Id. at 177-78.  As described above, the Plan mirrors the plans distinguished by the Congoleum court—it (a) proposes "substantial" trust funding in the form of cash and valuable rights to insurance coverage, such that the Payment Note is "only a small part of the overall funding package"; and (b) provides for payment in full of Allowed General Unsecured Claims. Id.  As the Plant Insulation court explained, "[t]o the extent Congress has provided an exception to the general rule that the trust should control the reorganized debtor, the overarching goal—that asbestos claimants get paid to the fullest possible extent—informs that exception." In re Plant Insulation Co., 734 F.3d 900, 916 (9th Cir. 2013). The substantial funding provided by the Plan, coupled with  the unanimous acceptance of the Plan by asbestos personal injury claimants, demonstrates  that this overarching goal will be achieved, .

    4.    The Plan Satisfies Section 524(g)(2)(B)(i)(IV)

Finally, section 524(g)(2)(B)(i)(IV) requires an asbestos trust "to use its assets or income to pay claims and demands."  11 U.S.C. § 524(g)(2)(B)(i)(IV).  Here, the Asbestos Personal Injury Trust will assume the  liability and responsibility for all Asbestos Personal Injury Claims (see Plan § IV.K.3) and will use its assets, which will include the Debtors' assigned asbestos insurance rights, to pay and satisfy Asbestos Personal Injury Claims and Demands in accordance with the Plan, the Asbestos Personal Injury Trust Distribution Procedures and the Confirmation Order (see Plan § IV.F.), thus satisfying the requirements of section 524(g)(2)(B)(i)(IV).

5.        The Debtors Are Entitled to a Discharge

The Debtors are entitled to a supplemental discharge under section 524 of the

Bankruptcy Code because they are entitled to a discharge under section 1141 of the Bankruptcy

Code.  As a result, the Debtors are entitled to a supplemental channeling injunction pursuant to

section 524(g).  Pursuant to section 1141(d)(3) of the Bankruptcy Code,  "[t]he confirmation of a

plan does not discharge a debtor if – (A) the plan provides for the liquidation of all or

substantially all of the property of the estate; (B) the debtor does not engage in business after

consummation of the plan; and (C) the debtor would be denied a discharge under section 727(a)

of this title if the case were a case under chapter 7 of this title."  11 U.S.C. § 1141(d)(3).  None of

these factors is present here.

First, the Plan does not provide for the liquidation of all or substantially all of the

property of the estate.  The Debtors are transferring certain of their rights under insurance

policies to the Asbestos Personal Injury Trust, but HPCI is retaining its other assets, and Kaiser

Gypsum is acquiring additional assets.  As described above, the Permanente Property will vest in

Reorganized HPCI, and HPCI will also retain its equity interest in the Operating Subsidiaries.

Reorganized Kaiser Gypsum will become the owner of the Real Properties.  Both of the

Reorganized Debtors will engage in business following Plan confirmation.

**B.      The Debtors' History, the Nature of Asbestos-Related Litigation
         and the Facts of These Reorganization Cases Support the Findings
         Required for Issuance of the Asbestos Permanent Channeling Injunction**

Section 524(g)(2)(B)(ii) of the Bankruptcy Code requires the Court to make

certain factual findings to support the issuance of a channeling injunction under

section 524(g)(1)(A).  As set forth below, the Debtors' history, the nature of asbestos-related

litigation and the facts of these Reorganization Cases all support the findings required for the

issuance of the Asbestos Permanent Channeling Injunction under section 524(g)(l)(A) of the Bankruptcy Code.

To support entry of a channeling injunction under section 524(g)(l)(A), a court must find that "the debtor is likely to be subject to substantial future demands for payment arising out of the same or similar conduct or events that gave rise to the claims that are addressed by the injunction." 11 U.S.C. § 524(g)(2)(B)(ii)(I).

Here, the Debtors' asbestos-related liabilities arise from their manufacture and sale of the Asbestos Products that, decades ago, contained small amounts of asbestos. Asbestos was removed from these products by the end of 1976. Since 1978, one or both of the Debtors have been named in more than 38,000 asbestos-related lawsuits. As of August 31, 2016, the Debtors were defendants in approximately 14,000 pending asbestos-related bodily injury lawsuits filed in courts across the country.

Based on the substantial number of asbestos-related personal injury lawsuits that were filed in the past and were continuing to be filed prior to Petition Date, the Debtors would likely be subject to substantial future Demands for payment arising from the same or similar conduct or events that gave rise to the Asbestos Personal Injury Claims. Accordingly, section 524(g)(2)(B)(ii)(I) is satisfied.

Section 524(g)(2)(B)(ii)(II) of the Bankruptcy Code requires a court to find that "the actual amounts, numbers, and timing of such future demands cannot be determined." 11 U.S.C. § 524(g)(2)(B)(ii)(II). The Debtors are unable to predict the amounts, numbers and timing of future Demands in respect of alleged asbestos-related personal injuries. Accordingly, this finding is likewise satisfied.

Section 524(g)(2)(B)(ii)(III) of the Bankruptcy Code requires a finding that "pursuit of such demands outside the procedures prescribed by such plan is likely to threaten the plan's purpose to deal equitably with claims and future demands." 11 U.S.C. § 524(g)(2)(B)(ii)(III). Under the Plan, all asbestos claimants, current and future, will receive equitable treatment in accordance with the Asbestos Trust Distribution Procedures. Without the Plan, there is a risk that present claimants will be treated more favorably than future claimants, because the potential for uninsured judgments, including punitive damages, could leave the Debtors without sufficient assets to make equivalent payments to future claimants. Thus, Truck is simply wrong when it argues that the Plan is "entirely unnecessary, because the Debtors insured asbestos liabilities would be resolved in the same way if the Joint Plan is not confirmed—in the tort system." Truck Obj. at 21.[31] As noted above, there is a substantial risk in the tort system of disparate treatment of future claims with respect to uninsured claims or portions of claims which explains, at least in part, why the Plan is supported by the FCR — the Court-appointed representative of future claimants. Thus, the requirements of section 524(g)(2)(B)(ii)(III) are met.

Section 524(g)(2)(B)(ii)(IV) of the Bankruptcy Code requires a court to find that, as part of the confirmation process, the terms of the channeling injunction proposed, including "any provisions barring actions against third parties," are set forth in the plan of reorganization and the disclosure statement in support of the plan. 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(aa). A

---

[31] Truck also contends that the Debtors conceded that section 524(g) relief is not necessary by consenting to stay relief earlier in the Reorganization Cases. Truck Obj. at 21. This argument fails because it ignores that the stay relief granted by this Court protected the Debtors against the uninsured liabilities that led them to file for bankruptcy. Indeed, as a condition to stay relief, each asbestos claimant must sign an Acknowledgement and Release Form that waives the claimant's right to recover all uninsured portions of their claim against the Debtors [D.I. 1108, ¶ 3]. Truck's argument does nothing to undermine the very real and pressing need for section 524(g) relief.

court must also find that "a separate class or classes of the claimants whose claims are to be

addressed by a trust described in clause (i) is established and votes, by at least 75 percent of

those voting, in favor of the plan." 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb).  As part of the Plan

confirmation process, the Debtors included the terms of the Asbestos Permanent Channeling

Injunction, including provisions therein barring actions against any Protected Party, in both the

Plan and the Disclosure Statement.  <u>See</u> Plan § IX.B.2; Disclosure Statement § VII.Q.2.  The

Debtors also designated Class 4 under the Plan for all Asbestos Personal Injury Claims.  <u>See</u> Plan

§§ III.B; Disclosure Statement § VII.Q.2.  The voting claimants in Class 4 unanimously accepted

the Plan.

      Finally, section 524(g)(2)(B)(ii)(V) of the Bankruptcy Code requires a court to

find that:

> the trust will operate through mechanisms such as structured,
> periodic, or supplemental payments, pro rata distributions,
> matrices, or periodic review of estimates of the numbers and
> values of present claims and future demands, or other comparable
> mechanisms, that provide reasonable assurance that the trust will
> value, and be in a financial position to pay, present claims and
> future demands that involve similar claims in substantially the
> same manner.

11 U.S.C. § 524(g)(2)(B)(ii)(V).  Here, the Asbestos Personal Injury Trust will pay Asbestos

Personal Injury Claims in accordance with the Asbestos Personal Injury Trust Distribution

Procedures, which contain mechanisms that provide reasonable assurance that the Asbestos

Personal Injury Trust will value, and be in a financial position to pay, present Asbestos Personal

Injury Claims and future asbestos-related Demands that involve similar claims in substantially

the same manner.

      Specifically, the Asbestos Personal Injury Trust Distribution Procedures provide

for the processing and payment of the uninsured portions of Insured Asbestos Claims and the

Uninsured Asbestos Claims that would have been paid by the Debtors prepetition, on an impartial, first-in-first-out basis. To ensure substantially equivalent treatment of all present and future Asbestos Personal Injury Claims, the Asbestos Personal Injury Trustee will be required to determine, with the consent of the Trust Advisory Committee and the FCR, the percentage of value that holders of present and future Asbestos Personal Injury Claims are likely to receive from the Asbestos Personal Injury Trust (the "Payment Percentage"). This determination will take account of estimates of payments related to Uninsured Amounts (as defined in the Asbestos Personal Injury Trust Distribution Procedures), the value of the Asbestos Personal Injury Trust Assets, and projected expenses. Further, at least once every three years, the Asbestos Personal Injury Trustee will be required to reconsider the then-applicable Payment Percentage based on current information. In determining whether to adjust the Payment Percentage, the Asbestos Personal Injury Trustee is obligated to assess the liability forecast on which the Payment Percentage is based against the claims filed and the Asbestos Personal Injury Trust's corresponding payment history. Each Distribution made to an asbestos claimant will reflect the Payment Percentage in effect at the time of such Distribution. To further ensure equitable treatment of similarly-situated claims, in the event the Asbestos Personal Injury Trustee determines it appropriate to increase the Payment Percentage, the Asbestos Personal Injury Trustee will be required to make supplemental payments to all asbestos claimants who previously liquidated their Asbestos Personal Injury Claims based on a lower Payment Percentage.

Accordingly, the Asbestos Personal Injury Trust Distribution Procedures provide reasonable assurance that the Asbestos Personal Injury Trust will value, and be in a financial position to pay, present Asbestos Personal Injury Claims and future asbestos-related Demands in

substantially the same manner.  The Plan and the Asbestos Personal Injury Trust Distribution

Procedures contemplated therein satisfy the requirements in section 524(g)(2)(B)(ii)(V).

### C.     The Court May Extend the Asbestos Permanent Channeling Injunction to Third Parties

Sections 524(g)(3)(A) and 524(g)(4)(A)(ii) of the Bankruptcy Code designate

certain entities that are protected by a channeling injunction entered pursuant to

section 524(g)(1)(A).  Specifically, section 524(g)(3)(A) provides that:

> (ii) no entity that pursuant to such plan or thereafter becomes a direct or indirect transferee of, or successor to any assets of, a debtor or trust that is the subject of the injunction shall be liable with respect to any claim or demand made against such entity by reason of its becoming such a transferee or successor; and

> (iii) no entity that pursuant to such plan or thereafter makes a loan to such a debtor or trust or to such a successor or transferee shall, by reason of making the loan, be liable with respect to any claim or demand made against such entity, nor shall any pledge of assets made in connection with such a loan be upset or impaired for that reason.

11 U.S.C. § 524(g)(3)(A)(ii)-(iii).  Consistent with that section, the Plan contemplates that the

Asbestos Permanent Channeling Injunction will be extended to protect the following:

> Entities that, pursuant to the Plan or on or after the Effective Date, become a direct or indirect transferee of, or successor to, any assets of any Debtor or Reorganized Debtor, or the Asbestos Personal Injury Trust, but only to the extent that liability is asserted to exist by reason of such Entity becoming such a transferee or successor [see Plan § I.A.103.h.]; and

> Entities that, pursuant to the Plan or on or after the Effective Date, make a loan to any Debtor or Reorganized Debtor, or the Asbestos Personal Injury Trust or to a successor to, or transferee of, any assets of any Debtor or Reorganized Debtor, or the Asbestos Personal Injury Trust, but only to the extent that liability is asserted to exist by reason of it becoming such a lender[.] [see id. § I.A.103.i.].

In addition to the entities protected by virtue of section 524(g)(3)(A),

section 524(g)(4)(A)(ii) provides that a channeling injunction entered pursuant to

section 524(g)(1)(A):

> may bar any action directed against a third party who is
> identifiable from the terms of such injunction (by name or as part
> of an identifiable group) and is alleged to be directly or indirectly
> liable for the conduct of, claims against, or demands on the debtor
> to the extent such alleged liability of such third party arises by
> reason of—
>
> (I) the third party's ownership of a financial interest in the debtor, a
> past or present affiliate of the debtor, or a predecessor in interest of
> the debtor;
>
> (II) the third party's involvement in the management of the debtor
> or a predecessor in interest of the debtor, or service as an officer,
> director or employee of the debtor or a related party;
>
> (III) the third party's provision of insurance to the debtor or a
> related party; or
>
> (IV) the third party's involvement in a transaction changing the
> corporate structure, or in a loan or other financial transaction
> affecting the financial condition, of the debtor or a related party,
> including but not limited to —
>
>> (aa) involvement in providing financing (debt or equity), or
>> advice to an entity involved in such a transaction; or
>>
>> (bb) acquiring or selling a financial interest in an entity as
>> part of such a transaction.

11 U.S.C. § 524(g)(4)(A)(ii).  As required by section 524(g)(4)(A)(ii), each Protected Party

under the Plan is either identifiable from the terms of the Asbestos Permanent Channeling

Injunction or is a member of an identifiable group.  See Plan § I.A.103.  In addition, the Plan

defines Protected Party to include those parties that fit within the categories listed in

section 524(g)(4)(A) of the Bankruptcy Code.  See Plan § I.A.103.  Accordingly, the Court

should extend the Asbestos Permanent Channeling Injunction to protect all Protected Parties

from liability for any Asbestos Personal Injury Claims.

### D.     The Court Has Appointed a Legal Representative to Protect
###          the Rights of Persons Who Might Subsequently Assert Demands

Section 524(g)(4)(B)(i) provides that a channeling injunction will be valid and

enforceable with respect to future demands only if "as part of the proceedings leading to issuance

of such injunction, the court appoints a legal representative for the purpose of protecting the

rights of persons that might subsequently assert demands of such kind."  11 U.S.C.

§ 524(g)(4)(B)(i).  During the proceedings leading to the issuance of the Asbestos Permanent

Channeling Injunction, the Court appointed Lawrence Fitzpatrick as the FCR [D.I. 99] for the

purpose of protecting the rights of persons that might subsequently assert Demands against the

Debtors.  As such, the requirements of section 524(g)(4)(B)(i) of the Bankruptcy Code are met

here.

### E.     Entry of the Asbestos Permanent Channeling Injunction
###          Is Fair and Equitable With Respect to Future Asbestos Claimants

Section 524(g)(4)(B)(ii) requires a court to determine that entry of the channeling

injunction, and the protection from liability that is afforded to the parties named therein, "is fair

and equitable with respect to the persons that might subsequently assert such demands, in light of

the benefits provided, or to be provided, to such trust on behalf of such debtor or debtors or such

third party."  11 U.S.C. § 524(g)(4)(B)(ii).  In accordance with that section, the Reorganized

Debtors and/or Lehigh Hanson, on behalf of all Protected Parties, are contributing certain assets

to the Asbestos Personal Injury Trust.  See Plan § IV.K.2.  On the Effective Date, (a) the

Reorganized Debtors or Lehigh Hanson, on behalf of and as a contribution to such Reorganized

Debtors, will make a $49 million payment to the Asbestos Personal Injury Trust; (b) the

Reorganized Debtors, as co-obligors, will issue the Payment Note; (c) the Reorganized Debtors

will transfer the Phase 1 Claims to the Asbestos Personal Injury Trust, free and clear of any liens,

claims or encumbrances, including any rights of setoff based on any liability of the Debtors;[32]

and (d) the Reorganized Debtors will transfer the Asbestos Personal Injury Insurance Assets to

the Asbestos Personal Injury Trust.

Ignoring Lehigh Hanson's significant contribution to the Asbestos Personal Injury

Trust, Truck alleges that Lehigh Hanson will receive the benefit of a release and channeling

injunction "without making any real contribution to the Trust for the benefit of asbestos

claimants and demand holders." Truck Obj. at 21. In making this argument, Truck attempts to

compare Lehigh Hanson's $49 million contribution to outstanding Intercompany Claims owed to

the Debtors. Id. at 22–24. This argument fails for two reasons. First, confirming the Plan will

not eliminate the Debtors' Intercompany Claims,. Plan §§ III,B.6 (Intercompany Claims are

unimpaired and will be reinstated); IV.R.2.a (excepting Intercompany Claims from claims that

are settled). Thus, any comparison of Lehigh Hanson's contribution to the Debtors'

Intercompany Claims is irrelevant . Second, under the Plan, (a) holders of Allowed Asbestos

Personal Injury Claims will receive the negotiated amount of funding to which they agreed, and

(b) holders of Allowed General Unsecured Claims will be paid in full. There is simply no need

for Lehigh Hanson (or any other party) to make a greater contribution to the Plan or the Asbestos

Personal Injury Trust. These facts demonstrate that Truck's "fair and equitable" argument is

groundless.

---

[32]     The Debtors or the Reorganized Debtors shall pay all Debtor Appellate Costs. The Asbestos Personal
Injury Trust shall pay all Asbestos Personal Injury Trust Appellate Costs. If the Asbestos Personal Injury
Trust ultimately obtains any recovery with respect to Phase 1 Claims, whether as a result of settlement or
judgment that exceeds $12 million, the Asbestos Personal Injury Trust shall remit to the Debtors or the
Reorganized Debtors any amounts remaining, in excess of $12 million, after the Asbestos Personal Injury
Trust Appellate Costs have been deducted from the full recovery amount.

Nor is it required that each Protected Party make an independent contribution to the Asbestos Personal Injury Trust for the Court to find that the Asbestos Permanent Channeling Injunction is fair and equitable.  To the contrary, the Bankruptcy Code expressly permits an injunction barring third-party claims against certain entities, so long as the injunction is "fair and equitable."  11 U.S.C. § 524(g)(4)(A)(ii).  Whether the protection granted to non-debtors is fair and equitable is judged "in light of the benefits provided, or to be provided, to such trust *on behalf of* such debtor or debtors or such third party."  11 U.S.C. § 524(g)(4)(B)(ii) (emphasis added).  Here, the Plan provides that "[o]ne or more of the Reorganized Debtors and/or Lehigh Hanson on behalf of and as a contribution to such Reorganized Debtors will pay an aggregate of $49 million in cash to the Asbestos Personal Injury Trust."  Plan § IV.K.2.a.  And, as discussed immediately above, it is expected that the Asbestos Personal Injury Insurance Assets, together with the other assets contributed to the Asbestos Personal Injury Trust, will be sufficient to pay all current and future Asbestos Personal Injury Claims in full.  In light of these benefits, the Asbestos Personal Injury Channeling Injunction is undoubtedly fair and equitable.

## IX.   REPLY TO TRUCK'S OTHER OBJECTIONS

### A.   Truck's Litigation Tactics Do Not Divest the Court of Authority to Enter the Plan Finding

Truck's allegation that this Court lacks authority to enter the Plan Finding is another attempt to avoid honoring its contractual obligations to the Debtors and holders of Asbestos Personal Injury Claims.  Truck's efforts include years of ill-fated and self-serving pre-petition coverage litigation, and its conduct post-petition here, with Truck:  (a) filing numerous objections to the Plan (and prior versions of the Plan) in an attempt to stall the confirmation process, and (b) proposing a self-serving and patently unconfirmable competing plan.  When it became clear that the Court would not confirm its competing plan, Truck filed its Complaint for

Declaratory Relief on August 28, 2019 [Adv. Pro. Case No. 19-3052, D.I. 1] (the "Complaint")

in a transparent attempt to circumvent this Court's jurisdiction and litigate its confirmation

objection before a jury in the District Court.[33]

      Truck raised this issue as a plan objection  long before recasting it as a Complaint,

including in its First Amended Disclosure Statement for the First Amended Truck Plan

[D.I. 1204 at 2] and in a confirmation objection filed on November 6, 2018 [D.I. 1302 at 19-20].

Truck later  sent a letter to the Debtors, dated April 3, 2019, asserting that the Debtors had, solely

as a result of their efforts  in the Reorganization Cases, breached the Assistance and Cooperation

Clause in the Asbestos Insurance Policies issued by Truck to the Debtors (defined and quoted in

section IX.F.1, below) and threatening to deny coverage if the Debtors did not capitulate and

either support Truck's competing plan or revise the Plan to benefit Truck [D.I. 1682-1]

(the "April 3 Reservation of Rights Letter").  Truck raised its objections again on June 6, 2019,

as a supplemental objection to a prior version of the Plan and Disclosure Statement [D.I. 1682],

incorrectly arguing that the Debtors must file an adversary proceeding to resolve the dispute.

Then, nearly ten months after first raising its objection and on the eve of the Court's

September 4, 2019 disclosure statement ruling, Truck filed the Complaint alleging that the Plan

Finding and its long-pending confirmation objection were non-core matters that must be tried

before a jury in the District Court.[34]

      Truck's objective has been clear for some time:  gain leverage by delaying

confirmation of any chapter 11 plan that does not place it in a better position than it was in

---

[33]    The District Court entered an order on October 1, 2019 staying Truck's adversary proceeding pending this Court's ruling on the Plan [Dist. Crt. Case No. 19-467, D.I. 3].

[34]    Instead of including these issues within the Truck Objection, Truck refers the Court to its Memorandum of Law in Support of Truck Insurance Exchange's Motion to Withdraw the Reference of Adversary Proceeding to the Bankruptcy Court [Adv. Pro. 19-3052, D.I. 5-1] (the "Truck Adversary Brief").

before these Reorganization Cases were filed.  But Truck is neither a debtor in the

Reorganization Cases nor entitled to the benefits of chapter 11.  See 11 U.S.C. § 109(3)

(prohibiting a domestic insurance company from being a chapter 11 debtor).  More importantly,

Truck's objections and the Plan Finding are inextricably intertwined with confirmation and lay at

the heart of this Court's jurisdiction and authority.  See, e.g., 28 U.S.C. § 157; 11 U.S.C.

§§ 524(b), 1129(a)(1), (2), (3) & (11).  Finally, Truck has waived any right to a jury trial (though

none existed), not only by prosecuting its confirmation objection with this Court for nearly ten

months before filing the Complaint, but also by filing proofs of Claim in the Reorganization

Cases.

### B.    Truck's Confirmation Objection and the Plan Finding Are Core Matters

Under 28 U.S.C. § 157(b)(1):

> Bankruptcy judges may hear and determine all cases under title 11
> and all core proceedings arising under title 11, or arising in a case
> under title 11, referred under subsection (a) of this section, and
> may enter appropriate orders and judgments, subject to review
> under section 158 of this title.

Proceedings "arising under" title 11 are those where the claim for relief either is

created by the Bankruptcy Code or depends on resolution of a substantial question of federal

bankruptcy law.  Harlan v. Rosenberg & Assocs., LLC (In re Harlan), 402 B.R. 703, 709 (Bankr.

W.D. Va. 2009).  A claim "arising in" title 11 is one that is "not based on any right expressly

created by title 11, but nevertheless, would have no existence outside of the bankruptcy."  Grausz

v. Englander, 321 F.3d 467, 471 (4th Cir. 2003) (quotation marks omitted).

1.    Truck's Confirmation Objection and the Plan Finding "Arise In" the
Reorganization Cases Because the Debtors' Alleged Breaches of the Truck
Policies Would Not Exist But For the Bankruptcy

Truck's confirmation objection (and its Complaint)[35] "arise in" a case under

title 11 because the allegations are based solely on the Debtor's actions taken in furtherance of

the Reorganization Cases, the Plan and their duties as debtors in possession.  See, e.g.,

Complaint ¶¶ 47-52 (alleging Debtors' obtaining stay relief to permit asbestos lawsuits to

proceed in state court, as contemplated in a Plan-related agreement, breached the Truck Policies),

¶¶ 53-55 (alleging Debtors' actions in support of the Plan and in opposition to Truck's competing

plan breached the Truck Policies); Truck Objection § I.A (failure to include alleged fraud

protection measures in Plan breached the Truck Policies); Hoyt Dep. at 19:12-20:13.[36]  Without

question, Truck's claims "would have no practical existence but for the bankruptcy." Bergstrom

v. Dalkon Shield Claimants Trust (In re A.H. Robins Co.), 86 F.3d 364, 372 (4th Cir. 1996).

Despite the clear nexus between its allegations and the Reorganization Cases,

Truck argues that its confirmation objection and Complaint are non-core, garden-variety

coverage disputes that would exist regardless of the Debtors' bankruptcy.  In support of this

argument, Truck's Adversary Brief cites to two general lines of cases.  The first line of cases

stand for the unremarkable proposition that state court lawsuits pending before a bankruptcy case

is filed are non-core because they neither arise in the bankruptcy case nor arise under the

Bankruptcy Code.[37]  These cases are distinguishable for several reasons, most notably that,

---

[35]    The Debtors must refer to the Complaint because Truck did not brief these matters in the Truck Objection, instead directing the Court to its Adversary Brief filed in support of its Complaint.  The Truck Objection and Complaint, however, raise identical issues.

[36]    The relevant portions of the transcript of the February 26, 2020 deposition of Scott Hoyt are attached hereto as Exhibit A.

[37]    See, e.g., In re U.S. Brass Corp., 110 F.3d 1261 (7th Cir. 1997); Bowles v. Massey Energy Co., 2012 WL 6628953 (S.D. W. Va. Dec. 19, 2012) ("This proceeding also need not have arisen in a Chapter 11 case.  This much is obvious by the fact that Patriot's claims were litigated in state court for years before Patriot's

unlike those cases, Truck's claims here are based on actions taken by the Debtors in furtherance

of the Reorganization Cases, the Plan and their duties as debtors in possession.  Truck's claims

simply could not exist outside the Debtors' bankruptcy.

Truck's second line of cases involve post-petition breaches of prepetition

contracts.  In that scenario, courts have held that the timing of the breach alone does not

determine the nature of the claim; rather, the court must also consider the relationship of the

claim to the underlying bankruptcy case.[38]  Virtually every case Truck cites, however, involves

breach of contract claims based on facts and allegations independent of the bankruptcy case.

Those cases are entirely distinguishable from cases—such as here—where the alleged breach

was allegedly caused by actions taken by debtors in possession in furtherance of their bankruptcy

case and plan of reorganization.

The only case Truck cites that is factually similar was decided contrary to Fourth

Circuit precedent.  See In re Babcock & Wilcox, Co., 2001 WL 1018366 (E.D. La. July 2, 2001).

Babcock involved allegations that a debtor's post-petition actions, including sharing information

with asbestos claimants and seeking to assume and assign insurance policies pursuant to its plan,

---

Chapter 11 filing."); G-I Holdings, Inc. v. Hartford Accident & Indemn. Co. (In re G-I Holdings Inc.),
278 B.R. 376, 383 (Bankr. D. Del. 2002).  The only case cited by Truck that did not fit into either category
is Logan v. Westchester Fire Ins. Co. (In re PRS Ins. Grp.), 445 B.R. 402, 404–05 (Bankr. D. Del. 2011),
which involved a bankruptcy court determining the scope of its post-confirmation jurisdiction to consider a
coverage dispute lawsuit filed by a liquidating trustee nearly three years after the debtor's liquidating plan
was confirmed.  Logan is clearly distinguishable from the facts of this case.

[38]  See, e.g., U.S. Lines, Inc. v. Am. Steamship Owners Mut. Protection & Indemnity Assoc. (In re U.S. Lines
Inc.), 197 F.3d 631, 637 (2d Cir. 1999) (coverage issue that could trigger inequitable distribution among
creditors under plan is a core proceeding); Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion
Pictures Corp.), 4 F.3d 1095, 1097, 1102 (2d Cir. 1993) (alleged post-petition breach of prepetition movie
licensing agreement by a party who did not file a claim against the estate was non-core); Wellman Thermal
Sys. Corp. v. Columbia Cas. Co., 2005 WL 4880619, at *2 (S.D. Ind. Oct. 5, 2005) (post-petition coverage
lawsuit where alleged breaches were unrelated to the debtor's bankruptcy); Kartzman v. Utica Nat'l Ins. Co.
(In re John A. Rocco Co.), 2015 WL 1727474, at *4 (Bankr. D.N.J. Apr. 13, 2015) (same); Catholic Bishop
of N. Alaska v. Continental Ins. Co. (In re Catholic Bishop of N. Alaska), 2008 WL 8657847, at *3 (Bankr.
D. Alaska Sept. 16, 2008) (same); Nat'l Century Fin. Enters. v. Gulf Ins. Co. (In re Nat'l Century Fin.
Enters.), 312 B.R. 344, 355 (Bankr. S.D. Ohio 2004) (same).

violated a cooperation clause in the underlying insurance policy. The court's analysis began with the premise that the "contract action is a creature of state law and does not involve rights created by bankruptcy law. Hence, it is not a core proceeding." Id., at *4. The court's decision then flowed from that presumption, without considering the intersection between the insurer's claims and the debtor's bankruptcy case, including the debtor's ability to assume and assign contracts under section 365 of the Bankruptcy Code, the permissible contents of a plan under section 1123 of the Bankruptcy Code or the impact of the claims on confirmation of the debtor's plan under section 1129 of the Bankruptcy Code.

Whether an action is core or non-core is not based solely on the application of state law:

> The bankruptcy judge shall determine, on the judge's own motion or on timely motion of a party, whether a proceeding is a core proceeding under this subsection or is a proceeding that is otherwise related to a case under title 11. *A determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law.*

28 U.S.C. § 157(b)(3) (emphasis added).

Unlike the court in Babcock, the Fourth Circuit has adopted a holistic approach to determine the scope of "arising in" jurisdiction. In Bergstrom v. Dalkon Shield Claimants Trust (In re A.H. Robins Co), 86 F.3d 364 (4th Cir. 1996), the Fourth Circuit recognized that, to properly determine the scope of "arising in" jurisdiction, a court must examine the relationship between the dispute and the underlying bankruptcy case. In Robins, the Fourth Circuit held that proceedings or claims arising in title 11 are those that "are not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy." Id. at 372 (quotation marks omitted). In other words, a controversy "arises in title 11" when "it would have no practical existence but for the bankruptcy." Id. Under this framework, the Fourth

Circuit held that the bankruptcy court had "arising in" jurisdiction to limit the amount of

attorneys' fees that could be collected during the distribution of assets from a plan-created trust

because neither the trust nor its allocation of attorneys' fees would have existed but for the

bankruptcy. Id. And, when a dispute is not based on any right expressly created under the

Bankruptcy Code but would not exist absent a bankruptcy proceeding, that dispute is a core

matter. Id.

The Fourth Circuit relied on Robins' broad interpretation of arising in jurisdiction

in Grausz v. Englander, 321 F.3d 467 (4th Cir. 2003). After being denied a discharge in

bankruptcy, the debtor in Grausz commenced a legal malpractice suit in state court against his

bankruptcy counsel. The law firm removed the action to the district court, asserting bankruptcy

jurisdiction under 28 U.S.C. § 1334. The debtor then moved to remand the action to state court,

asserting the district court lacked subject matter jurisdiction. The district court granted summary

judgment in favor of the law firm, holding that the bankruptcy court's fee award barred the

debtor's malpractice claims. The debtor appealed. In affirming the lower court, the Fourth

Circuit held that, although A.H. Robins did not address bankruptcy jurisdiction over professional

malpractice claims, "the case's broad interpretation of 'arising in' jurisdiction surely means that

jurisdiction exists over a malpractice claim against a lawyer for providing negligent advice to a

debtor in a bankruptcy case." Id. at 471-72. The malpractice claims were core because they

"would have no practical existence but for the bankruptcy." Id. at 472.

Based on Fourth Circuit precedent, the Babcock court clearly erred in focusing its

decision on the state-law nature of the claims without analyzing the claims' relationship to the

underlying bankruptcy case. Thus, the ruling in Babcock, which is not binding precedent and is,

in fact, contrary to Fourth Circuit precedent, should be disregarded.

With respect to very similar arguments advanced by an insurer, the court in

Travelers Cas. and Sur. Co. v. Skinner Engine Co., Inc. (In re Am. Capital Equip., LLC),

325 B.R. 372 (W.D. Pa. 2005), determined that it had core jurisdiction over the claims at issue.

In Travelers, an insurer filed a declaratory judgment action on the eve of the debtor's

confirmation hearing, alleging that the debtor's actions in connection with negotiating and

proposing a consensual plan of reorganization with asbestos claimants violated the debtor's

insurance policies and relieved the insurer of its contractual obligations.  Id. at 374.  In denying

the insurer's motion to withdraw the reference, the district court found that:

> As alleged in Travelers' own complaint, the relief sought in this
> adversary proceeding is inextricably tied to the debtor's actions in
> negotiating and proposing a plan of reorganization in the course of
> its bankruptcy case.  This is not simply an insurance coverage
> action brought by a debtor that happens to take place at the same
> time as its bankruptcy case.  It is a declaratory judgment action
> filed by one of the debtor's insurers seeking to avoid any and all
> liability under the debtor's insurance policies based solely on the
> debtor's actions in its bankruptcy case.

Id. at 376.  The court then held that:

> Travelers itself has framed the issues in its declaratory judgment
> complaint such that the claims and rights that it asserts could arise
> only in the context of this bankruptcy case and would not exist
> independent of the bankruptcy environment.  According to
> Travelers' complaint, Travelers will be excused from its duty to
> defend and indemnify Skinner only if Skinner's actions in
> negotiating and formulating a plan of reorganization in the
> bankruptcy case violate the insurance policies.  Travelers has asked
> specifically for a determination of what effect the debtor's
> negotiations in bankruptcy and the debtor's proposed plan in
> bankruptcy have on its contracts of insurance with the debtor.
> Under those circumstances, Travelers' claims could not arise
> outside the context of bankruptcy.  As such, we find that the
> adversary proceeding is core.

Id. at 377-78; see also Century Indem. Co. v. Special Metals Corp. (In re Special Metals Corp.),

317 B.R. 326 (Bankr. E.D. Ky. 2004) (insurance coverage dispute based on insurer's treatment in

debtor's plan is a core proceeding);[39] In re Babcock & Wilcox Co., 2004 WL 4945985, at *5

(Bankr. E.D. La. Nov. 9, 2004) (concluding that insurance-related findings were core),[40] vacated

on other grounds, 2005 WL 4982364 (E.D. La. 2005).

      Truck argues that Travelers is legally incorrect because it "focus[es] on the factual

underpinning of the claim at issue rather than the legal nature of the claim."  Truck Adversary

Brief at 18.  However, as discussed above, that is *exactly* what the Fourth Circuit has instructed

this Court to do.  Thus, based on clear Fourth Circuit precedent, making the Plan Finding and

addressing the issues raised in the Truck Objection (and Complaint) are core matters that arise in

these Reorganization Cases.

      2.    Truck's Confirmation Objection and the Plan Finding Also "Arise Under"
          the Bankruptcy Code

      Section 157(b)(2) of title 28 of the United States Code sets forth a non-exclusive

list of core matters, including "confirmations of plans."  28 U.S.C. § 157(b)(2)(L).  In turn,

section 1129(a) of the Bankruptcy Code lists the detailed factual findings required for a

bankruptcy court to confirm a plan.[41]  Among those provisions is section 1129(a)(3) of the

Bankruptcy Code, which requires the court to find that the "plan has been proposed in good faith

---

[39]    The court in Special Metals applied a four-factor test to determine whether a claim is *non*-core: "1) It is not
specifically identified as a core proceeding under § 157 (b)(2)(B) through (N); 2) The cause of action
existed prior to the filing of the bankruptcy petition; 3) The cause of action would continue to exist
independent of the provisions of title 11; and 4) The parties' rights, obligations, or both, are not
significantly affected as a result of the filing of the bankruptcy petition."  In re Special Metals, 317 B.R.
at 331-32.  Each of these factors leads to the conclusion that Truck's confirmation objection, the Complaint
and the Plan Finding are core matters.

[40]    "To the extent that a determination need be made of whether the Plan is capable of confirmation, or
whether it is incapable of confirmation because its provisions run afoul of certain contractual rights of
insurers, that determination is at the very heart of the function of the bankruptcy court, that is to determine
whether the Plan is confirmable under the Bankruptcy Code."  In re Babcock & Wilcox, 2004 WL
4945985, at *5.

[41]    The Court also will need to make findings under sections 524(g) and 1129(a)(1) and (2) of the Bankruptcy
Code, each of which also will require resolution of Truck's objections.

and not by any means forbidden by law."[42]  The Court also must determine that the Plan has an

adequate means of implementation, which in this case includes whether the proceeds of the

Truck Policies remain available to pay thousands of asbestos personal injury claimants under the

Plan.  11 U.S.C. §§ 1129(a)(1), 1123(a)(5)

When placed in their proper context, it is clear that the Plan Finding and Truck's

confirmation objection (and Complaint) are core matters that not only arise in the Reorganization

Cases, but that also arise under the Bankruptcy Code, because they are inextricably intertwined

with confirmation.

Indeed, the Plan Finding is a necessary part of the confirmation process given that

the right to receive the proceeds of the Asbestos Insurance Policies comprises the majority of the

ultimate value of the Asbestos Personal Injury Trust Assets.  Because of this, the Debtors must

obtain certainty that the Asbestos Insurers cannot use the Reorganization Cases and actions taken

in furtherance of such cases as a defense to coverage after the Plan is confirmed.

3.     This Court Also Has Constitutional Authority to Rule on Truck's
Confirmation Objection and Enter the Plan Finding

Nothing in the Truck Objection, the Complaint or the Plan Finding raises a Stern

issue.  See Opt-Out Lenders v. Millennium Lab Holdings II, LLC (In re Millennium Lab

Holdings II, LLC), 591 B.R. 559, 573-78 (D. Del. 2018) (whether plan provisions are legally

permissible and whether plan can be confirmed are core matters over which the bankruptcy court

---

[42]     Despite Truck's allegations, it is not necessary for this Court to look beyond the terms of the Plan to find it
was proposed in good faith.  In "analyzing whether a plan has been proposed in good faith under
§ 1129(a)(3), "'the important point of inquiry is the plan itself and whether such a plan will fairly achieve a
result consistent with the objectives and purposes of the Bankruptcy Code.'"  In re Am. Capital Equip.
LLC, 688 F.3d 145, 156 (3d Cir. 2012) (citing In re Combustion Eng'g, Inc., 391 F.3d at 247 (quoting In re
PWS Holding Corp., 228 F.3d 224, 242 (3d Cir. 2000)).  The requirements of section 1129(a)(3) are
discussed in Section V.A.3, above.

has constitutional authority).  Even if <u>Stern</u> were implicated, confirmation of a proposed plan of

reorganization clearly meets the disjunctive test laid out by the Supreme Court:

> Congress may not bypass Article III simply because a proceeding
> may have *some* bearing on a bankruptcy case; the question is
> *whether the action at issue stems from the bankruptcy itself* or
> would necessarily be resolved in the claims allowance process.

<u>Stern v. Marshall</u>, 564 U.S. 462, 499 (2011) (emphasis added).  The operative proceeding before

this Court is confirmation of the Plan, a proceeding that inarguably stems from the bankruptcy

itself.  <u>Millennium Lab Holdings</u>, 591 B.R. at 573-78; <u>see also</u> <u>In re Am. Capital Equip., LLC</u>,

688 F.3d 145, 156 (3d Cir. 2012) ("[a] plan is confirmable only if it is feasible") (citing <u>In re</u>

<u>Combustion Eng'g, Inc.</u>, 391 F.3d at 243 n.59).  Thus, this Court has the constitutional authority

to make the Plan Finding and to enter a final order resolving Truck's confirmation objection and

the issues raised in the Complaint.

### C.    An Adversary Proceeding Is Not Necessary to Resolve Truck's Objection or Enter the Plan Finding

Truck cites to Bankruptcy Rule 7001(2) in support of its argument that an

adversary proceeding is necessary to make the Plan Finding.  Truck Adversary Brief at 2; FED.

R. BANKR. P. 7001(2) ("The following are adversary proceedings: . . . a proceeding to determine

the validity, priority, or extent of a lien or other interest in property…."}.  Although Truck does

not describe the "property" at issue, it presumably refers to the Truck Policies.  But Truck has

never (a) challenged the Debtors' ownership of the Truck Policies, (b) alleged that it holds a

competing interest in the Truck Policies or (c) argued that it is entitled to the proceeds of the

Truck Policies.  To the contrary, Truck merely alleges that the Debtors' conduct during the

Reorganization Cases, including filing for bankruptcy and negotiating, formulating  and seeking

confirmation of the Plan, breached the Truck Policies.  These breach of contract claims do not

require the Court to determine the validity, priority or extent of a lien or other interest in

property.

As explained by the Seventh Circuit in <u>In re U.S. Brass Corp.</u>, allegations that a

debtor breached an insurance policy do not raise ownership issues with respect to the underlying

policy:[43]

> Eljer [the debtor/insured] cites cases which hold that an insurance
> policy is the insured's property.  <u>In re Shondel</u>, 950 F.2d 1301,
> 1305 (7th Cir. 1991); <u>Home Ins. Co. v. Cooper & Cooper, Ltd.</u>,
> 889 F.2d 746, 748 (7th Cir. 1989); <u>In re Vitek, Inc.</u>, 51 F.3d 530,
> 534 (5th Cir. 1995).  Of course it is.  But no one is trying to take
> away Eljer's property.  The issue in these cases is the scope of the
> insurance policies, an issue of contractual interpretation, not their
> ownership.

110 F.3d 1261, 1268 (7th Cir. 1997).

Thus, Bankruptcy Rule 7001(2) is not applicable.  And, because no other

provision of Bankruptcy Rule 7001 even arguably applies,[44] an adversary proceeding is not

required to resolve Truck's confirmation objection or enter the Plan Finding.

> **D.      Truck Has Waived Any Potential Right to a Jury Trial**

An adversary proceeding is not required to protect Truck's alleged Seventh

Amendment right to a jury trial, which (if it ever existed) has been waived.  A party's right to a

jury trial in bankruptcy exists only as long as the party does not assert a claim against the

bankruptcy estate.  <u>Granfinanciera, S.A. v. Nordberg</u>, 492 U.S. 33, 57–58 (1989).  Filing a proof

of claim against a bankruptcy estate triggers the process of "allowance and disallowance of

claims," and a creditor who files such a claim subjects itself to the bankruptcy court's equitable

---

[43]     <u>U.S. Brass</u> is otherwise inapplicable to the facts of this case because the coverage claims at issue were
litigated in state court several years before the bankruptcy was filed.

[44]     The Fourth Circuit has described an adversary proceeding as an action brought "for one or more of the
reasons specified in Bankruptcy Rule 7001."  <u>See</u> <u>In re Duncan</u>, 448 F.3d 725, 727 n.1 (4th Cir. 2006).

jurisdiction in proceedings affecting that claim.  Id. at 58.  For example, in Langenkamp, the

Supreme Court held that if a creditor who has filed a proof of claim is met with an adversary

proceeding, the resolution of which affects the equitable restructuring of the debtor-creditor

relationship, then the creditor loses its right to a jury trial even with regard to traditional legal

claims.  Langenkamp v. Culp, 498 U.S. 42, 44 (1990); Granfinanciera, 492 U.S. at 58-59 & n.14.

Here, Truck has filed against each Debtor's estate an identical $583,216.04 Claim

for "Unpaid Insurance Deductibles."  Claim Nos. 42 (Kaiser Gypsum) and 43 (HPCI).  As

explained in the Attachment to Proof of Claim of Truck Insurance Exchange (the "Claim

Addendum" and, together with the proofs of claim, the "Truck Proof of Claim"), Truck

calculated each Claim by subtracting $2,186,783.96 in amounts Truck allegedly paid under

prepetition cost-sharing agreements from $2,770,000 in unpaid prepetition deductibles, resulting

in the "Net Deductible Obligation" of $583,216.04.  The Truck Proof of Claim, however, also

states a claim for "Future Deductibles," which are defined as unliquidated deductibles payable to

Truck with respect to future asbestos-related bodily injury lawsuits to be filed in various courts.

Claim Addendum ¶¶ 2-3.  The Truck Proof of Claim further states that:

> As of the date of this Proof of Claim, the Debtors are liable to
> Claimant [Truck] for (a) the Net Deductible Obligation, and (b) the
> Future Deductibles in a currently unknown and unliquidated
> amount.
>
> In filing this Proof of Claim, Claimant does not submit itself to the
> jurisdiction of the Bankruptcy Court for any purpose *other than*
> with respect to this Proof of Claim.
>
> ***
>
> Claimant does not waive any right to amounts due for any claim
> asserted hereby by not stating a specific amount due for any such
> claim at this time.

Id. ¶¶ 9-10, 12 (emphasis added).

By filing claims for unliquidated Future Deductibles under the Truck Policies,

then later alleging that the Debtors have breached those same policies and released Truck from

its future coverage obligations (and, by default, the Debtors' obligation to pay Future

Deductibles), Truck has triggered the claims adjudication process in these Reorganization Cases.

Because of this, Truck has submitted itself to the jurisdiction of this Court with respect to the

Debtors' and Truck's respective coverage-related rights and obligations under the Truck Policies,

including any claims that would affect the enforceability of the Truck Policies.  Although the

Truck Proof of Claim purports to preserve Truck's various rights and remedies,[45] those general

reservations of rights cannot nullify Truck's unequivocal submission to the jurisdiction of this

Court with respect to Truck's Claims.  See In re China Fishery Grp. Ltd., 2017 WL 3084397, at

*5 (Bankr. S.D.N.Y. July 19, 2017) (notwithstanding broad reservation of rights in proof of

claim, it is well settled that filing proof of claim subjects claimant to bankruptcy court's

jurisdiction); In re Prof'l Facilities Mgmt. Inc., 2015 WL 6501231, at *5-6 (Bankr. M.D. Ala.

Oct. 27, 2015) (treating counterclaim as akin to proof of claim and implied consent to

bankruptcy court's jurisdiction despite affirmative defenses disclaiming such consent); In re

Adelphia Commc'ns Corp., 307 B.R. 404, 412 n. 17 (Bankr. S.D.N.Y. 2004) ("It may be, as

stated in this [reservation of rights provision], that the Copyright Owners did not 'intend,' by

filing the Proof of Claim, to consent to the jurisdiction of the bankruptcy court or to waive the

right to a jury trial, but under the holdings of many courts, including the United States Supreme

Court, that was the effect.").

---

[45]     For example, the Truck Proof of Claim contains broad language intended to reserve Truck's rights to,
among other things, contest this Court's jurisdiction and withdraw the reference with respect to the subject
matter of the Truck Proof of Claim.  See Claim Addendum ¶¶ 10-12, 16-17.

Even if Truck had not waived its alleged right to a jury trial by filing the Truck

Proof of Claim (which it did), Truck nevertheless has consented and is subject to this Court's

jurisdiction by virtue of its actions in the Reorganization Cases.  On its own accord, Truck first

raised its confirmation objection with this Court in September 2018 in its First Amended

Disclosure Statement for the First Amended Truck Plan.  Truck then filed a formal objection on

November 6, 2018 and proceeded to litigate that objection in this Court for nearly ten months

before abruptly shifting course on the eve of the Debtors' Disclosure Statement hearing, after it

became apparent that Truck's tactics would not gain traction in this Court.  Truck's long-term

course of conduct in these Reorganization Cases constitutes its consent to this Court's

jurisdiction and authority to enter the Plan Finding and adjudicate Truck's confirmation objection

and the issues raised in the Complaint.  See Wellness Intern. v. Sharif, 135 S. Ct. 1932, 1944

(2015) (entitlement to an Article III adjudicator is a "personal right" that is subject to waiver

through implied consent).

  **E.**  **The Court May Enter the Plan Finding Based Solely on the Terms of the Plan, the Asbestos Insurance Policies and Applicable Case Law**

A condition precedent to confirmation of the Plan is a finding by the Court that:

> The Debtors' conduct in connection with and throughout these
> Reorganization Cases, including, but not limited to, their
> negotiations with the ad hoc committee of asbestos personal injury
> claimants and the pre-petition future claimants' representative, and
> the commencement of these Reorganization Cases, as well as the
> drafting, negotiation, proposing, confirmation, and consummation
> of the Plan, and their opposition to any other plan of
> reorganization, does not and has not violated any Asbestos Insurer
> Cooperation Obligations contained in any Asbestos Insurance
> Policies, nor was such conduct a breach of any express or implied
> covenant of good faith and fair dealing.

Plan § VIII.A.3.u (the "Plan Finding").  Contrary to Truck's arguments, the Plan Finding does not

require this Court to conduct a wide-ranging investigation into privileged communications

among the Debtors, the ACC and the FCR to determine whether the Plan was proposed in good

faith.  The Court need only look to the terms of the Plan, the Truck Policies and applicable law.

When "analyzing whether a plan has been proposed in good faith under

§ 1129(a)(3), 'the important point of inquiry is the plan itself and whether such a plan will fairly

achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'" In re Am.

Capital Equip. LLC, 688 F.3d 145, 156 (3d Cir. 2012) (citing In re Combustion Eng'g, 391 F.3d

at 247 (quoting In re PWS Holding Corp., 228 F.3d 224, 242 (3d Cir. 2000)); see § V.A.3, above

(analyzing section 1129(a)(3) of the Bankruptcy Code).  Here, the Plan is the culmination of the

Debtors' restructuring efforts throughout the Reorganization Cases, including negotiations with

the ACC and the FCR.[46]  Any ancillary matters not reflected in the Plan are irrelevant, non-

binding and without the ability to affect Truck's rights and obligations under the Truck Policies.

Thus, even if the allegations contained in Truck's Objection, Complaint and Adversary Brief are

assumed to be true (though they are not), the Debtors' actions leading up to the Plan did not and

will not breach the Assistance and Cooperation Clause contained in the Truck Policies or any

express or implied covenant of good faith and fair dealing under those policies.  The relevant

inquiry is the Plan itself and, as explained below, that Plan does not (and will not) cause a breach

the Truck Policies as a matter of law.

---

[46]    Contrary to Truck's allegations that it was excluded from the Plan negotiation process (see Truck Adversary
Brief at 2, 6; Complaint at ¶¶ 43, 46), as set forth above, the Debtors participated in a mediation with Truck
the ACC and the FCR in an effort to achieve a consensual resolution of the disputes related to the Debtors'
current and future asbestos liability.  See supra note 22.  The Debtors further understand that additional
discussions among Truck, the ACC and the FCR also occurred.  Notwithstanding these  efforts, the parties
ultimately were unable to reach a resolution of these matters.

F.     **The Debtors Have Not Breached Their Duties to Truck Under the Truck Policies**

Truck contends that the Plan constitutes a breach by the Debtors of the Assistance and Cooperation Clause and the implied covenant of good faith and fair dealing under the Truck Policies, purportedly giving Truck a complete defense to coverage for Asbestos Personal Injury Claims. See Truck Obj. at 27-32; Hoyt Dep. at 74:4-76:10. [47] Specifically, Truck contends that the Debtors have breached the Truck Policies by "colluding" with the ACC and the FCR to negotiate and sponsor a Plan that will require Truck to defend current and future claims against the Debtors without access to exposure evidence that Truck wants, such as Garlock-style "fraud prevention measures," that could have been included in the Plan, along with other steps that Truck believes would help to lower its exposure when settling insured liabilities. Truck Obj. at 27-31.

As explained below, Truck's efforts to use the Assistance and Cooperation Clause or the implied covenant of good faith and fair dealing as the basis to escape Truck's insurance contract obligations is baseless under express Truck Policy language and applicable law.

1.     The Plan Does Not Constitute a Breach of the Assistance and Cooperation Clause

Among other limited obligations imposed upon them under the Truck Policies,[48] the Debtors are required to cooperate with Truck and assist it in certain specific, enumerated activities:

---

[47]     Although the Truck Objection states that these breaches already have occurred, Truck's Rule 30(b)(6) corporate witness, Scott Hoyt, testified at deposition that the Debtors' breach of these policy obligations only will occur at the time a plan is confirmed without fraud protection mechanisms like those imposed in In re Garlock Sealing Techs., LLC, 504 B.R. 71 (Bankr. W.D.N.C. 2014) ("Garlock"). Hoyt Dep. at 28:6-29:7; 177:16-180:11; 192:13-195:6.

[48]     "'A fundamental disparity exists between the insured, which performs its basic duty of paying the policy premium at the outset, and the insurer, which, depending on a number of factors, may or may not have to perform its basic duties of defense and indemnification under the policy.'" Kransco v. Amer. Empire Surplus Lines Ins. Co., 23 Cal.4th 390, 404 (2000) (citing Foley v. Interactive Data Corp., 47 Cal.3d 654,

## 8. **ASSISTANCE AND COOPERATION OF THE INSURED**

The insured shall cooperate with the Company [Truck], and upon
the Company's request, shall attend hearings and trials and shall
assist in affecting settlements, securing and giving evidence,
obtaining the attendance of witnesses and in the conduct of suits.
The insured shall not, except at his own cost, voluntarily make any
payment, assume any obligation or incur any expense other than
for such immediate medical and surgical relief to others as shall be
imperative at the time of the occurrence.

Exhibit B, Truck Ins. Exch. Comprehensive Liability Policy No. 3504000, incepting Jan. 1, 1974

at TRK 0000180 (the "Assistance and Cooperation Clause").

Despite admitting that the Assistance and Cooperation Clause is a standard form

provision that is widely used by domestic liability insurers, Truck has identified no prior instance

where an insurer (including Truck itself) has argued that the Assistance and Cooperation Clause

provides a coverage defense based solely on the insured's support of a plan of reorganization that

is contrary to an insurer's self-interested demands.  See Hoyt Dep. at 28:6-12, 65:8-66:4 and

78:13-79:15; Exhibit C, Truck's Response to Debtors' Request for Production of Documents,

Request No. 3 ("Documents sufficient to show all instances when you have asserted the

Assistance and Cooperation Clause as a ground to deny coverage.").  Truck's Rule 30(b)(6)

witness (who also serves as Truck's insurance counsel) testified that he performed legal research

prior to sending the April 3 Reservation of Rights Letter to the Debtors but was unable to find

any precedent where an Assistance and Cooperation Clause was applied in the context of a

bankruptcy plan (and none is cited in his letter).  Hoyt Dep. at 110:23-111:15, 112:14-23; April 3

Reservation of Rights Letter.  Truck's attempt to extend its policy language to create a new,

---

693 (1998) (noting the "insurer's and insured's interest are financially at odds")).  "One of the most
important benefits of a maximum limit insurance policy is the assurance that the company will provide the
insured with defense and indemnification for the purpose of protecting him from liability."  Kransco,
23 Cal.4th at 400-01 (quoting Commercial Union Assurance Cos. v. Safeway Stores, Inc., 26 Cal.3d 912,
918 (1980)).

affirmative obligation that would require the Debtors to promote Truck's financial interests while

seeking their own reorganization is disingenuous, inconsistent with Truck Policy language and

contrary to law.

First, the express language of the Assistance and Cooperation Clause, together

with cases interpreting and applying such a provision, show that the Debtors are only required,

when requested, to cooperate with Truck's defense efforts and to assist it in effecting settlements

*in individual claims or suits only*.  See Kallis, et al., Policyholder's Guide to the Law of Ins.

Coverage § 24.03 (1st ed. 2019 Supp. 2012); see, e.g., Campbell v. Allstate Ins. Co., 60 Cal.2d

303, 306-07 (1963) (evidence insufficient to show that insurer was prejudiced by  breach of

cooperation clause that involved insured's failure to reply to mail and telephone calls about an

accident investigation); Hall v. Travelers Ins. Cos., 15 Cal. App. 3d 304, 309 (1971) (insured

breached the cooperation clause by failing to obtain new counsel and contest liability, which

substantially prejudiced defense of the case); State Farm Fire & Cas. Co. v. Miller, 5 Cal. App.

3d 837, 841-42 (1970) (insured's breach of cooperation clause by making it impossible to

ascertain his whereabouts prior to and at trial was supported by findings premised on substantial

evidence, but findings did not support conclusion that insured's breach of cooperation clause in

its policy substantially prejudiced insurer in defense of action).

Although assistance and cooperation can refer to several things, in the context of

liability insurance, it always relates to the defense of individual cases.  For instance, courts "have

construed cooperation provisions to impose an obligation to:  (a) provide the insurer with a full

and truthful account of the occurrence, and to satisfy the insurer's reasonable request for

information on the underlying details of the case; (b) assist the insurer by forwarding notices,

summonses, pleadings or other suit papers, so that the insurer may promptly prepare a defense

against a third-party complaint; (c) submit to an examination under oath, or otherwise make himself available for trial, as the insurer conducts his defense; and (d) cooperate in the substantive aspects of his defense, such as filing third-party actions when requested and avoiding settlement without the approval of the insurer." Kallis, et al., Policyholder's Guide to the Law of Ins. Coverage § 24.03 (1st ed. 2019 Supp. 2012).

Tellingly, Truck admits that the Assistance and Cooperation Clause can only apply where Truck has a duty to defend. Hoyt Dep. at 91:23-92:6. And, cases analyzing the Assistance and Cooperation Clause make clear that a breach of the clause must be determined on a case-by-case basis, with any alleged breach of the clause determined only after a defended case has been resolved.[49] Those principles cannot be reconciled with Truck's attempt to apply the Assistance and Cooperation Clause to all currently pending and all future cases not yet filed (let alone tendered and being defended), which is the event that gives rise to Debtors' policy obligations to assist and cooperate.

Moreover, Truck admits that Debtors have always complied with these defense-related obligations. Hoyt Dep. at 19:2-20:13, 27:13-29:7. And the Plan affirms the Reorganized Debtors' obligations to continue to cooperate with Truck, as required by the Truck Policies, in the defense of Asbestos Personal Injury Claims post-confirmation. See Plan § IV.L.2.

---

[49]   Truck's performance under the Truck Policies is excused only if its ability to provide a defense in an underlying case has been substantially prejudiced by the Debtors' failure to cooperate. Truck Ins. Exch. v. Unigard Ins. Co., 79 Cal. App. 4th 966, 976 (2000); Campbell v. Allstate Ins. Co., 60 Cal.2d 303, 307 (1963). To succeed on this coverage defense, Truck must establish, at the very least, that if the Assistance and Cooperation Clause had not been breached, there was a substantial likelihood the trier of fact would have found in the insured's favor. Billington v. Interins. Exch. of S. Cal., 71 Cal.2d 728, 737 (1969) (finding that an insured breached the cooperation clause by failing to appear for depositions on at least seven occasions).

Moreover, prejudice resulting from an insured's alleged failure to cooperate cannot be determined until the outcome of the underlying case is known. United Servs. Auto. Ass'n v. Martin, 120 Cal. App. 3d 963, 966 (1981) ("Logically, the required showing of prejudice cannot be made while the main tort action is still pending, its outcome uncertain, and therefore declaratory relief against the injured persons at this stage is inappropriate.").

Nevertheless, Truck argues that the Debtors have breached (or will breach) the Assistance and

Cooperation Clause by failing to include in the Plan provisions *for Truck's benefit*—i.e.,

provisions to obtain exposure evidence from current and future claimants through <u>Garlock</u>-like

Plan provisions.  Truck Obj. at 27-31.  Ironically, and as explained below, this suggestion is

itself a breach *by Truck* of the express and implied provisions of the Truck Policies.  Truck is

attempting to expand its standard form policy language into some amorphous obligation that

requires the Debtors to promote Truck's general financial interests during their reorganization.

This effort plainly conflicts with express policy language and thus is not permitted.  <u>See Kwok v.</u>

<u>Transnation Title Ins. Co.</u>, 170 Cal. App. 4th 1562, 1571 (2009) (courts "do not rewrite any

provision of any contract, [including an insurance policy], for any purpose").

  The Truck Policies, covering the period from January 1965 to April 1983, were

renewed annually, with the same policy number; changes to coverage terms were generally

added by endorsement.  Hoyt Dep. at 36:13-37:2.  During each of the nineteen years of coverage,

Truck made two basic promises to the Debtors—namely, to indemnify and defend.[50]  Truck's

promise to indemnify states that it will "pay on behalf of the insured all sums which the insured

shall become obligated to pay, as damages or otherwise, by reason of the liability imposed upon

him by law . . . [because of personal injury or property damage]."  <u>Exhibit B</u>, Truck Ins. Exch.

Comprehensive Liability Policy No. 3504000, incepting Jan. 1, 1974 at TRK0000169.  Truck's

promise to defend states that it will:

> [i]nvestigate and defend any claim or suit against the insured
> alleging such injury, sickness, disease or destruction and seeking

---

[50]  The Debtors' bankruptcy does not affect Truck's obligations under the Truck Policies. Exhibit B, Truck Ins. Exch. Comprehensive Liability Policy No. 3504000, incepting Jan. 1, 1974 at TRK0000181 ("Bankruptcy or insolvency of the insured or of the insured's estate shall not relieve the company of any of its obligations hereunder."); Hoyt Dep. at 77:17-78:4.

> reimbursement or damages on account thereof, even if such claim
> or suit is *groundless, false or fraudulent.*
>
> ***
>
> The Company [Truck] may make such investigation, negotiation
> and settlement of any claim or suit *as it deems expedient.*

Id. (emphasis added).  Notably, Truck's express defense obligation is to "investigate and defend"

*any* claim against Debtors—"even if such claim or suit is groundless, *false or fraudulent*"—and

Truck exclusively has the right to investigate, negotiate and settle any claim against Debtors as it

"*deems expedient.*"  Despite these promises, which reflect a clear intent to allocate defense and

settlement responsibilities to Truck alone, its argument here attempts to shift those

responsibilities to Debtors.

Further, given that allocation, the plain language of the Assistance and

Cooperation Clause can only be read to require the Debtors to provide evidence and witnesses

*within their control.*  Examples of the Debtors' obligations might include making a witness

available for a corporate designee deposition in an asbestos injury case, identifying other

company witnesses for depositions, signing a release form to effectuate a settlement or providing

information about the companies' operations and product formulation, sale and distribution.  See,

e.g., Hoyt Dep. at 83:18-88:17.  Interpreting the Debtors' policy obligations as Truck proposes,

by requiring an insured to provide the insurer with third-party information that is not within the

insured's control or otherwise readily available to it, is beyond the obligations expressed in the

Assistance and Cooperation Clause and impermissibly shifts a significant aspect of the obligation

to defend Asbestos Personal Injury Claims from Truck to the Debtors.  Truck's attempt to

transfer even a part of its defense obligation to the Debtors must be rejected; again, courts "do

not rewrite any provision of any contract, [including an insurance policy], for any purpose."

Kwok, 170 Cal. App. 4th at 1571.

Finally, Truck argues that an insured's duty to assist and cooperate serves to prevent collusion between the insured and its "litigation adversaries," and that the Debtors have violated the Assistance and Cooperation Clause by working in these Reorganization Cases with the ACC and FCR.  Truck Obj. at 28.  However, the typical pattern giving rise to improper collusion is where, in a third-party lawsuit, the insured agrees with the claimant to an amount of liability, stipulates to judgment and then assigns to the claimant the right to satisfy that judgment from an insurance policy, combined with a covenant by the claimant not to sue the insured.  See, e.g., Safeco Ins. Co. of Amer. v. Parks, 170 Cal. App. 4th 992, 1013 (2009) ("[C]ollusion occurs when the insured and the third party claimant work together to manufacture a cause of action for bad faith against the insurer or to *inflate the third party's recovery* to artificially increase damages flowing from the insurer's breach . . . .  The insurer may raise collusion as a defense in a subsequent bad faith action.") (emphasis added); Andrade v. Jennings, 54 Cal. App. 4th 307, 327 (1997) ("Collusive assistance in the procurement of a judgment not only constitutes a breach of the cooperation clause but also is a breach of the covenant of good faith and fair dealing.").

Here, the Plan does not propose to establish the amount of any judgment that Truck must pay under the Truck Policies.  Instead, the Plan merely returns Asbestos Personal Injury Claims to the tort system and places Truck in the *exact same position* it was in before the Debtors' bankruptcy.  Hoyt Dep. 108:17-109:15.  That process neither works to manufacture a bad faith cause of action against Truck nor inflate a claimant's recovery that Truck would have to pay.  Besides, unlike the ongoing adversarial nature of the underlying asbestos lawsuits, "the best strategy for all parties involved in a Chapter 11 case is to *negotiate a consensual plan*."  In re Grand Traverse Dev. Co. Ltd. P'ship, 150 B.R. 176, 190 (Bankr. W.D. Mich. 1993) ("Chapter 11 is not structured for an adversarial dispute but instead envisions a consensual attempt to

reorganize the debtor's business.  This distinction is crucial."); In re MPM Silicones, LLC, No.

14-22503-RDD, 2014 WL 4637175, at *3 (Bankr. S.D.N.Y. Sept. 17, 2014) (referencing the

"apple-pie proposition in bankruptcy cases that the goal after all is consensual plans").

     2.    The Plan Does Not Constitute a Breach of the Truck Policies' Implied
          Covenant of Good Faith and Fair Dealing

       Insurance coverage under the Truck Policies for asbestos personal injury claims

against the Debtors is governed by California law.  Truck's argument that the Debtors have

breached (or will breach on Court approval of the Plan) the implied covenant of good faith and

fair dealing lacks merit under California law; the California Supreme Court has rejected the

concept of "reverse bad faith" asserted against a policyholder as a defense to coverage.  See

Kransco v. Amer. Empire Surplus Lines Ins. Co., 23 Cal. 4th 390, 407 (2000), as modified (July

26, 2000); see also Endurance Amer. Specialty Ins. Co. v. Lance-Kashian & Co., CV F 10–1284

LJO DLB, 2010 WL 3619476 (E.D. Cal. Sept. 13, 2010); Hale v. Provident Life & Acc. Ins. Co.,

2003 WL 1510463 (Cal. Ct. App. Mar.  25, 2003).  And despite its arguments that the Debtors

are liable for bad faith, Truck is aware of and knows such a claim cannot stand under California

law.  Hoyt Dep. at 126:10-16 ("Q. …you are aware that the California Supreme Court has

rejected the concept of reverse bad faith as a defense [to] coverage in California, yes?  A. I

believe that is correct.").

       A bad faith cause of action against insurers developed due to the "fundamental

disparity [that] exists between the insured, which performs its basic duty of paying the policy

premium at the outset, and the insurer, which, depending on a number of factors, may or may not

have to perform its basic duties of defense and indemnification under the policy."  Kransco,

23 Cal. 4th. at 404 (citing Foley v. Interactive Data Corp., 47 Cal.3d 654, 684-685 (1998)).

None of the bargaining and contractual inequities that led to the creation of a bad faith cause of

action against an insurer exist when comparing the insured's duties to that of the insurer; they are

not equivalent and Truck's argument that the Debtors' support of the Plan constitutes a breach of

the implied covenant of good faith and fair dealing, while ironic, is not legally cognizable. Id. at

404-05.

Further, it has long been recognized in California that "[t]here is an implied

covenant of good faith and fair dealing in every contract that neither party will do anything

which will injure the right of the other to receive the benefits of the agreement." Comunale v.

Traders & Gen. Ins. Co., 50 Cal.2d 654, 658 (1958).  However, as Truck concedes, the duty of

good faith and fair dealing cannot impose upon an insured any obligation that differs from the

insured's express obligations under the policy.  Hoyt Dep. at 124:24-125:16.  Yet this is precisely

what Truck tries to accomplish here by arguing that the Debtors have an affirmative duty to

reorganize in a manner that promotes Truck's financial interests.  The Court should not entertain

Truck's attempt to elevate its financial interests over the Debtors' successful reorganization, and

certainly not under the guise that the Truck Policies somehow impose an obligation on Debtors

to do so.

To the contrary, Truck's claim that the Debtors are breaching the Truck Policies

because the Plan lacks provisions that help Truck defend alleged "false and fraudulent" claims is

not only meritless, but is a blatant attempt by an insurer to place its own financial interests ahead

of those of its insureds.  Under California law, that constitutes a tortious breach by Truck of the

covenant of good faith and fair dealing implied by law in each of the Truck Policies.  See Egan

v. Mut. of Omaha Ins. Co., 24 Cal.3d 809, 818-19 (1979) ("For the insurer to fulfill its obligation

not to impair the right of the insured to receive the benefits of the agreement, it again must give

at least as much consideration to the latter's interests as it does to its own.").  The fact that

California prohibits Truck from treating its insureds in this manner establishes the lack of good faith in Truck's objections to the Plan.

### G.     Truck's Allegations of Bad Faith Are Meritless and Self-Serving

As set forth above, the Plan satisfies section 1129 of the Bankruptcy Code, including the good-faith requirement of section 1129(a)(3).  Truck incorrectly argues otherwise.

First, Truck asserts that the Plan is a "collusive agreement that is designed to perpetuate fraud" based on the allegation that the "Debtors are well aware of th[e] [tort system] scheme to suppress and manipulate evidence."  Truck Obj. at 5, 8.  In support of this claim, Truck isolates and misrepresents the meaning of certain quotes from a deposition where the Debtors' representative, Charles McChesney, agreed with statements made by the Debtors' counsel to this Court that the Debtors believe they were treated unfairly in the tort system and were suspicious of misconduct.  Mr. McChesney, however, <u>did</u> <u>not</u> testify that the Plan was a collusive agreement that would (or, at any point, was intended to) promote fraud or suppression of evidence in the state court tort system.  McChesney Dep. at 365:2-369:7.[51]  Mr. McChesney's testimony does not provide even a modicum of support for Truck's arguments in this regard, and Truck's attempt to use that testimony to demonstrate anything to the contrary is wholly disingenuous.

Second, Truck's suggestion that the Plan was not proposed in good faith because it "contravenes section 524(g)'s objective and purpose" is belied by case law.  Truck Obj. at 14.  As explained by the Third Circuit, the primary purpose of section 524(g) is twofold:  "ensuring the equitable resolution of present and future asbestos claims, and 'enabling corporations saddled

---

[51]     The relevant portions of the transcript of the February 19, 2020 deposition of Charles McChesney are attached hereto as <u>Exhibit D</u>.

with asbestos liability to obtain the 'fresh start' promised by bankruptcy.'" <u>In re W.R. Grace</u>

<u>& Co.</u>, 729 F.3d 311, 320 (3d Cir. 2013) (quoting <u>In re Federal-Mogul Glob. Inc.</u>, 684 F.3d 355,

359 (3d Cir. 2012)).  The Plan achieves both objectives:  (a) it allows both present and future

claimants the same opportunity each held prepetition to litigate their Asbestos Personal Injury

Claims in the tort system against an unlimited insurance asset, and (b) it provides the

Reorganized Debtors with the certainty and finality of injunctive protection necessary to emerge

from bankruptcy as a going concern.

        Truck's argument that returning cases to the tort system post-confirmation

contravenes the purpose of section 524(g) was flatly rejected in one of the very cases on which

Truck relies.  Truck Obj. at 15 (citing <u>Plant</u>).  In <u>Plant</u>, the District Court for the Northern

District of California, faced with similar objections from insurers, stated explicitly that

section 524(g) "does not suggest, as [insurers] seem to think, that asbestos claims may not be

returned to the tort system, where appropriate, as part of the reorganization Plan." <u>In re Plant</u>

<u>Insulation Co.</u>, 485 B.R. 203, 230–31 (N.D. Cal. 2012), <u>rev'd on other grounds</u>, 734 F.3d 900

(9th Cir.), <u>and aff'd</u>, 544 F. App'x 669 (9th Cir. 2013).  While section 524(g) requires that a trust

be established and that the debtor's asbestos liabilities be channeled to that trust (both of which

are provided for under the Plan), nothing in that statute precludes the continued resolution of

claims in the tort system.  And,  courts have confirmed "pass-through" plan structures that allow

asbestos claimants to prosecute their claims in the tort system post confirmation to recover the

value of insurance proceeds.  <u>See</u>, <u>e.g.</u>, <u>Burns & Roe Enters., Inc.</u>, 2009 WL 438694, at *4

(explaining that under the plan, the trust could "authorize individual claimants, whose claims are

potentially covered by policies issued by [a non-settling insurer], to commence litigation in the tort system").[52]

Further, permitting asbestos claimants to pursue insurance recoveries in the tort system would place Truck in the exact position it was in, with the exact rights it had and bargained for, prior to the commencement of these Reorganization Cases.  As discussed herein, returning to the tort system will not expose Truck to risks it was not subject to pre-bankruptcy, and all of Truck's rights to assert defenses related to any fraudulent claims are fully preserved.  See Hoyt Dep. at 108:17-109:15 (agreeing that the insurance companies were "fully exposed" to the tort system prepetition).  Truck's objection is a clear attempt to use the Debtors' bankruptcy as a way to limit its responsibility for defending  claims, but defending even allegedly fraudulent claims is an obligation Truck expressly assumed under the Truck Policies.  Truck Policy at TRK0000169.  Nothing in the Bankruptcy Code, including section 524(g), changes that obligation.  Id. at TRK0000181 ("Bankruptcy or insolvency of the insured or of the insured's estate shall not relieve the company of any of its obligations hereunder"); Hoyt Dep. at 77:17-78:4.  Overall, Truck has not pointed to, and cannot point to, any provision in the Plan that renders it unconfirmable.

---

[52]   See also Order Confirming Sixth Am. Joint Plan of Reorganization of Thorpe Insulation Co. and Pacific Insulation Co. (Following Remand) § 5.1.6, In re Thorpe Insulation Co., Case No. 07-19271-BB (Bankr. C.D. Cal. May 8, 2013) [D.I. 3429] (providing that asbestos claimants may commence actions to obtain the benefit of Asbestos Insurance Coverage in the tort system post confirmation); Order Confirming Am. and Restated Second Am. Plan of Reorganization of Plant Insulation Co. as Modified § 5.2.6, In re Plant Insulation Co., Case No. 09-31347 (Bankr. N.D. Cal. Mar. 3, 2014) [D.I. 2722] (providing that post-confirmation, asbestos claimants may commence suit against the Reorganized Debtor and pursue their Claims in the tort system to obtain the benefit of Asbestos Insurance Coverage).

## X.    REQUEST FOR AUTHORITY TO CONSUMMATE AND IMPLEMENT THE PLAN NOTWITHSTANDING 14-DAY STAY OF THE CONFIRMATION ORDER IMPOSED BY OPERATION OF BANKRUPTCY RULE 3020(E)

Notwithstanding the 14-day stay imposed by operation of Bankruptcy

Rule 3020(e), the Debtors respectfully request that the Confirmation Order be effective

immediately upon entry of an order by the District Court adopting the Bankruptcy Court's report

and recommendation regarding the Plan's compliance with the requirements of section 524(g) of

the Bankruptcy Code and issuing and affirming the Asbestos Permanent Channeling Inunction in

accordance with section 524(g)(3) of the Bankruptcy Code.  See 11 U.S.C. § 524(g)(3)(A) ("If

the requirements of paragraph 2(B) are met and the order confirming the plan of reorganization

was issued or affirmed by the district court that has jurisdiction over the reorganization

case…."); FED. R. BANKR. P. 3020(e) ("An order confirming a plan is stayed until the expiration

of 14 days after the entry of the order, unless the court orders otherwise."); see also Advisory

Committee Note ("The court may, in its discretion, order that Rule 3020(e) is not applicable so

that the plan may be implemented and distributions may be made immediately.").

Given that all creditors have either voted unanimously in favor of the Plan or are

being paid in full, it is appropriate for the Court to exercise its discretion and order that the Plan

may become effective immediately, permitting the Debtors to consummate the Plan and

commence its implementation without delay after the entry of the Confirmation Order.  The

Debtors submit that this relief is in the best interests of the Debtors' estates and creditors and will

not prejudice any party in interest.

## XI.    CONCLUSION

For the reasons set forth in this Memorandum of Law, the Debtors submit that

(a) the Plan, as modified by the Modifications, fully satisfies all applicable requirements of the

Bankruptcy Code and should be confirmed by the Court; and (b) the Debtors should be permitted

to consummate the Plan immediately following entry of an order by the District Court adopting

the Bankruptcy Court's report and recommendation and issuing and affirming the Asbestos

Permanent Channeling Inunction.

Dated:  June 15, 2020
         Charlotte, North Carolina

Respectfully submitted,

*/s/ John R. Miller, Jr.*
C. Richard Rayburn, Jr. (NC 6357)
John R. Miller, Jr. (NC 28689)
RAYBURN COOPER & DURHAM, P.A.
1200 Carillon
227 West Trade Street
Charlotte, North Carolina 28202
Telephone: (704) 334-0891
Facsimile: (704) 377-1897
E-mail:rrayburn@rcdlaw.net
       jmiller@rcdlaw.net

-and-

Gregory M. Gordon (TX 08435300)
Amanda Rush (TX 24079422)
JONES DAY
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
E-mail:gmgordon@jonesday.com
       asrush@jonesday.com

-and-

Paul M. Green (TX 24059854)
JONES DAY
717 Texas, Suite 3300
Houston, Texas  77002
Telephone:  (832) 239-3939
Facsimile:  (832) 239-3600
E-mail:pmgreen@jonesday.com

ATTORNEYS FOR DEBTORS

## **EXHIBIT A**

NAI-1508961146

Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
- - - - - - - - - - - - - - - - - - - - x
In re
KAISER GYPSUM COMPANY, INC., et al.,
         Debtors.
- - - - - - - - - - - - - - - - - - - - x
Bankruptcy Case No. 16-31602

           C O N F I D E N T I A L

         Oral deposition of SCOTT HOYT,
     taken pursuant to notice, was held at
     the law offices of GIBSON DUNN, 200 Park
     Avenue, New York, New York, commencing
     February 26, 2020, 9:07 a.m., on the
     above date, before Leslie Fagin, a Court
     Reporter and Notary Public in the State
     of New York.
                           - - -




           MAGNA LEGAL SERVICES
     320 West 37th Street, 12th Floor
        New York, New York 10018
            (866) 624-6221



1               S. Hoyt - Confidential

2          Q.    Based up on your inquiry, did you

3    identify any other instance in which Truck

4    has asserted that either of the debtors had

5    breached the assistance and cooperation

6    clause of the policy?

7          A.    Did I identify any other instance

8    in which Kaiser had violated the clause,

9    other than those identified in the proceeding

10   here?

11         Q.    That wasn't exactly my question.

12               Did you identify any other instance

13   in which Truck asserted that either of the

14   debtors had breached the cooperation --

15   assistance and cooperation clause in the

16   policy?

17         A.    Not other than those identified in

18   our objection filed here and in the

19   interrogatory responses.

20         Q.    I'm looking at the interrogatory

21   response and the only one identified here is

22   the adversary proceeding?

23         A.    Right.   That's what I'm referring

24   to.

25         Q.    You've expressed those same



1          S. Hoyt - Confidential

2     assertions in the objections, but it's all

3     encompassed within the adversary proceeding?

4          A.     Correct.

5          Q.     No other instance where Truck has

6     asserted that Kaiser breached the assistance

7     and cooperation proceeding?

8          A.     Not that I am aware of.

9          Q.     You made a reasonable inquiry to

10    determine whether there was one?

11         A.     A reasonable inquiry in terms of my

12    knowledge and memory of having been on the

13    Kaiser matter for Truck over decades.





13    Q.    Let me ask you this, Mr. Hoyt.   In
14  terms of Exhibit 38, if you will turn to
15  that, specifically on page 10, I want to look
16  at the subject matters of testimony,
17  paragraph 3.
18    A.    Yes.
19    Q.    Any alleged breaches of Kaiser
20  policies by any of the debtors, apart from
21  the information that we just talked about in
22  response to interrogatory No. 1.
23        Have you identified, in preparing
24  to testify today, any other breaches that
25  Truck believes one or both of the debtors



Page 28

1           S. Hoyt - Confidential

2     have engaged in?

3         A.    Not other than are laid out in our

4     objection filed and our interrogatory

5     responses.

6         Q.    So with respect to the assistance

7     and cooperation clause, you are not aware of

8     any instance in which Truck has asserted or

9     believed that one or both of the debtors have

10    violated that clause before this context of

11    the bankruptcy?

12        A.    Correct.

13        Q.    Beyond the documents that you

14    reviewed and the notes --

15        A.    Let me have that question read

16    back.

17           (Record read.)

18        A.    That's correct.

19           And I should clarify, the position

20    really is that if this plan is confirmed,

21    Kaiser will have breached the assistance and

22    cooperation clause because the plan does not

23    include any safeguards or disclosure

24    requirements with regard to fraud, so the

25    point is, Kaiser could still add those into



Page 29

1      S. Hoyt - Confidential

2      its plan and perhaps not be in violation of

3      breach of the assistance and cooperation

4      clause, but it seems determined to go forward

5      with the plan without those safeguards and

6      protections and should it do so, our position

7      is that will be an actual breach.





13    Q.    Mr. Hoyt, are you familiar with the

14    1974 policy that Truck issued to Kaiser

15    Cement?

16    A.    Yes.

17    Q.    Do you recall how long that policy

18    was in place?

19    A.    To the early '80s.

20    Q.    It was reviewed annually with the

21    same policy number?

22    A.    Yes.

23    Q.    And it was renewed by endorsement,

24    generally, confirming the amount of the

25    deductible?


MAGNA
LEGAL SERVICES

Page 37





8      Q.      Would it surprise you to learn that

9   the assistance and cooperation clause has the

10   exact same language verbatim from the

11   inception of the Truck policies in 1965 until

12   they stopped in 1983?

13      A.      Would it surprise me, no, it's

14   standard form language.

15      Q.      By standard form language, what's

16   your understanding of the use of standard

17   form language by domestic insurers issuing

18   CDL policies?

19      A.      I don't understand the question.

20      Q.      How does an insurance company use

21   standard form language, what does that mean

22   to you?

23      A.      They borrow the language of forms

24   that have been generated by insurance

25   industry organizations like ISO, like the



1           S. Hoyt - Confidential

2    National Bureau of Casualty Underwriters and

3    other organizations that draft language for

4    use in the industry.



4    Q.    Let me ask you, having looked at

5    the duty to defend, which includes Truck's

6    obligation to defend any claim or suit, even

7    if it is groundless, false or fraudulent, is

8    there any policy obligation that imposes a

9    duty upon Kaiser in the case of suits that

10    are groundless, false or fraudulent?

11        MR. KRAKOW:    Objection to form.

12    A.    Yes.

13    Q.    What are those policy provisions?

14    A.    The assistance and cooperation

15    clause.

16    Q.    What is it in the assistance and

17    cooperation clause that imposes an obligation

18    on the policyholder where a case is false or

19    fraudulent?

20    A.    That's laid out in detail in our

21    objection and in my letter, but, generally,

22    what I can say is there is a duty by the

23    insured to cooperate and assist the insurer

24    in securing evidence to enable it to

25    determine whether that case is fraud,



1          S. Hoyt - Confidential

2     fraudulent, frivolous.

3          Q.    Does that, in your view, shift some

4     of the obligation of the duty to defend a

5     case over to the insured?

6          A.    No, it requires the insured to

7     assist in cooperating in the defense to that

8     extent.

9          Q.    To what extent?

10         A.    To the extent of helping secure

11    evidence, sometimes not readily obtainable by

12    the insurer, to determine the merits of that

13    claim and whether it should ultimately be

14    paid.   Apart from the defense, whether that

15    claim should ultimately be paid, because the

16    false, frivolous, whatever, those adjectives

17    go to the duty to defend, not to the duty to

18    indemnify.

19         Q.    Understood.

20              And my question for you, the

21    determination of whether a suit is false or

22    fraudulent is included in this policy in one

23    place and it's where it defines Truck's duty

24    to defend, correct?

25         A.    Yes.



1        S. Hoyt - Confidential

2        Q.    My question for you was, where in

3    the policy is there any obligation by the

4    policyholder to respond to a claim that is

5    false or fraudulent, and you have identified

6    the assistance and cooperation clause.

7    Anything else?

8        A.    That is what comes to mind, and a

9    duty of good faith to assist the insurer in

10   the investigation.





17    Q.    Action against company provision,

18    at the end of that section reads, Bankruptcy

19    or insolvency of the insured or of the

20    insured's estate shall not relieve the

21    company of any of its obligations hereunder.

22        Do you see that?

23    A.    Yes.

24    Q.    Is that your understanding, that

25    the fact that the debtors filed for



1              S. Hoyt - Confidential

2    bankruptcy, does not relieve Truck of any of

3    its obligations under No. 43?

4         A.   I agree, it says what it says here.

13         Q.   Let's turn to No. 8, condition No.

14   8, the assistance and cooperation of the

15   insured.

16         A.   All right.

17         Q.   You've identified this as a

18   standard insurance policy form.

19              Do you have any opinion as to

20   whether we should expect to see this in most

21   of the general liability forms issued in the

22   '60s and '70s?

23              MR. KELLY:   Objection to form.

24         A.   I don't know about whether we see

25   this identical language.  I know it was



1        S. Hoyt - Confidential

2    common to have an assistance and cooperation

3    provision in the policies.

4        Q.    And it existed in 19 of Truck's

5    policies, correct?

6        A.    I believe so.

7        Q.    And you can determine from looking

8    at all 19 policy years and forms whether the

9    language changed?

10        A.    Correct.

11        Q.    Do you have an opinion, as you sit

12    here now, an educated opinion as to whether

13    the language changed at all?

14        A.    You've told me it didn't.   I will

15    accept that.   I don't believe it did.





18          Q.      This provision requires, in the

19   case of Kaiser, to provide a witness for a

20   30(b)(6) deposition in the underlying

21   asbestos cases, correct?

22              MR. KRAKOW:   Objection to form.

23          A.      That's one way to cooperate, that's

24   one item.

25          Q.      That would certainly be required


MAGNA
LEGAL SERVICES

1            S. Hoyt - Confidential

2    under this provision, correct?

3        A.    Yes.

4        Q.    And that witness' testimony is not

5    information Truck has available to it, it's

6    information that the insured has available to

7    it?

8        A.    Right.

9        Q.    Let me go through here.  The first

10   requirement is that the company requests one

11   of these four things, correct?

12       A.    That's what it says.

13       Q.    Would you agree that these

14   obligation arise only when Truck says we need

15   this?

16       A.    No.

17       Q.    When would it be the policyholder's

18   obligation to secure and give evidence

19   without a request from Truck?

20       A.    It says, The insured shall

21   cooperate with the company, that's mandatory,

22   so whether there is a formal request or not,

23   I would say the insured has a duty to

24   cooperate, it's mandatory.  The insured may

25   be aware of information that the insurer



1                S. Hoyt - Confidential

2      doesn't even know to ask for.

3          Q.    That would be one example of

4      cooperation?

5          A.    Yes.

6          Q.    Providing important information

7      that the insurer is not aware of?

8          A.    Or can't obtain.

9          Q.    Let's go through this.

10             Affecting settlements.   How does

11     the policyholder help affect a settlement,

12     A-F-F-E-C-T?

13             MR. KRAKOW:   Objection to form.

14         A.    You want me to relate it to this

15     particular case?

16         Q.    I want you to relate it to Truck's

17     defense of Kaiser since the late 1970s and

18     Kaiser's response to any request from Truck

19     that it cooperates.

20             It apparently has been doing so

21     because you don't have a single instance of a

22     breach of this paragraph until the bankruptcy

23     case, correct?

24         A.    Right.   So I don't know why you are

25     taking me back that far in history when I



1       S. Hoyt - Confidential

2    want to talk about the bankruptcy context.

3       Q.   I will tell you why.  Because since

4    the 1970s, Kaiser has been performing without

5    breaching this provision and it is, for the

6    first time, being alleged that it has

7    breached this position because of positions

8    it's taking in the bankruptcy case.

9            So I want to explore what Kaiser

10   has been doing since the 1970s that was fine

11   and why that's different than the

12   interpretation of this assistance and

13   cooperation clause that Truck is now

14   advancing.

15       A.   Is that an argument or a question?

16       Q.   You asked me to explain why I want

17   to go through the provision.  I explained it.

18           So let's start with attending

19   hearings and trials.

20           You have a policyholder who doesn't

21   attend a hearing or trial.  That prevents you

22   from successfully being able to defend a

23   case?

24           MR. KRAKOW:  Objection to form.

25       A.   It could.



S. Hoyt - Confidential

1
2   Q.    Assisting and affecting
3   settlements.  If you have a policyholder that
4   doesn't sign a release form, you can't effect
5   a settlement, right?
6            MR. KRAKOW:  Objection to form.
7        A.   True.
8        Q.   Can you think of any other way that
9   Kaiser, prior to the filing of its bankruptcy
10  petition, helped Truck effect settlement?
11           MR. KRAKOW:  Objection to form.
12       A.   No.  And I don't understand why we
13  are doing this.  I already told you --
14           MR. KRAKOW:  You don't need to
15       argue.  Just answer his questions.
16       A.   No.
17       Q.   How about securing and giving
18  evidence?
19       A.   Before the bankruptcy?
20       Q.   Before the bankruptcy, has Kaiser
21  been securing and giving evidence to Truck?
22           MR. KRAKOW:  Objection to form.
23       A.   As far as I know.
24       Q.   That would include information
25  about the company's operations that Truck



           S. Hoyt - Confidential

2  didn't know before it began defending these

3  claims?

4       A.    Yes.

5       Q.    Information about the company's

6  products, their formulation, their

7  production, their sale and distribution?

8       A.    Yes.

9       Q.    Truck didn't know that before it

10 began defending these cases?

11      A.    Correct.

12      Q.    Obtaining the attendance of

13 witnesses, in the conduct of suits, Kaiser

14 has partnered with Truck since the '70s to

15 attend depositions and provide evidence that

16 Truck needed, correct?

17      A.    Yes.





23      A.    I agree with you, the duty to

24  defend commences with tender.

25      Q.    And until that duty to defend



Page 92

1              S. Hoyt - Confidential

2    arises, there is no duty to cooperate?

3         A.    Correct.

4         Q.    And if there is no duty to defend,

5    there is no duty to cooperate?

6         A.    Correct.





17      Q.      Did Truck have the benefit of any,

18   quote, mandated asbestos exposure disclosures

19   and authorizations, closed quote, before

20   September 30, 2016, in defending Kaiser

21   against asbestos claims?

22      A.      Not to my recollection.

23      Q.      The last sentence -- the next

24   sentence.  The terms of that agreement

25   protect the debtors, their parents and



1        S. Hoyt - Confidential

2    affiliates from any future fraud, but leave

3    Truck and the other insurers fully exposed.

4    The final phrase of that paragraph also

5    refers to leaving Truck and the other

6    insurers fully exposed.

7            What is it that Truck and the other

8    insurers are fully exposed to?

9        A.    They are exposed to the tort system

10   without the benefit of disclosures and/or

11   other safeguards or other fraud protection.

12       Q.    With that definition, Truck and the

13   other insurers were fully exposed before

14   September 30, 2016, right?

15       A.    Yes.





23      Q.   So let's take a look at Exhibit 16.

24      It's already been marked in a prior

25      deposition.



1          S. Hoyt - Confidential

2               Do you recognize Exhibit 16?

3     A.    Yes.

4     Q.    A copy of a letter you sent to Mr.

5    Greg Gordon at Jones Day and myself on April

6    3, 2019?

7     A.    Yes.

8     Q.    Did you do some legal research

9    before you sent this letter?

10     A.    Yes.

11     Q.    Did you find any instances where

12    the assistance and cooperation clause had

13    been applied in the context of a bankruptcy

14    plan?

15     A.    I don't believe so.





14        Q.    Do you have a recollection, as you

15   sit here right now, whether any of the cases

16   you cite for the purpose of assistance and

17   cooperation clause are applying that clause

18   in the context of a bankruptcy plan?

19        A.    No.

20        Q.    They're applying it in the defense

21   of an underlying claim against an insured

22   party, correct?

23        A.    Yes.





24  The scope of an insured's duty of
25  good faith and fair dealing is limited by the



1          S. Hoyt - Confidential

2    express obligations in the policy.

3              True or false?

4              MR. KRAKOW:  Objection to form.

5         A.    I would state it as the duty of

6    good faith by the insurer is to make sure the

7    obligations by the insured and the rights of

8    insured are carried out in good faith by the

9    insured on its part.

10         Q.    Would you agree, those obligations

11    are limited by the express obligations that

12    are contained in the policy?

13              MR. KRAKOW:  Objection to form.

14         A.    I would say the good faith duty

15    applies to the express obligations in the

16    policy.



Page 126



10      Q.    Let me ask you to go back to the

11   policy, Exhibit 43.

12            Before I do that, you are aware

13   that the California Supreme Court has

14   rejected the concept of reverse bad faith as

15   a defense coverage in California, yes?

16      A.    I believe that's correct.





16    Q.    Is it the plan of reorganization
17  that Truck is asserting violates Kaiser's
18  need to cooperate and assist?
19    A.    It's the failure of the plan to
20  take any steps to require disclosures or
21  safeguards to weed out fraudulent claims,
22  whether -- enough said.
23    Q.    The failure of the plan to include
24  those provisions?
25    A.    Yes.



MAGNA
LEGAL SERVICES

1              S. Hoyt - Confidential

2         Q.    And I think you testified earlier

3    that that still could be cured?

4         A.    Yes.

5         Q.    How so?

6         A.    By implementing those safeguards

7    and those disclosure requirements like the

8    court in Garlock mandated.

9         Q.    And if those safeguards were put in

10   the plan prior to or at confirmation, would

11   Kaiser still have violated its duty to

12   cooperate and assist?

13        A.    I would have to look at the

14   provisions and how they interrelate with the

15   plan at that time.  I'm not going to

16   hypothesize, but I would have to see.

17        Q.    Is there anything, other than the

18   failure to incorporate those provisions into

19   the plan, that constitutes, in Truck's view,

20   Kaiser's violation of its duty to cooperate

21   and assist?

22        A.    It's the whole process that led up

23   to that failure.  The invitation to Truck to

24   share costs, for the purpose, the stated

25   purpose by Kaiser of coming up with a



1            S. Hoyt - Confidential

2    consensual approach or plan that would

3    achieve a Garlock-type result of actual value

4    of the claims and not inflated value of the

5    claims.  Truck's paying over $2-1/2 million

6    towards that end and then not getting a

7    single invitation to negotiate towards that

8    end, and then being presented with a plan

9    that has safeguards only for Kaiser with

10   respect to fraud, but leaves Truck at the

11   mercy of the tort system without them and

12   then shielding the negotiations and

13   communications that were supposed to involve

14   Truck, but, instead, involved only the ACC,

15   FCR and Kaiser shielding those with a common

16   interest privilege that shields from the

17   insurer, not only participation, but even

18   learning about what the negotiations were and

19   so it's the whole gamut of things that are

20   outlined in the interrogatory responses, in

21   our objection.

22        Q.    You are saying those constitute a

23   violation of the assistance and cooperation

24   in the insured clause in the Truck policy?

25        A.    I'm saying they appear to and



Page 180

1        S. Hoyt - Confidential

2  unless steps are taken to remedy that in the

3  plan by taking measures to protect Truck

4  through disclosures and safeguards, that that

5  would be an actual breach of the assistance

6  and cooperation clause.  So back to your

7  point, steps could still be taken, in my

8  view, to avoid that end.

9        Q.    If those steps are taken, there

10  would not be an actual breach?

11        A.    Correct.





13    Q.    There were state law rights that

14 Truck had prior to Kaiser's bankruptcy

15 filing, isn't that correct?

16    A.    Are you talking about the rights in

17 the policy?

18    Q.    Yes.

19    A.    Yes.

20    Q.    Did Kaiser's bankruptcy filing

21 eliminate any of those rights for Truck?

22    A.    It seeks to effectively cut the

23 assistance and cooperation clause and take

24 that away.

25        Before the bankruptcy, Kaiser had



1          S. Hoyt - Confidential

2    all the incentive to work with Truck to

3    aggressively defend against the liabilities

4    to the point where it came to Truck with a

5    proposal to come together on a consensual

6    plan that would help reduce that liability,

7    as in the Garlock case, and, instead, it

8    entered a plan with creditors that takes away

9    all of its incentive to vigorously defend

10   those claims and provide information in

11   helping Truck fighting those claims and

12   basically says, we turn you back to the tort

13   system without safeguards and protections.

14        Q.    The objective word there was, it

15   seeks to, is that what you said, the

16   plaintiff seeks to?

17        A.    Correct.

18        Q.    Has it done it yet?

19        A.    No.  We won't know until

20   confirmation, if it's confirmed as is, yes.

21        Q.    And would Truck have been denied

22   its rights prior to confirmation?

23        A.    The way it's being carried --

24   Kaiser is operating now as if the plan is in

25   place.


MAGNA ▶
LEGAL SERVICES

Page 194

1                S. Hoyt - Confidential

2           Q.    I thought you testified a minute

3     ago that Truck controls defense?

4           A.    Yes.

5           Q.    Today?

6           A.    Yes.   That doesn't mean it doesn't

7     get the assistance and cooperation or

8     shouldn't get the assistance and cooperation

9     of its insurers doing that.

10          Q.    The trial coming up today, has

11    Kaiser refused to attend a hearing?

12          A.    No.

13          Q.    Has Kaiser refused to make a

14    witness available?

15          A.    No.

16          Q.    Who selects defense counsel today,

17    who has the right to select defense counsel

18    today?

19          A.    Truck, but it seeks the input, in

20    the past, it has sought the input of Kaiser

21    in doing so.

22          Q.    Who pays the defense counsel today?

23          A.    Truck.

24          Q.    Is there anything that keeps --

25    strike that.


MAGNA
LEGAL SERVICES

Page 195

1          S. Hoyt - Confidential

2              What keeps the defense counsel on

3    any individual case from sending out whatever

4    discovery requests that defense counsel wants

5    to send out?

6          A.     Nothing.



Page 291

1

2                          CERTIFICATE

3

             I HEREBY CERTIFY that the witness,
4    SCOTT HOYT, was duly sworn by me and that the
     deposition is a true record of the testimony
5    given by the witness.

6    _____
             Leslie Fagin,
7            Registered Professional Reporter
             Dated: February 26, 2020

8

9

10

             (The foregoing certification of
11   this transcript does not apply to any
     reproduction of the same by any means, unless
12   under the direct control and/or supervision
     of the certifying reporter.)

13

14

15

16

17

18

19

20

21

22

23

24

25



## **EXHIBIT B**

NAI-1508961146



# TRUCK INSURANCE
## EXCHANGE

KAISER CEMENT & GYPSUM CORP.
Policy #350-60-00

TRK0000166

PR0822

PR01223

Appellant's Appendix 02322

TRUCK0000572

The Truck Insurance Exchange (an inter-insurance exchange, hereinafter
sometimes referred to as Company) agrees with the insured, named in the
Declarations made a part hereof, in consideration of the payment of the
total premium when due and in reliance upon the statements in the Declarations
and subject to the Limits of Liability, Exclusions, Conditions and other
terms of this policy:

### INSURING AGREEMENTS

I.  COVERAGE:

To pay on behalf of the insured all sums which the insured shall be-
come obligated to pay, as damages or otherwise, by reason of the
liability imposed upon him by law, assumed by him under contract as
defined, or by reason of any other legal liability of the insured how-
ever arising or created or alleged to have risen or to have been created
because of:

1.  Personal injury, sickness, disease, including death;

2.  Injury to or destruction of property

including all loss resulting therefrom.

II.  DEFENSE, SETTLEMENT, SUPPLEMENTARY PAYMENTS:

With respect to such insurance as is afforded by this policy, the
company shall:

1.  Investigate and defend any claim or suit against the insured
alleging such injury, sickness, disease, or destruction and
seeking reimbursement of damages on account thereof, even if
such claim or suit is groundless, false or fraudulent. Except
as respects malpractice liability the company may make such
investigation, negotiation and settlement of any claim or suit
as it deems expedient. As respects malpractice liability and
employee benefits liability the company will neither settle
nor compromise any claim or suit covered hereunder, except with
the written consent of the insured.

2.  (a)  pay all premiums on bonds to release attachments for
an amount not in excess of the applicable limit of
liability of this policy, all premiums on appeal bonds
required in any such defended suit, the cost of bail
bonds required of the insured in the event of automobile
accident or automobile traffic law violation during the
policy period, not to exceed $250 per bail bond, but
without any obligation to apply for or furnish any such
bonds;

(b)  pay all expenses incurred by the company, all costs
taxed against the insured in any such suit and all

- 1 -

TRK0000169

PR0825

PR01226

Appellant's Appendix 02325

TRUCK0000575

afforded by this policy for bodily injury liability or for property
damage liability shall comply with the provisions of such law which
shall be applicable with respect to any such liability arising out
of the ownership, maintenance or use during the policy period of any
automobile insured hereunder, to the extent of the coverage and limit
of liability required by such law, but in no event in excess of the
limits of liability stated in this policy.  The insured agrees to
reimburse the company for any payment made by the company which it
would not have been obligated to make under the terms of this policy
except for the agreement contained in this paragraph.

The Company agrees that this policy shall be deemed endorsed to comply
with the minimum requirements of any Motor Vehicle "No Fault" or
"Modified No Fault" Federal law or the minimum requirements of any
Motor Vehicle "No Fault" or "Modified No Fault" law of any state,
province or territory in which the Named Insured has resident employees.

6.  NOTICE OF OCCURRENCE:

When an occurrence takes place, written notice shall be given by or on
behalf of the insured to the company or any of its authorized agents
as soon as practicable after the named insured's Insurance Manager
has knowledge thereof when, in his opinion, it is likely to result
in a claim under this policy.  Such notice shall contain particulars
sufficient to identify the insured and also reasonably obtainable
information respecting time, place and circumstances of the occur-
rence, the names and addresses of the injured and of available
witnesses.

7.  NOTICE OF CLAIM OR SUIT:

If claim is made or suit is brought against the insured, the insured
shall promptly forward to the company or its authorized agent every
demand, notice, summons or other process received by him or his repre-
sentative.

8.  ASSISTANCE AND COOPERATION OF THE INSURED:

The insured shall cooperate with the company, and upon the company's
request, shall attend hearings and trials and shall assist in effect-
ing settlements, securing and giving evidence, obtaining the attend-
ance of witnesses and in the conduct of suits.  The insured shall
not, except at his own cost, voluntarily make any payment, assume
any obligation or incur any expense other than for such immediate
medical and surgical relief to others as shall be imperative at the
time of the occurrence.

9.  ACTION AGAINST COMPANY:

No action shall lie against the company unless, as a condition pre-
cedent thereto, the insured or his legal representative shall have
fully complied with all the terms of this policy, nor until the

- 12 -

TRK0000180

PR0836

PR01237

TRIAL EX. 302
Page 15

Appellant's Appendix 02336

TRUCK0000586



amount of the insured's obligation to pay shall have been finally
determined either by judgment against the insured after actual trial
or by written agreement of the insured, the claimant and the company.

Any person or organization or the legal representative thereof who
has secured such judgment or written agreement shall thereafter be
entitled to recover under this policy to the extent of the insurance
afforded by this policy. Nothing contained in this policy shall
give any person or organization any right to join the company as a
codefendant in any action against the insured to determine the in-
sured's liability.

Bankruptcy or insolvency of the insured or of the insured's estate
shall not relieve the company of any of its obligations hereunder.

10.  **OTHER INSURANCE:**

If the insured has other insurance against a loss covered by this
policy, the insurance under this policy shall be excess insurance
over all such other valid and collectible insurance; but if the
carrier or carriers of such other insurance shall deny liability
therefor in its entirety or as to any portion of such other insurance,
then and in that event this company shall handle such loss or claim
under this policy in the same manner and to the same extent as though
such other insurance did not exist, and the insured shall assign
to this company all rights against the carrier or carriers of such
other insurance, and execute all papers necessary to secure to this
company such rights or shall in its own name whenever requested by
the company, and at the company's expense, institute any demand or
legal proceedings which this company deems necessary against the
carrier or carriers of such other insurance.

With respect to the insurance afforded under Insuring Agreement
III 4, no insurance is afforded by this policy with respect to
any loss against which other insurance is available to the insured,
where, but for the existence of this policy, such other insurance
would apply as primary insurance to such loss. If for any reason
other than the existence of this policy such other insurance is not
available to the insured as respects such loss, or after such other
insurance available to the insured has been exhausted, then, in either
event, this policy shall apply.

11.  **SUBROGATION:**

In the event of any payment under this policy, the company shall be
subrogated to all the insured's rights of recovery therefor against
any person or organization and the insured shall execute and deliver
instruments and papers and do whatever else is necessary to secure
such rights. The insured shall do nothing after loss to prejudice
such rights. The company waives its right of subrogation (1) against
any person, firm or corporation, subsidiary of, or allied or
affiliated with the insured, (2) against any person, firm or corpo-
ration, with which the insured is associated as a joint venturer or

- 13 -

TRK0000181

PR0837

PR01238

Appellant's Appendix 02337

TRUCK0000587

**EXHIBIT C**

NAI-1508961146

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| In re | Chapter 11 |
| KAISER GYPSUM COMPANY, INC., *et al.*[1] | Case No. 16-31602 (JCW) |
| Debtors | (Jointly Administered) |

**TRUCK INSURANCE EXCHANGE'S RESPONSES AND OBJECTIONS TO DEBTORS' FIRST SET OF REQUESTS FOR PRODUCTION**

Truck Insurance Exchange ("**Truck**") hereby responds and objects to Debtor Kaiser Gypsum Company, Inc. ("**Kaiser Gypsum**") and Debtor Hanson Permanente Cement, Inc. ("**HPCI**") (collectively the "**Debtors**") First Set of Requests for Production of Documents ("**Requests**"). These objections and responses reflect Truck's present knowledge, information, and belief. Truck reserves the right to amend and/or supplement these responses and objections if it later learns of new information relevant hereto, through discovery or otherwise.

Nothing herein shall be construed as an admission by Truck as to the relevancy, or admissibility at trial, of any documents that it may produce in response to the Requests. Truck expressly reserves the right to object to further discovery into the subject matter of any of these Requests and to any attempt to offer into evidence any document, or portion thereof, produced in response to these Requests. Truck reserves its right to challenge the competency, relevancy, materiality, or admissibility, at trial or any subsequent proceeding, of this or any other action, of any documents and/or things it provides in response to these Requests.

---

[1] The Debtors are the following entities (the last four digits of their respective taxpayer identification numbers follow in parenthesis): Kaiser Gypsum Company, Inc. (0188) and Hanson Permanente Cement, Inc. (7313). The Debtors' address is 300 E. John Carpenter Freeway, Irving, Texas 75062.

other objections, Truck is not producing documents in response to this Request. But if Truck did produce documents in response to this Request, based on this objection it would limit its production to non-privileged documents sufficient to show the drafting history, interpretation, or meaning of the Assistance and Cooperation Clause in other Truck Policies.

**REQUEST NO. 3:   Documents sufficient to show all instances when you have asserted the Assistance and Cooperation Clause as a ground to deny coverage.**

**RESPONSE TO NO. 3:**   Truck objects that this Request is overbroad, unduly burdensome, and oppressive; is not proportional to the needs of the case; and seeks undisclosed subjective or extrinsic evidence that is not relevant to any claim or defense and is unlikely to lead to the discovery of admissible evidence.   Whether Truck asserted the Clause as to other insureds under different polices/contracts, facts and circumstances is not relevant to its assertion here. Truck has no compilation or resource to enable it to search for documents showing instances when it asserted the Clause as to other insureds.   Based on this objection, Truck will limit its production of documents in response to this Request to non-privileged documents sufficient to show its assertion of the Assistance and Cooperation Clause as a ground to deny coverage to the Debtors.

**REQUEST NO. 4:  All documents and communications evidencing, referring or relating to the application, interpretation or meaning of "to cooperate with the company" as that or a substantially similar phrase is used in the Assistance and Cooperation Clause.**

**RESPONSE TO NO. 4:**  Truck incorporates its objections and response to Requests No. 1 and 2 above.

Dated: November 22, 2019

/s/ Robert B. Krakow
GRIER WRIGHT MARTINEZ, PA
Michael L. Martinez (N.C. State Bar No. 39885)
521 East Morehead Street, Suite 440
Charlotte, NC 28202
Phone:  (704) 375.3720; Fax:  (704) 332-0215
Email:  mmartinez@grierlaw.com

– and –

GIBSON, DUNN & CRUTCHER LLP
Michael A. Rosenthal (admitted *pro hac vice*)
Robert B. Krakow (admitted *pro hac vice*)
Alan Moskowitz (admitted *pro hac vice*)
Matthew G. Bouslog (admitted *pro hac vice*)
Dylan S. Cassidy (admitted *pro hac vice*)
200 Park Avenue
New York, NY 10166-0193
Phone:  (212) 351-4000; Fax:  (212) 351-4035
Email:  MRosenthal@gibsondunn.com
Email:  RKrakow@gibsondunn.com
Email:  AMoskowitz@gibsondunn.com
Email:  MBouslog@gibsondunn.com
Email:  DCassidy@gibsondunn.com

– and –

PIA ANDERSON MOSS HOYT, LLC
Scott R. Hoyt (admitted *pro hac vice*)
136 E. South Temple, 19th Floor
Salt Lake City, UT 84111
Phone: (817) 454-5678; Fax: (801) 350-9010
Email: SHoyt@pamhlaw.com

*Counsel for Truck Insurance Exchange*

## EXHIBIT D

NAI-1508961146

1            CHARLES McCHESNEY - CONFIDENTIAL

2    UNITED STATES BANKRUPTCY COURT

3    WESTERN DISTRICT OF NORTH CAROLINA

4    CHARLOTTE DIVISION

5    -----------------------------------------x

6    In Re:

7    KAISER GYPSUM COMPANY, et al.

8                   Debtors,

9                      Chapter 11

10                     Case no. 16-316-2 (JCW)

11   -----------------------------------------x

12                   9:00 a.m.

                     February 19, 2020

13

                     250 Vesey Street

14                   New York, New York

15                   * CONFIDENTIAL *

16         CONTINUED CONFIDENTIAL DEPOSITION of

17   CHARLES E. McCHESNEY, II, a Witness in the above

18   entitled matter, pursuant to Notice, before

19   Stephen J. Moore, a Registered Professional

20   Reporter, Certified Realtime Reporter and Notary

21   Public of the State of New York.

22

23

24

25

                                    Page 163

```
 1              CHARLES McCHESNEY - CONFIDENTIAL

 2          Q       Did you attend the May 10, 2018

 3   hearing on the -- the first hearing on the plan

 4   proponents' motion to lift the automatic stay

 5   to allow asbestos liability claims to proceed

 6   in the tort system?

 7          A       I did.  Yes, I recall being at

 8   the hearing where that motion was heard -- I

 9   was at all the hearings where that motion was

10   heard.

11          Q       At that hearing, Mr. Gordon

12   addressed Truck's accusations that if the

13   claims were allowed to proceed in the tort

14   system, that would facilitate a resumption of

15   fraud that had taken place in the fraud system,

16   and Mr. Gordon made the following statement,

17   "but I -- I will say this, that do the Debtors

18   think they -- they were fairly treated in the

19   tort system?

20                  "No.

21                  "Do the Debtors -- are the

22   Debtors suspicious that maybe they were the

23   subject of misconduct in the tort system?

24                  "Yes.

25                  "But the -- the -- but the
```

Page 365

```
 1              CHARLES McCHESNEY - CONFIDENTIAL
 2      important point is, Your Honor, that we have
 3      negotiated an agreement.
 4              "All our views were taken into
 5      account in that agreement and we are satisfied
 6      with that agreement.
 7              "We think it's a good agreement
 8      and it's an agreement in our view that paves
 9      the way for us to emerge from bankruptcy."
10              Is there anything in what
11      Mr. Gordon stated there that did not, in your
12      view, reflect the views of the Debtors as to
13      how they were treated in the tort system?
14              MR. RASMUSSEN:  Objection to the
15          form.
16              MR. PHILLIPS:  I object to the
17          form of the question.
18              MR. HORKOVICH:  Objection,
19          foundation, erroneous assumption.
20      A       May I read the testimony?
21      Q       Sure.
22      A       Or the transcript?
23      Q       Sure.
24      A       I do not disagree with what
25      Mr. Gordon said in those sentences you read.
```

Page 366

```
 1              CHARLES McCHESNEY - CONFIDENTIAL
 2        Q        Mr. Gordon goes on to say, "So,
 3    you know, a lot can be said about fraud, a lot
 4    of references can be made to Garlock and the
 5    like, but the point is there is nothing
 6    inconsistent in that regard.
 7                 "We didn't think we were treated
 8    fairly either, it is what it is, we have
 9    settled, and this agreement takes the Debtors
10    out of the tort system, and that's the only --
11    the -- the only point that matters from an
12    estate perspective."
13                 You're welcome to read that as
14    well.
15                 The same question, do you agree
16    with what your counsel stated there?
17                 MR. RASMUSSEN:  Objection to the
18         form.
19                 MR. PHILLIPS:  Objection to the
20         form of the question.
21                 MR. HORKOVICH:  Same objections.
22        A        So, I think the first sentence
23    of the highlighted portion that you read is
24    Mr. Gordon's assessment of and response to
25    arguments that Truck made at that hearing with
```

Page 367

CHARLES McCHESNEY - CONFIDENTIAL

1    respect to the findings in the Garlock case.

2                        I've testified previously that I

3    have not read the Garlock opinion, I don't know

4    what the judge did or did not find, I do not

5    know what evidence the judge did or did not

6    hear.

7                        Mr. Gordon is much closer to the

8    Garlock hearing.

9                        I don't think that the Debtors

10   can weigh in at all on the relevance,

11   applicability, rightness or wrongness of

12   whatever was ruled in Garlock.

13                       So, I would say that's

14   Mr. Gordon's statement, that's not the Debtors'

15   statement, the rest of what he said I would

16   agree within the highlighted section.

17           Q        And by the rest, you are

18   referring to the fact that the Debtors did not

19   believe they were treated fairly in the tort

20   system?

21           A        Let me read what he said.

22                    MR. HORKOVICH:    Same objections.

23           A        The rest of what he said was,

24   "We didn't think we were treated fairly either.

Page 368

1              CHARLES McCHESNEY - CONFIDENTIAL

2      It is what it is, we have settled, and this

3      agreement takes the Debtors out of the tort

4      system and that's the only -- the only point

5      that matters from an estate perspective."

6              The Debtors agreed with that

7      statement.

8              MR. KRAKOW:  Let's take a short

9         break.  I am actually skipping past a

10        lot of what I had prepared, so we will

11        be done pretty soon.

12              (At this point in the proceedings

13        there was a recess, after which the

14        deposition continued as follows:)

15        Q      Mr. McChesney, could you please

16    find in your stack Exhibit 16, which is the

17    April 3, 2019 letter from Scott Hoyt to your

18    counsel that's been referred to as the

19    reservation of rights letter?

20        A      Okay.

21        A      I've got it.

22        Q      Did you see this letter soon

23    after it was sent?

24        A      Yes, I think either Mr. Cook or

25    Mr. Gordon forwarded it to me after they

                                      Page 369

```
 1          CHARLES McCHESNEY - CONFIDENTIAL

 2

 3              C E R T I F I C A T E

 4

 5

 6          I, STEPHEN J. MOORE, a Shorthand

 7     Reporter and Notary Public of the State of

 8     New York, do hereby certify:

 9

10          That, CHARLES E. McCHESNEY, II,

11     the witness whose deposition is

12     hereinbefore set forth, was duly sworn,

13     and that such deposition is a true  and

14     accurate record of the testimony given by

15     such witness.

16

17          I further certify that I am not

18     related to any of the parties to this

19     action by blood or marriage; and that I am

20     in no way interested in the outcome of

21     this matter.

22

23          STEPHEN J. MOORE, RPR, CRR

24

25
```

Page 400