

FILED & JUDGMENT ENTERED
Steven T. Salata

November 13 2020

Clerk, U.S. Bankruptcy Court
Western District of North Carolina



J. Craig Whitley
United States Bankruptcy Judge

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE WESTERN DISTRICT OF NORTH CAROLINA

# CHARLOTTE DIVISION

| | |
|---|---|
| In re:<br>KAISER GYPSUM COMPANY, INC., et al.,[1]<br>Debtors. | Case No. 16-31602 (JCW)<br>Chapter 11<br>(Jointly Administered) |

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

This matter arises from the Fifth Omnibus Objection to Lower Duwamish Waterway

Claims, an objection filed by debtors Hanson Permanente Cement, Inc. and Kaiser Gypsum

Company, Inc. to the claims numbered 30, 32, 48, and 56 filed by Glacier Northwest, Inc., two

against each Debtor.  Glacier subsequently withdrew its claims against Kaiser (Claim Nos. 30

and 48) and withdrew from its claims against Hanson (Claim Nos. 32 and 56) recovery of costs

incurred in response to contamination in the Lower Duwamish Waterway and recovery of future

costs to be incurred in response to contamination in the LDW or at properties currently or

formerly owned by Glacier [Docket No. 2126].

---

[1] The Debtors are the following entities (the last four digits of their respective taxpayer identification numbers
follow in parentheses):  Kaiser Gypsum Company, Inc. (0188) and Hanson Permanente Cement, Inc. (7313).  The
Debtors' address is 300 E. John Carpenter Freeway, Irving, Texas 75062.

4851-5115-0019.16

Glacier has maintained its claim against Hanson seeking recovery of past response costs incurred in the upland portion of an approximately 18-acre property owned by Glacier, located at 5900 and 5096 West Marginal Way in Seattle, Washington (the "Property"). Glacier asserts a right to contribution pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 et seq., and the Washington Model Toxics Control Act ("MTCA"), Ch. 70.105D RCW. In addition to seeking contribution for costs that it has incurred, Glacier also seeks contribution for response costs incurred by Reichhold Chemicals, Inc. ("Reichhold"), which assigned its rights to Glacier as part of a settlement reached between Glacier and Reichhold in Reichhold's bankruptcy. Glacier alleges that these combined past costs total approximately $8.6 million and seeks contribution from Hanson for thirty-seven and one-half percent (37.5%) of these past costs, or $3,230,597. Hanson has objected to Glacier's claim arguing that it is not a liable party or, alternatively, if liable, it should be allocated only a de minimis share of the costs incurred.

This claim objection was heard by the Court on June 24, 25, and 30 and July 1, 2020. Hanson and Kaiser Gypsum Company, Inc. (collectively, "Debtors") were represented by C. Marie Eckert of Miller Nash Graham & Dunn, LLP, Gregory M. Gordon and Paul Green of Jones Day, and Jack Miller of Rayburn Cooper & Durham, P.A. Glacier was represented by Amit D. Ranade of Hillis Clark Martin & Peterson P.S. Due to CV-19 and the ensuing "stay at home' orders" issued by various Governors, and with the consent of the parties, this hearing was conducted by videoconferencing technology. Extensive evidence, including testimony and documents, was presented at the hearing, and each party presented a closing argument. At the conclusion of the hearing, the Court requested that each party submit proposed findings of fact and conclusions of law. The Court has carefully considered the parties' pre-hearing briefs, the

4851-5115-0019.16

testimony presented at the hearing, the exhibits admitted into evidence, oral arguments of

counsel, and proposed findings of fact and conclusions of law.  The Court, being fully advised,

now makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

### A.   HISTORIC OWNERSHIP AND OPERATIONS

1.      Since 1991, Glacier has owned the Property, which is comprised of an upland

portion of about 13.8 acres and an aquatic portion of about 4.2 acres [Amended Joint Statement

of Stipulated Facts [Docket No. 2295] ("JSF") ¶ 3]. The aquatic portion is within an embayment

in the Lower Duwamish Waterway ("LDW"), commonly known as Glacier Bay [*Id.*].

2.      The Property is in a historically industrial part of Seattle, where the Duwamish

River has been dredged into a deeper water channel known as the Lower Duwamish Waterway

("LDW"). Sediments in the LDW are heavily polluted with hazardous substances. The LDW is a

federal Superfund site and is on the Hazardous Sites List maintained by the Washington

Department of Ecology ("Ecology"). The U.S. Environmental Protection Agency ("EPA") and

Ecology have parceled oversight responsibilities between them. EPA is the lead agency

overseeing the investigation and cleanup of LDW sediments, while Ecology is the lead agency

overseeing the investigation and cleanup of properties that are potential sources of contamination

to the LDW. With respect to the Property, the allocation of responsibility means EPA is leading

investigation and cleanup of the sediments in the aquatic portion of the Property while Ecology

is leading investigation and cleanup of the upland portion of the Property.

3.      In the 1920s, the Duwamish River was dredged and straightened into a deeper

water channel to accommodate marine transportation and the growth of industrial activities along

the river. Dredged material was deposited on the Property and other riverfront properties.

Industrialization in the area was in its nascent stages at the time.

- 3 -

4.      For nearly thirty years prior to the time that Hanson began leasing the Property in 1965, there were extensive industrial operations that both parties agree led to contamination of soil and groundwater at the Property [*See* JSF ¶¶ 4-16].  The prior contaminating operators and the periods of their respective operations include, among others, Mineralized Cell Wood Preserving Company (1936-1939), the United States by and through Carlisle Lumber Company (1940-43) and Crown Zellerbach Corporation (1943-44), and Reichhold Chemicals, Inc. (1946-1961) [*Id.*].

5.      Between 1936 and 1939, Mineralized Cell Wood Preserving Company ("Mineralized Cell") used portions of the Property to treat and preserve timber [JSF ¶ 5].  This process involved applying a solution containing arsenic, copper, and zinc to the ends of freshly cut logs, with excess solution dripping to the ground [*Id.*]. Mineralized Cell is now defunct. Mineralized Cell's operations are a source of arsenic, copper, and zinc at the Property [*Id.*]. During the period of Mineralized Cell's operations, the Property was owned by King County, Washington ("King County") [JSF, App. 1].

6.      Between 1940 and 1944, the United States Army and entities it contracted with used portions of the Property to manufacture activated charcoal and whetlerite for use in gas masks [JSF ¶ 6].  Between 1940 and 1942, under contract with the United States, Carlisle Lumber Company ("Carlisle") constructed a manufacturing plant for this purpose on the northern end of the Property [*Id.*]. Carlisle operated this plant until February 1943, at which point the United States awarded a contract to Crown Zellerbach Corporation ("Crown"). Crown upgraded the Army plant and operated it until November 1944 [*Id.*].

7.      The Army plant consisted of structures made of wood and corrugated metal with steel frames.  Some structures had wooden floors; others stood on concrete slabs no thicker than

- 4 -

four inches.  Given the types of foundation, flooring, and materials used for these structures, the construction during this period required relatively minimal soil excavation [Ex. 33].

8.      The operations of the United States, Carlisle, and Crown are a source of arsenic, carcinogenic polycyclic aromatic hydrocarbons ("cPAHs"), copper, dioxins and furans, polychlorinated biphenyls ("PCBs"), total petroleum hydrocarbons, and zinc at the Property [JSF ¶ 6].  During the period when the United States, Carlisle, and Crown operated the Property, the Property was owned by the following entities: King County (1940-April 1943), Carlisle-related entities (April 1943-July 1943), and the United States (July 1943-November 1944) [JSF, App. 1].

9.      A 1945 report by the Washington Pollution Control Commission noted that Crown's activities included dumping discarded charcoal and sawdust on the ground [JSF ¶ 7]. The report also observed that Crown was discharging copper ammoniate, a byproduct of the manufacturing process, that drained into the LDW and recommended that Crown instead dump the byproduct on land upland from the LDW [*Id.*]. The report noted that this part of the Property was already being used as a "dumping ground" by Crown for discarded charcoal and sawdust [Ex. 9 at 11-12].

10.     From 1946 to 1961, the United States continued to own the Property and leased the Property to Reichhold to operate a chemical manufacturing plant [JSF ¶ 9 & App. 1].  The lease required Reichhold to maintain the charcoal/whetlerite structures, machinery, and equipment in case the United States needed to resume production [JSF ¶ 9].  Reichhold used the Property to produce resins, glues, formaldehyde, pentachlorophenol ("PCP"), and sodium pentachlorophenate [JSF ¶ 10]. To do so, Reichhold retrofitted some existing structures and constructed new improvements, including an aboveground tank farm to store chemicals, a boiler house, a railroad spur, a cooling tower, a plant office, and experimental laboratory, pilot

- 5 -

production plants (on the north-central portion of the Property) for PCP and sodium

pentachlorophenate, and other improvements. Reichhold's new buildings were made of wood

and corrugated metal with steel frames. They stood on the same types of foundations as the

Army structures [*Id.*].

11.     Between 1946 and 1956, Reichhold constructed unlined drainage ditches to

convey chemical wastes from its manufacturing process [JSF ¶ 11].  In 1955, Reichhold

constructed a washwater impoundment in the central portion of the Property to collect waste and

washwater for infiltration into the soil [*Id.*]. Reichhold's operations are a source of carcinogenic

polycyclic aromatic hydrocarbons ("cPAHs"), dioxins and furans, polychlorinated bi-phenols

("PCBs"), PCP, total petroleum hydrocarbons, and other phenols at the Property [JSF ¶ 15].

Reichhold ceased production in 1958 and used the Property as administrative offices and

laboratory space until 1961 [JSF ¶ 13].  Upon termination of its lease, Reichhold abandoned the

chemical plant, leaving some equipment in place.

12.     The structures constructed by Mineralized Cell, Carlisle, Crown, and Reichhold

stood on the material dredged from the Duwamish River in the 1920s. Chemicals spilled or

released by Mineralized Cell, Carlisle, Crown, or Reichhold would have deposited onto this

"dredge fill" layer [Docket No. 2291 at ¶ 16; Ex. 33 at 3; Ex. 2 at Figures 2-13 to 2-19, 5-1 to 5-

19, and 7-3 to 7-16].

13.     The Port of Seattle acquired the Property from the United States on June 1, 1964

[JSF, App. 1].

14.     Terminal 115, also owned by the Port of Seattle, abuts the southern boundary of

the Property.  Beginning in November 1969, the Port of Seattle embarked on a project to further

expand Terminal 115 with extensive filling, dredging, and excavation [Ex. 234 at

4851-5115-0019.16

GLACIER06592; Ex. 209 at 11]. In approximately 1970, material was placed on the Property

along the southern shoreline of the Property during the Port of Seattle's Terminal 115

construction activities [JSF ¶ 22]. This fill material increased the size of the upland portion of

the Property and contamination has been detected in this area of filling [*Id.*]. A portion of the

expanded shoreline created by the Port extended as much as 55 feet onto the Property [Ex. 234 at

GLACIER06592; Ex. 209 at 11]. Terminal 115 has been expanded through extensive filling, a

majority of which occurred between the 1950s and 1971 [Ex. 234 at GLACIER06659].

Approximately the southern third of the Property's shoreline was expanded eastward by as much

as 20 feet prior to 1963 with unknown fill material [Ex. 1, Figure 2-21 (GLACIER15416); Ex.

209, at 11-12].

**B.    HANSON'S TENURE AT THE PROPERTY**

15.    Hanson entered into a long-term lease of the Property (the "Port-Hanson lease")

with the Port of Seattle on January 1, 1965 [JSF ¶ 17]. On May 13, 1969, Hanson entered into a

real estate contract with the Port of Seattle to purchase the property [JSF ¶ 21]. On September

17, 1973, Hanson acquired title to the property by fulfillment deed [*Id.*].

16.    Under the Port-Hanson Lease, Hanson leased the Property for the purpose of

constructing a cement manufacturing plant. The Port-Hanson Lease required Hanson to expend

at least $10 million to construct its cement facilities on the Property [*Id.*]. The Port-Hanson

Lease also required Hanson to demolish all existing structures [Ex. 230; Ex. 231; Ex. 49].

17.    Hanson did not construct the proposed plant, but rather, built a bulk cement

storage and distribution terminal facility [JSF ¶ 17]. The cement terminal included storage silos,

storage bins, a scale house, a conveyor system, a shop building, a dock, and a stormwater swale

system. Hanson's engineers designed the existing facilities. Hanson engaged Duwamish

Shipyards, Inc. and other contractors to demolish the structures [JSF ¶ 18]. Based on available

4851-5115-0019.16

records, it appears that the existing structures at the Property were demolished between 1965 and 1967 and the new cement distribution terminal was constructed between 1967 and 1968 [*See* Ex. 209 at 5].

18.    The cement distribution terminal included storage silos, storage bins, a scale house, a conveyor system, a shop building, a dock, and a stormwater swale system.  Hanson had the authority to control and did control the project that converted the Property from a chemical plant to a cement distribution terminal [Docket No. 2291 at ¶ 18; Exs. 1, 2, 36, 38, 45, 46, 50].

19.    Foundations for the new buildings were poured to depths of approximately four feet below the ground surface [JSF ¶ 19]. This is in contrast to the foundations under the Army and Reichhold structures which were no more than four inches thick. The silos also required support pilings driven up to 90 feet into the earth. The scale of the earthwork required to construct the cement distribution terminal was substantially larger than any prior excavation/construction performed by Carlisle, Crown, or Reichhold.

20.    Aerial photographs taken during the time of Hanson's construction of the cement terminal show growing numbers of large stockpiles of soil and debris in the central and southern portion of the Property as the chemical plant is demolished and soil is excavated from under and around the chemical plant.  The photographs also show vehicle tracks leading from demolition and excavation areas to the shoreline of the Property.  A comparison of the photographs taken in this time period shows the upland portion of the Property increasing in size as fill material is placed along the shoreline.  Although there is no direct evidence, it appears that Hanson or its contractors stockpiled soil and debris generated from its demolition and earthwork activities and used the soil and debris as fill material along the shoreline of the Property, increasing the size of the upland portion of the Property [JSF ¶20; Exs. 51-53].

4851-5115-0019.16

21.     By 1974, Hanson had graded the southern portion of the Property and turned it into a parking lot and storage area. In approximately 1975, Hanson installed a stormwater system in the southern portion of the Property. The stormwater system consisted of catch basins and a pipe that tied into a 48-diameter stormwater line located south of the Property [JSF ¶ 23]. In 1976, Hanson constructed a warehouse building in the northwestern portion of the Property [JSF ¶24]. These activities further disturbed the soil [JSF ¶¶ 22–24; Exs. 1, 2; Ex. 207(a) at Figure 5].

22.     The entire Property is now covered with a three to five-foot layer of "shallow fill" material sitting on top of the "dredge fill" material on which Mineralized Cell, Carlisle, Crown, and Reichhold constructed and operated their facilities. Likewise, a consistent "riverbank fill" material now covers the entire length of the Property's shoreline, from the surface down to the riverbed. These layers of "shallow fill" and "riverbank fill" did not exist in 1963, after Reichhold vacated the Property and before Hanson's redevelopment project [Ex. 2 at Figures 2-13 to 2-19, 5-1 to 5-19, and 7-3 to 7-16; Ex. 32].

23.     The shallow fill and riverbank fill contain elevated concentrations of arsenic, cPAHs, copper, dioxin and furans, PCBs, PCP, total petroleum hydrocarbons, and zinc. These substances are the same chemicals associated with the operations of Mineralized Cell, Carlisle, Crown, and Reichhold. There is no evidence that Hanson or successor owners or operators of the Property, including Glacier, spilled or released these chemicals in the course of their normal business operations [*Id.*].

24.     The hazardous substances in the shallow fill and riverbank fill did not migrate there through natural forces. The hazardous substances in the shallow fill are located above the groundwater table, which means they could not have been transported there through groundwater. This is also true for the hazardous substances in the riverbank fill located above the

- 9 -

groundwater table. As for the hazardous substances in the riverbank fill at or below the groundwater table, the concentrations of them are too high to be explained by migration through groundwater [*Id*.].

25.    Based on the evidence presented, several parties contributed to the contamination of soils found on the Property, including Mineralized Cell, Reichhold, and Carlisle. Hanson did not create the contamination, but it had the largest role in dispersing contaminated soils across the Property, including the shoreline. Whether Hanson was aware of the contamination at the time it owned the property is a disputed matter discussed below.

26.    By 1987, Hanson ceased operations or sold all its facilities in the Seattle area [Declaration of Charles E. McChesney II in Support of Debtors' Fifth Omnibus Objections to Claims ¶ 6 [Docket No. 2029, Ex. A]].  As part of this divestment of Seattle area operations, Hanson sold the Property to Lone Star Industries, Inc. on April 10, 1987 [JSF, App. 1]. If Hanson was aware of contamination on the Property, there is no evidence that it disclosed the same to Lone Star [Ex. 57]. Lone Star Industries, Inc. sold the Property to Lone Star Northwest, GP on December 17, 1987 [JSF, App. 1]. Lone Star Northwest, GP sold the Property to Glacier (then known as Lone Star Northwest LP) on April 12, 1991 [*Id;* JSF ¶ 27].  During the period of Lone Star Industries and Lone Star Northwest, GP ownership, Ash Grove Cement Company ("Ash Grove Cement") operated the cement terminal at the Property [JSF, App. 1].

27.    From 1991 to the present, Glacier has owned and conducted operations at the Property [JSF ¶ 27].  Like Hanson, Glacier uses the Property as a wholesale bulk cement distribution terminal and stores and distributes cement and related cementitious products at and from the Property [*Id.*]. As with Hanson, Glacier's operation of the cement facility does not

4851-5115-0019.16

appear to have caused any contamination of the Property. Nor did Glacier distribute the

contamination, the Property having been fully developed prior to its ownership.

## C.    WHETHER HANSON HAD KNOWLEDGE OF THE PROPERTY'S CONTAMINATION AT THE TIME OF CONSTRUCTION OR THEREAFTER

28.    The parties disputed at the hearing whether Hanson was aware of the contamination

at the Property when the demolition and construction activities starting in approximately 1965, or

during the period of its occupancy of the Property [*E.g.,* Glacier's Pre-hearing Brief Docket No.

2281 at 1, 4-6; Hanson's Pre-hearing Brief Docket No. 2290 at 13-14, 17-19]. The question of

Hanson's knowledge of contamination is important to a fair allocation of past response costs, yet

it is also difficult to gauge. A half-century has passed since the operative events, such that no one

with personal knowledge was available to testify.  Moreover, environmental sciences were then

in their infancy.  EPA and CERCLA did not yet exist.  As noted below, purchasers of

commercial real estate transfers did not routinely conduct environmental examinations as part of

their preclosing due diligence [*See* ¶ 31]. And to the extent anyone during this period might be

aware of onsite environmental contamination, the widely accepted practice was to simply bury

the material—on the (greatly erroneous) assumption that over time, the contaminants would be

rendered nontoxic.  Thus, the available evidence as to whether Hanson was aware of any

contamination at the Property, and if so, to what extent Hanson appreciated its toxicity is scant.

What evidence there is, is circumstantial.

29.    Hanson contends that no one identified or knew of contaminated conditions at the

Property until the first environmental investigations of the Property were made in the mid-1980s.

Hanson points to non-environmental geotechnical soil sampling done for Hanson in 1964 and

1966 that did not identify any signs of contamination such as odors or discolorations [*See* Ex. 43-

44].

- 11 -

30.      Meanwhile, Glacier asserts that Hanson must have known about the
contamination at the Property for three reasons: (1)  Reichhold's contaminating activities were
documented in records of Washington's Pollution Control Commission ("PCC") during the
1950s, and those documents were public records; (2) Hanson should have been aware of
Reichhold's contaminating activities because Hanson owned property across the river from
Reichhold's plant, and; (3) workers and contractors would have or should have smelled and
reported to Hanson chemical odors while conducting the demolition and construction activities
on the Property.

31.      In support of its first argument, Glacier introduced several PCC memoranda and
communications from the 1950s between Reichhold and the PCC discussing neighbor
complaints about odors, unnaturally colored effluents and discharges in the LDW, and "fish
kills" all attributed to the release of chemicals by Reichhold at the Property [JSF ¶ 14; Exs. 9-
27]. The mere existence of historical documentation regarding the impact of Reichhold's
pollution to the waterway during the 1950s, however, does not establish that Hanson knew or
should have known of contamination of the upland portions of the Property more than a decade
later when it leased the Property in 1965.  Glacier did not introduce any evidence that Hanson
was aware of the PCC records, which date back to the 1940s and 1950s, decades before Hanson
leased that property, decades before the passage of CERCLA or MTCA, and at a time when the
lasting impact of environmental contamination was not generally understood.

32.      Nor did Glacier introduce any evidence that it would be a customary practice for a
prospective lessee of commercial or industrial property to make a public records request or
conduct environmental due diligence of any sort at the time Hanson leased the Property in the

- 12 -

4851-5115-0019.16

mid-1960s.  In fact, Glacier's own expert, Philip Spadaro of The Intelligence Group ("TIG"),

confirmed that no such practice existed in that timeframe:

> **Ms. Eckert:** . . . So, Hanson would have been looking at the property . . . sometime in
> 1964 . . . I assume there was no practice at that time of doing environmental
> investigations or assessments at a property prior to lease or purchase, is that fair?

> **Mr. Spadaro:** Yes.  That's, that's quite true. . . .

[Trans. at 300].

33.    Moreover, Hanson points to evidence that suggests that the successor agency to

the PCC, Ecology, apparently as late as 1985 did not believe that Reichhold's pollution in the

waterway equated to pollution of the upland.  In a letter to Hanson's predecessor, Kaiser Cement,

dated January 4, 1985, Ecology enclosed an environmental report prepared for the EPA [Ex. 48].

EPA concluded, based on that report, that "[a]fter considerable investigation, . . . there is no

evidence that hazardous waste is, or ever was, disposed of on-site" [*Id*.]. Given that Ecology and

EPA, two regulatory agencies with obvious access to public records, lacked knowledge of

contamination at the Property in 1985, it would be improper to impute such knowledge to

Hanson in 1965.

34.    Further, Glacier, which purchased the Property in 1991, 26 years after Hanson

leased the Property and over a decade after the passage of CERCLA and MTCA, did not

introduce any evidence that Glacier itself searched public records or conducted environmental

due diligence on the Property prior to its purchase.

35.    Hanson argues that the only two environmental investigations of the Property

conducted during Hanson's tenure occurred twenty years after Hanson first leased the Property,

and Hanson contends that neither of these investigations concluded that there were

environmental conditions requiring remediation. Glacier suggests the opposite: that these reports

- 13 -

warned Hanson that it should investigate further, but that it chose not to [Exs. 47-48]. This Court has evaluated the evidence and agrees with Hanson.

36.    The earliest environmental investigation of the Property identified by either party was done in 1984 by JRB Associates, which performed a preliminary assessment evaluation of the Property on behalf of the EPA.  The EPA recommended, based on the JRB Associates evaluation, "no further action," [Ex. 48], and EPA concluded that "there is no evidence that hazardous waste is, or ever was, disposed of on-site" [JSF ¶ 25].

37.    The second investigation occurred in 1985 when Parametrix, Inc. conducted an environmental audit of a portion of the Property in connection with a potential purchase by the Port of Seattle [*Id.*].  The Parametrix audit detected arsenic and phthalates in soil samples, but other chemicals of concern were not detected, including volatile organic compounds, semivolatile organic compounds, cPAHs, and PCP [Ex. 228].  Based on the evidence presented at the hearing, this Court finds that this 1985 Parametrix environmental audit is the earliest discovery of environmental contamination on the upland portion of the Property at issue in this proceeding.

38.    Glacier's second argument on the question of Hanson's knowledge is that during the time period in which Reichhold operated, Hanson owned land "about 165 yards from the Property" across the LDW from the Reichhold plant and therefore must have been aware of Reichhold's polluting activities.  No party introduced any evidence of whether the Property at issue could be seen or heard from this other property, and Glacier's expert, Mr. Spadaro, testified that any smells would not have traveled more than "[t]ens of yards" [Trans. at 229].  The little evidence that was adduced at the hearing on this point does not establish that Hanson knew or should have known that the upland portion of the Property was contaminated by Reichhold based

- 14 -

on Hanson's ownership of a different property on the other side of the river.  In addition, even if

Hanson had been aware of pollution of the waterway by Reichhold operations that ceased by

1958, it would not prove that Hanson should have been aware that the upland Property at issue in

this matter was contaminated in 1965 when Hanson first leased the Property.

39.    Glacier also presented evidence to support its contention that Hanson would likely

have become aware of contamination at the time it leased and began demolition work at the

Property because workers or third-party contractors would have smelled odiferous contaminants

left on the Property by Reichhold.  However, the sole evidence to support this contention was the

opinion of Glacier's expert, Mr.  Spadaro, who offered that odiferous chemicals, particularly

pentachlorophenol, could have been smelled on the Property during Hanson's demolition and

construction activities.  This opinion was contradicted by the opinion of Hanson's expert, Ryan

Bixby of Sound Earth Strategies ("SES"), who testified that in the "part-per-million

concentrations detected at the property," pentachlorophenol was "unlikely to have exhibited an

odor" [Trans. at 357].  Glacier did not introduce any evidence that any worker or contractor

reported to anyone, let alone Hanson, any chemical odors at the time of the demolition or

construction activities.  At the hearing, Hanson's expert also pointed to two foundation

investigations and engineering reports in 1964 and 1966, respectively, involving the collection of

subsurface samples and soil cores on the Property that were conducted for Hanson in advance of

construction of the cement storage and distribution facilities on the Property. Neither of those

investigations contains any references to chemical odors or staining or discoloration of the

sampled soils [Exs. 35-45].  During his testimony, Mr. Spadaro noted that the 1985 Parametrix

environmental audit report recorded some high readings of organic vapors, which might indicate

odors [Trans. at 227].  The report itself, however, concluded that those vapors were likely

- 15 -

methane [Ex. 228 at KC2006015], which Mr. Spadaro acknowledged is an odorless gas [Trans. at 308].

40.     The only other testimony relating to odors was by Peter Stolz, Glacier's Manager of Permitting and Government Affairs, who manages Glacier's investigation and remediation efforts at the Property. Mr. Stoltz conceded that he was not present at the Property during the late 1960s when the cement terminal was constructed, but testified  that in 1995 or 1996, while employed as an environmental consultant for a different company, he took a "sediment grab" sample at the Duwamish Shipyards property located to the north of the Property, in a location where the outfall from Reichhold's operations would have entered the LDW, and that this sediment grab had a very strong ammonia smell [Trans. at 84-86].  Because the sample was taken at the adjacent Duwamish Shipyards property almost forty years after Reichhold ceased operations, it is unknown whether Reichhold's operations caused the ammonia odor or whether the odor was attributable to some other entity or operation.  In addition, the sample was taken from river sediment, not the uplands where the cement terminal was constructed and where the Property would have been disturbed as part of the demolition and construction activities that occurred in the late 1960s.  Moreover, the record of environmental investigation activities established in this case demonstrates that Glacier itself has been engaged in investigation and remediation activities at the Property since the early 1990s [Ex. 1 at GLACIER15315-GLACIER15321].  Mr. Stoltz testified that, during the entirety of that time, he was unaware of any worker at the site having reported any noxious odors [Trans. at 203].

41.     After evaluating fully the above-referenced evidence, this Court finds that Glacier has not met its burden of proof to show that Hanson knew or should have known that the Property was contaminated at the time that it conducted its construction activities, including

- 16 -

when Hanson first leased the Property, when it engaged contractors to demolish buildings and

construct the cement terminal, or at any other time prior to the 1985 Parametrix environmental

audit.

## D.    ENVIRONMENTAL CLEANUP AND PROCEDURAL POSTURE

42.    The lower 5 miles of the LDW, including the aquatic area of the Property, was

added by the EPA, in accordance with regulations promulgated under CERCLA, to the

Superfund National Priorities List in 2001 [Ex. 1 at GLACIER15286]; this designated area is

referred to as the Lower Duwamish Waterway Superfund Site (the "LDW Superfund Site").  In

2014, the EPA issued a final CERCLA Record of Decision that selected the cleanup remedy for

sediments within the LDW Superfund Site, including sediments within the aquatic portion of the

Property [*Id.*].

43.    In 2010, Hanson received a CERCLA Section 104(e) Information Request from

EPA in connection with the LDW Superfund Site [*See* Ex. 30]. Hanson responded to that EPA

information request and identified its past ownership of the Property in its response [*Id.*].

Further, as has been argued by both parties and attested to numerous times in these bankruptcy

proceedings, including by witnesses for both Hanson and Glacier, Hanson was invited to

participate in a confidential non-judicial alternative dispute resolution process with dozens of

other LDW Superfund Site potentially responsible parties ("PRPs") (including Glacier) designed

to allocate response cost responsibility in connection with the LDW Superfund Site (the "LDW

Allocation Process") [Hanson Pre-hearing Brief at 8; Declaration of Charles E. McChesney II in

Support of First Day Pleadings ("First Day Decl.") ¶ 33 [Docket No. 13]; Glacier Northwest,

Inc.'s Motion *in Limine* to Exclude Debtor's Exhibit 212 ("Glacier MIL") at 3 [Docket No.

2300]; Declaration of Howard Jensen in Support of Glacier MIL ("Jensen Decl.") ¶ 2 [Docket

No. 2300, Unnumbered Exhibit]].  The LDW Allocation Process involves only in-water LDW

4851-5115-0019.16

Superfund Site response costs and response actions: it does not include upland Property at issue

in this case [Hanson Pre-hearing Brief at 8; Jensen Decl., Ex. 3 at § 1.4 (defining "Claims

Addressed in the Allocation Process" as "shall not include . . . (3) costs for investigations and

cleanups performed under MTCA not relating to implementing the Lower Duwamish Waterway

[Superfund Site] AOC, ROD or Consent Decree")]. Hanson joined the LDW Allocation Process

shortly after being invited to do so and has been a participant and funder of the LDW Allocation

Process since that time [Hanson Pre-hearing Brief at 8; First Day Decl. ¶ 33; Jensen Decl. ¶ 2].

44.     Hanson contends, and no contrary evidence was proffered, that it has never been

asked by the EPA, Ecology, or any other environmental regulatory authority to participate in,

fund, or otherwise, be involved in any investigation or remediation activities associated with the

environmental contamination at the Property [Hanson Pre-hearing Brief at 8].

45.     Glacier introduced into evidence a letter dated January 8, 1993, addressed to

"Kaiser Sand & Gravel, Inc." asking that entity to participate in investigation activities at the

Property [Ex. 59]. But Glacier offered no evidence to establish who the entity "Kaiser Sand &

Gravel, Inc." is, what this entity's connection to the Property may be, or this entity's connection,

if any, to Debtor Hanson. No entity named Kaiser Sand & Gravel, Inc. is identified in the

parties' Joint Statement of Stipulated Facts as an owner or operator of the Property [JSF, App.

1]. And no entity named Kaiser Sand & Gravel, Inc. was identified by the Debtors in reciting

Hanson's corporate history to this Court at the time the petitions were filed in these bankruptcy

proceedings [First Day Decl. ¶ 9].

46.     After acquiring the Property in 1991, and upon discovering contamination,

Glacier invited Hanson, Reichhold, and others to join in an investigation and cleanup effort. The

invitation was not accepted. In 1993, Glacier commenced a lawsuit against Reichhold (but not

4851-5115-0019.16

Hanson) under CERCLA and MTCA seeking recovery of response costs and remedial action

costs at the Property [JSF ¶ 28].  In 1995, Glacier and Reichhold settled that lawsuit by agreeing

to cooperate and share costs of investigation and remediation of the Property on a 75%

Reichhold/25% Glacier basis [*Id.*]. Reichhold took the lead in managing the work [Exs. 59, 63].

47.    Prior to July 2009, Glacier and Reichhold conducted their remedial actions

voluntarily and without formal oversight by Ecology [JSF ¶ 29].  Effective July 28, 2009,

Glacier and Reichhold entered into an Agreed Order with Ecology that obligated Glacier and

Reichhold to complete a Remedial Investigation ("RI") and a Feasibility Study ("FS") and

develop a draft cleanup action plan for the Property [*Id.*].

48.    In a letter dated August 10, 2011, Ecology stated that the draft work plan for

RI/FS submitted by ERM-West, Inc. ("ERM")  on behalf of Glacier and Reichhold "did not

incorporate many of the previously requested edits/changes/additions" that were required by

Ecology to be incorporated pursuant to the terms of the Agreed Order between Ecology,

Reichhold, and Glacier [Ex. 205, GLACIER03706].  The Ecology letter characterized the draft

RI/FS work plan as "disappointing" because "an enormous effort was made to be thorough and

clear on what would be required for an adequate RI/FS Work Plan for this Site" [*Id.*].   Ecology

sent additional letters to ERM regarding the draft RI/FS Work Plan on April 11, 2012 [Ex. 232]

and June 29, 2012 [Ex. 233]. In a letter dated August 31, 2012, Ecology informed ERM that it

had completed the RI/FS Work Plan itself after Glacier and Reichhold "made insufficient

progress" [Ex. 206, at GLACIER05105].   Hanson's Expert, Mr. Bixby, opined that it was an

"extremely unusual and rare occurrence" for Ecology to take over work that the PRPs have

agreed to perform [Ex. 207 at 11]. Mr. Stoltz testified that, during his 30-year career, he was only

aware of one other instance in which Ecology had taken over the work of the PRPs [Trans. at

180-81]. Hanson suggests that Glacier was not cooperative with Ecology and not acting responsibly in dealing with the contamination issue.

49.     Glacier's manager/witness, Stolz disagreed. He characterized this as a good faith disagreement by Glacier with Ecology over the necessary scope of work to complete the investigation of the Property. Stolz testified that Ecology eventually came to agree with Glacier and Reichhold and that their efforts saved approximately $1.5 million and protected the deep aquifer from contamination.  The evidence is not sufficiently clear to draw any firm conclusion whether Glacier had legitimate disagreements with Ecology about the investigatory work or whether it was dragging its feet.

50.     In 2014, Reichhold commenced a Chapter 11 bankruptcy case [JSF ¶ 30]. Glacier filed a timely proof of claim.  In 2015, Glacier and Reichhold entered into a Settlement Agreement to resolve Glacier's objection to the terms of a proposed bankruptcy auction to sell Reichhold's assets free and clear of successor liability under Section 363 of the Bankruptcy Code [*Id.*].  Under this 2015 Settlement Agreement, Glacier released and waived all of its claims against Reichhold and Reichhold assigned to Glacier the right to recover from third parties all costs, fees, and expenses incurred by Reichhold in response to contamination at the Property [Ex. 63].

51.     In January 2020, Glacier submitted to Ecology a draft RI prepared by its consultant ERM[2]  [JSF ¶ 31].  The draft RI describes the sources, nature, and extent of the contamination at the Property.  Both parties relied on the report in the evidentiary hearing.  In

---

[2] During discovery, Glacier produced at least two copies of the ERM RI, which had different bates-numbers. Glacier submitted Volume I of the draft RI as Ex. 1. Because Hanson's expert reviewed and cited in his expert reports to a copy of Volume I of the draft RI with different bate-stamp numbers, Hanson submitted that second copy of the draft RI as Ex. 234. Although they have different bate-stamp numbers, the parties have stipulated that the two RI/FS documents are admitted as part of Ex. 1 and admitted as Ex. 234 are the same document.

4851-5115-0019.16

April 2020, Glacier submitted to Ecology a draft FS prepared by ERM [JSF ¶ 32]. The draft FS identifies cleanup alternatives and the "preferred alternative." The estimated costs of the cleanup alternatives range between $9.9 million and $74.5 million.

52.     Glacier maintains that it and Reichhold have together incurred at least $8,604,890.98–$8,611,943.46[3] in past remedial action costs which it maintains relate to contamination at the Property. Glacier seeks contribution from Hanson for thirty-seven and one-half percent (37.5%) of these past costs, or $3,230,597. Glacier submitted into evidence invoices issued to Glacier and Reichhold. The costs fall into three categories: (a) costs incurred jointly by Glacier and Reichhold under the 1995 settlement agreement; (b) costs incurred solely by Glacier; and (c) costs incurred solely by Reichhold. Of the total remedial action costs, Glacier paid $3,015,937.20, and Reichhold paid $5,596,006.26[4] [Ex. 64; Exs. 65–78; Ex. 3 at 19–20]. As discussed below, Hanson disputes much of these costs.

## RULINGS ON EVIDENTIARY MOTIONS

i.     Glacier's *Daubert* motion and Hanson's counter *Daubert* motion are denied.

53.     Before the hearing, Glacier filed a Motion *In Limine* to Exclude Debtor's Expert Witness ("Glacier's *Daubert* Motion"). Hanson filed a Response to Glacier's Motion *In Limine* and an Alternative Conditional Motion *In Limine* to Exclude Portions of Glacier's Expert Witness ("Hanson's Countermotion"). The basis for both motions was that portions of the experts' methodologies were not "testable". Glacier argued that the entirety of the report of Hanson's expert witness, Mr. Bixby, was based on professional opinion rather than a testable algorithm. Glacier also argued that Hanson's expert should be excluded because his report

---

[3] In its proposed findings, Glacier asserts $8,611,943.46 as the exact past remediation cost. However, Glacier's expert Spadaro, calculated this number at $8,604,890.98 [*See* Glacier Ex. 3, p.19]. As the latter number was supported by the evidence, we will use it.

[4] Again, based upon the higher $8,611,943.46 number.

provided improper legal conclusions by analyzing data under the Gore Factors.  Hanson

countered that testability is not required for the kind of testimony offered by Mr. Bixby and Mr.

Spadaro and that the Gore Factors provide technical considerations that may be properly

examined in an expert report without providing a legal conclusion.  Alternatively, Hanson argued

that if the Court finds that testability is required under the *Daubert* standard*,* then Steps 6 and 7

of Mr. Spadaro's expert report (which apply an exacerbation factor and reallocate non-

participating PRP shares) suffered from the same deficiency and should also be excluded.

54.    The Court agrees that lack of testability does not require exclusion under *Daubert*

for expert testimony in the realm of allocation of liability under CERCLA and MTCA.  The

experts in this case each possess a high level of technical expertise and experience, and both

have addressed technical data and the allocation of cleanup costs, the latter of which inherently

involves some subjectivity that does not lend itself to testing.  As this subject matter does not

lend itself to purely testable expert opinions, the testability factor under *Daubert* is not a

reasonable measure of the reliability of expert testimony here [*See Kumho Tire Co., Ltd. v.

Carmichael*, 526 U.S. 137, 149-53 (1999) ("[W]e can neither rule out, nor rule in, for all cases

and for all time the applicability of the factors mentioned in *Daubert*. . . . [W]e conclude that the

trial judge must have considerable leeway in deciding in a particular case how to go about

determining whether particular expert testimony is reliable"); *see also B.F. Goodrich v. Betkoski*,

99 F.3d 505, 524-25 (2d Cir. 1996), *overruled on other grounds by New York v. Nat'l Serv.

Indus., Inc.*, 352 F.3d 682, 685 (2d Cir. 2003) (recognizing that "certainty . . . is not always a

realistic goal in environmental science, where certainty can be elusive")].  The testimony of both

experts is helpful to the Court. The experts analyzed the substantial technical empirical data,

summarized and evaluated decades of historical information and underlying facts, and provided

4851-5115-0019.16

their professional opinion as to what inferences, if any, should be drawn from that information and those facts.

55.    Glacier's second argument for exclusion was that Hanson's expert, Mr. Bixby, posited improper legal opinions in his expert report by relying on the Gore Factors.  An expert's opinion derived from the expert weighing the Gore Factors may well invade the province of the Court [*See Chitayat v. Vanderbilt Assocs.*, No. CIV A 03-5314 DRH ML, 2007 WL 2890248, at *6 (E.D.N.Y. Sept. 27, 2007)].  And, in this regard, both expert opinions either expressly rely upon or incorporate elements of the Gore Factors.  However, in his expert report and testimony, Mr. Bixby also analyzed a substantial volume of historical documents and technical data regarding the Property and provided information useful to the Court in exercising its equitable powers and consideration of appropriate equitable factors.  In addition, Mr. Bixby's expert rebuttal report provides an opinion based on the same algorithm used by Glacier's expert and thus would contain the same legal conclusions as Mr. Spadaro's opinion.  To the extent that either expert provided testimony based solely on speculation or testimony that presents a legal conclusion, the Court will disregard that testimony.  However, the Court denies Glacier's *Daubert* Motion and Hanson's Countermotion because testability is not a good indicator of reliability in this case; Mr. Bixby's expert reports and testimony are sufficiently reliable and aid the Court's decision-making.

ii.    Portions of Peter Stoltz's testimony are excluded.

56.    Peter Stoltz, an employee at Glacier, provided extensive testimony regarding historical events and documents at the Property.  This testimony included providing his personal opinion on what Hanson would have observed when it first arrived at the Property in 1965, what fish kills in the 1950s would have looked like, and other similar glosses on historical events at the Property that Mr. Stoltz did not personally witness.  Mr. Stoltz also explained his knowledge

of the Property's history as having been gained by "studying online and reading . . . and tr[ying] to learn everything I could about what was done at this site, in particular" [Trans. at 69]. Hanson objected to this testimony on the basis of hearsay and lack of personal knowledge.

57.     Hanson's objections are sustained. To the extent Mr. Stoltz testified regarding events beyond his own personal knowledge (i.e., events he did not personally witness), the Court will exclude this testimony as improper lay witness testimony. Furthermore, to the extent Mr. Stoltz testified to information obtained through reviewing historical documents or online research, this testimony constitutes hearsay and is excluded. The parties have stipulated to the admission of the historical documents themselves, which are part of the record in this case.

58.     At the hearing, and in response to Hanson's objections to Mr. Stoltz's testimony, Glacier argued that Mr. Stoltz could testify as an expert [Trans. at 162-67]. However, Glacier's counsel admitted that Mr. Stoltz did not prepare an expert report and Hanson's counsel objected that it was not provided an opportunity to depose Mr. Stoltz as an expert [*Id.*]. Under these circumstances, the Court will not recognize Mr. Stoltz as an expert witness.

   iii.    Ryan Bixby's testimony regarding excavation activities is not excluded.

59.     During the hearing, Glacier objected to Mr. Bixby's testimony regarding the magnitude of the excavation required for a wastewater impoundment and buildings constructed by Reichhold in comparison to construction of the cement terminal during Hanson's tenure. Glacier's objection was based on the fact that Mr. Bixby is not a structural engineer. However, Glacier's own expert, Mr. Spadaro, testified to this same topic (and provided more specific testimony regarding the exact type of foundation that, in his opinion, the Reichhold and Carlisle buildings would have required). Mr. Spadaro, like Mr. Bixby, does not have a degree in structural engineering. Mr. Bixby's testimony regarding the excavation required for the washwater impoundment constructed by Reichhold and other structures was based on the ERM

RI and historical documents providing information on the size of the wastewater impoundment and Reichhold building foundations and utilized basic principles that are common knowledge [Trans. at 365-70]. To the extent the experts discussed excavation and soil displacement topics, the Court will factor their lack of structural engineering degrees into the weight of the testimony. Glacier's objection is overruled.

## <u>CONCLUSIONS OF LAW</u>

1.      This Court has jurisdiction over this dispute. 28 U.S.C. §§ 157 and 1334. This contested matter is a core proceeding. 28 U.S.C. § 157(b)(2).

## A.      GLACIER BEARS THE BURDEN OF PROOF.

2.      The timely filing of a proof of claim is prima facie evidence that the claim is valid, and a party objecting to the claim "must introduce evidence to rebut the claim's presumptive validity" [*In re Harford Sands Inc.*, 372 F.3d 637, 640 (4th Cir. 2004)]. If the objecting party meets this burden, "the creditor has the ultimate burden of proving the amount and validity of the claim by a preponderance of the evidence" [*Id.*]. Glacier timely filed a proof of claim.

3.      Hanson has objected to Glacier's claim on the grounds that it is unenforceable under applicable law and should be disallowed under 11 U.S.C. § 502(b)(1).  Hanson also contends that, if the claim is allowed, the amount of the claim should be de minimus. In support of its objection, Hanson produced evidence sufficient to rebut the presumption of validity. Glacier has the ultimate burden of proving the amount and validity of its claim.

4851-5115-0019.16

4.      Glacier asserts claims under CERCLA and MTCA for recovery of past remedial

action and response costs incurred at the Property.  In addressing Hanson's objection, Glacier

focused on MTCA. [5]

5.      As an initial matter, the Court concludes that, as defined and used in MTCA:

(a) Hanson is a "person;" (b) the Property is a "facility;" and (c) arsenic, cPAHs, copper, dioxin

and furans, PCBs, PCP, total petroleum hydrocarbons, and zinc are "hazardous substances" [*See*

Wash. Rev. Code § 70.105D.020].

6.      MTCA provides a private right of action against any person liable for the

recovery of remedial action costs [Wash. Rev. Code § 70.105D.020]. Under MTCA a plaintiff is

entitled to recover costs for "remedial actions that, when evaluated as a whole, are the substantial

equivalent of a department-conducted or department-supervised remedial action" [Wash. Rev.

Code. § 70.105D.080]. This includes attorneys' fees and expenses for work that qualifies as a

remedial action [*Id.*].

7.      MTCA defines a remedial action as "any action or expenditure consistent with the

purposes of this chapter to identify, eliminate, or minimize any threat or potential threat posed by

hazardous substances to human health or the environment including any investigative and

monitoring activities" [Wash. Rev. Code. § 70.105D.020(33)]. MTCA's implementing

regulations describe what work meets the "substantial equivalent" threshold in the statute [*See*

Wash. Admin. Code § 173-340-545].

---

[5] In its 2020 regular session, the Washington legislature recodified certain MTCA provisions. Wash. Sess. Laws Ch. 20, SHB 2246. The recodification did not result in substantive changes [*Id.* at Sec. 101] ("Any statutory changes made by this act should be interpreted as technical in nature and not interpreted to have any substantive, policy implications"). For the sake of continuity with the briefing and testimony presented in this action, this decision cites to the MTCA provisions in effect when Glacier filed its claims.

4851-5115-0019.16

8.      Persons liable under MTCA include any person who "owned or operated the facility at the time of disposal or release" of hazardous substances and any person who transported hazardous substances [Wash. Rev. Code §§ 70.105D.040(1)(b) and (1)(d)]. To be a liable party under CERCLA and MTCA, an entity must fall into one of four categories established by those two statutes: "(1) owners and operators of facilities at which hazardous substances are located; (2) past owners and operators of these facilities when the disposal of hazardous substances occurred [or when a release occurred under MTCA[6]]; (3) persons who arranged to dispose of or treat hazardous substances; and (4) transporters of certain hazardous substances" [*Exxon Mobil Corp. v. United States*, 335 F. Supp. 3d 889, 905 (S.D. Tex. 2018) (citing 42 U.S.C. § 9607(a)(1)-(4)); *see also* Wash. Rev. Code § 70.105D.040(1)].

    i.    <u>Hanson's excavation, grading, and filling activities constitute a disposal and release under MTCA.</u>

9.      MTCA defines a "release" to include any entry of any hazardous substance into the environment [Wash. Rev. Code § 70.105D.020(32)].

10.     MTCA does not define "disposal." In these circumstances, Washington's courts look to case law construing CERCLA, which is MTCA's federal counterpart [*Taliesen Corp. v. Razore Land Co.*, 135 Wash. App. 106, 144 P.3d 1185, 1197 (2006)]. Courts construing CERCLA hold that "the dispersal of contaminated soil during excavation and grading of a development site" is a disposal within the meaning of CERCLA [*Kaiser Aluminum & Chem. Corp. v. Catellus Dev. Corp.*, 976 F.2d 1338, 1342 (9th Cir. 1992); *see also Ashley II of*

---

[6] Under MTCA, a "release" is any intentional or unintentional entry of any hazardous substance into the environment, including but not limited to the abandonment or disposal of containers of hazardous substances. There is no dispute that the hazardous substances at issue entered the environment years before Hanson became associated with the Property.

4851-5115-0019.16

*Charleston, LLC v. PCS Nitrogen, Inc*. 791 F. Supp. 2d 431 (D.S.C. 2011)]. Washington courts

have cited these cases with approval in cases involving MTCA [*See Taliesen*, 144 P.3d at 1197].

11.     The Court concludes that the dispersal across the Property, including the shoreline,

of contaminated soil and demolition debris through excavation, grading, and filling activities

during Hanson's redevelopment project is a "release" and "disposal" under MTCA (hereinafter,

referred to as "disbursal").

## II. HANSON WAS AN OPERATOR AT THE TIME THE HAZARDOUS SUBSTANCES WERE DISPERSED.

12.     MTCA defines an "operator" to include any person "who exercises control over

the facility." Wash. Rev. Code § 70.105D.020(22)(a). The touchstone of operator status is the

authority to control the activity with a nexus to the contamination [*Taliesen*, 144 P.3d at 1198].

In *Ashley II*, 791 F. Supp. 2d at 479, the district court held liable as an "operator" under

CERCLA a tenant who commissioned a contractor to construct a detention pond, install asphalt

driveways, and grade and proof roll the parcel [*See also Kaiser*, 976 F.2d at 1341-42].

13.     Hanson leased the Property for the express purpose of redeveloping it into a

cement terminal. Hanson had legal possession and control of the Property during the demolition

and earthwork activities that dispersed and thereby exacerbated the contamination at the

Property. Hanson's engineers designed the new cement terminal and determined how the

Property would be graded, excavated, and filled. Hanson used form contracts to retain the

contractors that performed the demolition and earthwork activities. Hanson may have hired

contractors to "operate" the machinery, but those contractors did not control the Property or the

project in ways that relieve Hanson of its operator status.

4851-5115-0019.16

14.    The Court concludes Hanson is liable under MTCA as an "operator" for the disposal and release of hazardous substances at the Property caused by its demolition and earthwork activities.

### III. HANSON WAS AN OWNER WHEN SOME OF THE HAZARDOUS SUBSTANCES WERE DISPERSED.

15.    MTCA defines an "owner" to include any person "with any ownership interest in the facility" [Wash. Rev. Code. § 70.105D.020(22)]. Under Washington law, the interest of a purchaser in a real estate contract is an ownership interest [*Stokes v. Polley*, 145 Wash. 2d 341, 37 P.3d 1211, 1215 (2001)].

16.    First, Hanson is not a current owner of the Property.  Second, Hanson did not generate most of the hazardous substances that drive the remediation at the Property. These were the result of industrial activities that occurred in the three decades before Hanson had any connection with the Property.  Rather, it was Hanson's demolition and earthwork activities during 1965-1967 that predominantly dispersed those contaminants about the Property and as the shoreline was expanded.  During this time period, Hanson was simply a lessee. The Port of Seattle owned the Property.  Thus, Hanson was an "operator" during this period, but it was not an owner and was not liable in that capacity as a past owner under CERCLA or MTCA for the largest portion of the exacerbation.

17.    However, on May 13, 1969, Hanson signed a real estate contract to purchase the Property and by September 17, 1973, Hanson had satisfied its obligations under that real estate contract to obtained full legal title by fulfillment deed.  In the early 1970s, Hanson installed a stormwater system in the southern portion of the Property, constructed a warehouse building in the northwestern portion of the Property, graded the southern portion of the Property turning it into a parking lot and storage area. These activities further disturbed the soil and dispersed the

4851-5115-0019.16

hazardous substances. Thus, Hanson is liable under MTCA as an "owner" of the Property for this portion of the disposals and releases of hazardous substances from these activities.

    iv.   <u>Hanson was a transporter of hazardous substances.</u>

    18.   MTCA holds liable as a transporter any person who has "accepted any hazardous substance for transport to a disposal, treatment, or other facility selected by such person from which there is a release, or a threatened release for which remedial action is required…" [Wash. Rev. Code. § 70.105D.040(1)(d)]. Courts construing CERCLA have held that a person who excavates and moves contaminated soil from one area on a property to another is liable as a transporter [*See* Kaiser, 976 F.2d at 1343].

    19.   Between 1965 and 1974, Hanson excavated, graded, and otherwise moved contaminated soil and debris from certain areas of the Property to others.

    20.   Hanson is liable under MTCA as a "transporter" of hazardous substances.

    v.   <u>Hanson is not an "arranger."</u> [7]

    21.   In *Burlington Northern & Santa Fe Ry. Co. v. U.S.*, 556 U.S. 599, 129 S.Ct. 1870, 173 L.Ed.2d 812 (2009), the Supreme Court established the legal requirements of arranger liability. Under *Burlington Northern*, in order to establish arranger liability, the plaintiff must prove that the defendant *specifically intended to dispose* of hazardous materials at the site, not just that it knew or should have known of the potential for hazardous substance disposal when it contracted for a specific activity to be undertaken by another person [*Burlington Northern & Santa Fe Ry. Co*, 556 U.S. at 610]. Having already determined that Glacier has failed to prove that Hanson "should have known" of contamination at the Property, Glacier also has failed to prove that Hanson had the specific intent to dispose that is required under the *Burlington*

---

[7] Glacier did not argue in its Pre-Hearing Brief or at the hearing that Hanson is an arranger.

4851-5115-0019.16

*Northern* standard.  The evidence advanced by the parties does not show that, either in hiring

contractors to do the demolition work or in conducting any cement terminal construction work,

Hanson specifically intended to dispose of hazardous materials at the site.  Therefore, Glacier has

not met its burden to establish arranger liability.

In sum, Hanson was variously an operator, owner, and transporter, as defined by

CERCLA and the MTCA, but not an arranger.  Therefore, Hanson is liable for response costs

incurred to address contamination at the Property.

## A.   EQUITABLE ALLOCATION OF LIABILITY UNDER CERCLA AND MTCA.

22.   After a finding of liability under CERCLA or MTCA, the Court must perform two

tasks essential for an equitable allocation ruling.  First, the Court must determine how to

equitably allocate responsibility for the defendant's share of response costs.  Second, the Court

must determine whether all or only portions of the response costs advanced by the plaintiff are

recoverable and thus subject to the Court's determination as to the defendant's equitable share.

23.   As to the first of these tasks – equitable allocation of the defendant's share – this

Court is given discretion under both CERCLA and MTCA to apply whatever equitable factors it

deems are appropriate under the circumstances:

> Any person may seek contribution from any other person who is
> liable or potentially liable under section 9607(a) of this title, during
> or following any civil action under section 9606 of this title or
> under section 9607(a) of this title.  Such claims shall be brought in
> accordance with this section and the Federal Rules of Civil
> Procedure and shall be governed by Federal law.  *In resolving
> contribution claims, the court may allocate response costs among
> liable parties using such equitable factors as the court determines
> are appropriate.*

[42 U.S.C. § 9613(f)(1) (emphasis added); *see also* Wash. Rev. Code § 70.105D.080 (providing

that any recovery for contribution claims "shall be based on such equitable factors as the court

determines are appropriate")].  In allocating CERCLA response costs, the "plain language [of

4851-5115-0019.16

CERCLA] grants a court significant discretion to choose which factors to consider in

determining equitable allocation of liability." [*PCS Nitrogen, Inc. v. Ashley II of Charleston

LLC,* 714 F.3d 161, 186 (4th Cir. 2013)].

24.    In determining how to allocate liability, courts often use the "Gore Factors,"

which include:

> (i) the ability of the parties to demonstrate that their contribution to
> a discharge, release, or disposal of hazardous waste can be
> distinguished; (ii) the amount of the hazardous waste involved; (iii)
> the degree of toxicity of the hazardous waste involved; (iv) the
> degree of involvement by the parties in the generation,
> transportation, treatment, storage, or disposal of the hazardous
> waste; (v) the degree of care exercised by the parties with respect
> to the hazardous waste concerned, taking into account the
> characteristics of such hazardous waste; and (vi) the degree of
> cooperation by the parties with the Federal, State or local officials
> to prevent any harm to the public health or the environment.

[*Exxon Mobil Corp.*, 335 F. Supp. 3d at 934 (citing *Carson Harbor Vill., Ltd. v. Unocal Grp.*,

270 F.3d 863, 893-94 (9th Cir. 2001)].

25.    Courts also consider the "Torres Factors," which include "(1) [t]he extent to

which cleanup costs are attributable to wastes for which a party is responsible; (2) [t]he party's

level of culpability; (3) [t]he degree to which the party benefitted from disposal of the waste; and

(4) [t]he party's ability to pay its share of the cost." [*Id.* (internal quotations omitted) (citing

*Lockheed Martin Corp. v. United States*, 35 F.Supp.3d 92, 123 (D.D.C. 2014)); *PCS Nitrogen*

714 F.3d at 186 ("The court's ultimate allocation of liability reasonably weighs relevant factors,

including the degree of involvement each party had in disposals (both primary and secondary) on

the site, the degree of care each party exhibited with respect to hazardous substances, the degree

4851-5115-0019.16

to which each party cooperated with government officials with respect to hazardous substances, and the benefit each party reaped from disposals of hazardous substances on the site.")].[8]

## B.    ALLOCATION OF HANSON'S SHARE OF LIABILITY

    i.    <u>The parties' expert reports provide a basis for allocating a share of liability to Hanson</u>.

    26.    The Property's history spans decades and the historical record is extensive. Both parties introduced exhibits detailing the history at the Property. The parties' experts examined those exhibits and other historical documents in detail while preparing their expert reports. Both parties generally agree on allocation up to a certain point, as reflected in both Steps 1 through 5 of the algorithm used by TIG in Mr. Spadaro's expert report, and in the factors analyzed by SES in Mr. Bixby's expert report. Specifically, these portions of each expert's report considered very similar allocation factors relevant to this case. For example, Mr. Spadaro of TIG analyzed: (1) the relative percentage of contamination at the Property attributable to each constituent of concern ("COC") on the Property; (2) the relative percentage of contribution to each COC by each operator of the Property; (3) the percent of costs attributable to each operational period for each COC; (4) the relative portion of responsibility assigned to Property owners during each operational period; and (5) (as a conclusion to the above steps) the amount of the liability share

---

[8] In addition, courts can also consider a variety of other factors, including:

    1. The knowledge and/or acquiescence of the parties in the contaminating activities.
    2. The value of the contamination-causing activities to furthering the government's national defense efforts.
    3. The existence of an indemnification agreement demonstrating the parties' intent to allocate liability among themselves.
    4. The financial benefit that a party may gain from remediation of a site.
    5. The potential for windfall double recoveries by a plaintiff.
    6. The potential that a plaintiff might make a profit on the contamination at the expense of another PRP.
    7. CERCLA's intent that responsible parties, rather than taxpayers, bear the costs of cleanup.

*Exxon Mobil Corp.*, 335 F. Supp. 3d at 934-35 (internal quotations and citations omitted) (quoting *Lockheed Martin Corp.*, 35 F. Supp. at 123-24).

4851-5115-0019.16

attributable to each owner and operator.  Hanson's expert, Mr. Bixby of SES, considered: (1) whether an owner or operator handled or used COCs in its operations; (2) the degree of care exercised by a party to prevent releases or further spread of releases during its operation or ownership period; (3) the magnitude and duration of any releases caused by a party; (4) the extent of a party's knowledge and awareness of contamination during their period of ownership or operation; (5) the anticipated relative cost associated with the investigation of each COC released by each party; and (6) the ability to distinguish impacts related to each party.

27.   In their respective reports, both experts applied technical data to common overarching factors that drive the environmental investigation and allocation of liability under CERCLA and MTCA.  After analyzing these factors, the parties' experts reached very similar conclusions. After completing Steps 1 through 5 of his analysis, Mr. Spadaro of TIG determined that an appropriate allocable share for Hanson is 1.26% [Ex. 3 at 20-24 and Table 5].  Similarly, after completing his analysis Mr. Bixby of SES concluded that an appropriate allocable share for Hanson is 1.5% [Ex. 209 at 26].

28.   Glacier's expert adds two additional steps that result in Hanson's share being increased from 1.26% to 37.54%. In Step 6 of his algorithm, Mr. Spadaro of TIG applies an "exacerbation factor" to Hanson for redevelopment activities, which Glacier claims is necessary to account for contamination being spread around the Property as a result of Hanson's construction activities. Step 6 of Mr. Spadaro's algorithm results in an increase in Hanson's recommended share from 1.26% to 14.88%.  Next, in Step 7, Mr. Spadaro of TIG redistributes the liability shares of all 'non-participating' PRPs to the 'participating' parties in this action, which he defines as Reichhold, Glacier, and Hanson.  This Step 7 reallocation applies pro-rata redistribution principles to shift the liability shares of six 'non-participants' to the remaining

- 34 -

three 'participants' and results in an increase in Hanson's share from the original 1.26%

determined in Step 5 to a new proposed total share of 37.54% of the response costs.

29.    Mr. Spadaro testified that he coined the term "exacerbation factor" [Trans. at

253]. His firm attempted to use empirical data to determine the magnitude of his exacerbation

factor, but that the results of those attempts "seemed unreasonable" and "we chose not to do that"

[Trans. at 254].  Mr. Spadaro testified that he decided on 15 percent as an exacerbation factor

because, according to Mr. Spadaro, "15 percent is . . . my opinion of a reasonable place to back

off from those [prior] calculations and assign a 15 percent exacerbation factor to the act of

relocating contaminated soils and demolition debris to parts of the site where they had not

previously existed" [Trans. at 254-55].

30.    Hanson maintained that, to the extent it dispersed contaminants during its

demolition and construction activities, it did so unwittingly, that the dumping practices and

construction activities of prior operators, not Hanson, account for much of the disbursement of

contaminants throughout the Property and that, if an "exacerbation factor" is to be applied at all,

it also must take into account the construction activities of those prior operators. In his rebuttal

report, Hanson's expert Mr. Bixby used the TIG algorithm, with certain adjustments, and applied

a "collective exacerbation factor" which took into account and attempted to distribute the

exacerbation factor among and between the construction activities of all Property operators, no

matter when their construction activities occurred [Ex. 207 at 7-9]. Using collective exacerbation

factors of 15%, 10%, and 5%, Hanson's expert derived shares of 5.42%, 3.96%, and 2.48%,

respectively, for Hanson [*Id.* at 9].

31.    Mr. Spadaro's determination of a 15% exacerbation factor for Hanson appears

excessive in light of (a) Hanson's lack of knowledge and (b) the development activities engaged

4851-5115-0019.16

in by prior owners and operators of the Property, including Reichhold in whose shoes Glacier partially stands. Mr. Bixby's adjustments to the 15% exacerbation factor that account for dispersals made by other parties appear most reasonable, and lead to an adjusted share for Hanson of 5.42%.

32.     In Step 7 of his algorithm, Mr. Spadaro then redistributes shares of liable PRPs that he labels non-participating parties to three PRPs that he labels participating parties. His basis for determining which PRPs are non-participating and which are participating, as well as his rationale for redistributing the non-participating shares, is done without reference to any empirical data or analysis. Mr. Spadaro testified that "from our very first moment being engaged in the case, [I] viewed this [reallocation of non-parties' shares] as the, the problem statement was to take the, the cost of investigation of the site and allocate it to three parties in this proceeding" [Trans. at 313]. Mr. Spadaro's decision to allocate all costs solely between Reichhold, Glacier, and Hanson is not based on any technical data or environmental expertise and was admittedly made by Mr. Spadaro before he even started his expert analysis. The determination of how response costs should be allocated among potentially responsible parties, however, is a legal decision for the Court to make. For the reasons stated below, the Court will not rely on Mr. Spadaro's proposed reallocation in determining the 'fair share' to be allocated to Hanson.

33.     As an initial matter, Glacier has not advanced any legal authority to support its contention that in a bankruptcy claim allowance proceeding a reallocation of viable non-participating parties' shares to participating parties is proper. Glacier cites *Am. Cyanamid Co. v. Capuano*, 381 F.3d 6, 19 (1st Cir. 2004) in support of its proposed reallocation to Hanson. But *Capuano* does not support Glacier's position. *Capuano* states that a district court has discretion to allocate costs among the named parties or all parties. The district court in that case originally

4851-5115-0019.16

determined that it would consider the relative fault of non-parties in its allocation.  However, the

named parties failed to introduce any evidence regarding the fault of non-participating parties, so

the court was forced to allocate costs to only the named parties.  The district court did not,

however, determine the fault of non-participating parties and then reallocate that fault to

participating parties.  It had no evidence to determine the fault of the non-participating parties at

all.

34.     The circumstances here are clearly distinguishable.  Hanson and Glacier have

stipulated to, and introduced evidence regarding, the ownership, operations, and fault of a

number of PRPs that are not direct parties to this claim allowance proceeding, such as

Mineralized Cell, Reichhold, Carlisle, the United States, Crown, Duwamish Shipyards, Ash

Grove Cement, King County, and the Port of Seattle.

35.     A court may consider any equitable factors it determines are appropriate to

apportion shares of liability and allocate response costs among liable parties [*See* 42 U.S.C. §

9613(f)(1); *see also In re Kaiser Grp. Int'l, Inc.*, 289 B.R. 597, 606 (Bankr. D. Del. 2003)].  One

of those factors may be the share of liability attributable to PRPs not party to the particular

dispute before the court, including liability attributable to parties from whom response costs are

not recoverable. These shares are what courts have referred to as "orphan shares." [*See Kaiser*,

289 B.R. at 606 ("Parties held jointly and severally liable for a site cleanup initially shoulder the

burden of orphan shares. Yet when the parties seek contribution from other PRPs, the district

court … may apportion the amount of the orphan shares among the parties.") (internal citations

omitted)].  In apportioning liability in a contribution case, a court may allocate orphan shares

among all of the known, solvent PRPs, including the plaintiffs, in amounts corresponding to such

PRPs' relative equitable responsibility for any indivisible harm [*See, e.g., Charter Twp. of*

4851-5115-0019.16

*Oshtemo v. Am. Cyanamid Co.*, 898 F. Supp. 506, 509 (W.D. Mich. 1995) (citing *Chesapeake and Potomac Telephone Co. of Virginia v. Peck Iron & Metal Co., Inc.*, 814 F.Supp. 1269, 1277–78 (E.D.Va.1992)); *Kaiser*, 289 B.R. at 606-07].

36.     An orphan share is "that portion of response cost liability for which *no* known and solvent party amenable to suit bears responsibility" [*U.S. v. Davis*, 31 F.Supp.2d 45, 68 (D. R.I. 1998) (citing cases) (emphasis in original); *Charter Township*, 898 F.Supp. at 508 (orphan shares are "attributable to bankrupt or financially insolvent PRPs"); *Reichhold, Inc. v. U.S. Metals Ref. Co.*, 2004 WL 3312831, at *7 (D.N.J. Oct. 27, 2004) (quoting *U.S. v. Atlas Minerals and Chemicals, Inc.*, 1995 WL 510304, at *75 (E.D. Pa. Aug. 22, 1995) ("An 'orphan share' refers to a portion of liability for recoverable costs that would be allocated to a party that is impecunious, not subject to a judgment, or otherwise not available to satisfy a judgment")].

37.     By contrast, shares of liability attributable to non-participating, solvent PRPs do not constitute "orphan shares" that may be allocated to participating PRPs like Hanson in the present dispute [*See, e.g., Charter Township*, 898 F.Supp. at 508 ("[I]t is clear that shares attributable to solvent PRPs that are not parties in this case cannot be considered 'orphan shares.'"); *Kaiser*, 289 B.R. at 608 (orphan shares allocable to debtor PRP do not include costs that are recoverable from other non-defunct PRPs in other proceedings); *Davis*, 31 F.Supp.2d at 68 ("The mere fact that a party bearing responsibility is not before the Court does not make its share of liability an 'orphan share.'"); *New York v. Westwood-Squibb Pharmaceutical Co., Inc.*, 2004 WL 1570261, at *25 (W.D.N.Y. May 25, 2014) (same)]. The type of reallocation for which Glacier advocates could even result in a double recovery that is expressly prohibited under CERCLA [*See Davis*, 31 F.Supp.2d at 69; *see also* 42 U.S.C. § 9614(b)]. Glacier has not introduced any evidence that any share of liability attributable to any PRP at the Property

4851-5115-0019.16

constitutes an "orphan share," except for the share of liability attributable to Reichhold.  And, Glacier concedes that its claim against Hanson includes money that Reichhold contributed to the past investigation and remediation of the Property.

38.     Glacier cites *City of Bangor v. Citizens Commc'ns Co.*, 437 F. Supp. 2d 180, 225-26 (D. Me. 2006), in support of the proposed reallocation under Step 7.  That case, however, actually supports Hanson's position that reallocating shares of non-participating parties would be inappropriate.  In *City of Bangor*, the City was the current owner of a contaminated site and sued only one defendant, Citizens, for contribution to response costs.  In making its equitable allocation, the *City of Bangor* Court considered the City's failure to pursue other parties under the fourth Gore Factor, which looks to the degree of involvement by the parties in the disposal, generation, or transport of contaminated materials.  The Court stated "[t]o the extent that tar contamination in the northern section of Dunnett's Cove can also be traced to other sources, the City bears the responsibility for those other sources at this time" [*Id.*].  Further, "to the extent the City, as a responsible party under CERCLA, chose to pursue contribution from only one responsible party, it generally must continue to bear the responsibility for any 'orphan shares' that might be attributable to other responsible parties" [*Id.* at 225].  The Court concluded that the City was left with a forty percent share of liability, five percent or less of which reflected the City's role in actually contributing to the discharge of hazardous waste at the site as an owner or operator.

> "Another slightly greater portion of the forty percent share reflects the equitable share that might be assigned to other potentially responsible parties that the City has chosen not to pursue and for whom the City does not serve (and has not served) as a subsequent owner of the property.  Certainly, the evidence suggests that previous owners of these properties may have played a more active

4851-5115-0019.16

> role in creating the PAH contamination that is now in the
> Cove.  However, the City has chosen not to pursue these previous
> owners.  Even if the City had pursued these previous owners, the
> City would likely still be assigned some equitable share for these
> properties (and possibly all of the equitable share) both because of
> its current role as owner and because of its subsequent use and
> construction on these properties" [*Id.* at 225-26].

39.     Glacier asserts that *City of Bangor* supports reallocating non-participating party shares to Hanson, but that is a misreading of the case.  Like the plaintiff in *City of Bangor*, Glacier is the current owner of the Property and has, up to this point, chosen to pursue claims solely against Hanson.  To the extent the contamination can "be traced to other sources"—and, indeed, the origination of all contamination can be traced to sources other than Hanson—Glacier "bears the responsibility for those other sources at this time" [*See Id.* at 225].

40.     Glacier is not without recourse against other potentially responsible (or, in the parlance of MTCA, potentially liable) parties. During the hearing, Mr. Stoltz acknowledged that Glacier was likely to pursue parties other than Hanson and Reichhold to recover additional past and future costs. It is, therefore, undisputed that Glacier is free to pursue the additional responsible parties. The purpose of this proceeding is for the Court to determine Hanson's fair share of liability with respect to past investigation and remediation costs at the Property.  That other PRPs are not participating in this proceeding has no bearing on this determination.

41.     Glacier argues that Hanson could have sought contribution from other parties for remediation of the Property in this bankruptcy proceeding, chose not to, and, therefore, should be saddled with a portion of those parties' shares.  Hanson, however, could not have sought contribution from other non-participating PRPs because Hanson has not yet incurred any costs in connection with the Property and Hanson has not been held responsible under CERCLA sections 9606 or 9607(a) for remediation of the Property, each of which is a jurisdictional requirement to bring a contribution claim for costs under CERCLA [*See* 42 U.S.C. § 9613(f)(1) ("Any person

4851-5115-0019.16

may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title.")].  Similarly, Hanson has not yet been held liable for any remedial action costs and, therefore, could not have sued non-participating PRPs for contribution under MTCA for the recovery of such costs [*See* RCW 70A.030.080 ("[A] person may bring a private right of action, including a claim for contribution or for declaratory relief, against any other person liable under RCW 70A.030.040 *for the recovery of remedial action costs*.") (emphasis added)].  Glacier's contention that Hanson could have sought contribution from other parties for costs that Hanson has not yet incurred is incorrect.

42.     Further, several equitable bankruptcy principles also weigh against Glacier's proposed allocation of liability.  The overriding objectives of chapter 11 include maximizing the value of a debtor's estate for distributions to creditors in accordance with a confirmable plan of reorganization, affording equal treatment to similarly situated claims and creditors, and prioritizing a debtor's ability to successfully reorganize and emerge from bankruptcy with a "fresh start."  The suggestion that any portion of liability attributable to solvent PRPs be allocated to Hanson is at odds with these principles.  Despite the Bankruptcy Code's broad definition of what constitutes a "claim," there is no basis in that definition or otherwise for augmenting a contribution claim against a debtor's estate—which claim, by its nature, is based on several liability (i.e., a defendant's "fair share")—to include any claim the creditor has against third parties.  In contrast to an equitable allocation of orphan shares, there is no basis in law or equity that justifies requiring a chapter 11 debtor to pay the shares of identifiable, financially viable parties.  And, to do so, would be contrary to the fundamental equitable principles of the Bankruptcy Code.

- 41 -

43.     For the above reasons, the Court will not reallocate other PRP shares that have

been proposed by Glacier's expert.  The Court takes into consideration the analysis provided by

the parties' expert reports and testimony as a part of its decision-making process but makes its

own evaluation of the relevant allocation factors.

44.     Although Glacier has withdrawn its claim for future response costs, it has

suggested that the remediation costs it may incur in the future should be factored into this Court's

determination of Hanson's allocable share of liability [*See* Trans. at 487-88, 526].  Section

502(e)(1)(B) of the Bankruptcy Code plainly prohibits allowing claims for future environmental

response costs.[9]  As such, the Court agrees with Hanson that taking account of these claims when

the Bankruptcy Code requires that they be disallowed (and, thus, disregarded) effectively would

be an end-run around section 502(e)(1)(B) to achieve the outcome it expressly prohibits.

Bankruptcy courts are, indeed, courts of equity with authority to review the circumstances of any

claim to ensure that injustice is not done in the administration of a debtor's estate, but "whatever

equitable powers remain in the bankruptcy courts must and can only be exercised within the

confines of the Bankruptcy Code" [*In re Hemingway Transport, Inc.*, 993 F.2d 915, 924 (1st Cir.

---

[9] Under section 502(e)(1)(B) of the Bankruptcy Code, a claim must be disallowed if: (a) the claim is contingent; (b) the claim is for reimbursement or contribution; and (c) the claimant is co-liable with the debtor with respect to the claim [*See* 11 U.S.C. § 502(e)(1)(B)].  Claims for future environmental remediation costs are contingent until amounts are actually paid for such remediation [*See In re Chemtura Corp.*, 443 B.R. 601, 617 (Bankr. S.D.N.Y. 2011) (citing cases)].  Thus, any claims Glacier has for future clean-up costs are "contingent" for the purposes of section 502(e)(1)(B).  Regarding the second element, claims brought by co-liable parties are, by definition, claims for reimbursement or contribution.  *See id.* at 626.  Under the third element, "[t]he phrase 'an entity that is liable with the debtor' is broad enough to encompass any type of liability shared with the debtor, whatever its basis" [*In re Baldwin-United Corp.*, 55 B.R. 885, 890 (Bankr. S.D. Ohio 1985); *see also Route 21 Assocs. of Belleville, Inc. v. MHC, Inc.*, 486 B.R. 75, 97 (S.D.N.Y. 2012), *subsequently aff'd sub nom. In re Lyondell Chem. Co.*, 542 F. App'x 41 (2d Cir. 2013) (finding that this factor was satisfied where debtor and claimant were each liable for waste remediation under CERCLA)].  If Hanson were liable for any future remediation costs, it could only be co-liable with Glacier and the other relevant PRPs.  Indeed, the basis for any such liability would arise from Glacier's right to seek contribution under CERCLA and MTCA.  Accordingly, had Glacier not withdrawn its claims for future response costs, section 502(e)(1)(B) of the Bankruptcy Code would require that such claims be disallowed.

4851-5115-0019.16

1993) (disallowing claims for future response costs despite difficult result for claimant) (quoting *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988)); *see also Law v. Siegel*, 571 U.S. 415, 421 (2014) (bankruptcy courts are not permitted to exercise their equitable authority to circumvent what is prohibited or required under the Bankruptcy Code)].  The Court finds no merit in the argument that equitable authority under MTCA or otherwise can override the clear mandate of the Bankruptcy Code.  Accordingly, to the extent Glacier requests the Court to consider Glacier's future remediation costs in the Court's determination of Hanson's share of liability for response costs that Glacier already has incurred, the Court must decline to do so.

     ii.   <u>The Gore Factors support allocating a share of liability to Hanson</u>.

     45.     The Gore Factors also support the allocation of a share of liability to Hanson.  The first factor concerns the ability of the parties to demonstrate that their contribution to a discharge, release, or disposal of hazardous waste can be distinguished.  Based on the evidence presented at the hearing, Glacier's contention that Hanson's construction activities exacerbated contamination at the Property is well-founded.  Glacier cites ERM's RI as evidence of contamination existing in areas of the Property where polluters before Hanson had not operated.  Hanson notes that prior owners and operators conducted significant construction activities that could have spread contaminants around the Property long before Hanson's tenure.  In response, Glacier argues that those pre-Hanson construction activities were *de minimis*.  The stipulated facts, trial exhibits, and testimony showed that there were substantial construction activities by prior owners, including excavation for and installation of numerous structures, drainage ditches, a large washwater impoundment, septic, and other underground tanks, and there was substantial evidence that past practices included prior operators using the non-operational areas of the Property as a "dumping ground" [*E.g.*, JSF ¶¶ 6-11; Ex. 1 at Figure 2-4 (GLACIER15399) (showing overlapping operational areas of past operators and structures); Ex. 207(a) at Figures 2-5 and Tables 1-4)].

4851-5115-0019.16

However, the evidence firmly establishes that Hanson engaged in the most intensive construction activities. The first Gore Factor weighs in favor of assignment of significant shares to the owners of and operators at the Property that created, used, and released today's COCs during the periods of industrial activity before Hanson arrived (i.e., to Reichhold, Mineralized Cell, Carlisle Lumber, Crown Zellerbach, the United States, the Port of Seattle, and King County), as well as to Hanson.

46.     The second Gore Factor looks to the amount of hazardous waste involved. Both Glacier and Hanson agree that the parties that owned and operated the Property before Hanson was responsible for the actual generation of all of the hazardous waste driving the cleanup of the Property and some dispersal of that waste around the Property. Hanson's operations did not contribute to the amount of hazardous waste at the Property; however, it appears that Hanson dispersed more of that hazardous waste around the property than did its predecessors. [10] Accordingly, the second Gore Factor weighs heavily to an assignment of significant shares to the owners and operators before Hanson and a lesser share to Hanson.

47.     The third Gore Factor looks to the degree of toxicity of the hazardous waste involved. Hanson's operations did not include any hazardous waste activity. All hazardous waste at the Property exists because of operations that were conducted before Hanson arrived at the Property. The pre-Hanson operations of Mineralized Cell, Reichhold, Crown, Carlisle, and the U.S. Army led to the presence of the toxic contaminants found at the Property today. Hanson unknowingly disbursed much of those contaminants around the property. As such, the third Gore

---

[10] Neither Glacier's evidence nor Glacier's expert could quantify the exact amount or volume of contaminants spread as a result of Hanson's construction activities. The aerial photographs and graphic exhibits from the testing, however, reflect that Hanson spread a great deal of soil to all parts of the Property, and particularly to the shoreline.

Factor supports a significant allocation of liability to pre-Hanson operators, and a lesser share to

Hanson.

48.    The fourth Gore Factor looks to the degree of involvement by the parties in the

generation, transportation, treatment, storage, or disposal of the hazardous waste.  Hanson was

not involved in generating, treating, storing, transporting, or disposing the hazardous waste at

issue here.  Glacier alleges that Hanson exacerbated and moved the legacy contaminants at the

Property through its construction activities.  The Court accepts Glacier's theory but notes that it

is the pre-Hanson owners and operators of the Property that this Gore Factor suggests should be

allocated the largest share of responsibility, as those were the parties responsible for transporting,

generating, treating, storing and disposing of the hazardous waste to aid in their operations.

Hanson bears a smaller share for dispersing much of that hazardous waste around the Property.

49.    The fifth Gore Factor looks to the degree of care exercised by the parties with

respect to the hazardous waste concerned, taking into account the characteristics of such

hazardous waste.  As discussed in the findings of fact above, there is no evidence that Hanson

had knowledge of the Property's contamination at the time of the construction activities Glacier

contends give rise to liability.  Indeed, what evidence exists suggests just the opposite.  The only

environmental investigations conducted at the Property during Hanson's tenure occurred in late

1984 and in 1985, almost two decades after Hanson's construction activities were completed,

and neither of those investigations concluded that further investigation and remediation of the

Property was necessary. In light of these facts, it was impossible for Hanson to "take into

account the characteristics of hazardous waste" at the Property in its decision to lease, acquire or

conduct its operations at the Property (notably, the EPA even concluded as of 1985, "that there is

no evidence that hazardous waste is, or ever was, disposed of on-site") [Ex. 202 at

- 45 -

4851-5115-0019.16

GLACIER05934].  Nonetheless, it appears that Hanson exercised care in its operations at the Property by not releasing any additional hazardous substances.  It is noteworthy in evaluating this degree of care allocation factor that Hanson's first connection with the Property was in 1965 –15 years before CERCLA would be enacted, 24 years before MTCA would be enacted, and long before the terms "hazardous substance" and "hazardous waste" were created.

50.    The sixth Gore Factor analyzes the degree of cooperation by the parties with the Federal, State, or local officials to prevent any harm to the public health or the environment. Glacier has not alleged that Hanson has not cooperated with government officials. Hanson was never contacted by any regulatory authority with respect to environmental contamination at the Property. This factor favors neither party.

51.    Beyond the Gore factors, other equitable factors affect the allocation of liability. The first "Torres Factor" is the extent to which cleanup costs are attributable to wastes for which a party is responsible, while the second Torres factor looks to a party's level of culpability. It is undisputed that Hanson did not contribute any hazardous waste at the Site.  When Hanson engaged contractors to undertake its demolition and construction activities, it lacked knowledge that those activities could result in spreading contamination created by prior owners and operators. Hanson is not a culpable party that generated waste or knowingly increased contamination at the Property.

52.    The third Torres Factor looks to the degree a party benefitted from the waste disposal, and Hanson posits that this factor supports shifting some of the share of liability that may derive from those activities back to Glacier.  Hanson argues that under CERCLA allocation law, an owner is not entitled to cost recovery from a potentially responsible party for costs incurred that improve the value of the owner's property, as opposed to those that simply make the

4851-5115-0019.16

property environmentally compliant [*See, e.g., G.J. Leasing Co., Inc. v. Union Elec. Co.*, 54 F.3d 379, 386 (7th Cir. 1995); *City of Detroit v. Simon*, 247 F.3d 619, 630 (6th Cir. 2001)]. Hanson undertook the developmental burden of conducting the 1965-67 construction activities to convert the Property from a vacant, unused former chemical manufacturing plant into a viable cement terminal, and its construction activity was mandated by its lease with the Port of Seattle [Ex. 203 at KC2005744]. Thus, Hanson suggests that the construction activities that Glacier now complains about also allowed Glacier to benefit financially from its own use of the Property for the almost 30 years it has been operating and using the facilities Hanson constructed. Hanson further suggests that this weighs in favor of reducing the share that Glacier may recover from Hanson. Unfortunately, on this record, there is no way to quantify the relative benefits of these redevelopment activities. No allocation is made based upon this factor.

53.     Meanwhile, Glacier contends that the fourth Torres factor, the ability to pay, weighs in favor of allocating a larger share to Hanson. As Judge Torres explained, however:

> "Although ability to pay is one of the factors to be considered in equitably allocating CERCLA liability among contribution defendants, *a defendant's share of liability is not increased or decreased simply because that defendant's net worth is more or less than the net worth of other defendants*. Rather, the principal reason for considering ability to pay is to ensure that the party seeking contribution will not bear sole responsibility for any portion of the joint liability otherwise attributable to defendants from whom recovery is unlikely" [*United States v. Davis*, 31 F. Supp. 2d 45, 66 (D.R.I. 1998), aff'd, 261 F.3d 1 (1st Cir. 2001) (emphasis added)].

In this case, the 'defendant' is a debtor in a bankruptcy proceeding and the claimant is a solvent entity that retains the right to pursue several other parties for its past and future costs. Glacier has not introduced any evidence regarding the financial wherewithal of other potentially responsible parties. Glacier's argument that Hanson's share should be increased based on the 'ability to pay' factor is predicated on a contention that Hanson's Plan of Reorganization has committed funding

- 47 -

sufficient to pay the large share that Glacier seeks from Hanson [Glacier Pre-hearing Brief at 2,

12-13].[11]  That argument is inconsistent with the principle underlying the fourth Torres factor

and is an inappropriate basis to allocate to Hanson a larger share of the costs.

     54.     Glacier contends that this Court should consider as an equitable allocation factor

the fact that Hanson will receive a bankruptcy discharge upon the conclusion of these Chapter 11

proceedings and "Glacier alone will face this considerable expense" of future remediation.

Hanson contends that because Section 502(e)(1)(B) of the Bankruptcy Code, 11 U.S.C.

§ 502(e)(1)(B), bars recovery on contingent contribution claims and, more specifically, Glacier's

recovery of future cleanup costs (an outcome to which Glacier agrees)—it would be an

impermissible circumvention of the Bankruptcy Code's exclusion of future cost recovery for this

Court to consider future costs when deciding how to allocate past costs.  While both the

CERCLA and MTCA statutes grant this Court discretion in selecting those allocation factors it

will consider, the fact remains that this Court is a bankruptcy court and is bound by the

Bankruptcy Code.  The Supreme Court has held that bankruptcy courts are not permitted to

exercise their equitable authority to achieve something expressly prohibited by the Bankruptcy

Code [*See Law v. Siegel*, 571 U.S. 415, 421 (2014)].  To that end, this Court joins other courts

that have acknowledged that the disallowance of future remediation costs under Section

502(e)(1)(B) is a harsh outcome, but is not one this Court can undo by considering the quantum

of future costs Glacier might face as an allocation factor warranting an increase in liability for a

debtor [*See, e.g., Route 21 Assocs. Of Belleville, Inc. v. MHC, Inc.*, 486 B.R. 75, 97-98 (S.D.N.Y.

---

[11] It should be noted that the contingency fund is an omnibus fund intended to pay unexpected claims. It is not
reserved exclusively for Glacier.

4851-5115-0019.16

2012) (citing cases and noting that disallowance of a creditor's future cost claim is an outcome

that "may seem harsh but treats Route 21 no worse than the debtor's other unsecured creditors"].

55.     In sum, the factors examined by courts for equitable allocation support Hanson

receiving a share of liability for past response costs incurred at the Property, albeit not of the

magnitude Glacier desires.

  iii. <u>An allocation to Hanson is consistent with Fourth Circuit precedent</u>.

56.     Fourth Circuit case law also supports a finding of a *de minimis* share for Hanson.

Both Glacier and Hanson cite to *Ashley II of Charleston, LLC v. PCS Nitrogen, Inc*., 791 F.

Supp.2d 431 (D.S.C. 2011), *aff'd* 714 F.3d 161 (4th Cir. 2013), in support of their positions.

This Court agrees that as a CERCLA allocation case involving similar fact patterns and one that

was reviewed and affirmed by the Fourth Circuit, *Ashley II* is an important decision for

consideration.  In *Ashley II*, the district court was asked to determine the proper equitable

allocation of site response costs to approximately 6-8 different parties.  At least four different

PRPs (including the named plaintiff) had at various times owned or leased all or portions of a

contaminated property and had unwittingly moved contaminants around the site.  Like Hanson,

each of these four PRPs was alleged to have undertaken one or more construction or

redevelopment projects during their tenure, and these projects were alleged to have made

remediation more costly.  None of these four PRPs admitted to having any direct knowledge of

the presence of contaminants in soils that were moved or relocated.  But, unlike Hanson's

construction activities in the instant case, those PRPs' construction activities occurred in the

1990s, in a post-CERCLA legal environment, and the district court found that some of these

PRPs "should have known" that the site could have been contaminated.

57.     In its allocation ruling, the *Ashley II* court analyzed the facts surrounding each

PRPs' conduct and knowledge.  To each of these four "unwitting" and "unknowing"

4851-5115-0019.16

redevelopers, the court assigned shares of 0%, 1%, 3%, and 5% of the total site cleanup costs.

On appeal, the Fourth Circuit affirmed the allocation decision, finding that the district court had

not abused its discretion in selecting allocation factors and had not clearly erred in its application

of those factors to arrive at the 0%, 1%, 3%, and 5% allocation percentage shares assigned to the

parties that unknowingly moved contaminants around the site.  In this regard, the *Ashley II*

decision supports Hanson's argument that it should not receive more than a *de minimis* share of

liability in this case.

58.     Glacier, however, argues that Hanson is more like another PRP group (the

"Holcombe and Fair Parties") that engaged in construction activities at the *Ashley II* site and

received an allocable share of 16%.  The Holcombe and Fair Parties, however, are not an apt

comparison to Hanson in that the Holcombe and Fair Parties were not innocent redevelopers and,

due to their "bad actor" status, received a considerably higher allocable share of liability.    The

Holcombe and Fair Parties, unlike Hanson, upon learning that the site was contaminated, then

failed to disclose that fact prior to deeding a portion of the property to another PRP [*Id*. at 494-

95].  In addition, after learning of the contamination, the Holcombe and Fair Parties failed to

follow up with additional testing recommended by their environmental consultant [*Id.* at 455,

495].  Further, "after discovery of the contaminated state of the Site, the Holcombe and Fair

Parties made no effort to inform environmental authorities of the contamination" [*Id.* at 494].

When the environmental authorities did become involved, "the Holcombe and Fair Parties failed

to follow their instructions" and began construction activities without submitting the plans

required by those authorities and "without approval" of those authorities [*Id.*].  In sum, the

Holcombe and Fair Parties were bad actors who, through deliberate action and inaction,

4851-5115-0019.16

contributed to contamination at the site.  Relying on this series of improper action by the

Holcombe and Fair Parties, the *Ashley II* court allocated 16% of the site costs to them.

59.     None of the factors that the *Ashley II* court relied on in attributing a higher

percentage to the Holcombe and Fair Parties are applicable to Hanson. Hanson's development

activities took place almost 30 years prior to the activities at issue in *Ashley II*; Hanson's actions

occurred in a pre-CERCLA time period when "hazardous waste" was not even part of the

lexicon, when parties were not expected to know that industrial properties could be

contaminated, and when pre-purchase environmental due diligence was not the standard.

Moreover, unlike the Holcombe and Fair Parties in *Ashley II*, Hanson's construction activities

occurred before it could have had any knowledge of contamination at the Property and Hanson

did not refuse to heed any regulatory directives regarding environmental contamination.

Glacier's attempt to liken Hanson to the Holcombe and Fair Parties is misplaced.

60.     Here, there is no evidence that Hanson knew of the legacy contamination at the

Property.  Moreover, Hanson did not release or contribute any hazardous wastes or hazardous

substances to the Property during its tenure, and, at worst, it unknowingly moved contaminated

materials around the site.  It is the parties that contaminated the site that should be required to

pay most of the remediation costs, not a party that may have unknowingly moved contamination

around the site.  The *Ashley II* court allocated the lion's share of responsibility to the polluting

parties and *de minimis* shares to innocent redevelopers.  In this regard, *Ashley II* supports Hanson

receiving a low percent share of overall response costs at the Property.

iv.     Hanson's share of liability.

61.     In light of the above allocation analysis, and taking into account the expert

reports, evidence in the record, equitable factors described and analyzed above, and Fourth

4851-5115-0019.16

Circuit precedent, the Court concludes that Hanson is liable for a 5.42% share of the past

remediation costs. Before applying this share to the response costs, however, the Court must

decide which of the costs submitted by Glacier are recoverable.

## C.    RECOVERABILITY OF GLACIER'S COSTS

62.    Under CERCLA, a plaintiff may recover only "necessary costs of response" that

are consistent with the National Contingency Plan ("NCP") [42 U.S.C. § 9607(a)(4)(B)]. Under

the NCP, past cost documentation generally must be sufficient to provide an "accurate

accounting of federal, state, or private party costs incurred for response actions" [400 C.F.R. §§

300.160(a)(1), 300.700(c)(5)(ii)]. The U.S. Supreme Court also has limited the types of attorney

fees recoverable under CERCLA; the underlying legal work must be "closely tied to the actual

cleanup," cannot be related to litigation or consent decree negotiations, must "significantly

benefit the entire cleanup effort," and must "serve a statutory purpose apart from the reallocation

of costs" [*Key Tronic Corp. v. United States*, 511 U.S. 809, 820-21, 114 S. Ct. 1960, 128 L. Ed.

2d 797 (1994)].

63.    The remedial purposes of MTCA are "to identify, eliminate, or minimize any

threat or potential threat posed by hazardous substances to human health or the environment"

[RCW 70.105D.020]. Like CERCLA, only reasonable attorney fees for work that serves a

remedial purpose can be recovered [Wash. Rev. Code 70.105D.080; Wash. Rev. Code

70.105D.020]. MTCA was heavily patterned on CERCLA and Washington courts consider

federal cases interpreting similar provisions to be persuasive authority [*Unigard Ins. Co. v.

Leven*, 97 Wash. App. 417, 428, 983 P.2d 1155 (1999), *as amended* (Apr. 24, 2000)]. Thus, the

*Key Tronic* framework for analyzing attorney fees as remedial action costs applies under MTCA

as well.

4851-5115-0019.16

i.    <u>Glacier cannot recover costs related to the LDW Superfund Site</u>.

64.    Glacier initially filed claims for recovery of costs related to the LDW Superfund Site, but later withdrew those claims in view of the contribution protection afforded to Hanson through its settlement of LDW Superfund Site liability with the EPA.  To this end, Glacier has stipulated in this proceeding that it has "withdrawn its claim for recovery of costs incurred in response to contamination within the LDW Superfund site" [JSF ¶ 2.]  Hanson has challenged, and the parties dispute the extent to which, some of the $8.6 million in costs advanced by Glacier are barred from recovery because they relate to contamination within the LDW Superfund Site.

65.    The Property is comprised of an upland portion of about 13.8 acres, which is the subject of the environmental response at issue, and an aquatic portion of about 4.2 acres. The aquatic portion is within an embayment in the LDW, commonly known as "Glacier Bay" [JFS ¶3].  Glacier's claim in this action relates only to the upland portion of the Property. The aquatic portion of the Property, however, is a part of the defined "Site" being investigated under the Agreed Order between Ecology, Glacier, and Reichhold [Ex. 214, Agreed Order, at GLACIER21571-72 ("The Site includes upland property, groundwater, the streambank and adjacent tidal flats, including portions of the Lower Duwamish Waterway …")].  As a result, the work done by Glacier's environmental consultants, as well as its lawyers, includes work on the aquatic portion of the Property that is not a part of the upland Property. As explained by Glacier's primary environmental consultant, ERM, in its Draft RI: "Contaminated sediments located within the aquatic portion of the Site are part of the LDW and are subject to cleanup requirements defined by the LDW ROD (EPA's LDW Superfund Site Record of Decision)" [Ex. 1, Draft RI at §2.2; *see also* § 6.2].

66.    Hanson argues that costs related to sediment sampling and analysis are part of the LDW Superfund Site, and not the upland Property, and are therefore not recoverable by Glacier

4851-5115-0019.16

because of (a) the contribution protection afforded by Hanson's settlement with EPA, and (b)

Glacier's own stipulated withdrawal of its claim for these costs.  Hanson contends that these

sediment costs comprise a significant portion of the overall costs and Glacier has improperly

included them in its claim [Hanson Pre-Hearing Brief at 39-41].  Hanson pointed to various

examples in its briefing and at the hearing of costs apparently related to the LDW Superfund Site

[*Id.*; *see also* Trans. at 320-30].[12]  Hanson has identified a total of $1,321,907.30 in invoices that

were either directly associated with the LDW Superfund Site or coincided with the timing of

LDW Superfund Site work and did not contain any semblance of a description to demonstrate

they were associated with the upland remediation and not the LDW Superfund Site [*See* Ex. 216

at GLACIER18411; Ex. 217 at GLACIER16536; Ex. 218 at GLACIER23852; Ex. 219 at

GLACIER23846; Ex. 220 at GLACIER15667; Ex. 221 at GLACIER24146; Ex. 222 at

GLACIER23915; Exs. 223-224, GLACIER22334 and GLACIER22355].  When asked about

many of these invoices at the hearing, Glacier's expert conceded that the invoices were likely not

related to the upland property [*See* Trans. at 320-30].

    67.    Glacier argues that it should still be permitted to recover some of these costs

because they relate to in-water sediment sampling that was required under its 2009 Agreed Order

with Ecology.  As explained in the Draft RI, however, the lower 5 miles of the LDW, including

aquatic areas of the Property, was added to the National Priorities List in 2001 [Ex. 1 at

GLACIER15286]; this is referred to as the LDW Superfund Site.  In 2014, the EPA issued a

final Record of Decision that selected the cleanup remedy for sediments within the LDW,

including sediments within the aquatic portion of the Property [*Id.*]. Glacier has stipulated that it

---

[12] Hanson also explained in briefing and at the hearing that it could not review every invoice in light of the
compressed timetable under which the parties conducted discovery and pre-hearing briefing.

4851-5115-0019.16

has "withdrawn its claim for recovery of costs incurred in response to contamination within the LDW Superfund site" [JSF ¶ 2].

68.      Glacier cannot meet its burden of proof to establish that the $1,321,907.30 in invoices referenced above relate to work on the Property as opposed to the LDW Superfund Site and work concerning "contamination within the LDW Superfund site." Accordingly, the Court concludes that those costs identified by Hanson as associated with the LDW Superfund Site are unrecoverable, as are the costs that have no discernable connection to the upland site. Hanson's objections to these costs are sustained and Glacier's recoverable cost total will be reduced by $1,321,907.30.[13]

ii.      Glacier cannot recover costs related to its prior litigation with Reichhold

69.      As part of its cost submission, Glacier seeks recovery of attorney fees that it paid to the law firm Preston Thorgrimson Shidler Gates & Ellis in the amount of $24,331.66 [Ex. 64]. Hanson objects to Glacier's attempt to recover these attorney fees, as they relate to the cost recovery and contribution action that Glacier filed against Reichhold in 1993 [*E.g.*, Ex. 225, which refers to finalizing a complaint against Reichhold]. Hanson argues that, not only are these costs not otherwise recoverable under CERCLA or MTCA, Reichhold paid $223,557.20 in attorney fees to Glacier as part of the settlement of Glacier's contribution action against Reichhold [Ex. 60 at GLACIER22534]. As a result, Glacier appears to be seeking a double recovery from Hanson with respect to these fees.

70.      The Court agrees that Glacier's attorney fees in its prior action against Reichhold are not recoverable under *Key Tronic* and other authorities. In addition, both CERCLA and

---

[13] This is not to suggest that Hanson will bear no financial responsibility for the pollution in the LDW. In fact, Debtors have entered into settlements with EPA and others which are incorporated in the Third Amended Joint Plan and by which the Debtors will pay substantial sums as a PRP [*See* Docket No. 1601-1604, 1789 & 1908].

4851-5115-0019.16

MTCA prohibit the sort of double recovery that Glacier seeks.  Under CERCLA: "Any person who receives compensation for removal costs or damages or claims pursuant to this chapter shall be precluded from recovering compensation for the same . . . costs . . . pursuant to any other State or Federal law" [42 U.S.C. § 9614(b); *see also Friedland v. TIC – The Indus. Co.*, 566 F.3d 1203, 1207 (10th Circ. 2009)]. MTCA also precludes a double recovery of costs [*See, e.g., Seattle Times Co. v. LeatherCare, Inc.*, 337 F.Supp. 3d 999, 1077 (W.D. Wa. 2018) (reduced judgment by the amount recovered from another potentially responsible party); *Port of Ridgefield v. Union Pacific RR Co.*, 2018 WL 3769801 at *7 (W.D. Wa. Aug. 9, 2018) (interpreting MTCA, holding "[i]t is true that equity will not permit a double recovery or allowing a contribution-action plaintiff to recoup more than the response costs he paid out of pocket.")]. Hanson's objections to these costs are sustained and Glacier's recoverable cost total will be reduced by an additional $24,331.66.

      iii.   <u>Glacier cannot recover costs for unsubstantiated work</u>.

      71.     Hanson also objects that certain attorneys and consultants engaged by Reichhold and Glacier, most notably CH2MHILL and Anchor QEA, provided almost no information in some or all of their invoices about the work that was performed, making it impossible to determine that the work was reasonable and necessary, or whether it served a remedial purpose, or that it even related to the Property at issue.  For example, Hanson argued that Glacier's claim includes $542,680.93 for CH2MHILL work,[14] and that Hanson has not been able to determine what CH2MHILL did [Hanson Pre-Hearing Brief at 42-43].  CH2MHILL is not identified in

---

[14] Hanson has also separately objected to $160,228.47 of the CH2MHILL costs incurred during the period from January 2012 through October 2013, when the sediment samples were collected and analyzed, as likely relating to the sediment sampling [Hanson's Pre-hearing Brief at 40-41]. Since that reduction has already been taken into account, the total reduction to CH2MHILL's costs on the separate ground of lack of substantiation is reduced from $542,680.93 to $382,452.46.

4851-5115-0019.16

Glacier's expert report or in the January 24, 2020 Draft RI/FS as having performed any remedial work, and its invoices provide no description of the services it provided. It is impossible to tell if the services CH2MHILL invoiced for were reasonable or necessary or served a remedial purpose [*See, e.g.,* Ex. 227 at GLACIER24069].

72.    For the same reasons, Hanson objects to Glacier's claim including $138,600.14 for Anchor QEA work, the invoices for which span from 2013 to 2020. According to Hanson, Anchor QEA's invoices are similar to CH2MHILL's because they only provide a shorthand description of the work, such as "review EPA's proposed plan," (the only possible "EPA proposed plan" that could have been reviewed related to the LDW Superfund Site, not the Property) and provide no details about what kind of work was performed.

73.    At the hearing, Hanson's counsel questioned Mr. Spadaro of TIG as to his methodology for including these types of undescriptive invoices in Glacier's cost estimate:

> **Ms. Eckert**: I, I guess one of the problems here is there's really not much of a description of what services were provided [by CH2MHILL], correct?
>
> **Mr. Spadaro**: In some cases, it was challenging to ascertain. We did our best.
>
> . . .
>
> **Ms. Eckert**: So, the entries here in the descriptions of services provided [by Anchor QEA], we have professional services, review EPA's proposed cleanup plan. That's the description pretty much all the way down, almost all the way down. Now EPA's proposed clean-up plan related to the LDW Superfund site, did it not?
>
> **Mr. Spadaro**: It did, ma'am, yes.

[Trans. at 326-27].

74.    Glacier bears the burden of demonstrating its costs are recoverable. Glacier's own expert admitted that certain Anchor QEA invoices were related to the LDW Superfund Site and that it was challenging to ascertain to what work the CH2MHILL invoices related. Because it is not possible to determine if the CH2MHILL or Anchor QEA invoices related to services that

were reasonable or necessary or served a remedial purpose, the Court concludes that Glacier has

not met its burden and these invoices are not recoverable and are disallowed [Ex. 1 at

GLACIER15286]. Accordingly, the Court disallows Glacier's claim for recovery of Anchor

QEA costs in the amount of $138,600.14 and the balance of CH2MHILL costs, $382,452.46, for

a total of $521,052.60.

75.    Hanson also asserts that Glacier also cannot recover costs incurred because of its

failures to comply with Ecology's directions. Here, Hanson argues that during the 2011 and 2012

preparation of the Draft RI/FS Work Plan, Glacier and Reichhold were not responsive or

cooperative with Ecology, and therefore the costs associated with much of this work should be

excluded from Glacier's claim [Hanson Pre-Hearing Brief at 43-44]. In a letter dated August 10,

2011, Ecology stated that the draft work plan for RI/FS submitted by ERM-West, Inc. ("ERM")

on behalf of Glacier and Reichhold "did not incorporate many of the previously requested

edits/changes/additions" that were required by Ecology to be incorporated pursuant to the terms

of the Agreed Order between Ecology, Reichhold, and Glacier [Ex. 205, GLACIER03706]. The

Ecology letter characterized the draft RI/FS work plan as "disappointing" because "an enormous

effort was made to be thorough and clear on what would be required for an adequate RI/FS

[Work Plan] for this Site" [*Id.*]. Ecology sent additional letters to ERM regarding the draft RI/FS

work plan on April 11, 2012 [Ex. 232] and June 29, 2012 [Ex. 233]. In a letter dated August 31,

2012, Ecology informed ERM that it had completed the RI/FS Work Plan itself after Glacier and

Reichhold "made insufficient progress" [Ex. 206, at GLACIER05105].

76.    According to Hanson's expert, it is an "extremely unusual and rare occurrence"

for Ecology to take over completion of work that PRPs have agreed to perform [Ex. 206 at 11].

Hanson's expert states that this would only occur after PRPs "grossly and repeatedly failed to

- 58 -

4851-5115-0019.16

comply with minimum requirements" and indicates his opinion that because of this failure to

comply with minimum requirements some of the actions performed by Glacier and Reichhold

were not remedial actions for which costs are recoverable under MTCA or CERCLA [*Id.*].  At

the hearing, Hanson's counsel asked Mr. Stoltz whether he knew of other instances in his career

in which Ecology took over and issued its own work plan [Trans. at 180-81.  In his 30-year

career, Mr. Stoltz could only recall one other instance in which he was aware that Ecology had

taken over the work plan on another site [*Id.*].

77.     Hanson has argued that Glacier and Reichhold failed to comply with Ecology's

requests, that this led to the same work being performed repeatedly and ultimately led to Ecology

taking over the RI/FS Work Plan.  Hanson argues that this delayed the ultimate cleanup of the

site and increased the costs of the endeavor. Lacking any accounting, Hanson argues for a 7.5%

reduction in Glacier's allowed costs.

78.     However, the evidentiary record is far from clear that Glacier is culpable.

Glacier's witness Stolz characterized this as a good faith disagreement over the necessary scope

of work to complete the investigation of the Property. Stolz further testified that Ecology came to

agree with Glacier/Reichhold's position, that their efforts saved approximately $1.5 million, and

avoided contamination of the deep aquifer. Spatz offered a logical explanation for its

disagreement with Ecology, and his testimony was unrebutted. Thus, Hanson's objection is

overruled. No reduction is made of allowed costs based upon delay.

79.     In sum, the costs Glacier has advanced but is barred from seeking from Hanson

include (1) costs related to the LDW Superfund Site, including sediment sampling and Glacier

and Reichhold's responses to CERCLA Section 104(e) information requests from the EPA

relating to the LDW Superfund Site, totaling $1,321,907.30; (2) costs related to Glacier's

4851-5115-0019.16

litigation against Reichhold, which, in addition to not being recoverable, have already been paid

to Glacier by Reichhold, totaling $24,331.66; and  (3) costs lacking any reasonable degree of

description, such that the purpose and scope of the work performed cannot be discerned or even

tied to the Property or the remedial costs for which Glacier is entitled to seek recovery, which,

taking into account a prior reduction of CH2MHILL costs, is $521,052.60. Thus, Glacier's

$8,604,890.98 claim is reduced by $1,867,291.64 for a revised claim amount of $6,737,599.34

against which the 5.42% allocation of liability determined above will be applied.

## D.    CONCLUSION

THEREFORE, the Court holds that: (1) Hanson is allocated a 5.42% share of liability; (2)

Glacier's allowed costs total $6,737,599.34; and (3) Glacier is entitled to an allowed unsecured

claim against Hanson in the amount of $365,177.89.

**SO ORDERED**.

This Order has been signed                                  United States Bankruptcy Court
electronically. The Judge's
signature and Court's seal
appear at the top of the Order.

4851-5115-0019.16